United States of America vs.                          Evidentiary Hearing - Day I
Michael David Wilhite                                        September 15, 2015

Page 1

 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2

 3    Case No. 00-cr-00504-PAB

 4

 5    UNITED STATES OF AMERICA,

 6         Plaintiff,

 7    vs.

 8    MICHAEL DAVID WILHITE,

 9         Defendant,

10    DARLA DEE WILHITE,
      YAHAB FOUNDATION,
11
           Interested Parties.
12

13         Proceedings before MICHAEL E. HEGARTY, United States
      Magistrate Judge, United States District Court for the
14    District of Colorado, commencing at 9:56 a.m., September 15,
      2015, in the United States Courthouse, Denver, Colorado.
15

16         WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE
      HEREIN TYPOGRAPHICALLY TRANSCRIBED...
17

18                          APPEARANCES

19    MS. ELIZABETH M. FROEHLKE, ESQ., MR. JUAN G. VILLASENOR, ESQ.
                Appearing on behalf of the United States.
20
                    MR. RICHARD F. BEDNARSKI, ESQ.
21             Appearing on behalf of the Defendant.

22                   MR. SCOTT MIKULECKY, ESQ.
              Appearing on behalf of the Interested Parties.
23

24

25                   EVIDENTIARY HEARING - DAY I

United States of America vs.                          **Evidentiary Hearing - Day I**
Michael David Wilhite                                          September 15, 2015

```
 1                   P R O C E E D I N G S

 2              (Within, the electronically recorded proceedings

 3   are herein transcribed, pursuant to order of counsel.  Due to

 4   incomplete speaker identification in the FTR log notes,

 5   speaker identification in this transcript in some cases may

 6   be inaccurate.)

 7              THE COURTROOM DEPUTY:  All rise.  Court is in

 8   session.

 9              THE COURT:  Good morning.  Be seated.

10   Case No. 00-cr-504, United States of America versus David --

11   excuse me, Michael David Wilhite.  For the plaintiff, please.

12              MS. FROEHLKE:  Elizabeth Froehlke for the United

13   States.

14              THE COURT:  Thank you.

15              MR. VILLASENOR:  Juan Villasenor.

16              THE COURT:  Good morning.  Who's at your table,

17   please.

18              UNKNOWN SPEAKER:  Asset Investigator Troy Tyez,

19   Your Honor.

20              THE COURT:  Thank you.

21              UNKNOWN SPEAKER:  And Carisha Cruz.

22              THE COURT:  Thank you.  And for the defendants.

23              MR. BEDNARSKI:  Your Honor, Richard Bednarski here

24   on behalf of Michael Wilhite, the defendant, who is also

25   present.  And to my right is Nona Dobson who is a member of
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 3

 1  our staff.

 2          THE COURT:  Okay.  Thank you.

 3          MR. MIKULECKY:  Good morning, Your Honor.  Scott

 4  Mikulecky on behalf of Darla Dee Wilhite and Advanced Floor

 5  Concepts.  With me at counsel table is Mrs. Wilhite, and

 6  Allison Tungate, a new associate in our office.

 7          THE COURT:  Okay.  Thank you.  (Unintelligible)

 8  everybody.  Before we get started.  Did you guys have a

 9  chance to read the government's trial brief?

10          UNKNOWN SPEAKER:  Yes, Your Honor.

11          THE COURT:  Is there -- you know, fact issues

12  aside, is there anything in it you fundamentally disagree

13  with as far as what I'm going to be considering at the

14  hearing?

15          UNKNOWN SPEAKER:  Generally, no, Your Honor.  The

16  only question that -- the only issue, I think, is the

17  availability of the nominee theory under Colorado state law.

18  Leaving that aside, however, generally constructive trust and

19  resulting trust theories are relatively in a format.

20          THE COURT:  Okay.  The nominee theory is not well

21  decided in Colorado then?

22          UNKNOWN SPEAKER:  That's our belief, Your Honor,

23  yes.

24          THE COURT:  All right.  And you'll brief that --

25          UNKNOWN SPEAKER:  Yes, sir.

Page 4

1            THE COURT:  -- at the end of the matter.  Okay.

2            UNKNOWN SPEAKER:  Yes.

3            THE COURT:  All right.  Is there anything we need

4    to deal with before we begin?

5            MR. VILLASENOR:  Yes, Your Honor.

6            THE COURT:  Go ahead.

7            MR. VILLASENOR:  We have stipulated to the

8    admissibility of a number of exhibits, and I'll cover the

9    government's side, if that's all right.

10           THE COURT:  Yeah.

11           UNKNOWN SPEAKER:  That's fine.

12           MR. VILLASENOR:  And I'll go through our list

13   first, Your Honor.  It's -- we're stipulating to admit, 1, 3,

14   4, 5, 6, 8, 9, 11, 12, 13 -- 13, 14, 15, 16, 17, 18, 19, 20,

15   21, 22, 23, 24, 25, 26, 28, 29, 30, 31, 32, 33, 34, 35, 36,

16   37, 38, 39, 40, 43, 44, 45, 46 and 50.

17           THE COURT:  Okay.  That excludes 27, 41, 42, 47,

18   48, 49?

19           MR. VILLASENOR:  Correct.

20           THE COURT:  All right.

21           MR. VILLASENOR:  And I would offer them in

22   evidence at this point in time.

23           THE COURTROOM DEPUTY:  I don't have 50 on my list.

24           MR. VILLASENOR:  It is the notice of tax lien that

25   you -- that --

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 5

```
 1              THE COURT:  Does the defendant have 50?

 2              MR. BEDNARSKI:  Yes, Your Honor.  We do have 50.

 3              THE COURT:  All right.  Let's make sure Molly gets

 4    it.  So, I take it there's no objection to those -- to this?

 5              MR. BEDNARSKI:  I think we have some differences,

 6    Your Honor, but maybe you should go over the ones to which we

 7    have objections and see if we have agreement.  We object

 8    to --

 9              THE COURT:  Oh, by the way 7 wasn't either.

10              MR. BEDNARSKI:  2.

11              THE COURT:  And 2.

12              MR. BEDNARSKI:  2.

13              MR. VILLASENOR:  I think 2, yeah.

14              THE COURT:  And 10.

15              MR. VILLASENOR:  Yes.

16              MR. BEDNARSKI:  10.

17              THE COURT:  Yeah.  In addition to the numbers I

18    mentioned.

19              MR. BEDNARSKI:  I have that we had objected to 30

20    as well.  We have not agreed to that one.

21              THE COURT:  Why don't you pull it out.  Do you

22    actually know what it is?

23              MR. BEDNARSKI:  I do.

24              THE COURT:  It's an asset and liability list?

25              MR. BEDNARSKI:  Right.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 6

 1            THE COURT:  Okay.  You don't object to

 2    authenticity, just admissibility?

 3            MR. BEDNARSKI:  Yes, Your Honor.

 4            THE COURT:  Okay.

 5            MR. VILLASENOR:  Okay.  That's fine.

 6            MR. BEDNARSKI:  Then we are in agreement.

 7            THE COURT:  All right.  So, from -- all exhibits

 8    from 1 to 50 are admitted except for 2, 7, 10, 27, 30, 41,

 9    42, 47, 48, 49.

10            UNKNOWN SPEAKER:  Correct.

11            THE COURT:  All right.  Molly, did you get 50?

12            THE COURTROOM DEPUTY:  (Unintelligible).  I don't

13    have it on my -- my list.

14            THE COURT:  It's in the -- we have a notebook with

15    it.

16            THE COURTROOM DEPUTY:  Okay.  The amended exhibit

17    list that was filed with the Court under Docket No. 81 does

18    not have 50 on it.

19            MR. VILLASENOR:  We added that, Your Honor.

20            THE COURT:  Okay.

21            MR. VILLASENOR:  Yesterday, I believe it was.

22            THE COURT:  Do you have an updated exhibit list?

23            THE COURTROOM DEPUTY:  I have one in the book.

24            THE COURT:  No, I mean the government.

25            MR. VILLASENOR:  We can -- should we file one

United States of America vs.                           Evidentiary Hearing - Day I
Michael David Wilhite                                          September 15, 2015

1    today?

2           THE COURT:  Okay.  The exhibit list I have does

3    not have 50 either in the front of the exhibit notebook.  You

4    do have an updated one?

5           THE COURTROOM DEPUTY:  It's not in here either.

6           MR. VILLASENOR:  You mean on the list or on the --

7           THE COURT:  No.  An updated exhibit list, yes.

8    Because the one we have only runs through 49.  It was filed

9    on the 10th of September.

10          MR. VILLASENOR:  We'll get several copies to the

11   Court, if that's okay.

12          THE COURT:  Okay.  We can go forward without that

13   for the moment.

14          MR. VILLASENOR:  Thank you.

15          THE COURT:  All right.  Anything else before we

16   begin, Mr. Villasenor?

17          MR. VILLASENOR:  Yes, Your Honor.  Two more

18   things.  The -- we also stip -- are stipulating to

19   Mr. Wilhite's criminal restitution, that amount, which is as

20   of today, $1,718,129.70.

21          THE COURT:  17?

22          MR. VILLASENOR:  70.  7-0.

23          THE COURT:  And does that include any interest and

24   penalties?

25          MR. VILLASENOR:  There are no -- there is no

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 8

1   interest.  The Court did not impose any interest.  There are

2   no penalties.

3           THE COURT:  So, that's the principal amount?

4           MR. VILLASENOR:  It's the principal amount.  It

5   includes a credit that we received last month from a top

6   treasury offset payment from Social Security.

7           THE COURT:  Could I also have the original

8   forfeiture -- or restitution amount, please, and the

9   judgment.  Do you have that?

10           MR. VILLASENOR:  It's -- yes.  It's one of the

11   exhibits, Your Honor.  It's Exhibit 1, I believe.

12           THE COURT:  $1,741,000 even -- oh, and 700.

13           MR. VILLASENOR:  That's right.

14           THE COURT:  So, $1,741,700 is the original.

15           MR. VILLASENOR:  Correct.

16           THE COURT:  Okay.  Is this also the defendant's

17   stipulation as far as the current principal owing?

18           MR. BEDNARSKI:  Yes, Your Honor.

19           THE COURT:  Okay.  Anything further,

20   Mr. Villasenor?

21           MR. VILLASENOR:  Yes, Your Honor.  The government

22   moves for an order of sequestration under Rule 7 -- 650.

23           THE COURT:  Okay.

24           MR. BEDNARSKI:  No objection to that, Your Honor.

25   We were going to ask for the same thing.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

1         THE COURT:  All right.  So, if there are any

2 witnesses other than the first witness to be called in the

3 case, or an advisory witness, one for each -- well, I guess

4 you get an advisory witness, you guys get your clients --

5 then we have two rooms at the back you can sit in.

6         Sequestration is authorized under federal law.

7 The purpose of that is so that witnesses don't hear one

8 another's testimony and then can consider that testimony and

9 potentially alter their own testimony to make it either

10 consistent or inconsistent with what they've already heard.

11 We want everybody's testimony to be fresh and unrehearsed,

12 and without taint from somebody else's perception of facts.

13         So, any witnesses that will be testifying need to

14 leave the courtroom at this time.

15         UNKNOWN SPEAKER:  Okay.  Thanks.

16         THE COURT:  Is that it for the United States,

17 Mr. Villasenor?

18         MR. VILLASENOR:  Yes, Your Honor.

19         THE COURT:  Okay.  Mr. Bednarski.

20         MR. BEDNARSKI:  Your Honor, we also have

21 stipulations as it relates to our exhibits as well.

22         THE COURT:  Okay.

23         MR. BEDNARSKI:  The -- the government has agreed

24 to stipulate to the admissibility of Exhibits A through R.  I

25 can sing it if you want me to.  And then --

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 10

 1            THE COURT:  Do what you have to do.

 2            MR. BEDNARSKI:  Okay.  A, B, C, D -- and then also

 3  V, Your Honor, and Y.

 4            THE COURT:  Okay.  Is that the government's

 5  agreement?

 6            MR. VILLASENOR:  Yes.  With one slight revision.

 7  We are actually stipulating to Exhibit S.

 8            MR. BEDNARSKI:  Okay.

 9            MR. VILLASENOR:  Except to the first e-mail in the

10  chain.

11            THE COURT:  Okay.

12            MR. BEDNARSKI:  First or (unintelligible).

13            UNKNOWN SPEAKER:  So, it's first in time.

14            MR. BEDNARSKI:  Oh, it's first in time.  Okay.

15            MR. VILLASENOR:  First in time, yeah.

16            MR. BEDNARSKI:  So it's the first in time e-mail

17  of that, Your Honor.

18            THE COURT:  All right.  Can I have the page number

19  for Exhibit S.

20            MR. BEDNARSKI:  Page 2 into 3, Your Honor, in S.

21  So, it's a total of -- it's 2 -- the bottom of 2 through 4,

22  Your Honor --

23            THE COURT:  Okay.

24            MR. BEDNARSKI:  -- of those pages.

25            THE COURT:  Very good.  Those will be admitted

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 11

1  then.  A through R, V, Y, and S, except for the first e-mail

2  in time which is identified on pages -- end of page 2 through

3  page 4.

4          MR. BEDNARSKI:  Thank you, Your Honor.

5          THE COURT:  Okay.  Is that it?

6          MR. BEDNARSKI:  Yes, Your Honor.

7          THE COURT:  Mr. Mikulecky, anything from you?

8          MR. MIKULECKY:  Nothing.  Thank you, Your Honor.

9          THE COURT:  Okay.  Then let's proceed with our

10 first witness.  I don't think we need opening statements, do

11 we?

12         MR. BEDNARSKI:  I don't believe so, Your Honor.

13 It's up to the Judge -- it's up to the Court if the Judge

14 wants us.  We were prepared because we weren't sure if the

15 Court wanted --

16         THE COURT:  I'll leave it up to you.

17         MR. BEDNARSKI:  -- opening statements.

18         THE COURT:  If you want to you can have one.  I

19 don't need one, but I want you to be able to represent your

20 client zealously, so I'll let you do whatever you want.

21         MR. BEDNARSKI:  Your Honor, based off the Court's

22 representation that it doesn't need one, I think the Court

23 has a pretty good understanding both from the last hearing as

24 well as a number of the filings.  We're fine with moving

25 forward with our first witness.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 12

```
 1              THE COURT:  Okay.  For the United States, please.
 2              MR. BEDNARSKI:  Your Honor, this is also where we
 3      agreed to allow us to present our witnesses first based off
 4      of Mr. Mikulecky and Advanced Floor Concepts and Dee Wilhite
 5      also having a burden.  So, we will be starting with our
 6      presentation.
 7              THE COURT:  Okay.
 8              UNKNOWN SPEAKER:  May we have a second?
 9              THE COURT:  Go ahead.  You bet.
10              MS. FROEHLKE:  Your Honor, we -- we have prepared
11      an opening statement and we would like to put that forward.
12      Obviously --
13              THE COURT:  That'd be fine.
14              MS. FROEHLKE:  -- if opposing counsel wants to --
15              THE COURT:  And so you guys can do so to if you
16      want or you can just let the government do it.
17              MR. BEDNARSKI:  Your Honor, based off that I will
18      have a very short -- short one.
19              THE COURT:  Very good.
20              MR. MIKULECKY:  And then I'll have a much longer
21      one.
22                          OPENING STATEMENT
23      BY MR. BEDNARSKI:
24              Your Honor, Mr. Wilhite, back in 1997, was working
25      for Geoffrey Clements.  And he worked for him for about five
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 13

 1   years.  Working with Mallmore Unlimited.  This was a company

 2   that was dealing with international debentures.  At the time

 3   that he was working for Mr. Clements, Mr. Wilhite did not

 4   draw a salary; did not receive any type of payment in any

 5   way, shape or form for over five years of working with

 6   Mr. Clement, based off of the understanding and the belief

 7   that the next deal was just around the corner, and it was

 8   going to close, and there was going to be a large amount of

 9   money coming to him.

10           During that time, Mr. Wilhite both lived with Dee

11   Wilhite and, also, shortly thereafter they got married.  And

12   they were obviously living together at that point.

13   Throughout that timeframe, Ms. Wilhite -- Mrs. Wilhite was

14   the rock.  The financial rock of the family.  She was working

15   for banks at the time, as well as Klebold Consulting doing

16   inspections of properties related to construction projects,

17   and making sure that the contractors were doing the work that

18   they were billing for each and every month.

19           In 1997 -- in February of 1997, Mr. Clement went

20   into custody and went into prison.  I believe it was right

21   around February 13th, 1997.  He had told Mr. Wilhite and the

22   other people that were working for him at the time that he

23   was -- he had a meeting and he would be back, and never came

24   back.

25           It was shortly after that that Mr. Wilhite reached

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 14

 1   out to Sharon Clement, his -- Geoffrey Clement's wife to find

 2   out what happened.  And he found out that Mr. Clement had

 3   gone into custody.  Based off of that, and the idea that

 4   there were these deals that were still pending and still

 5   outstanding as it related to the Australians -- which is what

 6   this case all relates to -- Mr. Wilhite was worried that

 7   there was a fraud being perpetrated on the Australians, so he

 8   contacted the US Attorney's Office.  He spoke with Bob Brown.

 9   Told him his concerns.  It was at that point -- he did not

10   hear from any federal agents or -- or Mr. Brown until June of

11   1997, and he was interviewed by FBI and IRS agents.

12           It was at that time he was completely honest with

13   them.  They spent a lot of time with him.  He did express

14   concern that he might have been a target of the

15   investigation, and they -- they told him that they were

16   looking into him because of the amount of money that was

17   supposedly taken from the Australians.  It was at that point

18   that he had no further contact with FBI or IRS agents, or

19   anybody from the US Attorney's Office until March of 1998.

20           In March of 1998 there were discussions going back

21   and forth between Mr. Brown and Mr. Wilhite's attorney at the

22   time, Christopher Miranda, regarding that they wanted

23   Mr. Wilhite to be a cooperating witness.  In fact, you'll see

24   in the letters, which we'll point out throughout the

25   testimony, Your Honor, that these letters specifically

United States of America vs.                                    Evidentiary Hearing - Day I
Michael David Wilhite                                                September 15, 2015

Page 15

1   indicated to Mr. Wilhite's attorney that -- that they wanted

2   him as a witness, and they wanted to proceed with him as a

3   witness.  And only if he wasn't going to cooperate were they

4   going to indict him at that point.

5           So, throughout 1997, '98, '99, Mr. Wilhite was a

6   cooperating witness.  He met with the US Attorneys as well as

7   the agents involved in the case on a number of occasions, and

8   helped them develop a case against Mr. Clement.  It wasn't

9   until November of 2000, and shortly before that timeframe,

10  that Mr. Wilhite was actually advised that -- that the

11  prosecution, the government in this case, was going to bring

12  a case against him, and that they were going to charge him

13  under this case number, 2000-cr.

14          So, as the Court can see from this, he was --

15  actually, he was not filed as a co-defendant under

16  Mr. Clement's case.  There was no superseding indictment and

17  listing him as a co-defendant.  The prosecution -- the

18  government waited until November of 2000 to file a completely

19  separate criminal case against Mr. Wilhite.

20          Before they filed it, there were discussions

21  regarding plea -- the plea aspect of it, the plea agreement,

22  the plea offer.  Mr. Wilhite throughout that time did go

23  ahead, entered a guilty plea.  He was sentenced and he was

24  issued an order to pay restitution.

25          Up until the Court ordered him and through the

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 16

1    plea agreements when they were discussing restitution,

2    Mr. Wilhite had no knowledge that he was going to have to

3    repay restitution or be indicted.  Throughout that time he

4    was seen as a cooperating witness, and the letters back that

5    up.

6            Furthermore, throughout the case, there was no

7    evidence to suggest Mr. Wilhite knew about the fraud that was

8    being perpetrated by Mr. Clement.  And even more so, there

9    was absolutely no evidence that Mr. Wilhite received any

10   money from the transactions that occurred with the

11   Australians.  And so throughout this time, Mr. Wilhite had no

12   knowledge that he was going to have to repay restitution

13   because there -- because he didn't receive any money out of

14   it.

15           In 1997, Mr. -- once Mr. Clement was arrested,

16   Mr. Wilhite began working for what's called Steel Dimensions.

17   It's a company that is owned by Mark Russell, who Mr. Wilhite

18   and Mr. Clement had initially had a memorandum of

19   understanding to create a company.  That obviously didn't

20   work when Mr. Clement went into custody.  So, Mr. Wilhite

21   worked as an employee, as a vendor for Mr. -- for Mr. Russell

22   for his company Steel Dimensions doing structural steel

23   floors.

24           This was a new company.  It was the first time

25   Mr. Wilhite was back involved in construction in -- in

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 17

1   approximately 10 to 12 years.  He had no contacts.  He was

2   part -- he was part of sales.  He was involved in

3   approximately the -- four different installations.

4           It was in November of 1997 that Dee Wilhite

5   started her company Advanced Floor Concepts.  She started it

6   with her money, with her assets, and her line of credit.

7   Mr. Wilhite was not able to start a company at that point

8   because of his own credit issues, and he had no assets.

9   Mrs. Wilhite did ask him to come work for him -- work for

10  her, sorry, Your Honor.  And he agreed to do that, but he was

11  an employee.

12          He was not and has never been an owner of that

13  company.  He has run the company at times because

14  Mrs. Wilhite also has another company that she owns.  But at

15  the time she -- and still to this day, she's the sole owner

16  of both of those companies.  Mr. Wilhite has worked for that

17  company, but he has never owned the company.

18          The assets and the credit and the money that was

19  used to start it was solely Dee Wilhite's.  And it was her

20  idea.  And she's the one who, based off of her experience in

21  construction for over 25 years, believed that this was a

22  viable way to do it.  When she started the company, he was

23  the worker.  And he still through the time that he left the

24  company in 2008, that's all he was, was a worker.

25          He had different responsibilities signing checks,

United States of America vs.                                    Evidentiary Hearing - Day I
Michael David Wilhite                                                    September 15, 2015

Page 18

 1  agreeing to contracts.  He held himself out as CEO, general
 2  manager, project manager, but at no time does he hold himself
 3  out as owner of the company.  And he still to this day has
 4  never held himself out as owner of the company to anyone,
 5  Your Honor.
 6          And so as the result of this, while -- the
 7  government wants to proceed on a nominee theory, whether it
 8  be under the constructive trust or fraudulent transfer.
 9  Under the fraudulent transfer there was absolutely no assets
10  that were used of Mike Wilhite's to start that company
11  because he had none.  And the first two prongs of the
12  six-part test that's -- that the government cites in their
13  trial brief, they cannot meet.  All the assets, all the
14  money, that was Dee Wilhite's money, not -- not
15  Mr. Wilhite's.  And more so, they can't establish that he
16  knew there was going to be any type of litigation or any type
17  of lawsuit or verdict against him.  And so they cannot
18  establish nominee.
19          And then the final one is whether there's fraud
20  here.  Your Honor, she has the -- Dee Wilhite has the assets,
21  she had the knowledge, and she owned the company.  Thank you.
22          THE COURT:  Let me ask you a couple questions.
23          MR. BEDNARSKI:  Yes, Your Honor.
24          THE COURT:  Clement was indicted in '95.  Is it
25  going to be -- you believe it's going to be your evidence

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 19

 1    that your client did not know about -- anything about the

 2    indictment until '97, which is -- February of '97 is when he

 3    was sentenced, and then he obviously went out to serve his

 4    prison term.

 5              MR. BEDNARSKI:  And, Your Honor, Mr. Clement has

 6    two cases.

 7              THE COURT:  Right.

 8              MR. BEDNARSKI:  The first one was --

 9              THE COURT:  The '95 and the '99 case.

10              MR. BEDNARSKI:  -- a 1995 CR case.  And

11    Mr. Wilhite had no knowledge of that until Mr. Clement went

12    into custody in February of 1997.

13              THE COURT:  At sentencing?

14              MR. BEDNARSKI:  Correct.

15              THE COURT:  Okay.  So, he didn't know that he had

16    been indicted?

17              MR. BEDNARSKI:  Correct.  In the 1995 case, Your

18    Honor.

19              THE COURT:  Okay.

20              MR. BEDNARSKI:  And then the second case is the

21    1999 case, which was based off of the interactions that were

22    going on -- or the transactions that were going on with the

23    Australians.

24              THE COURT:  Okay.  And then the other question I

25    have is, will it be your evidence that Mr. Wilhite was paid

United States of America vs.                                  **Evidentiary Hearing - Day I**
Michael David Wilhite                                              September 15, 2015

Page 20

1   by the company commensurate with his responsibilities and

2   title?

3                MR. BEDNARSKI:  Yes, Your Honor.

4                THE COURT:  Okay.  Thank you.

5                MR. MIKULECKY:  Good morning, Your Honor.

6                THE COURT:  Thank you.

7                          OPENING STATEMENT

8   BY MR. MIKULECKY:

9                From our perspective it's a simple issue as to,

10  does Mrs. Wilhite own the company, and we believe the answer,

11  with all the evidence, is simply yes.

12               Mrs. Wilhite, you'll meet her.  She'll testify

13  with her 30 years of experience in construction; that as an

14  inspector she has inspected over 50,000 residential and

15  commercial buildings to ensure they complied with the plans

16  and specifications and with the building code; and that she

17  is knowledgeable in all aspects of residential and commercial

18  construction.

19               She met Mr. Wilhite -- or, rather, they got

20  married in 1993.  And from 1993, really, until 1997

21  Mr. Wilhite wasn't earning a salary.  In 1997 he began

22  earning a salary when he became employed at Steel Dimensions.

23  Now, the testimony will be that Steel Dimensions, like a lot

24  of small companies, did not want to make Mr. Wilhite an

25  employee.  Rather, they wanted to make him an independent

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 21

1   contractor to avoid the issues of withholding, unemployment

2   taxes, and other issues associated with having an employee.

3              More specifically, they wanted to have Mr. Wilhite

4   be paid as a vendor.  So, the request was made that

5   Mr. Wilhite start a company so that his checks could go to

6   that company in lieu of naming him as an employee.

7              Mrs. Wilhite then set up DW Support Services on

8   May 1st, 1997.  She filed the documents with the Colorado

9   Secretary of State and did the articles to set up that LLC.

10  She set it up with herself as the sole owner because

11  Mr. Wilhite at the time had bad credit.  He had filed

12  bankruptcy previously.  He had some tax liens against him.

13  For many years he had no income.

14             Back then, you may recall, banks did credit checks

15  before you were able to set up checking accounts.  So

16  Mr. Wilhite, because of his bad credit, could not have been a

17  signer on the account.  Mrs. Wilhite then set up DW Support

18  Services -- DW, of course, for Dee Wilhite to be the sole

19  owner of that company.

20             Now, initially it was set up solely to be a

21  depository for Mr. Wilhite's checks.  However, Mrs. Wilhite

22  quit her job on July 31st, 1997 working for Klebold

23  Construction doing consulting.  Banks would hire her when a

24  draw request came in to go out and make sure that the work

25  was being billed was actually being built.  She decided that

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 22

 1    she would start her own company and do that.

 2              So, she filed a trade name, Southern Colorado

 3    Consulting, to do that work.  And she began that part of the

 4    business on August 1st, 1997.  So at that point DW Support

 5    became an operating business.  The business solely being

 6    Mrs. Wilhite going out and doing the consulting and the

 7    inspection work for banks and for construction companies.

 8              In October, 1997, a few months later, a unique

 9    opportunity presented itself.  Mrs. Wilhite, through her

10    inspections -- and, again, doing over 50,000 of them -- was

11    aware that there were problems with shifting soils.  The

12    result was suspended floors in the basement.  However, they

13    were suspended with wood, and new to the industry was

14    suspending them with steel beams, which didn't have the

15    problems of the mildew, the mold, or the flex that steel had.

16              Mrs. Wilhite inspected several dozen of these and

17    realized it was a unique opportunity at that time because

18    there were no dominant players in that field.  So, she

19    decided at that point that this would be a good business for

20    her to get into, and she started Advanced Floor Concepts.

21              When she set up Advanced Floor Concepts, you will

22    see from her testimony, that she did all the same things that

23    she did for DW Support with an important distinction.  First,

24    she filed all the documents with the Colorado Secretary of

25    State.  Second, she obtained unemployment insurance.  She got

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 23

```
 1   general liability insurance.  She got the workers'
 2   compensation insurance.  She filed with -- to the IRS to get
 3   a Federal Tax ID number, which was required to operate the
 4   business.  She set up bank accounts.
 5           The important distinction, though, is she had to
 6   get financing for this company because this was a
 7   manufacturing company.  Southern Colorado Consulting was
 8   simply her going out and doing inspections.  That didn't
 9   require startup capital.  This company did.
10           So, to do that she got a loan from her mother.
11   And you'll see the books and records.  Mrs. Wilhite kept very
12   careful track of her expenses, her income, and the loans.
13   And you'll see where she borrowed money from her mother and
14   paid that back.
15           She got a loan from Castle Rock Bank pledging her
16   credit, pledging the assets of DW Support -- which by then
17   was her operating company -- pledging a truck that her and
18   Mr. Wilhite had owned, and putting her credit on the line for
19   $25,000, using that money as necessary.  She loaned her own
20   money to Advanced Floor Concepts.  And finally, she borrowed
21   some money from DW Support Services, borrowing on her line of
22   credit overdraft protection that she had for DW Support, as
23   well as some money that was in that account at that time.
24   It's important that you'll see all of these are documents --
25   or all of these transactions are well documented.  All of
```

United States of America vs.                                    **Evidentiary Hearing - Day I**
Michael David Wilhite                                           **September 15, 2015**

Page 24

1    this money was paid back.

2           So, although DW Support loaned some money to

3    Advanced Floor Concepts, that money was paid back within

4    several years.  And you'll see all of that documented.  The

5    loan to her mother was paid back.  The loan to Castle Rock

6    Bank was paid back.  So, Mrs. Wilhite put her assets on the

7    line, got the credit, and provided the financing to get

8    Advanced Floor Concepts started.

9           Initially, Advanced Floor Concepts consisted of

10   Mr. Wilhite and a gentleman named Roger Villa as the

11   employees, and Mrs. Wilhite.  Typical, of course, when

12   companies are starting, initially there wasn't much money.

13   So after paying the employees, Mr. Wilhite and Mr. Villa,

14   sometimes Mrs. Wilhite wouldn't get paid.  Eventually, the

15   company grew and added more employees.

16          Now, what the government wants you to believe is

17   that when the company was set up, when Mrs. Wilhite was

18   getting all these loans, doing all these transactions to

19   start this company, based on her experience, based on this

20   opportunity, and based on her contacts that she had from

21   being in the construction industry for over 30 years --

22   really, being a pioneer as a woman contractor and a woman in

23   the construction field -- the government wants you to believe

24   that she set all of this up as an elaborate scam to avoid

25   Mr. Wilhite having to pay any money back on his restitution.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 25

```
 1              What's an important thing to note, in addition to
 2   the fact that it's understandable why Mrs. Wilhite would set
 3   up a company, is what she didn't know.  What she didn't know
 4   in 1997, when she set up the company, was Mr. Wilhite's role
 5   in the Mr. Clement matter.  And, in fact, the testimony will
 6   be from both Mr. Wilhite and Mrs. Wilhite that it was not
 7   until 2000 when Mr. Wilhite confessed to Mrs. Wilhite his
 8   full role in that matter.
 9              So, Mrs. Wilhite will testify in '97 she had no
10   idea, no expectation that Mr. Wilhite would be indicted
11   because she didn't think he had done anything wrong.
12              More importantly, though, Mrs. Wilhite will also
13   say she certainly had no idea that there would be any
14   restitution ordered for the simple reason that Mr. Wilhite
15   did not get any money from Mr. Clement's antics.  So, she
16   never would have expected in October of 1997 that he would
17   have to pay money back that he never received.  So, rather
18   than it being an elaborate scheme, the evidence will show,
19   Your Honor, that there were sound business reasons for
20   Mrs. Wilhite to set up Advanced Floor Concepts as her
21   company.
22              As the company began to grow, more employees were
23   added.  And Mrs. Wilhite delegated responsibilities for
24   contracting, for purchasing, for signing checks, for
25   depositing checks.  The testimony will show that half a dozen
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 26

1  to a dozen employees over the 20 years that Mrs. Wilhite has

2  operated this company had that authority, including

3  Mr. Wilhite.  But the ultimate authority, the ultimate

4  responsibility for the company rested with Mrs. Wilhite.

5          The business did well until the recession hit.

6  And Mrs. Wilhite, once again, had to use her personal assets

7  and her personal liability and personal credit to keep

8  Advanced Floor Concepts open.  She had to pledge her house

9  that she had bought in Westcliffe.  We'll come back to that

10 in a moment about that house.  She had to negotiate with the

11 bank who was trying to call her loans.  And, in fact, she

12 hired a bankruptcy attorney because she was on the verge of

13 filing personal and corporate bankruptcy.

14          Finally, she was able to get the business turned

15 around, get the bank to offer reasonable terms to her, and

16 the company was able to survive.  As the economy improved,

17 however, Mrs. Wilhite's health began to decline.  Her back,

18 which had been bothering her for years from all her work

19 doing construction, began to get worse to the point it was

20 difficult for her to be able make the trip to Castle Rock

21 from their home in Westcliffe.  Southern Colorado, a little

22 southwest of Pueblo.  About a two, two-and-a-half-hour drive.

23          Mr. Wilhite's health also began to fail.  In 2007

24 and 2008 he suffered a series of strokes, which left him with

25 some impairment in his mental abilities.  In fact, it got to

United States of America vs.                          Evidentiary Hearing - Day I
Michael David Wilhite                                          September 15, 2015

Page 27

 1  the point that Mrs. Wilhite had to tell the staff that if
 2  Mr. Wilhite tells you something that seems confusing, you
 3  need to call me.  Because he would say one thing, give an
 4  order to do something in one moment, and five minutes later
 5  he would say something completely contradictory.  So,
 6  Mrs. Wilhite had to tell the staff Mr. Wilhite is struggling,
 7  you need to let me know if there are any problems.
 8          The testimony will be that it got to the point in
 9  August of 2008 that Mr. and Mrs. Wilhite realized that he
10  could not really function anymore at Advanced Floor Concepts
11  where he was involved in running the company.  Mr. Wilhite
12  then left the company in August of 2008.
13          The company was left in the day-to-day operations
14  of Roger Otterstein who, unfortunately, passed away in 2010.
15  Mrs. Wilhite's back was still causing her problems at this
16  time, but Mr. Wilhite's health had improved.  He had found
17  the right medication to be able to keep his strokes under
18  control.  And so at Mrs. Wilhite's request, Mr. Wilhite would
19  come from Westcliffe to the office in Castle Rock once a
20  week, once every two weeks, to communicate any direction from
21  Mrs. Wilhite; to gather information; to boost morale in the
22  company, and just see what was going on.  And also, he was
23  kind of serving as a mentor for the gentleman who was then in
24  control of the company operating it day to day, Torin
25  Jackson, who will testify as well.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 28

```
 1              That process continued.  The business did well
 2   until about 2014, 2015.  Mrs. Wilhite decides that she would
 3   like to try to sell the company.  So, you'll hear that she
 4   hired a business broker and obtained two offers; that the --
 5   decided to pursue the offer with Barton Supply.
 6              We will have the testimony of Mark Stubbert of
 7   Barton Supply.  They were their long-time steel supplier.
 8   And Mr. Stubbert will testify that he knew it was
 9   Mrs. Wilhite's company; that the key negotiations occurred
10   with Mrs. Wilhite -- although, being a husband and wife
11   Mr. Wilhite was present as well; and that sometimes because
12   Mr. Wilhite was a counselor on it, he would communicate and
13   convey the terms that Mrs. Wilhite wanted to Mr. Stubbert.
14              You will see some casual documents that indicate
15   that money would go Mr. Wilhite rather than Mrs. Wilhite, but
16   you'll see the formal documents that indicate the money if
17   the company were to be sold went to Mrs. Wilhite.
18              You'll hear the testimony of the accountant for
19   Advanced Floor Concepts who said, yes, it's always been
20   Mrs. Wilhite as the owner as well.  Ultimately, that sale,
21   however, fell through and Mrs. Wilhite continues to own the
22   company.
23              You're also going to hear that since 2008 four
24   different sets of attorneys from the United States Attorney's
25   Office have asked Mrs. Wilhite for information on Advanced
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 29

 1   Floor Concepts; and that we have provided interviews,

 2   meetings, and documents.  Either voluntarily or subpoenaed.

 3   The government has also subpoenaed documents from vendors,

 4   from suppliers, from contractors, from clients of Advanced

 5   Floor Concepts.

 6          So, over the years the United States has received

 7   tens of thousands of pages of documents.  Each time, from

 8   2008 until this lawsuit was brought, four different

 9   occasions, four different sets of attorneys have reached the

10   conclusion after looking at all the documents that Advanced

11   Floor Concepts is owned by Mrs. Wilhite.  And you'll see

12   notes in the USA's file that says it's Mrs. Wilhite's

13   company.

14          You're going to see a few loose documents, a few

15   stray documents, two or three out of the tens of thousands,

16   where Mr. Wilhite is listed as the owner.  You'll hear the

17   explanations for those.  What you won't see is the tens of

18   thousands of documents -- you'll be pleased to know -- that

19   show Mrs. Wilhite is the owner.

20          Likewise, there have been scores of employees at

21   Advanced Floor Concepts.  You're going to hear from the

22   government.  They're going to present two employees who are

23   going to say that they thought it was Mr. Wilhite's company.

24   Again, you'll be relieved to know we're not going to parade

25   up scores of witnesses to say, in fact, it was Mrs. Wilhite's

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 30

 1    company.

 2              But the fact is, Your Honor, that there will be no

 3    new evidence.  The documents for 2007 or 2008 that have an

 4    identification of Mr. Wilhite, the employees left or were

 5    fired from Advanced Floor Concepts years ago.  There's no new

 6    evidence here.  This is the same evidence that four different

 7    sets of US Attorneys have looked at and concluded that this

 8    is Mrs. Wilhite's company.  At the conclusion of the case

 9    we'll ask you to draw the same conclusion that those other

10    sets of US Attorneys Offices have done.

11              THE COURT:  Thank you.

12                        OPENING STATEMENT

13    BY MS. FROEHLKE:

14              Your Honor, this is a case about how Michael

15    Wilhite has concealed, with his wife's help, his actual

16    ownership interest in Advanced Floor Concepts which, as the

17    court has heard, is a multi-million-dollar limited liability

18    company that was built from the ground up by Mr. Wilhite over

19    the last 18 years.

20              In doing so, he has sheltered his assets from the

21    reach of a victim to whom he owes $1.7 million.  The motive

22    for Mr. Wilhite's action is simple:  To avoid paying

23    restitution to the victim of his crime, the National

24    Australia Bank.

25              The evidence will show that for almost 20 years,

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 31

 1   since participating in the scheme that defrauded investors of

 2   over $1.7 million, Mr. Wilhite and his wife Darla Wilhite

 3   have attempted to hide his actual property interest in

 4   Advanced Floor from the government and, thus, from his

 5   victim.

 6           During this hearing the Court will hear that

 7   Mr. Wilhite was a coconspirator in an international wire

 8   fraud scheme.  His coconspirator Mr. Clement was indicted

 9   before Mr. Wilhite consented to an information being filed

10   against him.  He assisted in his coconspirator's prosecution

11   securing a favorable plea deal in that case.

12           In his own case, Mr. Wilhite pleaded guilty to

13   wire fraud.  He was sentenced to three months in the Bureau

14   of Prisons, three years supervised release, an order to make

15   his victim whole through restitution.  Mr. Wilhite has not

16   voluntarily paid a penny toward his restitution debt since he

17   got off supervised release in 2004.

18           The Court has one question before it today.  Does

19   Michael Wilhite have an ownership interest in Advanced Floor?

20   The government doesn't dispute that Darla Wilhite's name is

21   on all organized documents of the company.  The evidence will

22   show, however, that Mrs. Wilhite was not just the financial

23   rock, she is the nominee of the significant asset of the

24   defendant's multimillion-dollar company.  He is the majority

25   interest holder in Advanced Floor, which is a member-managed

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 32

 1   LLC per its operating agreement.  On paper, Mrs. Wilhite is

 2   the managing member, but the evidence will show that Michael

 3   Wilhite manages this company.  He is the man behind the

 4   curtain.

 5           Under the two frameworks we employ to answer the

 6   question posed in this proceeding, we start with the premise

 7   that the -- screens (unintelligible).  I apologize, Your

 8   Honor.  Well, I did have a slide show for you, Your Honor.

 9   I'm not sure if it's going to --

10           THE COURT:  No rush.

11           MS. FROEHLKE:  -- come up right now.

12           THE COURT:  We'll get it going.

13           MS. FROEHLKE:  Okay.  The two frameworks we employ

14   to answer this question start with the premise that Darla

15   Wilhite is a third-party nominee holding a hundred percent

16   bare legal title of Advanced Floor.  As a nominee, though,

17   she is a shell to conceal Mr. Wilhite's actual ownership.

18   The evidence will establish this fact through nominee theory,

19   which we have discussed in our trial brief.  It is an

20   equitable remedy that we will seek, finding that Mr. Wilhite

21   does own a majority interest in Advanced Floor.

22           The first of the two frameworks that the Court can

23   apply is the objective framework outlined in Holeman v.

24   United States by the Tenth Circuit.  It looks to nonexclusive

25   objective factors to determine nominee property interest.

United States of America vs.                                    Evidentiary Hearing - Day I
Michael David Wilhite                                                    September 15, 2015

Page 33

 1                    First, that the property is held by an insider,

 2       which a spouse certainly is; second, the property is

 3       controlled by the debtor; third, the debtor enjoys the

 4       benefits and use of the property; fourth, it was created when

 5       the debtor knew or reasonably should have known that he was

 6       incurring debts he could not pay back; fifth, the nominee has

 7       little interference with the debtor's control and enjoyment

 8       of the property; and sixth, the debtor received no

 9       consideration for the property in the first place.

10                    The evidence the Court hears in this case will

11       meet all of these factors.  And it is important to note that

12       subjective intent is not relevant.

13                    The second framework that the Court can apply is

14       the constructive trust framework, which is -- looks simply to

15       equity, whether the third-party nominee holds property for

16       the benefit of another and whether it was obtained through

17       fraud or improper purpose.  Under either approach, the Court

18       should look to badges of fraud and the case in its totality.

19       And these badges of fraud demonstrate Mr. Wilhite was not

20       just an employee of this company.

21                    Mr. Wilhite's ownership interest in Advanced Floor

22       will be demonstrated through his history in the steel

23       industry; his knowledge that he would have a future in that;

24       his control over the company; his use and enjoyments of funds

25       from the company; and Mrs. Wilhite's lack of interference

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 34

1    with his control of the company.

2            The Court will hear that Mr. Wilhite is the owner

3    of Advanced Floor from former employees, customers, and even

4    from the Wilhite's own admissions.  Today the Court will hear

5    Mr. Wilhite's history in the steel industry, which will show

6    that he had an interest, plan, and intent to start his own

7    structural steel business.  That is, in fact, what he did in

8    October of 1997 through his wife.

9            The Court will see the designated deposition

10   testimony of Geoffrey Clement.  Mr. Clement testified that he

11   and Mr. Wilhite were good friends in the early 1990s.  He

12   introduced Mr. Wilhite to the steel industry by taking him to

13   a conference on building steel-framed homes in 1995.

14   Mr. Clement was also Mr. Wilhite's coconspirator in the wire

15   fraud scheme relating to this case.  The two men became

16   involved in the steel industry while they were perpetrating

17   the fraud against the National Australia Bank.

18            Steel became a hobby or an interest for

19   Mr. Clement and Mr. Wilhite.  So much so that Mr. Clement

20   started a steel company, Steel by Design.  That was the first

21   of two companies Mr. Wilhite worked at relating to structural

22   steel.  Mr. Wilhite started at Steel by Design in 1996.  At

23   that time he signed all of his paychecks over to his wife.

24   Also around that time, Mr. Wilhite, Mr. Clement, and an

25   engineer named Mark Russell discovered a new innovation in

United States of America vs.                    Evidentiary Hearing - Day I
Michael David Wilhite                                September 15, 2015

Page 35

1    steel flooring.  They decided to start another company

2    together with this new technology.  Plans for the new company

3    were in the works in 1997 when Mr. Clement suddenly went to

4    prison.

5              Without Mr. Clement, plans for the new steel

6    business fell through, but Mr. Wilhite still had steel floors

7    on his mind.  He went to work for Mr. Russell's company,

8    Steel Dimensions, as a salesman in the spring of '97.  He

9    made connections with clients in that industry; made sales

10   for Steel Dimensions for about six months.  He instructed

11   Mr. Russell during that time to direct all of his paychecks

12   to his wife's company, DW Support Services.

13             In October of 1997, Mr. Wilhite left Steel

14   Dimensions.  He took his knowledge and connections that he

15   had gained from working with Mr. Clement and Russell to the

16   new company Advanced Floor Concepts.  That is not a

17   conclusion reached by the government.  The Court has before

18   it the stipulated Exhibit 21 in which Mr. Wilhite explained

19   to his probation officer he left Steel Dimensions to start

20   his own company.  That admission comes from Mr. Wilhite

21   himself.

22             The evidence will also show that Mr. Wilhite was

23   on notice of potential restitution when Advanced Floor was

24   organized in October of 1997.  He went to the US Attorney's

25   Office in February of that year to cooperate in prosecuting

Page 36

1   his coconspirator Mr. Clement.  In June, 1997, the FBI came

2   to interview Mr. Wilhite about his dealings with Mr. Clement.

3   In that interview Mr. Wilhite asked if he was a target of the

4   investigation, and the FBI agents responded that he was.

5   Mr. Wilhite knew, by the very latest, in June 1997 that he

6   was in hot water.

7            The evidence will also show that at the time he

8   started Advanced Floor, Mr. Wilhite had a six-figure IRS lien

9   against him that had been filed in 1993.  He needed to hide

10   his assets due to past and future debts.  All to the same

11   creditor, the government.  Mr. Wilhite supposed bad credit

12   does not allow him to shelter assets from his victim.

13            Advanced Floor Concepts was organized, as the

14   Court knows, in October of 1997 in the name of Darla Wilhite.

15   The Court will hear that Mrs. Wilhite did use money from her

16   husband's Steel Dimension paychecks directed straight to her

17   as startup funds for Advanced Floor.

18            The Court will further hear that unlike

19   Mr. Wilhite, Darla Wilhite had no experience in structural

20   steel -- in structural steel.  In fact, she had just started

21   her own business, DW Support Services, a few months

22   beforehand.  And for the last 18 years she has built that

23   company as DW Support, or Southern Colorado Construction

24   Consulting.  She has an office in the same building as

25   Advanced Floor, but the evidence will show Mrs. Wilhite does

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 37

1   not get involved with her husband's management of Advanced

2   Floor and, likewise, her husband does not get involved in her

3   management of DW Support Systems.

4           The evidence will show that since 1997

5   Mrs. Wilhite's name as consistently been on government

6   documents relating to Advanced Floor, however, it is and

7   always has been Michael Wilhite running the company.

8           The Court now has before it stipulated exhibits

9   that include contracts, bank documents, and other documents

10  in which he refers to himself as CEO, general manager, and

11  owner.  And to clarify, in stipulated Exhibit 22 Mr. Wilhite

12  does refer to himself as the owner of Advanced Floor.

13  Stipulated Exhibit 12 is a letter from Mrs. Wilhite to

14  friends and family referring to Advanced Floor as Mike's

15  company.  Exhibit 45 is yet another document where he admits

16  to leading Advanced Floor.

17          The Court has before it numerous admissions by the

18  Wilhites themselves, and it will hear testimony from several

19  people who know that Mr. Wilhite is the owner of Advanced

20  Floor.

21          Linda Gould, a former project coordinator, will

22  testify in this hearing that it was common knowledge at

23  Advanced Floor that it was Mike's company even though Dee's

24  name was on everything.  And Dee is a nickname that

25  Mrs. Wilhite commonly goes by.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 38

 1              Mrs. -- Ms. Gould will testify it was common

 2    knowledge that he owed a debt to the government, and his name

 3    could not be on documents.  Another former employee Dennis

 4    Cross was the controller for Advanced Floor in 2009.  He will

 5    tell a similar story.  As a controller he felt uncomfortable

 6    with the owner of Advanced Floor not signing company

 7    documents.  When he inquired about this with Mr. Wilhite,

 8    Mr. Wilhite explained to him that he owed money to the

 9    government, so his wife's name had to be on everything.

10              The Court will hear that Mr. Wilhite made all of

11    the major decisions, did hiring, firing, negotiating, and

12    even solicited an acquisition from a private equity firm.  He

13    had dominion and control over Advanced Floor in every way.

14    He managed the company, his name was just not on the

15    documents.

16              Evidence surrounding Mr. Wilhite's supposed

17    retirement also demonstrates his intent to hide his assets.

18    The Court will see that the very first time this office

19    contacted Advanced Floor regarding Mr. Wilhite was in August

20    of 2008.  Stipulated Exhibit 19 shows that Advanced Floor

21    responded that Mr. Wilhite had just retired 17 days earlier.

22    And it is true, the last paycheck Mr. Wilhite got was on

23    11 -- August 11th, 2008.

24              The Court will see that he did not, in fact,

25    retire.  He never announced a retirement to employees, his

United States of America vs.                                     Evidentiary Hearing - Day I
Michael David Wilhite                                              September 15, 2015

Page 39

1   duty and presence at the company did not change, and he

2   continued to work as the boss.

3            The evidence will also show that he attempted to

4   sell Advanced Floor to a private equity firm in the fall of

5   2013.  The documents from those negotiations show, first,

6   that Mr. Wilhite did not, in fact, retire in 2008, but also

7   that he is indeed controlling and running the company.  In

8   the numerous e-mails regarding due diligence, valuation,

9   letters of intent, and other negotiating terms, Darla Wilhite

10  is never mentioned.  It is Michael Wilhite running the

11  negotiations.

12           Indeed, in stipulated Exhibit 45, Mr. Wilhite's

13  letter of intent, he dictates that he continue leading the

14  company through December of 2015.  The acquisition deal fell

15  through, but the documents will show how Mr. Wilhite manages

16  this company.

17           The United States has sought to execute on Michael

18  Wilhite's interest in Advanced Floor because it is being held

19  by his wife as his nominee.  Darla Wilhite has the burden to

20  prove any interest she actually has in Advanced Floor, and

21  the government submits she will not do so in this hearing.

22           The Court will see today the Wilhites are

23  excellent businesspeople.  They have built two companies, his

24  and hers from the ground up, that are thriving businesses.

25  They have achieved the American Dream.  However, with a sharp

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 40

 1   business sense, there was also a plan to conceal

 2   Mr. Wilhite's assets.

 3           The evidence will show Mr. Wilhite has been

 4   running Advanced Floor from its inception using different

 5   titles inconsistently throughout the years -- CEO, general

 6   manager, owner -- but he has always had the same job.  The

 7   boss.  He is the man behind the curtain, and for years he has

 8   hoped the United States and his victim would pay no attention

 9   to the evidence revealing his actual role.

10           Whether it is through a constructive trust due to

11   badges of fraud, or through the objective factors test, the

12   evidence in this trial will compel the Court to apply the

13   equitable remedies sought by the United States, and find that

14   Michael Wilhite owns the majority interest in Advanced Floor

15   as a managing member.

16           The United States also requests that the Court

17   apply a 10 percent surcharge on the outstanding amount of

18   defendant's restitution debt to cover its cost of litigation

19   in this case.

20           THE COURT:  Okay.  Could counsel come forward for

21   a second, please.

22           (The following bench conference was had.)

23           THE COURT:  Is there -- is there any criminal

24   implications if they all helped conceal money -- do you have

25   criminal implications for her at all?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 41

 1             MR. VILLASENOR:  I think as far as I am being

 2   advised I haven't -- I mean, they haven't mentioned that in

 3   any way, shape or form.  I mean, we have talked to her about

 4   it, so --

 5             THE COURT:  All right.  Yeah.  She has a Fifth

 6   Amendment right.  And maybe it's in cross-examination

 7   questions that it might be an issue.  I don't know.  Have you

 8   guys considered the criminal --

 9             UNKNOWN SPEAKER:  We wouldn't because we are

10   (unintelligible).

11             THE COURT:  Well, I know you wouldn't.  You two

12   wouldn't.

13             MS. FROEHLKE:  We haven't spoken with the Criminal

14   Division about separate charges (unintelligible).

15             THE COURT:  Okay.  Yeah, I mean, it would be nice

16   if there was just some kind of pre immunity agreement here.

17   But I guess that's something we'll have to deal with when it

18   comes up.  But I just want you to be aware, you know, if they

19   haven't waived the right to prosecute, and I don't know what

20   the limitations for it is, but it (unintelligible) it's

21   probably ongoing that she might be conspiring to conceal

22   assets, and I suspect that's a crime.

23             MR. VILLASENOR:  Actually.  I mean, I -- I agree

24   with Your Honor, that there could be some potential criminal

25   implications.  But --

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 42

 1              THE COURT:  Okay.  I just want her rights

 2    protected.

 3              MR. VILLASENOR:  And -- and we've spoken with her

 4    about those rights.  Obviously, as this Court knows that's

 5    usually where I delve into rather than this civil stuff that

 6    these guys come in.

 7              THE COURT:  (Unintelligible).

 8              MR. VILLASENOR:  But -- so, yes, I have -- we have

 9    talked about it, and so I don't think it's an issue today.

10              THE COURT:  One other thing.  Just be ready to --

11    just based on what she said in opening, if I confirm that he

12    tried to shelter assets from the IRS, not from restitution,

13    but that that continued over into the restitution as an

14    ongoing effort to shield assets from the IRS, where does

15    that -- where would that leave us?

16              MS. FROEHLKE:  I think that leaves us with him

17    owning the company, Your Honor.  I think that the actual

18    result doesn't change because the subjective intent really is

19    not relevant.

20              THE COURT:  So intent is not an element.

21              MS. FROEHLKE:  No.

22              UNKNOWN SPEAKER:  Subjective intent.

23              MS. FROEHLKE:  No.  Subjective intent is not an

24    element.

25              THE COURT:  Okay.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 43

 1          MS. FROEHLKE:  And the objective factors

 2   demonstrate actual --

 3          THE COURT:  Yeah.  (Unintelligible) it's just that

 4   she --

 5          UNKNOWN SPEAKER:  I understand, Your Honor.

 6          THE COURT:  She said that in '93 he had this tax

 7   debt.

 8          UNKNOWN SPEAKER:  Your Honor, the lien is done.

 9          MS. FROEHLKE:  It's expired.

10          UNKNOWN SPEAKER:  It's expired.

11          MS. FROEHLKE:  But at the time, of course,

12   (unintelligible).

13          UNKNOWN SPEAKER:  Right.  It's 20 years.  So

14   that's --

15          THE COURT:  True.  True okay.

16          UNKNOWN SPEAKER:  Yeah.  2013.

17          THE COURT:  All right.  You want to say anything

18   about that?

19          UNKNOWN SPEAKER:  No.  I mean, again, I think the

20   first part of it was back in '83.  So, it was -- there were

21   like four or five different ones.

22          THE COURT:  I think she said in her opening there

23   was a '93 lien that was existent.

24          UNKNOWN SPEAKER:  Correct.  It is no longer in

25   existence, Your Honor.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 44

1          THE COURT:  Okay.

2          UNKNOWN SPEAKER:  And they made no attempts to

3    collect on that lien.

4          THE COURT:  Okay.  Okay.

5          MS. FROEHLKE:  But I don't think it does change

6    the actual --

7          THE COURT:  I understand.  We'll have to save that

8    for briefing.

9          UNKNOWN SPEAKER:  Yeah.  I'm just saying, I know

10   your concern is more from is there a potential criminal

11   aspect --

12         THE COURT:  Right.

13         UNKNOWN SPEAKER:  -- to that side of it, and I

14   don't believe there would be, Your Honor --

15         THE COURT:  Okay.

16         UNKNOWN SPEAKER:  -- considering there were no

17   attempts by the IRS to determine this.  So, I think -- I

18   don't think there's that aspect.

19         THE COURT:  Okay.  By the way, I may ask questions

20   that lead you to believe I'm leaning one way or the other.

21   I'm not.  I'm not predeciding anything.  So, we're going to

22   wait until all the evidence is in before I really even dive

23   in and take a hard look at this thing.

24         UNKNOWN SPEAKER:  Your Honor, you mentioned Fifth

25   Amendment.  Of course, it's a civil proceeding

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 45

```
 1   (unintelligible).  If she asserts her Fifth Amendment --
 2              THE COURT:  No.  The presumption could be used
 3   against her.
 4              UNKNOWN SPEAKER:  (Unintelligible).
 5              THE COURT:  Yeah, I understand.
 6              UNKNOWN SPEAKER:  And anything that she asserts
 7   the Fifth Amendment on.
 8              THE COURT:  But, you know, it's very sacred, so I
 9   just wanted to make sure that, you know, we protect her
10   that's if protection needs to be given.  All right?
11              UNKNOWN SPEAKER:  That's fine.
12              UNKNOWN SPEAKER:  Thank you, Your Honor.
13              (The bench conference was concluded.)
14              THE COURT:  Okay.  Are we ready to begin with our
15   evidence?
16              UNKNOWN SPEAKER:  Yes, Your Honor.
17              THE COURT:  Okay.  And I ask counsel to remember
18   to help me enforce the order on sequestration.  So, I won't
19   -- I won't know any of the witnesses and I'll leave it to you
20   guys to make sure your witnesses are not in here.  Okay?
21              UNKNOWN SPEAKER:  Yes, Your Honor, thank you.
22              MR. MIKULECKY:  Your Honor, we call Darla Wilhite.
23              THE COURT:  Okay.  Ms. Wilhite.
24              (The witness, Darla Dee Wilhite, was sworn to tell
25   the truth by the Courtroom Deputy.)
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 46

1          THE WITNESS:  I do, so help me God.

2          THE COURT:  Okay.  And so a rule that a District

3    Judge told me once, that I think is a very good rule, is when

4    there is an oath being administered we all need to be still,

5    and not moving papers around and not walking around.  Okay?

6    Please proceed, Mr. Mikulecky.

7          MR. MIKULECKY:  Thank you, Your Honor.

8                    DIRECT EXAMINATION

9    BY MR. MIKULECKY:

10   Q    Please state your name.

11   A    Darla Dee Wilhite.

12   Q    Good morning, Mrs. Wilhite.  Could you explain to the

13   Judge what you do for a living, please.

14   A    I am the owner of Advanced Floor Concepts and the owner

15   of DW Support Services, d/b/a Southern Colorado Construction

16   Consulting.

17   Q    What do those companies do?

18   A    Advanced Floor Concepts builds suspended structural

19   steel floors where the soils are expansive, and Southern

20   Colorado Construction Consulting monitors construction

21   projects for various banks in the state of Colorado.

22   Q    How long have you been in the construction industry?

23   A    Formally, I have been in the construction industry for

24   43 years.  I'm sorry, 40 years.

25   Q    There's two notebooks in front of you.  If you'd look

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 47

 1   at the thinner of the two and turn to Exhibit A, please.  Can

 2   you identify that, please.

 3   A    It's my professional resumé.

 4   Q    Okay.  Under qualifications -- and I'm not going to

 5   read this, obviously.  I'll just ask you about it.  But under

 6   qualifications it says, Completed over 25,000 commercial and

 7   residential inspections for over 60 institutions and 100

 8   general contractors over the last 13 years.

 9        When was this resumé prepared?

10   A    2009, 2008.

11   Q    Okay.  So, since then have you done more inspections?

12   A    Yes, sir, I have.

13   Q    How many have you done now?

14   A    Between 25- and- 35,000 more.

15   Q    So, 50- to- 60,000 inspections you've done?

16   A    That is correct.

17   Q    What are you looking for in those inspections?

18   A    I am the -- looking to make sure that the project is

19   being built according to plans and specifications.  I'm

20   also -- since I work with the banks, I'm out there primarily

21   to make sure that the work is getting done in a proper

22   manner; to see what has been done, what hasn't been done,

23   who's there, what materials are there so that I can reconcile

24   back to the bank to let them know whether the draw should be

25   paid or not.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 48

1   Q    You said that you want to make sure the work is being

2   done in a proper manner.  Do you mean in accordance with the

3   plans and specifications and the building codes?

4   A    I'm primarily responsible for the plans and

5   specifications.  The -- if I see something flagrantly wrong

6   that is not in accordance with the building code I will bring

7   that to the attention of the bank, but it's not my job to

8   specifically tell the contractor that they're not building it

9   per code.  That's up to the building inspector and the

10  various municipalities.

11  Q    But you have to be knowledgeable of the code?

12  A    Yes, I do.

13  Q    And knowledgeable of how to read plans and

14  specifications?

15  A    Yes, sir.

16  Q    How did you get this --

17              THE COURT:  One second, Mr. Mikulecky.  I've got

18  to understand the math here.  If you've done 25,000

19  inspections in seven years, that's 3,500 a year.

20              THE WITNESS:  Yes, sir.

21              THE COURT:  That's 10 a day for --

22              THE WITNESS:  Yes, sir.

23              THE COURT:  -- for every single day of the year.

24  Do you think you've done --

25              THE WITNESS:  Sometimes I do 50 to 60 inspections

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 49

 1   in a day.

 2           THE COURT:  How can you possibly travel to 60 or

 3   -- 50 or 60 work sites?

 4           THE WITNESS:  You have to -- you have to realize

 5   that a lot of these are what we call production builders.

 6   They'll be five projects on one street; across the street,

 7   five projects on the other.  I've just done 10 inspections in

 8   a half an hour.

 9           THE COURT:  What -- tell me what is entailed in an

10   inspection.

11           THE WITNESS:  I'm looking to see what's done,

12   what's not done, what materials are there, and who's on-site.

13           THE COURT:  And what -- what's a typical -- give

14   me the range of projects you're inspecting.

15           THE WITNESS:  I'm sorry, I don't --

16           THE COURT:  It's single family dwellings?

17   Apartment complexes?  Commercial buildings?

18           THE WITNESS:  I am doing all of those, but the

19   primary -- the bulk of the inspections are production

20   builders.  I have several custom builders that I do

21   inspections for.

22           THE COURT:  What's a production builder?

23           THE WITNESS:  Like Richmond Homes.

24           THE COURT:  Okay.

25           THE WITNESS:  The low-end construct -- or

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 50

1   contractors.

2         THE COURT:  So there might be 30 homes being built

3   and you could look at those 30 homes in a matter of minutes?

4         THE WITNESS:  Thirty homes would probably take

5   about an hour, hour and a half.

6         THE COURT:  Okay.  So, you spend a couple

7   minutes -- three, four minutes on each inspection?

8         THE WITNESS:  Correct.

9         THE COURT:  Okay.  Thank you.

10  Q   (By Mr. Mikulecky)   And, again, you're looking to make

11  sure that the contractor says I'm entitled to money.  I put

12  up a hundred percent of the Sheetrock, for example, so I

13  should get this amount of money.  You're going to make sure

14  that that Sheetrock is installed a hundred percent and

15  installed properly?

16  A   Yes, sir.

17  Q   Okay.  Same thing for the plumbing, electrical,

18  roofing, all other aspects of construction?

19  A   Yes, sir.

20  Q   Where did you get your interest in construction?

21  A   From my dad.

22  Q   What did your dad do?

23  A   My dad was a well-driller, but he was also a phenomenal

24  carpenter.  And my mom was the dreamer, my dad was the doer.

25  Mom would say I want this built, and dad would build it for

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 51

1    her.  And I had the -- I was daddy's girl, so wherever dad

2    was that's where I was.

3    Q    So, did your dad teach you then how to build?

4    A    Yes, he did.

5    Q    When was that?

6    A    Probably starting when I was like 11, 12.

7    Q    So, how did you then take that interest and turn it

8    into a career?  What have you done?  And we don't want to go

9    through every line entry on your resumé, but if you can just

10   summarize for the Judge your construction experience from

11   that young interest you had as a child.

12   A    Well, I wanted to be an architect because I was just

13   fascinated with building, and my mother wouldn't allow me to

14   do that.  When I moved to California I was married to a

15   gentleman who was in the carpenters' union, and his father

16   was corporate vice president in charge of all OCs

17   construction for Dillingham Corporation, and president of

18   C. Norman Peterson and president of Gordan Ball.

19   Q    What are those companies?  Sorry.

20   A    Those are big commercial construction companies.

21   Q    Okay.  Thank you.  Go ahead.

22   A    So, needless to say when we were altogether we talked

23   construction.  In 1973, '74, somewhere in there, the company

24   that my husband was working for had a huge government project

25   that they were bidding and they needed people to come out and

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 52

 1   help them take the bids, elaborating on exclusions, and

 2   inclusions of the contract, and I was hooked.  I just fell in

 3   love with it.

 4       When my second child was born, dear friends of mine

 5   owned a custom construction company, and they hired me to do

 6   material procurement and coordinate their subcontractors.

 7   And they were going to teach me as they went along.  Well,

 8   unfortunately, or fortunately, two weeks after I started

 9   working for them they informed me they were coming back to

10   Colorado to go elk hunting for three weeks, and they had

11   eight custom homes going at that time.  So, I got full

12   emersion real quick.

13   Q    Trial by fire I guess?

14   A    Yes.

15   Q    So, did you have any -- any problems?  At that point

16   you hadn't had any formal education in construction, right?

17   A    No.  No.

18   Q    Had you ever --

19   A    Just --

20   Q    Have you ever --

21   A    -- by osmosis.

22   Q    Okay.  Have you ever had any formal education in

23   construction?

24   A    No.

25   Q    Okay.  So, they're thrusting you into supervising the

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 53

1   construction of eight houses?

2   A    That is correct.

3   Q    Did you have any problems?

4   A    Yeah.

5   Q    Give us an example.

6   A    Well, first of all, this was in 1974, and women weren't

7   really acceptable in the construction industry.  I made it

8   very clear to all of the subcontractors and suppliers that I

9   was not going to lie to them; that if I didn't understand

10  what they were asking me that I would ask questions, and that

11  I would watch.  But I would never try to lie to them.

12      I had one gentleman in particular, the plumber, by the

13  name of Bruce Ibe, and he decided that he was going to make

14  my life miserable.  He would come up with off-the-wall

15  plumbing terms that I had no idea.  He would always call at

16  11 o'clock at night and say I need a hoodee ring.  I'm going,

17  what?  And then he would just hang up.  Well, I would

18  dutifully go to the plumbing supply house and say I need a

19  hoodee ring.  Or he said I need to know where the water and

20  sewer laterals are.  I had no idea what a water and sewer

21  lateral was, but I'd call the water district and asked them.

22  And they very graciously explained to me what it was and

23  where it was for this particular project.  Same thing with

24  the sewer lateral.  They -- fortunately, the water district

25  gave me the number of who I needed to call for the sewer.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 54

```
 1              And, finally, one night Bruce called and I just
 2    said enough.  Enough.  You know, I haven't lied to you.  I
 3    have gotten you the things that you requested, and I said
 4    that's enough.  Of course I had a few other choice words for
 5    him.  But, anyway, after that it was great.  And when I went
 6    on to build custom homes Bruce was always the plumber of
 7    choice.
 8    Q    So you won his respect?
 9    A    Yes.
10    Q    And you learned then by asking questions and doing?
11    A    Yes, sir.
12              THE COURT:  Let me ask about the doing.  Have you
13    framed a house?  Participated in framing a house?
14              THE WITNESS:  Yes, sir, I have.
15              THE COURT:  Swung the hammer?
16              THE WITNESS:  Yes, sir, I have.
17              THE COURT:  Okay.  Trusses?
18              THE WITNESS:  Yes, sir, I have.
19              THE COURT:  Foundation?
20              THE WITNESS:  Yes, sir, I have.
21              THE COURT:  Okay.  And drywall?
22              THE WITNESS:  Yes, sir, I have.
23              THE COURT:  What about the plumbing and
24    electrical?
25              THE WITNESS:  I can do some plumbing.  Electrical
```

United States of America vs.                                    Evidentiary Hearing - Day I
Michael David Wilhite                                                     September 15, 2015

Page 55

 1   I will not do because I got zapped.

 2           THE COURT:  Okay.  And do you -- have you done the

 3   physical labor of building a house multiple times?  Dozens?

 4   Hundreds?  Thousands?  Tens?  What would you say?

 5           THE WITNESS:  Actually, physically building the

 6   house, four houses.

 7           THE COURT:  Okay.  Your own or somebody else's?

 8           THE WITNESS:  My own and someone else's.

 9           THE COURT:  Okay.  Thank you.

10   **Q    (By Mr. Mikulecky)  And over your career before we get**

11   **to Advanced Floor Concepts and Southern Colorado Consulting,**

12   **what else did you do?  You talked a little bit about you were**

13   **a project supervisor there for those eight houses.  What did**

14   **you do next?**

15   A    I was a -- I built a spec house for some folks.  And

16   the gentleman who lived across from where I was building the

17   spec house saw what I was doing and hired me to do the

18   estimating for seven houses for him.  After that, the banker

19   who had financed the spec house hired me to build a spec

20   house for him out of Rancho Santa Fe area in California.

21   **Q    Okay.  And when you say built, given the judge's**

22   **questions, can you explain what your position was and what**

23   **your tasks and responsibilities were.**

24   A    I was coordinating the subs.  I was purchasing

25   materials.  I was making sure that the -- all the components

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 56

 1   were going in, in a correct manner in the sequence that

 2   they're supposed to go in; interacted with the

 3   subcontractors, making sure that they had what they needed.

 4   If there were questions that came up on the plans I would

 5   either talk to the engineer or the architect to resolve any

 6   issues that came up.

 7   Q    So, you were like a project manager or a construction

 8   manager?

 9   A    Basically, yes.

10   Q    Okay.  And in answer to the judge's questions, you said

11   you actually also built houses, correct?

12   A    Yes, sir.

13   Q    About when was that?

14   A    1979 to 1986.

15   Q    During the time then that you worked in the

16   construction industry, when did that stop?

17   A    I'm sorry, I don't understand your question.

18   Q    You've talked about that you were working.  You've done

19   -- we're up to the point now where you were hired to -- by a

20   banker to help with his house.  Did you ever work for a

21   company doing construction?

22   A    No.  Other than my own.

23   Q    What about the time you spent as an employee of a

24   construction company?

25   A    Well, that was from 1974 until 1979, and then my

United States of America vs.  Evidentiary Hearing - Day I
Michael David Wilhite  September 15, 2015

Page 57

1  husband at that time and I formed Medlicott Construction.

2  Q    What did you do from '74 to '79?  Or is that the

3  timeframe we just covered?

4  A    Yes.  That's the timeframe we just covered.

5  Q    Okay.  And then you worked for -- you and your husband

6  formed a construction company.  This is in California?

7  A    Yes, sir.

8  Q    Meldicott (phonetic) Construction?

9  A    Medlicott, yes.

10 Q    Medlicott.  Thank you.  Okay.  What did that company

11 do?

12 A    We built houses.

13 Q    Residential homes?

14 A    Yes.

15 Q    Okay.  What was your role?

16 A    I did -- helped dig the foundations, set up -- took all

17 the forms to pour concrete, framing --

18 Q    Are you actually out there doing that work?

19 A    Yes.

20 Q    Okay.

21 A    Putting in septic systems, insulation, drywall.

22 Q    So, you were actually out there building the houses?

23 A    Yes, sir.

24 Q    Okay.  Were you also still continuing in your role as

25 the project manager, or construction manager coordinating the

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 58

1   other subcontractors and crafts that were working on the

2   house?

3   A    Yes.

4   Q    And supervising their work as well?

5   A    Yes, sir.

6   Q    Did you have to have knowledge then of the plans and

7   specifications and the building code for those?

8   A    Yes, sir.

9   Q    Have you maintained that knowledge?

10   A    Yes, sir.

11   Q    Have you also worked -- done any inspection for, or

12   done any work for commercial construction?

13   A    Actually, at that time we also built a 40-by-80 metal

14   building.  And I helped put all that together.

15   Q    Physically, again, out there doing the labor to build

16   it?

17   A    Yes, sir.

18   Q    How long were you working for Medlicott Construction?

19   A    Until 1986 when I moved back home to Colorado.

20   Q    So, how many -- up until this time then, how many years

21   have you been in construction up to '86?

22   A    Well, I started in '74.  So, 41 years.

23   Q    Well, from '74 to '86 we've got about 12 years at that

24   time, right?

25   A    Yes.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 59

1   Q    Okay.  So you come out to Colorado.  What did you do

2   then?

3   A    Colorado wasn't ready for women in construction, and I

4   ended up going to work at Littleton National Bank as a

5   construction loan officer's assistant.  And I -- it was my

6   duties to check all of the draws that were coming in against

7   the invoices to make sure that everything was as it should

8   be, and then I also physically went out and inspected the

9   projects to see whether they were being built correctly.

10  Q    Did you encounter any problems being -- as you said,

11  Colorado wasn't ready for women in construction at that point

12  and you were out on the job site, did you encounter any

13  difficulties there?

14  A    Not when I was working with the bank, no.

15  Q    Okay.  So, you were doing those inspections.  That's

16  what you testified to earlier, you would check to make sure

17  the work the contractor said they did was what was being

18  done?

19  A    Yes.

20  Q    Okay.  And make sure they were entitled to the money

21  they were requesting?

22  A    Yes, sir.

23  Q    And that the work was done properly?

24  A    Yes, sir.

25  Q    How long did you do that work?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 60

 1   A    I did that for three years.

 2   Q    What did you do next?

 3   A    I went to work for Klebold Consulting, and put me on

 4   the other side.  I wasn't working in the bank, but I was

 5   working for the bank by doing inspections, and doing

 6   preanalysis on projects to make sure that projects could be

 7   built for what the contractor was submitting in his budget,

 8   and also making sure that there weren't items that had been

 9   inadvertently left out.

10   Q    Okay.  So, two things that you're doing then for

11   Klebold -- I want to make sure I understand.  Klebold was

12   doing the same sort of work for the bank that you did while

13   you were at the bank; is that right?

14   A    Correct.

15   Q    Okay.  They were just hired by the banks as an

16   independent party to do it rather than a bank employee?

17   A    Yes, sir.

18   Q    All right.  So part of what you did for Klebold was

19   that same inspection; going on the job site, making sure that

20   the money being requested lined up with the work that was

21   done?

22   A    Yes, sir.

23   Q    Okay.  And now you've talked about a preevaluation

24   analysis; is that right?

25   A    It's a preanalysis of the construction documents.  I

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 61

 1    looked at plans, specifications, contract, budget, go through

 2    it to make -- to determine whether this is a good risk for

 3    the bank to take on.

 4    Q    So, someone -- the bank or the owner is asking for a

 5    certain amount of money for a loan, correct?

 6    A    Yes.

 7    Q    Okay.  And the bank hires you to make sure that the

 8    money they're asking for is enough to build the house or

 9    building that they say they want to do?

10    A    Correct.  Or on the other flip side, that there isn't a

11    whole lot of extra money stuck in there somewhere.

12    Q    Okay.  So make sure there's just enough money to finish

13    the project as it's being called out in the plans and specs?

14    A    Right.

15    Q    Okay.

16         THE COURT:  Ms. Wilhite, was your job also ever to

17    take photographs and include those in a file?

18         THE WITNESS:  Every project that's inspected has a

19    minimum of four pictures taken.

20         THE COURT:  That you took?

21         THE WITNESS:  Yeah.

22         THE COURT:  Okay.

23    Q    (By Mr. Mikulecky)  So that's the work you did for

24    Klebold Construction?

25    A    Yes, sir.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 62

```
 1   Q    How long did you work for Klebold?

 2   A    Eight and a half years.

 3   Q    When did you leave Klebold?

 4   A    July -- the end of July of 1997.

 5   Q    Did you leave on your own?

 6   A    Yes, I did.

 7   Q    What did you do next?

 8   A    I started my own construction consulting company.

 9   Q    Doing the same work for Klebold that you had done for

10   the banks?

11   A    Yes, sir.

12   Q    Okay.  Now you're doing it on your own?

13   A    Yes, sir.

14   Q    Okay.  We're going to come back to that company.  You

15   also then started Advanced Floor Concepts, right?

16   A    That is correct.

17   Q    Okay.  We're going to come back to those in a few

18   moments.  So, over this time you started those two companies,

19   you said, in '97, correct?

20   A    Yes, sir.

21   Q    Both companies still around today?

22   A    Yes, sir.

23   Q    So you've got -- since '74, so 41 years of experience

24   in construction?

25   A    Yes, sir.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 63

1  Q    You said when you first came out that Colorado wasn't

2  ready for women in construction.  Now that you have two

3  construction companies, do you still encounter any obstacles

4  being a woman-owned business in a male dominated construction

5  world?

6  A    Only occasionally.

7  Q    What sort of examples?  What do you mean?

8  A    I had a young man inform me that I had no right to ask

9  where a septic tank was located.  And I informed him that I

10  most assuredly did, because that's what he had requested on

11  his drawing and he wanted to be paid for it.  And, basically,

12  I told him I'd been in construction longer than you've been

13  alive.

14  Q    So, even today you still face challenges from people

15  who don't believe as a woman that you can own a construction

16  business?

17  A    True.

18  Q    Let's talk about Mr. Wilhite.  When did you meet

19  Mr. Wilhite?

20  A    I met Michael in November of 1971.

21  Q    How?

22  A    He was a -- on a construction -- a commercial job site

23  where my husband was working, and Michael and Jed had become

24  friends.  And come to find out that I was pregnant and

25  Michael's wife was pregnant, and we both had boys in 1972.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 64

1  We all became very good friends.  And I've taken care of his

2  children and he's taken care of my children.

3  Q    This is while you were in California?

4  A    Yes, sir.

5  Q    Okay.  Did you eventually get divorced from your

6  husband, Mr. Medlicott?

7  A    Yes.  My divorce was final in 1987.

8  Q    Is that when you moved to Colorado?

9  A    I moved to Colorado in 1986.

10  Q    So before the divorce was final?

11  A    Yes, sir.

12  Q    Divorce was in the works at that time?

13  A    Yes.

14  Q    After your divorce, when was your next contact with

15  Mr. Wilhite?

16  A    I was a construction manager on a job -- a house that

17  was being built out in Aurora, and I picked up messages --

18  this was in 1989 -- and Michael had left a message at my

19  home.  And I called him back.  And I asked him, I said, How

20  did you find me?  Because when I left, I left.  I didn't want

21  anybody to know where I was.  But mutual friends finally

22  found my phone number, and we started -- we'd been best

23  friends for years, so we just continued on, and discovered

24  that a friendship was a good basis for a marriage

25  relationship.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 65

```
 1   Q    Was Mr. Wilhite in California at the time?

 2   A    Yes, sir.

 3   Q    Did he move to Colorado?

 4   A    He moved to Colorado in 1992.

 5   Q    Where was he staying when he came to Colorado?

 6   A    He stayed with me.

 7   Q    You said it formed a good basis for a marriage.  When

 8   did you get married?

 9   A    1993.

10   Q    Where did you live?

11   A    At my home in Castle Rock.

12   Q    That was your house?

13   A    Yes, sir.

14   Q    At the time you were married, did Mr. Wilhite have any

15   income to provide to the family?

16   A    No, sir.

17   Q    So, you were providing the sole support?

18   A    Yes, sir.

19   Q    Do you remember when that changed?

20   A    1997.

21            THE COURT:  (Sneezing).

22            MR. MIKULECKY:  Bless you.

23            THE WITNESS:  Bless you.

24            THE COURT:  Thank you.  Mrs. Wilhite, what was

25   your approximate income in that 1989 to 1993 time period?
```

Page 66

```
 1              THE WITNESS:  1989.  I started out at 18,000 a
 2   year in '89, and when I left I think I was making 32,000.
 3              THE COURT:  Thank you.
 4   Q    (By Mr. Mikulecky)  So, in 1997 you said that changed.
 5   First, what were you doing in 1997 -- January 1997?
 6   A    I was working for Klebold Consulting Group.
 7   Q    And you already talked about that.  You said
 8   Mr. Wilhite then was getting income.  What was Mr. Wilhite
 9   doing at that point?
10   A    He was doing some work with Jeff Clement on steel
11   floors.
12   Q    Do you remember the name of the company?
13   A    Steel by Design.
14   Q    Okay.  Now, 1997 was also the year that you set up DW
15   Support, right?
16   A    Yes, sir.
17   Q    Why was that?
18   A    Because I got tired of doing all the work and
19   Mr. Klebold making all the money.
20   Q    Before you started working for DW Support, let's back
21   it up a little earlier.  Because that wasn't the initial
22   reason you set up DW Support, was it?
23   A    Oh, no.  I'm sorry.  I misunderstood you.
24   Q    Okay.  So what was the initial reason that DW Support
25   was set up?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 67

1   A    Michael went to work for Steel Dimensions, Mark

2   Russell.  And Mark didn't want to set up all of the

3   documentation and reporting items necessary to have

4   employees, so he wanted Michael to be paid as a vendor.

5   Q    Okay.  And let's fill in some gaps here.  You said that

6   he worked for Steel by Design.  How long was that?

7   A    I don't recall.  I mean, he left, I believe, in

8   February or March.

9   Q    Of 1997?

10  A    Yes, sir.

11  Q    Okay.  So then he begins working for Steel Dimensions

12  in February or March of 1997, correct?

13  A    Must have been --

14  Q    Steel Dimensions --

15  A    Must have been April.

16  Q    Okay.

17  A    The first paycheck was May 1st.

18  Q    All right.  And you said that the owner of Steel

19  Dimensions didn't want Mr. Wilhite as an employee?

20  A    He wanted him to work for him, but he didn't want to

21  pay him as an employee because --

22  Q    Okay.

23  A    -- then he would have to do all of the tax reporting.

24  Q    So --

25  A    Payroll tax reporting.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 68

1  Q    So he wanted to pay him as an independent contractor?

2  A    He wanted to pay him as a vendor.

3  Q    So, I'm not sure I understand what you mean.

4  A    Then he doesn't even have to do a 1099.

5  Q    Oh, okay.  So, how -- connect the dots for me.  He

6  wants to pay him as a vendor.  How did you get to, therefore

7  I started DW Support.  Why did you use that avenue?

8  A    Because in order for Michael to be paid he needed to

9  have some type of company, i.e. vendor status, to receive the

10 payments.  So I set up DW Support Services.  Michael couldn't

11 be on there because he had bad credit, and --

12 Q    Can you explain what you mean.

13 A    I couldn't -- I couldn't set up a checking account with

14 him on it at that point in time.

15 Q    Why not?

16 A    Because of his bad credit.

17 Q    How do you know that you couldn't set up a checking

18 account with him because of his bad credit?

19 A    I worked for banks and I set up a lot of accounts, and

20 the first thing you do is you -- at that time, was you pull

21 up someone's credit report to see if they're going to be a

22 good risk.  Even though a checking account is money in, money

23 out, it's your money, but the tendency normally is with

24 someone with bad credit they will be bouncing checks.

25 Q    So back then, based on your experience in the banking

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 69

1    industry, you knew that banks did credit checks.  Mr. Wilhite

2    didn't have good credit, so you knew you wouldn't be able to

3    get a joint account?

4    A    Correct.

5    Q    Okay.  So you set up DW Support.  Take a look, if you

6    would, at Exhibit B.  What is that?

7    A    It's the articles of organization for DW Support

8    Services.

9    Q    Okay.  And at the bottom dated May 1st 1997, right?

10   A    Yes, sir.

11   Q    Okay.  Who prepared this document?

12   A    I did.

13   Q    In Article II you're also listed as the registered

14   agent, correct?

15   A    Yes, sir.

16   Q    In Article III you're listed as the manager?

17   A    Yes, sir.

18   Q    And it says also management is vested in the manager,

19   correct?

20   A    Yes, sir.

21   Q    Article IV, organizer.  That's you, as well, correct?

22   A    Yes, sir.

23   Q    Okay.  So, you prepared and filed this with the

24   Colorado Secretary of State?

25   A    Yes, I did.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 70

```
 1   Q    When did you then begin working for DW Support?

 2   A    Not until I formed Southern Colorado Construction

 3   Consulting.

 4   Q    Okay.  How did you form that?

 5   A    I did a trade name affidavit, a d/b/a.

 6   Q    Why not just start another company?

 7   A    Why go through the thresh.

 8   Q    So it's just easier to set it up as a trade name for

 9   the company you had already set up, DW Support?

10   A    Yes, sir.

11   Q    Okay.

12            THE COURT:  Were you suspicious at all of what

13   Steel Dimensions was trying to do by claiming that

14   Mr. Wilhite was a vendor instead of a contractor or an

15   employee?

16            THE WITNESS:  I didn't -- I hadn't even dug into

17   that much, so I didn't know.  I just know that Michael was

18   finally able to provide some funds for the family.

19            THE COURT:  So, it didn't cross your mind that

20   something fishy was going on?

21            THE WITNESS:  No.  I mean, as long as -- as -- you

22   know, with the checks coming into DW Support I realized that

23   I was having to pay both the employer and the employee side

24   of the payroll taxes.

25            THE COURT:  Okay.  Thank you.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 71

1   Q    (By Mr. Mikulecky)  So, you then made DW Support an

2   operating company, correct, as opposed to before it was

3   simply to take Mr. Wilhite's paychecks?

4   A    Correct.

5   Q    Okay.  Is DW Support still around?

6   A    Yes, it is.

7   Q    How many employees does it have?

8   A    Right now two and a half.

9   Q    I assume that means part-time as opposed to a partial

10  person?

11  A    Yes.  Correct.

12  Q    Okay.  Has it had more employees over the years?

13  A    Yes, it has.

14  Q    How many employees have you had since its founding

15  almost 40 years ago?  Oh, no.  I'm sorry, almost 20 years

16  ago.  I'm sorry.

17  A    So, all at once or over --

18  Q    Over the years.

19  A    Oh, there's probably 35.

20  Q    Have you been responsible for hiring and firing those

21  employees?

22  A    Yes, I have.

23  Q    Making the decisions for DW Support?

24  A    Yes, sir.

25  Q    Have you always been the sole owner of DW Support?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 72

```
 1   A    Yes, sir.
 2            THE COURT:  How about the maximum number at one
 3   time?  I think that's what you thought he was asking.
 4            THE WITNESS:  If I remember correctly I had 9, I
 5   believe.
 6   Q    (By Mr. Mikulecky)  Also, in 1997 you started Advanced
 7   Floor Concepts, correct?
 8   A    That is correct.
 9   Q    When was that?
10   A    The end of October, 1997.
11   Q    Why did you start another company in October of 1997
12   when you just had just started DW Support as an operating
13   company in August, 1997?
14   A    Having seen so many structural floors -- and at that
15   point in time the bulk of them were made out of wood -- I
16   started seeing structural steel floors that were being
17   produced by Bill Burkey.
18   Q    And let me stop you for a moment there.  Explain what a
19   structural floor is, please, and what it's meant to do.
20   A    Okay.  A structural floor is built so that when -- when
21   the soils expand and push up, if you had just a slab on grade
22   and those soils push up, that foundation and that slab will
23   crack and break.  So, originally, because of the Front Range
24   propensity towards expansive soils, they built a wooden
25   structural floor.  So, the wooden floor would be anywhere
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 73

 1   from 12 to 24 inches to 36 inches off of the ground.  And

 2   this would eliminate any possibility of that soil, as it

 3   moved up and down, pushing against the floor.

 4        They were finding back in 1996, 1997 that those

 5   structural floors made out of wood were starting to fail.

 6   They used a product called TJI, which is Trus Joist, Inc.

 7   And it basically looks like an I-beam.  It has a top, a

 8   flange and a bottom, but these were made out of wood.  And

 9   along with expansive soil you have a tremendous amount of

10   moisture that comes up from those crawl spaces.  So, the

11   wooden floors were starting to rot out.  They were getting

12   really inundated with the moisture.

13        Along came the structural steel floors.  As I say, Bill

14   Burkey was one of the original ones who started building that

15   type of floor, and I had seen some of them out in the field

16   when I was doing inspections.  Then Geoff Clement started

17   Steel by Design, and Mark Russell started Steel Dimensions,

18   and I was getting more and more intrigued that this was

19   something that could really, truly solve a huge problem for

20   construction in the Front Range.

21        I just -- it was -- the time was right.  And it was one

22   of those things where I could jump into this right now and do

23   something with it, or I could wait and see how the industry

24   progressed.  And I just was excited about getting it going,

25   getting it started.  That was the primary reason.  The other

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 74

 1  reason was I wanted to have a woman-owned construction

 2  company so that I could eventually, if at all possible, go

 3  for government work for government set-asides.  That didn't

 4  happen because the company took off, and I really didn't want

 5  to go through some of the trials and tribulations of getting

 6  paid by the government.

 7          THE COURT:  What's the comparative cost between a

 8  wood structural floor and a steel structural floor?

 9          THE WITNESS:  Actually, surprisingly, there's not

10  that much of a difference.  TJIs are not inexpensive, because

11  they are -- they are engineered, once again.  You have

12  different types of TJIs depending on the span.  What kind of

13  support there is underneath them.  So, at that time, when I

14  first started, I -- if I remember correctly, a TJI floor cost

15  like 250 to 275 a square foot.  The first steel floors that

16  AFC built were running about 325, 350 a square foot.

17          So there wasn't that big of a difference, but when

18  you think about the long run where the steel will last

19  probably the life of the home, the TJI floor will last five

20  to seven years before it rots out.

21  Q    (By Mr. Mikulecky)  What other problems were there with

22  TJI floors that steel addressed besides the wearing out of

23  the TJI floors?

24  A    Well, a lot of times if they weren't blocked -- and

25  what I mean by blocking, if you've got -- your joists are

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 75

 1   running parallel and if the span is really great, that floor
 2   will deflect if it isn't blocked.  And to say -- you would
 3   run into some framers who would be going so fast they
 4   wouldn't block it, so there was deflection.
 5   Q    Okay.  Help me.  What's blocking?
 6   A    That's where you're putting -- if you've got parallel,
 7   you've got a piece of wood that goes from here to this one
 8   over here.  So it's blocked to stiffen the floor.
 9   Q    Okay.  So a piece of wood spanning the two joists that
10   run --
11   A    Correct.
12   Q    Are running parallel?
13   A    Correct.
14   Q    Okay.  To help take some of that flex out?
15   A    Well, and as I say, just to stabilize it because, say,
16   they were -- if they were doing too long of a span, the floor
17   wouldn't be real, real firm.
18   Q    Steel --
19   A    Whereas the steel floors -- they're steel.
20   Q    Flexing wasn't a problem?
21   A    Well, in the beginning one of the things that Bill
22   Burkey was doing is he was using 8- to- 10-inch metal joists.
23   And you can imagine.  It would be like -- you could hear
24   every step that was taken.  Plus his floors, the deflection,
25   it's an engineering calculation.  His floors were L over 360,

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 76

1   and on an 18-foot span that would -- that floor would deflect

2   a half an inch.  And the floors that AFC is building now are

3   L over 2000, and our deflection is .04.

4   Q   Of an inch?

5   A   Yes.

6   Q   So a tremendous improvement?

7   A   Yes.

8   Q   So, your -- you see these steel floors as a -- it

9   sounds like a simple solution to a problem?

10   A   Yes, sir.

11   Q   Were there many other companies installing steel floors

12   at this time?

13   A   There were a couple that were trying to break into the

14   industry.  There was one called Stryan and he finally -- I

15   think, 2009, 2010 he went out of business.

16         There's another company called Dwayne Sanders.  I don't

17   know what he actually calls his company.  But Dwayne has been

18   in it pretty much from the beginning, but he doesn't do very

19   many floors at all.  There's a couple more, but they're

20   very -- very small companies.  Bill Burkey went out of

21   business, probably 2005.  He sold the company, and then it

22   just didn't go anywhere.

23   Q   Okay.  So you -- October, September, 1997, you're

24   seeing this new industry spring up.  Why then?  Why not

25   November?  Why not 1998?  Why not 1999?

United States of America vs.                           Evidentiary Hearing - Day I
Michael David Wilhite                                          September 15, 2015

Page 77

1    A    Because I wanted to get in on the ground floor.

2    Q    No pun intended, or pun intended?

3    A    Yeah.

4    Q    Okay.  Understood.  Did you know that it was going to

5    be successful when you started it?

6    A    I had no idea.  But I like a challenge and I felt that,

7    hey, why not take a chance.

8    Q    What did you provide to Advanced Floor Concepts?  What

9    did you bring to the company?

10   A    I brought money, assets, credit, contacts, construction

11   experience, and the fact that I'm a woman.

12   Q    Let's go through those in some more detail.  We won't

13   cover the part about being a woman though.

14   A    Okay.

15   Q    Construction experience.  You've testified at this

16   point, 1997, so you've had about 23, 24 years of experience?

17   A    Correct.

18   Q    But, this industry is in its infancy, right?  The steel

19   floor industry?

20   A    Yes, sir.

21   Q    How many had you seen and how did you see them?

22   A    I saw them out doing inspections.

23   Q    Oh, okay.  When you were doing the inspections for --

24   A    For Klebold.

25   Q    Klebold.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 78

1    A    And also some from when I started my own company.

2    Q    How many did you see?

3    A    20, 25.

4    Q    How did you learn about them?

5    A    Once again, I watched, I asked questions, and it was
6    just intriguing to me.

7    Q    Had you ever built a steel floor before you started
8    Advanced Floor?

9    A    Actually, I did.

10   Q    Okay.  Where and when?

11   A    When Michael was working for Steel Dimensions, I went
12   out on weekends and helped him build structured floors.

13   Q    That's when he was working for whom?

14   A    Mark Russell.

15   Q    Steel Dimensions?

16   A    Yes.

17   Q    Okay.  Let's talk about contacts.  Another thing you
18   said you brought to the company.  Explain what you mean by
19   that, please.

20   A    Having been doing construction inspections from 1989
21   forward I knew most of the major contractors in the Front
22   Range.

23   Q    Personally?

24   A    Yeah.

25   Q    Any idea how many that would be?  Are we talking 5, 10,

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 79

1   100?

2   A   Oh, no.  There probably were 100.

3   Q   **You also talked about assets, credit, cash.  What did**

4   **you provide there?**

5   A   Well, I had some money from DW Support, and my mother

6   was willing and able to lend me anything that I needed,

7   because she knew it would get paid back.  I tried not to take

8   advantage of that situation, but when the need arose she was

9   there to lend it.

10   Q   **Did you also get loans in your own name?**

11   A   Yes, I did.  I got a line of credit from Castle Rock

12   Bank.

13   Q   **We're going to go through what you did then with your**

14   **contacts and your assets and your experience in a moment as**

15   **you set up Advanced Floor, but first, the glaring question.**

16   **Why did you not make Mr. Wilhite a coowner of Advanced Floor**

17   **Concepts?**

18   A   Michael had very bad credit, and not real good with

19   money, and he's not a woman.

20   Q   **Again, back to the -- what you thought it would be a**

21   **benefit of being a woman-owned business?**

22   A   Yes, sir.

23   Q   **Okay.  And at least when you started you wanted to have**

24   **that as a possibility?**

25   A   Yes, sir.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 80

1    Q    Okay.

2             THE COURT:  Are you going to cover the loan

3    amounts?

4             MR. MIKULECKY:  Yes, sir.

5             THE COURT:  Okay.

6             MR. MIKULECKY:  We're going to go through that

7    with all the transactions.

8    Q    (By Mr. Mikulecky)  Let's continue talking about Mike,

9    though, for a moment.  It's October/November of 1997.  Do you

10   remember when Mr. Wilhite had told you about his concern with

11   Mr. Clement's business dealings?

12   A    In February of 1997.

13   Q    Do you remember what, generally, he had told you about

14   it?  We don't want to go through everything.

15   A    Just that he was concerned that Geoff had stolen the

16   money from the Australian deal.

17   Q    What did he tell you, or what did you understand at

18   that time about his role in that transaction?

19   A    I didn't know that -- all I knew was that he worked

20   with Geoff.  I didn't know -- and that he had concerns

21   regarding what Geoff had done and in finding out that Geoff

22   had just gone to prison for doing this very same thing.  And

23   we talked about it and he said, you know, I think I need to

24   talk to the US Attorney's Office.  And we both felt that that

25   was the right thing to do.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 81

```
 1              THE COURT:  Mr. Mikulecky, there won't be any
 2   marital privilege issues here, will there?
 3              MR. MIKULECKY:  No, sir.
 4              THE COURT:  Okay.  Thank you.
 5   Q    (By Mr. Mikulecky)  Did you have any idea of -- let's
 6   go to October/November, 1997, when you formed Advanced Floor
 7   Concepts.  Any idea of what Mr. Wilhite's role was in
 8   Mr. Clement's schemes?
 9   A    No.  I had no clue.
10   Q    When did you learn about it?
11   A    In November or December of 2000.
12   Q    How do you know that was the date?
13   A    Because Carol Ricca talked.
14   Q    Who is Carol Ricca?
15   A    She was the probation officer.  She was calling for a
16   presentencing interview with me, and she asked me the same
17   question you just did.  Do you know what Michael's role was?
18   So I said, He didn't do anything.  Geoff took all the money.
19   She said, You need to go talk to Mr. Wilhite.  I said okay.
20   And I went down and Michael finally told me what had actually
21   transpired.
22   Q    Told you about his role at that time?
23   A    Yes, sir.
24   Q    So, it wasn't until about three years after that you
25   formed AFC that you learned of Mr. Wilhite's role in
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 82

```
 1   Mr. Clement's activities?

 2   A    That's correct.

 3   Q    Did you in November or October, 1997, expect that

 4   Mr. Wilhite was going to be indicted?

 5   A    No.

 6   Q    Did you expect in October or November, 1997, that

 7   Mr. Wilhite would be ordered to pay restitution?

 8   A    No.

 9   Q    Why not?

10   A    Because I didn't think he'd done anything wrong.

11   Q    Did he get any money?

12   A    No, he did not.

13   Q    Did Mr. Wilhite's involvement -- Mr. Wilhite going to

14   the Department of Justice, Mr. Brown, about Mr. Clement's

15   schemes in February of '97 -- have any role, any impact on

16   your decision to form AFC as your company?

17   A    No.  None whatsoever.

18   Q    Let's talk about some of the funding then.

19              THE COURT:  Let me ask a question here before we

20   leave this topic.

21              Mrs. Wilhite, you said that in November or

22   December of 2000 when a probation officer called and tipped

23   you off to Mr. Wilhite's involvement, it's only then that you

24   had some indication that he might have assisted in a fraud?

25   Is that what you said?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 83

1        THE WITNESS:  That is correct.

2        THE COURT:  And did you know at that time that he

3   had been sued in civil court in the US District Court the

4   year before, 1999?

5        THE WITNESS:  We -- I don't -- I don't remember

6   that.  I'm sorry.

7        THE COURT:  You didn't -- you didn't know that he

8   was named as a defendant along with Mr. Clement in a civil

9   lawsuit brought by this bank in 1999?

10       THE WITNESS:  No, I did not.

11       THE COURT:  Okay.  Go ahead.  And if I misstate

12   anything I want you to tell me also.

13       MR. MIKULECKY:  I have no knowledge of that case

14   at all, Your Honor, so I can't address that for you.

15   Q    (By Mr. Mikulecky)  Let's talk about the funding, the

16   source of monies that you talked about when you started

17   Advanced Floor Concepts.  First, before we get into the

18   details though, when you started DW Support or, more

19   appropriately, Southern Colorado Consulting, when you're

20   doing the inspection business, we didn't talk at all about

21   you needing money to start the company.  What's the

22   difference?

23   A    SCC is a service company, so all I need is a vehicle, a

24   camera and a computer, and I had those.

25   Q    Compare that with Advanced Floor Concepts then, please.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 84

 1   A    Advanced Floor Concepts required a truck, tools,

 2   materials.  You know, I had to buy the steel, fasteners.

 3   Q    So, it had cash needs just to start operating?

 4   A    Yes, sir.

 5   Q    Okay.  Take a look, please, at Exhibit H.  Are you

 6   there?

 7   A    Uh-huh.

 8   Q    What is this?

 9   A    This is a loan from mom to Advanced Floor Concepts.

10   Q    Okay.  So, it's a -- an account QuickReport from

11   QuickBooks, I assume, right?

12   A    Yes, sir.

13   Q    Okay.  That's what you used for Advanced Floor Concepts

14   and DW Support?

15   A    Yes, sir.

16   Q    Okay.  And this shows -- it says:  Loan, Elsie Lillian.

17   That's your mother?

18   A    Yes, sir.

19   Q    Okay.  And at least as of December 31, 1999 what does

20   it show as the balance?

21   A    $3,000.

22   Q    Is that how much she had lent you or is that only at

23   that time what was left?

24   A    No, that's what she had lent me.

25   Q    Okay.  Was that paid back?

United States of America vs.                                    Evidentiary Hearing - Day I
Michael David Wilhite                                                  September 15, 2015

1    A    Yes, it was.

2    Q    When?

3    A    September 2nd, 2000.

4    Q    Okay.  I'd ask you to flip back for a moment to

5    Exhibit G.  What is that document?

6    A    This is the settlement statement for Advanced Floor

7    Concepts' line of credit at the Castle Rock Bank.

8    Q    Is this the loan that you took out?

9    A    Yes, sir.

10   Q    And it shows in the middle top of the page the

11   agreement date November 7, 1997.  So, this is just when

12   you're getting AFC started, right?

13   A    That is correct.

14   Q    Okay.  For a $25,000 line of credit, correct?

15   A    Yes, sir.

16   Q    Okay.  In the lower left corner where the signature

17   line appears, who is identified as the member of AFC?

18   A    Myself.

19   Q    Go to page 2 of Exhibit G.  What's that?

20   A    This is a revolving draw note.

21   Q    So this is just the promissory note for that line of

22   credit?

23   A    Correct.

24   Q    Same one?

25   A    Yes, sir.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 86

1  Q    Okay.  Lower left corner again, you're identified as

2  the member of AFC, LLC, correct?

3  A    Yes, I am.

4  Q    Okay.  Next one, page 3.  What is that document?

5  A    This was a guarantee.  I had to sign on as not only

6  owner or member, but also guarantor of this loan.

7  Q    So you had to provide a personal guarantee as well?

8  A    Yes, sir.

9  Q    And in the lower left-hand corner, just a signature

10  block for you personally, right?

11  A    Yes, sir.

12  Q    Okay.  Page 4, just the terms of the guarantor.  Go

13  page 5, please.  What's that?

14  A    This is a security agreement showing that I'm pledging

15  DW Support Services also as additional collateral.

16  Q    So you also had to pledge the assets of DW Support?

17  A    Yes, sir.

18  Q    Now, in November, at this point you've been operating

19  DW Support as an operating company almost -- almost four

20  months; is that right?

21  A    Yes, sir.

22  Q    And if you flip past all of the legal terms, get to the

23  signature page in the upper right-hand corner it says page 8.

24  Do you see that?

25  A    Yes, sir.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 87

1    Q    Okay.  And who is signing this document?

2    A    I am.

3    Q    In what capacity?

4    A    Owner.

5    Q    Of?

6    A    DW Support Services.

7    Q    Good.  Thank you.  Page 9.  What is that document?

8    A    This is pledging my personal property as additional

9    collateral.

10    Q    Well, it's actually pledging the property of DW Support

11    again, correct?

12    A    Oh, I'm sorry this is insurance on the personal

13    property.

14    Q    Okay.  So you pledged the assets of DW Support.  Now

15    you're also promising to keep it insured?

16    A    Yes, sir.

17    Q    And, again, in the lower left corner you're signing it

18    as the owner of DW Support?

19    A    Yes, sir.

20    Q    And on the next page, page 10, that's the item that is

21    being pledged as collateral that you're going to keep

22    insured, right?

23    A    Yes, sir.

24    Q    And that was a Jeep?

25    A    Yes, sir.

United States of America vs.                          Evidentiary Hearing - Day I
Michael David Wilhite                                        September 15, 2015

1  Q    That was owned by DW Support?

2  A    Uh-huh.

3  Q    Okay.  Page 11.  What is that?

4  A    This is more collateral.

5  Q    Okay.  Now, it says the borrower is Advanced Floor

6  Concepts, right?

7  A    Yes, sir.

8  Q    And it says the owner, Michael Wilhite and Dee Wilhite,

9  right?

10 A    Yes, sir.

11 Q    So, is that saying that you and Mr. Wilhite are the

12 owner of Advanced Floor Concepts?

13 A    No.  This was -- we were pledging our pickup truck that

14 we had -- that was in both of our names.

15 Q    So, just like we saw with DW Support, you're simply the

16 owner of the vehicle?

17 A    Correct.

18 Q    Okay.  So if you go then -- continue pages to page 14

19 of Exhibit G, signature pages are you and Mr. Wilhite

20 individually?

21 A    Correct.

22 Q    Okay.  And if you go to page 15, that's the vehicle

23 that you both own that also is collateral?

24 A    Yes, sir.

25 Q    Okay.  Go to page 17.  This, again, is an agreement

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 89

1    where you've got to now provide insurance on that vehicle as

2    well, correct?

3    A    Correct.

4    Q    Okay.  So, to get this loan from Castle Rock Bank you

5    had to provide the security of DW Support, security of all

6    its assets, security of the vehicle that you and Mr. Wilhite

7    had owned, and your personal credit, and guarantee it,

8    correct?

9    A    Yes, sir.

10   Q    Did you draw on that loan from time to time then to

11   fund AFC?

12   A    Yes, sir.

13   Q    Take a look, please, at Exhibit I.  What is this

14   document?

15   A    This is a loan from me to Advanced Floor Concepts.

16   Q    Just a ledger of those loans --

17   A    Yes, sir.

18   Q    -- right?  In the left-hand column it says:  Loan, Dee

19   Wilhite.  Obviously you, correct?

20   A    Yes, sir.

21   Q    And then this tracks the history of the loan as you've

22   made to Advanced Floor Concepts over the years.

23   A    Yes, sir.

24   Q    So, the first one, December 31, 1997, the amount of

25   almost $1400, correct?

United States of America vs.                    Evidentiary Hearing - Day I
Michael David Wilhite                                September 15, 2015

Page 90

```
 1   A    Yes, sir.

 2   Q    And then we see in the next to the last column, the one

 3   entitled split, do you see that?  The one entitled split, the

 4   next to the last column there?  Amount is the last column,

 5   right?  The heading at the top?  Do you see the heading that

 6   says amount, the far right-hand side?

 7   A    Yeah.

 8   Q    Okay.  The one next to it says split, correct?

 9            THE COURT:  Are you on the first page of the

10   exhibit?

11            THE WITNESS:  I am.

12            THE COURT:  Okay.

13            MR. MIKULECKY:  May I approach, Your Honor?

14            THE COURT:  Yes, you may.

15   Q    (By Mr. Mikulecky)  It's this one here.

16   A    Oh, I'm sorry.

17   Q    That's all right.  Do you see where I am, where it says

18   split?

19   A    Uh-huh.

20   Q    And various places it says Castle Rock B, for Castle

21   Rock Bank, correct?

22   A    Correct.

23   Q    Is that where you drew on that line of credit to loan

24   money to AFC?

25   A    Yes, sir.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 91

1  Q    Okay.  And we get down to the bottom of the page, and

2  how much are you still owed by AFC?

3  A    Zero.

4  Q    So, you were -- the money you lent was paid back?

5  A    Yes, sir.

6  Q    And it looks like with various transactions you

7  borrowed from other banks to fund AFC?

8  A    Correct.

9  Q    Have those banks also been your personal assets and

10 credit that's been used?

11 A    As a guarantor.

12 Q    Okay.  Now, let's take a look at DW Support.  You said

13 that DW Support had loaned some money as well, correct?

14 A    Correct.

15 Q    Turn, please, to Exhibit J.  What is that?

16 A    This is a loan to Advanced Floor Concepts from DW

17 Support Services.

18 Q    And this is from the viewpoint of Advanced Floor

19 Concepts, correct?

20 A    Correct.

21 Q    Okay.  And this just shows that as of December 31, '99,

22 the balance was $285.01, correct?

23 A    Correct.

24 Q    And it shows various loans and repayments up through

25 2002, correct?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 92

 1   A    Correct.

 2   Q    Okay.  Go to the next page where the balance appears.

 3            MR. MIKULECKY:  And my apologies, Your Honor, but

 4   when we shrunk it to fit on one page it got very small.

 5   Q    (By Mr. Mikulecky)  What's the balance that Advanced

 6   Floor Concepts owes to DW Support?

 7   A    Zero.

 8   Q    Turn to Exhibit K, please.  Now, this is the loans from

 9   the viewpoint of DW Support, correct?

10   A    Correct.

11   Q    All right.  So, this was the loans that DW made to AFC.

12   So, we just have the mirror image now of the transaction that

13   we just looked at, but you kept track of the loans and the

14   records of both companies, right?

15   A    Correct.

16   Q    Okay.  So, what does it show as the very first loan to

17   AFC from DW Support?

18   A    $2500.

19   Q    And what was the date of that?

20   A    1/8 of '97.

21   Q    I'm sorry, is that 1/8 or November 8?

22   A    November 8.

23   Q    Okay.  And then that second loan?

24   A    November 13th, 1997.

25   Q    Okay.  And that was another thousand dollars?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 93

```
 1   A    Correct.

 2   Q    And then it shows the $2,000 was paid --

 3   A    Yes.

 4   Q    -- on April 5th, '98, and then more money borrowed in

 5   1998 as well, correct?

 6   A    Correct.

 7   Q    Okay.  So as of this snapshot, and the heading at the

 8   top, or the sideways top, so this shows as of December 1st,

 9   1998.  How much did DW Support still owe Advanced Floor

10   Concepts?  And the balance is on the next page again.

11   A    No.  Okay.  This is --

12   Q    That was it.

13   A    This is a loan to AFC.

14   Q    Okay.  So how much did AFC still owe DW --

15   A    $2500.

16   Q    Okay.  And that's reflected on the second page?

17   A    Correct.

18   Q    Okay.  Let's take a look at where that money, that

19   2500-dollar first loan and that 1000-dollar first loan came

20   from.  Turn, please, to Exhibit L.  What is this?

21   A    This is the check register for DW Support Services from

22   May of 1997 through December 31st, 1997.

23   Q    Okay.  And we're not going to go through all these

24   transactions.  But just to get us understanding how this was

25   set up, the first entry, May 1st, 1997, right?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 94

```
 1   A    Yes, sir.

 2   Q    And we've actually got two of them on that date.  Those

 3   show deposits from Steel Dimensions.  That was a company for

 4   which Mr. Wilhite was working at the time?

 5   A    Yes, sir.

 6   Q    Okay.  And that was also -- wasn't May 1st, '97 the day

 7   you set up DW Support?

 8   A    Correct.

 9   Q    Okay.  So that's why you had set it up, to get those

10   paychecks?

11   A    Yes, sir.

12   Q    Okay.  So, it shows then money being deposited to DW

13   from Steel Dimension for -- it says reimbursed expenses,

14   self-explanatory.  Under the account where it says DW Support

15   Services, what is that for?  See that in the middle there?

16   Third -- fourth column from the left?

17   A    On 7/1?

18   Q    Well, let's go down to the very first entry.  5/1/97,

19   it says the payee is Steel Dimensions.  It says the account

20   is DW Support Services.

21   A    Yes, sir.

22   Q    What is that for?

23   A    That was Michael's paycheck.

24   Q    Okay.  So whenever it says paycheck under account, it

25   says DW Support Services?
```

United States of America vs.                                   Evidentiary Hearing - Day I
Michael David Wilhite                                                    September 15, 2015

1    A    Yes, sir.

2    Q    Okay.  And DW Support was also receiving expenses,

3    reimbursements that it had advanced, and you -- from Steel

4    Dimensions, correct?

5    A    Yes, sir.

6    Q    And you were keeping track of those entries separately?

7    A    Yes, sir.

8    Q    Okay.  Now, if you go down to the -- in the number

9    column, the second one from the left, the first entry has the

10   number 1,001.  Do you see that?

11   A    Yes, sir.

12   Q    And that shows that on June 5th, 1997, you were the

13   payee.  And it says payroll expense, $4000.  What is that?

14   A    That was a check that was drawn to pay household

15   expenses from Michael's check.

16   Q    So, the money went into DW Support, and you took it out

17   to put it in your personal account to pay living expenses?

18   A    Yes, sir.

19   Q    So this is the time that Mr. Wilhite is now

20   contributing to the family income and family support?

21   A    Yes, sir.

22   Q    Okay.  And we won't have to go through all of these,

23   but that pattern continues.  For example, you can see in

24   July 1st, another deposit from Steel Dimensions for 3,750.

25   That, again, is Mr. Wilhite's paycheck?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 96

```
 1   A    Yes, sir.
 2   Q    Okay.  We get that in August.  And you're also
 3   continuing -- not every month, but almost every month -- to
 4   take money out to put it in the family account for you to pay
 5   family expenses, right?
 6   A    Yes, sir.
 7   Q    Okay.  Let's go all the way up to the time that that --
 8            THE COURT:  Let me ask a question.
 9            MR. MIKULECKY:  Certainly.
10            THE COURT:  Mr. Wilhite was an employee of this
11   company; is that correct?
12            THE WITNESS:  Mr. Wilhite was an employee of Steel
13   Dimensions.
14            THE COURT:  DW Support Services.
15            THE WITNESS:  No, sir.
16            THE COURT:  Was not.
17            THE WITNESS:  No.
18            THE COURT:  Okay.  What would you say at this time
19   his connection was with -- what was he legally, in your mind,
20   relative to DW Support Services?
21            THE WITNESS:  He was my husband.
22            THE COURT:  Right.  But his paychecks were being
23   deposited into this company's account, right?
24            THE WITNESS:  Okay.  The vendor payment was being
25   put into DW --
```

United States of America vs.                          Evidentiary Hearing - Day I
Michael David Wilhite                                       September 15, 2015

 1              THE COURT:  Right.

 2              THE WITNESS:  -- Support.

 3              THE COURT:  So, relative to who he was working for

 4   he was a vendor, that's why you set this company up?

 5              THE WITNESS:  Correct.

 6              THE COURT:  Because they wanted to treat him as a

 7   vendor?

 8              THE WITNESS:  Correct.

 9              THE COURT:  All right.  So, they were making him

10   vendor payments?

11              THE WITNESS:  Correct.

12              THE COURT:  But they were making those payments

13   directly from -- from Steel Dimensions to --

14              THE WITNESS:  DW --

15              THE COURT:  -- DW Support Services?

16              THE WITNESS:  Yes, sir.

17              THE COURT:  Okay.  That was his paycheck,

18   essentially?  What we would call a paycheck?

19              THE WITNESS:  Yes, sir.

20              THE COURT:  All right.  It was going into this

21   company?

22              THE WITNESS:  Yes.

23              THE COURT:  All right.  And that was the -- that

24   was the resources he was bringing into the family,

25   essentially.

United States of America vs.                    Evidentiary Hearing - Day I
Michael David Wilhite                                    September 15, 2015

Page 98

```
 1              THE WITNESS:  Correct.

 2              THE COURT:  I don't see any checks written to him.

 3              THE WITNESS:  He doesn't have a checking account.

 4              THE COURT:  Well, you don't need a checking

 5   account to have a check written to you.  You could walk to

 6   the bank and cash it.  So -- but I don't -- can you explain

 7   why -- if that's his money going into this company, why he's

 8   not ever paid anything out of his own paycheck.

 9              THE WITNESS:  He had walking-around money.  He

10   had -- you know, things were very, very tight.

11              THE COURT:  Where did you get the walking-around

12   money?

13              THE WITNESS:  I would give it to him.

14              THE COURT:  Just cash?

15              THE WITNESS:  Yeah.

16              THE COURT:  Okay.

17              THE WITNESS:  I mean, I paid taxes on all of this.

18   And as long as the taxes were being paid and it was -- it was

19   running through the company.

20   Q   (By Mr. Mikulecky)  Mrs. Wilhite, at this time and

21   beyond, who's been responsible in your family for handling

22   the finances?

23   A   Me.

24   Q   At this time period, and we're into August of 1997, did

25   Mr. Wilhite have a checking account?
```

United States of America vs.                          Evidentiary Hearing - Day I
Michael David Wilhite                                            September 15, 2015

Page 99

 1   A    Not -- I don't believe he did.

 2   Q    So, you were paying all the household expenses out of

 3   your checking account?

 4   A    That is correct.

 5   Q    So, you could have made the check payable to

 6   Mr. Wilhite, had him cash it, and then deposit that money

 7   into your account to pay the bills, right?

 8               MS. FROEHLKE:  Objection.  Leading.

 9               THE COURT:  I'll allow it.  I asked the question

10   that set the necessary (unintelligible).  So, go ahead.

11   A    Yeah.

12   Q    (By Mr. Mikulecky)  This way was simpler, I presume?

13   A    Yeah.

14   Q    Okay.  Let's go to page 3 of Exhibit L.  And we're

15   going to go to the fifth entry down that's dated October 31,

16   1997, with payee Steel Dimensions, account DW Support.

17   Deposit, you said that -- you testified that was

18   Mr. Wilhite's paycheck, correct?

19   A    Correct.

20   Q    Okay.  And then we have some additional deposits for

21   reimbursed expenses from Steel Dimensions again, right?

22   A    Yes, sir.

23   Q    All right.  And a payment made payable to you to put

24   into the household account for expenses on August -- I'm

25   sorry, October 31 for $2900, right?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 100

 1   A    Yes, sir.

 2   Q    Okay.  And then you pay a few other expenses.  What are

 3   those three expenses there?  First deposit, one to Xcel or US

 4   West.  They're just other expenses that were paid out of the

 5   account?

 6   A    Yeah.  This is for DW Support for the phone and cell

 7   phone.

 8   Q    Okay.  And then we get to the November 8, 1997 entry,

 9   Check No. 1072, payable to Advanced Floor Concepts.  Do you

10   see that?

11   A    Uh-huh.

12   Q    And that was for $2500?

13   A    Yes, sir.

14   Q    And that's the same, if we were to flip back, that we

15   saw for that first loan for $2500 on the books of both

16   companies, right?

17   A    Yes, sir.

18   Q    Now, at the time before that check was written, the

19   balance in the account was only $1288.78, right?

20   A    Yes, sir.

21   Q    All right.  And after this check was written, DW

22   Support had a negative account balance, right?

23   A    Yes, sir.

24   Q    And, in fact, it continued to have a negative account

25   balance until December 30th, 1997, right?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 101

 1  A    That is correct.

 2  Q    Do you remember how you were able on the DW Support

 3  Services checking account to write a check, and how to have

 4  it paid?

 5  A    I had overdraft coverage on my checking account.

 6  Q    On your loan in your credit?

 7  A    Yes, sir.

 8  Q    Okay.  And we also then see that second loan to AFC a

 9  few lines down for November 13th, 1997.  Do you see that?

10  A    Yes, sir.

11  Q    And that's also -- that's that second 1,000-dollar

12  check that we saw, correct?

13  A    Yes, sir.

14  Q    And that was also -- the overdraft protection paid

15  that?

16  A    Yes, sir.

17  Q    We get to the end of the year and we have a whole bunch

18  of deposits.  What's that?

19  A    Those were checks that came in from Southern Colorado

20  Construction Consulting.

21  Q    So, for the consulting work, inspection work that you

22  had done?

23  A    Yes, sir.

24  Q    So, no longer any deposits from Mr. Wilhite?

25  A    No, sir.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 102

1    Q    In fact, the last one was -- from Steel Dimensions was

2    October 31, '97; is that right?

3    A    Yes, sir.

4    Q    Okay.  So, after that money was spent, the rest of the

5    money DW spent, if I understand correctly, was from your line

6    of credit, and then paid back with the work that you did

7    through inspections?

8    A    Correct.

9    Q    Okay.

10         THE COURT:  Mrs. Wilhite, having a personal

11   experience with overdraft checks, I know that the bank moves

12   funds into an account to cover the overdraft, or else charges

13   you an overdraft fee or both even if you have overdraft

14   coverage.  Did that not occur with your bank?  Because I

15   don't see any -- in none of this accounting do I see the

16   movement of funds by the bank --

17         THE WITNESS:  Okay.

18         THE COURT:  -- into the account.

19         THE WITNESS:  I had, at that point in time, a

20   unique way of doing this.  I wanted to know where I was and

21   how much money that I needed.  I just -- on a daily basis.

22         THE COURT:  Okay.  So, this is not an actual check

23   ledger.

24         THE WITNESS:  This is the check ledger.  But, as I

25   say, instead of going, okay, I'm going to have them move

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 103

 1  $5,000 over, I wanted to know where I was.  I wanted to know,

 2  you know, am I going to be able to do both of these companies

 3  and --

 4          THE COURT:  But is it your testimony the banks

 5  simply allowed you to maintain a negative balance for months

 6  at a time?

 7          THE WITNESS:  No.  No.  No.  No.  This was -- this

 8  was one month, because the checks started coming in.  I did

 9  the -- it's almost exactly a month.

10          THE COURT:  About a month.  So, the bank allowed

11  you to maintain a negative balance that whole time?

12          THE WITNESS:  They just did -- um, if I were to

13  check right today my account was showing zero and I wrote a

14  check for $10,000, they would use the line of credit to put

15  that $10,000 in to cover that check.

16          THE COURT:  Right.  And that would require

17  interest.  They would charge you interest on that line of

18  credit.

19          THE WITNESS:  Correct.

20          THE COURT:  And so there should be a line of

21  credit entry during this time period for money moved by the

22  bank over to cover the deficiency?

23          THE WITNESS:  And that probably was put in, you

24  know, the first of the year.  I don't know.

25          THE COURT:  Okay.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 104

```
 1              THE WITNESS:  I only pulled through December 30th.

 2              THE COURT:  Thank you.

 3              MR. MIKULECKY:  And I'll try to clarify, Your

 4   Honor.

 5   Q    (By Mr. Mikulecky)  This is not a statement from Castle

 6   Rock Bank, correct?

 7   A    No, sir.

 8   Q    This is the account that -- the book records that you

 9   set up on QuickBooks, correct?

10   A    Yes.

11   Q    So, the bank records would show those transfers in off

12   of your line of credit and the fees for that, wouldn't it?

13   A    Yes.

14   Q    Okay.  But you set it up this way on purpose so that

15   you would know what the debt was, because the bank account

16   that showed a 10,000-dollar balance wouldn't show how much

17   you owed?

18   A    That's correct.

19   Q    Okay.  So there were advances made by the bank as

20   necessary from your line of credit?

21   A    Yes, sir.

22   Q    It's just not reflected there?

23   A    Yes, sir.

24   Q    Okay.  Now, it looks like you're keeping careful track

25   then of those expenses.  Please take a look at Exhibit M, as
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 105

 1    in Mary.

 2            MR. MIKULECKY:  And Your Honor, for planning, I'll

 3    be at a good breaking point in a few moments.

 4            THE COURT:  Any time.

 5    Q    (By Mr. Mikulecky)  What is Exhibit M?

 6    A    It's a balance sheet for DW Support.

 7    Q    As of what date?

 8    A    December 1st, 1998.

 9    Q    So, this is after the loans have been made -- about a

10    year after the loans have been made, right?

11    A    Yes, sir.

12    Q    Okay.  And under the category -- about the middle of

13    the page -- other assets, about four lines up from total

14    assets.

15    A    Yes, sir.

16    Q    What does that reflect?

17    A    A loan to AFC for $2500.

18    Q    And if we were to flip back to Exhibit K, which has

19    this same time period, it shows that exact same balance,

20    right?

21    A    Yes, sir.

22    Q    Exhibit N.  What is that?

23    A    Loans to AFC from DW Support.

24    Q    So this is now the longer version, because this shows

25    as of December 1st, 2003, right?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 106

1   A     Yes, sir.

2   Q     So, this shows all the history of the loans to AFC from

3   DW Support over that time period?

4   A     Yes, sir.

5   Q     Okay.  And it starts out again with that same

6   2500-dollar loan, that same 1,000-dollar loan that we've

7   already seen, right?

8   A     Yes, sir.

9   Q     It shows that same 1,000 -- or that same 2000-dollar

10  repayment?

11  A     Yes, sir.

12  Q     And then shows other borrowings and other repayments

13  over the years?

14  A     Yes, sir.

15  Q     Okay.  Turn to the second page, please, of that

16  exhibit.  That's the balance column which we couldn't, again,

17  squeeze on without making it illegible.  So, when does it

18  show that -- how many entries down before that balance got

19  paid off?

20  A     That was paid off a couple of times, three times.

21  Q     And as of 2003, was it paid in full?

22  A     Yes, sir.

23  Q     Okay.  So, it looks like -- and I apologize again for

24  you having to flip pages, but it looks like within a couple

25  of years that initial loan was paid off by AFC, correct?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 107

 1    A    Yes, sir.

 2    Q    All right.  Borrowed some money and that was paid off

 3    again in 2000?

 4    A    Yes, sir.

 5    Q    Borrowed some money, paid off again in 2003?

 6    A    Yes, sir.

 7    Q    So, whatever money DW Support lent to AFC has been

 8    repaid each time?

 9    A    Yes, sir.

10    Q    Same with the loan from your mother and Castle Rock

11    Bank?

12    A    Yes, sir.

13         MR. MIKULECKY:  Your Honor, I'm at a good breaking

14    point here before I --

15         THE COURT:  Yeah.

16         MR. MIKULECKY:  -- go to a new section.  If you

17    want to stop here.

18         THE COURT:  Let me follow-up with just a couple

19    questions.

20         So, if there was ever a loan between the two

21    companies it always went from DW Support Services to AFC; is

22    that right?

23         THE WITNESS:  At the beginning, yes.

24         THE COURT:  Okay.  And is there a reason it -- was

25    DW Support Services just providing more steady cash flow and

United States of America vs.                                    **Evidentiary Hearing - Day I**
Michael David Wilhite                                                    **September 15, 2015**

Page 108

 1   occasionally Advanced Flooring wasn't?  What's the reason

 2   that would only flow one way?

 3             THE WITNESS:  Well, first of all, DW Support

 4   didn't really have any outlay other than to me.  There was --

 5   I had no employees at that point in time.  And I wanted to

 6   use the money from DW rather than drawing on that line of

 7   credit until such time as it was really necessary.

 8             THE COURT:  Okay.

 9             THE WITNESS:  It was just to cover materials and

10   to pay Roger.

11             THE COURT:  Very good.  Thank you.  All right.

12   What's your preference as far as coming back?

13             MR. MIKULECKY:  Your Honor, would 1 o'clock work

14   for the Court?

15             THE COURT:  Whatever works for you

16   (unintelligible).  Whatever is best for you.

17             MR. MIKULECKY:  That will work.

18             THE COURT:  Okay.  We'll be back at 1:00.  We'll

19   be in recess.

20             THE COURTROOM DEPUTY:  All rise.  Court is in

21   recess.

22             (A break was taken from 12:04 p.m. to 1:07 p.m.)

23             THE COURT:  Please be seated.  Back on the record

24   in 00-cr-504.  Continuing with the hearing.  And Mrs. Wilhite

25   can come back up to the stand.  Mrs. Wilhite, you're welcome

United States of America vs.                    Evidentiary Hearing - Day I
Michael David Wilhite                                    September 15, 2015

Page 109

1  to stand, move around, whatever you want.  Okay?

2          THE WITNESS:  Thank you.  That will help.

3          THE COURT:  Just remember you're still under oath.

4  All right?

5          THE WITNESS:  I'm sorry?

6          THE COURT:  You're still under oath.

7          THE WITNESS:  Yes, sir.

8  Q   (By Mr. Mikulecky)  All right.  Mrs. Wilhite, before we

9  broke for lunch we were talking about the funding that you

10 obtained to be able to start AFC.  Let's talk now about the

11 documents.  So, take a look, please, at Exhibit C.

12         THE COURT:  By the way, Mrs. Wilhite, what did all

13 the funding go to?  What did you do with the money that you

14 needed at the start of the company?

15         THE WITNESS:  I bought materials.

16         THE COURT:  Actual materials you were going to use

17 to build the floors?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  What about installation, machinery,

20 anything like that?

21         THE WITNESS:  I bought a Hilti gun, and -- which

22 is a screw gun.  And it has a large head on it for screwing

23 the big anchor bolts into the walls, supporting the saddles.

24         THE COURT:  Do these arrive at the job site

25 preformed, or do you have to build them on the job site?

Page 110

1              THE WITNESS:  No, we build them on the job --

2      well, the saddles are built by our steel supplier to our

3      specifications.  And the I-beams come out based upon the

4      dimensions that were given to them.

5              THE COURT:  And can people just lift the I-beams

6      themselves, or do you need some kind of a crane or a lift?

7              THE WITNESS:  It depends on the size of the floor.

8      It depends on the size of the beams.

9              THE COURT:  Okay.  Are some too heavy to lift?

10             THE WITNESS:  Yes, sir.  And that's when I

11     utilized the -- a crane to come out and lift them into the

12     hole.

13             THE COURT:  Okay.  You hired that crane as needed?

14             THE WITNESS:  Yes, sir.

15             THE COURT:  Okay.  Thank you.

16     Q    (By Mr. Mikulecky)  Exhibit C.  What is that?

17     A    It's the articles of organization for Advanced Floor

18     Concepts.

19     Q    Did you prepare this?

20     A    Yes, I did.

21     Q    And the one right before it is the articles of

22     organization for DW Support.  And you already testified you

23     prepared that one too?

24     A    Yes, sir.

25     Q    And just doing a flip comparison, they look the same?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 111

 1   A    They are.

 2   Q    And you're, again, the registered agent, the initial

 3   manager, and the organizer for all of them -- both, right?

 4   A    Yes, sir.

 5   Q    Okay.  And you filed that with the secretary of state?

 6   A    Yes, I did.

 7   Q    You signed it October 24, 1997, correct?

 8   A    Yes, sir.

 9   Q    Okay.  You did other documents to set up Advanced Floor

10   Concepts, correct?

11   A    I'm sorry?

12   Q    You used other documents to organize Advanced Floor

13   Concepts, correct?

14   A    Yes, sir.

15   Q    Take a look at Exhibit D, please.  What is that?

16   A    It's the operating agreement.

17   Q    Okay.  For Advanced Floor Concepts?

18   A    Yes, sir.

19   Q    Okay.  Did you prepare this document as well?

20   A    Yes, sir.

21   Q    Okay.  Now, under Roman Numeral II, Management, it says

22   the company will be member managed unless provided in its

23   formation documents.  Do you see that?

24   A    Yes, sir.

25   Q    Flip back then, if you would, please, to Exhibit C, the

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 112

```
 1    formation documents.  That says that management is vested in

 2    its member.  Correct?

 3    A    Yes, sir.

 4    Q    So, it's -- so the -- on that one -- I'm sorry, and its

 5    manager.  So it's a manager-run organization, Advanced Floor

 6    Concepts?

 7    A    Yes, sir.

 8    Q    Okay.  Also, in Exhibit D, if you go through the

 9    document to page 5 in the upper right-hand corner, section 7

10    paragraph 1, Officers.  Do you see that?

11    A    Yes, sir.

12    Q    Okay.  And that provides that the company's management

13    can appoint officers -- president, vice president and so on

14    -- who have responsibilities according to their positions,

15    and they don't have to be members or managers, right?

16    A    That is correct.

17    Q    All right.  Next page, page 6, Necessary Acts.  What

18    does that provide?  Does that say that the members, managers,

19    and officers are authorized to do what's necessary to carry

20    out the business of Advanced Floor Concepts?

21    A    Yes, sir.

22    Q    Okay.  And then you signed as the member and the

23    manager, right?

24    A    Yes, sir.

25    Q    Okay.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 113

```
 1              THE COURT:  Give her a little more chance to

 2   answer --

 3              MR. MIKULECKY:  Sorry.

 4              THE COURT:  -- before you suggest the answer.

 5   Okay?

 6              MR. MIKULECKY:  Okay.

 7   Q    (By Mr. Mikulecky)  Next page, page 7.  What is that?

 8   A    It's a safety protocol for the company.

 9   Q    Who prepared this?

10   A    I did.

11   Q    In what capacity did you sign it?

12   A    President, slash, owner.

13   Q    Were you the president at this time?

14   A    I had the right to appoint presidents and, yes, I was.

15   Q    Okay.  Were you the owner?

16   A    Yes, I was.

17   Q    Okay.  Exhibit E.  What is that?

18   A    This is a restated and amended operating agreement.

19   Q    Now, the first one we just saw that you signed was in

20   1997, correct?

21   A    Yes, sir.

22   Q    So, why are you doing an amended one and restated in

23   2013?

24   A    When I did my financial planning for my will, the

25   attorney who prepared those documents suggested that I
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 114

 1   restate and amend the operating agreement.

 2   Q    Okay.  Now we don't want to get into any advice of your

 3   attorney, but it was done pursuant to your attorney's advice;

 4   is that correct?

 5   A    Yes, sir.

 6   Q    Okay.  Take a look, please, at page 4 of Exhibit E.

 7           THE COURT:  With regard to Exhibit E, is it

 8   stipulated that this was executed at some point?

 9           MS. FROEHLKE:  No, Your Honor.

10           THE COURT:  Okay.  So, let's be clear.  What we're

11   looking at is an unexecuted copy.

12           THE WITNESS:  Yes, this is not an executed copy.

13   The copy that's with my will is executed.

14           THE COURT:  Okay.

15   Q    (By Mr. Mikulecky)  So, you did sign this exhibit?

16   A    Yes.

17   Q    The amended and restated operating agreement?

18   A    Yes, sir.

19   Q    Okay.

20           THE COURT:  Exactly as it is?

21           THE WITNESS:  Yes, sir.

22   Q    (By Mr. Mikulecky)  And the signature page on page --

23   well, we'll get to that.  Keep going through page 4.  Article

24   VII, Management of Company.  What does that provide regarding

25   the management of the company?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 115

1   A    That the members have the exclusive right to manage the

2   company's business.

3   Q    And is that you?

4   A    That is me.

5   Q    Are there any other members?

6   A    No, sir.

7   Q    Have there ever been?

8   A    No, sir.

9   Q    Go to about the middle of the paragraph.  There are --

10  first there's some parenthetical, in the middle of it, Roman

11  Numerals -- or double i, and triple i, and single i.  After

12  that begins the sentence, No contract obligation.  Do you see

13  that?  Right about dead middle of that paragraph 7.01?

14          MR. MIKULECKY:  Approach, Your Honor, to --

15  A    Yes, sir.  I see that.

16  Q    (By Mr. Mikulecky)  Okay.  Can you read that sentence,

17  please.

18  A    No contract obligation or liability of any kind or type

19  can be entered into on behalf of the company by any member

20  other than the member or officer of the company acting with

21  the consent of a majority interest.

22  Q    Well, it says majority interest.  This time you're,

23  again, still the only member, right?

24  A    Yes, sir.

25  Q    So, obviously, you're the majority interest as well?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 116

1   A    Yes, sir.

2   Q    Okay.  So, what does that provision allow you to do in

3   terms of delegating responsibilities?

4   A    I have the authority to make any decisions that I

5   choose to make for the company.

6   Q    Does that also allow you to give that power to others?

7   A    Yes.

8   Q    Okay.  Turn, please, to -- let's go to that last page

9   then, the signature line, page 10.  The copy that we have is

10  not signed, correct?

11  A    Correct.

12  Q    And your testimony is you do have an original that you

13  signed?

14  A    Yes, sir.

15  Q    And it is identical to this?

16  A    Yes, sir.

17  Q    This also identifies you as the sole member, unit

18  holder?

19  A    Yes, sir.

20  Q    Okay.  Turn to Exhibit F, please.  In addition to these

21  corporate documents, you had to do other documents with the

22  government as well, correct?

23  A    Yes, sir.

24  Q    Okay.  First page of Exhibit F.  What is that?

25  A    That was my unemployment insurance tax account number.

United States of America vs.                                    Evidentiary Hearing - Day I
Michael David Wilhite                                                  September 15, 2015

Page 117

 1    Q     That's for Advanced Floor Concepts?

 2    A     Yes, sir.

 3    Q     Did you apply for this?

 4    A     Yes, sir.

 5    Q     Second page of Exhibit F.  What is that?

 6    A     It's wage withholding license.

 7    Q     What's the date in the upper right-hand corner?

 8    A     November 19th, 1997.

 9    Q     So, the same time you were forming AFC?

10    A     Yes, sir.

11    Q     Did you apply for this?

12    A     Yes, sir.

13    Q     What does this allow you to do?

14    A     Withhold taxes from my employees.

15    Q     Next page, page 3.  What is that?

16    A     Colorado business registration.

17    Q     For what company?

18    A     For Advanced Floor Concepts.

19    Q     And is this to register, then, the business with the

20    state?

21    A     Yes, sir.

22    Q     In lower left-hand corner, who signed it?

23    A     I did.

24    Q     Okay.  And the right-hand side, can you make out the

25    title and the date for copy?

United States of America vs.                                  Evidentiary Hearing - Day I
Michael David Wilhite                                              September 15, 2015

Page 118

 1   A    Manager/member, 11/17/97.

 2   Q    **Next page, page 4 of Exhibit F.  What is that?**

 3   A    That was my application to the IRS for an employer tax

 4   identification number.

 5   Q    **Being redundant again, it's for Advanced Floor**

 6   **Concepts?**

 7   A    Yes, sir.

 8   Q    **Who signed it?**

 9   A    I did.

10   Q    **Capacity?**

11   A    Manager/member.

12   Q    **The next page, page 5.  What is that?**

13   A    This is the reply from the Internal Revenue giving me

14   my tax ID number.

15   Q    **Sent to you, right?**

16   A    Yes, sir.

17   Q    **And at the time of the formation, November 28, 1997?**

18   A    Yes, sir.

19        THE COURT:  If you want to, after the hearing,

20   redact any Social Security numbers --

21        MR. MIKULECKY:  Thank you, Your Honor, for that.

22   We will.

23        THE COURT:  Okay.

24   Q    **(By Mr. Mikulecky)  Next page, 6, of Exhibit F.  What**

25   **is that?**

United States of America vs.                                    Evidentiary Hearing - Day I
Michael David Wilhite                                                   September 15, 2015

 1   A   This is a response from Steve Gooch at GKS Insurance

 2   that my liability insurance had been set up.

 3   Q   Okay.  And "my" meaning Advanced Floor Concepts?

 4   A   Yes, sir.

 5   Q   And they are responding to you, sending it back to you,

 6   right?

 7   A   Yes, sir.

 8   Q   Okay.  The next page, that's the binder for the

 9   insurance?

10   A   Yes, it is.

11   Q   What type of insurance did you obtain?

12   A   This is liability insurance.  And the vehicles are not

13   on this one, but this is commercial liability.

14   Q   For Advanced Floor Concepts?

15   A   Yes, sir.

16   Q   And then the final page of Exhibit F, what is that?

17   A   That's for the vehicles.

18   Q   What's workers --

19   A   Oh, I'm sorry.  That's for workman's comp.

20   Q   For Advanced Floor Concepts?

21   A   Yes, sir.

22   Q   Did you apply for and obtain this insurance for the

23   company?

24   A   Yes, I did.

25   Q   Did Mr. Wilhite have anything to do with any of this?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 120

 1   A    No, sir.

 2   Q    Okay.  All right.  So you filed the documents with the

 3   secretary of state to get incorporated.  You got the

 4   documents for the Federal Government to get your licenses and

 5   your withholding.  We talked about how you needed some money

 6   for supplies.  Did you also apply for credit to be able to

 7   get supplies?

 8   A    Yes, I did.

 9   Q    Take a look, please, at Exhibit O.  What is that?

10   A    This is a credit application with Barton Supply.

11   Q    For Advanced Floor Concepts?

12   A    Yes, sir.

13   Q    All right.  Who does it identify in the middle of the

14   page as the owner?

15   A    Myself.

16   Q    And as the authorized financial officer right below

17   that, who is that?

18   A    Myself.

19   Q    And who signed it?

20   A    I did.

21   Q    All right.  So you got then the credit that you needed.

22   Barton was supplying the steel beams for the company?

23   A    Yes, sir.

24   Q    Gone through all these steps to set up the company.

25   Before we -- as we move on from Advanced Floor, did you --

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 121

1    after you set up Advanced Floor Concepts in 1997, later set

2    up another company that you owned?

3    A    Yes, I did.

4    Q    What company was that?

5    A    Steel Deck Supply.

6    Q    And we won't go through all these details, but did you

7    do the same steps with Steel Deck Supply of setting that up?

8    A    Yes, sir.

9    Q    Were you the sole owner of it?

10   A    Yes, I was.

11   Q    What happened to it?

12   A    It failed.

13   Q    What did it do, and how did it fail?

14   A    It was a perfect example of waiting too long to get

15   into an industry.

16   Q    What do you mean?

17   A    I set it up, and there were too many people in the

18   game.

19   Q    What was it supposed to do?

20   A    We were furnishing metal deck and bar joist to

21   commercial projects.  And it was supposed to have been -- we

22   were supposed to have been the sole supplier for Wheeling

23   Corrugating, and Wheeling Corrugating ran into problems

24   themselves.  Ended up having to buy metal deck from other

25   suppliers, which then completely wiped out any profit that I

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 122

```
 1   had.  So, it lasted maybe four years, and I finally -- I
 2   pulled the plug and I said I'm done.
 3   Q    Did you lose money?
 4   A    Oh, yeah.
 5   Q    Is that money out of your pocket?
 6   A    Yes, sir.
 7   Q    Was Mr. Wilhite involved in that business with any of
 8   his finances at that point?
 9   A    No, sir.
10        THE COURT:  Ms. Wilhite, let's look at Exhibit O.
11   That was the Barton Supply.
12        THE WITNESS:  Yes, sir.
13        THE COURT:  At that time you'd been operating
14   about a year?  Is that --
15        THE WITNESS:  Yes, sir.
16        THE COURT:  -- approximately correct?  And had
17   you, in fact, brought in $1.2 million in sales during your
18   first year?
19        THE WITNESS:  I believe we did, yes.
20        THE COURT:  Okay.  And were you employing 10
21   people at the time?
22        THE WITNESS:  I -- I couldn't tell you right off
23   the top of my head.
24        THE COURT:  And the employees that you had, were
25   they just actual construction workers?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 123

1          THE WITNESS:  Yes.

2          THE COURT:  Did you have any other employees

3   besides construction workers?

4          THE WITNESS:  No, sir.

5          THE COURT:  All right.  Thank you.

6   Q    (By Mr. Mikulecky)  Now, for construction -- follow-up

7   on that a little bit.  You had people in the field doing

8   actual installation, correct?

9   A    Correct.

10  Q    And did you also have people in the office handling

11  other things besides the actual installation?

12  A    In 1998 I was doing all of the accounting myself, and

13  purchasing supplies.  Michael was doing some of the AutoCAD

14  drawings, if I remember correctly, and he was also out in the

15  field.

16  Q    Still on the subject of employees, you testified that

17  of course the business started slowly.  During the time that

18  Mr. Wilhite was an employee of Advanced Floor Concepts, how

19  was he paid?

20  A    He was paid with a paycheck.

21  Q    All right.  Did you also take home a paycheck from

22  Advanced Floor Concepts?

23  A    In the beginning?

24  Q    At any time?

25  A    Yes.  I did.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 124

1    Q    And how did your salary compare to Mr. Wilhite's?

2    A    It was more than Mr. Wilhite's.

3    Q    You made more?

4    A    Yes, sir.

5    Q    How did Mr. Wilhite's salary compare to others in the

6    company doing comparable work with comparable

7    responsibilities?

8    A    It was pretty much equal.

9    Q    So, Mr. Wilhite's was the same as the other employees

10   doing the same type of work?

11   A    Correct.

12   Q    Okay.

13        THE COURT:  Ms. Wilhite, you testified earlier

14   that you had at any one time 9 -- up to 9 employees at DW

15   Support Services.

16        THE WITNESS:  Yes, sir.

17        THE COURT:  Were any -- did anyone ever work for

18   both companies?

19        THE WITNESS:  Yes, my son.

20   Q    (By Mr. Mikulecky)  So, we talked about that.  In 1998,

21   as the Judge points out, you're growing, you've got 10

22   employees.  Initially you said in '98 you're in the office

23   doing a lot of the day-to-day work.  As the company grew, did

24   that change?

25   A    Yes, sir.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 125

1   Q     How so?

2   A     I eventually hired an accountant to relieve me of doing

3   payroll and all of that, but still oversaw all of the

4   accounting, reconciling the accounts.

5   Q     As the company grew, did you hire other employees to

6   delegate other of your responsibilities for operations?

7   A     Yes.  I hired an engineer and -- well, he wasn't -- he

8   was going for his PE, so he's an engineer, apparent, but --

9   and then my son learned AutoCAD, and so he was working in the

10  office.  And at that point in time I think it was -- mainly,

11  I was hiring more field workers than I was hiring anybody

12  else because I had Michael, Shea, and Torin doing the

13  engineering.  And Shea and Michael would go out in the field

14  as needed.

15  Q     You were delegating your responsibilities, though, for

16  operating the company, correct?

17  A     Yes, sir.

18  Q     Did that include authority to sign contracts on behalf

19  of AFC?

20  A     Yes, sir.

21  Q     Turn, please, to Exhibit Q.  What is the first page of

22  Exhibit Q?

23  A     This is a master contract or construction agreement

24  between Toll Brothers and Advanced Floor Concepts.

25  Q     Who is Toll Brothers?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 126

1    A    One of the contractors that we work with.

2    Q    Somebody for whom you install the steel floors?

3    A    Yes, sir.

4    Q    Okay.  That's a rather lengthy contract, but if you'd

5    flip pages to get to page 8 of Exhibit Q.  Are you there?

6    A    Yes.

7    Q    Okay.  Who signed that contract?

8    A    Torin.

9    Q    Torin who?

10   A    Jackson.

11   Q    Who is he?

12   A    He currently is my office manager and engineer.

13   Q    In what capacity did he sign it?  Can you read it?

14   A    Manager estimating engineering.

15   Q    Okay.  Date of August 28, 2013, right?

16   A    Yes, sir.

17   Q    Now, we saw earlier when we went through the articles

18   that you, as the managing-member, have authority to approve

19   and give permission for employees to take acts.  Did

20   Mr. Jackson have your permission --

21   A    Yes.

22   Q    -- to do this?  Turn to the next page, please, of

23   Exhibit Q, page 9, in the upper right-hand corner?

24   A    Uh-huh.

25   Q    What is that?

United States of America vs.                                    **Evidentiary Hearing - Day I**
Michael David Wilhite                                                    September 15, 2015

Page 127

 1   A   This is a contract confirmation.

 2   **Q   With -- between?**

 3   A   Toll Brothers and Advanced Floor Concepts.

 4   **Q   Who's signing on behalf of Advanced Floor Concepts?**

 5   A   Fern Pena.

 6   **Q   Who is she?**

 7   A   She was my accountant.

 8   **Q   Was this done with your approval and delegation?**

 9   A   Yes, it was.

10   **Q   Next page, please.  Page 10 of Exhibit Q.  What's that?**

11   A   Same thing.  Construction agreement between Toll

12   Brothers and AFC.

13   **Q   And who signed that one?**

14   A   I did.

15   **Q   What's the date?**

16   A   January 27th, '05.

17   **Q   And to back up, the one we had with Ms. Pena before**

18   **that was in October of 2006.  And the capacity you're signing**

19   **is as the manager of AFC, correct?**

20   A   Yes.

21   **Q   The next page, page 11, is a continuation of that**

22   **contract?**

23   A   Yes, sir.

24   **Q   And, again, you're signing on behalf of the company?**

25   A   Yes, sir.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 128

```
 1               THE COURT:  And, Ms. Wilhite, you had various
 2   people sign legally binding agreements over time.  Did they
 3   always do so at your direction on each instance, or did
 4   anybody in the company besides yourself have advanced
 5   authority to bind the company?
 6               THE WITNESS:  Only on these -- on the construction
 7   contracts or proposals.
 8               THE COURT:  So, you gave them general authority on
 9   construction contracts and proposals?
10               THE WITNESS:  Yes, sir.
11               THE COURT:  Okay.  Thank you.
12   Q   (By Mr. Mikulecky)  You didn't expect them to call you
13   and run every contract by you?
14   A   Well, as you can see, they're pretty boilerplate.  They
15   are read, but very seldom is there any kind of change.
16   Q   So, you didn't expect them to call you with every
17   contract?
18   A   No, sir.
19   Q   Okay.  Now, page 12.  It's a document prepared by
20   Advanced Floor Concepts; is that right?
21   A   Yes, sir.
22   Q   Okay.  You are identified as the manager?
23   A   Yes, sir.
24   Q   Mr. Wilhite as the project manager?
25   A   Yes, sir.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 129

```
 1    Q    What's the next page?

 2    A    His W-9.

 3    Q    For Advanced Floor Concepts?

 4    A    Yes, sir.

 5    Q    Okay.  Did you prepare this?

 6    A    Yes, I did.

 7    Q    Did you sign it?

 8    A    Yes, I did.

 9    Q    Next page, 14.  What's that?

10    A    This is, once again, an addendum to the Toll Brothers

11    contract.

12    Q    Who's signing?

13    A    Torin.

14    Q    Torin Jackson?

15    A    Yes, sir.

16    Q    And the date?

17    A    10/4 of '06.

18    Q    So, Mr. Jackson's been with Advanced Floor at least

19    since 2006?

20    A    Before that.

21    Q    The final page.  What is that, please?

22    A    It's a proposal and contract with Toll Brothers.

23    Q    Signed, again, by Mr. Jackson?

24    A    Yes, sir.

25    Q    In 2005?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 130

 1   A    Yes, sir.

 2   Q    We're going to test your dexterity and ask you to look

 3   at the large exhibit book, please.  And look to Exhibit 9.

 4   A    Exhibit 9?

 5   Q    Yes, please.

 6   A    Okay.

 7   Q    Again, this is more construction contracts between Toll

 8   Brothers and Advanced Floor Concepts, correct?

 9   A    Yes, sir.

10   Q    Okay.  Just rather than going through all of them, if

11   you would just flip through them and tell me who signed these

12   contracts, and the timeframe.

13   A    Michael, 2006; Michael, 2005; Michael, 2005; Michael,

14   2006; Michael, December of '05.

15   Q    Were you -- did you give authority to Mr. Wilhite to

16   sign contracts just as you did Ms. Pena and Mr. Jackson?

17   A    Yes, sir.

18   Q    Okay.  And, again, just general authority.  You didn't

19   expect him to check with you on every arrangement?

20   A    No, sir.

21   Q    Okay.  Mr. Wilhite signed them and his title, if you

22   look, it says going through, CEO, general manager, project

23   manager, general manager, general manager.  Do you see that?

24   A    Yes.

25   Q    Did it make any difference to you how Mr. Wilhite

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 131

1  signed the contracts?  What title he used?

2  A   Never.  It didn't make any difference to me at all.

3  Q   Okay.  Take a look at exhibit -- while you're still in

4  the big book, please, Exhibit 40.

5  A   Okay.

6  Q   What is that?

7  A   It's a business credit application with Ford Credit.

8  Q   For Advanced Floor Concepts?

9  A   Yes, sir.

10  Q   Okay.  And in the middle -- the top middle of it, about

11  five lines down Mr. Wilhite's name appears.  Do you see that?

12  A   Yes, sir.

13  Q   It's a little hard to read.  It looks like it says

14  fleet manager, right?

15  A   Yes, sir.

16  Q   And below that who's named as the owner/guarantor?

17  A   Myself.

18  Q   With what position?  Can you make that out right next

19  to your name there?

20  A   It's got to be manager.

21  Q   Okay.  And then you signed it as well at the bottom,

22  correct?

23  A   Yes.

24  Q   Why did you put Mr. Wilhite down as fleet manager?

25  A   Because he negotiates for vehicles.  I don't.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 132

1   Q   So, you were essentially giving him the authority to --

2   A   Yes.  I delegated that authority to him.

3   Q   Okay.  Looking backwards now on Exhibit 31, please.

4   A   Okay.

5   Q   What is that?

6   A   This was a vehicle ordered from Al Serra.

7   Q   For Advanced Floor Concepts?

8   A   Yes, sir.

9   Q   Okay.  Signed by whom?

10  A   Michael signed it.

11  Q   Did you give him the authority to do that?

12  A   Yes, I did.

13  Q   Just as you had done with Ford.  Again, you told him he

14  could go and negotiate those deals?

15  A   Yes, sir.

16  Q   Did you expect him to call you with whatever the -- get

17  approval for the final price that he negotiated?

18  A   Actually, I was with him and I sat in the truck.

19  Q   Okay.  For this one.  What about with the other ones,

20  the times you gave him authority?  Did you expect him to call

21  and run every negotiation by you?

22  A   No.  I knew that he would get the best deal.

23  Q   Okay.  Now, you also gave authority to employees to

24  sign checks and deposit checks on behalf of Advanced Floor

25  Concepts, correct?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 133

1   A    Yes, sir.

2   Q    **Please turn to Exhibit 4.**

3   A    Okay.

4   Q    **Can you identify that?**

5   A    It's a signature card for American National Bank.

6   Q    **For the checking account of Advanced Floor Concepts,**

7   **correct?**

8   A    Yes, sir.

9   Q    **Okay.  Who are the people who are authorized to sign on**

10  **behalf of Advanced Floor Concepts?**

11  A    Fern Pena, myself, Michael Wilhite, and Cory Phillips.

12  Q    **You already said Ms. Pena was an employee of Advanced**

13  **Floor?**

14  A    Yes, sir.

15  Q    **What was her position?**

16  A    She was the accountant.

17  Q    **Okay.  And Mr. Phillips?**

18  A    Mr. Phillips was with Steel Deck Supply.

19  Q    **You were given --**

20          THE COURT:  Can I interrupt for a second?

21          MR. MIKULECKY:  Sure.

22          THE COURT:  Happy birthday.

23          UNKNOWN SPEAKER:  Thank you.

24  Q    **(By Mr. Mikulecky)  And you were giving him signature**

25  **authority on these accounts as well?**

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 134

1   A    Yes, sir.

2   Q    And the date that was signed in the left-hand column is

3   what?

4   A    7/25 of '08.

5   Q    All right.  And then the page that follows are some

6   examples of checks.  Who signed those?

7   A    Fern.

8   Q    Okay.  Turn, please, to Exhibit 5.  And we're going

9   to -- the first two pages are for your personal account and

10  Mr. Wilhite's personal account, right?

11  A    Yes, sir.

12  Q    Okay.  So, let's go to the third page, which is

13  Advanced Floor Concepts.  What's the date on this one in the

14  lower left corner?

15  A    5/27 of 2010.

16  Q    Okay.  Who -- and this is for Advanced Floor Concepts

17  again?

18  A    Yes, sir.

19  Q    Who are the signers on the account?

20  A    Myself, Michael, and Torin Jackson.

21  Q    The next page is five months later.  Do you see that in

22  the lower left-hand corner?  We're on page 4 of 8 --

23  A    Yes, I do.

24  Q    -- on Exhibit 5.  On October 6 you signed this,

25  correct?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 135

 1   A    Yes, sir.

 2   Q    Who are the signers now on the account for Advanced

 3   Floor?

 4   A    Myself, Michael, Torin, and Nate Stiverson.

 5   Q    Who is Mr. Stiverson?

 6   A    He's one of my other engineers.

 7   Q    Okay.  Now, the next page appears to be a duplicative

 8   page, even though it's labeled 5 of 8.  So, go then page to

 9   please -- go, please, to page 6 of 8.

10   A    Okay.

11   Q    All right.  This shows also the signers for Advanced

12   Floor Concepts, correct?

13   A    That is correct.

14   Q    Names we've already gone through; you, Mr. Wilhite,

15   Mr. Jackson, Mr. Stiverson.  In each box for each individual,

16   next to the last entry shows employer.  Do you see that?  The

17   next to the last line entry in each box?

18   A    Uh-huh.

19   Q    Okay.  Who does it show as your employer?

20   A    Southern Colorado Construction Consulting.

21   Q    Okay.  Below you, Mr. Jackson?

22   A    Advanced Floor Concepts.

23   Q    And Mr. Stiverson?

24   A    Advanced Floor Concepts.

25   Q    Mr. Wilhite?

United States of America vs.                    Evidentiary Hearing - Day I
Michael David Wilhite                                  September 15, 2015

Page 136

```
 1   A    Nothing.

 2   Q    Why nothing for Mr. Wilhite?  And this is in 2010,

 3   correct?  In the lower right-hand corner?

 4   A    Yeah.

 5   Q    So --

 6   A    Oh, I don't know.

 7   Q    Was Mr. Wilhite employed in 2010?

 8   A    He was going in part-time.

 9   Q    Was he employed?

10   A    No.  He was going in at my behest.

11        THE COURT:  Mrs. Wilhite, why didn't you sign for

12   Advanced Floor Concepts?

13        THE WITNESS:  Because I'm the owner.

14        THE COURT:  I don't understand.  Why did you

15   designate yourself as Southern Colorado Construction versus

16   Advanced Floor Concepts?

17        THE WITNESS:  My relationship with American

18   National Bank has gone back for a long time.  They had all of

19   my accounts, not only Advanced Floor Concepts, DW Support

20   Services, slash, SCCC, but also Steel Deck Supply.  And they

21   probably pulled this up, and just put that information on it.

22        THE COURT:  Right.  That's probably not the right

23   way to do it, given that this is an account information sheet

24   for Advanced Floor Concepts; is that right?

25        THE WITNESS:  I -- once again, I have -- I'm not
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 137

 1   the bank.  I have no idea why they --

 2           THE COURT:  The bottom --

 3           THE WITNESS:  -- filled out this form like this.

 4           THE COURT:  The bottom section is -- identifies

 5   the nonindividual entity that the document's dealing with.

 6           THE WITNESS:  No, I realize that.  But I have no

 7   idea why they would --

 8           THE COURT:  Well, I understand.  Okay.

 9           THE WITNESS:  -- put down Southern Colorado

10   Construction Consulting.

11           THE COURT:  All right.  But it wasn't -- did

12   Southern Colorado Construction Company have anything to do

13   with what was going on with the bank?

14           THE WITNESS:  Other than my bank account was

15   there.

16           THE COURT:  Okay.

17   Q    (By Mr. Mikulecky)  But you didn't prepare that

18   document, correct?

19   A    No, sir.

20   Q    Okay.  The next page is another signature page for

21   Advanced Floor Concepts, correct?

22   A    Yes, sir.

23   Q    And that's in 2007?

24   A    Yes, sir.

25   Q    Who are the signatures there?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 138

 1   A    Myself, Michael, Fern, and Torin.

 2   Q    Turn then to Exhibit 6, please.  What is that?

 3   A    This is more information for the bank.

 4   Q    Okay.  More resolutions that the bank prepared --

 5   A    Yes, sir.

 6   Q    -- about Advanced Floor Concepts?

 7   A    Yes, sir.

 8   Q    And on this one they correctly identify you as the

 9   manager/member of Advanced Floor Concepts, correct?

10   A    Yes, sir.

11   Q    Okay.  And the other signers we've already gone through

12   in 2010.  The next page of Exhibit 6, another one.  This one

13   dated May 11, 2009, bottom right corner.  Do you see that?

14   A    Yes, sir.

15   Q    Who are the signers on the account here?

16   A    Myself, Dennis Cross, Brendan DePaola, and Cory

17   Phillips.

18   Q    So, Mr. Wilhite is not a signer on the account at this

19   time in 2009, right?

20   A    No, sir.

21   Q    Finally, turn to Exhibit P in the smaller exhibit book,

22   please.

23   A    Okay.

24   Q    And this is another signature card with American

25   National Bank for Advanced Floor Concepts?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 139

1  A    Yes, sir.

2  Q    And in the right-hand side column where it says account

3  owner name and address, do you see that box that has Advanced

4  Floor Concepts, LLC?

5  A    Yes, sir.

6  Q    And the third line there, what does that say?

7  Update -- it begins update to -- it says update to change

8  signers.  Do you see that?

9  A    I'm sorry, I don't.

10  Q    My poor directions, I apologize.

11  A    Oh, okay.

12  Q    So, who are the signers on the account at this time in

13  2009?

14  A    Myself, Dennis Cross, Brendan DePaola, and Cory.

15  Q    And, again, you're removing Mr. Wilhite as the signer

16  on the account, correct?  He's no longer a signer?

17  A    That is correct.

18  Q    And as we recap the chronology we saw on the 2007

19  timeframe, Mr. Wilhite is a signer; 2009 timeframe, he's not

20  a signer; 2010, he is a signer again, correct?

21  A    Yes, sir.

22  Q    Okay.  We'll come back to the reason for that in just a

23  moment.

24          THE COURT:  Hold on a second.  Do -- each of these

25  documents seem to be opening a new account.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 140

```
 1                THE WITNESS:  No.  They're just updating.
 2                THE COURT:  That one is -- okay.  Why -- why did
 3      they need the update?
 4                THE WITNESS:  Because I was changing signatories
 5      of the account.
 6                THE COURT:  Okay.  After you opened the first
 7      account with American National Bank, did you ever open any
 8      other accounts?
 9                THE WITNESS:  I mean, I have an operating account
10      there.  I don't believe that I ever had the payroll account
11      there.
12                THE COURT:  Okay.
13                THE WITNESS:  I had my own personal accounts there
14      because that was required by them.
15      Q    (By Mr. Mikulecky)  Didn't you also have a sweep
16      account at ANB for putting money into, and then sweeping it
17      into your other accounts?  Do you remember that?
18      A    Well, I transfer money from ANB for payroll and for
19      taxes.  So, I don't know if you're talking about that.  A
20      bank.
21      Q    We've seen that you have given responsibility for
22      signing contracts, signing checks, signing deposits, for
23      buying vehicles, delegate a lot of responsibility.  Who
24      ultimately retains liability and responsibility for AFC?
25      A    I do.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 141

 1    Q    We saw that Mr. Wilhite was eliminated from the

 2    checking account as a signer in 2009.  What was --

 3    A    Yes, sir.

 4    Q    What was happening with Mr. Wilhite's health between

 5    2007, when he's on the account, and 2009 when he's removed?

 6    A    He was having small mini strokes, TIAs.

 7    Q    When was that?

 8    A    I believe that the first one started in 2007.

 9    Q    When --

10    A    And he had like six or seven of them.

11    Q    What happened?

12    A    He would begin speaking just gibberish, and get just

13    really horrible headaches.  He had one episode where it was

14    so bad that he called the ambulance and they took him to the

15    hospital.

16    Q    Did they ever figure out what was causing those

17    problems?

18    A    High blood pressure.

19    Q    Did it have any effect on him other than the headaches

20    and the speaking in gibberish?

21    A    A lot of times he would give directions and wouldn't

22    remember saying anything.

23    Q    Give directions for what?

24    A    He would -- he would tell Torin to -- and this is

25    totally hypothetical, but he would tell Torin to design a

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 142

1   floor, and come back 10 minutes later and tell him to design

2   it again.  He just -- he couldn't remember.  Short-term

3   memory was not very good at that point in time.

4   Q    Okay.  So, the strokes were affecting his mental

5   ability?

6   A    Yes, sir.

7   Q    Okay.  At the time was he working for AFC?

8   A    Yes.

9   Q    And we've seen that you've given him signing authority

10  for the checks and the cars and things.  So, what was he

11  doing at AFC at the time?  What were his responsibilities?

12  A    Well, before he left the company he was basically

13  running the office, doing sales.  No, not so much sales

14  because Roger Otterstein was doing the sales.  But he would

15  do, you know, interaction with contractors, and do some of

16  the designs on some of the more complicated floors.

17  Q    Did the six or seven strokes that he had impact his

18  ability to perform his job?

19  A    I felt that it did, yes.

20  Q    So what happened?

21  A    He and I talked about it, and we just decided that it

22  was time for him to step down.  And Torin had grown to the

23  point where he could take over, and he did.

24  Q    Was Roger -- I'm sorry, you said Otterstein; is that

25  right?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 143

1   A   Otterstein, yes.

2   Q   Was he also involved in the company then?

3   A   He was sales, yes.  He was in charge of sales.

4   Q   Okay.  Was there any specific event that occurred that

5   said, okay, you've just had something happen and so tomorrow

6   you're done, or today you're done?  Was it that way, or was

7   it just an evolution that led to the decision that

8   Mr. Wilhite would not work anymore at AFC?

9   A   The final straw was when he had to call the ambulance

10  and they took him to the hospital.

11  Q   Do you remember about when that was?

12  A   2008 some time.

13  Q   Okay.  Do you remember when Mr. Wilhite left the

14  company?

15  A   In 2008.

16  Q   And do you remember about when that was?

17  A   First part of August.

18  Q   So, he leaves the company in August of 2008.  How is

19  your health at this time?

20  A   It's not great.  My back was really bad.  My mother had

21  just passed away.  The economy was sinking.  I was having to

22  let people go.

23  Q   Where were you living in 2008 at this time?

24  A   I was living in -- well, part of 2008 I was living

25  here.  And then the latter half -- or latter quarter of 2008

United States of America vs.                                    Evidentiary Hearing - Day I
Michael David Wilhite                                                September 15, 2015

Page 144

 1    I was up in Westcliffe.

 2    Q    Westcliffe is where you moved?

 3    A    Yes, sir.

 4    Q    Okay.  How long of a drive is it from Westcliffe to

 5    your offices in Castle Rock?

 6    A    2 hours and 15 minutes.

 7    Q    How was your back impacting your ability to make that

 8    drive as a passenger or a driver?

 9    A    It was not good.  I would take an Aleve and hit the

10    road.

11    Q    So it was painful?

12    A    Yes, sir.

13    Q    Okay.  You mentioned that Mr. Otterstein was working

14    for Advanced Floor Concepts as well; that he was in charge of

15    the sales.  What happened to his health?

16    A    He was diagnosed with stage 4 lymphonic [sic] -- I

17    can't say it --

18    Q    Cancer?

19    A    -- lymphoma.  Cancer.

20    Q    Okay.  When was that?

21    A    Probably -- I want to say September of 2009.

22    Q    What happened?

23    A    He passed away in March of 2010.

24    Q    Did that affect the operations at AFC?

25    A    Yes, because we had to -- I had to let a lot of people

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 145

1   go.

2   Q    So --

3   A    And so Michael came down at my be -- request and was

4   picking up some of the slack of what Roger had been doing,

5   and Brendan.  Because we had to let Brendan go also.

6   Q    You said, though, that Mr. Wilhite had to leave the

7   company in 2008 because of his health.  Had that changed in

8   2010?

9   A    We were able to get the high blood pressure under

10  control.

11  Q    Was he still having strokes?

12  A    Nope.

13  Q    Was he having any lingering mental affects?

14  A    Nope.

15  Q    Okay.  So, why didn't you go back then to Castle Rock

16  to run the show?

17  A    Because the doctor told me that I could not be driving

18  that much.

19  Q    Okay.  So, what did you do as a result then?  What did

20  you tell Mr. Wilhite?

21  A    I requested that he go down and be my eyes and ears,

22  and if there were questions that came up that I was a phone

23  call away.

24  Q    Did you give him -- as you had when he was an employee

25  with Advanced Floor Concepts, did you give him

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 146

 1   responsibilities to -- and power to make decisions on your

 2   behalf?

 3   A    Not major decisions, no.

 4   Q    In the large exhibit notebook turn to Exhibit 33, if

 5   you would, please.  Are you there?

 6   A    Uh-huh.

 7   Q    Okay.  The bottom e-mail is the one I want to focus on.

 8   It's from Cindy Barker to John Rawls.  Who are those people?

 9   A    Cindy Barker is my accountant.  John Rawls is from --

10   my CPA.

11   Q    Outside firm?

12   A    Yes, sir.

13   Q    Okay.  And I want to focus on the text of the e-mail.

14   It says, Here is the ANB invoice and the vehicle list I go

15   by.  That is accurate.  Chris, Torin and I have gone through

16   the asset list and mark what we know.  The list is now on

17   Mike's desk for him to review.

18            Do you see that?

19   A    Uh-huh.

20   Q    Did you know that Mike was going to be doing -- looking

21   at a vehicle list of some sort?

22   A    It's fine with me.

23   Q    Is that within the responsibilities that you had

24   delegated to him?

25   A    Yes.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 147

1    Q    Okay.  The next e-mail, that Exhibit 34.  Another

2    e-mail from Ms. Barker to Mr. Rawls, who you've identified

3    already.  After the salutation it says, We received checks

4    for hail damage on four of our vehicles.  We are repairing

5    one of them.  The other three checks Mike wants to give gifts

6    to us and use the rest for himself.

7              Do you see that?

8    A    Uh-huh.

9    Q    Were you involved in any of this?

10   A    I knew that the trucks had been damaged by hail, and we

11   talked about giving gifts to the employees, and decided not

12   to do that.

13   Q    Who's "we"?  You said, "we talked about giving gifts."

14   A    Mike and I talked about it.

15   Q    Okay.  So, you were involved in this process?

16   A    Yes, sir.

17   Q    Okay.  Who made the decision then about giving gifts or

18   not giving gifts to the employees?

19   A    I did.

20   Q    Who communicated those decisions for you?

21   A    Michael.

22   Q    Turn to Exhibit 37, please.  Are you there?

23   A    Uh-huh.

24   Q    Okay.  The top e-mail is from Mr. Wilhite to John

25   Rawls.  Again, you've already identified him.  This is --

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 148

 1  says, To effect a transfer of funds, can AFC write a check

 2  directly to Yahab or does the check need to go to Dee first

 3  and then Yahab?

 4          Do you see that?

 5  A    Yes, sir.

 6  Q    Okay.  Now, we were before in this courtroom talking

 7  about Yahab.  Do you remember that?

 8  A    Yes, sir.

 9  Q    All right.  And I believe your testimony, correct me if

10  I'm wrong, is that Mr. Wilhite was not involved Yahab,

11  correct?

12  A    He is not on -- in the Yahab Foundation at all.

13  Q    Okay.  So --

14  A    Once again, all he was doing was on my -- at my request

15  he sent an e-mail to John.

16  Q    At your request?

17  A    Yes.

18  Q    Okay.  Exhibit 38.  An e-mail from you to Mr. Rawls,

19  January, 2015.

20  A    Yes.

21  Q    Okay.  It says, Have you decided what you want me to do

22  regarding the use of the trucks?  Would really like to get

23  these done so Mike can take them to work with him tomorrow.

24          You're letting Mike take trucks to work?

25  A    Hey, if you'll look up under the subject it's for the

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 149

1    W-2s that I had processed.

2    Q    Oh, so you're talking about taking the W-2s to work?

3    A    Yes, sir.

4    Q    Oh, so Mike was just going to take those in?

5    A    Yes, sir.

6    Q    Okay.  Exhibit 39.  An e-mail -- bottom e-mail from

7    Ms. Barker to Mr. Rawls.  We've identified them already.

8    After the salutation, Talked with Mike and he would like to

9    adjust inventory to 90,000 and change.  Is that okay with

10   you?

11          Do you see that?

12   A    Yes, sir.

13   Q    Okay.  Is Michael making the decisions to adjust

14   inventory for AFC?

15   A    No.  When I was reviewing our financials I noticed that

16   the inventory was very, very high, and I requested that Chris

17   and Cody do an actual inventory.  And I think when -- before

18   this started it was showing like $186,000 of inventory.  And

19   that inventory had not been counted for some time, so I

20   requested that this be reduced to the actual numbers of what

21   materials were being stored in the north yard.

22   Q    So, again, was this your decision about --

23   A    Yes, sir.

24   Q    -- inventory?  Okay.  And you were communicating with

25   Mike to --

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 150

1   A    Yes, sir.

2   Q    -- convey that information?

3   A    Yes, sir.

4   Q    Okay.  During the years AFC has had its share of

5   financial problems, correct?

6   A    That is correct.

7   Q    And we saw earlier that you had pledged your assets and

8   your credit and your guarantee.  Did you have to do that

9   again after the company got started?

10  A    Yes, I did.

11  Q    And had some negotiations, some difficult negotiations,

12  in fact, with ANB Bank, correct?

13  A    That is correct.

14  Q    Take a look, please, at Exhibit 3.  What is that?

15  A    It's a credit application with ANB Bank.

16  Q    For whom?  Who's the borrower?

17  A    Myself.

18  Q    All right.  And in the middle of that middle box who do

19  you list as the employer?

20  A    Advanced Floor Concepts.

21  Q    And your position?

22  A    Owner.

23  Q    What was the purpose -- it says above that at the end

24  of that first box, it says the purpose is refinance.  Do you

25  see that?

United States of America vs.                      Evidentiary Hearing - Day I
Michael David Wilhite                                      September 15, 2015

Page 151

1   A    Yes, sir.

2   Q    **Explain to the Judge what you were refinancing and your**

3   **history with ANB that led to this.**

4   A    Well, actually, this was the refinance of my property

5   in Westcliffe.

6   Q    **I understand.  And what I want you to do is explain to**

7   **the Judge what led up to this with your loan history with**

8   **ANB, and the problems that you had.**

9   A    With the recession we had -- and part of the Steel Deck

10  Supply fiasco, our line of credit with ANB Bank was up to

11  $1.8 million.  And December 31st of 2009 they called us into

12  the bank and I had to write them a huge check, which I did.

13  And they said that I needed to sign the agreement that they

14  had drawn up for Advanced Floor Concepts.  I said -- and I

15  told them I had not even read the documents, and according to

16  their own documents it needed to be reviewed by an attorney.

17  And they informed me that I either sign them right now or

18  that they would start foreclosure on the ranch, and also take

19  all the assets of AFC.

20  Q    **And let me stop you there for a minute.  First, you**

21  **said that -- our line of credit.  Who's line of credit were**

22  **you --**

23  A    Advanced Floor Concepts.

24  Q    **Okay.  Did you guarantee that?**

25  A    Yes, I did.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 152

1  Q    Did you pledge any as assets to support that as well?

2  A    My ranch.

3  Q    Your ranch down in Westcliffe?

4  A    Yes, sir.

5  Q    Okay.  We're going to come back to that ranch in a

6  little bit.  All right.  And then they were going to

7  foreclose on the ranch and on AFC unless you signed the

8  documents?

9  A    Yes, sir.

10  Q    Okay.  That's where I interrupted you.  So what

11  happened next?

12  A    Okay.  Then they put down a repayment -- if I remember

13  correctly -- $89,000 a month.  And this was right in the

14  middle of the recession and there was no way.  And so I

15  defaulted on the first two payments.  And so they -- I told

16  them, I said, I can't make those kind of payments.  We need

17  to amortize this out over several years.  And they weren't

18  willing to do that, so I hired a bankruptcy attorney to start

19  the process for bankruptcy.  When they found out that that's

20  what we -- that that was what would have to have happened

21  they backed off and we were able to negotiate terms where it

22  would be amortized over eight years, but at 9 percent

23  interest with an origination fee of 1 percent every year, and

24  having the ranch be appraised every year.

25  Q    Who negotiated those terms with the bank?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 153

 1    A     I did.

 2    Q     Who's -- who's liability was at stake here?

 3    A     Mine.

 4    Q     Did Mr. Wilhite have any liability at stake here on

 5    this?

 6    A     Other than he signed as guarantor.  He had to sign as

 7    guarantor, which was one of the requirements of ANB Bank.

 8    Q     ANB Bank made him sign too?

 9    A     Yes.

10    Q     Did he have any assets pledged?

11    A     No, sir.

12    Q     What were -- what were the monies used for for AFC?

13    A     It was to put it into an amortized loan rather than a

14    massive paydown.

15    Q     And AFC had gotten into financial trouble because of

16    the recession at that time?

17    A     Yes, sir.

18    Q     Okay.  So, Exhibit 3 is a renegotiation of those terms

19    that they weren't so favorable on the first time?

20    A     Yes, sir.

21    Q     Okay.  Now, eventually, the company did do well after

22    you had those renegotiations with the bank, and you were

23    looking at selling the company at some point, right?

24    A     Yes, sir.

25    Q     Before we get to that, take a look at Exhibit 12,

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 154

1    please.  Are you there?

2    A    Uh-huh.

3    Q    What is that document?

4    A    It's a Christmas letter.

5    Q    From you and Mr. Wilhite?

6    A    Yes, sir.

7    Q    Do you know about when this was?

8    A    Approximately 1999.

9    Q    Okay.  I want to focus on the -- first, second,

10   third -- fourth paragraph.  It says, Dee's company continues

11   to grow.

12            Do you see that?

13   A    Uh-huh.

14   Q    Two new employees were added this year as Dee can no

15   longer do all of the work.  The good Lord has certainly

16   smiled on us.

17            What company are you referring to there?

18   A    That was DW Support.

19   Q    For the doing business as Southern Colorado

20   Construction?

21   A    Yes, sir.

22   Q    Okay.  Let's go to the preceding paragraph.  It says,

23   Michael's business continues to grow.  His company is now the

24   foremost provider of steel structural floors, suspended

25   floors and decks in Denver for custom builders.

United States of America vs.                                    Evidentiary Hearing - Day I
Michael David Wilhite                                                    September 15, 2015

Page 155

```
 1              Do you see that?
 2    A    Uh-huh.
 3    Q    What business are you referring to?
 4    A    AFC.
 5    Q    You're calling it Michael's business?
 6    A    AFC.
 7    Q    Why are you calling it Michael's business?
 8    A    Because Michael was managing it.
 9    Q    Did he own it at this time?
10    A    No, he did not.
11    Q    Did you mean he was the owner at this time?
12    A    No, I did not.
13    Q    Okay.  As you were selling the business, how did that
14    process go?
15    A    I retained the services of a business broker and they
16    proceeded to put together a marketing strategy.  I received
17    two letters of intent.  One from BMC, one from Barton/Kodiak.
18    BMC's offer was -- I turned down outright.  It was -- you
19    know, they were both looking for a bargain basement sale.
20    Michael once again negotiated with Barton.  They sent a
21    letter of intent.  After reviewing it, going through all of
22    what they were proposing, I wasn't willing to proceed with
23    that sale and I pulled the plug.
24    Q    Who was involved in the negotiations with
25    Barton/Kodiak?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 156

 1   A    Michael and Mark Stubbert were the main negotiators.

 2   There were, you know, several other folks.  Steve Sweeney was

 3   involved in it.  There were other folks that were talking to

 4   me about this whole thing, but as I say the terms just didn't

 5   work.

 6   Q    Why weren't you involved in negotiating the sale if

 7   it's your business?

 8   A    I'm not a good negotiator.  And so, when you're going

 9   to have someone negotiate for something that has been a part

10   of your life for so long, you want to have the best.

11   Q    How would Mr. Wilhite know what terms you would be

12   willing to sell the business?

13   A    Michael and I developed a spreadsheet, and worked out

14   all the different scenarios of how it would work and how it

15   wouldn't work.  And when Barton Supply gave their original

16   letter of intent, and after discussions with them it didn't

17   fit into the parameters that I felt would work.

18   Q    So, if I understand the process correctly, then you and

19   Mr. Wilhite would have discussions about the offer or the

20   letter of intent; is that right?

21   A    Yes, sir.

22   Q    Who would then make decisions as to what terms would be

23   acceptable and what would be unacceptable?

24   A    That was my ultimate decision.

25   Q    Okay.  But you would discuss it with Mr. Wilhite as

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 157

1    your husband?

2    A    Yes, sir.

3    Q    Okay.  And then you would -- if I understand it, the

4    next step then is you would task Mr. Wilhite with, okay, go

5    negotiate.  You know what I want.  Is that an accurate

6    summary?

7    A    That's correct.  Yes.

8    Q    Okay.  If you turn to Exhibit 45.

9    A    Okay.  And I need to stand up.

10   Q    Oh, please, go ahead.  Yeah, we've been going about an

11   hour, do you want to take a little stretch there?

12   A    I'll stand up and do this for a while if that's all

13   right.

14   Q    Thank you, Your Honor.  So Exhibit 45.

15   A    Okay.

16   Q    The first page is essentially a cover e-mail, but the

17   second page is the letter of intent from Kodiak.  Do you see

18   that?

19   A    Yes, I do.

20   Q    Is this the letter of intent you were just describing?

21   A    Yes, sir.

22   Q    Okay.  Now, it's signed -- if you go to page 5 of 8 in

23   the bottom center -- by Mr. Wilhite.  Do you see that?

24   A    Uh-huh.

25   Q    Yes?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 158

 1   A    Yes, sir.

 2   Q    Okay.  Did you know that he was going to be signing

 3   this letter of intent?

 4   A    Yes.  It's accepting that he's received it.

 5   Q    Okay.  Was that with your --

 6   A    Yes.

 7   Q    -- authority and approval?

 8   A    Uh-huh.

 9   Q    Okay.  Turn to Exhibit 46, please.  This is an e-mail

10   from Mr. Wilhite to Mr. Stubbert and to Brian -- I hope I'm

11   not pronouncing it incorrectly -- Cleveringa.  Who is

12   Mr. Stubbert and Mr. Cleveringa?

13   A    Mark Stubbert is with Barton Supply, and he was also

14   representing Kodiak.  And Brian was part of Kodiak.

15   Q    Okay.  So, Mr. Wilhite sent this e-mail to the other

16   parties, the potential purchasers, right?

17   A    Yes, sir.

18   Q    Okay.  And it's titled, Due Diligence List.  Do you see

19   that?

20   A    Yes, I do.

21   Q    Do you know what this addresses?

22   A    This is answering -- or salient points within the

23   proposal that they had given us.

24   Q    Okay.  So responses back to issues that they've raised

25   with their due diligence?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 159

1   A    Yes.

2   Q    Okay.  Were you involved in working on the due

3   diligence list?  And I don't mean this e-mail, just generally

4   in preparing the information, assembling the information that

5   they were requesting?

6   A    Yes, I was.

7   Q    Okay.  Look at the bottom of this first page, please,

8   of Exhibit 46, Item No. 32.  Do you see that?

9   A    Yes, sir.

10  Q    Okay.  Can you read that, please.

11  A    Advanced Floor Concept is organized as a limited

12  liability company owned entirely by Darla Dee Wilhite and

13  taxed as a Sub S corporation.  There are no affiliate

14  companies or separate divisions.

15  Q    Do you remember what question or issue was on 32 that

16  you were responding to here?

17  A    No.

18         MS. FROEHLKE:  Objection --

19  A    Not right off the top of me.

20         THE COURT:  It's moot.

21  Q    (By Mr. Mikulecky)  On the next page of Exhibit 46 --

22  A    Uh-huh.

23  Q    -- take a look at Item 64.  Do you see that?

24  A    Yes.

25  Q    Okay.  What does that say?

United States of America vs.                                    Evidentiary Hearing - Day I
Michael David Wilhite                                                    September 15, 2015

Page 160

 1    A    Ownership reviews all financial statements.  No checks

 2    are signed by accounting, but by ownership.  Mike Wilhite or

 3    Torin Jackson.  Safety --

 4    Q    Sorry.  You can stop there for a moment.  Ownership at

 5    this point is whom that it's referring to there?

 6    A    That is not correct.

 7    Q    No, let me -- that's not my question.  My question is

 8    who is ownership referring to there in September of 2013?

 9    Whose ownership of the company?

10    A    Myself.

11    Q    And is it true that you review the financial

12    statements?

13    A    Yes, I do.

14    Q    Okay.  And the checks are signed by either you,

15    Mr. Wilhite or Mr. Jackson?

16    A    Yes, sir.

17    Q    Okay.  I'm missing an exhibit.  I apologize, Your

18    Honor.  What happened to the sale?

19    A    It wasn't acceptable to me.

20    Q    So, did you continue to try to negotiate?

21    A    No.  I just --

22    Q    Broke off the negotiation?

23    A    Yes, sir.

24             THE COURT:  What was unacceptable about it?

25             THE WITNESS:  They wanted me to -- they wanted to

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 161

 1   basically give me a certain amount of money down and they

 2   wanted me to carry two-thirds of it over five years.  And it

 3   was set up as part of that -- of that was to be taken from

 4   profit sharing.  And my concern was, well, if they gave

 5   themselves a raise my profit level would go down.  If they

 6   decided to buy more equipment -- there was no specifics set

 7   up to do anything that would keep them from -- from wiping

 8   out the profits, so I would get nothing.

 9             THE COURT:  What about the value of the company?

10   It looks like a little over $3 million they were willing to

11   pay; is that right?

12             THE WITNESS:  It was actually 3.6.

13             THE COURT:  3.6.  Was that consistent with your

14   view on the value of the company?

15             THE WITNESS:  No, it was not.

16             THE COURT:  What did you view the value would be?

17             THE WITNESS:  I felt that the value at that point

18   in time should have been about 4 percent of EBITDA, four

19   times EBITDA.

20             THE COURT:  So, what's the bottom line then on

21   that?

22             THE WITNESS:  That would have been 4 to 4.3

23   million.

24             THE COURT:  And what was -- what was your other

25   company worth at the time?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 162

 1            THE WITNESS:  DW Support?  250,000.

 2            THE COURT:  Okay.  We looked at a document a few

 3   minutes ago that you put the value of both companies at

 4   $8 million.  What document was that, Mr. Mikulecky?

 5            MR. MIKULECKY:  Your Honor, that was the ANB

 6   application for refinance, which was Exhibit 3.

 7            THE WITNESS:  But you have to realize, sir, that

 8   in 2012 I thought the company was worth more than that.  I

 9   didn't know what the market would bear.  And after hiring the

10   business broker, it was very evident that the market could

11   not bear that kind of value.

12   Q    (By Mr. Mikulecky)  Did you also have issues with the

13   loan that you had to ANB, and did that impact the sale?

14   A    Yes.  I was in hopes that ANB would let Kodiak assume

15   that loan, and ANB was not willing to let them do that unless

16   Michael and I, once again, signed on as guarantors.

17   Q    So, you would have still been liable on the loan?

18   A    Yes.

19   Q    Were they paying you enough at closing to be able to

20   pay those loans off?

21   A    No, they were not.

22   Q    So what was your concern?

23   A    Well, I had -- I had to pay the broker $400,000.  I had

24   -- in 2012 I still owed $1.6 million on the loan, if I

25   remember correctly.  So, you start doing the math and if I

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 163

 1   had sold the company I would have nothing to live on.

 2   Q    So you'd have no income, correct?

 3   A    Correct.

 4   Q    And continuing liability on the loan?

 5   A    Correct.

 6   Q    And under the terms they were proposing, they

 7   theoretically would make payments in the future; is that

 8   right?  Would they make another payment to the future to you

 9   or no?

10   A    No.

11   Q    Under the terms they were on?

12   A    It would basically -- it would be set up as -- if I

13   remember correctly it was the first year I would receive 50

14   percent of the profit, they would receive 50 percent of the

15   profit.  The next year it -- I would receive 33 percent of

16   the profit and they would get 67 percent.  And the fourth

17   year I would -- they would pay off the last of the sales

18   price.  It just -- it just didn't work.

19   Q    So, there was potential income in the future, but in

20   the meantime you have liability on the loan, correct?

21   A    Correct.  And plus I would still have to pay taxes on

22   the whole thing.

23   Q    And your concern was also that they could, of course,

24   take the assets of the company and you wouldn't have that

25   source of income?

United States of America vs.                                    Evidentiary Hearing - Day I
Michael David Wilhite                                                      September 15, 2015

Page 164

1          MS. FROEHLKE:  Objection.  Leading.

2          THE COURT:  I'll sustained it.  Give her a

3     question that doesn't suggest the answer.

4     Q    (By Mr. Mikulecky)  **What were your concerns about the**

5     **ability to be repaid?**

6     A    I -- whenever you sell something you have -- you

7     basically lose control over how the company is run.  And as a

8     consequence, my fear was that they may -- may not have the

9     highest of standards for the building of the floors that I

10    have and they'd lose customers.

11    Q    **And if they lost customers?**

12    A    That loses income.

13    Q    **Income to you?**

14    A    Yes.

15    Q    **Okay.**

16         THE COURT:  What's the relevance, Mr. Mikulecky,

17    about the failed sale to the issues we have in the case?

18         MR. MIKULECKY:  There are documents, as you've

19    seen, about the sale.  Questions about since Mr. Wilhite

20    signed it, the government arguing, therefore, Mr. Wilhite has

21    owned the company.

22         THE COURT:  Right.  But --

23         MR. MIKULECKY:  So, what I'm trying to --

24         THE COURT:  But the fact that it failed or didn't

25    fail is not relevant to what I'm doing.

United States of America vs.                                    Evidentiary Hearing - Day I
Michael David Wilhite                                                    September 15, 2015

Page 165

```
 1              MR. MIKULECKY:  Only that I'm trying to explain

 2    that Mrs. Wilhite was the one making those decisions and she

 3    has a rationale for doing so.

 4              THE COURT:  Okay.  Thank you.

 5              MR. MIKULECKY:  She's not just a straw man.

 6    Q   (By Mr. Mikulecky)  Mrs. Wilhite, this is not -- this

 7    proceeding is not the first time that the government has

 8    contacted you about Advanced Floor Concepts and Mr. Wilhite's

 9    ownership of it, correct?

10    A    That is correct.

11    Q    Do you remember how many times that's happened over the

12    past seven or eight years?

13    A    A lot.

14    Q    Turn, please, to Exhibit R.  Are you there?

15    A    Uh-huh.

16    Q    Okay.  And you have to turn it sideways to be able to

17    read it.  And I'll tell you this is a government -- a

18    document that the government produced.  I know it's not a

19    document that you prepared.  On the first page it says at the

20    top, United States Department of Justice Consolidate Debt

21    Collection System Compressed History Report, Criminal.  On

22    the left-hand side, Mr. Wilhite.  Do you see that?

23    A    Uh-huh.

24    Q    Yes?

25    A    Yes.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 166

1   Q    Okay.  Sorry.  Just to make it easier for the record.

2          MS. FROEHLKE:  Your Honor, I would object to this

3   witness testifying about the government's record.  Here, she

4   has no personal knowledge of --

5          THE COURT:  Well, we'll see.  We don't know that

6   yet.  He's -- that's what he's establishing.  So, overruled

7   for the moment.

8   Q    (By Mr. Mikulecky)  I want to go to page 4.  And you

9   have to look up in the upper right-hand corner for the page

10  numbers.

11         THE COURT:  Let's establish whether she had any

12  familiarity with the document.

13         MR. MIKULECKY:  I understand.  I'm not going to

14  ask her any questions about it.  I just want to make sure

15  she's there.

16  Q    (By Mr. Mikulecky)  Do you remember the first time that

17  the government contacted you and asked you questions about

18  Advanced Floor Concepts and Mr. Wilhite?

19         MS. FROEHLKE:  Your Honor, the witness is looking

20  at this document to answer the question.

21         THE COURT:  Yeah.  I understand.  So, you

22  shouldn't use this document to refresh any recollection

23  because we haven't established that you don't have a

24  recollection.  So --

25  A    Okay.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 167

1    Q    (By Mr. Mikulecky)  Do you recall the first time?

2    A    I'm going to say 2008, 2009.

3    Q    Okay.  Now, did you have a memory of that before you

4    looked --

5    A    No.

6    Q    Okay.  So, you don't have a memory of when it was?

7    A    As I say, 2008, 2009.

8    Q    Is what you recall?

9    A    Yes.

10        THE COURT:  Hold on.  You either recall it --

11        THE WITNESS:  I'm sorry.

12        THE COURT:  -- or you're looking at a document

13   that tells you --

14        THE WITNESS:  Okay.  I can't even read it --

15        THE COURT:  -- that's when it was.

16        THE WITNESS:  -- because I don't have my glasses

17   on so --

18        THE COURT:  I understand.  But now do you recall

19   it after looking at the document, or are you just relying on

20   the document as being accurate?

21        THE WITNESS:  I remember them calling me in and

22   Michael, and Scott, and I believe Rick was there also.  And

23   at that point in time AFC had lost $543,000 in that

24   particular year, so I'm guessing, 2009.

25   Q    (By Mr. Mikulecky)  And let me stop you --

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 168

```
 1   A    So that was the first time.
 2   Q    Okay.  Let me stop you for a minute there.  Without
 3   your glasses can you read this?
 4   A    No.
 5   Q    Okay.  So that was based on your memory not based on
 6   seeing the document?
 7   A    That is correct.
 8   Q    Okay.  So, let's put the document aside then for the
 9   time being, Exhibit R.
10        So you remember that in 2008 or 2009 you were contacted
11   and there was a meeting at that time?
12   A    Yes, sir.
13   Q    Were documents given to the government as well?
14   A    I believe I gave them my tax returns.
15   Q    All right.  Any other documents you recall giving them?
16   A    No.
17   Q    Do you remember giving any documents related to
18   Advanced Floor Concepts at that time?
19   A    Possibly the balance sheet.
20   Q    What happened as a result of that meeting and giving
21   the tax returns and the documents?
22   A    The government didn't contact me again for a while.
23   Q    How long, and what happened next?
24   A    I had purchased a little house out -- to flip.  It was
25   an auction.  And fixed the house up, came time for the sale
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 169

1    to close, and lo and behold the government had put a lien on

2    my property.

3    **Q    For what?**

4    A    For a judgment against Michael, even though the house

5    was not in Michael's name.

6    **Q    Okay.  So you had bought a house in your name?**

7    A    Yes.

8    **Q    Where did the money come from for that?**

9    A    From my mom -- from the inheritance from my mother.

10   **Q    Okay.  You did the work on the house?**

11   A    Yes.

12   **Q    Did you actually do the physical work yourself or hire**

13   **people to do it?**

14   A    I did part of the work myself and hired others.

15   **Q    Okay.  Time to sell it, the government put a lien on**

16   **related to Mr. Wilhite's debt?**

17   A    Yes, sir.

18   **Q    Okay.  What happened?**

19   A    I called you.

20   **Q    Okay.  And not getting into the details of those**

21   **discussions, what was the result?**

22   A    The Justice Department released the lien.

23   **Q    Okay.  And that was on a house that you had bought for**

24   **flip?**

25   A    Yes.

United States of America vs.                                    Evidentiary Hearing - Day I
Michael David Wilhite                                               September 15, 2015

Page 170

1   Q   Did you have to provide documents to the Justice

2   Department?

3   A   I don't believe so.  I want to say you handled it.

4   Q   So you don't recall what was provided?

5   A   No.

6   Q   Okay.  But eventually the lien was removed by the

7   government?

8   A   Yes, sir.

9   Q   What was the next communication you had with the

10  government about this?

11  A   I thought, well, if they put a lien on that little

12  house, I wonder what they did on the ranch.  And sure enough

13  they had put liens on -- a lien on my property up in

14  Westcliffe also.

15  Q   Okay.  Do you remember about when that was?

16  A   2010, I believe.

17  Q   Okay.  What happened next?

18  A   I called Scott.

19  Q   And what -- what action was taken with the government.

20  What did we do?

21  A   The lien was released.

22  Q   Do you remember the documents that we had to provide to

23  show the government, that you gave them?

24  A   I believe that I gave them all of the closing

25  documents, all of the title insurance, contract, everything.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 171

1    Q    Okay.  Turn, if you would, please, to Exhibit T.

2            MR. MIKULECKY:  And, Your Honor, this is an

3    exhibit that is not yet stipulated.  And I guess not yet.  It

4    probably won't be, but it's not stipulated.

5            THE COURT:  By the way, you did mention in opening

6    that there were four different sets of DOJ lawyers.

7    Obviously we haven't heard a single name.  Was that going to

8    come through Mr. Wilhite or was that your sort of --

9            MR. MIKULECKY:  Exhibit R is a stipulated exhibit,

10   Your Honor, and we can go through and see the different

11   history of those.

12           THE COURT:  Okay.  Well, you will have to point

13   that out then, because I doubt that either witness is going

14   to be able to identify the people with whom they dealt with

15   over -- over time.

16           MR. MIKULECKY:  And --

17           THE COURT:  If you're going to rely on that.

18           MR. MIKULECKY:  Understood.

19           THE COURT:  Okay.

20           MR. MIKULECKY:  And Exhibit T is one of them.

21   Q    (By Mr. Mikulecky)  Can you identify Exhibit T?

22   A    This is a letter from you to Steven Taylor.

23   Q    And the second page are you cc'd on this?

24   A    To me.

25   Q    So you got a copy of this?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 172

```
 1   A    Yes, sir.
 2   Q    Okay.  And attached to it are checks, tax records,
 3   deeds, other documents.  Would you take a moment to look
 4   through those and see if you can identify those.
 5   A    I don't know what these two checks are for.  This is
 6   from the assessor.  This is page 4.
 7   Q    Okay.  And that's for the property -- or the ranch in
 8   Westcliffe that shows you as the owner, right?
 9   A    Yes, sir.
10   Q    Okay.
11   A    And this next document is a warranty deed.
12   Q    For the Westcliffe ranch?
13   A    Yes, sir.
14   Q    Okay.  Next?
15   A    This is the promissory note to ANB Bank for the ranch.
16   Q    With you as the borrower?
17   A    Yes, sir.
18   Q    Okay.  Next?
19   A    Title policy.
20   Q    For the ranch again?
21   A    Yes, sir.
22   Q    Okay.  Showing the title in your name?
23   A    Yes, sir.
24   Q    And the second page is the other part of the title
25   policy on the next page?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 173

1   A    Yes.

2   Q    Okay.  Then we get to a cashier's check.  What's that?

3   A    This was my divorce settlement that made the down

4   payment for the ranch.

5   Q    Okay.  Next page, page 10?

6        THE COURT:  Whoa.  Divorce settlement?

7        THE WITNESS:  Yes, from my first marriage.

8        THE COURT:  2004?

9        THE WITNESS:  The divorce was set up so that my

10   ex-husband could retain the house and property in California

11   until his demise so that the kids could go back and see their

12   dad.  He died in 2003, and this was the settlement --

13        THE COURT:  Thank you.

14        THE WITNESS:  -- for that.

15   Q    (By Mr. Mikulecky)  Okay.  The next page?  We're up to

16   page 10 now of Exhibit T.

17   A    This is a settlement statement.

18   Q    Okay.  Page 11 is the second page of that settlement

19   statement, correct?

20   A    Yes, sir.

21   Q    Page 12?

22   A    This is the contract to buy and sell real estate.

23   Q    All right.  And on page 18, the signature, that's

24   yours, correct?

25   A    Yes, it is.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 174

1   Q     Okay.  Page 20.  What is that?

2   A     This was the counterproposal to buy the ranch.

3   Q     On page 21 you signed that?

4   A     Yes, I did.

5   Q     Okay.  Page 22 is the counterproposal and their

6   signature?

7   A     Yes, sir.

8   Q     Are these documents that we went through all copies of

9   records that you've maintained for your purchase of the

10  ranch?

11  A     Yes, sir.

12  Q     And are they true and accurate copies?

13  A     Yes, they are.

14  Q     And you maintain those for the ranch and to keep your

15  records complete?

16  A     Yes, sir.

17             MR. MIKULECKY:  Move for the admission, Your

18  Honor, of Exhibit T.

19             THE COURT:  What's the relevance?

20             MR. MIKULECKY:  Your Honor, the testimony has

21  already been from Mrs. Wilhite that she pledged the ranch as

22  an asset for the ANB loan which was used to fund AFC.  One of

23  the issues is going to be the fact that that ranch is owned

24  solely by her.  So, again, she's pledging solely her assets.

25  We provided all these documents to the government after they

Page 175

```
 1  put a lien on the home to establish to their satisfaction
 2  that the lien -- or that the house was owned solely by
 3  Mrs. Wilhite and, therefore, could not be liened for
 4  Mr. Wilhite's debt.  So, we're providing all these records to
 5  prove that to the government.  The next exhibit shows that
 6  that lien was removed.
 7           THE COURT:  Right.  But again, as it relates to
 8  any issue in our case?
 9           MR. MIKULECKY:  The issue in our case, Your Honor,
10  is they're saying that Mrs. Wilhite is a paper owner.  She's,
11  as we've shown, provided all of the loans.  She's put her
12  house, which she solely owns on the line.  And that was
13  risking foreclosure.  She's already testified that when the
14  economy turned bad ANB was going to take her business, and
15  going to foreclose on her house.  And we want to show that
16  she's been the one at risk.  She's done -- foot the
17  liability.  This has been her business every step of the way.
18  And part of it is she put her personal assets on the line.
19           So, it's important to establish that the
20  government challenged that, now, for the second time that it
21  is her assets.  And this, in fact, the government backed down
22  when we proved that this was solely owned by her, and this is
23  her asset.  It was her security for her company.
24           THE COURT:  Did you say there was any letter from
25  the government that says -- that agrees with her?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 176

 1          MR. MIKULECKY:  The next exhibit, Your Honor, is
 2    Exhibit U.  The second page of that is the release from the
 3    government.  My letter to Mr. Taylor asking him to sign the
 4    release of lien, which you'll notice was signed by the
 5    government and recorded.
 6          MS. FROEHLKE:  Your Honor, we would object to
 7    relevance and hearsay of both exhibits.  The release --
 8    partial release of a lien should not impugn some sort of
 9    agreement by the government or binding decision made by the
10    government just because the partial lien release was
11    negotiated by Mr. Mikulecky.  And doesn't mean we necessarily
12    thought that to be the case.
13          Furthermore, the actual addressee, Mr. Steven
14    Taylor, of this initial letter is not testifying in this
15    hearing whatsoever, and it's completely hearsay.
16          THE COURT:  That's probably not a good reason
17    because you'll have Mr. Taylor get a subpoena tonight up in
18    his house in Evergreen.
19          You know, I've received her oral testimony.  I
20    think I'll exclude the exhibit.  So I'll sustain the
21    objection, but for what it's worth, I accept the fact that
22    all documents are titled in her name, and that she used the
23    property as collateral with the bank.
24    Q    (By Mr. Mikulecky)  Do you remember then the next time
25    that you heard from the government after this lien in 2011?

United States of America vs.                                     Evidentiary Hearing - Day I
Michael David Wilhite                                                        September 15, 2015

Page 177

1    A    They filed a writ of execution for a sheriff sale for

2    Advanced Floor Concept without due process.

3    Q    Okay.  Before that do you remember another meeting in

4    2012 at the offices of the US Attorney?

5              MS. FROEHLKE:  Objection.  Leading.

6              THE COURT:  No, that's fine.  It's just a

7    statement used to refresh her recollection.  Overruled.

8    A    I don't -- I don't remember.

9    Q    (By Mr. Mikulecky)  Okay.

10   A    I'm sorry.

11   Q    That's all right.  Do you remember that the government

12   has subpoenaed documents from Advanced Floor Concepts?

13   A    Yes, sir.

14   Q    Do you remember that you have voluntarily produced

15   documents for Advanced Floor Concepts?

16   A    Yes, sir.

17   Q    And personal tax returns?

18   A    Yes, sir.

19   Q    Corporate tax returns?

20   A    Yes, sir.

21   Q    And they have subpoenaed records from your accountants?

22   A    Yes, sir.

23   Q    From suppliers?

24   A    Yes, sir.

25   Q    From your customers as well?

United States of America vs.                              Evidentiary Hearing - Day I
Michael David Wilhite                                            September 15, 2015

Page 178

```
 1   A    Yes, sir.

 2   Q    Your bank records?

 3   A    Yes, sir.

 4   Q    For three or four different banks, correct?

 5   A    Yes, sir.

 6   Q    All right.  Have you kept track of how many documents

 7   have been voluntarily produced or subpoenaed?

 8   A    Around 10,000, I'm guessing.

 9   Q    And all the documents that we've seen so far have

10   identified you as the owner of Advanced Floor Concepts; is

11   that right?

12             MS. FROEHLKE:  Objection.

13             THE COURT:  I think it misstates the testimony,

14   but if you want her to answer that question I'll overrule the

15   objection.  Go ahead.

16   A    Restate it, please.

17   Q    (By Mr. Mikulecky)  Yes.  Have you seen any documents

18   here today that have identified anyone other than you as the

19   owner of Advanced Floor Concepts?

20   A    No, sir.

21   Q    Turning to Exhibit 22, please.  Are you there?

22   A    Yes, sir.

23   Q    What is that?

24   A    It's a signature card for Colorado Mountain Bank.

25   Q    For whom?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 179

```
 1   A     Myself and Michael.

 2   Q     So a joint account for you and Mr. Wilhite?

 3   A     Yes, sir.

 4   Q     Okay.  What's the date?

 5   A     January 22nd, '07.

 6   Q     Okay.  Turn to the second page, please, of Exhibit 22.

 7   A     Okay.

 8   Q     Whose handwriting is on that page?

 9   A     Mine.

10   Q     And there is two signatures at the bottom.  Do you see

11   that?

12   A     Yes, sir.

13   Q     Whose signatures?

14   A     Mine and Michael's.

15   Q     Okay.  Now, under the primary account holder, that's --

16   your identified in that section, correct?

17   A     Yes, sir.

18   Q     Joint account holder is Mr. Wilhite, correct?

19   A     Yes, sir.

20   Q     And for his employer it shows, several lines down,

21   Advanced Floor Concepts, correct?

22   A     Yes, sir.

23   Q     Okay.  His position it says owner, right?

24   A     That's what it says.

25   Q     Why did you list Mr. Wilhite as the owner of Advanced
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 180

1    Floor Concepts?

2    A    Because I made a mistake.

3    Q    How did that happen?

4    A    Well, two things.  I fill out multiple credit

5    applications, financial reports.  And at that point in time I

6    would do Southern Colorado Construction Consulting, d/b/a DW

7    Support, owner; Advanced Floor Concepts, owner; Steel Deck

8    Supply, owner.  It was -- it was just a mistake.  And plus my

9    sister had just passed away 10 days prior to me filling this

10   out.  I had spent probably a good week trying to comfort my

11   mother who just lost her oldest daughter.  And I was just

12   looking for some peace.  Went up to the ranch.  Thought,

13   okay, I've got some free time in the middle of the week, went

14   down and filled this out.  It was just a mistake.

15   Q    When you were distracted, obviously?

16   A    Yes.

17   Q    Mrs. Wilhite, since you started Advanced Floor Concepts

18   almost 20 years ago, you testified that it's grown, stumbled

19   in the recession, almost closed.  Is it now stable again and

20   doing well?

21   A    Yes, it is.

22   Q    Has the company received benefit from -- well, the

23   company has received benefit of your decisions, of your

24   money, but has the company also received benefit from its

25   employees?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 181

 1   A    Of course.  That's how a company grows.

 2   Q    Do you believe that your company, Advanced Floor

 3   Concepts, has benefited unfairly from the work of its

 4   employees?

 5   A    No.  I do not.

 6   Q    Why not?

 7   A    They're paid a fair wage.  In fact, most of my

 8   employees are paid more than other companies that do the same

 9   thing.

10   Q    What do you expect of your employees?

11   A    That they do an honest day's work for an honest day's

12   pay.

13   Q    Do you expect them to improve the company?

14   A    The employees that are with my company now have been

15   with me for a long time.  They're very loyal.  And they --

16   they have pride in what they do.

17   Q    Do you expect then the work that they do to be

18   beneficial to your company?

19   A    Of course.

20   Q    Does the work that they do to benefit the company make

21   any of them owners?

22   A    No, it does not.

23   Q    Why not?

24   A    Because I am the sole owner.

25   Q    Who has responsibility -- who has liability for the

United States of America vs.                    Evidentiary Hearing - Day I
Michael David Wilhite                                September 15, 2015

Page 182

```
 1   financial risks of AFC?

 2   A    I do.

 3   Q    Who makes the ultimate decisions at AFC?

 4   A    I do.

 5   Q    Has that ever changed?

 6   A    No, it has not.

 7   Q    Who suffers the consequences of any bad decisions that

 8   AFC makes?

 9   A    I do.

10   Q    Who has maintained this company?

11   A    I do.

12   Q    Who organized it?

13   A    I did.

14           MR. MIKULECKY:  Your Honor, if I can have just a

15   moment.

16           THE COURT:  Yeah.  I'm going to ask you questions,

17   Mrs. Wilhite.  To your knowledge does Mr. Wilhite own any

18   property in his name whatsoever?

19           THE WITNESS:  No, sir, he did does not.

20           THE COURT:  Neither real nor personal property?

21           THE WITNESS:  No.

22           MR. MIKULECKY:  Are you through, Your Honor?

23           THE COURT:  Yes.

24           MR. MIKULECKY:  Okay.  Sorry.  We have no further

25   questions.  Can we take a break for Mrs. Wilhite's back?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 183

 1           THE COURT:  That will be fine.  How long do you

 2    want?

 3           MR. MIKULECKY:  10 or 15 minutes.  Just time to

 4    walk around and stretch her back.

 5           THE COURT:  Just tell me when you're ready.  I'm

 6    prepared to go until -- you guys can decide how long you want

 7    to go.  I can go until 6:00.  That's about the best we can do

 8    out of the Marshals downstairs.

 9           MR. MIKULECKY:  Understood.

10           THE COURT:  They like to us to clear out by then.

11           MS. FROEHLKE:  Your Honor, we do have one witness

12    who can only testify today.  So, at some point if we can take

13    a break for that.  It shouldn't be too long.

14           THE COURT:  Well, I think that should be the next

15    witness if that's all right with you guys.

16           MS. FROEHLKE:  I agree, Your Honor.

17           UNKNOWN SPEAKER:  And, Your Honor, we talked with

18    the government and we agreed that we'll take them out of

19    order, so absolutely --

20           THE COURT:  Okay.

21           UNKNOWN SPEAKER:  -- once they're finished with

22    Mrs. Wilhite, we can then call Mr. Fisher.

23           THE COURT:  Very good.  We'll be in recess.

24           UNKNOWN SPEAKER:  Or we can call him right when we

25    start back.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 184

 1              UNKNOWN SPEAKER:  (Unintelligible).

 2              UNKNOWN SPEAKER:  Up to you.  So what --

 3              UNKNOWN SPEAKER:  We'll let you know

 4    (unintelligible).

 5              UNKNOWN SPEAKER:  That's fine.

 6              THE COURT:  Okay.

 7              THE COURTROOM DEPUTY:  All rise.  Court is in

 8    recess.

 9              (A Break taken from 2:35 p.m. to 2:54 p.m.)

10              THE COURT:  Back on the record in Case

11    No. 00-cr-504.  We've completed the direct examination of

12    Mrs. Wilhite.  What's the United States' preference at this

13    point?

14              MS. FROEHLKE:  Your Honor, we would call Rod

15    Fisher for a brief direct testimony out of order.

16              THE COURT:  Okay.  Rod Fisher, please come

17    forward.

18              (There was a pause in the proceedings.)

19              THE COURTROOM DEPUTY:  Raise your right hand.

20              (The witness, Mr. Rod Fisher, was sworn to tell

21    the truth by the Courtroom Deputy.)

22              THE WITNESS:  I do.

23              THE COURT:  Please proceed when you're ready.

24    /////

25    /////

United States of America vs.                                Evidentiary Hearing - Day I
Michael David Wilhite                                              September 15, 2015

Page 185

```
 1                        DIRECT EXAMINATION
 2   BY MS. FROEHLKE:
 3   Q    Mr. Fisher, how are you currently employed?
 4   A    I am employed with R&S Steel, steel service center in
 5   Denver.
 6   Q    What is R&S Steel?
 7   A    We distribute structural products, kind of like a
 8   lumberyard.  But it's steel related products.
 9   Q    How long have you been with R&S?
10   A    Three years.
11   Q    What about before that?  Where did you work?
12   A    Timberline Steel, O'Neil Steel, Steel Incorporated for
13   34 years.
14   Q    Is that all one company that went --
15   A    Yes.
16   Q    -- through different names?  Okay.  What was your title
17   with the Timberline company that you spent 30-plus years at?
18   A    At the end I was general manager and outside sales.
19   Q    And what were your duties in that capacity?
20   A    Managed the sales department, both internally and
21   externally, and financial statements and stuff like that.
22   Q    What about your title today?
23   A    I am the general manager of R&S.
24   Q    And are your duties similar to the general manager
25   duties you just listed?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 186

 1   A    They are.

 2   Q    How long have you been in the steel industry total?

 3   A    Right at close to 38 years.

 4   Q    Was this all in Colorado or anywhere else?

 5   A    It was.

 6   Q    Do you know Michael Wilhite?

 7   A    I do.

 8   Q    When did you first meet him?

 9   A    Well, it had to have been probably 2003, 2004

10   timeframe.

11   Q    And what was the context of that?

12   A    He was a customer of ours.

13   Q    Was this when you were with --

14   A    -- the Timberline Group.

15   Q    How did you come to meet Michael?  Mr. Wilhite.

16   A    It was on a sales call.  We went there, and I was

17   introduced by Tami Lombardo who was the outside salesman at

18   that time.

19   Q    What -- how did he introduce Mr. Wilhite to you?

20   A    It was just Mr. Wilhite.  Mike Wilhite, Advanced

21   Floors.

22   Q    Did he indicate what Mr. Wilhite's position was in any

23   way?

24   A    Prior to that we had an internal meeting and I was

25   instructed or told that Mike was the --

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 187

 1              MR. BEDNARSKI:  Objection, Your Honor.  Hearsay.

 2              THE COURT:  Sustained.

 3              MS. FROEHLKE:  Your Honor, may I respond?

 4              THE COURT:  Yes.

 5              MS. FROEHLKE:  I believe that this would be affect

 6   on the listener.  Mr. Fisher proceeded under whatever

 7   impression he was given by his internal meeting to deal with

 8   Mr. Wilhite accordingly.

 9              MR. BEDNARSKI:  And what's the relevance of that,

10   Your Honor?

11              THE COURT:  He can testify as to that he had an

12   impression, but the source of that, I think at least at this

13   instance, it's hearsay.

14              MS. FROEHLKE:  Yes, Your Honor.

15              THE COURT:  This is an out-of-court statement made

16   to prove the truth of the matter that he was told Mr. Wilhite

17   was owner.

18              MS. FROEHLKE:  And we would offer it for his

19   perspective and knowledge of who he was dealing with in the

20   company in terms of his own position as sales manager, not

21   necessarily that Mr. Wilhite was, in fact, the owner.

22              MR. BEDNARSKI:  Your Honor, then what's the

23   relevance of that?  There is no relevance to that.

24              THE COURT:  Well, if Mr. Wilhite -- if he's

25   treating Mr. Wilhite as an owner and he's spent 38 years in

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 188

 1  the industry and he knows what an owner is -- which I'll

 2  accept that he does -- and Mr. Wilhite is acting as an owner,

 3  there's at least some marginal relevance to that.  You can

 4  ask him how he treated him, but I think at least in this

 5  instance the question is objectionable.

 6  Q    (By Ms. Froehlke)  Mr. Fisher, did you have any opinion

 7  or impression as to what Mr. Wilhite's position in the

 8  company was?

 9            MR. BEDNARSKI:  Objection, Your Honor, foundation.

10            THE COURT:  Well, when we get to the foundation

11  that might be a good objection.  The question is did he have

12  one.

13            THE WITNESS:  That he was --

14            THE COURT:  So, that's a yes or no question.

15            THE WITNESS:  That he was the decision-maker.

16            MR. BEDNARSKI:  Your Honor --

17            THE COURT:  Okay.  Let's -- let's -- I'll strike

18  the answer.  Ask him the answer again.

19  Q    (By Ms. Froehlke)  Sure.  Mr. Fisher, if you could just

20  answer yes or no.  Did you have an impression or opinion

21  about Mr. Wilhite's title in the company?

22  A    Yes.

23  Q    What was the basis of your impression or opinion?

24            THE COURT:  Without giving the impression or

25  opinion, just describe why you believe whatever it is you

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 189

 1   believe.

 2            THE WITNESS:  Basically, just because of the

 3   dealings that we had with him that he was the decision-maker

 4   within the company.

 5   Q    (By Ms. Froehlke)  What dealings did you have with him?

 6   A    The -- where we were supplied pricing, if there was

 7   questions or concerns about stuff, generally, he was the

 8   point of contact along with some other people within the

 9   organization.

10   Q    And if we could back up for a minute and explain

11   exactly what you were supplying to Advanced Floor.

12   A    It was some fabricated steel parts.  There was also

13   beams for his structural floors that we painted -- prepainted

14   and delivered.  Some we delivered, some they will-called.

15   Most of it they will-called on their own trailers at night.

16   We would stage it, they'd come by in the morning and pick it

17   up and go to a job site.

18   Q    Were you in charge of this account?

19   A    Jointly, yes.

20   Q    With who else?

21   A    Tammy Lombardo, who was the outside salesman dedicated

22   (unintelligible).

23   Q    When did you first meet Mr. Wilhite in person, if at

24   all?

25   A    Again, probably back 2004.  Somewhere in that area.

United States of America vs.                                    **Evidentiary Hearing - Day I**
Michael David Wilhite                                                   September 15, 2015

Page 190

 1   Q     **And where was that?**

 2   A     At his facility in Castle Rock.

 3   Q     **When you say "his facility," what do you mean?**

 4   A     His office in Castle Rock.

 5   Q     **Advanced Floor?**

 6   A     Uh-huh.

 7   Q     **What did you discuss that day?**

 8   A     It was just more of a greet and meet.  Meet Mike and

 9   the people that was working for him at that time.

10   Q     **Who else did you meet that day?**

11   A     I believe there was Torin, there was -- Skyler was

12   there.  I think Torin was there.  I think Brendan was there.

13   Some of his key people were there.

14   Q     **What positions, to your knowledge, did they hold?**

15   A     Torin was kind of a -- did a lot of the purchasing

16   side.  I think he even had some engineering function.

17   Brendan was his -- was more the field supervisor.  And Skyler

18   did some buying and also some engineering, I believe.

19   Q     **Was Mrs. Wilhite there that day?**

20   A     I don't recall if she was or not, to be honest with

21   you.

22   Q     **How often did you interact with Mr. Wilhite on behalf**

23   **of Timberline Steel?**

24   A     At least monthly.  I mean, we had meetings or, you

25   know, meet directly with Mike or with some of the people down

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 191

1   there.

2   Q    Did you ever have a meeting regarding steel with

3   Mrs. Wilhite?

4   A    Not that I recall, no.

5   Q    What did these meetings entail?

6   A    They entail a variety of things.  It could be some new

7   pricing that we had presented to them, or it could have been

8   some issues with service, or a new product that possibly they

9   were going to bring on board.  Or just a variety of things

10  that you deal with on a day-to-day basis.

11  Q    Did you gather an impression that Mr. Wilhite needed

12  approval for price adjustments or something that maybe

13  changed the original agreement?

14  A    No.

15  Q    How long did this relationship continue?

16  A    Until we elected to get out of that type of business,

17  which was -- I believe was in 2007.

18  Q    Can you estimate how much -- dollar wise how much

19  business Advanced Floor and Timberline Steel did during that

20  time?

21          MR. BEDNARSKI:  Objection, Your Honor.  Relevance.

22          THE COURT:  I think it goes to the volume of

23  business.  So, I know relatively the volume of business that

24  the company was doing based on the documents I've already

25  seen, so if this is the 70-80 percent supplier then that's

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 192

1  relevant.  So I'll overrule that.

2  A    I would say it was 2 to -- 2- to- 3 and a half million

3  dollars annually, when it was going full -- full blow.

4  Q    (By Ms. Froehlke)  When you elected to get out of

5  the -- that area, as I think you just testified to, how did

6  you -- how did Advanced Floor learn of that?

7  A    I talked to Mike about it.

8  Q    And what did that conversation entail?

9  A    Basically explained to him why we were getting out of

10  painting beams.  It just wasn't profitable anymore and we

11  were going to go a different direction.  And so we

12  communicated that to him.

13  Q    What was his response?

14  A    At the time, if I recall, it was, well, I think we can

15  still make it work.  There's a few places that don't allow

16  us -- or we don't think we have to paint the beams anymore,

17  but then that didn't -- that didn't happen.  We ended up

18  losing the business.

19  Q    Did Mr. Wilhite ever discuss Advanced Floor's business

20  in general with you outside of the Timberline contract?

21  A    Just once and a while we would talk about some new

22  product that he was bringing on board.  Like, some decking

23  material for decks and stuff like that.  But other than that,

24  no.

25  Q    Did Mr. Wilhite ever mention that he was retired to

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 193

1   you?

2   A    No.

3   Q    Did you ever notice a drop in his communication with

4   you over the time period through 2009, I think you said?

5   A    Yeah.  Towards the end he seemed to be kind of tailing

6   out of it, and Torin was doing more.  And then there was

7   another gentleman that they brought on board, I think was

8   related to the family.  I don't recall his name, but he got

9   more active I think in the last year and a half of it.

10  Q    Have you ever met Mrs. Wilhite?

11  A    I have.

12  Q    In what context?

13  A    We've gone to dinner.  We've gone to some sporting

14  events together along with Mike.  We did company barbecues

15  for them.

16  Q    Did you know if she was employed or not?

17  A    That, I don't know.

18  Q    Did you know -- have you ever dealt with Mrs. Wilhite

19  in relation to Advanced Floor?

20  A    No, not directly.

21          MS. FROEHLKE:  No further questions.

22          THE COURT:  I'm going to ask just a couple before

23  we go to cross.

24          MR. BEDNARSKI:  Yes, Your Honor.

25          THE COURT:  What year -- what month and year did

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 194

 1   your business relationship end with Advanced Floor Concepts?

 2            THE WITNESS:  I want to say it was 2007.  It was

 3   either 2007 or early 2008.  Because we got out of that and

 4   redid that whole area.

 5            THE COURT:  Were you ever aware of any health

 6   problems that Mr. Wilhite had?

 7            THE WITNESS:  No.

 8            THE COURT:  And in any of your conversations with

 9   Mr. Wilhite did -- did you discuss aspects of the contracts

10   such as how much product, what the price would be, when it

11   would be delivered, all those kinds of things?

12            THE WITNESS:  Yes, sir.

13            THE COURT:  Okay.  In any of those conversations,

14   did Mr. Wilhite ever say that he needed to confer or check

15   with any other person before he could commit to any

16   particular aspect of a -- of a sale?

17            THE WITNESS:  Not that I recall, no.

18            THE COURT:  Okay.  Go ahead.

19            MR. BEDNARSKI:  Thank you, Your Honor.

20                      CROSS-EXAMINATION

21   BY MR. BEDNARSKI:

22   Q    Good afternoon, Mr. Fisher.

23   A    Good afternoon.

24   Q    Now, you had indicated that you were working with, I

25   think it was, Timberline Steel when you were having this

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 195

 1    contact with Advanced Floor Concepts and selling them these

 2    beams and the other manufactured steel; is that correct?

 3    A    Yes, sir.

 4    Q    That started in approximately 2003?

 5    A    It started before -- yes.  Probably about 2002, 2003.

 6    Q    And then it went to 2000 and about '7, maybe very early

 7    part of 2008?

 8    A    Correct.

 9    Q    Now, when you were introduced, you were introduced to

10    Mike Wilhite at his office at Advanced Floor Concepts,

11    correct?

12    A    I believe so, yes.

13    Q    I think you had indicated that there were other

14    employees there, right?

15    A    Yes.

16    Q    Torin Jackson was one of them?  I'm sorry, I just need

17    you to say yes or no for the record.

18    A    Yes.

19    Q    We're recording it.  Thank you.  That I think there was

20    a Skyler Stiverson.  Does that sound about right?

21    A    That sounds about right.  Yes, sir.

22    Q    And I think you had indicated there was a Brendan; is

23    that right?

24    A    That's correct.

25    Q    And they all had different roles within the company?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 196

1  A    Yes, sir.

2  Q    Now, when you would call Mr. Wilhite, you'd call him

3  and talk with him as it related to different pricings of the

4  steel, right?

5  A    Either a phone call or in person, yes, sir.

6  Q    And -- and all of those contacts, were they all made

7  just by you or were they also made by the other outside sales

8  that initially introduced you to Mr. Wilhite?

9  A    By other people also.

10 Q    Now, you'd indicated that in 2007 -- so, between 2003

11 and 2007 you were having some of these monthly meetings,

12 approximately, with Mr. Wilhite, right?

13 A    Correct.  Yes, sir.

14 Q    It dealt with different products that you guys might

15 have; that you might be changing some of the products that

16 you had?

17 A    Correct.  Or the design changed, whatever.

18 Q    Design change, pricing change.  Just different changes?

19 A    Yes, sir.

20 Q    Now, in that time you'd indicated that Mr. Wilhite did

21 sign contracts with Timberline, right?

22 A    No signed contracts.  Most of it was either verbal or

23 done over, you know, on -- there was no signing of anything.

24 It was just agreed upon.

25 Q    Okay.  So, it was kind of at your word?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 197

 1    A    Yes.

 2    Q    And then obviously invoices would be sent to Advanced

 3    Floor Concepts from Timberline, right?

 4    A    Correct.

 5    Q    Now, would it be fair to say that you weren't involved

 6    in, necessarily, the financial aspects of Timberline; is that

 7    right?

 8    A    That is correct.

 9    Q    That what you would do is the invoice would get sent

10    out, and then a check would come in and go to your accounting

11    department?

12    A    That is correct.

13    Q    Now, as -- as general manager of Timberline you did --

14    you talked to people about pricing, right?

15    A    Yes, sir.

16    Q    You -- and the price that you had, you were allowed to

17    negotiate that if you felt it was appropriate, correct?

18    A    Correct.

19    Q    You had the ability to talk to them about design,

20    right?

21    A    Yes.  We talked about some design changes, yes.

22    Q    And, obviously, you didn't create the design changes,

23    you talked to them about the design changes?

24    A    Correct.

25    Q    You were able to enter into verbal contracts?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 198

 1   A    Yes.

 2   Q    You were able to negotiate those verbal contracts with

 3   not only Advanced Floor Concepts but other -- other

 4   companies, correct?

 5   A    Correct.

 6   Q    Now -- and what you were doing in the negotiation of

 7   those things was exactly what Mike was doing in the sense

 8   that he was negotiating those contracts, right?

 9   A    I believe so, yes.  I can't speak for Mike.

10   Q    Well, right.  And what I mean by that is, the Judge

11   asked you a few questions about that he didn't have to go get

12   approval for some -- from somebody before he entered into

13   this contract with you, right?

14   A    Correct.

15   Q    And you didn't have to do that either, correct?  As

16   general manager of Timberline, you could enter into a verbal

17   contract without getting approval?

18   A    No.  Most of the time I had approval from the vice

19   president or president of the company.

20   Q    Okay.  So you had approval before you went in?

21   A    Uh-huh.

22   Q    Now, if you negotiated those, were you then able to

23   make a deal without going back to your -- your -- or your --

24   the owners?

25   A    As long as the most part -- if the price we agreed upon

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 199

 1   didn't change, yes.  If there was a change, then I would have

 2   to go back.

 3   Q    Okay.  If there's a significant change you'd have to go

 4   back?

 5   A    Yes, sir.

 6   Q    Now, as general manager of Timberline you were not an

 7   owner of Timberline; is that correct?

 8   A    That's correct.

 9   Q    There were owners above you, right?

10   A    Yes, sir.

11   Q    Now, these owners, they're not necessarily involved in

12   the everyday dealings of the company, correct?

13   A    The owner we had was.

14   Q    Okay.  The owner you had was.  And at R&S you said

15   you're general manager now, correct?

16   A    Yes, sir.

17   Q    You're not an owner of the company, right?

18   A    No, sir.

19   Q    Fair to say each company and each business that you've

20   had contact with over your 38 years, they run their

21   businesses differently?

22   A    Correct.

23   Q    Some owners are highly involved?

24   A    Yes.

25   Q    Some owners aren't?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 200

 1   A    Correct.

 2   Q    Some owners leave it to the general manager or the

 3   manager of the company to handle the day-to-day business,

 4   correct?

 5   A    Yes, sir.

 6   Q    Now, in 2007, slash, early part of 2008, I think you

 7   had testified that at that time Mike seemed that he was

 8   starting to decrease the amount of work that he was doing for

 9   Advanced Floor Concepts, correct?

10   A    Yes, sir.

11   Q    And that other people, in this case Torin Jackson,

12   Skyler, Brendan DePaola, they were kind of taking over more

13   of the role of what Mike had been before?

14   A    And one other gentleman.  And like I said I can't

15   remember his name, but he was probably more active than the

16   other three.

17   Q    Does Roger Otterstein sound familiar?

18   A    I -- yeah, it doesn't ring a bell, but it's -- I mean,

19   it's possible.

20   Q    Okay.  And I'm just asking.

21   A    Yeah.

22   Q    And so before you terminated your business in this

23   area, those other individuals started negotiating the

24   contracts with you or your outside sales, correct?

25   A    Correct.

United States of America vs.                                    Evidentiary Hearing - Day I
Michael David Wilhite                                                      September 15, 2015

Page 201

1          MR. BEDNARSKI:  Thank you.  No further questions.

2          THE COURT:  Okay.  Mr. Mikulecky, anything from

3    you?

4          MR. MIKULECKY:  No, Your Honor.

5          THE COURT:  All right.  Any redirect?

6          MS. FROEHLKE:  Briefly, yes.

7                    REDIRECT EXAMINATION

8    BY MS. FROEHLKE:

9    Q    Mr. Fisher, in your interactions with Advanced Floor

10   over those years, did you ever have any reason to believe

11   there was a decision-maker, as you called Mr. Wilhite, other

12   than Mr. Wilhite?

13   A    No, ma'am.

14         MS. FROEHLKE:  No further questions.

15         THE COURT:  Just one more, and you can obviously

16   ask more questions if you want to.  Did Mr. Wilhite ever tell

17   you that he was an owner?

18         THE WITNESS:  No, sir.

19         THE COURT:  Okay.  Thank you.  All right.

20         MR. BEDNARSKI:  No --

21         THE COURT:  You're excused.

22         MR. BEDNARSKI:  No questions.

23         THE COURT:  All right.  Are we going to go to

24   Mrs. Wilhite cross?  Okay.  Are you able to come up,

25   Mrs. Wilhite?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 202

```
 1              MRS. WILHITE:  Yes.

 2              THE COURT:  Okay.

 3                      CROSS-EXAMINATION

 4   BY MS. FROEHLKE:

 5   Q    Mrs. Wilhite, I believe you testified that you've been

 6   married to Mr. Wilhite since 1993; is that right?

 7   A    That's correct.

 8   Q    And you've been his primary source of financial support

 9   since that time?

10   A    Yes, ma'am.

11   Q    He does not contribute to the household at all; is that

12   right?

13   A    Not financially since 2008.

14   Q    And he has not received a paycheck since 2008 from

15   Advanced Floor?

16   A    That's correct.

17   Q    Prior to that he was receiving a paycheck, right?

18   A    Yes, he was.

19   Q    And I believe you just testified earlier that your

20   husband has no assets of his own?

21   A    That is correct.

22   Q    You and your husband discuss important matters; is that

23   right?

24   A    That is correct.

25   Q    So he told you about Mr. Clement's criminal case in
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 203

1    1997.  Do you recall that?

2    A    He told me about the fact that he was concerned that

3    Geoff had -- had created a fraudulent transaction with the

4    Bank of Australia.

5    Q    And he told you that while you were still working at

6    Klebold Consulting, right?

7    A    That is correct.

8    Q    So, early 1997?

9    A    That is correct.

10   Q    And you knew your husband went to the US Attorney's

11   Office in 1997 as well, right?

12   A    Yes, ma'am.

13   Q    He told you about his interview with FBI agents in June

14   of that year?

15   A    I don't recall.

16   Q    You don't recall hearing about an FBI interview with

17   your husband?

18   A    It's 18 years ago.

19   Q    You'd agree being interviewed by the FBI is probably an

20   important matter?

21   A    Yes.

22   Q    And your husband hired a criminal attorney in his case,

23   right?

24   A    Yes, he did.

25   Q    I believe your lawyer may have mentioned it was in

United States of America vs.                          Evidentiary Hearing - Day I
Michael David Wilhite                                        September 15, 2015

Page 204

```
 1   1998.  Do you recall?

 2   A    I don't recall.

 3   Q    But you paid for that attorney, didn't you?

 4   A    Yes, but I don't know the dates.

 5   Q    But you do recall paying a criminal attorney for his

 6   fees and possibly some sort of retainer in 1998?

 7   A    I suppose so.

 8   Q    You testified earlier you didn't know that your husband

 9   was going to be criminally charged until 2000; is that

10   correct?

11   A    That is correct.

12   Q    But you do know that he was criminally charged

13   eventually, right?

14   A    Yes.

15   Q    And he pled guilty?

16   A    Yes.

17   Q    And you do know that he was ordered to pay restitution,

18   right?

19   A    That is correct.

20   Q    I'd like you to turn to Exhibit A.  It's in the smaller

21   notebook in front of you.  And we can also pull it up on the

22   screen here.  This is your resumé you testified earlier?

23   A    That is correct.

24   Q    If we could go to the second page of Exhibit A.  I

25   apologize, the last page of Exhibit A.  Mrs. Wilhite, this is
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 205

 1   your list of references on your resumé?

 2   A    Yes, ma'am.

 3   Q    Those are two banking references; is that right?

 4   A    That is correct.

 5   Q    There are no steel floor clients listed?

 6   A    This was my banking practices.

 7   Q    And you don't have any steel floor references included

 8   in your resumé?

 9   A    No, ma'am.

10   Q    If you go back to the first page of Exhibit A, I just

11   want to clarify something.  It says that you've owned

12   Advanced Floor since August, 1997.  That's incorrect, right?

13   A    Yes.  It was a typo.

14   Q    Okay.  So you intended for it to read October?

15   A    Yes, ma'am.

16   Q    Okay.  Before you started DW Support Systems you were

17   at Klebold Consulting, right?

18   A    That is correct.

19   Q    You were there for eight and a half years?

20   A    Yes, ma'am.

21   Q    As an inspector?

22   A    Yes, ma'am.

23   Q    You had no direct experience in structural steel floor,

24   right?

25   A    Not until spring of 1997.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 206

```
 1   Q    When you went to a job your husband was working on?  Is
 2   that what you testified to earlier?
 3   A    I had seen structural steel floors being constructed in
 4   the course of my duties as an inspector.
 5   Q    But you had never constructed one yourself?
 6   A    No, ma'am.
 7   Q    You had never designed one yourself?
 8   A    No, ma'am.
 9   Q    You had never purchased steel for a steel floor prior
10   to Advanced Floor, right?
11   A    No, I had not.
12   Q    And you quit Klebold in July of 1997?
13   A    That is correct.
14   Q    And that's because you were doing everything, right?
15   A    Yes, ma'am.
16   Q    You were doing all the work and the owner was making
17   all the money?
18   A    That is correct.
19   Q    You started DW Support in May '97; is that right?
20   A    That is correct.
21   Q    And you did not need startup funds for that?
22   A    No.
23   Q    And just to be clear, Southern Colorado Construction
24   Consulting, I know we've discussed this, but that's the same
25   thing as DW Support Systems, right?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 207

 1   A    It's a d/b/a.

 2   Q    It's a d/b/a.

 3   A    Yes, ma'am.

 4   Q    Okay.  So this represented you going out on your own,

 5   right?

 6   A    Yes.

 7   Q    And it's also an inspection business, what you were

 8   doing at Klebold, right?

 9   A    That is correct.

10   Q    You used contacts from your previous work to develop a

11   client base?

12   A    I did.

13   Q    And it was a full-time inspection job?

14   A    No.  When I first started the company you build it one

15   bank at a time, and they bring on -- as they brought on loans

16   then I was dispatched to do the inspections and do the

17   monitoring of the projects.

18   Q    When do you think you began doing 50 to 60 inspections

19   a day, as you to testified earlier?

20   A    Oh, probably three years ago.  It -- it had built back

21   up.  When I first started the company it probably took two

22   years.

23   Q    So --

24   A    (Unintelligible).

25   Q    -- within two years you had a steady inspection

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 208

 1   business?

 2   A    Large numbers.  But when I first started the company I

 3   had calculated what it would take for us to live on, and if I

 4   could bring in $3500 a month it would work.  And I was there

 5   by the end of December.

 6   Q    You were at $3500 a month by the end of December?

 7   A    Yes, ma'am.

 8           THE COURT:  December what year?

 9           THE WITNESS:  1997.

10   Q    (By Ms. Froehlke)  How much do you get paid per

11   inspection?

12   A    It varies.

13   Q    What does it vary by?

14   A    Negotiation.  Production builders, typically $35 per

15   inspection; custom homes, $45 per inspection; custom homes,

16   $52 an inspection; development loans, $125 per inspection;

17   commercial projects, anywhere from 75- to- $250 per

18   inspection.

19   Q    How many inspections a day were you doing when you

20   reached that $3500 a month mark in December of 1997?

21   A    Probably a hundred.

22   Q    A hundred inspections a day?

23   A    No.  No.  No.  No.  A month.

24   Q    A month.  Okay.  And DW Support is still in business,

25   right?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 209

 1    A    Yes, ma'am.

 2    Q    You frequently will transfer assets from one company to

 3    another?

 4    A    I haven't for a long time.

 5    Q    But you have done that in the past?

 6    A    Yes, ma'am.

 7    Q    And you believe DW is worth about $250,000, you just

 8    testified to?

 9    A    Thereabouts.

10    Q    DW Support is much smaller today than it was prior to

11    the recession, right?

12    A    That is correct.

13    Q    How many employees did you have at its peak?

14    A    I believe nine, if I recall correctly.

15    Q    And how many employees do you have now?

16    A    One and a half.

17    Q    And you had to completely take over DW Support when the

18    recession hit, right?

19    A    That is correct.

20    Q    Because you had to lay off all of your employees?

21    A    That is correct.

22    Q    You testified earlier that in 1996 and 1997 your

23    husband was working for Steel by Design?

24    A    Yes.

25    Q    Do you recall him signing over his paychecks to you?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 210

 1   A     Yes.

 2             MS. FROEHLKE:  If we could pull up Exhibit 7.

 3   Q    (By Ms. Froehlke)  Mrs. Wilhite, if you'd turn to

 4   Exhibit 7.

 5             MR. MIKULECKY:  Your Honor, while she's looking,

 6   we have not stipulated to the admission of this exhibit.

 7             MS. FROEHLKE:  That's correct, Your Honor.

 8             THE COURT:  Thank you.  You can still show it

 9   though.

10             MS. FROEHLKE:  And, actually, I'm going to stop

11   relying so much on only the screen.  I mean, Exhibit 14.

12   Thank you.

13   Q    (By Ms. Froehlke)  If we can go to the second page of

14   Exhibit 14.  Mrs. Wilhite, do you recognize this check?

15   A     It's a check from Steel by Design.

16   Q    Do you recognize the signatures on the back of the

17   check?

18   A     Yes.

19   Q    Whose signatures are they?

20   A     Michael's and myself.

21   Q    So, Mr. Wilhite is endorsing his paycheck over to you?

22   A     That is correct.

23   Q    If we could go to the next page, please.  Do you

24   recognize the signatures on back of this check?

25   A     Yes.  Michael and myself.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 211

1   Q    And he's endorsing his paycheck over to you again?

2   A    That's correct.

3   Q    If we could go to the next page.  Is this the same

4   situation, Mrs. Wilhite?

5   A    Yes, ma'am.

6   Q    Did you ever ask your husband why he was endorsing his

7   paychecks over to you?

8   A    No.  We're husband and wife, and I was paying the

9   bills.

10  Q    You deposited this in a bank account?

11  A    Yes, I did.

12  Q    If we could go to the next page.

13          THE COURT:  No, stay there for a second.  The

14  first two checks, Mrs. Wilhite, said labor.  This one says

15  loan.  Do you have any reason why -- or know why this company

16  would be loaning your husband $1250?

17          THE WITNESS:  You'll have to ask Mr. Wilhite that.

18          THE COURT:  Okay.

19  Q    (By Ms. Froehlke)  If we could go to the next page.

20  Mrs. Wilhite, do you recognize the signatures on the back of

21  this check?

22  A    Yes, I do.

23  Q    And did you believe at the time that this was a

24  paycheck or a loan?

25  A    A paycheck.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 212

1   Q    If we could go to the next page.  And is this, again,

2   the same situation, the endorsement?

3   A    Yes.

4   Q    And I think we have two more pages to go here.  If we

5   could go to the next page.  And do you recognize your

6   signature on the back of this check as well?

7   A    I do.

8   Q    And I think we're on the last page of Exhibit 14.  This

9   is also him endorsing his paycheck over to you?  Is that

10  right, Mrs. Wilhite?

11  A    I am assuming.  Check 1108?

12  Q    Yes.

13  A    Yes.

14  Q    Steel by Design was owned by Geoffrey Clement?

15  A    That is correct.

16  Q    And he went to prison in February, 1997, right?

17  A    Yes.

18  Q    Mr. Wilhite then went to Steel Dimensions?

19  A    That is correct.

20  Q    Were you aware before working at Steel Dimensions that

21  your husband was negotiating starting a steel structure

22  business with Mr. Clement and Mr. Russell?

23  A    I don't recall that.

24  Q    And I should clarify.  Mr. Russell is the owner of

25  Steel Dimensions; is that right?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 213

 1   A    I realize that, yes.

 2   Q    So, you were not aware of your husband looking into

 3   starting a steel company?

 4   A    No, I was not.

 5   Q    He also directed his paychecks from Steel Dimensions to

 6   DW Support, your company, right?

 7   A    That is correct.

 8   Q    In return you gave him some pocket money?  I believe

 9   those are your words, Mrs. Wilhite.

10   A    Yeah.  Well, he had -- he had sufficient funds that he

11   needed.  If he needed more, he would ask for more and I would

12   give him more.

13   Q    You gave him $100, $200 as needed, right?

14   A    Once again, this was 18 years ago, I don't remember

15   exactly how much he -- he got.

16   Q    Well, we've talked about this before in testimony,

17   haven't we?

18   A    In the deposition?

19   Q    Yes.

20   A    As I say, if he needed $100, then he had $100.

21   Q    Did you give him any interest in DW Support for his

22   paychecks being directed there?

23   A    No, I did not.

24   Q    Were you aware of a tax lien against him that had been

25   filed in 1993?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 214

1  A    I knew that he had had a bankruptcy, and I don't recall

2  about that.

3  Q    Well, I'm not referring to a bankruptcy, Mrs. Wilhite.

4  I'm referring to --

5  A    I know.  I'm saying I remember about the bankruptcy,

6  but I don't know about -- I don't recall about the tax lien.

7  Q    And just to be clear, you were financially then

8  supporting him in 1997?

9  A    He -- we were both adding money to the -- to contribute

10  to the family expenses.

11             THE COURT:  Mrs. Wilhite, I want to go back to

12  these checks.  The series that the United States showed you,

13  if you wouldn't mind going back to page 7 of 8.  That check

14  has Mr. Wilhite signature alone.  Do you see that?

15             THE WITNESS:  Yeah.

16             THE COURT:  It also goes -- if you look at the

17  endorsement stamp, every other check is endorsed by Norwest

18  Bank, deposited apparently into the Norwest Bank.  This one

19  is Colorado Community First National Bank.  Are you aware of

20  any account that Mr. Wilhite had at Colorado Community First

21  National Bank?  Because that actually is the check out of

22  which the -- the check was -- the bank out of which the check

23  was written.  So, it seems like he might have just cashed it

24  -- gone down to that bank and cashed it, right?

25             THE WITNESS:  That's possible.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 215

1              THE COURT:  Okay.

2              THE WITNESS:  I don't know.

3              THE COURT:  Did he have authority to do that?

4              THE WITNESS:  The check's made out to him.

5              THE COURT:  Okay.

6    Q    (By Ms. Froehlke)  If you could turn to Exhibit 23.

7    And you testified about this document earlier.  This is the

8    Articles of Organization for Advanced Floor; is that right?

9    A    That is correct.

10   Q    And that was on -- filed on October 24th, 1997?  The

11   date is down by your signature.

12   A    Yes.

13   Q    So, at that time you were doing about a hundred

14   inspections for DW Support a month?  By December you were

15   doing a hundred inspections a month, I believe you just

16   testified, Mrs. Wilhite?

17   A    Yeah.  Well, by December.  But this was October.

18   Q    This was October 24th?

19   A    Yes, ma'am.

20   Q    How many inspections a month do you think you were

21   doing in October?

22   A    I would have no idea.  I don't recall.

23   Q    Did -- do you recall your business increasing by a

24   significant amount between October 24th and December of the

25   same year?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 216

1    A    Yes, ma'am.

2    Q    Did you have a reason for that happening?

3    A    I met with more banks and got more contracts.

4    Q    And we heard earlier you used the revenue from DW

5    Support to start Advanced Floor, right?

6    A    That, along with a line of credit.

7    Q    And that line of credit pledged DW Support, right?

8    A    Yes, it did.

9    Q    And Mr. Wilhite didn't get any shares in Advanced Floor

10   on paper in exchange for his paychecks from the steel

11   companies; is that right?

12   A    That is correct.

13   Q    Did he get any other consideration for those paychecks?

14   A    No.

15   Q    If we could turn, please, to Exhibit D.  Mrs. Wilhite,

16   this is the operating agreement of Advanced Floor, right?

17   A    The original one, yes.

18   Q    If you turn to the last page you'll see your signature.

19   It looks like you executed this on November -- or, I

20   apologize, October 29th, 1997; is that right?

21   A    That is correct.

22   Q    This document says that Advanced Floor is a member

23   managed company.  Would you agree?

24   A    Yes.

25   Q    It says management decisions require approval of

United States of America vs.                    Evidentiary Hearing - Day I
Michael David Wilhite                                   September 15, 2015

1    majority members?

2    A    Yes.

3    Q    And members do not get paid for their duties of

4    membership, right?

5    A    Yes.

6    Q    But they can be paid for services provided in other

7    capacities?

8    A    Yes.

9    Q    Distributions can be made to members by majority

10   support; is that right?

11   A    Yes.

12   Q    And members make initial contribution of cash,

13   services, or property?

14   A    Yes.

15   Q    And members may take all necessary acts to carry out

16   the business; is that right?

17   A    That is correct.

18   Q    Now, Mrs. Wilhite, earlier you were testifying quite a

19   bit about delegating your duties.  And you and I have

20   discussed that before in testimony.  Do you remember that?

21   A    I don't remember the exact testimony, no.

22   Q    Is it your testimony today that you delegated your

23   duties as a majority member in Advanced Floor?

24   A    I delegated a lot of duties to a lot of different

25   employees.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 218

1   Q    It is your testimony that you delegated your management

2   duties?

3   A    Not the overall management.  The final decision is with

4   me.

5   Q    Is that a yes or a no that you delegated your

6   managing-member duties, Mrs. Wilhite?

7   A    No.

8   Q    And you also never appointed an officer, even though

9   that was available to you in the operating agreement, right?

10  A    I appointed, at their request, two officers.  Roger

11  Otterstein and Brendan DePaola.

12  Q    And what did you appoint them as?

13  A    Vice president in charge of sales, and vice president

14  in charge of operations.

15  Q    When you came to my office in October of 2014, you

16  testified that you had not appointed any officers; is that

17  correct?

18  A    I don't remember what I testified to you.  I do know

19  that I had forgotten about the -- that Brendan and Roger had

20  requested that they have titles.

21  Q    Well, you do remember coming to my office, right,

22  Mrs. Wilhite?

23  A    Yes, ma'am.

24  Q    And you were under oath that day?

25  A    Yes, ma'am.

United States of America vs.                                    Evidentiary Hearing - Day I
Michael David Wilhite                                                    September 15, 2015

Page 219

1              THE COURT:  Mrs. Wilhite, you also appointed

2     yourself as president, correct?

3              THE WITNESS:  I'm sorry?

4              THE COURT:  You appointed yourself as president?

5              THE WITNESS:  I go by managing-member.

6              THE COURT:  Okay.  I thought there was a reference

7     during Mr. Mikulecky's direct examination that you said you

8     appointed yourself as president because you can.  Am I right

9     about that or not?  I mean, didn't you say that on direct?

10             THE WITNESS:  Well, there was one document in here

11    that I signed as president.

12             THE COURT:  Okay, but that was an informal title?

13             THE WITNESS:  As far as I'm concerned, yes.

14             THE COURT:  Okay.

15    Q    (By Ms. Froehlke)  Mrs. Wilhite, I'm showing you your

16    deposition.

17             MS. FROEHLKE:  Referring opposing counsel to

18    page 28.  You'll see on the screen page 28 line 25.

19             THE COURT:  Your voice is not being recorded,

20    probably.

21             MS. FROEHLKE:  I apologize.

22    Q    (By Ms. Froehlke)  Mrs. Wilhite, if you could look at

23    page 28, line 25 at the bottom here.  We're discussing the

24    operating agreement of Advanced Floor, and I ask you:

25    Question, Have you ever appointed an officer?  On the next

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 220

1    page, line 1, No, I have not.

2          Did I read that correctly?

3    A    Yes, you did.

4    Q    Now, you also testified that you revised your operating

5    agreement in 2013; is that right?

6    A    That is correct.

7    Q    That was based on legal advice?

8    A    Yes, ma'am.

9    Q    The exhibit that we looked at earlier, you discussed

10   with your attorney that it's unsigned, right?

11   A    That is correct.

12   Q    And you've never provided our office with the signed

13   copy of that agreement?

14   A    It was never requested.

15   Q    Your testimony is it was never requested?

16   A    Yes, ma'am.

17   Q    And so that's a yes, you've never provided it then?

18   A    Yes, ma'am.

19   Q    You claim this signed copy is with your will?

20   A    Yes, it is.

21   Q    Where is that?

22   A    In a vault.

23   Q    Where is the vault?

24   A    At my house.

25          THE COURT:  I think we talked about that vault,

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 221

 1   didn't we?

 2          UNKNOWN SPEAKER:  We did, Your Honor.

 3          MS. FROEHLKE:  We did.

 4          UNKNOWN SPEAKER:  Quite extensively.

 5   Q   (By Ms. Froehlke)  I'd like to talk about Advanced

 6   Floor now.  As of last October when you and I -- when you

 7   were deposed there were 25 employees.  Does that sound

 8   correct still today?

 9   A   That is still correct.

10   Q   You don't really go into the office; is that correct?

11   A   Very seldom.

12   Q   But you're the only person able to make policy; is that

13   right?

14   A   The final policy, yes.

15   Q   And you're the only person able to change policy; is

16   that right?

17   A   That is correct.

18   Q   And you've already testified that you're the only

19   managing-member, correct?

20   A   That is correct.

21   Q   Would you agree with me that you're the only person who

22   can bind the company as the managing-member?

23   A   No, I would not agree with you.

24   Q   Mrs. Wilhite, do you believe that your operating

25   agreement allows someone who is not a member to bind the

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 222

1    company?

2    A    Yes, I do.

3    Q    Without delegation?

4    A    I -- I'm not understanding what you're asking.

5    Q    Is it your testimony that according to the operating

6    agreement of Advanced Floor, whether the revised or original,

7    someone who is not a managing-member can bind the company

8    without the approval of that member?

9    A    I give approval to Torin, to Michael, to Nate, to Cindy

10   to sign contracts for various construction projects.

11   Q    But they are not able to bind the company just on their

12   own volition, right?

13   A    Okay.  What is -- I don't understand what you're

14   meaning by "bind."

15   Q    To sign on behalf of Advanced Floor in a contract or

16   commitment of some legal nature?

17   A    Yes, they are authorized to do that.

18   Q    I think we're having a miscommunication here,

19   Mrs. Wilhite.  Without a managing member's approval, those

20   employees you just mentioned do not have the authority to

21   enter into a contract?

22   A    And I have given them the approval to sign contracts.

23   Q    Okay.  Do any of them have the authority to sell your

24   company?

25   A    No, ma'am.

United States of America vs.                          **Evidentiary Hearing - Day I**
Michael David Wilhite                                        **September 15, 2015**

Page 223

1   Q      Does anyone besides you have the authority to sell your

2   company?

3   A      No, ma'am.

4   Q      You are aware your husband attempted to negotiate a

5   sale?

6   A      At my direction.

7   Q      You mentioned that you and your husband developed a

8   spreadsheet relating to those negotiations?

9   A      That is correct.

10  Q      You don't have that spreadsheet with you today, do you?

11  A      No, ma'am.

12  Q      You've never disclosed that spreadsheet?

13  A      Why would I?  It was a deal -- I told them, no, I did

14  not want to sell the company under those terms.

15  Q      Is that a no, you've never disclosed this spreadsheet

16  to our office.

17  A      No, I have not.

18  Q      So, I'd like to discuss those e-mails relating to the

19  sale negotiation.  First, I want to establish, generally, the

20  e-mail procedures at Advanced Floor.  Your husband's e-mail

21  is Mike@steelfloors.com; is that right?

22  A      That is correct.

23  Q      And your e-mail is Theranch@SCCinspections.com, right?

24  A      That is correct.

25  Q      You don't have a steelfloors.com e-mail address?

United States of America vs.                          Evidentiary Hearing - Day I
Michael David Wilhite                                          September 15, 2015

Page 224

 1   A    Actually, I do.  But I don't use it anymore.

 2   Q    Have you ever used it?

 3   A    Yeah.

 4   Q    Why was the Advanced Floor e-mail address that you

 5   apparently have not used in the negotiations of selling

 6   Advanced Floor?

 7   A    It wasn't necessary.

 8   Q    So, the e-mails -- and if we could turn to exhibit -- I

 9   apologize.  If we could turn to Exhibit 44.  This e-mail is

10   to -- oh, are you there, Mrs. Wilhite?

11   A    Yes, I am.

12   Q    This e-mail is to Mark Stubbert with Barton Supply?

13   A    Yes.

14   Q    From your husband?

15   A    Yes.

16   Q    And you're copied?

17   A    Yes.

18   Q    And this e-mail discusses the acquisition price and

19   other details of the potential sale, right?

20   A    Yes.

21   Q    Why did you not send this e-mail to Mark?

22   A    Mike was in the process of negotiating, it.  I don't --

23   Mike doesn't -- or Mark doesn't need to be inundated from

24   both of us.

25   Q    You were the person negotiating, right, Mrs. Wilhite?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 225

1   A    Mike was negotiating on my behalf.

2   Q    You didn't feel the need to send an e-mail yourself as

3   the owner of Advanced Floor?

4   A    No, because the final signature has to come from me not

5   from anyone else.

6   Q    If you could turn to the next exhibit, 45.  Again, this

7   is an e-mail from your husband?

8   A    Yes.

9   Q    A letter of intent?

10  A    This was the letter of intent from Kodiak to Advanced

11  Floor Concepts.

12  Q    And I believe, if you turn to page 6 of 8 in that

13  exhibit, this is your husband's response; is that right?

14  A    Yes.

15  Q    And your husband also wrote a confidentiality agreement

16  that was attached as Exhibit A to that response?

17  A    Yes.

18  Q    As owner of Advanced Floor you did not sign these

19  documents?

20  A    This was a proposal only.  This wasn't final the

21  document.

22  Q    So, that's a no, you did not sign these documents?

23  A    No, I didn't.

24  Q    Advanced Floor --

25       THE COURT:  Before you leave that document, I have

United States of America vs.                                    Evidentiary Hearing - Day I
Michael David Wilhite                                                    September 15, 2015

Page 226

1   a question.  Whose signature is that?  Although it says

2   Michael, it looks more like your handwriting.  Is that

3   your --

4           THE WITNESS:  No.  That's Michael's handwriting.

5   It's not mine.

6           THE COURT:  Is it?  Okay.  All right.

7   Q   (By Ms. Froehlke)  And you mentioned earlier,

8   Mrs. Wilhite, that you are a bad negotiator that's why you

9   didn't get involved in the Kodiak deal?

10  A   Michael is -- I'm not a bad negotiator, but Michael is

11  a better negotiator than I am.

12  Q   You also testified earlier that you are the negotiator

13  on the refinance with ANB Bank?

14  A   That's because I dealt with those folks for so many

15  years I know them personally.

16  Q   Is that a yes, Mrs. Wilhite?

17  A   Yes.

18  Q   You were the negotiator?

19  A   Yes.

20  Q   In fact, you obtained more favorable terms as a result

21  of your negotiations; is that right?

22  A   That is correct.

23  Q   You threatened bankruptcy, I believe you testified to?

24  A   That is correct.

25  Q   And ANB backed down?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 227

1    A    They did.

2    Q    And just to be clear, you do have the -- an e-mail

3    address, right?

4    A    Yes.

5    Q    You're familiar with how e-mail works, I assume?

6    A    Yes.

7    Q    Do you send e-mails on a daily basis, would you say?

8    A    Yes.

9    Q    I'd like to talk a little bit about value and what you

10   take home from Advanced Floor.  Are you still paid twice a

11   month?  Is that right?

12   A    That is correct.

13   Q    You have an annual salary of about $146,000?

14   A    That's correct.

15   Q    Does that sound right?  In 2014 Advanced Floor grossed

16   7 million in revenue?

17   A    That is correct.

18         MR. MIKULECKY:  Your Honor, object to the

19   relevance of what this is.

20         THE COURT:  Go ahead.

21         MS. FROEHLKE:  Your Honor, I'm discussing both the

22   witness's money that she takes home from Advanced Floor,

23   which we are contending represents the actual interest that

24   Mr. Wilhite has.  She's taking home his salary as a nominee

25   for the salary because she's standing in his place as both an

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 228

1  employee and -- I plan to discuss distributions as well --

2  managing-member distributions that she takes home on a

3  monthly basis as his nominee as well.

4          THE COURT:  If the United States prevailed in the

5  case, how would it -- how would you expect it to get money?

6          MS. FROEHLKE:  Frankly, Your Honor, I think at

7  that point we would reach out to opposing counsel to

8  negotiate how that was going to happen.  I think we would be

9  entitled to the interest of Mr. Wilhite in the take-home

10 salary that the Wilhites are enjoying, and the distributions

11 -- significant distributions that they enjoy on a monthly

12 basis.  But, frankly, I think the statute allows us to

13 liquidate his membership interest as well, and to sell it on

14 the open market.

15         THE COURT:  So doesn't this potentially go to

16 damages?

17         MR. MIKULECKY:  Your Honor, no.  The issue was the

18 ownership.  Not how much that ownership is worth.  Unless the

19 United States is going to argue that if her paycheck is less

20 than a certain amount they don't have any argument, than how

21 much she got is irrelevant.  The fact that she got the

22 distributions or got the paycheck, I agree that's relevant.

23 How much it is in terms of establishing ownership has

24 absolutely no bearing on establishing (inaudible).

25         THE COURT:  Well, if her testimony is she gets

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 229

1    everything, what difference does the amount make?

2              MS. FROEHLKE:  Your Honor, if we want to sort of

3    bifurcate that issue for a later time, we are happy to do

4    that.

5              THE COURT:  Okay.  That would be fine.  So the

6    objection will be sustained.

7    Q    (By Ms. Froehlke)  Mrs. Wilhite, if you would turn to

8    Exhibit 41.  Without speaking to its content --

9              MS. FROEHLKE:  And, Your Honor, this is not a

10   stipulated exhibit at this time.

11   Q    (By Ms. Froehlke)  Do you recognize this document,

12   Mrs. Wilhite?

13   A    Yes, it's a tax return.

14   Q    Who's tax return?

15   A    Michael's and my personal tax return.

16   Q    Do you know if the records of your tax return are kept

17   in the regular course of business at Advanced Floor?

18   A    The AFC tax returns are kept at -- at AFC.

19   Q    But as a -- as a -- excuse me, Sub S, LLC your personal

20   tax return is what the Advanced Floor's taxes are funneled

21   through; is that right?

22   A    That is correct.

23   Q    And so --

24             MR. MIKULECKY:  Your Honor, we'll stipulate these

25   are authentic.  But we're going to object on admissibility on

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 230

 1  relevance grounds.

 2          THE COURT:  Understood.  Yeah.  You don't have to

 3  authenticate it.

 4          MS. FROEHLKE:  Your Honor, I do have a relevant

 5  point, not related to the actual numbers.

 6          THE COURT:  Okay.

 7  Q   (By Ms. Froehlke)  If we could turn to the next page.

 8          MS. FROEHLKE:  Your Honor, would you like me to

 9  move to admit the --

10          THE COURT:  Well, if you want to actually read it

11  into the record or --

12          MS. FROEHLKE:  Okay.

13          THE COURT:  -- any information from it it needs to

14  be in evidence.  So, at the moment you can ask her general

15  questions about it in an effort to get it in, but if you

16  think you've got enough I'm not going to advise you on

17  whether you should or shouldn't at the moment move.

18          MS. FROEHLKE:  Yes, Your Honor.

19  Q   (By Ms. Froehlke)  Mrs. Wilhite, your tax return as the

20  named owner of Advanced Floor is how Advanced Floor's taxes

21  are funneled, right?

22  A   That is correct.

23  Q   And so your tax return is kept in the normal course of

24  business at Advanced Floor; is it not?  It's a record kept at

25  Advanced Floor in the normal course of business, would you

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 231

1    agree?

2    A    The personal -- the personal tax returns are kept at my

3    home office.  AFC tax returns are kept at the AFC office.

4    Q    And you do work out of your home office; is that right?

5    A    That is correct.

6    Q    And the information on your tax return is -- is input

7    by someone with knowledge of the information they're putting

8    in; is that right?

9    A    That is correct.

10            MS. FROEHLKE:  Your Honor, we believe that -- Your

11   Honor, we move to admit Mrs. Wilhite's and Mr. Wilhite's 2014

12   tax return.

13            THE COURT:  On what basis?

14            MS. FROEHLKE:  On the basis that she has testified

15   that it is a business record of Advanced Floor under 803(6).

16            THE COURT:  Okay.  Mr. Mikulecky?

17            MR. MIKULECKY:  Your Honor, I'm not sure of the

18   relevance.  We agree that they're authentic documents.  And I

19   think she stated (unintelligible) of AFC, but regardless we

20   will concede that they are authentic, but they have no

21   bearing on ownership, yet it's been established, therefore

22   the relevance (unintelligible).

23            THE COURT:  Okay.  Articulate again, the

24   relevance, please.

25            MS. FROEHLKE:  Your Honor, I just want to point

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 232

 1  out the occupations listed for her husband and she at the

 2  bottom of page 2 of 8.

 3            MR. MIKULECKY:  Your Honor, on that point, no one

 4  has signed it.  So, we don't know which is the original and

 5  which is the -- who's going to be signing under your

 6  signature and who's going to be signing under spouse.

 7            THE COURT:  That is true.

 8            MR. MIKULECKY:  Either one of them

 9  (unintelligible).

10            THE COURT:  That's true enough, although this is

11  kept somewhere.  Are you able to make a representation --

12  you've relied on a previous document that was unexecuted, and

13  represented that it was executed as-is.  I'll ask

14  Mrs. Wilhite then, in fairness to the government, was this

15  document executed as-is --

16            THE WITNESS:  Yes.

17            THE COURT:  -- to your knowledge?

18            THE WITNESS:  Yes.

19            THE COURT:  And whose signature was on the first

20  -- first line with the --

21            THE WITNESS:  Since Michael's listed first,

22  Michael signed it and then I signed it.

23            THE COURT:  Okay.  All right.  And do you have an

24  objection, Mr. Mikulecky, based on the ground that the United

25  States has proffered, which is solely for the purpose of

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 233

 1   those signatures?

 2              MR. MIKULECKY:  Just a moment, Your Honor.

 3              THE COURT:  And, again, let me understand what

 4   you're saying.  She's identified as a construction

 5   supervisor.  He's just identified as construction.  Are you

 6   wanting to prove that he was working?

 7              MS. FROEHLKE:  Yes, Your Honor.  Their claim is

 8   that he retired in 2008, and the tax returns clearly list him

 9   as construction occupied, for years beyond this as well.

10              THE COURT:  I will receive it for that reason.

11   Impeachment.

12              MS. FROEHLKE:  Yes.

13              THE COURT:  Okay.

14              (Exhibit 41 admitted into evidence.)

15   Q   (By Ms. Froehlke)  Mrs. Wilhite, your -- you just

16   testified that the signed copy of this document would list

17   your husband's occupation as construction; is that right?  He

18   would sign first on the line above?

19   A    Yes, ma'am.

20   Q    And you would sign below; is that right?

21   A    Yes, ma'am.

22   Q    Would that also be true for page 4 of 8, which is your

23   2013 tax return?

24   A    Yeah.

25   Q    And would that also be true for page 6 of 8, which is

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 234

 1   your 2012 tax return?

 2   A    Yes.

 3   Q    And you've mentioned you do have a will; is that right?

 4   A    That is correct.

 5   Q    You decided to take your husband off of your will in

 6   the last few years; is that correct?

 7   A    Mike has never been in my will.

 8   Q    And you edited your will so that it became a trust to

 9   which he is not a beneficiary; is that right?

10   A    That is correct.

11   Q    You did that on the advice of counsel?

12   A    Yes, I did.

13   Q    I'd like to talk about your paychecks.  Not necessarily

14   for the amounts that they are, but for circumstances

15   surrounding them.

16           THE COURT:  Before we leave the issue of wills,

17   does Mr. Wilhite have a will?

18           THE WITNESS:  Yes, he does.

19           THE COURT:  Where is that?

20           THE WITNESS:  In a vault.

21           THE COURT:  In a vault.  Okay.  And are you aware

22   of its contents?

23           THE WITNESS:  Yes.

24           THE COURT:  Okay.

25   Q    (By Ms. Froehlke)  Mrs. Wilhite, if you could turn to

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 235

 1    Exhibit 24, please.  You provided the government with this

 2    document, right?

 3    A    I would assume so, yes.

 4    Q    Do you recognize it?

 5    A    Yes.

 6    Q    What is it?

 7    A    It's a payroll journal for my company.

 8    Q    And this lists all payees that have been employed by

 9    Advanced Floor over its existence; is that correct?

10    A    No, this is just my paychecks.

11    Q    If you turn to page 6 of 10 it goes into your husband's

12    paychecks.  Do you see that there?

13    A    Okay.

14    Q    I'd like to point to page 10 of 10, the last paycheck

15    received by your husband.  This was on August 15, 2008; would

16    you agree?

17    A    That is correct.

18    Q    And he was paid $2,263.60 that day?

19    A    That is correct.

20    Q    That is the amount that matches the previous paychecks

21    all the way through March of that year; would you agree?

22    A    Yes.

23    Q    If you could turn to page 3 of 10.  Specifically --

24             MS. FROEHLKE:  If, Carisha, you can help me

25    highlight August 15th.  It's about a third of the way down or

United States of America vs.                          Evidentiary Hearing - Day I
Michael David Wilhite                                        September 15, 2015

Page 236

 1   so.

 2   Q    (By Ms. Froehlke)  You also received a paycheck on

 3   August 15th, right, Mrs. Wilhite?  Of 2008?  If you want to

 4   look at the screen we have zoomed that in for you.

 5   A    Yes.

 6   Q    And that was in the amount of $2,291.60?

 7   A    That is correct.

 8   Q    And, again, that amount matches your paychecks for the

 9   entire year of 2008, right?  Looking --

10   A    Correct.

11   Q    -- up the line?

12           THE COURT:  Well, not exactly.  It starts with

13   March.

14   Q    (By Ms. Froehlke)  So, within $10 or so, you were being

15   paid about the same amount from January to August of 2008;

16   would you agree?

17   A    That is correct.

18   Q    You and your husband were issued paychecks on the same

19   pay cycles; is that right?

20   A    That is correct.

21   Q    And if we could turn to Exhibit 4.  Do you recognize

22   this signature card in Exhibit 4, Mrs. Wilhite?

23   A    Yes.

24   Q    Which account is this?

25   A    American National Bank.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 237

1  Q    And the Account No. 70991178 represented the payroll

2  account; did it not?

3  A    I have no idea.

4  Q    Well, if you can turn -- turn to the second page of 11,

5  of Exhibit 4.  These are payroll checks, right?  Coming out

6  of that account?  You'll see your and your husband's payroll

7  checks about halfway down the page?

8  A    Yes.

9  Q    So, if you look at the date of the checks here, we

10 pulled your payroll checks from July 31st of 2008.

11 A    Okay.

12 Q    And you'll see that amount, $2,263.61 matches

13 Exhibit 24 that we were just looking at, right?

14 A    Yes.

15 Q    And the check below it, yours, also matches the amount

16 we just discussed.  If you want to look at the screen again,

17 it will be zoomed in.

18 A    Okay.

19 Q    And then on the next page the two checks on the bottom

20 of that page are the actual checks from August 15th, 2008,

21 that we saw in your payroll document; is that right?  They,

22 again, match those amounts?

23 A    Yes.

24 Q    If you can turn to page 4 of 11.  The middle check on

25 this page is your payroll check from August 29th, 2008.  That

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 238

1   was the next pay cycle after August 15th; do you agree?

2   A    Yes.

3   Q    Your check amount jumped from 2,100 -- $2,291 to

4   $4,178; do you agree?

5   A    Yes.

6   Q    And if we could turn to Exhibit 19.  Mrs. Wilhite, do

7   you recognize this letter?

8   A    Yes.

9   Q    August 28, 2008?

10  A    Yes.

11  Q    This was the first letter that Advanced Floor received

12  from our office regarding your husband's restitution; is it

13  not?

14  A    I would have no way of knowing that.

15  Q    Do you recall receiving any letters addressed to

16  Advanced Floor prior to August, 2008?

17  A    Not that I recall.

18  Q    If you turn the page, page 2 of 2, the box:  Is not

19  employed by our firm; date terminated/retired, 8/11/08.  Did

20  you write that?

21  A    No, I did not.

22  Q    Do you know who did?

23  A    It looks like Michael's handwriting.

24  Q    Why did your paycheck double the first pay period that

25  your husband was not being paid?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 239

 1   A    Because I couldn't have taken care of all the bills

 2   that were necessary to be taken care of based solely upon my

 3   salary.  And as owner of the company, I can give myself a

 4   raise whenever I want to.  And, also, the -- my accountant

 5   said that I needed to increase my salary so that I would get

 6   to the point that my Social Security would be fully funded.

 7   Q    And I just want to briefly go back to the actual check,

 8   Mrs. Wilhite, on Exhibit 4.  That check where you doubled

 9   your salary.  It's page 4 of 11.

10        UNKNOWN SPEAKER:  (Unintelligible).

11        MS. FROEHLKE:  I think we're working on it.

12        UNKNOWN SPEAKER:  Okay.

13        MS. FROEHLKE:  No, it should be the fourth page of

14   Exhibit 4.  I'm talking to Carisha.  She's trying to pull it

15   up.  Yes, that's right.  Thank you.

16   Q    (By Ms. Froehlke)  That middle check there is yours.

17   We just discussed that.  You'll notice the demarcation that

18   it was posted on September 3rd, 2008; is that right.

19   A    Yes.

20   Q    And it was issued on August 29, 2008; is that right?

21   A    Yes.

22   Q    Do you recall why you waited five days to cash your

23   paycheck?

24   A    I have no idea.

25   Q    Was that your typical practice?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 240

 1   A    Sometimes.

 2   Q    We spoke earlier about you giving authorization to

 3   other employees to sign contracts and that kind of thing,

 4   right?

 5   A    Yes.

 6   Q    And I believe you testified that it would not have made

 7   a difference what your husband's title was in his signature,

 8   because it didn't make a difference to you, right?

 9   A    No, it doesn't.

10   Q    Would it have made a difference to you if Torin Jackson

11   signed as CEO of the company?

12   A    He never would, but it really wouldn't matter.

13   Q    What about Fern Pena?  Would it have made a difference

14   to you if she signed as CEO of the company?

15   A    She never would, but -- she was an accountant.

16   Q    Cindy Barker is your current accountant; is that right?

17   A    That's correct.

18   Q    And you interact more with her than the rest of the

19   employees, don't you?

20   A    Yes, I do.

21   Q    Torin Jackson is the office manager?

22   A    Yes.

23   Q    And you interact with him once or twice a year; is that

24   right?

25   A    That's about right.  More often if necessary.

Page 241

1  Q    Would you say you interact with him more than five

2  times a year?

3  A    It depends on what comes up.  If nothing comes up,

4  Torin knows what to do.

5  Q    And Torin sees your husband three days a week, doesn't

6  he?

7  A    When Michael is there three days a week, yes.

8  Q    And Michael does go three days a week to Advanced

9  Floor; is that correct?

10  A    Not every week, no.

11  Q    In October, 2014, when you testified in your

12  deposition, was he going there three days a week?

13  A    Yes, he was.

14  Q    And your testimony is that he was just interacting with

15  Torin, but it wasn't an employer-employee relationship; is

16  that right?

17  A    Pretty much.

18        MS. FROEHLKE:  If I may have a moment, Your Honor.

19        THE COURT:  Yes.

20  Q    (By Ms. Froehlke)  Mrs. Wilhite, if you could turn

21  briefly to Exhibit I.  And we -- I'll submit to you that you

22  testified earlier Exhibits H, I, J, K, L and M were all of

23  these QuickReports?  Do you remember that?  From DW and from

24  Advanced Floor?  We can go through each one if you'd like.

25  A    No.  So, you want me to turn to Exhibit I?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 242

```
 1   Q     Yes.

 2   A     Okay.

 3   Q     Would you agree with me that you went through several

 4   exhibits with your attorney that were printed in this same

 5   format?

 6   A     Yes, ma'am.

 7   Q     And they were from QuickBooks program; is that right?

 8   A     Yes, ma'am.

 9   Q     You created these documents for the purposes of

10   litigation, didn't you?

11   A     No.  These were started from -- in 1997 when I started

12   the company.

13   Q     In the upper left-hand corner it shows that you printed

14   this document in August of 2015; is that right?

15   A     That's correct.

16   Q     And you input the data points within the document

17   yourself, didn't you?

18   A     I'm not real sure what you're asking me.

19   Q     If we could go back to the whole document.  The data

20   points such as type, date, memo -- I'm having trouble reading

21   it this time -- name, split and amount.  You input those data

22   points yourself, right?  This isn't a bank statement?

23   A     That is correct.

24   Q     And you did not provide any of these documents to our

25   office before August 19th, 2015, did you?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 243

1   A    I have no idea.  I have given you so much information,

2   I couldn't tell you the exact date and what documents I've

3   given you at any given point in time.

4   Q    **You would agree that this one was printed in August of**

5   **2015, though?**

6   A    Yes, that's what it says.

7              MS. FROEHLKE:  No further questions, Your Honor.

8              THE COURT:  Okay.  Any redirect?

9              MR. MIKULECKY:  Thank you, Your Honor.  First,

10  Mrs. Wilhite, do you need to stand up and stretch?

11             THE WITNESS:  Yes.

12             MR. MIKULECKY:  Do you need to walk around for a

13  few moments?

14             THE WITNESS:  No.  I'll be good once I stretch.

15             MR. MIKULECKY:  Okay.  Do you want to take a

16  moment or are you okay to go?

17             THE WITNESS:  No.  Go.

18                     REDIRECT EXAMINATION

19  BY MR. MIKULECKY:

20  Q    **All right.  You were asked some questions -- we'll**

21  **start with the most recent topics first -- about Exhibit I,**

22  **J, K and L about the QuickReports.  Do you remember that?**

23  A    Uh-huh.

24  Q    **Yes or no?**

25  A    Yes.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 244

1    Q    Okay.  You need to make sure you answer out loud since

2    you're not real close to the microphone.

3    A    Okay.

4    Q    All right.

5         THE COURT:  Please bring the microphone as close

6    as you can.  You can stay right there though.

7         THE WITNESS:  It doesn't move.

8         THE COURT:  Okay.  Thanks.

9    Q    (By Mr. Mikulecky)  And you were asked some questions

10   about did you put in the information that's shown on those

11   reports, correct?

12   A    That is correct.

13   Q    And you were asked if you printed that report in August

14   of 2015, correct?

15   A    Correct.

16   Q    Did you put those data points, those -- that data, that

17   information into that report in August of 2015?

18   A    No, sir.

19   Q    When were those put in?

20   A    As they occurred.

21   Q    So, it was part of your transactions, part of your job

22   with Advanced Floor Concepts, you had to support your

23   entering those on a daily or weekly basis?

24   A    That is correct.

25   Q    So, the ones that show in August of 2005, those would

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 245

1   have been entered in August of 2005?

2   A    That is correct.

3   Q    So, you didn't create those entries just for purposes

4   of litigation?

5   A    No.

6        MS. FROEHLKE:  Objection.  Leading.

7        THE COURT:  It's moot.

8   Q    (By Mr. Mikulecky)  Do you -- do you remember giving --

9   when the government asked for documents, do you remember

10  giving them the entire QuickBooks you had on your program for

11  your companies?

12  A    For which company?

13  Q    For both companies.

14  A    I know that they received all of AFCs, and I believe

15  that they also asked for DW Support.  So, they were all

16  there.

17  Q    Do you remember, in fact, that they were password

18  protected and we had to provide the password for them?

19  A    That is correct.  That is true.

20  Q    And then the reports that are here, is that just

21  generated by hitting different report functions in the

22  QuickBooks' software?

23  A    That is correct.

24  Q    So all of that data is in the QuickBooks information

25  that was provided to the government?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 246

 1   A    Yes, sir.

 2   Q    Also, as to testimony and questions about Torin

 3   Jackson.  And you said you only have interaction with him

 4   three or four times a year.  Do you remember that?

 5   A    Yes.

 6   Q    Mr. Torin Jackson, in fact, you were grooming him to

 7   take over the company, correct?

 8   A    That is correct.

 9   Q    So, it's your expectation that --

10        MS. FROEHLKE:  Objection.  Leading.

11        THE COURT:  Yeah, you're -- almost every question

12   you're asking is leading, so --

13        MR. MIKULECKY:  Okay.

14        THE COURT:  -- you've got to ask --

15        MR. MIKULECKY:  I understand.

16        THE COURT:  Not open-ended questions.

17   Q    (By Mr. Mikulecky)  What's your expectation then of --

18   with -- if Mr. Jackson is performing his duties as to how

19   often he's going to be contacting you?

20   A    That is correct.

21   Q    What is your expectation -- I'm sorry -- as to what you

22   expect?

23   A    Torin is a take-charge type of person.  I am delighted

24   to have him on board.  And it is my desire, should something

25   happen to me, Torin would take over full charge of managing

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 247

1    the company under the direction of a board of directors

2    through the trust.

3    Q    So, do you expect him to be contacting you at a certain

4    period of time?  Daily?  Weekly?  Monthly?  Yearly?  What?

5    A    Only if he has a problem.

6    Q    And if he doesn't have a problem, you don't expect it?

7    A    No.  I don't.

8    Q    Okay.  There were some questions about the letter of

9    intent, and that Mr. Wilhite had signed that.  I want to make

10   sure we're clear.  Was that with your knowledge, approval and

11   permission?

12   A    Yes, it was.

13   Q    Did you have discussions with Mr. Wilhite about the

14   terms of that letter of intent?

15   A    Yes, I did.

16   Q    Who made the decisions regarding what terms were going

17   to be acceptable in that letter of intent?  Who made the

18   decisions?

19   A    I made the decisions.

20   Q    And then who carried out those instructions?

21   A    Michael.

22   Q    Thank you.  Now you, however, were negotiating with ANB

23   Bank, correct?

24   A    Yes.

25   Q    Why?  Why were you negotiating with ANB Bank?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 248

 1   A    To find out if they would be willing to get -- have

 2   that loan serviced by Kodiak, and basically assume all of

 3   the -- the terms and conditions of the loan.

 4   Q    And -- I'm sorry, I'm moving -- not during the time of

 5   the sale, but during the time when ANB was trying to force

 6   you to sign the documents and you said, No, I'm not going to

 7   do it.  Those terms are too harsh.  That's the time period

 8   I'm talking about.  Do you remember that time?

 9   A    Oh, yes.

10   Q    Okay.  Why were you negotiating with ANB Bank instead

11   of having Mr. Wilhite do it?

12   A    Because it was my company.

13   Q    But when Mr. Wilhite is negotiating on the letter of

14   intent, that's still your company.  What's the difference?

15   A    The difference is that I had a working relationship

16   with all of the loan officers at ANB, and had had for many

17   years.  They knew me personally.  I knew them personally.

18   And so it was a more comfortable situation for me to be

19   involved in, even though the outcome was not comfortable in

20   any way, shape or form.

21   Q    You were asked some questions, also, about the funding,

22   which I thought we already went through with how AFC was

23   funded.  And you had testified earlier about the different

24   sources of the money that you used to fund AFC.  Could you

25   explain again what those sources of funds were?

Page 249

 1    A    Money from DW Support, the line of credit, and from my

 2    mother.

 3    Q    Were all those loans paid back?

 4    A    Yes, sir.

 5    Q    With the DW Support checks that were -- the checks from

 6    Steel Dimensions, which were deposited into the DW Support

 7    bank account.  I want to talk about those now.  You said that

 8    Mr. Wilhite got some pocket money for that money for the

 9    paychecks that were deposited, correct?

10    A    That is correct.

11    Q    Was your testimony also, then, that you took the money

12    from that account and put it into the family -- your personal

13    checking account?

14    A    That is correct.

15    Q    Family expenses were paid with that?

16    A    That is correct.

17    Q    So, for example, was the house in which Mr. Wilhite was

18    living, was the mortgage paid with that money?

19    A    Yes.  For that period of time.

20    Q    Food on the table?  Was that paid for, also, with

21    Mr. Wilhite's money?

22    A    Yes, it was.

23    Q    Okay.  Clothes?

24    A    Yes.

25    Q    Heat, utilities?

United States of America vs.                          Evidentiary Hearing - Day I
Michael David Wilhite                                        September 15, 2015

Page 250

 1   A    Yes.

 2   Q    So, Mr. Wilhite received more than just walking-around

 3   money, correct?

 4   A    That is true.

 5   Q    And the family benefited from that as well?

 6   A    That is true.

 7            MS. FROEHLKE:  Objection.  Leading.

 8            THE COURT:  Overruled.

 9   Q    (By Mr. Mikulecky)  You looked at Exhibit 14 with the

10   checks from Steel by Design that were made payable to

11   Mr. Wilhite and endorsed by you and Mr. Wilhite.  Do you

12   remember those?

13   A    That is correct.

14   Q    Mr. -- do you know why Mr. Wilhite endorsed the checks?

15   A    So that I could deposit the checks to put into the

16   family account.

17   Q    And why did you endorse the checks then?

18   A    Because the checking account was in my name.

19   Q    And why was it only in your name?

20   A    Because Mr. Wilhite had bad credit and was not very

21   good with money.

22   Q    You were asked some question about transferring assets

23   between the companies.  Do you remember that?

24   A    Yes.

25   Q    First of all, do you record any assets that are

United States of America vs.                    Evidentiary Hearing - Day I
Michael David Wilhite                                   September 15, 2015

Page 251

1    transferred between the companies?

2    A    Yes, I do.

3    Q    Second, why do you transfer assets between the

4    companies?

5    A    More specifically when I first started DW Support -- or

6    SCCC, I had employees.  And instead of doing double duty and

7    filling out all of the forms, the 941s, 940s, FUTA, SUTA, all

8    of that, I ran my employees through the Advanced Floor

9    Concepts.  Also, the Pinnacol, the workman's comp.  And at a

10   point in time DW Support could handle all of that by itself,

11   and I owed money to AFC.

12   Q    When you say "I owed money to AFC," who is "I" in that

13   sentence?

14   A    Well, "I" is DW owed money to "I" as AFC.  And I wanted

15   everything clean, so I transferred funds into AFC to settle

16   the debt that DW Support had to AFC, just as AFC paid back

17   the debts to DW Support.

18   Q    Okay.  And we saw earlier a bunch of transactions where

19   you were showing books and records of AFC and DW Support,

20   showing loans and payments back and forth between the

21   companies.  Do you remember those?

22   A    Correct.  Yes.

23   Q    Okay.  So, I want to make sure I understand your

24   testimony, so correct me if I'm wrong.  You're saying that

25   there are other transactions between the companies where

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 252

1    money was owed between the companies.  Is that --

2    A    That is correct.

3    Q    For payroll it sounds like?

4    A    That is correct.

5    Q    And so to pay that debt, an asset was transferred from

6    the owing company to the company that was owed money?

7    A    That is correct.

8    Q    Do I have that right?

9    A    Uh-huh.

10   Q    Okay.  So, you're not just transferring assets, you're

11   paying debts.  Is that --

12            MS. FROEHLKE:  Objection.  Leading.

13   A    That's correct.

14            THE COURT:  All right.  Let's -- I've got to start

15   sustaining these objections if you're going to ask --

16            MR. MIKULECKY:  That's fine, Your Honor.

17            THE COURT:  -- leading questions.  I know you're

18   trying to rush through it, but we still have to pay attention

19   to form.

20            MR. MIKULECKY:  Understood.

21   Q    (By Mr. Mikulecky)  There was some testimony you had

22   earlier, you were asked some questions about your experience

23   with steel floors before you started Advanced Floor Concepts.

24   A    That is correct.

25   Q    What experience had you had before you started Advanced

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 253

```
 1    Floor Concepts with steel floors?

 2    A    I saw them out in the field.  And when Mike went to

 3    work for Steel Dimensions I helped build those floors, so I

 4    became very familiar with how they were put together.

 5    Q    Any idea how many floors you had inspected?

 6    A    To date or at that time?

 7    Q    At that time, I'm sorry.  Thank you.

 8    A    Oh, probably 20, 25.

 9    Q    Finally, Exhibit A, your resumé.  You may want to take

10    a look at that for reference, if you would, please.  Are you

11    there?

12    A    Uh-huh.

13    Q    Yes?

14    A    Yes.

15    Q    You testified earlier that that's your resumé, correct?

16    A    Yes, it is.

17    Q    And you were asked some questions about why you had 19

18    references there at the end.  Do you remember that?

19    A    Yes.

20    Q    Do you remember what the purpose was of your creation

21    of Exhibit A?

22    A    For DW Support Services probably.

23    Q    Well, do you remember if it had anything to do with

24    financial?  Were there any financial reasons?  Any loans you

25    were trying to obtain?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 254

1   A    I was trying to get the line of credit going for AFC.

2   Q    **And had the banks requested a resumé?**

3   A    Yes, they did.

4   Q    **And is that what that Exhibit A is?**

5   A    Yeah.  Yes.

6   Q    **Is that -- is that the reason that you had banking**

7   **references on it because the banks had asked for those?**

8           MS. FROEHLKE:  Objection.  Leading.

9   A    Actually, the bankruptcy --

10          THE COURT:  That's overruled.

11  A    The bank references are on there because those are the

12  two gentlemen that I had worked with extensively.

13  Q    **(By Mr. Mikulecky)  Based --**

14  A    Through Klebold Consulting and all the way through.

15  Q    **So, they were most familiar with your -- were they the**

16  **ones most familiar with your banking relationships?**

17  A    My banking relationships, my work ethic.

18  Q    **Are you still involved in the operation of AFC?**

19  A    Yes, I am.

20  Q    **How?**

21  A    Primarily accounting.  I monitor the books.  I go

22  through to make sure that the receivables are being paid on

23  time; going through and monitoring what accounts payables

24  need to be addressed; where we are in making sure that our

25  vendors, suppliers are all taken care of.  As I say,

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 255

1    reconcile the books.  Making sure that all three accounts are

2    in balance at all times.  I do all of the tax reporting.  I

3    do all of FUTA, SUTA, 941s, 940s at the end of the year, all

4    of the state reporting for unemployment.  That sort of thing.

5              MR. MIKULECKY:  Thank you very much.

6              THE COURT:  Mrs. Wilhite, the resumé, do you

7    believe you created that in connection with the first

8    financing you received, this line of credit of $25,000, at

9    the beginning of your company; is that right?

10             THE WITNESS:  It's been updated since then, sir.

11             THE COURT:  Okay.  But it was created for that

12   purpose?

13             THE WITNESS:  The original, yes.

14             THE COURT:  All right.  But in all your updates,

15   how many updates do you think you have had?

16             THE WITNESS:  Oh, several.  I mean, this

17   particular one is quite old.  Terry Hostetler hasn't been

18   with Bank of the West since 2008.  And Mark is not with

19   American National Bank anymore.  He's with Kirkpatrick.

20             THE COURT:  Okay.  But you were applying for the

21   line of credit in October of 1997.  The date of the documents

22   -- it was completed on November 7th.  I assume you didn't

23   walk in and the same day walk out with a line of credit of --

24             THE WITNESS:  No.

25             THE COURT:  -- $25,000.  So, you'd been talking

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 256

 1  with the bank about that a little bit.

 2          THE WITNESS:  Well, if you look back on the

 3  experience, April 1st, 1989 to August 1st, 1997.

 4          THE COURT:  No, I see that.

 5          THE WITNESS:  Okay.  But the above was added after

 6  the fact.

 7          THE COURT:  Right.  But you didn't just walk in in

 8  one day and obtain the line of credit from the bank.  Had you

 9  been negotiating a little bit with them.

10          THE WITNESS:  I was -- I was also working for

11  Castle Rock Bank as a construction consultant.  They were the

12  first bank that I -- I started doing inspections for.

13          THE COURT:  Okay.  But the date of the line of

14  credit was November 7th?

15          THE WITNESS:  Yes.

16          THE COURT:  That's Document --

17          MR. MIKULECKY:  Exhibit G, Your Honor.

18          THE COURT:  Exhibit G.  Okay.  Did it take a while

19  to negotiate that line of credit?

20          THE WITNESS:  Not really.

21          THE COURT:  Okay.  I'm just wondering, in all your

22  updates you never changed the August 1st start date for

23  Advanced Floor Concepts, but that's not true, right?

24          THE WITNESS:  I just didn't catch it.

25          THE COURT:  Right.  But it shows -- since the end

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 257

1   date for Klebold was August 1st, 1997, and the start date for

2   the other was also August 1st, it shows no unemployment --

3           THE WITNESS:  There was no unemployment.

4           THE COURT:  -- on the face of it.

5           THE WITNESS:  There really wasn't any.

6           THE COURT:  Okay.  Mr. Wilhite never received any

7   money from DW; is that correct?

8           THE WITNESS:  No.

9           THE COURT:  All right.  And he stopped receiving

10  money from AFC in October of 19 -- October of 2000 --

11          MR. MIKULECKY:  '8, Your Honor.

12          THE COURT:  '8.

13          MR. MIKULECKY:  August of 2008.

14          THE COURT:  August of 2008.  August 11th, 2008 was

15  his last paycheck from AFC?

16          THE WITNESS:  Correct.

17          THE COURT:  And he hasn't received any money

18  directly from AFC since then?

19          THE WITNESS:  That is correct.

20          THE COURT:  All right.  But he's put in hundreds

21  of days of work for AFC since then; is that right?

22          THE WITNESS:  Correct.

23          THE COURT:  And I'd just like you to articulate

24  what you believe the fairness of that is for a man to work

25  hundreds of days and get paid nothing.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 258

1          THE WITNESS:  He's helping me out.  And if you
2     look at family-owned business there's a lot of times -- in
3     fact, I think if my memory serves me correctly, 50 percent of
4     the time there are other family members who work in a
5     family-owned business and are not paid.
6          THE COURT:  Okay.
7          THE WITNESS:  And he is -- he is -- he can go to
8     Castle Rock or he can not go.  The choice is his.
9          THE COURT:  The company is better off if he goes,
10    probably.
11         THE WITNESS:  Yeah.
12         THE COURT:  Now, your will.  You say you have it
13    in a trust.  It leaves the money to a trust?
14         THE WITNESS:  Yes.
15         THE COURT:  Who are the beneficiaries of the
16    trust?
17         THE WITNESS:  There's several Christian ministries
18    that are the beneficiaries of the trust.  My children,
19    Michael's children are the beneficiaries of the trust.
20         THE COURT:  Okay.  That's all I need to know.  His
21    children are in your will?
22         THE WITNESS:  Yes, sir.
23         THE COURT:  Because otherwise he wouldn't be able
24    to leave anything to his children because he has nothing.
25         THE WITNESS:  Correct.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 259

```
 1            THE COURT:  All right.  Anybody have any questions
 2   in light of what I've asked?
 3            MR. MIKULECKY:  Yes, sir.
 4            THE COURT:  Go ahead.
 5   Q    (By Mr. Mikulecky)  On Exhibit A, Mrs. Wilhite, that
 6   line the Judge was asking you questions about for August 1st.
 7   That says for Advanced Floor Concepts and DW Support,
 8   correct?
 9   A    Yes.
10   Q    And for DW Support, that is an accurate statement?
11   A    Yes.
12   Q    That began on August 1, correct?
13   A    Yes, it is.
14   Q    Okay.  And that's why you had no gap in your
15   employment, correct?
16   A    That is true.
17   Q    For where Advanced Floor Concept, that one would
18   actually be in October, right?
19   A    That is correct.
20   Q    Okay.  Also, with regard to Mr. Wilhite after he left
21   the company.  Before he left the company, was he -- what role
22   did he have with the company?
23   A    He was basically the general manager, did some
24   estimating.  And once he left the company the duties that he
25   was performing were taken over by Torin, Skyler, Nate, Chris.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 260

1    Q    Before Mr. Wilhite left the company, rather than going

2    through all the different responsibilities, is there someone

3    you can point to as the person -- if you had to say someone

4    who was running the company while Mr. Wilhite was still there

5    before 2008, who would that be?

6    A    Torin.

7    Q    Before Mr. Wilhite left?

8    A    Yes.

9    Q    Okay.  What about after Mr. Wilhite left, and now he's

10   going back three days a week?  Is he doing the same

11   responsibilities that he had before?

12   A    No.  Torin -- Torin has stepped up and has taken over

13   those duties.  When the recession hit, AFC became lean and

14   mean.  We let a lot of people go.  The receptionist/project

15   coordinator was replaced with (unintelligible).  So, she was

16   basically -- answered the telephone and was a receptionist.

17   Did some filing.

18   Q    So, focusing though on just Mr. Wilhite after he

19   voluntarily left the company for health reasons and came

20   back, what is he doing now for Advanced Floor Concepts versus

21   what he was doing before?  Explain the difference for the

22   Judge, please.

23   A    Well, before, he was -- he was truly doing a lot of the

24   management of -- as Rod Fisher testified, he met with

25   Michael.  And so Michael did meet with vendors.  Once Michael

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 261

 1   left, the other folks stepped up and filled in with the

 2   duties that Michael was doing.  Before he left, he was doing

 3   a lot of AutoCAD work.  Now he draws pretty pictures for me

 4   with -- on AutoCAD for different ideas that I have come up

 5   with that I would like to build.

 6   Q    Can you approximate how much of what he's doing now, as

 7   a percent of what he was doing before?  Is he doing 90

 8   percent now of what he did before?  10 percent?  50 percent?

 9   Do you have an approximation?

10   A    Maybe -- maybe 15 to 20 percent.

11   Q    Of what he was doing before?

12   A    That is correct.

13   Q    Okay.  Thank you.

14          THE COURT:  Anything further?

15          MS. FROEHLKE:  Yes, Your Honor.

16                   CROSS-EXAMINATION

17   BY MS. FROEHLKE:

18   Q    Mrs. Wilhite, I don't want to belabor this resumé.  I

19   think you called it a typo but, just to clarify, DW Support

20   was organized in May of 1997, right?

21   A    That is correct.

22   Q    Not August?

23   A    Okay.  But if you read that d/b/a Southern Colorado

24   Construction Consulting, that started August 1st.

25   Q    Okay.  And that's the d/b/a of DW Support that --

United States of America vs.                                    Evidentiary Hearing - Day I
Michael David Wilhite                                                      September 15, 2015

Page 262

```
 1   A    That's correct.
 2   Q    -- started in May, right?
 3   A    DW Support started in May, SCC started August 1st, and
 4   AFC started the last part of October.
 5   Q    You talked a lot about the instructions that you've
 6   been giving your husband since he quote/unquote retired.
 7   None of those instructions have been in writing, have they?
 8   A    No.
 9             MS. FROEHLKE:  No further questions.
10             THE COURT:  Okay.  For planning purposes I'm
11   available tomorrow afternoon.  I don't know if that matters
12   to you guys.  It's just a morning session down in the
13   Springs.
14             MR. MIKULECKY:  I'm a mediator in mediation
15   tomorrow, Your Honor.
16             THE COURT:  Good for you.
17             MR. MIKULECKY:  Yeah.  Thank you.  Question their
18   wisdom (unintelligible).
19             THE COURT:  Okay.
20             MR. MIKULECKY:  But I have no idea how long that
21   will last.
22             THE COURT:  That's fine.  You can step down,
23   Mrs. Wilhite.
24             Can you call the next witness?
25             MR. BEDNARSKI:  Your Honor, it's up to the Court.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 263

 1   Obviously, our next witness is Mr. Wilhite.  I don't know if

 2   the Court wants to start that and interrupt it.

 3           THE COURT:  I think it's best, but if you think

 4   then maybe you can -- if there's a reason why you don't want

 5   to --

 6           MR. BEDNARSKI:  I mean, there's no reason, from my

 7   perspective.  It's just a matter -- you know, oftentimes I

 8   know trying to split up witnesses in the middle --

 9           THE COURT:  With a jury that's difficult, but --

10           MR. BEDNARSKI:  I know it's different with a --

11   with a judge versus jury, so I'm fine with starting.

12           THE COURT:  Okay.

13           MR. BEDNARSKI:  Your Honor, if I could just have a

14   moment.  I think the bigger issue is Mrs. Wilhite's back,

15   and --

16           THE COURT:  Well, why don't we take a two-minute

17   break.  Okay?

18           MR. BEDNARSKI:  Thank you, Your Honor.

19           THE COURT:  All right.  We'll be in recess.

20           THE COURTROOM DEPUTY:  All rise.  Court is in

21   recess.

22           (A break was taken from 4:32 p.m. to 4:36 p.m.)

23           THE COURT:  00-cr-504.  And do you have a

24   suggestion as to schedule?

25           MR. BEDNARSKI:  Yes.  Yes, Your Honor.  Based off

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 264

 1   of Mrs. Wilhite's health we're going to ask to end today.

 2   She's got approximately a three-hour drive back home --

 3              THE COURT:  Okay.

 4              MR. BEDNARSKI:  -- to Westcliffe, and she's

 5   already in some serious pain.

 6              THE COURT:  Understood.

 7              MR. BEDNARSKI:  Regarding tomorrow -- and we'll

 8   leave it to the Court as to whether this is an option --

 9   Mr. Mikulecky, as he said, has the mediation.  I'm actually

10   in court with you tomorrow at 10 a.m., so as long as you get

11   me out early enough I can be up here.

12              THE COURT:  Yeah.  Well --

13              MR. BEDNARSKI:  But if the Court will be willing,

14   that while I'm there, and as we get close to the noon hour I

15   can advise the court as to whether or not we can do tomorrow

16   afternoon.

17              THE COURT:  Are you guys willing to be on standby?

18              UNKNOWN SPEAKER:  Yes.

19              THE COURT:  Okay.  Yes.

20              MR. BEDNARSKI:  And then what we would do is we

21   would just have Mr. Wilhite.  All the rest of our witnesses

22   are currently scheduled for Thursday.

23              THE COURT:  Right.

24              MR. BEDNARSKI:  And what I would ask is if we do

25   that, if we can excuse Mrs. Wilhite for that testimony

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day I
September 15, 2015

Page 265

 1   tomorrow so that she doesn't have to make that drive.

 2          THE COURT:  Any objection?

 3          UNKNOWN SPEAKER:  Nope.

 4          THE COURT:  Okay.  Yeah.  So, I mean, I just

 5   figured people would rather go on a Wednesday afternoon than

 6   a Friday afternoon, so --

 7          MR. BEDNARSKI:  Absolutely, Your Honor.  I try not

 8   to put anything on my Friday afternoons.

 9          THE COURT:  Yeah.  But, yeah, that's fine.  We'll

10   be flexible.  Okay.

11          MR. BEDNARSKI:  Okay.

12          THE COURT:  So, you'll be ready to go on-call.

13          MS. FROEHLKE:  Yes.

14          THE COURT:  And we'll let you know as soon as

15   possible what the plaintiff -- defendant's preference is, and

16   we'll just do tomorrow afternoon if we can.

17          MR. BEDNARSKI:  And if need be, we can always

18   start while Mr. Mikulecky is on his way up here.

19          THE COURT:  Okay.  Yeah.  I agree.

20          MR. MIKULECKY:  If I get out of the mediation I'll

21   call you.

22          THE COURT:  Okay.  If you're unsuccessful call me,

23   maybe I can come in and help you.

24          MR. MIKULECKY:  Exactly.  Have a pinch hitter.

25          MR. BEDNARSKI:  He may just need you to call.

Page 266

1            THE COURT:  Is it down there?

2            MR. MIKULECKY:  It is.

3            MR. BEDNARSKI:  He can just walk over and say

4    settle this guys, I need him up in Denver.

5            THE COURT:  I'll bring my robe.  All right.  We'll

6    be in recess.

7            MR. MIKULECKY:  Thank you, Your Honor.

8            THE COURT:  Thank you.

9            THE COURTROOM DEPUTY:  All rise.  Court is in

10   recess.

11           (The within hearing was adjourned at 4:38 p.m.)

12           I certify that the foregoing is a correct

13   transcript, to the best of my knowledge and belief (pursuant

14   to the quality of the recording) from the record of

15   proceedings in the above-entitled matter.

16

17

18

19   /s/ Kelly Mair                    September 21, 2015

20   Signature of Transcriber          Date

21

22

23

24

25

United States of America vs.                                    **Evidentiary Hearing - Day I**
Michael David Wilhite                                                  September 15, 2015

Page 267

```
 1                              INDEX

 2

 3   WITNESSES:                                    PAGE NO.

 4   For the Plaintiff:

 5   Rod Fisher
          Direct Examination by Ms. Froehlke          185
 6        Cross-Examination by Mr. Bednarski          194
          Redirect Examination by Ms. Froehlke        201
 7

 8   For the Defendant:

 9   Darla Dee Wilhite
          Direct Examination by Mr. Mikulecky          46
10        Cross-Examination by Ms. Froehlke          202
          Redirect Examination by Mr. Mikulecky      243
11        Recross-Examination by Ms. Froehlke        261

12
                             EXHIBITS
13
     Plaintiff's Exhibits:          Offered      Received
14
     (Previously Stipulated)
15   1, 3 through 6, 8, 9,             --             6
     11 through 26, 28, 29,           --             6
16   31 through 40,                   --             6
     43 through 46, 50                --             6
17
     41                              231           233
18

19   Defendant's Exhibits:          Offered      Received

20   (Previously Stipulated)
     A through R,                     --            10
21   S (with exception of first e-mail)  --         10
     V, Y                             --            10
22
     T                               174            --
23

24

25
```