United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 268

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2

 3    Case No. 00-cr-00504-PAB

 4

 5    UNITED STATES OF AMERICA,

 6         Plaintiff,

 7    vs.

 8    MICHAEL DAVID WILHITE,

 9         Defendant,

10    DARLA DEE WILHITE,
      YAHAB FOUNDATION,
11
           Interested Parties.
12

13         Proceedings before MICHAEL E. HEGARTY, United States
      Magistrate Judge, United States District Court for the
14    District of Colorado, commencing at 2:36 p.m., September 16,
      2015, in the United States Courthouse, Denver, Colorado.
15

16         WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE
      HEREIN TYPOGRAPHICALLY TRANSCRIBED...
17

18                          APPEARANCES

19    MS. ELIZABETH M. FROEHLKE, ESQ., MR. JUAN G. VILLASENOR, ESQ.
              Appearing on behalf of the United States.
20
                   MR. RICHARD F. BEDNARSKI, ESQ.
21             Appearing on behalf of the Defendant.

22                  MR. SCOTT MIKULECKY, ESQ.
             Appearing on behalf of the Interested Parties.
23

24

25                    EVIDENTIARY HEARING - DAY II
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 269

                          P R O C E E D I N G S
1
2              (Within, the electronically recorded proceedings

3    are herein transcribed, pursuant to order of counsel.  Due to

4    incomplete speaker identification in the FTR log notes,

5    speaker identification in this transcript in some cases may

6    be inaccurate.)

7              THE COURT:  Back on the record in 00-cr-504, for

8    the second day of our evidentiary hearing.  And for the

9    United States, please.

10             MR. VILLASENOR:  Good afternoon, Your Honor.  Juan

11   Villasenor and Elizabeth Froehlke, and Mr. Troy Tyez and

12   Carisha Cruz at the table.

13             THE COURT:  Thank you.  And for Mr. Wilhite?

14             MR. BEDNARSKI:  Your Honor, Richard Bednarski here

15   on behalf of defendant Michael Wilhite who is also present.

16   I believe Mr. Mikulecky is on the phone.

17             THE COURT:  Right.  Mrs. Wilhite has been excused

18   from today.  Mr. Mikulecky, are you there?

19             MR. MIKULECKY:  Yes, Your Honor, I am.  Although,

20   once we begin I'm going to mute my phone to avoid any

21   background noise or inadvertent slips of the tongue while I'm

22   driving.

23             THE COURT:  That will be fine.  How many minutes

24   are you out?

25             MR. MIKULECKY:  At this point, I anticipate about

United States of America vs.                                    **Evidentiary Hearing - Day II**
Michael David Wilhite                                                     September 16, 2015

Page 270

```
 1   20.
 2             THE COURT:  Okay.  We'll see you when you get
 3   here.  Okay?
 4             MR. MIKULECKY:  Thank you, sir.
 5             THE COURT:  All right.
 6             UNKNOWN SPEAKER:  He's driving faster than I did
 7   because I didn't make it here that fast.
 8             THE COURT:  Traffic wasn't too bad when we came.
 9   Okay.  Ready for your next witness?
10             MR. BEDNARSKI:  Yes, Your Honor, Your Honor, the
11   defense would call Michael Wilhite.
12             THE COURT:  Okay.  And in light of Mr. Mikulecky's
13   being by phone, let's all, when we do speak, be near a
14   microphone, okay?
15             MR. BEDNARSKI:  Yes, Your Honor.
16             THE COURTROOM DEPUTY:  Please, raise your right
17   hand.
18             (Whereupon, the witness, Michael David Wilhite,
19   was sworn to tell the truth by the Courtroom Deputy.)
20             THE WITNESS:  I do.  So help me God.
21                      DIRECT EXAMINATION
22   BY MR. BEDNARSKI:
23   Q    Good afternoon, Mr. Wilhite.
24   A    Good afternoon.
25   Q    Would you please introduce yourself to the Court and
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 271

1    then spell your last name for the record, please.

2    A    My name is Michael Wilhite.  The last name is spelled

3    W-i-l-h-i-t-e.

4    Q    Michael, do you know why we're here today?

5    A    Yes, sir, I do.

6    Q    This is based off the Government believing that you are

7    a majority owner of Advanced Floor Concepts; is that right?

8    A    That's my understanding, yes.

9    Q    Do you currently work at Advanced Floor Concepts?

10   A    No, sir, I do not.

11   Q    Why not?

12   A    I left the company in 2008 due to two medical

13   conditions.  I had a series of strokes which rendered me

14   incapability of carrying on with my responsibilities at that

15   time.  And I was diagnosed with severe complex sleep apnea,

16   and I was only sleeping about an hour a night, effectively,

17   so I was ineffective in my position.

18   Q    Did -- did you go back to the company in 2010?

19   A    Yes, I did.

20   Q    In what capacity did you go back to the company in

21   2010?

22   A    Effectively, as an owner's representative.  I went back

23   to the company to be the eyes and ears of Dee Wilhite, the

24   owner of the company.

25   Q    What do you mean you are and were the eyes and ears of

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 272

```
 1  Dee Wilhite, your wife?

 2  A    Well, Dee Wilhite has difficulty traveling.  She's got

 3  severe scoliosis.  Driving or riding in the car is extremely

 4  painful.  So, she doesn't spend much time at all in the

 5  office, and she asked me if I wouldn't mind going up to the

 6  office on occasion -- a day, maybe two days a week -- and

 7  just looking over the company's operations, and reporting

 8  back to her where the company stood.

 9           THE COURT:  Mr. Bednarski, just before we go any

10  further, I didn't have a chance to look through all your

11  exhibits.  Do you have any in there that would date

12  Mr. Wilhite's medical issues?

13           MR. BEDNARSKI:  No, Your Honor.

14           THE COURT:  Is it possible for you to get those

15  before Friday?

16           MR. BEDNARSKI:  I can try, Your Honor.

17           THE COURT:  Okay.  Has the United States seen any

18  actual medical documentation?

19           MR. VILLASENOR:  No, Your Honor.

20           THE COURT:  Okay.  That's going to be fairly

21  important for me.  Okay?

22           MR. BEDNARSKI:  Yes, Your Honor.

23           THE COURT:  It could make a difference.

24           MR. BEDNARSKI:  Yes, Your Honor.

25           THE COURT:  All right.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 273

```
 1            MR. BEDNARSKI:  We will work on getting that.

 2            THE COURT:  Very good.

 3    Q    (By Mr. Bednarski)  Mr. Wilhite, when you say you go to

 4    Advanced Floor Concepts one or two days a week, or every

 5    other week, and you say you're the eyes and the ears, what

 6    are you doing, if anything, in the office when you go up

 7    there?

 8    A    Well, I don't have any specific duties, so I don't have

 9    any work to do.  But I look at the schedule board to see what

10    jobs are on the schedule.  I look at the financial software

11    to see, you know, what the earnings have been, what the

12    profitability may have been.  I usually liaise with the

13    fellows in engineering and ask the superintendent out in the

14    field if everything is going fine.  It's just a general

15    thing.

16    Q    Now, it seems like a lot of that could be done by Dee

17    over the phone; is that right?

18    A    I suppose it could be, but she's, you know, got other

19    responsibilities.  And I have a long-standing relationship

20    with all of the individuals I talk to.

21    Q    And so, even though she can do it over the phone, why

22    does she still send you up there?

23    A    Well, I'm more effective at it perhaps, and I've known

24    these fellows for over a decade.  And I have both a personal

25    and professional relationship with them.  I've seen the guys
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 274

1    grow up, get married, have children, in some cases have

2    grandchildren, and I enjoy spending time with them.  And I

3    enjoy looking to see how the company has progressed, and the

4    fact that I had a part in that progression.

5    Q    Now, we heard yesterday from your wife Dee that you

6    don't get paid to go do this, right?

7    A    No, sir, I do not.

8    Q    Now, the Judge asked a few questions regarding you're

9    not getting paid.  Do you recall those questions when he was

10   asking Dee about those?

11   A    Yes, sir, I do.

12   Q    So -- and I think he said it was something about a

13   hundred days, but you've probably been up there more than a

14   hundred days over the last four or five years?

15          THE COURT:  I think I said hundreds.

16          MR. BEDNARSKI:  Hundreds.  I'm sorry, Judge.  I

17   thought you said a hundred days.  Okay.

18          THE COURT:  Hundreds of days.

19          MR. BEDNARSKI:  I apologize.

20          THE COURT:  Sure.

21   Q    (By Mr. Bednarski)  So, he had talked about that you

22   had been up there at hundreds of days of the last number of

23   years, and you haven't received a single payment as it

24   relates to what you do for Dee and Advanced Floor Concepts.

25   Do you recall that questioning?

United States of America vs.                                    Evidentiary Hearing - Day II
Michael David Wilhite                                                    September 16, 2015

Page 275

1    A    Yes, I do.

2    Q    **So, out of these hundreds of days why -- why aren't you**

3    **getting paid?**

4    A    Well, Your Honor, I go up there for a couple of

5    reasons.  One of them, rather selfishly, is to get away from

6    the ranch.  We're quite isolated down there.  And after three

7    or four or five days I have had my share of dealing with dogs

8    and cats, and shoveling horse poop and chicken poop.  It gets

9    a little bit old.

10        I like going up to visit with the guys up there.  Also,

11   because we're so remote there's some things we can't get

12   locally, so I do some shopping while I'm up there.  You know,

13   I like to help my wife.  And going up there I don't do any

14   work.  I just -- I check things out.  I look around.  I visit

15   with fellas.  It's become more of a hobby for me than

16   anything else.  And you don't get paid for hobbies.

17             THE COURT:  How about, have you ever been

18   reimbursed for gas?

19             THE WITNESS:  The gasoline for the truck that I

20   drive is on a company credit card.

21             THE COURT:  Okay.

22   Q    **(By Mr. Bednarski)  And do you drive a company vehicle?**

23   A    Yes, I do.

24   Q    **Now, when you go up, and if you stay for more than a**

25   **day, where do you stay?**

Page 276

1   A    I stay at the La Quinta Inn and Suites in Castle Rock.

2   Q    And do you have to pay that out of your own pocket?

3   A    No, that's secured by a company credit card.

4   Q    So, I just want to break it down, because you mentioned

5   a number of things as to why you still go up there.  Okay?

6   So, I just want to talk about each one individually.

7        I think the first one you said is you like to go up

8   there because you -- after three, four days on the ranch you

9   need to get away?

10  A    That's correct.

11  Q    Can you explain to the Judge why that is?

12  A    Well, we live on 330 acres, and we have horses, dogs,

13  cats, chicken and cattle.  And it's a little over 9,000 feet,

14  so the altitude is a tough on a guy my age.  Even though I'm

15  for the most part acclimated, it's just a lot of hard work.

16  And there's very little social interaction.  Our nearest

17  neighbor is a mile or so away, and the only social

18  interaction is church on Sunday.  And, you know, I need some

19  of that.  I appreciate the time and -- that I spend with my

20  wife.  And I love my wife.  She's a great partner, great

21  friend for 44 years, and -- but I like to get away, get back

22  into society.

23  Q    And then, the second thing was you said you know the

24  guys.  Can you explain to the Judge what you mean by that,

25  and what you do when you are interacting with these guys at

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 277

```
 1    Advanced Floor Concepts?

 2    A    Sure.  We have a kidding expression in the company, we

 3    talk about the new guy in engineering, his name is Torin

 4    Jackson.  He's the general manager of the company.  But he's

 5    the new guy, he's only been there 12 years.  Everybody else

 6    has been there longer than him.  But Torin came over from an

 7    engineering firm 12-plus years ago, and I watched him grow

 8    up.  I watched him move from the city up into the foothills.

 9    Helped him with designing a greenhouse for his house.  And

10    he's -- I won't say he's like another son to me, but I'm

11    very, very fond of him.

12            Nate and Skyler have been there longer than Torin.

13    They're brothers.  And I've seen them both grow up, and seen

14    them win hockey trophies, and watched both of them get

15    married.  And for Skyler, watched the birth of his first

16    child.

17            THE COURT:  Hopefully not live.

18            THE WITNESS:  No, not live.  No.  Just knew of it.

19            THE COURT:  Okay.

20    A    But they're just -- they're real special people.  And

21    it's not just business with them.  It's personal.  I've just

22    seen so much of them.  And the guys in the field, Francisco

23    Carranza -- who we call Paco -- has been with the company 17

24    years, going on 18.  And he's in his late 50s, perhaps even

25    60 by now, but I've seen his kids grow up.  And I've watched
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 278

 1   his daughter -- not live -- but go to college.  And it was

 2   the first person in his family that had ever, ever, ever gone

 3   to college.  And it was a great celebration.

 4        So, it's a trite expression to say that these people

 5   are more than just workers, they're more like family, but I

 6   do feel that way.  These people are special to me.

 7   **Q   (By Mr. Bednarski)  Then, the next thing you said was**

 8   **part of the reason you go up there is to do some shopping.**

 9   **And if you can tell the Judge what you mean by that.**

10   A   It's about 50 miles to the nearest shopping from our

11   house.  That would be from the mountains west of Pueblo, down

12   to Pueblo, or down to Cañon City.  And we usually stock up on

13   things that we need and shop every couple of weeks, but

14   prices aren't necessarily that good in town for those things

15   that we can get.  But I usually haul back sacks of chicken

16   feed and dog food and cat food, and all that sort of stuff.

17             And the things that we order over the net, which

18   we do frequently, are all shipped to the office because the

19   difference in shipping to a rural area versus shipping to a

20   commercial building, it's half the cost.  So, there's

21   generally a couple of packages for things that my wife has

22   ordered, and I pick those up and bring them back.

23             THE COURT:  Do you have a physical address besides

24   a PO Box?

25             THE WITNESS:  Well, yes, we do.

United States of America vs.                                    Evidentiary Hearing - Day II
Michael David Wilhite                                                    September 16, 2015

Page 279

 1            THE COURT:  Okay.  Lots of people in that area of
 2    the country don't.
 3            THE WITNESS:  Well, it's a physical address, but
 4    the road to the house is five-eighths of a mile long, the
 5    private road.  And in some places it's quite steep and
 6    there's absolutely no possibility that a UPS truck or a FedEx
 7    truck can navigate that in the winter.  No matter how well I
 8    plow it, it's just -- it's dangerous.
 9            THE COURT:  Okay.
10    Q    (By Mr. Bednarski)  And then the last one you said was
11    to help your wife.  What do you mean by that?
12    A    Well, Dee needs to not only be able to look on the
13    computer and see what the, you know, current assets, current
14    liabilities, accounts receivable, accounts payable, total
15    sales, net profit.  She can see those from the computer, but
16    looking at it from a distance is not the same as getting an
17    up-close look.  I mean, there's no way that she can know for
18    the fleet of trucks that the company runs how many of them
19    are going to need repairs, what kind of planning needs to be
20    done for capital improvements and capital replacement.  And
21    for all the time that I worked at the company, that was my
22    responsibility.  So, I'm -- I'm familiar with those kinds of
23    needs.
24        And you asked the other day, How do we get beams down
25    into the basement for the structural floor?  And Dee

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 280

1   responded that we used a crane.  Well, the company actually

2   owns two 23-and-a-half-ton cranes.  And they're a little bit

3   long in the tooth now.  2- to- 300,000 miles on each of them.

4   And they're great machines, but the older they get the more

5   maintenance they need.  And preventive maintenance is a lot

6   cheaper than responding to a breakdown.

7       So, these are kind of -- some of the kind of things I

8   kind of look over and try to kind of give her a heads-up that

9   these things are coming; that we're going to have some

10  expenses.  That's kind of what I mean by eyes and ears.

11  **Q    (By Mr. Bednarski)  Now, how often are you going to**

12  **Advanced Floor Concepts?**

13  A    It varies.  I usually spend a day, sometimes a day and

14  a half, a week up there.  There are some weeks where I don't

15  go at all.  But during that day to day and a half I'm not in

16  the office full-time.  I've got other things that, you know,

17  I like to do that take me outside of the office.  Lunch with

18  associates or past friends up there.

19          Westcliffe -- this is kind of small, but there's a

20  movie theater in Westcliffe that shows movies that were

21  released 10 years ago.  So, Castle Rock has a real movie

22  theater, and I like to see a movie once and a while.

23  **Q    Now, when you go up there, are you managing the**

24  **company?**

25  A    No.  Torin manages the company.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 281

```
 1   Q    Are you running the company?

 2   A    Absolutely not.

 3   Q    Are you doing any estimating?

 4   A    No.

 5   Q    Are you doing any negotiations of contracts?

 6   A    No.  Not at all.

 7   Q    Are you doing any balancing of the finances?

 8   A    No.  Cindy Barker in accounting takes care of that.

 9   Q    Do you sign checks?

10   A    I don't think I've signed a check for a couple of

11   years.  So, no, I'm not a check signer.  I'm not involved in

12   purchasing material for the company.  I'm -- none of the

13   day-to-day activities.

14   Q    Are you involved in sales?  Talking with contractors?

15   A    No.  The only time I've ever been involved in sales is

16   when I was in the office late one evening and a potential

17   client called, I took down the information and gave it to

18   Torin the next day.

19   Q    And did you negotiate that client?  Like, did you

20   negotiate a contract with that client?

21   A    No.  Not at all.  I simply answered the phone and took

22   the information.

23        THE COURT:  And, Mr. Wilhite, you don't consider

24   yourself an employee of Advanced Floor Concepts?

25        THE WITNESS:  No, sir, I do not.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 282

```
 1              THE COURT:  And when were you last an employee?

 2              THE WITNESS:  It was in August of 2008.

 3              THE COURT:  Okay.  Thank you.

 4    Q    (By Mr. Bednarski)  Now, in your capacity as the eyes

 5    and ears of Dee, what -- besides going to Advanced Floor

 6    Concepts, do you do anything else for Advanced Floor

 7    Concepts?

 8    A    No.  That would be the limit of what I do.

 9    Q    Have you -- have you participated in the negotiation of

10    the sale -- potential sale of Advanced Floor Concepts?

11    A    Yes, I have.

12    Q    Now, obviously that is different than being in the

13    office, right?

14    A    Correct.

15    Q    Did you negotiate that potential sale of Advanced Floor

16    Concepts as an employee managing or running the company?

17    A    No.  I did not.

18    Q    Now, we saw yesterday -- if you'd look at the United

19    States' exhibits, if you would look at Exhibit 45.  Do you

20    recognize that?

21    A    Yes, sir, I do.

22    Q    Go past the first page, and it starts on the second

23    page with a letter of intent to purchase interest.  And it's

24    dated August 26, 2013.

25    A    That is correct.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 283

1   Q    And the letter is made out to you; is that right?

2   A    Yes, it is.

3   Q    Why?

4   A    When -- Dee had the idea that the company might have

5   developed into a valuable asset that others might want to

6   acquire.  She had read an advertisement in a newspaper or on

7   television or something, there was a company -- I'm sorry, I

8   can't remember the name -- but they were holding a seminar in

9   Denver.  And they said if you think you have a company you

10  could sell, come attend the seminar and we'll give you all

11  the information you need.  She asked me to attend the

12  seminar, which I did.  And it was a good seminar.  And they

13  gave out a lot of information, and also offered their

14  services as a business broker.  I brought that information,

15  brochures, pamphlets, and what I heard, back to Dee, and she

16  made a decision to retain the services of that company to

17  solicit bids for a sale of the company.  And Kodiak was one

18  of the bids that came in under their auspices.

19  Q    Okay.  So were you involved in those negotiations?

20  A    Yes, I was.

21  Q    How involved?

22  A    Well, I was sort of the lead person in negotiations.

23  Dee had asked me to take that on as a responsibility, to

24  accept and return the letter of intent to Kodiak to negotiate

25  the terms.  It sounds kind of strange, but if you remember,

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 284

1    Nancy Pelosi said you have to sign it to find out what's in
2    it.  Well, letters of intent are pretty much the same thing.
3    You have to agree to open negotiations to find out what the
4    real offer is.
5    Q    And why were you in the -- in charge of these
6    negotiations?
7    A    Because Dee asked me to do it.
8    Q    Do you know why she asked you to do it?
9    A    Well, I have an opinion as to why she asked me to do it
10   and --
11            MR. VILLASENOR:  I'll object on speculation, Your
12   Honor.
13            THE COURT:  Sustained.  Let's try to prevent --
14            MR. BEDNARSKI:  That's why I -- I said did he
15   know, Your Honor.
16            THE COURT:  Okay.
17            MR. BEDNARSKI:  That's all I was asking.
18            THE COURT:  Very good.
19   Q    (By Mr. Bednarski)  Now, did you sign this letter of
20   intent?
21   A    Yes, sir, I did.  At Dee's direction.
22   Q    Why did you sign it and not Dee?
23   A    I had it on my desk.  I went over it in detail with
24   Dee, and she said please sign it and send it back so we can
25   open negotiations.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 285

1   Q    And why did you sign it as CEO?

2   A    I've used the term CEO, general manager, project

3   manager, variously.  I have no real title in the company, but

4   I knew I could use those titles and not get in trouble with

5   Dee because she was my wife.

6   Q    Now, in this particular case, if you are not CEO or

7   managing or running the company, why did you sign this letter

8   of intent as well as the confidentiality agreement as CEO?

9   A    Dee asked me to sign it, and I just picked the title.

10  That was my choice.

11  Q    Now, throughout these negotiations did you have final

12  authority on the sale of Advanced Floor Concepts?

13  A    No, sir.

14  Q    During these negotiations, who had final authority on

15  the sale of Advanced Floor Concepts?

16  A    That authority always rested in Dee Wilhite.

17  Q    Now, when you were negotiating this -- this potential

18  sale of the company, can you describe how those negotiations

19  went on based off of your role in it, and how that happened?

20  A    Yes, I can.  Once the letter of intent was executed by

21  both parties to the transaction, there was a due diligence

22  procedure where the potential buyer or prospective buyer

23  proffered a long list of questions that required answers.

24  They could be questions regarding operations, personnel,

25  finances and any other aspect of the company that an

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 286

1  intelligent buyer would want to know before they signed the

2  deal on.

3  Q    Were you involved in responding to the due diligence

4  list?

5  A    Yes, sir, I was.

6  Q    What was your role?

7  A    Well, the questions came in, and -- and all the

8  questions that I could answer I did answer.  And I don't

9  recall any questions that were outside the realm of my

10 knowledge at that time.

11 Q    Now, it looks as if you sent that directly to Mark

12 Stubbert and Brian Cleveringa; is that right?

13 A    That would be correct.

14 Q    Who is Mark Stubbert?

15 A    Mark Stubbert is a shareholder in Kodiak Partners, and

16 he is a vice president of Barton Supply.

17 Q    Was he involved in the negotiations?

18 A    Yes, he was.

19 Q    What was his role in the negotiations?

20 A    He was the introductory party.  Sort of a go-between

21 between Advanced Floor Concepts and Kodiak Partners.

22 Q    Now, if you would go to Exhibit 46, United States'

23 Exhibit 46.  Is that an e-mail that you sent to Brian

24 Cleveringa and Mark Stubbert?

25 A    Yes, it is.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 287

1   Q    And is that related to the due diligence list?

2   A    That would be correct.

3   Q    Did you create that e-mail?

4   A    Yes, sir, I did.

5   Q    Based off of what you'd testified before, which was

6   they asked questions -- due diligence questions, and you

7   answered them?

8   A    Correct.

9   Q    Now, when you answered their Question No. 32 about

10  ownership, how did you answer that?

11  A    Well, looking at the document it identifies Darla

12  Wilhite as the sole and only owner of the company.

13  Q    And how did you answer Question 64 as it related to

14  review of financial statements and signing of checks?

15  A    It delineated those people that cannot sign checks.

16  That is to say accounting, or Cindy Barker in this case,

17  cannot sign a check because you need a separation between the

18  creator of the check and the signer of the check for safety

19  purposes.

20  Q    And who -- who can sign checks?

21  A    I can sign a check, Torin Jackson can sign a check, and

22  I believe that Nate Stiverson can also sign a check.

23  Q    And it also says in here, No checks are signed by

24  accounting, but by ownership.  Who did you mean by ownership?

25  A    By ownership I meant Dee Wilhite.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 288

1   Q     Did those negotiations lead to the sale of Advanced

2   Floor Concepts?

3   A     No, they did not.

4   Q     Whose decision was it to terminate the negotiations as

5   it related to the sale -- the potential sale of Advanced

6   Floor Concepts?

7   A     It was Dee Wilhite.

8   Q     Okay.  Mike, I want to take you back to 1997.  I know

9   that was a long time ago, but I have some questions about

10  that, okay?

11  A     Certainly.

12  Q     Now, do you know a Geoffrey Clement?

13  A     Yes, I do.

14  Q     How do you know him?

15  A     I met Geoff over the telephone from San Diego.  He was

16  involved in the sale of international bank debentures.  It

17  was an area that I had an interest in, and I got to know him

18  over the phone.  And then when I moved to Colorado, later met

19  him in person.

20  Q     And did you work for Mr. Clement?

21  A     Yes, I did.

22  Q     And do you recall initially what company you worked for

23  him with?

24  A     I think his initial company was Mallmore Limited.

25  Q     When did you start working for him?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 289

```
 1   A     I think it was back in '95, '96.  That time period.

 2   Q     Did you work for him before that?

 3   A     No.  I worked with him, but not directly for him.

 4   Q     When you say you worked with him, what do you mean by

 5   that?

 6   A     We liaised over the phone on potential projects that we

 7   could both be involved in.  But it wasn't until I moved to

 8   Colorado that -- and met him personally that I began to work

 9   directly for him.

10   Q     And I just want to clarify a couple things.  Because

11   you say it was when you moved to Colorado.  When did you move

12   to Colorado?

13   A     In 1992.

14   Q     And when did you marry Dee?

15   A     1993.

16   Q     And so you'd initially said you thought you started

17   working for him in 1995.  Is it 1995 or was it earlier than

18   that that you started working for Mr. Clement?

19   A     When you say working for, it would be 1995 to 1996.

20   Q     So, were you working with him from when you moved out

21   here in Colorado in 1992 until 1995 or so?

22   A     That would be correct.

23   Q     And what -- when you worked for him what did you do for

24   him?

25   A     My job was to identify prospective clients for
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 290

```
 1   financial offerings that he had created.  And that's

 2   essentially what my role was.

 3   Q    In the time that you worked for him, so '95 to -- when

 4   did you stop working for him?

 5   A    1997.

 6   Q    So between 1995 and 1997, when you were working for

 7   him, did you get paid?

 8   A    Yes.

 9   Q    When?

10   A    It was in the early part of 1997.  Perhaps going back

11   slightly into 1996, where I think a sum total of six or seven

12   paychecks issued by Mallmore Limited to me.

13   Q    And let's go, you said from Mallmore Unlimited, right?

14   A    Mallmore Limited.

15   Q    Mallmore Limited, sorry.  So, if you would turn to the

16   Government's Exhibit 14.  Are you there?

17   A    I have it.

18   Q    If you'd look at page 2 of 8 through 8 of 8.  Are these

19   the checks that you got paid by Mr. Clement?

20   A    Yes.

21   Q    Now, these obviously say Steel by Design not Mallmore

22   Limited.

23   A    I'm sorry, I misspoke myself.  I didn't recall where

24   the checks came from.

25   Q    So, in your time that you worked for him at Mallmore
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 291

  1  Limited did you ever get paid?

  2  A    No, sir.

  3  Q    And you were there about two years?

  4  A    That's correct.

  5  Q    Someone's going to have to know why you kept working

  6  for someone for two years if you never got paid.

  7  A    It's a little embarrassing to recollect it, but the

  8  projects that Geoff represented that he could take care of

  9  were large-dollar projects.  And if there was one successful,

 10  it would have covered a two-year salary many times over.  And

 11  there was always a deal just around the corner.  The

 12  traditional carrot on a stick.  Keep working, keep working,

 13  keep working because you're that close.  And then when that

 14  didn't happen, there's another one.  Keep working, keep

 15  working, because you're that close.  And nothing ever

 16  happened.

 17  Q    Now, in the three years you were working with him

 18  before, did you ever make any money off the deals or the

 19  prospective clients you brought to him?

 20  A    No, I did not.

 21  Q    Did you have another job in that timeframe?

 22  A    Unfortunately not.

 23  Q    So, from 1992 to 19 -- late 1996 when you first get a

 24  check from Steel by Design, you go five years without making

 25  any money?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 292

1  A    That's correct.

2  Q    How did you live?  How did you survive?

3  A    Well, I was living with Dee from 1992 on.  And then in

4  1993 we got married, and Dee covered all the household

5  expenses.  And did a great job of doing that.

6  Q    And that was through her work, whether it be through

7  the banks or Klebold Consulting or whichever it was, correct?

8  A    That is correct.

9  Q    Now, in -- in looking at those checks one of the

10  questions that the Judge asked yesterday was some of the

11  checks show loan.  Do you recall that?

12  A    Yes.  And I've seen it here.

13  Q    Did you ever take a loan from either Sharon Clements or

14  Mr. Clements?

15  A    No.  Never.

16  Q    What were those paychecks for?

17  A    They were for work done for Steel by Design.

18  Q    What was Steel by Design?

19  A    It was a company that Geoff had formed to build steel

20  frame structures, steel structural floors as a result of a

21  contract he negotiated with a company down in Texas that

22  marketed complete building packages out of steel instead of

23  wood.

24  Q    Were you involved in this company?  Outside of being an

25  employee?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 293

1   A    No.  Only as an employee.

2   **Q    When did you start working for the company, Steel by**

3  **Design?**

4   A    I believe that was the end of 1996.

5   **Q    Were you going to be an owner of Steel by Design?**

6   A    There was some discussion in a memorandum issued about

7  forming a company in which I would become an owner, yes.

8   **Q    And who was that with?**

9   A    It would have been with Geoff Clement, Mark Russell,

10  and myself.

11   **Q    Were you ever an owner of Steel by Design?**

12  A    No, sir.

13   **Q    Did that ever come to fruition?**

14  A    Unfortunately not.

15   **Q    Why not?**

16  A    Well, Geoff went to prison in March of 1997, and as of

17  that date no agreement had ever been entered into formally.

18   **Q    So, I want to go to the time when he was -- went to**

19  **prison, okay.  It was right around February of 1997?**

20  A    That's correct.

21   **Q    How did you find out that he was going to the Bureau of**

22  **Prisons, federal prison?**

23  A    I believe it was on February 14th, because it was

24  Valentine's Day.  That's why it sticks in my mind.  And Geoff

25  announced to myself and other people in the office that he

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 294

1   had to go downtown for a meeting, and that it would be that

2   afternoon because there was something on the table that

3   needed his input.  Never came back that afternoon.  And the

4   next day I, and others, asked his wife Sharon, Well, where's

5   Geoff?  And she was initially very evasive.  And he didn't

6   show up at all that day.  And we pushed the issue, Where is

7   Geoff?  And she finally relented and said that he'd been

8   incarcerated.

9   Q    Did she tell you why he was being incarcerated?

10  A    No.

11  Q    After you found out that -- that Mr. Clement went to

12  prison, what did you do?

13  A    Specifically --

14  Q    Well, let me go back.  When he went to prison you

15  obviously were getting paid by Steel by Design, so you were

16  working for Steel by Design, right?

17  A    That's correct.

18  Q    What were you doing for Steel by Design?

19  A    I was doing design and limited engineering, and

20  construction of a prototype.

21  Q    At that time, did Steel by Design have any contractors

22  that it was working for as a --

23  A    No.

24  Q    -- subcontractor?

25  A    It had not.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 295

1   Q    Had Steel by Design started selling any type of designs

2   for steel structural floors or steel structures?

3   A    No, it did not.

4   Q    So, it sounds like it was in the concept phase.  Would

5   that be a fair --

6   A    Yes, that's correct.

7   Q    -- fair way to say it?  While you were working for

8   Steel by Design, were you still working for Mallmore Limited?

9   A    Yes, I was.

10  Q    In what capacity?

11  A    Well, there was only one transaction on the table

12  involving a group out of Australia, and I was available to

13  shepherd any miscellaneous details that were required to

14  complete that transaction.

15  Q    Were you involved in the negotiations of that

16  transaction?

17  A    Yes, I was.

18  Q    Were you involved in the paperwork going back and forth

19  to not only Australia but also England?

20  A    Yes, I was.

21  Q    So, after you found out that Mr. Clement went to jail,

22  I assume your employment with Mallmore Limited ended?

23  A    Immediately.

24  Q    What, if anything, did you do based off of your

25  knowledge of the transactions with the Australians?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 296

1    A    I contacted the US Attorney's Office, and asked to

2    speak with someone.

3    Q    Do you recall who you spoke with?

4    A    Yes.  I spoke to US Assistant Attorney Bob Brown.

5    Q    And what did you -- what did you tell him?

6    A    Well, I told him that there was a transaction, a

7    financial transaction involving a group out of Australia, and

8    that Mr. Clement, who was setting up the transaction had been

9    incarcerated.  And I said, In my mind I'm starting to put the

10   dots together and I think there is a case of fraud involved

11   here.  And I know something about it, and I'd like to

12   cooperate and see if we can't get these people their money

13   back.

14   Q    When you called the US Attorney, had you spoken with

15   Dee about you're going -- that you were going to call the

16   US -- the Assistant US Attorney?

17   A    Absolutely.

18   Q    What did you tell her about your involvement in this

19   transaction with the Australians?

20   A    Well, I told her that I had processed paperwork; that I

21   had set up accounts at various financial institutions.  And

22   at that point in time that's the limit of what I told her.

23   Q    Did you tell her at any time that you were involved in

24   the negotiations of that transaction?

25   A    Yes.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 297

1   Q    Did you at any time tell her that you were involved in

2   the fraud that was being perpetrated on the Australians?

3   A    No, I did not tell her that.

4   Q    Why not?  Why not?

5   A    Once I discovered that it was fraudulent and came

6   face-to-face with my part of the fraud, I was deeply ashamed

7   at what I had done.  I knew it was wrong, and I did it

8   anyway.  And I was very much afraid that once she knew what I

9   had done, that she would no longer want to be my wife.

10  Q    After this phone call with the Assistant US Attorney

11  Bob Brown, what was your next contact with federal agents, if

12  any?

13  A    I think that it was in -- between March and June of

14  1997.

15  Q    And can you briefly describe who came out to meet with

16  you?

17  A    Although I don't remember names, there was a gentleman

18  from the FBI, and another gentleman.  I think he was from the

19  IRS, although they both could have been FBI.  It was a long

20  time ago.  And they came to the office of Steel Dimensions

21  and sat across the desk that I used to do work there, and

22  interviewed me about the specifics of that -- that potential

23  fraud.

24  Q    Were you cooperative with them?

25  A    I think that I was, yes.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 298

1    Q    Now, we've heard that -- at least as part of the

2    interview notes from that, that in the middle of that

3    interview you did ask the agents whether you were a target of

4    this investigation.  Did you ask them that?

5    A    Yes, I did.

6    Q    Why?

7    A    Their questions were very detailed and very aggressive,

8    and I felt threatened in the interview.  And, of course, I

9    knew what I had done and I just wanted to find out, you know,

10   are you lookin' at me or are you asking me to help you get

11   the money back; find out what Geoff did?  So I asked, you

12   know, Am I a target here?

13   Q    And what did they respond to you?  If you recall.  And

14   it doesn't have to be specifics, just generally what did they

15   respond to you?

16   A    Generally speaking, they said they were looking into my

17   involvement.

18   Q    After that meeting with the FBI, IRS, with the federal

19   agents, did you tell Dee about the -- the interview you had

20   with the federal agents?

21   A    Yes, I did.

22   Q    Did you tell her at that point -- anywhere between

23   March and June of 1997, did you tell her at that point that

24   you were a potential target, or that the federal agencies

25   were looking in to you as being a part of this potential

United States of America vs.                            Evidentiary Hearing - Day II
Michael David Wilhite                                 September 16, 2015

Page 299

```
 1   fraud -- or of this fraud?  Not this potential fraud.

 2   A    No, I did not.

 3   Q    Why not?

 4   A    Well, again, I knew my role in there.  I knew that I

 5   had done something very wrong.  And I knew that at some point

 6   in time that would be revealed, and I was ashamed.  I was

 7   scared, and I just didn't want her to know.

 8   Q    After this, I think we heard that you hired an

 9   attorney.  Mr. Miranda, right?

10   A    That's correct.

11   Q    Based off of how the case went from there, did you have

12   contact after June of 1997 with federal agents or the -- or

13   someone from the Assistant US Attorney's Office?

14   A    Yes, I did.

15   Q    Do you know approximately when that was?

16   A    It was after June of 1997.  There were a number of

17   meetings where Mr. Miranda, as the attorney representing me,

18   had scheduled those meetings.  I don't remember when the very

19   next meeting was.

20   Q    Were they in 1997, or did they start occurring after

21   1998?

22   A    I believe it was after 1998 they started occurring.

23   Q    Now in that, what was -- what did you believe your role

24   was for the Government in these meetings?

25   A    Well, I believed that I was a cooperating witness; that
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 300

```
 1   I was a source of information.  I had produced documents and

 2   given them to the Federal Government about wire transfers

 3   that went from the US to banks in England.  And I gave them

 4   documents showing the solicitor's name whose trust account it

 5   went into.  And I thought that I was helping them put a case

 6   together and saving a lot of time.

 7   Q    During these meetings with the federal agents and the

 8   Assistant US Attorney as early as 1998, were there

 9   discussions between all the parties that they were going to

10   indict you?

11   A    No.  Not at that time.

12   Q    Were there any discussions about you going to have to

13   repay restitution?

14   A    No.  None at all.

15   Q    Now, did you testify in the trial against Geoffrey

16   Clements?

17   A    Yes, I did.

18   Q    And, like, obviously, I think you know that he got

19   indicted in 1999.  Is that about right?

20   A    That's about right.

21   Q    So, in 1998 you were cooperating with their

22   investigation; is that right?

23   A    Yes.

24   Q    After 1999, when Mr. Clement was indicted, what was

25   your role at that point with the Government?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 301

```
 1   A    Continuing cooperation.  In fact, there were two
 2   weekends when Bob Brown came down to Castle Rock, and we
 3   spent literally the entire day together going through
 4   documents, and what I later saw to be exhibits, and asking me
 5   questions.  And it was two complete Saturdays.
 6   Q    Were you cooperative throughout?
 7   A    Yes, I was.
 8   Q    And so in the investigation stage, before they indicted
 9   Mr. Clement, were there ever any discussions -- were you ever
10   told that you were going to be indicted by the US Government?
11   A    No, not at all.
12   Q    Were you ever told by the US Government that you were
13   going to have to repay restitution?
14   A    Not at that time.
15        THE COURT:  What's the time period?
16        MR. BEDNARSKI:  During the investigation, before
17   the indictment of Mr. Clement.
18        THE COURT:  Right.  But he said, "not at that
19   time."  Mr. Wilhite, what did you mean when you said "not at
20   that time"?
21        THE WITNESS:  I meant the time period that counsel
22   referenced.
23        THE COURT:  Which is?  Tell me --
24        THE WITNESS:  Prior to 1999.
25        MR. BEDNARSKI:  Between 1997 to 1999, when
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 302

1   Mr. Clement was indicted.  And I'll clear it up, Judge.

2          THE COURT:  Okay.

3   Q   (By Mr. Bednarski)  So, from 1997 to 1999, before

4   Mr. Clement was indicted, had you ever been told that you

5   were going to have to repay restitution?

6   A   No.

7   Q   Okay.  Now, after the indictment of Mr. Clement, before

8   you were indicted in November of 2000, in those discussions

9   were there discussions about you being indicted?

10  A   Just prior to my actually being indicted the

11  representatives from the Federal Government indicated to my

12  attorney that I would be indicted.  And at that point in

13  time, they said this is the kind of deal we might be able to

14  offer.  And I think at that time it was 24 to 30 months of

15  incarceration.

16         And, interestingly enough, it was based on the

17  amount of money involved.  And one day I went home and on a

18  computer looked up the difference between the value of a US

19  dollar and an Australian dollar, and it was significant.  So,

20  I printed it out as of the date that these transfers took

21  place.  Gave it to my attorney, gave it to the US Attorney,

22  and they apparently realized that the value of the offense

23  was quite a bit less, and they did then offer a much lower

24  plea agreement.

25  Q   And did that occur before or after you were indicted?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 303

1    A     Just prior to being indicted.

2    Q     **So just prior to being indicted when you were -- were**

3    **you being a cooperating witness with the US Government as it**

4    **related to the charges and the indictment brought against**

5    **Mr. Clement?**

6    A     All the way through.

7    Q     **Now, as a cooperating witness, what did -- what did you**

8    **do for them?**

9    A     Well, I provided information on wire transfers of

10   anybody who was involved, both on the Australian side, the

11   European side and, to the degree I knew, anyone on the US

12   side.  I provided documents that I had copies of.  And then

13   they presented various documents that they had acquired, and

14   asked me if I could identify those documents.  So, I went

15   through an awful lot of documents to identify them or not be

16   able to identify them.

17   Q     **Now, you also, as part of your cooperation, testified**

18   **against Mr. Clement, right?**

19   A     Yes, I did.

20   Q     **Now, as part of that cooperation with the US Government**

21   **as it related to the indictment of Mr. Clement and the case**

22   **against Mr. Clement, did you cooperate and help the US**

23   **Government retrieve assets that Mr. Clement had fraudulently**

24   **taken?**

25   A     Yes, I did.

United States of America vs.                               Evidentiary Hearing - Day II
Michael David Wilhite                                              September 16, 2015

Page 304

1   Q    Do you know approximately how many -- how much you were

2   able to help the Federal Government seize as it related to

3   the money that was taken by Mr. Clement in this transaction?

4   A    I don't know the exact dollar amount.  Bob Brown

5   characterized my cooperation as significant and substantial,

6   and extremely helpful in getting that done.  I have since

7   come to understand that one portion of the funds recovered

8   equated to about $880,000.  US dollars.

9   Q    Based on your cooperation and helping the US Government

10  obtain that -- those assets, did you believe you were going

11  to owe restitution?

12  A    No.  I had no idea.

13  Q    Now, let's go to November of 1997.  Your wife starts

14  Advanced Floor Concepts, correct?

15  A    Yes.

16  Q    Now, at the time that she started Advanced Floor

17  Concepts, did you know that you were going to be indicted?

18  A    No, not at that time.

19  Q    Did you have reason to believe you were going to be

20  indicted?

21  A    No.  I thought my cooperation in helping the government

22  would keep me out of trouble.

23  Q    Did you know that you were going to have to repay

24  restitution?

25  A    I had no idea restitution would ever be assessed.

United States of America vs.                                                    Evidentiary Hearing - Day II
Michael David Wilhite                                                                    September 16, 2015

Page 305

```
 1    Q     Why?
 2    A     I don't understand the law, to start with.  And
 3    secondly, I never got any money.  I never received a dime
 4    from anything that I did for Geoff other than the paychecks
 5    that we just talked about.
 6    Q     From Steel by Design?
 7    A     Correct.
 8    Q     Now --
 9          THE COURT:  Could we -- Mr. Wilhite, when did you
10    retain Mr. Miranda?
11          THE WITNESS:  If I remember correctly, and it's a
12    long time ago, it was after the first meeting with the FBI
13    and IRS agent.  That would be March, up until June of 1997.
14    It was during that time period.  And Mr. Miranda represented
15    me all the way through indictment and sentencing, and then
16    subsequently passed away.
17          THE COURT:  We've heard that you don't have any
18    checking account.  How was Mr. Miranda paid?
19          THE WITNESS:  My wife paid for it.
20          THE COURT:  Out of what account?
21          THE WITNESS:  Out of her checking account.
22          THE COURT:  Personal checking account?
23          THE WITNESS:  Yes, sir.
24          THE COURT:  Okay.  Do you remember approximately
25    how much Mr. Miranda was paid?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 306

```
 1              THE WITNESS:  She told me that it was about

 2    $50,000 when everything was said and done.

 3              THE COURT:  All through?

 4              THE WITNESS:  Yes.

 5              THE COURT:  Were those payments regular throughout

 6    the representation?

 7              THE WITNESS:  I never saw her make the payments,

 8    but I'm assuming that that's probably the case.

 9              THE COURT:  Okay.  Thank you.

10              MR. BEDNARSKI:  Any other questions, Judge, in

11    that area?  Because I was going to move on.

12              THE COURT:  No.

13              MR. BEDNARSKI:  Okay.

14    Q    (By Mr. Bednarski)  One -- you were here yesterday for

15    the opening statement of the government.  Do you remember

16    that?

17    A    Yes, I do.

18    Q    And one of the things they had mentioned was that since

19    2004 you have not voluntarily paid anything towards

20    restitution.  Do you recall that?  Do you recall that?

21    A    I recall that, yes.

22    Q    Is that true?

23    A    I don't believe that that's true at all.

24    Q    Have you made a voluntary payment since you got off

25    supervised release?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 307

```
 1    A    No, I made voluntary payments all the way up to

 2    supervised release.  And then when I enrolled in Social

 3    Security, payments were deducted from Social Security.  But

 4    to correct myself, voluntary payments after supervised

 5    release, I don't recall making voluntary payments.

 6    Q    So, why haven't you made any voluntary payments towards

 7    your restitution since you got off of supervised release?

 8    A    Well, first off, I didn't have any money.  And second,

 9    the government never followed up to help me establish a

10    payment plan or to lay out what I needed to do or to work

11    through this.  So, I had no guidance on it.

12    Q    Well -- and let's talk about that you had no money.

13    Obviously, that was in '04.  You were working for Advanced

14    Floor Concepts, right?

15    A    Yes.

16    Q    You were making a paycheck?

17    A    Correct.

18    Q    And you were getting paid approximately two times a

19    month?

20    A    That is correct.  I don't recall what my payments were

21    in 2004, but, yes, I was earning a paycheck at that point.

22    Q    So, you --

23                THE COURT:  Mr. Bednarski, hold on a second.

24                MR. BEDNARSKI:  Yes, Your Honor.

25                THE COURT:  Something comes to my mind, which I
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 308

```
 1   think I ought to disclose, but it shouldn't have any impact
 2   on this matter.  I did supervise the FLU unit from 2002 until
 3   2006.  So the unit that was responsible for recovering any of
 4   this kind of debt, I supervised as the civil chief of the US
 5   Attorney's Office, but I have no recollection of ever having
 6   a discussion about Mr. Wilhite or anything that he owed.
 7   Okay?  So, I just think I need to disclose that.
 8              MR. BEDNARSKI:  I appreciate the disclosure.
 9   There's no issues on our part, Your Honor.
10              THE COURT:  Thank you.
11              MR. BEDNARSKI:  And I think I saw in your bio that
12   that was the case.
13   Q    (By Mr. Bednarski)  You've never met him before, have
14   you?
15   A    I have no idea what ya'll said.
16   Q    He -- what he said was he was the Chief Assistant US
17   Attorney in charge of the Financial Litigation Unit.  Which
18   is the unit that is in charge of going after and getting
19   restitution or payments from defendants who have been ordered
20   to pay.
21   A    Okay.
22   Q    Okay.  So, the unit that these two work for, he used to
23   supervise back in 2002 to 2006.
24   A    I understand.
25   Q    You got that?  Now, after 2004 to 2008 you had money,
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 309

1    correct?  You were making money, correct?

2    A    Yes.

3    Q    But you still did not make any payments towards

4    restitution, correct?

5    A    That is correct.

6    Q    Why not?

7    A    A couple of reasons.  One, I wasn't being -- I use the

8    term encouraged, and it's the worst term I could possibly

9    pick, by the government to make those payments.  I had no

10   contact with the government whatsoever.  And I -- I recognize

11   that restitution was assessed.  I have never understood how I

12   can pay back money that I've never received.  That's a

13   mystery to me, because I don't understand the legal system.

14   But I had no contact with the Federal Government, and so I

15   didn't -- I didn't make any payments.

16   Q    So, since 2008 until you started getting Social

17   Security and -- and money was being deducted from your Social

18   Security, did you make any payments towards restitution?

19   A    No, I did not.

20   Q    Why not?

21   A    Well, in 2008 I left the company and I wasn't earning

22   any money.

23   Q    Now, in that timeframe, did the government at that

24   point follow-up with you?

25   A    There was one contact, and there was a meeting held

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 310

 1    downtown Denver, and I think it was in 2010.  I don't recall

 2    the participants, but they had gone over the books and

 3    records of the company.  It was my impression at the time

 4    that they determined that since I wasn't working, there was

 5    nothing that could be proffered.  And we just left the

 6    meeting.  And I think the parting comment by the fella in

 7    charge was he hoped that business was going to get better so

 8    that I could be reemployed.

 9         But to your question, are you asking about attempts by

10    the Federal Government to --

11    Q    I asked did you have any contact, and you answered

12    that.

13    A    Good.

14    Q    So you recall this one meeting you had at the US

15    Attorney's Office?

16    A    Correct.

17    Q    Did you have any other type of communication with the

18    government, whether it be through e-mail, letter, anything

19    like that, from 2008 until 2 -- until now?

20    A    I believe there was a letter that came through just

21    reminding me that I owed restitution and asking me to --

22    to -- well, to pay that restitution.

23    Q    Do you recall -- do you recall any e-mails from -- back

24    in 2012 from the US Attorney's Office regarding trying to set

25    up a payment plan and asking you to pay $2500 a month?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 311

1    A    I vaguely recall that, yes.

2    Q    If you would go to Government's Exhibit 18.  Does that

3    look familiar?

4    A    Yes, it does.

5    Q    So, in 2012 they were asking you to pay money, right?

6    A    That's correct.

7    Q    After -- after you had this communication with them,

8    did the government do any further follow-up regarding

9    payments towards restitution until they started deducting

10   money out of your Social Security?

11   A    No, they did not.

12   Q    Now, if you would go to Defendant's Exhibit S.

13            MR. BEDNARSKI:  Oh, the Government one was 18.

14            UNKNOWN SPEAKER:  Thank you.  Sorry.

15            THE COURT:  While we're on this exhibit, what was

16   the other felony that Mr. Wilhite mentioned?

17            MR. BEDNARSKI:  I'm sorry?

18            THE COURT:  You said he had two felony

19   convictions.  What was the other felony?

20            MR. BEDNARSKI:  I don't remember him saying he had

21   two felonies.

22            THE COURT:  He does in this document.  He says, I

23   am a 62-year-old unemployed --

24            MR. BEDNARSKI:  Oh, sorry.

25            THE COURT:  -- man with two felony convictions.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 312

1          MR. BEDNARSKI:  I apologize, Your Honor.  I

2    thought you meant on the stand --

3          THE COURT:  No.

4          MR. BEDNARSKI:  -- he testified to.

5    Q    (By Mr. Bednarski)  What is your other felony

6    conviction?

7    A    Well, there are two felony convictions.  One, is wire

8    fraud, and the second is aiding and abetting a scheme.

9          THE COURT:  Okay.  So, you were talking about just

10   the one prosecution with two charges?

11         THE WITNESS:  Correct.

12         THE COURT:  You didn't have any prior felonies?

13         THE WITNESS:  No, sir.

14         THE COURT:  Okay.

15         UNKNOWN SPEAKER:  It was a two-count information.

16         THE COURT:  Thank you.

17   Q    (By Mr. Bednarski)  Now, do you recall -- I don't want

18   to talk about the last -- the first e-mail in time on that

19   exhibit, I just want to deal with the last couple.  It deals

20   with -- it deals with information going back and forth

21   between you and -- I think it was Britta Nord over at the US

22   Attorney's Office, right?

23   A    I believe that's the name, yes.

24   Q    About payments, right?

25   A    Yes.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 313

1   Q    Now, at that time, after you had explained that you
2   were no longer working for Advanced Floor Concepts, did the
3   government do anything to follow-up to try and obtain any
4   further information or money towards the restitution until
5   those e-mails in 2012?
6   A    No, sir.
7   Q    Now, in -- if you would go to Government's Exhibit 19.
8   Do you recall that?
9   A    Yes, I do.
10  Q    Now, this was sent on August 28th, 2008.
11  A    Yes, sir.
12  Q    If you would look at the second page, it says, Michael
13  David Wilhite, Social Security number, is not employed by our
14  firm.  Date terminated/retired 8/11/08.
15  A    That is correct.
16  Q    Is that your handwriting?
17  A    Yes, it is.
18  Q    Why did you fill it out and not someone from Advanced
19  Floor Concepts?
20  A    It was handed to me by Cindy Barker.  I happened to be
21  in the office when it arrived and she said, What do you want
22  me to do with this?
23  Q    Now, after you had indicated that you retired, did you
24  send that back into the US Government?
25  A    Yes, sir.

United States of America vs.                   Evidentiary Hearing - Day II
Michael David Wilhite                            September 16, 2015

Page 314

1  Q    After that, did you receive any contact from the US

2  Government to follow-up on your retirement/medical issues

3  between 2008 and 2011?

4  A    No.

5  Q    Or -- yeah, 2011.  And from 2004 to 2011 was there any

6  follow-up by the government as it related to your ability to

7  pay or have you make any payments towards the restitution?

8  A    No, sir.

9  Q    Okay.  The last thing I'm going to talk to you about is

10  the formation of Advanced Floor Concepts.  Okay?

11  A    Certainly.

12  Q    Now, was Advanced Floor Concepts, the ability to -- was

13  Advanced Floor Concepts your idea?

14  A    No, sir, it was not.

15  Q    Was it your idea to start a structurally steel floor

16  company?

17  A    No, it was not.

18  Q    Was it Dee's idea?

19  A    Yes.

20  Q    Why -- why wasn't it your idea?

21  A    Well, the idea of forming any company with no money,

22  bad credit, no connections in the Denver construction market,

23  and a judgment hanging over my head, forming a company on my

24  own would be just ludicrous.

25        THE COURT:  Could we -- Mr. Wilhite, we've heard

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 315

1    about bad credit the whole entire hearing so far.  Could you

2    give some meat on those bones as far as why you had such bad

3    credit?

4            THE WITNESS:  Yes, Your Honor, I can.  I had a

5    previous bankruptcy.

6            THE COURT:  What year?

7            THE WITNESS:  Oh, I don't recall.  It was in

8    the -- there were two bankruptcies.  One was, I think, in

9    1982, and then another bankruptcy about seven years later.

10           THE COURT:  Both personal?

11           THE WITNESS:  Yes.

12           THE COURT:  What state?

13           THE WITNESS:  I'm sorry?

14           THE COURT:  What state?

15           THE WITNESS:  California.

16           THE COURT:  What district?

17           THE WITNESS:  I couldn't tell you.  It was

18   San Diego.

19           THE COURT:  San Diego.

20           THE WITNESS:  Uh-huh.  And there was a business

21   bankruptcy, coupled with a personal bankruptcy.  And then

22   later there was a personal bankruptcy seven or eight years

23   later.  And when I left San Diego I was unable to meet my

24   obligations.  I was homeless for three or four months and

25   lived on the streets of San Diego.  And then during the

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 316

1   previous time -- and I know that it contributed to a lot of

2   bad judgment -- I was severely alcoholic and drug addicted.

3   And fortunately, by the grace of God, I am not now.  I've

4   been clean and sober for 28 years.

5            THE COURT:  Okay.  All right.  Thank you.

6   Q    (By Mr. Bednarski)  Now, you had also just said that

7   you had a judgment hanging over your head.  What judgment was

8   that?

9   A    I believe it was a tax lien from California for unpaid

10  taxes.

11  Q    And when you say that that's the reason why you

12  couldn't start a company, is that because you were trying to

13  get out of paying that tax lien?

14  A    Absolutely not.

15  Q    Then what did you mean by having this judgment hanging

16  over your head?

17  A    Well, in order to start a company, and we'll say a

18  construction company in this instance, it's going to require

19  capital, either as an investment by others or a financial

20  entity, a bank loan.  And with that kind of judgment for a

21  tax lien, no bank or any investor is going to look at me

22  forming a company.  It just wouldn't happen.

23  Q    Now, I want to talk a little bit about some of the

24  things you talked about.  Okay?  I think we cleared up the no

25  credit.  So then the second aspect is that you said you had

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 317

1    no money.  Obviously, you were bringing in money at that

2    point from Steel Dimensions; is that right?

3    A    That's correct.

4    Q    When you say you didn't have money, what do you mean by

5    that since you were getting a paycheck?

6    A    The paychecks that I received I had given over to Dee.

7    For the previous five years I had not contributed almost

8    anything to the household expenses and it was at that point,

9    since I was making some money, it was time for me to step up

10   and carry my share of the load.

11   Q    Now, over -- I think it was approximately six months

12   that you worked for Steel Dimensions, you made about $4,000 a

13   month; is that right?

14   A    Approximately.

15   Q    Now, would that have been enough to start a

16   construction company?

17   A    I don't believe so, no.

18   Q    Now, you also said that you had no assets.

19   A    That is correct.

20   Q    What do you mean by that?

21   A    When I came out to Colorado in 1992, I brought a

22   suitcase with a minimal amount of clothing and I had a

23   bicycle.  That was all that I had.  And that was the limit of

24   it.  The timeframe that you're talking about, I had an old

25   truck that I used to get back and forth, you know, from

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 318

1   Castle Rock to north of Denver where Steel Dimensions was.

2   And I was part owner of that truck along with Dee, but I

3   didn't own anything else.

4   Q    And then the next thing you said -- and we cleared up

5   the bankruptcy, the judgment that was out there.  The final

6   thing that you had talked about was no contacts.  So, I want

7   to talk to you a little bit about that.  Before you started

8   working for Steel by Design at the end of 1996, when was the

9   last time you were involved in construction?

10  A    It would have been about 10 years prior to that in

11  San Diego.

12  Q    So, in -- with your construction experience, what did

13  you do?

14  A    In San Diego I was the project manager for different

15  commercial construction companies, and I supervised the

16  construction of schools and mid-rise buildings, factories,

17  that type of thing.

18  Q    Was all of your construction experience in California?

19  A    Yes.

20  Q    When you moved out here, did you get involved in

21  construction before Steel by Design?

22  A    No, not at all.

23  Q    Obviously, as we talked previously, Steel by Design was

24  really in its concept phases -- phase at the time, right?

25  A    Correct.

United States of America vs.                    Evidentiary Hearing - Day II
Michael David Wilhite                                September 16, 2015

Page 319

1    Q    Had you met with any contractors at that point?

2    A    No.  There was nothing to meet with them about.

3    Q    Now, when -- you then went and worked for Mark Russell

4    at Steel Dimensions, right?

5    A    That's right.

6    Q    And you worked for him for about six months?

7    A    Also correct.

8    Q    In those six months did you develop connections to

9    contractors here in Colorado?

10   A    Personally, no, I did not.

11   Q    Now, in that timeframe, did Steel Dimensions install

12   any structural steel floors?

13   A    Yes, they did.

14   Q    Approximately how many?

15   A    To the best of my recollection, four, five, or six

16   during the time period that I was there.

17   Q    Were you involved in the sale of those?

18   A    No.  Mark Russell was.

19   Q    Were you involved in communications with the

20   contractors about the installation of those floors?

21   A    No, sir.

22   Q    Based off of installing those floors, did you have

23   contacts that you -- with these contractors that you could

24   then sell Advanced Floor Concepts' structural steel floor to

25   them?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 320

1    A    Mostly, I just met the superintendent.  There was one

2    contractor, Abe Suderman, who I got to know.  And Advanced

3    Floor Concepts subsequently did do work for Abe Suderman.

4    But that's the only instance I can recall.

5    Q    Now -- so, when you say you have no contacts, did we

6    cover everything, or is there more that you would like to

7    describe to the Court as to why you had no contacts?

8    A    No.  I was insulated from the general contracting

9    community.  Mark Russell handled sales.  The only way I knew

10   Abe Suderman, he was a one-house-a-year custom builder.  He

11   was an older gentleman, hands on, and he came out to the job

12   site.  And that's where I met him was on the job site.

13   Q    And so you, then, left in -- at the end of October of

14   1997, you left Steel Dimensions; is that right?

15   A    That's correct.

16   Q    Why did you leave them?

17   A    Well, Dee had an idea to form a structural steel

18   company, and took steps to do so, and offered me a position

19   with the company.  And I wanted to help my wife out.  I

20   thought it was a good decision, and subsequently left the

21   employ of Steel Dimensions.

22   Q    Any other reason why you left Steel Dimensions to go

23   work for your wife's company?

24   A    Well, kind of a personal reason.  When the very first

25   job came around for Steel Dimensions to install, on the day

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 321

```
 1   installation started, Mark Russell, the owner, left for a
 2   two- or- three-week vacation in Europe.  And he left us
 3   with -- with very little direction other than a set of
 4   blueprints.  Absolutely no money to buy any miscellaneous
 5   parts that might be needed to complete the floor.  My wife
 6   ended up coming out-of-pocket to buy those missing parts and
 7   pieces, and we got the floor completed.  And I didn't feel
 8   real comfortable with that kind of approach.
 9   Q    Now, Steel Dimensions was also a competitor; is that
10   right?
11   A    With Advanced Floor Concepts?
12   Q    Correct?
13   A    Yes.  They became competitors.
14   Q    How -- how would that have looked if you worked for the
15   competitor of your wife's company?
16   A    It probably would have resulted in a lot of cold nights
17   on the couch.
18   Q    Now, when Advanced Floor Concepts was started, who
19   funded it?
20   A    Dee Wilhite did.
21   Q    Who created it?
22   A    Dee Wilhite.
23   Q    What was your role when Advanced Floor Concepts was
24   started?
25   A    When I went to work for the company everyone there wore
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 322

 1  whatever hat was required.  I did some drafting, some

 2  engineering, some purchasing, and definitely installation in

 3  the field.  Did that for years.  And whatever needed to be

 4  done since there weren't a lot of people involved.  There was

 5  just Dee and Roger and myself, and in the beginning we all

 6  worked in the field installing floors.

 7  Q    And did you get to a point where you were running the

 8  company?

 9  A    Yes.  It was quite some time later.

10  Q    Approximately when was it that you took over, kind of,

11  the general manager role of the company?

12  A    The company probably had been in existence for three or

13  four years, and towards the end of that time period I would

14  be working with a crew in the field installing a floor, and

15  I'd get a phone call from a potential client and I'd have to

16  step aside to take that phone call.  And after that occurred

17  on a regular basis, the crew leader came to me and says, you

18  know, why don't you just back away from our crew and let us

19  take care of it because we can't count on you being here.

20  Q    And so it was at that point you stopped installation

21  and moved into administration?

22  A    Yes.

23  Q    Okay.  Now, we've talked about that you then left the

24  company in 2008 because of your strokes and the sleep apnea?

25  A    Correct.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 323

1   Q    We talked about that.  And then you said you started

2   going back, you know, a couple days a week because Dee asked

3   you, in 2010.  What changed between 2008 and 2010 that you

4   needed to go -- August, 2008, that you needed to go back to

5   be the eyes and ears for Dee?

6   A    Well, one of the key people in the company, a gentleman

7   named Roger Otterstein, who was in charge of sales and worked

8   in other areas of the company, he got sick.  And he was

9   diagnosed with terminal cancer, and he was ineffective in his

10  position.  So, I went back to the office to support what he

11  was doing.  He passed away, I think, in March of 2010.

12  Q    Well -- and I think we also heard yesterday that there

13  was a Brendan DePaola that was also in there in that

14  timeframe with Roger Otterstein; is that right?

15  A    That is correct.

16  Q    What happened to Brendan that he couldn't take over the

17  role that Roger was doing in order to -- that you wouldn't

18  have to go back to be the eyes and ears of Dee?

19  A    Brendan was field oriented and not sales or

20  administration oriented.  He could not have filled Roger's

21  shoes ever.

22  Q    And so those two -- is he still with the company,

23  Brendan?

24  A    No.  During the Great Recession, Brendan was let go in

25  2008 or 2009.  The company was hemorrhaging money and needed

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 324

1  to cut back on staff.  Brendan was let go, Roger passed away,
2  Linda Gould was let go, Dennis Cross left the company.  And
3  that was, I think, typical of a lot of companies in that
4  timeframe.
5  Q    Now, when you went back in 2010, what was your role at
6  that point?
7  A    I had no formal role.  No responsibilities or duties.
8  I just went back to look over the company, to give advice or
9  mentoring if it was needed to get the company, you know,
10  moving again.
11  Q    Once Roger Otterstein had passed away who was to take
12  over the managing, slash, running of Advanced Floor Concepts?
13  A    Well, we spent years working with Torin Jackson who was
14  a -- an Engineer in Training.  So, EIT is the formal
15  training; meaning, that you are a fully qualified engineer,
16  but you have not yet taken your exam to be a Professional
17  Engineer.  So -- but Torin, great guy, good head on his
18  shoulders, and he developed into an excellent manager.  And
19  today he manages all aspects of the company, with field
20  personnel working underneath him, and the engineering staff
21  in the office working underneath him, and the accounting
22  staff at the office reporting to him.
23  Q    Did you start Advanced Floor Concepts?
24  A    No, sir.
25  Q    Did you start Advanced Floor Concepts and put it in the

United States of America vs.                                    Evidentiary Hearing - Day II
Michael David Wilhite                                              September 16, 2015

Page 325

1    name of your wife?

2    A    No.  Absolutely not.  Couldn't have done that.

3    Q    Did you start Advanced Floor Concepts, put it in the

4    name of your wife in order to defraud the government?

5    A    No.

6              MR. BEDNARSKI:  Thank you.  I have no further

7    questions.

8              THE COURT:  Okay.  Mr. Wilhite, from August 11th,

9    2008, which the records show was your retirement date, until

10   March of 2010, which you just testified was about the time

11   you started getting involved again, how often did you go into

12   the office?

13             THE WITNESS:  At that time probably once a week,

14   once every couple of weeks.  There were extended periods of

15   time where I didn't go to the office at all.

16             THE COURT:  Okay.  Did you communicate with the

17   office even if you didn't go into the office?

18             THE WITNESS:  Not on a regular basis.  But if

19   someone called me with a question, I'd certainly answer the

20   phone.

21             THE COURT:  What about e-mail?

22             THE WITNESS:  No.  We didn't exchange e-mails very

23   much.

24             THE COURT:  Okay.  And then in March of 2010, how

25   often did you start going in?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 326

 1          THE WITNESS:  When Roger died I went in probably

 2    two days a week to kind of bolster up.  I mean, it was a big

 3    hit to the company emotionally when Roger passed away.  And I

 4    just wanted to be there as a shoulder to lean on, to

 5    encourage, to pick up any sales leads that Roger had not

 6    followed -- or been able to follow through on.  So, it was a

 7    little more focused at that point in time for a little while.

 8          THE COURT:  Was his death sudden?

 9          THE WITNESS:  Well, it depends on what you call

10    sudden.  From the time of diagnosis to when he died, it was

11    probably six or seven months at the outside.  And I was --

12    you know, one of those moving things, I was holding him when

13    he took his last breath.

14          THE COURT:  When did he last participate in a

15    full-time basis then for the company before his death?

16          THE WITNESS:  Full-time probably stopped about

17    three months before, but he was still able to carry on his

18    duties.  And as his illness progressed it took more time away

19    for treatment and whatnot.  The last 30 days prior to his

20    death he was in the hospital for all of those 30 days.

21          THE COURT:  Okay.  Thank you.  Anything further,

22    Mr. Bednarski?

23          MR. BEDNARSKI:  No, Your Honor.

24          THE COURT:  Okay.  Any cross?

25          MR. VILLASENOR:  Yes, Your Honor.  Would I be able

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 327

1    to take a restroom break?

2            THE COURT:  That would be fine.  Let me know when

3    you're ready.  We'll be in recess.

4            MR. VILLASENOR:  Thank you.

5            THE COURTROOM DEPUTY:  All rise.  Court is in

6    recess.

7            (A break was taken from 3:56 p.m. to 4:10 p.m.)

8                    CROSS-EXAMINATION

9    BY MR. VILLASENOR:

10   Q    Mr. Wilhite, you just testified that you left Advanced

11   Floor in 2008 because you had strokes and sleep apnea; is

12   that right?

13   A    Yes.

14   Q    Do you recall that I took your deposition in October,

15   2014?  Do you recall that?

16   A    I believe so.

17   Q    And we testified about the very issue about why you

18   left Advanced Floor in 2008, correct?

19   A    I don't recall.

20   Q    Let's pull it up.  Page 21, please.

21           THE COURT:  I prefer you ask him what you think

22   his testimony was, and if he denies that then you can show

23   him the deposition.

24   Q    (By Mr. Villasenor)  Isn't it true, Mr. Wilhite, that

25   you testified at your deposition that you quit Advanced Floor

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 328

1    in 2008 because your position was eliminated?

2    A    That was part of it.

3    Q    Yes or no, sir?

4    A    Yes.

5    Q    And isn't it true that you also testified that when I

6    asked you is it -- you're saying your wife laid you off, you

7    said, Pretty much so, yes?

8    A    Yes.

9              MR. VILLASENOR:  Then --

10             THE COURT:  Okay.

11             MR. VILLASENOR:  He's confirmed his testimony.

12             THE COURT:  All right.

13   Q    (By Mr. Villasenor)  Now, Mr. Wilhite, you pled guilty

14   to wire fraud and aiding and abetting; is that correct?

15   A    That is correct.

16   Q    And there was a plea deal obviously, right?

17   A    Yes.

18   Q    And as part of that plea deal you agreed that at

19   Mr. Geoffrey Clement's direction you made representations

20   that Mr. Clement and his company, Mallmore Limited, had the

21   experience and ability to make certain high-yield low-risk

22   investments, right?

23   A    I'm sorry, I'm not sure I understand the question.

24   Q    You agreed that as part of your plea deal you -- you

25   acted at Mr. Clement's direction, correct?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 329

 1   A     Yes.  I think so.

 2   Q     Okay.  And that you also agreed that you and

 3   Mr. Clement represented that KNL Fishing, Inc. -- Finishing,

 4   Inc. -- which was Mr. Clement's corporation, right?

 5   A     I believe it was his corporation, yes.

 6   Q     And you basically agreed that that company would

 7   provide collateral for loans; that the value of the

 8   collateral was false based on information Mr. Clement

 9   provided, right?

10   A     Sir, I have not refreshed myself to the plea agreement,

11   so you're referencing things I have no memory of.

12   Q     Okay.  The basis for your crime was the fact that you

13   forged a letter from Merrill Lynch and that you faxed that

14   letter to Australia, correct?

15   A     That is correct.

16   Q     Okay.  Go to Exhibit 1 -- 2 at page 1.

17         MR. BEDNARSKI:  Your Honor, this is one of them

18   that's not in yet.  We are objecting as to relevance.

19         THE COURT:  Very good.

20         MR. VILLASENOR:  Your Honor, they opened the door

21   to his underlying criminal conduct.

22         THE COURT:  Well, I don't have anything to decide

23   at the moment.  He was just giving me information.

24         MR. BEDNARSKI:  Yes, Your Honor.

25         MR. VILLASENOR:  And I was too.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 330

1            THE COURT:  Okay.

2    Q    (By Mr. Villasenor)  Exhibit 2, page 1.  Is that the

3    letter you forged, Mr. Wilhite?  Page 1, Exhibit 2.  That

4    front page?

5    A    Yes.

6            MR. VILLASENOR:  I offer Exhibit 2, page 1 in

7    evidence.

8            MR. BEDNARSKI:  I still object as to relevancy.

9    Even if we've opened the door, what's the relevance to his

10   document coming in, Your Honor?

11           THE COURT:  Well --

12           MR. BEDNARSKI:  He hasn't denied that he was

13   convicted of it, or that he forged a letter.  So I don't

14   understand why we have to have a cumulative exhibit as to

15   that, Your Honor.

16           THE COURT:  Okay.  Because if it's a cumulative

17   objection then I'm going to overrule it.  I think that

18   evidence of the crime itself is admissible.  It was a crime

19   of dishonesty.  I don't know what exactly what the Federal

20   Rules would say about this, but we have heard testimony, and

21   this will provide context.  So I'll admit the exhibit.

22   Exhibit 2 is admitted.

23           (Exhibit No. 2 admitted into evidence.)

24           MR. VILLASENOR:  And it's just page 1, Your Honor.

25   I'm not offering anything else of Exhibit 2.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 331

```
 1              THE COURT:  Okay.
 2    Q    (By Mr. Villasenor)  Now, as part of your sentence you
 3    -- as part of your plea deal you were sentenced to three
 4    months in federal prison, correct?
 5    A    That is correct.
 6    Q    Now, you knew Mr. -- I think you testified earlier that
 7    you new Mr. Geoffrey Clement for many years, right?
 8    A    For approximately four years.
 9    Q    Okay.  And that you were working with him and for him
10    at some point in time during those years, right?
11    A    Yes.
12    Q    Let me ask you, who is Brian Ivey?
13    A    A gentleman from Australia.
14    Q    And what is his relationship to your wire fraud crime?
15    A    As I recall, he was involved in the transaction.
16    Q    Which transaction?
17    A    The transaction for which I pled guilty.
18              THE COURT:  What was the name again, please?
19              MR. VILLASENOR:  Brian Ivey.
20              THE COURT:  Spell the last name.
21              MR. VILLASENOR:  I-v-e-y.
22              THE COURT:  Thank you.
23    Q    (By Mr. Villasenor)  Let me direct you to Exhibit 7, at
24    pages 3 and 4.
25              THE COURT:  Again, another one not admitted?
```

United States of America vs.                                    Evidentiary Hearing - Day II
Michael David Wilhite                                                 September 16, 2015

Page 332

```
 1              MR. VILLASENOR:  Correct.

 2              MR. BEDNARSKI:  That's correct, Your Honor.

 3              THE COURT:  Thank you.

 4    Q    (By Mr. Villasenor)  So, did you exchange memoranda

 5    with Mr. Ivey?

 6    A    I seem to recall we did, yes.

 7    Q    Okay.  Do you recognize pages 3 and 4 of Exhibit 7?

 8    A    No.

 9    Q    Look at page 4 of Exhibit 7.  Is that your signature at

10    the bottom?

11    A    Yes, it is.

12    Q    Okay.  Wilhite & Associates.  Is that a company you

13    ran?

14    A    Yes.

15    Q    You owned it?

16    A    Yes.

17    Q    On page 3, if you go back to page 3, the letterhead

18    that we see, was that the letterhead for Wilhite & Associates

19    Financial Services?

20    A    Yes.

21              MR. VILLASENOR:  At this time I will offer

22    Exhibit 7, pages 3 and 4.

23              MR. BEDNARSKI:  Your Honor I would object just to

24    lack of foundation.

25              THE COURT:  I agree.  I don't know anything about
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 333

```
 1   it yet.  So, why don't we get some more foundation.
 2              MR. VILLASENOR:  Okay.
 3              THE COURT:  So it's sustained.
 4              MR. VILLASENOR:  All right.  That's fine.
 5   Q    (By Mr. Villasenor)  Did -- what were your dealings
 6   with Mr. Ivey with regard to the criminal -- your criminal
 7   scheme?
 8   A    I was a go-between between Geoff Clement and Mr. Ivey.
 9   Q    And as a go-between what did you do?
10   A    Corresponded with Mr. Ivey.
11   Q    Did you -- did you ever direct him to send money to you
12   or to bank accounts that you or your wife controlled?
13   A    I don't recall.
14   Q    Well, would it help -- taking a look at this memorandum
15   that you wrote, help you refresh your recollection in that
16   regard?
17              MR. BEDNARSKI:  Your Honor --
18   Q    (By Mr. Villasenor)  Paragraph 5.
19              MR. BEDNARSKI:  -- he's already said he doesn't
20   recognize the --
21              THE COURT:  I understand.  Even if he doesn't
22   recognize the document you can use any -- my professor taught
23   me you can use an apple to refresh someone's recollection.
24   So, this is an apple as far as I'm concerned.  Take a look at
25   the apple.  See if there's anything about it that refreshes
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 334

1   your recollection.  Take your time.  Read pages 3 and 4.

2   Once you're ready, then Mr. Villasenor will ask you a

3   question.

4            THE WITNESS:  I'm done.

5   Q   (By Mr. Villasenor)  Okay.  Does that document refresh

6   your recollection as to whether you directed Mr. Ivey, or

7   suggested, or told him, to send money to you or to your wife?

8   A   Yes.

9   Q   Okay.

10            MR. VILLASENOR:  Your Honor, I will offer this --

11   again, Exhibit 7, pages 3 and 4.

12            THE COURT:  Well, it says it did -- you asked

13   whether it refreshed his recollection, he said yes.  Let's

14   find out what his recollection is.

15   Q   (By Mr. Villasenor)  What is your recollection?

16   Without looking at the document.

17   A   I'm sorry, I don't understand the question, What is my

18   recollection.

19   Q   About what you told Mr. Ivey regarding sending money to

20   bank accounts controlled by you or your wife?

21   A   Well, there's no bank account controlled by me.

22   Q   What about your wife?

23   A   Yes.

24            THE COURT:  What do you remember now, Mr. Wilhite,

25   after reading that?

Page 335

 1                THE WITNESS:  I don't almost remember anything.

 2      This was back, '93.  That's 15 years ago.

 3                THE COURT:  Okay.  We use -- actually, yeah, 22.

 4      But we use the term "refresh your recollection."  You were

 5      supposed to look at pages 3 and 4.  If something in that

 6      document triggers a memory, then testify as to what that

 7      memory is.  But if your only knowledge of what he's talking

 8      about is in this document and you have no memory, then you

 9      should state that.

10                THE WITNESS:  Thank you.  And in this case I have

11      no memory of this document.

12                THE COURT:  Or what it says?

13                THE WITNESS:  Or what it says.

14                THE COURT:  Because he's asking you about --

15      you're asking someone to send money to you or your wife.  Do

16      you have any memory of your having done that?

17                THE WITNESS:  No, I don't.

18      Q    (By Mr. Villasenor)  Did you type this document, to the

19      best of your recollection?  3 and 4, Exhibit 7?

20      A    Again, I don't have a recollection of the document, so

21      I can't recall typing it.

22      Q    But it's your company's letterhead, correct?

23      A    Yes.

24      Q    Did you typically type memoranda with your office

25      letterhead, Wilhite & Associates?

United States of America vs.                    Evidentiary Hearing - Day II
Michael David Wilhite                                     September 16, 2015

Page 336

1    A    Back then, I'm sure that I did, yes.

2              MR. VILLASENOR:  Your Honor, I think there's

3    sufficient foundation to offer this in evidence and ask him

4    about the contents.

5              THE COURT:  Well, ask him if he's -- I'll ask it.

6    Mr. Wilhite, is there any reason to believe after having

7    looked over this document, that you didn't type and sign

8    this?  That someone else did?  Do you have any reason to

9    believe that?

10             THE WITNESS:  No, sir, I don't.

11             THE COURT:  Okay.  And what is the purpose you're

12   offering -- by the way, what are you offering exactly?

13             MR. VILLASENOR:  Your Honor, during opening

14   statements opposing counsel --

15             THE COURT:  First of all, tell me what you're

16   offering.

17             MR. VILLASENOR:  I'm offering Exhibit 7, pages 3

18   and 4.

19             THE COURT:  Okay.  And go ahead and tell me the

20   relevance.

21             MR. VILLASENOR:  The relevance is, Your Honor,

22   they opened the door because they said that neither

23   Mr. Wilhite nor his wife had ever received a penny from the

24   criminal scheme for which he was convicted.

25             THE COURT:  Understood.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 337

```
 1              MR. VILLASENOR:  This document refutes that.
 2              THE COURT:  Mr. Bednarski.
 3              MR. BEDNARSKI:  And, Your Honor, all these
 4    documents says he asked for it.  There's not a single
 5    document that showed he received a single cent.  So that's
 6    what we said is that he never received a single cent.  We
 7    never said that he didn't ask for anything.  We said he never
 8    received a single cent.
 9              THE COURT:  Do you stipulate that he did ask?
10              MR. BEDNARSKI:  Based off these documents, yes.
11              THE COURT:  Okay.
12              MR. VILLASENOR:  That's sufficient.
13              THE COURT:  Very good.  Then that will be a
14    stipulation that Mr. Wilhite, in fact, asked for money.
15              MR. BEDNARSKI:  And, Your Honor, if they would
16    stipulate that it was in '93.
17              THE COURT:  Very good.
18              MR. VILLASENOR:  And, Your Honor, that -- I
19    suppose that he asked that money be sent to his wife's bank
20    account.
21              THE COURT:  Mr. Bednarski?
22              MR. BEDNARSKI:  I don't know if it's his wife's
23    bank account or not, Your Honor.  I -- like, this is 1993.
24              MR. VILLASENOR:  If I may lay foundation on that.
25              THE COURT:  Go ahead.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 338

 1   Q    (By Mr. Villasenor)   Dee Medlicott, who is that?

 2   A    I don't know a Dee Medlicott.

 3   Q    **What was your wife's prior name before she married you?**

 4   A    Medlicott.  But you asked who is Dee Medlicott.

 5   Q    **It's not your wife?**

 6   A    My wife's name is Dee Wilhite.

 7   Q    **It's the same person, isn't it?**

 8   A    Different name, but Dee Wilhite is my wife.

 9            THE COURT:  Mr. Wilhite, you're being too cute

10   here.

11            THE WITNESS:  Sorry.

12            THE COURT:  Was your wife's maiden name Medlicott?

13            THE WITNESS:  Yes.

14            THE COURT:  Okay.

15            MR. BEDNARSKI:  And Your Honor, I think it was her

16   prior married name.  It was not her -- as she testified she

17   was married before --

18            THE COURT:  Understood.

19            MR. BEDNARSKI:  -- as Medlicott.  So, I just

20   wanted to clear that up.

21            THE COURT:  Okay.

22            MR. VILLASENOR:  So then, again, the stipulation,

23   Your Honor, is that he -- Mr. Wilhite requested that funds be

24   transferred to his -- Dee Medlicott.

25            THE COURT:  What day did you get married, please,

United States of America vs.                                    Evidentiary Hearing - Day II
Michael David Wilhite                                                   September 16, 2015

Page 339

1    Mr. Wilhite?

2              THE WITNESS:  October 23rd, 1993, I believe.

3              THE COURT:  Okay.  Would you like to stipulate --

4              THE WITNESS:  I'm sorry, November -- November 7th.

5    My wife will kill me.

6              THE COURT:  You better remember that.  You're

7    lucky she's not here.  Given that, this was well before the

8    marriage.  Mr. Bednarski, are you --

9              MR. BEDNARSKI:  Yes, sir.

10             THE COURT:  -- willing to amend your stipulation

11   that he requested money be sent to Dee Medlicott, who is the

12   same person as Dee Wilhite?

13             MR. BEDNARSKI:  Yes, Your Honor, 1993.

14             THE COURT:  Thank you.  It will be so noted.

15             MR. VILLASENOR:  Thank you.

16   Q    (By Mr. Villasenor)  Now, presently, your source of

17   income is Social Security benefits, right?

18   A    That is correct.

19   Q    Is that the only source of income you have?

20   A    Yes.

21   Q    And you've lived, I think you testified, with your wife

22   since at least 1993?

23   A    I'm sorry, I couldn't hear you.

24   Q    You've lived with your wife since at least 1993?

25   A    That's correct.

United States of America vs.                                    Evidentiary Hearing - Day II
Michael David Wilhite                                                    September 16, 2015

Page 340

1    Q    She's your principal source of financial support,

2    right?

3    A    That's true.

4    Q    And would you agree with me that you and she discuss

5    important things in your life?

6    A    Yes.

7    Q    Okay.

8              THE COURT:  Can I -- I'd like to find out.  Is it

9    the United States' position that Mr. Wilhite never received

10   any money or do you stipulate that he did not receive money?

11             MR. VILLASENOR:  I think the plea agreement is --

12   and we're bound by that in my view -- is that there was no

13   evidence that he received anything.

14             THE COURT:  Very good.  Thank you.

15   Q    (By Mr. Villasenor)  And I think you testified that you

16   hired an attorney, Mr. Christopher Miranda, right, in 1998?

17   A    That's correct.

18             THE COURT:  No.  He testified it was shortly after

19   the first meeting, which was March of 1997.  Let's not have

20   the record muddled up.  Isn't that what you testified to,

21   Mr. Wilhite?

22             MR. VILLASENOR:  March or June, that's right.

23             THE COURT:  Between March and June you had that

24   first meeting with agents from the US, and you hired

25   Mr. Miranda around that time?

United States of America vs.                                    Evidentiary Hearing - Day II
Michael David Wilhite                                                      September 16, 2015

Page 341

1            THE WITNESS:  Subsequent to that meeting, yes,

2    Your Honor.

3            THE COURT:  Okay.  But shortly after that?

4            THE WITNESS:  That's correct.

5            THE COURT:  Thank you.

6    Q    (By Mr. Villasenor)  And by this time you had had an

7    IRS tax lien filed against you for several years, right?

8    A    An IRS tax lien?

9    Q    Uh-huh.

10   A    I'm sorry, I don't recall an IRS tax lien.

11   Q    Well, let's go to Exhibit 50.

12   A    I'm there.

13   Q    You knew you owe -- owed those back taxes in Exhibit --

14   on Exhibit 50?

15   A    I recognize the lien now, yes.

16   Q    Okay.  And you knew this existed back in 1993?

17   A    I'm sorry?

18   Q    You knew the lien existed back in 1993?

19   A    No, I don't recall knowing that.

20   Q    When did you know that?

21   A    I don't recall when I knew that.

22   Q    Now, let's talk about Advanced Floor Concepts.  Before

23   working for Advanced Floor you worked in two companies in the

24   structural steel floor industry, right?

25   A    That's correct.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 342

1   Q    And you had a 20 percent ownership stake in a company

2   that Mr. Geoffrey Clement, Mark Russell and you were going to

3   start, right?

4   A    No.

5   Q    Look at Exhibit 8, please.  Do you recognize Exhibit 8?

6   A    Oh sorry.

7   Q    Do you recognize Exhibit 8?

8   A    Yes, I do.

9   Q    All right.  On the second paragraph it says:  Ownership

10  of the corporation shall be distributed 40 percent to

11  Russell, 40 percent to Clement, and 20 percent to Wilhite.

12            Did I read that correctly?

13  A    Yes.

14  Q    And that's your signature at the bottom of -- of

15  Exhibit 8?

16  A    Yes.

17  Q    You also testified, I think, that you were working for

18  Mr. Clement's company called Steel Structural Systems; is

19  that right?

20  A    I don't recall that name.

21  Q    Steel by Design?

22  A    Yes.

23  Q    Yes.  There's too much steel.  What was your role in

24  Steel by Design?

25  A    Drafting, purchasing, installation.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 343

1   Q    Steel by Design failed after Mr. Clement went to

2   prison; is that right?

3   A    That's my understanding.

4   Q    And what about this company and the memorandum of

5   understanding?  That never got off the ground either, right?

6   A    Not to my knowledge.

7   Q    And you went to work for Mr. Russell's company, right,

8   Steel Dimensions, after the Steel by Design failed and the --

9   this other company you had planned to start didn't -- didn't

10  work out?

11  A    That's three questions.  Which do you want me to answer

12  first?

13  Q    All of them.

14       THE COURT:  Well, break it down.  Ask him one at a

15  time.

16       MR. VILLASENOR:  All right.

17  Q    (By Mr. Villasenor)  The -- after the MOU company thing

18  failed you went to work for Mr. Russell, right?

19  A    No.

20  Q    When did you go to work for Mr. Russell?

21  A    In approximately March of 1990 -- '97.

22  Q    Okay.  Was the company noted in the MOU doing anything

23  at that time?

24  A    I have no idea.  I wasn't a part of it.

25  Q    The company on the memorandum of understanding, you

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 344

1   were not a part of it?

2   A    I have no knowledge as to whether that company was ever

3   formed.

4   Q    Okay.  Even that you had a 20 percent stake on there?

5   A    I have no knowledge as to whether that company ever did

6   anything.

7   Q    Even though you had a 20 percent stake in the company?

8   A    It was a memorandum of understanding, subject to a

9   formal agreement.

10  Q    Sir, answer my question.  It's a yes or a no.

11  A    No.

12  Q    Thank you.

13        THE COURT:  Is the United States aware of any

14  formal agreement that's referenced in the memorandum of

15  understanding?

16        MR. VILLASENOR:  No, Your Honor.

17        THE COURT:  Okay.

18  Q    (By Mr. Villasenor)  So, I think you testified you

19  started working for Steel Dimensions in March or April of

20  1997; is that right?

21  A    That seems correct.

22  Q    And you were an independent contractor?

23  A    Yes.

24  Q    You were not a vendor then?

25  A    I'm sorry?

United States of America vs.                    Evidentiary Hearing - Day II
Michael David Wilhite                                  September 16, 2015

Page 345

1   Q    You were not a vendor?

2   A    I don't understand the distinction between vendor and

3   independent contractor.

4   Q    I don't either that's why I'm asking you.  So, you were

5   -- as far as you knew, you were an independent contractor

6   then?

7   A    I'm not an expert on that.  I -- the term I've heard

8   used in connection with my association was vendor.

9   Q    Okay.  So, you were not an independent contractor?

10  A    I'm not an expert.  I can't determine that.

11  Q    Sir, were you an independent contractor or not?

12  A    I don't know.

13  Q    And you made about $4100 a month, right?

14  A    Correct.

15  Q    No taxes were taken out?

16  A    No.

17  Q    Is there a reason you keep looking that way, sir?

18  A    I'm not looking that way.  I'm looking at you.

19  Q    You were looking to your -- to my left.  Is there a

20  reason you're looking to my left?

21  A    No.

22  Q    Okay.  That would be about -- adding up the entire

23  salary -- $24,870 more or less, right, over your work at

24  Steel Dimensions?

25  A    It seems about right.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 346

1   Q    All right.  All of this money went to DW Support,

2   right?

3   A    That is correct.

4   Q    And you did not receive any stock ownership in DW

5   Support?

6   A    No.

7   Q    And, in fact, you testified in your deposition that all

8   you supposedly received in exchange for directing all of

9   these paychecks was chocolate chip cookies, right?

10  A    That was in my deposition, yes.

11  Q    I think you were here yesterday when we were looking at

12  the checks from Exhibit 14.  You -- turn to those checks,

13  please.

14       You endorsed all those checks, right, over to your

15  wife?

16  A    Give me just a moment.

17  Q    Sure.

18  A    Yes.

19  Q    And, again, you did not receive any ownership interest

20  in DW Support in exchange for turning over all these checks

21  to DW Support?

22  A    I had no ownership interest in DW Support.

23  Q    And you told Mr. Russell to direct your compensation,

24  whatever it was, to DW Support, right?

25  A    That is correct.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 347

1    Q    Tell us what you did for Mr. Russell's company.

2    A    I'm sorry, say it again.

3    Q    Tell us what you did for Mr. Russell's company.

4    A    I did drafting and installation.

5    Q    You didn't make any industry contacts?

6    A    Only the one I testified to earlier that I can recall.

7    Q    Okay.  You learned about how Steel Dimensions did

8    business though, right?

9    A    In the limited time that I was there.

10   Q    You learned about Steel Dimensions' general operations,

11   right?

12   A    I'm terribly sorry, I'm just having trouble

13   understanding the last words that you say.  I learned about

14   what?

15   Q    Steel Dimensions' general operations, right?

16   A    Yes.

17   Q    You learned about -- what about prices of materials?

18   You learned about that?

19   A    Not that I can recall.

20   Q    You learned about how Steel Dimensions did bid for

21   jobs?

22   A    No.  Mark Russell did the bidding.

23   Q    You learned about the cost of the materials for the --

24   A    No.

25   Q    -- job?  No?  And your -- you only learned about one --

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 348

1   you only got to know one builder; is that right?

2   A    That's all I can recall.

3   Q    Okay.  Suderman?  Or Suderman, is that what it was?

4   A    I think so.

5   Q    You didn't get to learn about Meadow -- you didn't get

6   to know anybody from Meadow Homes?

7   A    Not that I can recall.

8   Q    What about Mesa Properties?

9   A    Not at that time.

10  Q    US Home?

11  A    Not at that time.

12  Q    You mean -- and the time that we're talking about is

13  when you worked for Steel Dimensions, right?

14  A    That is correct.

15  Q    And your wife started Advanced Floor in October of

16  1997, right?

17  A    That's correct.

18  Q    She's the sole member of the LLC, correct?

19  A    Yes.

20  Q    The -- the business field that you're in is, what,

21  structural steel floor?  Would that be fair?

22  A    I'm sorry, say the question again.

23  Q    The business that Advanced Floor is in, the field,

24  structural steel floor?

25  A    That is correct.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 349

 1   Q    At your deposition you testified that you quit Steel

 2   Dimensions because your wife formed a company, Advanced

 3   Floor, and you went to work for that company.  Do you recall

 4   that?

 5   A    Yes, I do.

 6   Q    Do you recall that -- do you recall who your probation

 7   officer was for your criminal case?

 8   A    I don't recall his name, no.

 9   Q    Carol Ricca?  Does that ring a bell?

10   A    Carol Ricca did the presentencing report.  Was not the

11   probation officer.

12   Q    Okay.  But you remember her?

13   A    Vaguely, yes.

14   Q    After you pled guilty and before the sentencing you

15   spoke with someone from probation to prepare this presentence

16   report?

17   A    Yes, 18 years ago.

18   Q    Okay.  And someone prepared a presentence report,

19   correct?

20   A    Well, yes, I assume so.

21   Q    And you told whoever wrote this presentence report that

22   you quit Steel Dimensions because you wanted to start your

23   own business; isn't that right?

24   A    Yes.

25   Q    That's at paragraph 64 of Exhibit 22.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 350

1            THE COURT:  No, it's not.  It's not Exhibit 22 in

2   my book.

3            MR. VILLASENOR:  21, I'm sorry.  Paragraph 64.

4            THE COURT:  I don't have 22-1.  What exhibit are

5   you talking about?

6            MR. VILLASENOR:  21, paragraph 64.

7            THE COURT:  21.

8            MR. VILLASENOR:  Sorry.

9            THE COURT:  Go ahead.  You can --

10            MR. VILLASENOR:  All right.

11            THE COURT:  I can (unintelligible).

12            MR. VILLASENOR:  Okay.

13   Q    (By Mr. Villasenor)  And you've run Advanced Floor as

14   general manager, right?

15   A    Yes.

16   Q    CEO?

17   A    Yes.

18   Q    President?

19   A    No.  Not that I can recall, president.

20   Q    All right.  You ran the company's overall operations

21   between 1997 and 2008?

22   A    That's correct.

23   Q    You wrote checks obligating the company?

24   A    Yes.

25   Q    You negotiated contracts between 1997 and 2008, for

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 351

```
 1    Advanced Floor?

 2    A    Yes.

 3    Q    And you signed contracts too, right, for Advanced

 4    Floor?

 5    A    Yes.

 6    Q    Let's go to Exhibit 11, please.

 7    A    Which exhibit, please?

 8    Q    Eleven.  What is Exhibit 11?

 9    A    It appears to be a product information sheet.

10    Q    Who is the point of contact for Advanced Floor on

11    page 2?

12    A    That would be me.

13    Q    Why were you the point of contact?

14    A    Because I worked for the company.

15         THE COURT:  Can we get a date on this,

16    Mr. Wilhite?

17         THE WITNESS:  There is no date, Your Honor, but

18    given the address above of 110 Birch Avenue, it would be in

19    the time period between '97 and '99.

20         THE COURT:  Very good.  And I forget, did -- from

21    the beginning of Advanced Floor Concepts you were an employee

22    at the beginning?

23         THE WITNESS:  Yes.

24         THE COURT:  And did you get paid a salary starting

25    then?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 352

1            THE WITNESS:  Not at the very beginning, but later

2    I did.

3            THE COURT:  Once they started making money?

4            THE WITNESS:  Yes.

5            THE COURT:  Do you remember when you began drawing

6    a salary?

7            THE WITNESS:  Roughly, 1999 or 2000.  Thereabouts.

8            THE COURT:  Do you remember about what that would

9    have been?

10           THE WITNESS:  I have no idea.

11           THE COURT:  Okay.  Very good.

12   Q   (By Mr. Villasenor)  Let's take a look at Exhibit 9.

13   Have you taken a look at those documents?

14   A   Yes.

15   Q   Okay.  What are they?

16   A   It looks like a construction contract between Advanced

17   Floor Concepts and Toll Brothers.

18   Q   Is it only one or more than one?

19   A   It appears to be several.

20   Q   Okay.  And you executed all of those contracts?

21   A   I'm sorry?

22   Q   You signed all those contracts?

23   A   Yes.

24   Q   You made purchases of materials for Advanced Floor

25   regarding these contracts?

United States of America vs.                                    Evidentiary Hearing - Day II
Michael David Wilhite                                                    September 16, 2015

Page 353

 1   A    It could have been me.  It could have been Torin.  It
 2   could have been Nate.  It could have been Skyler.
 3   Q    What about purchasing steel?
 4   A    Same answer.
 5   Q    Okay.  You went to job sites too?
 6   A    Possibly.
 7   Q    During this timeframe?
 8   A    To what job site?
 9   Q    Any job site of yours.  Any of your company.
10   A    Yes.
11   Q    Did Advanced Floor ever work with an engineer whose
12   initials are KLP?
13   A    Yes.
14   Q    Who is that?
15   A    Kent Peterson.
16   Q    And what was the nature of that relationship between
17   Advanced Floor and this individual?
18   A    To the best of my recollection, Kent Peterson was an
19   engineer on a project where Advanced Floor Concepts
20   constructed and installed the structural floor.
21   Q    And what timeframe are we talking about here?
22   A    I don't recall.
23   Q    You recognize the name called -- an engineer called Ty
24   Carter?
25   A    Yes, I do.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 354

1   Q    And what was -- who is that person?

2   A    Ty Carter was a professional engineer.

3   Q    Which company was he associated with?

4   A    I don't recall the name of his company.

5   Q    Colorado Soil?

6   A    Seems right.

7   Q    All right.  Martin Design.  Does that ring a bell?

8   A    Yes.

9   Q    What was their relationship there?

10  A    Well, they had no relationship with Advanced Floor

11  Concepts.

12  Q    What was their involvement?  Their role?

13  A    Advanced Floor Concepts fabricated and installed

14  structural floors where Martin Design was the engineer of

15  record.

16  Q    Okay.  And Lewis Engineering?

17  A    I'm sorry?

18  Q    Lewis Engineering.  Does that ring a bell?

19  A    No.  But say the name again, please.

20  Q    Lewis Engineering?

21  A    Doesn't ring a bell.

22  Q    Okay.  Let's take a look at Exhibit 16.  Go ahead and

23  review those, please.

24  A    Okay.

25  Q    Are these the type -- are these additional types of

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 355

1  contracts you would have negotiated on behalf of Advanced

2  Floor?

3  A    They're not contracts.  Well, sorry.  They're proposals

4  that were issued by Advanced Floor Concepts.

5  Q    Who would have issued those?

6  A    It's unknown here who actually issued these.

7  Q    But based on -- what was the practice and procedure for

8  issuing these proposals and contracts?

9  A    The practice and procedure would be to prepare an

10 estimate, reduce it to proposal form and mail it or FAX it to

11 the builder.

12 Q    And who would have drafted the proposal?

13 A    It could have been any number of people.

14 Q    Such as?

15 A    Any employee of Advanced Floor Concepts.

16 Q    What about at the very beginning in 1997?

17 A    What period of 1997?

18 Q    Let's say October, 1997?

19 A    Then it would have been me.

20 Q    Okay.  April '97 would have been you too?

21 A    I think so, yes.  I'm sorry, ask that question again.

22 Q    I'm done with the question.

23        THE COURT:  No.  He wants you to ask it again.

24 It's fair.  He needs to know what he responded to.  You said

25 April, 1997.  I didn't remember the previous question.  So

United States of America vs.                                    Evidentiary Hearing - Day II
Michael David Wilhite                                                    September 16, 2015

Page 356

1   what was the question previous to April, 1997?

2              MR. VILLASENOR:  Whether he would have drafted

3   proposal and contracts.

4              THE COURT:  For?

5              MR. VILLASENOR:  For Advanced Floor.

6              THE COURT:  Well, it didn't exist in April of

7   1997.  Okay?  So, the question is:  In April of 1997, would

8   you have drafted contracts for Advanced Floor Concepts?

9              THE WITNESS:  No.

10             THE COURT:  Okay.  Do you have any evidence that

11  he did?

12             MR. VILLASENOR:  Exhibit 16 at page 2.

13             MR. BEDNARSKI:  Your Honor, I don't see a date, as

14  to who signed it, when it was done or anything.  If he's

15  going off of a plan date --

16             THE COURT:  Well, it's -- let me take a look at

17  it.

18             MR. VILLASENOR:  It's in evidence, Your Honor.

19             THE COURT:  I understand.  Exhibit 16, page 2, I'm

20  looking at.  I know what the answer is.  But if you want to

21  tell him -- what does that mean?  Plan date of 1990 --

22  4/24/1997?

23             THE WITNESS:  Do you want me to tell him?

24             THE COURT:  Yeah.

25             THE WITNESS:  It's the date on the blueprints.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 357

1    Q    (By Mr. Villasenor)  Okay.  Let's take a look at

2    Exhibit 22, page 2.  You signed page 2?

3    A    Yes.

4    Q    Okay.  You -- you read things before you sign them?

5    A    Usually I do.

6    Q    Let's move to Exhibit 25.

7              THE COURT:  Well, could you explain to me the

8    significance of 22.  When you mention these, it doesn't help

9    me at all --

10             MR. VILLASENOR:  Uh-huh.

11             THE COURT:  -- that you simply establish that his

12   signature is there.  I can read that, but I'd like to know

13   what you think the importance of this is.

14             MR. VILLASENOR:  Sure.

15   Q    (By Mr. Villasenor)  The position that identifies you

16   for -- as the joint account holder is owner of Advanced

17   Floor, correct?

18   A    That's what the document says, yes.

19   Q    Let's take a look at Exhibit 25.  What is Exhibit 25?

20   A    It appears to be a crew leader and crew member employee

21   handbook.

22   Q    For Advanced Floor?

23   A    Yes.

24   Q    You draft that -- did you draft this?

25   A    I don't think so.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 358

1   Q    Okay.  Let's go to page 21 of 34, of Exhibit 25.

2   Twenty-one.  You're identified as the Chief Executive

3   Officer, correct?

4   A    That is correct.

5   Q    How long was this document distributed at Advanced

6   Floor, to your knowledge?

7   A    I don't know.

8   Q    Is there a present version of this document?

9   A    I don't know.

10          THE COURT:  Do you have any idea what this

11   document is dated, Mr. Wilhite?

12          THE WITNESS:  Yes, Your Honor.

13          THE COURT:  Go ahead.

14          THE WITNESS:  It would have to be prior to March

15   of 2010, which was the month in which Roger Otterstein died.

16          THE COURT:  Very good.  Thank you.  Are each of

17   those people listed on 22, other than Mr. Otterstein and

18   yourself, according to your own testimony, still holding

19   their positions?

20          THE WITNESS:  No.  There are others who have left.

21          THE COURT:  Who?

22          THE WITNESS:  Fern Pena is no longer there.  Roger

23   Otterstein, as we discussed, is no longer there.  Brendan

24   DePaola, no longer there; Jimmy Holsworth, no longer there;

25   Chris Adams, still there; Jared Sandisteven (phonetic), no

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 359

```
 1    longer there.
 2            THE COURT:  And the earliest of those people to
 3    depart would have been what?  Who?  Anybody --
 4            THE WITNESS:  Fern Pena, I believe.
 5            THE COURT:  Okay.  When did he leave the company?
 6            THE WITNESS:  I don't recall.
 7            THE COURT:  Before Mr. Otterstein's death?
 8            THE WITNESS:  Yes.
 9            THE COURT:  Okay.  Thank you.
10    Q    (By Mr. Villasenor)  Mrs. Wilhite is not listed on
11    page 21, right?
12    A    I do not see her name.
13    Q    Let's turn to Exhibit 31.  Do you recognize Exhibit 31?
14    A    Yes, I do.
15    Q    What is Exhibit 31?
16    A    It looks to be a purchase agreement for the purchase of
17    a vehicle.
18    Q    For a what, I'm sorry?
19    A    Pardon?
20    Q    For a what?  Purchase -- I didn't hear you.
21            THE COURT:  He said a vehicle.
22    A    Purchase of a vehicle.
23    Q    (By Mr. Villasenor)  Okay.  What type of vehicle?
24    A    It appears to be a GMC Hummer H2.
25    Q    And you were the buyer?
```

United States of America vs.                                    Evidentiary Hearing - Day II
Michael David Wilhite                                                 September 16, 2015

```
 1   A      No.

 2   Q      Who was the buyer?

 3   A      Advanced Floor Concepts.

 4   Q      Is the address listed for Advanced Floor Concepts, is

 5   that its principal place of business?  At the top.

 6   A      At the top.  No, that's not the principal place of

 7   business.

 8   Q      Is that your personal address?

 9   A      And my wife.

10   Q      Did you -- is this vehicle still part of the company?

11   A      I'm really sorry.  Say that again.

12   Q      Is the Hummer H2 still part of the company?

13   A      Yes.

14   Q      Okay.  You drive it?

15   A      No.

16   Q      Who drives it?

17   A      No one does.

18   Q      Where is the vehicle?

19   A      It's parked.

20   Q      Why is it parked?

21   A      Because it's not being driven.

22   Q      By anybody?

23   A      That's correct.

24   Q      Okay.

25              THE COURT:  Was it brand new, Mr. Wilhite?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 361

 1           THE WITNESS:  At the time of purchase, yes.

 2           THE COURT:  How many miles does it have on it now

 3   do you think?

 4           THE WITNESS:  I believe about 125,000.  You want

 5   it?

 6           THE COURT:  No.  I'd like one someday, but --

 7           THE WITNESS:  They're overrated.  They really are.

 8           THE COURT:  By the way, do you know if the company

 9   has to file financials with anybody?

10           THE WITNESS:  No.  A privately owned company is

11   not required to file financials unless a lending institution

12   that holds some sway over the company requires it.

13           THE COURT:  Do you know if there is a document

14   that lists all assets?

15           THE WITNESS:  Yeah.  The balance sheet should list

16   all assets.

17           THE COURT:  All right.  Thank you.

18   **Q   (By Mr. Villasenor)  Now, Mr. Wilhite, you testified, I**

19   **believe, that in August, 2008, you had -- you retired from**

20   **Advanced Floor, right?**

21   A    I left the company in August of 2008, yes.

22   **Q    You also, shortly thereafter, came off the payroll,**

23   **right?**

24   A    That's -- well, my last paycheck was, I think,

25   August 11th.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 362

1  Q    And you testified earlier that since about 2010 you've

2  been the eyes and ears of -- at Advanced Floor for your wife,

3  right?

4  A    That's correct.

5  Q    So, between 2010 and 2014 you went to Advanced Floor a

6  couple times a week?

7  A    It was more or less than that depending on the week.

8  Q    And you -- I think you testified you -- now you don't

9  go at all?

10 A    No.

11 Q    How -- how long has that been that you don't go at all?

12 A    That's not what I said.  Your question was did I

13 testify that I don't go anymore, and I said no.

14 Q    Okay.  So, how often do you go now in this year?

15 A    I may go up one day a week, a day and a half a week, or

16 no days a week.

17 Q    And between 2010 and 2014 was the frequency of your

18 being at Advanced Floor different than 2015?

19 A    Yes.

20 Q    Okay.  How different?

21 A    A little bit more frequently in 2010.  A little less

22 frequently thereafter.

23 Q    Isn't it true, sir, that you continued to run Advanced

24 Floor after August, 2008?

25 A    No.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 363

1  Q    In 2009 you hired a controller named Dennis Cross;

2  isn't that true?

3  A    No.  Well, no.  Dee hired Dennis Cross.

4  Q    You interviewed him, right?

5  A    I met him.  He was interviewed prior to that by others.

6  Q    Your testimony is you didn't interview him at all?

7  A    I said I met him.

8  Q    Did you interview him?

9  A    No.

10 Q    After Mr. Cross started working for Advanced Floor,

11 didn't he ask you why you were not signing Advanced Floor

12 checks?

13 A    I don't recall.

14 Q    Isn't it true that he told you that -- that you told

15 him that you couldn't show that you own Advanced Floor

16 because you owed a debt to the government?  Didn't you tell

17 him that?

18 A    No.

19 Q    During this time you also purchased precious metals

20 using Advanced Floor funds; isn't that right?

21 A    No.

22 Q    And Mr. Cross also talked to you about this issue,

23 didn't he?

24 A    Not that I can recall.

25 Q    Didn't Mr. Cross ask you where the coins -- these gold

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 364

1   coins that you purchased were since they belonged to Advanced

2   Floor?

3   A    No.

4   Q    And isn't it true that you told Mr. Cross that you were

5   going to use the coins for your so-called retirement?

6   A    No.

7   Q    And you also told him, isn't this true, that the coins

8   were buried inside an empty beer keg on your property?

9   A    Absolutely not.

10  Q    You -- sir, you have an e-mail account at Advanced

11  Floor Concepts, right?

12  A    Yes, I have always had one.

13  Q    Okay.  Mike@steelfloor -- floors.com?

14  A    Correct.

15  Q    How long have you had that e-mail account?

16  A    Since e-mail accounts became available.  Probably in

17  excess of 10 years.

18  Q    And you've used that e-mail account to communicate with

19  our office, right?

20  A    Yes.

21  Q    And you've used that e-mail account to conduct business

22  on behalf of Advanced Floor too, right?

23  A    During what period?

24  Q    Any period?

25  A    If the -- if it's any period, then yes.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 365

1  Q    Let's take a look at Exhibit 18, please.  In the middle

2  of the page, is that an e-mail you sent?

3  A    Yes.  It appears so.

4  Q    Okay.  The signature lines that appear below the line

5  In light of the above, what does your office expect of me --

6  those signature lines -- Mike Wilhite, et cetera, is that

7  your typical signature lines for your e-mail?

8  A    Yes, it is.

9  Q    In this e-mail that you sent, you claim to be

10 unemployed, right?

11 A    Yes.

12 Q    And you sent this e-mail from Advanced -- the Advanced

13 Floor account, right?

14 A    Yes.

15 Q    Let's take a look at Exhibit 36.  Do you recognize

16 Exhibit 36?

17 A    Yes.

18 Q    Who is John Rawls?

19 A    John Rawls is an employee of Corne, Jantz & Associates.

20 Q    And what does he do, if you know?

21 A    I believe he's an accountant.

22 Q    Okay.  You see -- you sent one of those e-mails,

23 correct, on March, 2014, right?

24 A    Yes.

25 Q    And on that first line of the second paragraph, Our

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 366

1  debt-to-equity ratio, including the debt transfer to the

2  ranch is 1.79.  Do you see that?

3  A    Yes, I do.

4  Q    What were you inquiring about debt-to-equity ratio?

5  A    I wasn't inquiring.

6  Q    Why did that subject come up?

7  A    It was as a result of a conversation I had had with

8  John.

9  Q    And what was the conversation?

10 A    I don't recall the entire conversation, but it appears

11 to be about debt-to-equity ratio.

12 Q    And why were you mentioning that?

13 A    I don't recall.

14 Q    Was this in relation to Advanced Floor or your own

15 personal -- or was it in relation to Advanced Floor?

16 A    I'm sorry.  State the question again.

17 Q    Was the e-mail -- your e-mail in relation to Advanced

18 Floor business?

19 A    I believe it was in relation to Advanced Floor, yes.

20 Q    Okay.  What about it?  Based on the e-mail, what about

21 the business of Advanced Floor were you talking about here?

22         THE COURT:  Well, look at the bottom for goodness

23 sakes.  Mr. Wilhite, look at the last -- the bottom message.

24 Does that give you some context?

25         THE WITNESS:  The bottom one?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 367

 1              THE COURT:  Yeah.

 2              THE WITNESS:  Oh, I hadn't looked down that far.

 3              THE COURT:  Why don't you take a look at that.

 4    That's the start of it.

 5              THE WITNESS:  It -- apparently John Rawls was

 6    saying the debt-to-equity ratio was healthy.

 7    Q    (By Mr. Villasenor)  Of the company?

 8    A    Of Advanced Floor Concepts.

 9    Q    And you don't have any recollection as to why you were

10    discussing the debt-to-equity ratio of Advanced Floor in

11    2014?

12    A    No, I don't.

13    Q    Was this part of you being the eyes and ears for your

14    wife?

15    A    I just said I had no recollection, so I can't comment

16    on that.

17              THE COURT:  Was Corne Jantz & Associates solely

18    the accountant for the company or were they also your

19    personal accountant?

20              THE WITNESS:  They're company and personal.

21              THE COURT:  Okay.  Thank you.

22    Q    (By Mr. Villasenor)  Take a look at Exhibit 15.

23    A    Exhibit No. --

24    Q    -- 15.

25    A    Thank you.

United States of America vs.                                        Evidentiary Hearing - Day II
Michael David Wilhite                                                        September 16, 2015

Page 368

1    Q    Are you familiar with these receipts?

2    A    I recognize them, yes.

3    Q    What are they?

4    A    They appear to be receipts for purchases from a company

5    called Colorado Precious Metals and Coins, Inc.

6    Q    These purchases were for you?

7    A    No.

8    Q    Who were they for?

9    A    For Dee Wilhite.

10   Q    Where it says Receipt By, does that actually mean you

11   received whatever was purchased?

12   A    That's correct.

13   Q    What do you do with the -- with the things you

14   purchased based on these receipts?

15   A    Receive them, put them in my truck, take them home and

16   give them to the buyer.

17   Q    Mrs. Wilhite?

18   A    That's correct.

19   Q    Turn to Exhibit 37.

20   A    Go ahead.

21   Q    This is Mr. Rawls again e-mailing you, right?

22   A    Yes.

23   Q    And he says that you will do an inventory of your gold

24   coins/precious metals, and we will talk Monday about your end

25   options, correct?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 369

 1   A    Yes.

 2   Q    And what is the -- you replied, right, to him?  Above

 3   it?

 4   A    I'm sorry.  What was the question?

 5   Q    You replied to Mr. Rawls, right?

 6   A    I don't see it as a reply.

 7   Q    So you changed the subject, then, of the e-mail chain?

 8   A    I'm trying to -- I can't tell you.  They look like two

 9   different e-mails.

10   Q    Okay.  You mean your e-mail is not a response to

11   Mr. Rawls's e-mail?

12   A    I don't know.

13            THE COURT:  Mr. Wilhite, do you see the top

14   signature block where it has your name?

15            THE WITNESS:  Yes, Your Honor.

16            THE COURT:  The words High Strength Steel Floors,

17   I don't recall that coming up before.  Is that -- at some

18   point did somebody start including that together with the

19   name of the company?

20            THE WITNESS:  I think it's always been there, Your

21   Honor.

22            THE COURT:  Okay.  It's just kind of a trademark?

23            THE WITNESS:  It's a model or slogan for the

24   company.

25            THE COURT:  Very good.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 370

1             THE WITNESS:  It's on our trucks and everything.

2             THE COURT:  Oh, it is?

3             THE WITNESS:  Yeah.

4             THE COURT:  Okay.  Thanks.

5    Q   (By Mr. Villasenor)  Let's talk about Kodiak Building

6    Partners.  Are you familiar with Kodiak Building Partners?

7    A   Yes, I am.

8    Q   You negotiated selling Advanced Floor to Kodiak, right?

9    A   I negotiated for the sale of Advanced Floor Concepts.

10   Such sale never took place.

11   Q   Okay.  That was in 2013?

12   A   I think so.

13   Q   How did you initially begin discussions about a

14   potential purchase of Advanced Floor?

15   A   I don't recall when the first conversation was.

16   Q   You spoke -- who did you speak with about it?

17   A   Well, as I testified earlier on direct, Dee Wilhite

18   hired a business broker to solicit bids, and one of those

19   bids or offers to purchase they brought was Kodiak.

20   Q   Okay.  You didn't initiate the talks through

21   Mr. Stubbert?

22   A   He was the contact.

23   Q   Okay.  And you had a preexisting relationship with

24   Mr. Stubbert?

25   A   Yes.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 371

1    Q    Okay.  And what was that preexisting relationship?

2    A    He's an employee of Barton Steel where Advanced Floor

3    Concepts purchases steel.

4    Q    How long has that relationship existed?

5    A    Which relationship?

6    Q    With Mr. Stubbert.

7    A    As long as he's been employed.

8    Q    Which is?

9    A    I think about five or six years.

10   Q    Are you and Mr. Stubbert friends?

11   A    We're acquaintances.

12   Q    And did Mr. Stubbert introduce you to -- well, you know

13   who Mr. Steve Sweeney is?

14   A    Okay.  Say it again.

15   Q    Steve Sweeney?

16   A    What's the question?

17   Q    Do you know who he is?

18   A    That wasn't the previous question.

19        THE COURT:  That's the question now.

20        THE WITNESS:  Good.  I know who he is.

21   Q    (By Mr. Villasenor)  Okay.  Who is he?

22   A    He's a member of Kodiak Business [sic] Partners, I

23   think.

24   Q    Okay.  As you were negotiating this deal with Kodiak

25   Business [sic] Partners -- Building Partners, you

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 372

1   communicated with Mr. Stubbert via e-mail, right?

2   A    Yes.

3   Q    Using your Advanced Floor e-mail account?

4   A    Yes.

5   Q    You also communicated with Mr. Sweeney, right?

6   A    I believe so, yes.

7   Q    Via e-mail?

8   A    Yes.

9   Q    Okay.  Let's take a look at Exhibit 44.  Do you

10  recognize Exhibit 44?

11  A    Yes, I do.

12  Q    Is that an e-mail you sent to Mr. Stubbert?

13  A    Yes.

14  Q    In this e-mail why did you outline the salient deal

15  points as you understood them.  What -- what was the point of

16  that?

17  A    To further the negotiations.

18  Q    Did you have a meeting that predated this e-mail?

19  A    I might have.  I don't recall.

20  Q    So, how did you learn about these deal points?

21  A    I think these were points that were laid out by the

22  owner of Advanced Floor Concepts, Dee Wilhite.

23  Q    How had she laid them out?

24  A    She told me what they were.  Asked me to convey them to

25  Kodiak.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 373

1   Q    Where did she tell you this?  Where were you?

2   A    I'm assuming we were at home.

3   Q    And tell us what the deal points were, as you

4   understood them, at that time.

5   A    It looks like -- just various deal points for the sale

6   of the company.

7   Q    Well, what were they?  What was your understanding?

8   A    A loan of 49 percent for the purchase price; the loan

9   to be repaid; the balance of the transaction completed in

10  2016; Mike Wilhite continues to operate the company at his

11  current work schedule and salary; certain vehicles and

12  equipment are exempted; net receivables; major decisions with

13  (unintelligible) made between the buyer, and the seller.

14  Those seem to be the deal points.  Oh, and there are other

15  deal points on the second page.

16  Q    Sure.  Were you operating the company at this point in

17  time in 2013?

18  A    No.

19  Q    So why did you write that you would continue to operate

20  the company?

21  A    I don't recall.  I think it was a misstatement.

22  Q    Is it something your wife told you?

23  A    To make a misstatement, no.

24  Q    So, you -- you don't think she told you write down that

25  you would continue to operate the company?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 374

```
 1   A     I'm sorry.  It's two years ago, I don't recall.

 2   Q     And your current work schedule and salary, right?  You

 3   would continue to operate the company at your work schedule

 4   and salary, right?

 5   A     These were deal points on the deal that never came to

 6   fruition.  But, yes, written here, current work schedule and

 7   current salary.

 8   Q     And your salary would have been zero, presumably?

 9   A     Correct.

10   Q     Take a look at Exhibit 45, please.  Page 1.  This

11   contains the letter of intent you signed, correct?

12   A     Yes.

13   Q     And you also signed an amendment and a confidentiality

14   agreement, correct?

15   A     I'm sorry, say again.

16   Q     You signed an amendment and a confidentiality

17   agreement?  Page 6 of 8, Exhibit 45?

18   A     Are you referring to the confidentiality agreement?

19   Q     Yes.

20   A     Yes.

21          THE COURT:  What's the amendment?  I'm sorry, I

22   didn't catch that one.

23          MR. VILLASENOR:  It's at page 6 of 8, Your Honor.

24          THE COURT:  Okay.

25   Q     (By Mr. Villasenor)  And you testified, I think, that
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 375

 1   you signed these documents at your wife's direction; is that

 2   right?

 3   A    That is correct.

 4   Q    Did she also tell you to sign as CEO?

 5   A    No, she did not.

 6            THE COURT:  Mr. Wilhite, is it your testimony that

 7   had they signed this, this would have been a deal?

 8            THE WITNESS:  No.

 9            THE COURT:  Why?

10            THE WITNESS:  This was a letter of intent to open

11   up negotiations.  It's by no means or form a completed deal.

12   It's much, much more complicated.

13            THE COURT:  Okay.  So, had they signed this, which

14   apparently they didn't; is that correct?

15            MR. VILLASENOR:  No, they did, Your Honor.

16            THE COURT:  Oh, they did.  Was a letter of intent

17   signed?

18            THE WITNESS:  I believe so, yes.

19            THE COURT:  Oh, okay.  All right.

20            MR. VILLASENOR:  Look at page 5, Your Honor, and

21   it has the signature of Mr. Sweeney.

22            THE COURT:  I guess maybe the amendment wasn't

23   signed.

24            MR. VILLASENOR:  Oh, I see.

25            THE COURT:  Thank you.  How much more do you have,

United States of America vs.                                      Evidentiary Hearing - Day II
Michael David Wilhite                                                  September 16, 2015

Page 376

1    do you think, Mr. Villasenor?

2              MR. VILLASENOR:  At what time are we supposed to

3    break, Your Honor?  6:00?

4              THE COURT:  I'm not setting a time.  I'm just

5    interested.

6              MR. VILLASENOR:  Oh.  It may spill over until

7    tomorrow, Your Honor.

8              THE COURT:  Okay.  What's your preference?  Do you

9    want to keep going?

10             UNKNOWN SPEAKER:  Keep on going on, Your Honor.

11             THE COURT:  You guys want to keep going?

12             UNKNOWN SPEAKER:  Yes, sir.

13             THE COURT:  Okay.

14   Q    (By Mr. Villasenor)  As part of the -- you see a

15   paragraph, I believe it's 2, on the letter of intent,

16   Mr. Wilhite?

17   A    What page?

18   Q    It is page 2 of 8.

19   A    Which paragraph?

20   Q    Paragraph 2.  It's numbered.

21   A    Yes, I see it.

22   Q    Okay.  It says part of that -- the structure

23   contemplated that Kodiak would pay roughly one and a half

24   million right at the close of the transaction?

25   A    Yes.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 377

1  Q    And then another one and a half, roughly, in January

2  2016, right?

3  A    Yes.

4  Q    There would be, also, an operating committee consisting

5  of you, Mr. Stubbert, and Mr. Sweeney, right?

6  A    Yes.

7  Q    Mrs. Wilhite would not be part of this operating

8  committee, right?

9  A    Her name is not there.

10  Q    And as part of this operating committee, the three of

11  you would, quote, Govern strategic decisions of the business.

12  Unquote.  Did I read that correctly?

13  A    Say that again, please.

14  Q    The three of you, this operating committee, would,

15  quote, Govern strategic decisions of the business.  Unquote.

16  Did I read that correctly?

17  A    I don't think so.

18  Q    No?

19  A    Oh, I see it here now.  Yes.

20  Q    And you would, quote, Continue to lead the business on

21  a day-to-day basis through December of 2015.  Correct?

22  A    That's what's written here.

23  Q    You moved on to, after signing this letter of intent,

24  to actually iron out an actual deal, right?

25  A    No.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 378

1   Q   No.

2   A   There was no deal.

3   Q   To try to iron out a deal?

4   A   Oh, I see.  Yes.

5   Q   And as part of that process, you -- Kodiak would

6   conduct due diligence on Advanced Floor, right?

7   A   Yes.

8   Q   Okay.  And that included on its assets, operations, and

9   accounting?

10   A   Yes.

11   Q   And you provided information to Kodiak, correct, as

12   part of its due diligence?

13   A   The company provided the information.

14   Q   Well, let's take a look at Exhibit 46.  Are you

15   familiar with Exhibit 46, at pages 1 through 4?

16   A   Go ahead.

17   Q   You're familiar with that?

18   A   Yes, I am.

19   Q   Did you send that e-mail?

20   A   Yes, I did.

21   Q   And this has information of the due diligence that you

22   provided to Kodiak, right?

23   A   Yes.

24   Q   There are -- it says due diligence list, and there are

25   a number of items.  Do you see those?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 379

 1   A    I do.

 2   Q    No. 3, No. 14.  What happened to the -- was there a

 3   No. 2 and a No. 1?

 4   A    I don't recall.

 5   Q    And do you not recall why you didn't provide

 6   information on No. 1 and No. 2, for example?

 7   A    No, I don't recall.

 8   Q    Did Kodiak give you a due diligence list of

 9   information?

10   A    They might have.

11   Q    Okay.  Who would have given that to you?

12   A    It could have been anyone from Kodiak.

13   Q    Mr. Cleveringa, for instance?

14   A    Anyone from Kodiak.

15   Q    As part of the due diligence list, did you provide any

16   additional information to Kodiak?

17   A    Oh, I don't recall.  That was about the time that the

18   deal was rejected by Dee Wilhite, and negotiations were

19   terminated and the deal was never, ever, ever completed.

20   Q    You mean in September 26, 2013?

21   A    I don't recall the date.

22   Q    Well, you can look at the date on the e-mail that you

23   sent.

24   A    No.  I didn't say it was terminated on that date.

25   Q    Okay.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 380

1   A    It was subsequently terminated.

2   Q    All right.  So, at this point the negotiations were

3   ongoing?

4   A    Yes.

5   Q    Okay.  Let's take a look at page 6 of Exhibit 46.  You

6   sent that e-mail?

7   A    Yes.

8   Q    Were the negotiations still ongoing?

9   A    At that date, yes.

10  Q    Okay.  Explain what was happening.  Why did you send

11  this e-mail?

12  A    These were further negotiations prior to the deal being

13  terminated.

14  Q    Okay.  And why were you engaged in these further

15  negotiations?

16  A    Because the negotiations were ongoing at that time,

17  subsequently terminated by Dee Wilhite.

18  Q    Okay.  Why were you speaking with a bank officer

19  concerning AFC's guarantor obligation?

20  A    Because AFC had guarantor obligations with that bank.

21  Q    But why were you speaking to the bank in regard to this

22  deal?

23  A    If this had gone through, then those guarantor

24  obligations needed to be addressed, and the bank would have

25  an opinion.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 381

 1   Q    Okay.  And you said, They're willing to work with us.

 2   Do you see that?

 3   A    Yes.

 4   Q    What does that mean?  What were they willing to do?

 5   A    They were willing to work with us.  I don't know what

 6   that meant.

 7   Q    Well, you wrote it, right?

 8   A    Yes.  And I wrote it exactly the way the bank said it.

 9   If you put a deal together we're willing to work with you.

10   Q    They didn't go into any more specifics?

11   A    Not that I can recall.

12   Q    All right.  Here, it's correct to say, that you

13   modified the deal and you -- you were asking for about three

14   million at the closing of the deal, right?

15   A    Yes.

16   Q    And a fifty-fifty profit-sharing agreement for three

17   years, correct?

18   A    Yes.

19   Q    Okay.  How would this work?  How would the profit

20   sharing work, according to you?

21   A    I don't know.  It never got that far.

22   Q    Well, what did you have in mind when you sent this

23   asking for a fifty-fifty profit sharing?

24   A    It hadn't been negotiated.  Profit sharing can take on

25   a number of forms.  It never got that far.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 382

1   Q    I understand it didn't get that far.  What I'm asking

2   you is what did you have in mind when you said fifty-fifty

3   profit sharing?

4   A    I think the document speaks for itself.  50 percent of

5   the profit went to one entity, 50 percent went to another

6   entity.

7   Q    And as part of this deal, you were, again, offering --

8   well, three-year employment agreement at current schedule and

9   salary.  Do you see that?

10  A    I see that.

11  Q    Was that in regard to you?

12  A    I think that later got excised out of there.  There was

13  discussion about my being an employee of the new company, but

14  it never went anywhere.

15  Q    But my question, again, this three-year employment

16  agreement at current schedule and salary is in regard to you?

17  A    I believe so.

18  Q    So, you were essentially telling them that you'd make

19  zero dollars for your salary, right?

20  A    That had yet to be determined.

21  Q    It does say current schedule and salary, right?

22  A    That's what it reads, yes.

23  Q    Did Kodiak accept this offer on -- on the October 29,

24  2013, e-mail?

25  A    Not to my knowledge.

United States of America vs.                                    Evidentiary Hearing - Day II
Michael David Wilhite                                                    September 16, 2015

Page 383

```
 1   Q    Did they make a counterproposal?

 2   A    Not that I can recall.

 3   Q    If you read a counterproposal from Kodiak, would that

 4   refresh your recollection about whether they made a

 5   counterproposal?

 6   A    It might.

 7   Q    Go ahead and -- Exhibit 47 at page 15.

 8             THE COURT:  That's not in evidence.

 9             MR. VILLASENOR:  Right.

10   A    Exhibit what?

11   Q    (By Mr. Villasenor)  47 at page 15.

12   A    Go ahead.

13   Q    Did you read it?  Did you read that e-mail?

14   A    Go ahead.

15   Q    Do you recognize that e-mail?

16   A    Yes, I do.

17   Q    Okay.  Was it addressed to you?

18   A    Yes.

19   Q    Does that refresh your recollection as to the

20   counterproposal by Kodiak?

21   A    Yes.

22   Q    Okay.  At the time that this appears to have been sent,

23   October 15, 2013, did you read that e-mail?

24   A    Yes.

25   Q    Okay.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 384

1      MR. VILLASENOR:  Your Honor, we'll offer that in
2  evidence, 47.
3      THE COURT:  Well, the date of the document you
4  were just referring to is October 29th, and you're calling an
5  October 15th document a counterproposal to an October 29th
6  document.  I don't understand that.
7      MR. VILLASENOR:  That's right.  It seems that it
8  was a counterproposal, but you're right.
9      THE COURT:  Okay.  So, let's clear the record.
10  You see Mr. --
11      MR. VILLASENOR:  I think I got it reversed, Your
12  Honor.  Sorry.
13      THE COURT:  Okay.  Mr. Wilhite, Exhibit 46, at
14  page 6 of 12, is dated October 29th.  That's what we were
15  just talking about.  Fifty-fifty profit sharing, three-year
16  employment agreement, et cetera.  What is your testimony
17  about whether Exhibit 47 at page 15 is a counterproposal to
18  that?
19      THE WITNESS:  I do not believe it's a
20  counterproposal because it predates the earlier document.
21      THE COURT:  Okay.  Thank you.
22  Q   (By Mr. Villasenor)  What was this -- the October 15
23  e-mail, what is that in response to?  If you recall.
24  A   I don't recall.
25  Q   Would it be correct to say, then, that your e-mail from

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 385

 1    October 29 was a response to the October 15 e-mail?

 2    A    No, I don't recall if it would be.

 3    Q    Okay.  Let's take a look at Exhibit 47 at page 1.

 4    A    I'm there.

 5              MR. VILLASENOR:  May I have a moment, Your Honor?

 6              THE COURT:  Sure.

 7              MR. VILLASENOR:  Your Honor, we pulled up on the

 8    screen a native format version of -- of Exhibit 47.  Your

 9    Honor, I have a document for the Court.  It's a declaration

10    of authenticity regarding this exhibit.

11              THE COURT:  Okay.

12              UNKNOWN SPEAKER:  (Unintelligible).

13              THE COURT:  Where did you get the native format

14    from?

15              MR. VILLASENOR:  Barton Supply.

16              THE COURT:  All right.  And you have -- you

17    received it electronically, the same thing?

18              MR. BEDNARSKI:  I recall receiving it, not in the

19    native form, Your Honor.  I mean, I should say when the

20    documents were provided to us, it was not in native form.

21    They provided the native form later.

22              THE COURT:  But you have received it before today?

23              MR. BEDNARSKI:  Yes, Your Honor.

24              THE COURT:  Okay.

25    Q    (By Mr. Villasenor)  You recognize the e-mail that's on

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 386

```
 1   the screen?

 2   A    Yes, I do.

 3   Q    Did you send that e-mail?

 4   A    Yes.

 5   Q    Okay.  Did you include that -- the attachment called

 6   AFC Barton FAQ Questions Draft?

 7   A    Yes.

 8   Q    You use Microsoft Word, don't you?

 9   A    Yes.

10   Q    You know how to type on a computer?

11   A    Yes.

12   Q    You use Microsoft Word at Advanced Floor?

13   A    I use Microsoft Word.

14   Q    At home?

15   A    Yes.

16   Q    And in your office?

17   A    In the office as well.

18        MR. VILLASENOR:  Your Honor, what we have on paper

19   is a printed version of the native format.

20        THE COURT:  Okay.

21   Q    (By Mr. Villasenor)  Sir, you edited the document you

22   attached to the e-mail?

23   A    That's correct.

24   Q    All right.  And the document you attached to the e-mail

25   related to communications to employee -- to Advanced Floor
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 387

```
 1   employees regarding a proposed sale of Advanced Floor?

 2   A    No.

 3   Q    What did it relate to?

 4   A    It was a prospective memorandum that could be issued to

 5   employees in the event of a sale, and no sale ever took

 6   place.  And the memorandum would have to be modified several

 7   times from this version to correct errors.

 8             MR. VILLASENOR:  Your Honor, I will offer

 9   Exhibit 47, pages 1 through -- I suppose 18 -- no, no -- 14,

10   which consists of the e-mail -- he's admitted he edited it on

11   Microsoft Word -- the edits, the red lines, and other

12   metadata.

13             THE COURT:  Okay.  Any objection?

14             MR. BEDNARSKI:  Your Honor, the only objection I

15   have is he is not the only one that edited it based off of

16   the native format that has been provided.  So, it was edited

17   by other individuals as well.

18             THE COURT:  Do we have that in evidence?

19             MR. BEDNARSKI:  I believe it's listed on the back,

20   Your Honor.

21             THE COURT:  Of this?  It's on the back of what?

22             MR. VILLASENOR:  Page 11, Your Honor.

23             MR. BEDNARSKI:  Do you see that, Your Honor?

24             THE COURT:  I see what is on page 11, but what do

25   you think I'm supposed to see?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 388

 1          MR. BEDNARSKI:  Well, all I'm saying, Your Honor,

 2   is I think they had indicated that all of the edits were made

 3   by Mike, and there is an indication that there was an edit

 4   back in June of 2013 by an Eric Miller.

 5          THE COURT:  Do we know what that edit was?

 6          MR. VILLASENOR:  Yes, Your Honor.

 7          MR. BEDNARSKI:  I think it indicates right there,

 8   Your Honor, header and footer changes.

 9          THE COURT:  Okay.  Does that mean there were edits

10   to just page 1?

11          MR. BEDNARSKI:  I believe so, Your Honor.

12          THE COURT:  So, he might have created the footer

13   and the text in it, a text box, and a footnote and note

14   changes.  Subject to that objection, and whatever it means,

15   then the document will be admitted.

16          (Exhibit 47, pages 1-14, admitted into evidence.)

17          MR. VILLASENOR:  Thank you, Your Honor.

18   Q    (By Mr. Villasenor)  Now, Mr. Wilhite --

19          THE COURT:  That is pages -- all that you offered,

20   which is pages 1 through --

21          MR. VILLASENOR:  -- 14.

22          THE COURT:  14.

23   Q    (By Mr. Villasenor)  Now, there are a series of

24   questions, correct, in this document?  Right, Mr. Wilhite?

25   A    Yes.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 389

1  Q    And in response to Question 1, What's happening with

2  the partnership with Kodiak, you wrote, quote, Mike and Dee

3  Wilhite have agreed to partner with Kodiak Building Partners,

4  owner of Barton Supply.  Unquote.  Did I read that correctly?

5  A    Yes.

6  Q    And then in response to Question 3, Will Mike and Dee

7  remain with the company, you wrote, quote, Yes, Mike and Dee

8  will continue to own a majority interest in AFC, and will

9  work closely with Kodiak/Barton to develop new products and

10 expand market penetration.  Unquote.  Did I read that

11 correctly?

12 A    Yes.

13 Q    In response to Question 9, sir, Who's in charge?  You

14 wrote, quote, Mike and Dee will maintain the majority

15 interest in AFC and will continue to operate the company in a

16 day-to-day basis as before.  Unquote.  Did I read that

17 correctly?

18 A    Yes.

19        THE COURT:  Hey, guys.  Will they let us go past

20 6:00?  I know that they -- they don't like it, correct?

21        UNKNOWN SPEAKER:  (Unintelligible).

22        THE COURT:  All right.  So we need to end at least

23 by 6:00.

24        THE COURTROOM DEPUTY:  And out the door at 6:00.

25        THE COURT:  Yeah.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 390

 1              MR. VILLASENOR:  Oh, they --  I don't know that

 2    I'll --

 3              THE COURT:  So if you have more than 10 minutes

 4    left I suggest that we adjourn.

 5              MR. VILLASENOR:  I do.

 6              THE COURT:  Okay.  So, what time in the morning,

 7    guys?

 8              MR. BEDNARSKI:  9 a.m., please.  I mean, if we can

 9    start at 8:30, I'll get up and drive here.

10              THE COURT:  It's your call.

11              MR. BEDNARSKI:  Let's try 8:30, Your Honor.

12              THE COURT:  You okay with that?

13              UNKNOWN SPEAKER:  Yes, sir.

14              MR. VILLASENOR:  Sure.

15              THE COURT:  And you guys okay with that?

16              MR. VILLASENOR:  Yes.

17              THE COURT:  All right.  8:30.

18              MR. VILLASENOR:  Yep.

19              THE COURT:  Make it nice and tight tomorrow,

20    Mr. Villasenor.  You have some gaps -- not gaps, but some

21    long pauses.  So, let's try to reduce the pauses.  Okay?

22              MR. VILLASENOR:  Yes.

23              THE COURT:  All right.  Anything further before we

24    adjourn?

25              UNKNOWN SPEAKER:  Nothing from (unintelligible).

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

Page 391

1          THE COURT:  From the United States?

2          MR. VILLASENOR:  No.

3          THE COURT:  Okay.  We'll be in recess.

4          THE COURTROOM DEPUTY:  All rise.  Court is in

5     recess.

6          (The hearing was adjourned at 5:51 p.m.)

7          I certify that the foregoing is a correct

8     transcript, to the best of my knowledge and belief (pursuant

9     to the quality of the recording) from the record of

10    proceedings in the above-entitled matter.

11

12

13

14    /s/ Kelly Mair                    September 21, 2015

15    Signature of Transcriber          Date

16

17

18

19

20

21

22

23

24

25

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day II
September 16, 2015

**Page 392**

```
 1                           INDEX

 2    WITNESSES:                                 PAGE NO.

 3
      For the Defendant:
 4
      Michael David Wilhite
 5         Direct Examination by Mr. Bednarski        270
           Cross-Examination by Mr. Villasenor        327
 6

 7

 8                          EXHIBITS

      Plaintiff's Exhibits:           Offered        Received
 9
           2 (page 1)                    330           330
10
           7                331, 332, 334, 335, 336    337
11                                                  (stipulated)

12         47 (pages 1-14)    383, 384, 385, 387      388

13

14

15

16

17

18

19

20

21

22

23

24

25
```