United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 393

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2

 3   Case No. 00-cr-00504-PAB

 4

 5   UNITED STATES OF AMERICA,

 6        Plaintiff,

 7   vs.

 8   MICHAEL DAVID WILHITE,

 9        Defendant,

10   DARLA DEE WILHITE,
     YAHAB FOUNDATION,
11
          Interested Parties.
12

13        Proceedings before MICHAEL E. HEGARTY, United States
     Magistrate Judge, United States District Court for the
14   District of Colorado, commencing at 8:48 a.m., September 17,
     2015, in the United States Courthouse, Denver, Colorado.
15

16        WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS ARE
     HEREIN TYPOGRAPHICALLY TRANSCRIBED...
17

18                           APPEARANCES

19   MS. ELIZABETH M. FROEHLKE, ESQ., MR. JUAN G. VILLASENOR, ESQ.
              Appearing on behalf of the United States.
20
                   MR. RICHARD F. BEDNARSKI, ESQ.
21             Appearing on behalf of the Defendant.

22              MR. SCOTT MIKULECKY, ESQ.
          Appearing on behalf of the Interested Parties.
23

24
                   EVIDENTIARY HEARING - DAY III
```

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                    September 17, 2015

Page 394

25

```
 1                    P R O C E E D I N G S

 2                    (Within, the electronically recorded proceedings

 3         are herein transcribed, pursuant to order of counsel.  Due to

 4         incomplete speaker identification in the FTR log notes,

 5         speaker identification in this transcript in some cases may

 6         be inaccurate.)

 7                    THE COURT:  Good morning, please be seated.  Back

 8         on the record in case 00-cr-504.  Mr. Villasenor,

 9         Ms. Froehlke, Mr. Tyez and Ms. Cruz for the United States.

10         Mr. Bednarski, Mr. Mikulecky and Mr. Wilhite.  Not

11         Ms. Wilhite, correct?

12                    MR. BEDNARSKI:  Yes, Your Honor.  Mr. Mikulecky

13         was just talking with one of our witnesses who just arrived.

14                    THE COURT:  Okay.

15                    MR. BEDNARSKI:  We are asking the court to waive

16         Mrs. Wilhite's appearance.  Her medical issue just doesn't

17         allow her to sit here for the whole day.

18                    THE COURT:  Okay.

19                    MR. BEDNARSKI:  As well as travel the three hours

20         each way.

21                    THE COURT:  Any objection?

22                    MR. VILLASENOR:  None.

23                    THE COURT:  Okay.  Go ahead.  Do you want to wait

24         for Mr. Mikulecky or not?

25                    MR. BEDNARSKI:  No, Your Honor, we can start.
```

Page 395

 1          THE COURT:  Okay.  Mr. Wilhite, you can retake the

 2   stand.

 3          MR. VILLASENOR:  Your Honor, one issue.  We

 4   have -- I was going to ask if we could take a witness out of

 5   order since he has to be at the airport at --

 6          THE COURT:  Okay.  That's fine.  Mr. Wilhite, go

 7   ahead and step down.

 8          MR. BEDNARSKI:  No.  Over here, Mike.

 9          THE COURT:  Not there.  Sorry.

10          MR. VILLASENOR:  Brian Cleveringa.

11          THE COURT:  Okay.  Mr. Cleveringa.

12          UNKNOWN SPEAKER:  Where is he?

13          UNKNOWN SPEAKER:  They're grabbing him right now.

14          UNKNOWN SPEAKER:  Oh, okay.  Thank you.

15          THE COURTROOM DEPUTY:  Would you raise your right

16   hand.

17          (The witness, Brian Cleveringa, was sworn to tell

18   the truth by the Courtroom Deputy.)

19          THE WITNESS:  I do.

20          THE COURTROOM DEPUTY:  You can be seated right in

21   there.

22                    DIRECT EXAMINATION

23   BY MR. VILLASENOR:

24   Q    **Good morning, Mr. Cleveringa.**

25   A    Good morning.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 396

1    Q    Who is your employer?  If you don't mind, speak in

2    close to the microphone.

3              THE COURT:  That's a heavy chair.

4              THE WITNESS:  All right.  It is.  All right.

5              UNKNOWN SPEAKER:  And there's no wheels on it.

6              THE COURT:  (Unintelligible) magnet on the bottom.

7              UNKNOWN SPEAKER:  And there's no wheels on it.

8              THE COURT:  There's a magnet or something under

9    there.

10   Q    (By Mr. Villasenor)  Who is your employer?

11   A    Kodiak.

12   Q    Kodiak.  And what's the full name of that company?

13   A    It's Kodiak Building Partners.

14   Q    And what is your present position at Kodiak?

15   A    My present position is SVP of Operations and Senior

16   Vice President.

17   Q    Okay.  And what are your duties in that position?

18   A    My current role is to assist operators, integrate

19   companies, work in bettering our operations, inventories.  I

20   can go on, but I think that --

21   Q    Right.  Did you work at -- for Kodiak in 2013?

22   A    I did.

23   Q    And what was your position at that time?

24   A    CFO.

25   Q    And what were your duties as a Chief Financial Officer?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 397

1   A    Correct.  Chief Financial Officer.  Close the books,

2   work with banks on financing, worked on acquisitions.

3   Q    Okay.

4   A    Worked with investors.  All that.

5   Q    Are you familiar with Barton Supply?

6   A    I am.

7   Q    What's their relationship between Barton Supply and

8   Kodiak?

9   A    We -- Kodiak purchased Barton Supply in 2011.

10  Actually, it was July 15th, 2011.

11  Q    And what is the relationship, if any, between Barton

12  and Advanced Floor Concepts?

13  A    So, when we purchased Barton in 2011, Advanced Floor

14  was, and still is, one of the largest customers.  So at the

15  time Steve Sweeney, the president, wanted to get to know all

16  of the top customers.  So we had a handful of top customers.

17  That's kind of how we developed a relationship over time.  He

18  got to know them and got to know each customer, as a result

19  of us owning Barton.

20  Q    And to your knowledge did Mr. Sweeney, the president,

21  meet Mr. Michael Wilhite?

22  A    To my knowledge, yes.

23  Q    And when is the approximate date of this meeting?

24  A    I -- I don't know if I can give the exact date, so I'm

25  going to narrow it.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 398

1    Q    Sure.

2    A    I would say the back half of 2011, to my knowledge.

3    Q    **Are you aware, Mr. Cleveringa, that in August of 2013,**

4    **Kodiak entered into negotiations to purchase Advanced Floor**

5    **Concepts?**

6    A    Yes.

7    Q    **And who from Kodiak negotiated the proposed purchase of**

8    **Advanced Floor?**

9    A    So, on the Kodiak side -- and I'm defining Kodiak as

10   not Barton.

11   Q    **Okay.**

12   A    On the Kodiak side it was Steve Sweeney who originally

13   met and worked through the initial LOI, or letter of intent.

14   Q    **Okay.  And so give us the steps that Kodiak took to**

15   **negotiate a proposed deal with Advanced Floor.**

16   A    Yeah.  So, from the Kodiak side Steve met with Mike and

17   then worked on -- they worked on an LOI.  There was multiple

18   versions of this LOI, but finally by August -- I think that

19   you guys have the evidence -- August 28th, I think is the

20   date of the executed LOI, finally got signed between Kodiak

21   and Advanced Floor.  And that was signed.  That kind of put

22   into motion then the whole next steps of due diligence and

23   trying to work towards a finalize of deal and all the deal

24   points.

25   Q    **Okay.  Let's take a look at Exhibit 45.  And you have a**

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 399

1    book and you would also have -- will have a screen too.  You

2    may -- you're probably better off with the paper.

3    A    You said Exhibit 45?

4    Q    Yes.  Starting on page 2.

5    A    Okay.

6    Q    Is that the August LOI you've been referencing?

7    A    Yes.  Sorry, August 26th was the date of that.  And I

8    said 28th, but, yeah, this is it.

9    Q    Okay.  To your knowledge was Mr. Wilhite retired at

10   this -- at the time of the signing of that LOI?

11   A    No, he was still operating.

12   Q    Operating what?

13   A    Advanced Floor.

14   Q    You spoke, just now, that -- it sounds like to come up

15   with the LOI it was a -- there were back and forth

16   negotiations, correct?

17   A    That's correct.  That's correct.  As with every LOI.

18   Q    And who -- and who were the folks who did that?

19   A    So, on Kodiak side it was primarily Steve.  And there

20   was, on the Barton side I believe -- I'm just making a

21   statement, I believe Mark Stubbert was involved in those

22   e-mails as well.

23   Q    And on the Advanced Floor side?

24   A    Mr. Wilhite.

25   Q    Okay.  Is Steve --

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 400

1    A    To my knowledge it was only Mike.

2    Q    **Steve Sweeney from --**

3    A    Yes.

4    Q    **Okay.  You referenced steps after the LOI was signed,**

5    **correct?**

6    A    Yes.  So, we signed the LOI at the end of August, and

7    then starting in September we started working on diligence.

8    So, we had a diligence list that we asked Advanced Floor to

9    fill out.  They did fill out, you know, some of it, sent it

10   over.  Those e-mails I believe you guys have.  I got -- you

11   know, Mike sent over a handful of diligence items.  So

12   September was really kind of dedicated to the due diligence

13   process.

14   Q    **From the Kodiak side, who was the point person on the**

15   **due diligence?**

16   A    On the due diligence?  All due diligence went through

17   me.

18   Q    **And for the due diligence for Advanced Floor, who was**

19   **the point person at Advanced Floor?**

20   A    All of my e-mails addressed Mike or Cindy.  Cindy did

21   send me a handful of items.  Cindy baker.

22   Q    **Okay.  Barker, perhaps?**

23   A    Okay.  Barker.  Sorry.  My bad.

24   Q    **And did you communicate with Mr. Wilhite?**

25   A    I did.

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                  September 17, 2015

Page 401

```
 1    Q    How did you communicate with him?

 2    A    Via e-mail and phone.

 3    Q    In person?

 4    A    We did have in-person meetings.

 5    Q    And who was present at the in-person meetings?

 6    A    Depending on the meeting it was either Steve, myself,

 7    Mr. Wilhite; or it was Mr. Wilhite, myself, Mark; or it was

 8    just Mr. Wilhite and me.

 9    Q    Mark Stubbert?

10    A    Stubbert, yeah.

11    Q    Okay.  Do you know who Mrs. Darla Wilhite is?

12    A    I know that she -- I know they're married, and I know

13    on the articles of organizations that she gave us in

14    diligence she owns the company.

15    Q    Okay.  What conversations, if any, did you ever have

16    with Mrs. Wilhite during the due diligence process?

17    A    I never directly spoke to her.

18    Q    Have you ever met her?

19    A    I have never met her.

20    Q    If you don't mind turning to Exhibit 46, at pages 1

21    through 4.

22    A    Yeah.  So --

23    Q    And are you familiar with -- with that e-mail on

24    Exhibit 46, 1 through 4?

25    A    Yeah.  Yeah.  This e-mail was directly to me, and this
```

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                    September 17, 2015

Page 402

1    was regarding a bunch of the due diligence items.

2    Q     What's a due diligence list?

3    A     To simplify, it's a list of requested items so we can

4    understand about the company's both, past; understand how

5    it's organized; look for anything either financial or

6    nonfinancial.  Make sure that we have a full grasp of the

7    company so when we do do the legal agreement for what we

8    purchase, that we know what to address in the reps and

9    warranties.

10   Q     And --

11   A     And verify that the earnings are there.

12   Q     There are a number of items on this e-mail?

13   A     Uh-huh.

14   Q     No. 3, No. 13, No. 14.  Do you see those?

15   A     Yep.

16   Q     Were there Items No. 1, No. 2, and 4 as part of the due

17   diligence?

18   A     Yes.

19   Q     Did you ever receive complete due diligence responses

20   from Mr. Wilhite?

21   A     We never finalized a due diligence list.  We were -- it

22   was in the process.  It's not -- maybe I'm saying too much.

23   It's just -- it's not like it happens overnight.  It takes

24   time.

25   Q     Sure.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 403

 1            THE COURT:  Mr. Cleveringa, do you have a copy of
 2   what Mr. Wilhite was responding to in this document?
 3            THE WITNESS:  Do I have the original due diligence
 4   list?
 5            THE COURT:  Yeah.  There must have been a list
 6   of --
 7            THE WITNESS:  Yeah, I have it.
 8            THE COURT:  -- questions.
 9            THE WITNESS:  Well, I don't have it with me.
10            THE COURT:  No.
11            THE WITNESS:  But, yeah, I have it.
12            THE COURT:  You have it somewhere?
13            THE WITNESS:  Yeah.
14            THE COURT:  Okay.
15            THE WITNESS:  It's an Excel sheet.  I mean, it's
16   got a bunch of items on it.
17   Q    (By Mr. Villasenor)  Okay.  I want you to turn to
18   Exhibit 47 at pages 17 and 16.  And I want you to look --
19   look at them in sort of in reverse order since the chain, the
20   earliest e-mail is at the end and the latest e-mail is, of
21   course, at the beginning.
22        Are you familiar with this chain of e-mails on
23   October 15?
24   A    Yes.
25   Q    Who is Rob Corne?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 404

1   A    He was -- Mike had us work with him.  He was his CPA or

2   tax guy.  I'm not a hundred percent sure, but he was related

3   on the CPA side of everything for Advanced.

4   Q    **Did you communicate with Mr. Corn during the due**

5   **diligence process?**

6   A    I did.

7   Q    **And as far as you knew could Mr. Corne speak on behalf**

8   **of Mr. Wilhite on the topic of due diligence?**

9   A    He did answer questions on this e-mail that you guys

10  are seeing.  My e-mail, specifically to him on page 16, is

11  explaining a structure change that we were proposing.  So,

12  that was going to him to go to Mike and they could discuss

13  it.

14  Q    **Okay.**

15           MR. VILLASENOR:  Your Honor, at this time I would

16  like to offer Exhibit 47 pages 16 through 18.

17           THE COURT:  Under what exception?

18           MR. VILLASENOR:  Well, Your Honor, the statements

19  by Mr. Corne are not hearsay, they're a statement by a

20  party's agent.  His accountant.  The firm's accountant.  And

21  there are also nonhearsay purposes here to show the affect on

22  Mr. Cleveringa.

23           MR. BEDNARSKI:  No, objection, Your Honor.

24           THE COURT:  Okay.  It will be admitted.

25           (Exhibit 47, Pages 16 through 18 admitted into

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 405

1    evidence.)

2    Q    (By Mr. Villasenor)  If you can fill in some -- give us

3    some context on Mr. Corne's e-mail at 10:25 a.m. on

4    October 15th.  Why -- what's that about?

5    A    So, you know, from my recollection here, and then if

6    you look at, obviously, page 16, my complete response to

7    that, we -- the original LOI, which we looked at -- I can't

8    remember, Exhibit 45 you guys had.

9    Q    Yes.

10   A    We were going to buy 49 percent of the company, leaving

11   51 percent until 2016, was the final buyout.  You can see in

12   here, as I mention kind of later on, I went to the banks

13   trying to get this financed.  It would have been easier.  I

14   could have did a better job financing the company if I could

15   have owned a hundred percent of it, and that's the change

16   that we're talking about here.

17        So, what the proposal -- kind of what Rob's talking

18   about here is our move from 49 percent ownership to a hundred

19   percent, but then in here we're trying to keep all the deal

20   points the same.  You know, we'd do a million and a half

21   seller note in here, but it was all basically for bank

22   financing purposes.

23   Q    Okay.  On your e-mail at 12:35 p.m., the first

24   paragraph, which begins, The proposal might have

25   originally --

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 406

1    A    Uh-huh.

2    Q    -- originally was for us and so on.  Is that what's on

3    the letter of intent?

4    A    Yeah.  That will match the LOI.  The 49 to 51 percent.

5    Q    Okay.  And the second paragraph, it says, The revised

6    proposal would be for us, and so on.  Who made that revised

7    proposal?

8    A    So, the first -- there was a call prior, but this

9    e-mail kind of framed it up.  And then Steve -- from my -- my

10   recollection, Steve sent a -- another formal e-mail following

11   this later in the day with the exact same proposal.  And I

12   sent it only to Rob.  You guys can see that here.  Steve's

13   proposal went to Mike and Rob.

14   Q    Okay.  And the third paragraph you will see the fourth

15   sentence that begins, That is also why nothing else in the

16   deal changed, because Mike still wants to be involved for a

17   few years, and we want him involved?

18   A    Uh-huh.

19   Q    Do you see that?

20   A    Yep.

21   Q    What's the basis for your statement that Mike still

22   wants to be involved for a few years?

23   A    So, yeah.  I mean, from my perception Mike was running

24   the business.  He was the brain, so we wanted him to maintain

25   a role to kind of keep going forward with the company to make

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 407

1    sure we could kind of -- here, you know, I talk about

2    aggressive growth.  We were really going to try to go after

3    some additional kind of market share, so we kind of needed

4    his expertise.  Did that answer your question?

5    Q    Yes.  Did you touch on why Kodiak wanted Mr. Wilhite

6    involved too?

7    A    Yeah.  We needed him for his knowledge, and he --

8    Q    Okay.

9    A    From my perspective he was currently running that.  Or

10   at the time he was running the operations at his place in

11   Castle Rock there.  So, we wanted him to come on board and

12   kind of keep leading that effort.

13   Q    Did Kodiak and Advanced Floor reach a deal after all?

14   A    We did not.

15   Q    And why was that?

16   A    We could not finalize deal points of what the profit

17   sharing or cash flow sharing meant.

18   Q    Okay.  And when did the negotiations stop or when

19   did you no longer -- when did Kodiak no longer -- well, let

20   me rephrase.

21        When did Kodiak understood [sic] that the negotiations

22   were over?  What point in time?

23   A    Well, from my perception I would say they probably

24   ended somewhere in the middle of December is when things kind

25   of just dried up.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 408

1    Q    2013?

2    A    Correct.  Sorry.  I should have added the year.

3    Q    **To your knowledge was Kodiak introduced to Advanced**

4    **Floor for purposes of this deal through a seminar?**

5    A    No.

6              THE COURT:  How was it introduced?

7              THE WITNESS:  Back in -- when we purchased Barton

8    in 2011 they were, and still are, one of our biggest

9    customers at Barton.

10             THE COURT:  Right.  So you wined and dined them

11   the latter half.

12             THE WITNESS:  Yeah.  And that relationship, you

13   know, with Steve ultimately kind of grew, and that's really

14   how this whole thing came to fruition.

15             THE COURT:  Okay.  So it just evolved into

16   discussions about purchasing the company?

17             THE WITNESS:  Correct.

18             THE COURT:  All right.  Thank you.

19             THE WITNESS:  I mean, there are steps.  Obviously,

20   I want to disclose there's steps in there that I wasn't

21   involved in, but --

22   Q    **(By Mr. Villasenor)  Exhibit 45 in the letter of intent**

23   **on -- on section 2 -- Well, let me ask it this way.**

24        **To your knowledge did -- did Mr. Wilhite ever tell you**

25   **what kind of salary he was getting paid from Advanced Floor?**

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 409

 1   A    We did have salary reports.

 2   **Q    And what were those reports, if you recall?**

 3   A    To be honest, I can't recall what he was paying

 4   himself.

 5   **Q    Okay.**

 6   A    Or what Advanced was paying him.

 7   **Q    I may have it.**

 8          THE COURT:  This is a pretty important point,

 9   Mr. Cleveringa.  Do you specifically have a mind -- have a

10   memory of a salary report where some document listed a salary

11   for Mr. Wilhite, or do you just think that because that's the

12   way it should have gone?

13          THE WITNESS:  I had salary reports.  I cannot

14   specifically tell you if he was listed on there.

15          THE COURT:  Okay.

16          THE WITNESS:  Without having going back and

17   reviewing what's in there.

18          THE COURT:  Thank you.

19   **Q    (By Mr. Villasenor)  Would it surprise you to know that**

20   **Mr. Wilhite was not getting paid through Advanced Floor?**

21   A    Surprised?  I mean, in this industry, in building

22   materials I don't know if anything surprises me.

23   **Q    All right.**

24   A    Sorry.  I'm not joking.  Just don't know if it

25   surprised me.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 410

1    Q    All right.  Would that be expected not to be making any

2    money and be running a company?

3    A    No.  I mean, I can speak from deal experience, not

4    Advanced Floor experience.  Just general deal experience it

5    comes in different shapes and sizes.  Some owners distribute

6    to themselves.  Other owners do a salary.  You know, I've

7    seen about every possible setup that you can imagine.

8    Q    Okay.  Thank you.

9              MR. VILLASENOR:  No further questions.

10             THE COURT:  Any cross?

11             MR. BEDNARSKI:  Yes, Your Honor.

12                     CROSS-EXAMINATION

13   BY MR. BEDNARSKI:

14   Q    Mr. Cleveringa, you indicated that your employer is

15   Kodiak Building Partners, correct?

16   A    Correct.

17   Q    And you're currently vice president -- senior vice

18   president?  Is that what it is?

19   A    Yeah.  You can call me whatever you want.

20   Q    Now, as vice president do you own Kodiak Building

21   Partners?

22   A    I do not own a hundred percent of it.  I wish I did.

23   Q    Okay.  Do you own parts of it?

24   A    I have an ownership percent, but it's pretty small.

25   Q    Okay.  When you were CFO of -- back in 2013, was that

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 411

1    with Kodiak as well?

2    A    Yes.

3    Q    I think it was called like Boreas Advisors?

4    A    Yeah.

5    Q    Or something to that effect?

6    A    Good call.  On my e-mail it's Boreas Advisors.  Boreas

7    Advisors ultimately turned into Kodiak.

8    Q    Okay.

9    A    It's the same -- same company.

10   Q    When you were Chief Financial Officer did you own

11   shares of Boreas Advisors?

12   A    Can I explain the legal structure, because it's kind of

13   one in the same.

14   Q    Sure.

15   A    So, yes, I owned it.

16   Q    Okay.

17   A    Yeah.

18   Q    You owned some shares of it?

19   A    Yeah.  It's really everything under it.

20   Q    Okay.  Now, as -- as part owner -- Mr. Stubbert did not

21   own Barton Supply, correct?

22   A    That's correct.

23   Q    And he was involved in these negotiations, right?

24   A    That's correct.  He had a relationship with Mike.

25   Q    And he was, at least from the e-mails, heavily involved

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 412

1    in the negotiations?

2    A    On parts, yes.  Yeah.

3    Q    Now, you had indicated that, at least it was your

4    understanding, that Mr. Wilhite was not retired, that he was

5    still operating Advanced Floor Concepts; is that correct?

6    A    That is correct.

7    Q    Now, fair to say you weren't there on a day-to-day

8    basis?

9    A    I was not.

10   Q    You had a couple meetings with Mr. Wilhite.  Were they

11   in your office or his?

12   A    Le Peep.

13   Q    Le Peep?

14   A    Restaurant.  Yes.

15   Q    So, at a restaurant?

16   A    Yeah.  We did have a couple at Kodiak too.

17   Q    But no meetings at Advanced Floor Concepts?

18   A    I had my initial meeting with Cindy at Advanced.

19   Q    Okay.  So, you also had meetings with Cindy Barker?

20   A    Uh-huh.  One.

21   Q    She works in the accounting area, correct?  She's an

22   accountant for Advanced Floor Concepts?

23   A    Yes.  Well, yeah.  I thought she was administrative --

24   Q    Okay.  So as a result, as I had indicated, you weren't

25   there on a day-to-day basis to see what Mike was either doing

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 413

1   or not doing with the company, right?

2   A    That's correct.

3   Q    Didn't know how often he was there?

4   A    That's correct.

5   Q    Didn't know what, if anything, he was doing to operate

6   the business, right?

7   A    From being on site, no.  Because I wasn't on site.

8   Q    Right.  Like, you didn't know whether he was doing a

9   hiring or firing, right?

10  A    Can I answer from a diligence side?

11  Q    Sure.

12  A    So, correct, he was not doing hiring and firing of the

13  laborers.

14  Q    Okay.  Now, regarding this due diligence, you'd

15  indicated that that's kind of what September, 2013 was

16  essentially --

17  A    Uh-huh.

18  Q    -- dedicated to was going through this due diligence?

19  A    Correct.

20  Q    And I think you'd indicated that it actually -- there

21  were two different individuals from Advanced Floor Concepts

22  involved in the due diligence, right?

23  A    Correct.

24  Q    The first one was Mr. Wilhite?  You were getting

25  e-mails from him?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 414

```
 1   A     Uh-huh.

 2   Q     Right?

 3   A     Correct.

 4   Q     And then you were also getting e-mails from Cindy

 5   Barker?

 6   A     That's correct.

 7   Q     And it makes sense, she's on the financial side of

 8   it --

 9   A     Uh-huh.

10   Q     -- so she's giving you the financial information as it

11   related to the due diligence?

12   A     Yeah.

13   Q     Obviously, based off the information you were getting

14   from the due diligence, Mr. Wilhite had a lot of knowledge

15   about the company?

16   A     That is correct.

17   Q     He had been involved in the company since its

18   inception?

19   A     That was our understanding.

20   Q     And it would it be fair to say that based off of his

21   knowledge as it related to the due diligence, that was one of

22   the reasons why you thought he was operating -- still

23   operating the business?

24   A     That would be one piece of it, correct.

25   Q     Sure.  And that's all I'm asking is just one part in
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 415

1    it.

2         Now, you had indicated that -- if we could go to

3    Exhibit 45, please.

4    A    We just love this LOI.

5    Q    Oh, sorry.  I meant to go to 46.  Go to 46, please.

6    A    Okay.

7    Q    Now, in Exhibit 46, this is an e-mail from Mike to you,

8    also cc'ing mark, correct?

9    A    Correct.

10   Q    And it is his response to some of the questions you had

11   related to due diligence, right?

12   A    Correct.

13   Q    He also provided some documents as it related to your

14   request regarding the due diligence?

15   A    That's correct.

16   Q    Now, if you look at No. 32, on the first page,

17   Mr. Wilhite actually answered the question indicating that

18   Advanced Floor Concepts is organized as a limited liability

19   company owned entirely by Darla Dee Wilhite, and taxed as Sub

20   S corporation?

21   A    Correct.

22   Q    There are no affiliate companies or separate divisions,

23   right?

24   A    Correct.

25   Q    So, Mr. Wilhite was telling you, as part of the due

Page 416

1  diligence, that Darla Dee Wilhite was the owner of Advanced

2  Floor Concepts, correct?

3  A    That's correct.  And he gave us the articles of

4  organization.

5  Q    And so based off of receiving all of that, it was your

6  understanding that Darla Dee Wilhite owned the company?

7  A    She did own the company.

8  Q    So, any payment to -- to take AFC would have to go to

9  her or AFC, not to Mike?

10 A    Yeah.  We would have did the legal agreement to AFC.

11 That is correct.

12 Q    And so when these e-mails that -- that Mr. Villasenor

13 talked about later on regarding Mike would receive $1.5

14 million, Kodiak Building Partners wasn't going to write a

15 check to Mike Wilhite for $1.5 million, correct?

16 A    The company purchase would have been made to whatever

17 ultimately entity they decided.

18 Q    Correct.

19 A    It had to have AFC on there.

20 Q    Correct.  And -- and -- and the owner of AFC was Darla

21 Dee Wilhite?

22 A    Correct.

23 Q    Now, fair to say that even as Mike was the one

24 negotiating this deal, in order to finalize the sale of

25 Advanced Floor Concepts, Darla Dee Wilhite would have had to

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                    September 17, 2015

Page 417

1    sign the deal?

2    A    Oh, absolutely.

3    Q    Mike could not have signed to take the deal since he

4    was not the owner of Advanced Floor Concepts?

5    A    Yeah.  We would have legally been required to get that

6    signature from Darla, correct.

7    Q    Now, under this due diligence, if you would go to

8    page 2 of 12 on that 46, and if you look at No. 64.  And it

9    indicates that, Ownership reviews all financial statements.

10   No checks are signed by accounting, but by ownership, Mike

11   Wilhite, or Torin Jackson.  Safety/quality controller by

12   Chris Adams, customer service by Torin Jackson and Cody

13   Matlack.

14   A    Yeah.

15   Q    And so based off of reading this, your understanding

16   would be that checks can be signed by either the ownership,

17   which is Darla Dee Wilhite; Mike Wilhite, or Torin Jackson?

18   A    Yeah.

19   Q    Okay.  Now, you had indicated that you never spoke

20   directly with -- with Darla Dee Wilhite, correct?

21   A    That's correct.

22   Q    Never met her in person?

23   A    That's correct.

24   Q    Now, fair to say, you don't know what, if any,

25   conversations Mr. Wilhite had with his wife regarding this

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 418

1    negotiation for the sale of Advanced Floor Concepts?

2    A    Correct.  That was outside of my --

3    Q    And obviously no deal was reached, and so there was no

4    need to meet with her to finalize the deal with signatures

5    and everything?

6    A    That's correct.

7    Q    Now, if you would go to No. 47, please.  I want to go

8    to 16 through 18 that Mr. Villasenor talked to you about.

9    A    16 through 18.

10   Q    Pages 16 through 18.

11   A    Yep.

12   Q    Now, this was e-mails back and forth between you and

13   Mr. Corne, the accountant for Advanced Floor Concepts, right?

14   A    Correct.

15   Q    Regarding structure of the deal?

16   A    Yes.

17   Q    Potentially changing the structure of the deal?

18   A    This was a change.

19   Q    And this was directed, initially, to just Rob Corne,

20   correct?

21   A    That is correct.

22   Q    And then later on Mr. Sweeney followed up with an

23   e-mail to -- to Mr. Wilhite, as well as Mark Stubbert?

24   A    Definitely Mr. Wilhite.

25   Q    I'm sorry, and I think you.  Like, it had --

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 419

 1   A    Yeah.

 2   Q    -- you, Mr. Wilhite, and Rob Corne, right?

 3   A    Correct.  That's what -- that's the way I remember it.

 4   Q    Okay.  Now --

 5   A    Those three.

 6   Q    -- in this it indicates that -- that Mike wants to be

 7   involved for a few years, and we want him involved.  And I

 8   think you had indicated that from your perception you,

 9   meaning Kodiak builders, wanted him still involved, right?

10   A    Yes.

11   Q    He had the knowledge of the company?

12   A    Yeah.

13   Q    He had been involved in the company for -- since its

14   inception, right?  And at least as it was discussed, there

15   wasn't any specific, Okay, we're going to pay you this amount

16   of money to continue in your role?  For example, it wasn't

17   we'll pay you $4,000 a month?

18   A    So, employment agreements are outstanding, correct.

19   Q    Correct.  That's one of the things that didn't get

20   finalized because the deal never materialized?

21   A    That's correct.

22   Q    A lot of things didn't get finalized because the deal

23   didn't get --

24   A    Yeah.

25   Q    -- materialized?

United States of America vs.                          Evidentiary Hearing - Day III
Michael David Wilhite                                        September 17, 2015

Page 420

1    A    Correct.

2    Q    I think, like you said, the due diligence list didn't

3    ultimately get finalized because, again, the deal fell

4    through?

5    A    Correct.

6    Q    Any memorandums that might have gone to employees of

7    Advanced Floor Concepts, didn't get finalized because the

8    deal didn't go through?

9           MR. VILLASENOR:  Objection.  Calls for

10   speculation.

11          MR. BEDNARSKI:  I think he can answer if he knows

12   the question -- knows --

13          MR. VILLASENOR:  Well, Your Honor --

14          MR. BEDNARSKI:  -- the answer, Your Honor.

15          MR. VILLASENOR:  -- that's -- and it's not in

16   evidence either.

17          THE COURT:  Okay.  What's the question, please?

18          MR. BEDNARSKI:  Your Honor, the question was, Any

19   memorandum that would go to Advanced Floor Concepts'

20   employees didn't get finalized because the deal didn't get

21   finalized.

22          MR. VILLASENOR:  Objection --

23          THE COURT:  I'll sustain the objection.  He

24   doesn't know about memos to Advanced Floor Concept'

25   employees.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 421

```
 1              MR. BEDNARSKI:  Your Honor, that memorandum was
 2     sent to Mark Stubbert as part of this deal.
 3              THE COURT:  You said any memoranda.
 4              MR. BEDNARSKI:  Okay.  I apologize, Your Honor.
 5     Q    (By Mr. Bednarski)  A memorandum that was sent as part
 6     of the negotiations to Advanced Floor Concepts never was
 7     finalized because the deal didn't -- the deal fell through,
 8     correct?
 9              MR. VILLASENOR:  Same objections.  Lack of
10     foundation.  Calls for speculation.
11              THE COURT:  If you know.
12     Q    (By Mr. Bednarski)  If you know?
13     A    What was that?
14              THE COURT:  Do you know the answer to that
15     question?
16              THE WITNESS:  To the employee memos going out?
17     Q    (By Mr. Bednarski)  Yes.
18     A    No final employee memos went out.
19     Q    Now, I think you had indicated that at least you came
20     in when the due diligence was started in September of 2013,
21     right?
22     A    Yeah.  It really kicked off my -- my big chunk of that
23     was due diligence.
24     Q    Now -- and I think you had indicated that Mr. Sweeney
25     was the one that was involved in the initial negotiations
```

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                               September 17, 2015

Page 422

 1   with Mr. Wilhite regarding the LOI --

 2   A    That's correct.

 3   Q    -- as well as any initial negotiations, whether it was

 4   before the LOI or not?

 5   A    That's correct.

 6   Q    And fair to say that you were not involved -- sorry,

 7   you were not involved in those negotiations?

 8   A    That's correct.

 9              MR. BEDNARSKI:  May I have a moment, Your Honor?

10              THE COURT:  Yes.

11              MR. BEDNARSKI:  Your Honor, if I may approach the

12   witness.  We just received these documents last night from

13   Mr. Villasenor.  So, we are going to attach this or seek to

14   introduce it, after I speak with Mr. Cleveringa, as

15   Exhibit Z.

16              THE COURT:  Okay.

17              MR. BEDNARSKI:  If I may approach, Your Honor.

18              THE COURT:  Thank you.

19   Q    (By Mr. Bednarski)  Mr. Cleveringa, if you would review

20   that document.  And just once you're finished, if you would

21   let me know when you're finished.

22   A    Okay.

23   Q    Okay.  Now, do you know what this document is?

24   A    Yeah, it's an e-mail from Mark.  This is -- well, let

25   me see here.  This is actually the prelude to our formal

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 423

1   change that happens later in October.

2   Q    And are these e-mails from Kodiak Builders to the

3   Wilhites?  I mean, there are some e-mails in there related to

4   that, right?

5   A    So, Steve for sure.  Mark is at -- at Barton.

6   Q    And then also ones involving you --

7   A    Yeah.

8   Q    -- from both Mark as well as Mr. Sweeney, right?

9   A    Yeah, asking me to meet with Mike.

10  Q    Is this a document that's kept in the normal course of

11  business for Kodiak Building Partners?

12  A    We would just keep it as an e-mail.  We wouldn't keep

13  this as diligence.

14  Q    Correct.  But it --

15            MR. BEDNARSKI:  May we have a moment?

16            THE COURT:  Yes.

17            MR. BEDNARSKI:  Okay.

18            UNKNOWN SPEAKER:  (Unintelligible).

19            MR. BEDNARSKI:  Okay, you got it.

20  Q    (By Mr. Bednarski)  Do you recognize Mr. Sweeney's

21  e-mail address?

22  A    Yeah.

23  Q    And is that Steve.Sweeney@kodiakbp.com?

24  A    Correct.

25  Q    Do you recognize Mark Stubbert's e-mail address as

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 424

```
 1    MStubbert@bartonsupply.com?

 2    A    Yes.

 3    Q    Is this an e-mail chain that involved pretty much all

 4    the parties involved in the negotiation for the potential

 5    sale of Advanced Floor Concepts?

 6    A    Yes.

 7          MR. BEDNARSKI:  And we would seek for the

 8    introduction of Exhibit Z at this time.

 9          MR. VILLASENOR:  No objection.

10          THE COURT:  Where -- where is the evidence that

11    anybody from Advanced Floor was involved in the e-mail chain?

12          MR. BEDNARSKI:  Your Honor, if you look at the

13    first e-mail on September 9th, 2013 at 11:12 a.m. it says,

14    Steve Sweeney wrote, and it says Mike and Dee.

15          THE COURT:  I know, but the electronic data

16    doesn't indicate it went to that person.  There's no e-mail

17    address.

18          MR. BEDNARSKI:  That's correct, Your Honor.  I'll

19    remove that part of it.

20          THE COURT:  Could be a draft as far as I know.

21    So, you agree there's no internal evidence that this was

22    ever -- any of the communications ever received from or to

23    the Wilhites?

24          MR. BEDNARSKI:  Based off of this document, yes,

25    Your Honor.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 425

1              THE COURT:  Okay.  Well, since there's no
2    objection I'll admit the whole exhibit as Exhibit Z, but
3    still, I don't see the evidence that it actually went through
4    the wire to --
5              MR. BEDNARSKI:  And I understand, Your Honor.  My
6    focus isn't on that --
7              THE COURT:  Okay.
8              MR. BEDNARSKI:  -- that initial one that was
9    supposedly sent to Mike and Dee, outside of the fact that
10   that initial e-mail from Mr. Sweeney does say Mike and Dee,
11   correct?
12             THE COURT:  All right.
13             THE WITNESS:  Yes, it does.
14             (Exhibit Z admitted into evidence.)
15   Q   (By Mr. Bednarski) It doesn't say just Mike Wilhite?
16   A    No.  It says Mike and Dee.
17   Q    Now, if you go to the second -- if you go to the very
18   top of page 1 of Exhibit Z.
19             MR. BEDNARSKI:  And, Your Honor, I'll get you an
20   exhibit sticker here in just a second.
21             THE COURT:  I'll just mark mine, I don't need it.
22             MR. BEDNARSKI:  Thank you, Your Honor.
23   Q    (By Mr. Bednarski)  So if you go to the one right below
24   that, it says, Steve Sweeney wrote.  Do you see that?
25   A    Yep.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 426

1  Q    Now, in that first paragraph, the last sentence

2  actually does say, Which is a benefit to Mike and Dee.

3  Correct?

4  A    That is correct.

5  Q    So, again, it's involving Dee Wilhite in these

6  negotiations, correct?

7  A    This does, correct.

8  Q    Now, the e-mail that -- that was sent to Mr. Sweeney

9  and you from Mr. Stubbert actually indicates that, I think

10 more of this is coming from Dee, not Mike.  I think this is

11 more my fault in not making sure that she has a better

12 standing -- better understanding of the overall process,

13 correct?

14 A    Correct.

15 Q    And so, what did you take that to mean?

16 A    Personally?

17 Q    Yes.

18 A    I was just waiting to talk to Mike.

19 Q    So, but based off of this, it seems, you would agree

20 with me, that Mark was having discussions with Dee Wilhite?

21 A    Yeah.  Correct.  And, again, I never had direct

22 communication with Dee, so --

23 Q    Correct.  And Mark Stubbert was from the Barton part of

24 this, which is a little different part than Kodiak Building

25 Partners?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 427

1   A    Yeah.  And they have -- that's -- they have a

2   relationship, that's for sure.

3   Q    And I think based off of the discussions regarding

4   that, Kodiak Building Partners was going to initially buy out

5   49 percent --

6   A    Uh-huh.

7   Q    -- and AFC would remain controlled by Darla Dee Wilhite

8   as 51 percent majority owner, correct?

9   A    Yeah.  The 51 percent would have been the current

10  company AFC, which was owned by Darla.

11  Q    And obviously, one of the benefits to that is having a

12  woman-owned business for any potential government contracts?

13  A    So, we -- we vetted that out.  We -- in part of our

14  diligence because we can't have that.  Because our -- the way

15  our structure is doesn't allow -- we would void any of those

16  contracts right out of the gate.  So --

17  Q    Because it wasn't a hundred percent owned?

18  A    Correct.

19  Q    Okay.

20  A    So we made sure that, at least from our side, there was

21  going to be no back due diligence; no financial or P&L

22  impact.  And there was -- at least from the diligence we got,

23  we couldn't find any contracts that were of benefit for --

24  it's a minority-owned clause.

25        MR. BEDNARSKI:  Okay.  Thank you.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 428

1           THE COURT:  Hold on a second.  Mr. Cleveringa, do

2   you specifically remember discussions concerning a

3   female-owned company, and the impact that would have?

4           THE WITNESS:  Correct.  When I got the articles of

5   organization I seen Darla on them, my very first question was

6   are they getting minority business, and what is that impact.

7   And both were vetted out to be none.

8           THE COURT:  Okay.

9           MR. BEDNARSKI:  No further questions.  Thanks,

10  Mr. Cleveringa.

11          THE COURT:  Any redirect?

12          MR. VILLASENOR:  Briefly, yes.

13                  REDIRECT EXAMINATION

14  BY MR. VILLASENOR:

15  Q    Mr. Cleveringa, did Mr. Wilhite ever tell you that he

16  had any conversations with his wife about the proposed -- the

17  negotiations.

18  A    Between Mr. Wilhite and me?  No, none.

19  Q    Did he ever say, you know, I talked to my wife, the

20  owner, about this part of the deal and she says it's not

21  acceptable?  Anything like that?

22  A    Again, between me and Mr. Wilhite, no.

23          MR. VILLASENOR:  All right.  Nothing else.

24          THE COURT:  Okay.  You can step down.  Thank you

25  for coming.

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                     September 17, 2015

Page 429

```
 1              THE WITNESS:  Thanks.
 2              THE COURT:  Have a safe trip.  Where are you going
 3   back to?
 4              THE WITNESS:  I'm headed to Loving, South Texas.
 5   It's a beautiful time of year to stand outside and do
 6   inventories.  So, it will be fun.
 7              THE COURT:  Wear some sunscreen.
 8              THE WITNESS:  Everybody's jealous.  Have a good
 9   day.
10              THE COURT:  All right.  Okay.  Are we ready for
11   Mr. Wilhite?
12              MR. VILLASENOR:  Yes, Your Honor.
13              THE COURT:  Do I have a phone call right now?
14              THE COURTROOM DEPUTY:  I cleared it
15   (unintelligible) for the 9:30.  I haven't seen anybody.  As I
16   understand it they have not yet called in.
17              THE COURT:  You guys can go to the restroom if you
18   want to.  I have to take a phone call right here.  Or you can
19   stay wherever you want.
20              THE COURTROOM DEPUTY:  There it is.
21              MR. BEDNARSKI:  And, Your Honor, just real
22   quickly, at 11 o'clock today I have to step out.
23   Mr. Mikulecky will take over.  I have to be in
24   (unintelligible).
25              THE COURTROOM DEPUTY:  Judge Hegarty's courtroom.
```

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                    September 17, 2015

Page 430

 1   One moment, please.

 2              (A break was taken from 9:34 a.m. to 9:45 a.m.)

 3              THE COURTROOM DEPUTY:  All rise.  Court is in

 4   session.

 5              THE COURT:  Please be seated.  Okay.  Back on the

 6   record in 00-cr-504.  Ready for Mr. Wilhite's continued

 7   cross-examination, are we?

 8              MR. VILLASENOR:  Yes.

 9              THE COURT:  Okay.  Continue when you're ready.

10                       CROSS-EXAMINATION

11   BY MR. VILLASENOR:

12   Q    Mr. Wilhite, you know that in this proceeding the

13   government is alleging that Advanced Floor is your company,

14   right, but that it is held in your wife's name, right?

15   A    I understand.

16   Q    And during opening statement, Mrs. Wilhite's attorney

17   referred to this as a straw man theory, correct?

18   A    Perhaps.  I don't recall exactly.

19   Q    You were here, right?

20   A    Yes, I was.

21   Q    And you've seen a businessman use a straw man approach

22   before, haven't you?

23   A    No, I have not.

24   Q    And you understand the term straw man, right?

25   A    Yes.

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                      September 17, 2015

Page 431

1    Q    You lived in California before moving to Colorado,

2    correct?

3    A    That is correct.

4    Q    You lived in San Diego?

5    A    That is correct.

6    Q    You worked as a securities broker while you lived in

7    California?

8    A    Yes.

9    Q    At a firm called Hamilton Williams; is that right?

10   A    Yes, sir.

11   Q    And you were a branch manager of that firm's office,

12   right, in San Diego?

13   A    That's correct.

14   Q    And now Hamilton Williams had an office in LA too,

15   didn't it?

16   A    I believe so.

17   Q    And you were familiar with that -- how that office was

18   run, right?

19   A    Which office?

20   Q    The LA office.

21   A    No.

22   Q    (Unintelligible).  Please.  You testified in a US

23   Securities and Exchange Commission matter regarding your work

24   at Hamilton Williams; is that right?

25   A    Yes, I did.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 432

1  Q    Okay.  That was back in 1989?

2  A    I don't recall the date.

3         MR. VILLASENOR:  Your Honor, I have provided a

4  copy of that deposition to the clerk, and she just handed it

5  to you.

6         THE COURT:  Okay.

7  Q    (By Mr. Villasenor)  The date there says August 31,

8  1989, correct?

9  A    I see that, yes.

10  Q    Okay.  Turn to page 80, please.

11         MR. BEDNARSKI:  Your Honor, I'm going to object to

12  the use of this.  This has never been provided to us until

13  today.

14         MR. VILLASENOR:  Your Honor, it's impeachment at

15  this point, and I did provide it in a CD in a supplemental

16  disclosure.

17         THE COURT:  You don't have to provide impeachment

18  material, so --

19         MR. VILLASENOR:  I did provide it, anyway.  I

20  understand.

21         THE COURT:  Okay.  Overruled.  Now, there may be

22  other objections, but that's not a good one.

23  Q    (By Mr. Villasenor)  In response to -- are you on

24  page 80?

25  A    Yes.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 433

```
 1   Q    In response to a question from an SEC lawyer regarding

 2   discussions you had about how the LA office was run, you

 3   testified:  Mr. Ziegler indicated that Terry -- I'm sorry,

 4   Mr. Williams indicated that Terry Ziegler ran the LA office.

 5   But due to some complications and technicalities within the

 6   securities laws he was not able to appear on any documents as

 7   the branch manager.  And they had installed his wife -- or

 8   his sister-in-law -- I'm not clear which one it is -- Colleen

 9   White is the name that was given, as the branch manager.  I

10   believe that to be Mr. Ziegler's sister-in-law.  Mr. Williams

11   explained that Terry ran the office.  Terry called the shots.

12   But he did so from the background.

13        Did I read that correctly?

14   A    You referred me to page 8.  I'm not finding that.

15        THE COURT:  80.

16        THE WITNESS:  80?

17        MR. VILLASENOR:  Yep.

18        THE WITNESS:  Oh, I'm sorry.

19        MR. BEDNARSKI:  I'm sorry.  I thought he said 8,

20   too.

21        THE COURT:  8-0.  Instead of Mr. Villasenor

22   reading that again, just look at lines 14 to 23, okay,

23   Mr. Wilhite.

24   Q    (By Mr. Villasenor)  Did you -- did you look at those

25   lines?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 434

 1   A    Yes.

 2             MR. VILLASENOR:  Did the Court have a question,

 3   Your Honor?

 4             THE COURT:  No.

 5   Q   (By Mr. Villasenor)  Mr. Wilhite, yesterday you

 6   testified that the idea of forming a company with bad credit,

 7   no contacts, and a judgment hanging over your head would be

 8   ludicrous.  Do you recall that?

 9   A    Yes, I do.

10             THE COURT:  Wait a second.  I want to go back here

11   for a second.  The only reason that you brought this is to

12   impeach him on whether he knew how an LA office in some

13   securities company, that has nothing to do with this case,

14   operates?  Why -- why is that important?

15             MR. VILLASENOR:  Your Honor, this shows a lack

16   of -- lack of mistake, motive and intent to essentially

17   engage in a straw man theory, which is what we are alleging

18   in this case.  And he knew -- he learned about that back in

19   1989.

20             THE COURT:  Learned about what?

21             MR. VILLASENOR:  How that goes.  He knew that

22   there was an individual who could not be the branch manager

23   because he was in trouble with the law, and he knew that

24   individuals in that office or in that firm had installed

25   someone else as the nominal manager.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 435

1          THE COURT:  Did you know that then?

2          THE WITNESS:  No.

3          MR. VILLASENOR:  He --

4    Q    (By Mr. Villasenor)  You testified to that, didn't you?

5    A    If you're asking, did I learn about the straw man

6    theory, I would never had identified it as such at that point

7    in time.  It was just what they did.

8    Q    But your testimony in page 80, that's what you -- that

9    is your testimony, correct?

10   A    The testimony on page 80 is exactly what it says.

11   Q    Thank you.

12         MR. BEDNARSKI:  Your Honor, so I would object as

13   to relevance.  It doesn't seem like there's any --

14         THE COURT:  Well --

15         MR. BEDNARSKI:  We're talking about a branch

16   manager as compared to an owner of a company.  It doesn't

17   really seem to --

18         THE COURT:  Well, I agree.

19         MR. BEDNARSKI:  -- be apples to apples.

20         THE COURT:  That's not going to make any

21   difference for me.

22   Q    (By Mr. Villasenor)  All right.  You -- go back to my

23   previous question.  You had testified that the -- yesterday,

24   that the idea of owning a company -- forming any company with

25   bad credit, no contacts, and a judgment hanging over your

United States of America vs.                           Evidentiary Hearing - Day III
Michael David Wilhite                                         September 17, 2015

Page 436

1   head would be ludicrous, right?

2   A    Yes.  I answered that previously.  Same answer.

3   Q    Yes.  But you signed a memorandum of understanding to

4   form a corporation in which you were going to have a 20

5   percent ownership interest, right?

6   A    Which memorandum of understanding was that?

7   Q    Exhibit 8.

8   A    I'm sorry.  Which exhibit number?

9   Q    8.

10  A    Thank you.  The answer is yes.

11  Q    And the purpose of the company outlined in this

12  memorandum of understanding was to manufacture and install

13  steel flooring systems, right?

14  A    That's correct.

15  Q    You were going to be responsible for manufacturing and

16  installing the materials, right?

17  A    Yes.

18  Q    And you signed that memorandum, correct?

19  A    Correct.

20  Q    And you had bad credit in 1996, right?

21  A    Correct.

22  Q    And you had no contacts in the industry in 1996, right?

23  A    Correct.

24  Q    And you had a judgment hanging over your head too in

25  1996, right?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 437

1    A    Yes.

2    Q    **Mr. Wilhite, what medications are you presently taking?**

3    A    You talking about -- well, I take no pharmaceutical

4    medications whatsoever.

5    Q    **Between 2008 and the present have you taken any**

6    **medications?**

7    A    Blood pressure medication for a brief period of time.

8    Q    **When was that?**

9    A    Around 2008 to 2009.  I found out the medications were

10   far too powerful and discontinued them.

11              MR. VILLASENOR:  No further questions.

12              THE COURT:  Okay.  Redirect?

13              MR. BEDNARSKI:  Yes, Your Honor.  Thank you.  Your

14   Honor, if I may approach.

15              THE COURT:  Sure.

16                          REDIRECT EXAMINATION

17   BY MR. BEDNARSKI:

18   Q    **Mr. Wilhite, Mr. Villasenor asked you a question**

19   **regarding your deposition from 2014.  If you would go to**

20   **page 21 of that deposition.**

21              MR. BEDNARSKI:  I can get the Court a copy of it.

22              THE COURT:  Sure.

23              MR. BEDNARSKI:  I don't think the Court has one.

24              THE COURT:  Yep.  I'll need one.

25              MR. BEDNARSKI:  I have one right here, Your Honor.

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                   September 17, 2015

Page 438

1    May I approach.

2                 THE COURT:  Thank you.  Saving the planet.

3                 MR. BEDNARSKI:  Yep.

4    Q    (By Mr. Bednarski)  So, Mr. Wilhite, do you recall

5    those questions that Mr. Villasenor asked you regarding what

6    you testified to in 2014, regarding why you left the company

7    in 2008?

8    A    Yes, I do.

9    Q    And on that deposition, I just want to go through it

10   very quickly.  It just talks about why you left, and you said

11   that your job was eliminated.  And he asked you what job was

12   that, and you said general manager.  And the next question

13   was, So your wife laid you off?  And you said yes.  Was there

14   any additional questions as to why that job was eliminated?

15   In the deposition was there any questions related to why?

16   A    No.

17   Q    So why was your job eliminated?

18   A    Torin Jackson had matured to the point where he was

19   capable of running the company.  And so -- he had engineering

20   experience as well, so Torin took over running the company.

21   So, the job of general manager was taken over by Torin

22   Jackson.

23   Q    Were your health reasons one of the bases for why your

24   general manager position was eliminated?

25   A    Yes.  As previously stated, I had issues with a handful

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 439

1   of strokes, and sleep apnea.

2            THE COURT:  Mr. Bednarski, is there a document

3   that we have that's been admitted that identifies Mr. Jackson

4   as the general manager?

5            MR. BEDNARSKI:  Your Honor, the only one that has

6   been admitted is if the Court looks at exhibit -- I don't

7   think they have any internal memorandums related to that,

8   Your Honor.  Mr. Jackson will be testifying next, but if you

9   go to Exhibit Q, Your Honor.  And if you go to page 8 of

10  Exhibit Q, it's a contract signed by Torin Jackson -- Torin

11  Jackson, and it indicates manager estimating, slash,

12  engineering.

13           THE COURT:  (Unintelligible).

14           MR. BEDNARSKI:  Under his title, Your Honor.

15           THE COURT:  All right.  Manager

16  estimating/engineering?

17           MR. BEDNARSKI:  Correct, Your Honor.

18           THE COURT:  Okay.  Of course it's always dangerous

19  to raw in titles in these documents, isn't it?

20           MR. BEDNARSKI:  It is, Your Honor.  That's why we

21  have Mr. Jackson here to testify, Your Honor.  Sorry.  I keep

22  taking Mr. Mikulecky's book.  It's in better condition.

23  Q    (By Mr. Bednarski)  Mr. Wilhite, Mr. Villasenor asked

24  you some questions regarding some memorandum that you had

25  with Mr. Ivey and that you requested Mr. Ivey to send money

United States of America vs.                              Evidentiary Hearing - Day III
Michael David Wilhite                                              September 17, 2015

Page 440

1   to either Dee Wilhite's or Dee Medlicott's bank account.  Do

2   you recall that questioning?

3   A    Yes, I do.

4   Q    Did any money ever get sent from Brian Ivey to you

5   through your wife's bank account?

6   A    No.

7   Q    Did you ever receive any money from this

8   interaction/transactions with the Australians that

9   Mr. Clement and you were working on?

10   A    Not a single red cent.

11   Q    If you would go to Exhibit 21, please.

12        MR. BEDNARSKI:  Oh, it was mine.  Mr. Mikulecky

13   took mine.

14   Q    (By Mr. Bednarski)  If you would go to Exhibit 21.

15   That's the presentence investigation report, correct?

16   A    Yes.

17   Q    And you were asked some questions regarding whether or

18   not in paragraph 64 it said that you quit your position to

19   start your own business.  Do you remember that?

20   A    Let me get to it, please.

21   Q    It's on page 12 of 18.

22   A    I'm there now.

23   Q    Okay.  And you said, yes, you did tell Ms. Ricca that.

24   Why did you tell Ms. Ricca that?

25   A    I misspoke when I said start my own business.  I left

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                    September 17, 2015

Page 441

1    to work for Advanced Floor Concepts.  I was trying to convey

2    to her where I was going.

3    Q    And if you would refer back to page 10 of 18, and if

4    you would look at paragraph 48.  Would you -- could you

5    please describe for the Court what you told Ms. Ricca

6    regarding the ownership of Advanced Floor Concepts?

7              THE COURT:  What page?  What?

8              MR. BEDNARSKI:  Page 10 of 18, Your Honor.

9              THE COURT:  Thank you.

10             MR. BEDNARSKI:  Paragraph 48.

11   Q    (By Mr. Bednarski)  What did you relay to Ms. Ricca

12   regarding the ownership of Advanced Floor Concepts?

13   A    I told her that the Advanced Floor Concepts was owned

14   exclusively by Darla Dee Wilhite.

15             THE COURT:  Let's go back to that just for a

16   second.

17             MR. BEDNARSKI:  Yes, Your Honor.

18             THE COURT:  When was this interview?

19             MR. BEDNARSKI:  Are you asking me or Mr. Wilhite,

20   Your Honor?

21             THE COURT:  Do you have the knowledge?  I'll ask

22   you.

23             MR. BEDNARSKI:  Your Honor, it was sometime

24   between November, 2000, and his sentencing date.  I don't

25   know the exact date there was an interview with Ms. Ricca.

Page 442

```
 1              THE COURT:  Okay.  But, Mr. Wilhite, you were
 2     taking a salary up until you retired, weren't you?
 3              THE WITNESS:  Initially I did not take a salary.
 4     I don't know if this report was done during that initial
 5     time.
 6              THE COURT:  Well, it says you received no salary.
 7     That's page 48.
 8              THE WITNESS:  Right.  And that would be accurate
 9     at that time.
10              THE COURT:  Okay.  Go ahead.
11     Q   (By Mr. Bednarski)  Now, if you would go to Exhibit 22,
12     please.  So, it's the exhibit that Mr. Villasenor asked you
13     about regarding an application for a joint bank account
14     with -- with your wife Dee, correct?
15     A   Correct.
16     Q   Now, based off of that, did you fill out that
17     application?
18     A   No, sir, I did not.
19     Q   Did you fill out that you were owner of Advanced Floor
20     Concepts?
21     A   No, sir, I did not.
22     Q   Now, you signed the contract; is that right?  Or signed
23     the application, correct?
24     A   Yes.
25     Q   Before you had signed it, had you reviewed it in order
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 443

1   to make the changes necessary that you believed were

2   necessary?

3   A    No.  Dee handed the application to me and I simply

4   signed it.

5   Q    Now, if you would go to Exhibit 9.  Are you there?

6   A    Yes.

7   Q    Those are the contracts, I think, with Toll Brothers

8   that you signed?

9   A    Correct.

10  Q    What was the years of those contracts that you signed?

11  A    It's dated 2006.

12  Q    And if you look through, is it fair to say that they're

13  between '05 and '06?

14  A    That would be correct.

15  Q    At that time what was your role with Advanced Floor

16  Concepts?

17  A    I was the general manager of Advanced Floor Concepts.

18  Q    One of them -- I think one of them you say that you're

19  a CEO.  Were you ever -- were you ever given that title?

20  A    No.  I use that title, manager, interchangeably.  We

21  weren't real big on titles.

22  Q    Now, regarding the -- the employee handbook.  Do you

23  recall that discussion about the employee handbook?

24  A    Yes, I do.

25  Q    And I think in there it listed you as CEO?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 444

```
 1   A     I believe so.
 2   Q     And anywhere in that document did it say you were
 3   owner?
 4   A     No, nowhere in the document.
 5   Q     Does it say anywhere in there who the owner is?
 6   A     No, I don't believe so.
 7   Q     Did you have a part in creating that employee handbook?
 8   A     I don't recall creating that at all.
 9   Q     Do you know when that was drafted?
10   A     No.  I don't know the specific date.
11   Q     There was some questions regarding the purchase of a
12   Hummer H2.  Do you remember that?
13   A     I remember that.
14   Q     And you were listed as the buyer.  You were listed as
15   the signature.  Like, your signature was as the buyer, right?
16   A     That is correct.
17   Q     And do you recall when that Hummer was purchased?
18   A     It was 2008.
19   Q     And at that time frame that it was bought, were you
20   still working for Advanced Floor Concepts?
21   A     Could I look at the exhibit again?
22   Q     Absolutely.  If we go to Exhibit 31.  I was just going
23   to ask you to go to that.  If you look at the bottom right.
24   Are you there?
25   A     Not yet.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 445

1   Q     Okay.

2   A     I see the date now.

3   Q     And when -- when was that purchase executed?

4   A     12/14 of 2007.

5   Q     Were you still working for Advanced Floor Concepts?

6   A     Yes, I was.

7   Q     Now, Mr. Villasenor asked whether that was the address

8   of Advanced Floor Concepts at the top.  Do you remember that

9   line of questioning?

10  A     I do recall it, yes.

11  Q     Did you fill out that information?

12  A     No, I did not.

13  Q     Now, when you signed it, and you bought it on behalf of

14  Advanced Floor Concepts, is it a car that you drove?

15  A     No.

16  Q     Who drove it?

17  A     Dee Wilhite.

18  Q     Did you ever drive it?  Maybe once or twice?

19  A     I've only driven that a half a dozen times since it was

20  purchased.

21  Q     And I think you indicated that this shows that there's

22  33 miles on it when you bought it, and it has approximately

23  130,000 miles on it now?

24  A     Approximately.

25  Q     Who put on those miles?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 446

 1   A    Dee Wilhite.

 2   Q    And did she have a role in the company of Advanced

 3   Floor Concepts in 2007?

 4   A    I'm sorry, say again.

 5   Q    Did she have a role in the company, Advanced Floor

 6   Concepts, at the time?

 7   A    Yes.  She had a major role in the company.

 8   Q    What was that role?

 9   A    She was the owner of the company and continues to be.

10   Q    Now, when you went and purchased this, did you go

11   purchase it on your own or was it at the discretion of

12   someone else?

13   A    Under the authorization of Dee Wilhite for Advanced

14   Floor Concepts.

15   Q    Now, you -- there were a few questions regarding -- you

16   left the company in August 11, 2008.  And I think the last

17   paycheck shows that it was shortly after that, August 15th,

18   2008.  At the time that you left the company on August 11th,

19   2008, had you received any communication from the government

20   regarding your employment at Advanced Floor Concepts?

21   A    No.

22   Q    Had you received any communication from them requesting

23   a payment towards the restitution that you owed?

24   A    No.

25   Q    Did you know you were going to get a letter two weeks

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 447

1    later from the government as it related to your role or your

2    employment at Advanced Floor Concepts?

3    A    No, not at all.

4         THE COURT:  Mr. Wilhite, did you evidence your

5    resignation in any way?

6         THE WITNESS:  You mean a formal resignation,

7    written?

8         THE COURT:  Yeah.

9         THE WITNESS:  No.

10        THE COURT:  Okay.

11   Q   (By Mr. Bednarski)  Why not?

12   A    We're not that kind of company.

13        THE COURT:  Do you have an employee file, by any

14   chance?

15        THE WITNESS:  Yes, we do.

16        THE COURT:  Do you have an employee file with the

17   company?

18        THE WITNESS:  Do I personally have files?  No, the

19   company keeps those files.

20        MR. BEDNARSKI:  I think he's asking, does the

21   company have an employee file on you.

22        THE COURT:  What we would call a personnel file.

23        THE WITNESS:  Yes, absolutely.

24        THE COURT:  Has benefits and start, stop dates.

25   Things like that.

United States of America vs.                                Evidentiary Hearing - Day III
Michael David Wilhite                                       September 17, 2015

Page 448

```
 1              THE WITNESS:  All those things.
 2              THE COURT:  Okay.  Did you happen to ask for
 3    discovery of that kind of thing?
 4              MR. VILLASENOR:  I think we did.  We never
 5    received any such thing.
 6              MR. BEDNARSKI:  It was provided.
 7              THE COURT:  Okay.
 8              MR. VILLASENOR:  We don't have any such thing.
 9              THE COURT:  Well, I'm not going to leave it at
10    that.  He said he provided it.  You say you don't have it.
11              MR. VILLASENOR:  I've never seen anything labeled,
12    you know, Michael Wilhite's employee file.
13              THE COURT:  If you have people, and we all have
14    people, could you have them identify some time in the next
15    day or so the Bates numbers of the personnel files?  Thank
16    you.
17              MR. BEDNARSKI:  Thank you, Your Honor.
18    Q   (By Mr. Bednarski)  Mr. Wilhite, there were some
19    questions about an e-mail account, and that you used
20    Mike@steelfloors.com.  Do you recall that line of
21    questioning?
22    A   Yes, I do.
23    Q   Do you still use the Mike@steelfloors.com as your
24    primary e-mail?
25    A   Yes.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 449

1    Q     Why?

2    A     I have had that e-mail for 10, 12 years.  I saw no

3    reason to change it.

4    Q     Do you have any personal e-mail address?

5    A     I have a Gmail account that I use infrequently.

6    Q     Do you have any other e-mail addresses?

7    A     There may be an e-mail address that still exists, but

8    is inactive.

9    Q     Which one was that?

10   A     It would be Mike@steeldecksupply.com.

11   Q     One of the questions that the Court asked was the

12   signature line that -- at the bottom of every e-mail it kind

13   of looks somewhat similar.  Was that -- is that a signature

14   line that appears on every e-mail you send?

15   A     I believe so.

16   Q     Do you know when that was put into your e-mail address?

17   A     10, 12 years ago.

18   Q     Did you do that?

19   A     Yes.

20   Q     Have you ever changed it?

21   A     Not that I can recall.

22   Q     Why not?

23   A     There would be no purpose in changing it.

24   Q     The -- Mr. Villasenor also asked you some questions

25   regarding Exhibit 15, which was the Colorado Precious Metals

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                      September 17, 2015

Page 450

1    and Coins.  Do you recall those questions?

2    A    Yes, I do.

3    Q    Were you involved in the purchase of those -- of some

4    of those precious coins?

5    A    Yes, I was.

6    Q    In what regard?  In what role?

7    A    If Dee decided to purchase precious metals she would

8    tell me the amount she wanted to purchase.  I would place the

9    order with Dave Byatt of Colorado Precious Metals.  When the

10   package was available, given that I travel back and forth

11   between Castle Rock and the Springs occasionally, I would

12   arrange to pick those -- that package up and deliver it to

13   Dee.

14   Q    Now, if you would go to Exhibit 15 for me, please.

15   A    I'm there now.

16   Q    Okay.  If you would -- I think it starts on page 2.  Do

17   you see those checks?

18   A    Yes, I do.

19   Q    Which account are those drawn from?

20   A    They appear to be drawn from an account at ANB Bank.

21   Q    Who's the owner of that account?

22   A    Dee Wilhite.

23   Q    Is it an Advanced Floor Concepts' account?

24   A    No.

25   Q    The -- Mr. Villasenor also asked you -- if you would go

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 451

 1   to Exhibit 37, please.

 2   A    I'm there now.

 3   Q    And that's an e-mail from Mr. Corne to you regarding

 4   the value of your coins.  Do you see that?

 5   A    Yes, I do.

 6   Q    Did -- did you ever advise Mr. Corne that these

 7   precious coins, the gold and silver coins, were your coins?

 8   A    Absolutely not.

 9   Q    Are they your gold and silver coins?

10   A    No.

11   Q    There's been a lot of talk about that letter of intent,

12   and that you signed it as CEO.  Do you recall that?

13   A    Yes, I do.

14   Q    Did you ever sign any document in regard to the

15   potential sale of Advanced Floor Concepts to Kodiak Building

16   Partners as the owner?

17   A    No, I never did.

18   Q    Did you ever portray yourself as the owner of Advanced

19   Floor Concepts to Kodiak Building Partners?

20   A    No, sir.

21   Q    Did you ever tell them that they were going to pay you

22   that three-point-whatever-million dollars it was?

23   A    Absolutely not.

24   Q    Now, in one of the e-mails there's a discussion

25   regarding fifty-fifty profit sharing.  Do you remember some

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 452

1    discussion about that?

2    A    Yes, I do.

3    Q    When you sent an e-mail regarding fifty-fifty profit

4    sharing, were you talking about you would get 50 percent of

5    the profits of Advanced Floor Concepts?

6    A    No.

7    Q    What was your -- what was your intent as it related to

8    fifty-fifty profit sharing?

9    A    That during a specific period of time, profits -- as

10   they existed -- would be shared 50 percent with Kodiak

11   Building Partners, and 50 percent with Advanced Floor

12   Concepts.

13   Q    Now, I want to talk to you about Exhibit 47.  So, if

14   you'd go there, please.  That memorandum to -- that was

15   potentially to go to Advanced Floor Concepts' employees.  If

16   you would look -- we'll just start with page 6.  If you'd

17   look through page 6 through 11 and just look at the red.

18   Does it state when you made those changes?

19   A    The date here says September 5th of 2013.

20   Q    And when was that -- when was that in relation to how

21   these negotiations were ongoing?

22   A    Perhaps in the middle part of the negotiations, as I

23   recall.

24   Q    What was the purpose of this memorandum?

25   A    The memorandum was to be developed and distributed to

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 453

1    employees of Advanced Floor Concepts in the event a

2    transaction was completed to introduce Kodiak Building

3    Partners; to delineate what the transition would look like;

4    to make them comfortable knowing that their jobs would be

5    secured.  It was a transitional memorandum that was never

6    issued.

7    Q    Was it ever finalized?

8    A    No, it never was.

9    Q    After September 5th, 2013, were there any additional

10   changes made to it?

11   A    No.  I don't think so at all.

12   Q    Did you -- and this is -- we're going to try to create

13   this question.  So, is this a document that you created from

14   the very beginning, or is it a document that you used to cut

15   and paste or cut -- cut things out and add things?

16   A    My understanding, it's a document that Kodiak Building

17   Partners used in a separate transaction for a company called

18   New England Building Supply.  And they sent it to me and said

19   could you revise this to fit this circumstance here.  And I

20   spent five or ten minutes making some revisions.  It was by

21   no means a final document.  It would have taken more

22   revisions to make it accurate and complete.

23   Q    Were those revisions ever done?

24   A    No.

25   Q    And if you look at the very top it shows a date of

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                      September 17, 2015

Page 454

1    September 00, 2013.  Do you see that?

2    A    Yes.

3    Q    Why -- why does it have no date on it?

4    A    That was kind of a key indicator that it was not a

5    completed document.

6    Q    Now, after you made these initial changes, all the

7    changes were made on September 5th, 2013, did you ever go

8    back and make any additional changes to it?

9    A    No.

10   Q    Why not?

11   A    The transaction was canceled.

12   Q    We heard that the transaction wasn't canceled until

13   about December of the same year, 2013.  This was initially

14   created in September of 2013.  In those three months were

15   there any changes to that document?

16   A    Not changes made by me, no.

17   Q    Why not?

18   A    It was never resubmitted from Kodiak Building Partners

19   for finalization.

20   Q    Was it ever approved by Dee in a final form?

21   A    No.

22   Q    Is that something that you would have requested before

23   sending it to AFC employees?

24   A    Absolutely.  Dee would insist on a final review.  Any

25   document like that.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 455

1   Q     Is it a memorandum that would have been signed by both

2   Kodiak Building Partners as well as AFC?

3   A     It could have been.  It just never got that far.

4   Q     Now, Mr. Villasenor pointed out two parts where you

5   say, Mike and Dee will continue to own a majority interest

6   ownership in Advanced Floor Concepts.  And I think you

7   indicated yesterday that that was a mistake.  How could you

8   make that big of a mistake?

9   A     I spent about 10 minutes doing it, following the format

10  that was provided to me, and just kind of knocked it out as a

11  preliminary draft.  As I said before, it was subject to

12  correction, modification, and revision.

13  Q     Now, Mr. Villasenor asked regarding medications.  Do

14  you recall that question?

15  A     Yes.

16  Q     And we talked a little bit about the strokes you were

17  having in 2008.  Was there any determination as to why those

18  strokes were happening?

19  A     The best determination we ever got is that they were

20  blood-pressure related.  So, that seems to be the root cause

21  of those strokes.

22  Q     And, obviously, you had indicated that you were on

23  blood pressure medication in 2008 and 2009, but you found

24  them to be far too powerful.  Did that help you with the

25  strokes?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 456

1   A     That medication did not.

2   Q     Okay.  Are you on -- I think you said you're not on any

3   pharmaceutical medications.  Are you on any other type of

4   medications as it relates to blood pressure?

5   A     Yes, I am.

6   Q     What are those?

7   A     I take two capsules daily of a medication called Heart

8   Tension.  It's an all natural blood pressure medication, and

9   it works extremely well.

10  Q     And how long have you been on that?

11  A     Four or five years.

12  Q     Has that helped control your strokes?

13  A     I have not had a stroke since.

14  Q     And when was the last time -- year -- when was the last

15  year you had a stroke?

16  A     In 2008.

17        MR. BEDNARSKI:  May I have one moment.

18  Q     (By Mr. Bednarski)  Mr. Wilhite, if you would go to

19  Exhibit 8, please.  Mr. Villasenor asked you a few questions

20  regarding, you know, the fact that you had no contacts, the

21  fact that you had no -- no assets, no money, and no -- and

22  this judgment hanging over your head.  But you still entered

23  into this memorandum of understanding where you would

24  potentially own 20 percent of a company that ultimately

25  didn't get created.  Do you recall that?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 457

1    A    Yes, I do.

2    Q    Why were you willing to go in and be an owner, or a

3    part owner, of this company if you didn't -- if you had all

4    of those things still in your life?  No cash, no assets, no

5    contacts?

6    A    I think you have to make a distinction between forming

7    a company on your own, relying on your own credit, your own

8    contacts, your own assets, versus forming a partnership with

9    two other entities that possessed those assets, those

10   contacts, that credit.  I was a -- would have been a minority

11   partner, and what I lacked, the other two parties would have

12   supplied.

13   Q    Well, you could have co-owned Advanced Floor Concepts

14   with your wife, correct?

15   A    No, I don't believe so.

16   Q    Because she would have been -- similar to these guys

17   when she provided the assets, the contacts, all of that type

18   of thing, why didn't you co-own the company with her rather

19   than she own the company outright?

20   A    It was my opinion and belief at the time that my credit

21   history was so bad, and -- and I had no money at that point

22   in time and no assets to contribute, so I really would bring

23   nothing to the formation of the company that would engender

24   the right to an ownership interest.

25   Q    Would it have also jeopardized your family's assets?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 458

```
 1   Meaning, Dee's assets as your wife?

 2   A    It could have.

 3   Q    Thank you.

 4            MR. BEDNARSKI:  I have no further questions, Your

 5   Honor.

 6            THE COURT:  Okay.  You can step down.  Do we have

 7   another witness who's ready?

 8            MR. BEDNARSKI:  Yes, Your Honor.

 9            THE COURT:  Go ahead.

10            MR. BEDNARSKI:  Your Honor, defendant Michael

11   Wilhite, and the interested party Darla Dee Wilhite and

12   Advanced Floor Concepts will call Torin Jackson.

13            THE COURT:  Okay.  And before we do that -- so, my

14   current pro bono law clerk is sitting back there, Daniel

15   Reiner, has, as he described to me, a friendship, maybe even

16   arising to a mentor relationship, with Mr. Villasenor having

17   arisen from his interning with the US Attorney's Office.

18   We're not going to allow him to discuss the case with us, so

19   we're going to wall him off from any discussions of the case.

20   I kind of just -- I think he might have told me before, but

21   yesterday he told me, and so we're not going to -- he's going

22   to watch, but he's working full-time and not getting paid by

23   us, which -- so it's only fair we let him do whatever he

24   wants to do and have some fun.

25            MR. BEDNARSKI:  Well, and it's experience.
```

United States of America vs.                          Evidentiary Hearing - Day III
Michael David Wilhite                                              September 17, 2015

Page 459

```
 1              THE COURT:  And experience.  But we're not going

 2     to allow him to participate in discussions as we deliberate

 3     about the case.  Okay?

 4              MR. BEDNARSKI:  And we have -- we have no

 5     objection to that, Your Honor.

 6              THE COURT:  Okay.  Thank you.

 7              THE COURTROOM DEPUTY:  If you'd raise your right

 8     hand.

 9              (The witness, Torin Jackson, was sworn to tell the

10     truth by the Courtroom Deputy.)

11              THE WITNESS:  Yes.

12                       DIRECT EXAMINATION

13     BY MR. BEDNARSKI:

14     Q    Good morning, Mr. Jackson.

15     A    Good morning.

16     Q    How are you doing today?

17     A    Good.  How are you?

18     Q    Good.  Would you please introduce yourself to

19     Magistrate Hegarty, and spell your last name for the record,

20     please.

21     A    Hi.  I'm Torin Jackson, J-a-c-k-s-o-n.

22     Q    And just for the record, if you could spell Torin since

23     it's being --

24     A    Oh --

25     Q    -- recorded.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 460

```
 1   A    T-o-r-i-n.

 2            THE COURT:  Thank you.

 3   Q    (By Mr. Bednarski)  Mr. Jackson, how old are you?

 4   A    44.

 5   Q    Where do you work?

 6   A    Advanced Floor Concepts.

 7   Q    What do you do for Advanced Floor Concepts?

 8   A    General manager.

 9   Q    Do you -- do you have that title in the sense that

10   that's what you do, or is it people call you general manager?

11   A    We don't have a lot of titles, so it's in the sense of

12   what I do.

13   Q    Okay.  Is there a piece of paper anywhere that says

14   you're general manager?

15   A    I think -- what is -- I think my business card says

16   manager of estimating and engineering.

17   Q    Okay.

18   A    I believe.

19   Q    And so what I mean by that is there isn't like a formal

20   memorandum saying:  Torin Jackson is now our general manager?

21   A    No.

22   Q    Okay.

23   A    No.

24   Q    Do the other employees know that you're general

25   manager?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 461

1   A    Yes.

2   Q    **As general manager what are your duties?  What do you**

3   **do for the company?**

4   A    I just -- I make sure everything is going smoothly.

5   I'm the primary contact for the clients that call, if they

6   want an estimate, to ask about our product.  I distribute the

7   bids that come in to be done.  And then I review them, I

8   release them.  I review contracts, and sign contracts when

9   we're awarded work.  I do most of the scheduling for the jobs

10  to be done in the field.  If there's a problem in the field

11  our lead superintendent calls me.  I'm the main contact for

12  all of our suppliers.  I set all the pricing, all the

13  estimating.  You know, it's not a real big company, so I --

14  I'm kind of the catchall.

15  Q    **So, do you run the day-to-day operations --**

16  A    Yeah.

17  Q    **-- of Advanced Floor Concepts?**

18  A    Yes.  Yes.

19  Q    **How long have you been with Advanced Floor Concepts?**

20  A    Twelve years last June.  Late June.

21  Q    **Congratulations.**

22  A    Thanks.

23  Q    **What did you start as?  Did you start at general**

24  **manager?**

25  A    I started as -- I was the head of estimating and

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 462

 1   engineering.

 2   Q    At that time did you do all the same things you're

 3   doing now, which is set pricing, and contact -- being the

 4   primary contact for contractors?  Things like that?

 5   A    Not quite to the scale now.  But I did, yes, quite the

 6   large bulk of it.

 7   Q    Now, so, 12 years.  That would have been about 2003?

 8   A    Correct.

 9   Q    Does that sound about right?

10   A    Uh-huh.  Right.

11   Q    Do you know Mr. Wilhite?

12   A    Yes.

13   Q    Do you know his wife Dee Wilhite?

14   A    Yes.

15   Q    How do you know Mike?

16   A    Well, him and Dee called me, and then hired me.

17   Q    Okay.  When you say that they called you, who called

18   you?

19   A    Mike called me.

20   Q    Did you have an interview or how did that process work?

21   A    I did have an interview.

22   Q    Who was the interview with?

23   A    Mike and Dee.

24   Q    And where was it?

25   A    At their office.

Page 463

```
 1    Q    At Advanced Floor Concepts?

 2    A    Yeah.

 3    Q    Do you recall, was that on the Birch Avenue at the

 4    time?

 5    A    No.

 6    Q    No.  Okay.  Was it the one that they're at now?

 7    A    No.

 8    Q    Okay.  So there's been a couple places it's been?

 9    A    One in between, yes.

10    Q    Okay.  So, when you came in in 2003, was Mike working

11    at the company?

12    A    Yes.

13    Q    What was his role at that point?

14    A    I don't know if he ever told me an official role, but

15    he was -- he was hiring me, I believe, because he needed

16    someone to be the catchall.  He had people that were doing

17    the engineering and estimating, but I -- I would be guessing,

18    but I -- I think he wanted someone with more experience and

19    some management experience to run that.

20    Q    Would it be fair to say that he was running the

21    business at that point?

22              MS. FROEHLKE:  Objection.  Leading.

23              MR. BEDNARSKI:  I think it's trying to clarify,

24    Your Honor.

25              THE COURT:  Well, he wouldn't have any knowledge
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 464

1   of what was going on before he came on.

2          MR. BEDNARSKI:  No, I was talking about after he

3   started working, Your Honor.

4          THE COURT:  After he started working.

5          MR. BEDNARSKI:  Yeah, what Mr. -- it was just a

6   clarification question as to whether or not Mr. Wilhite was

7   running the company.

8          THE COURT:  What's your objection?

9          MS. FROEHLKE:  Mr. Bednarski was asking the

10  witness, Would it be fair to say -- and he was characterizing

11  the answer he was hoping the witness would agree with.  So,

12  my objection was leading, Your Honor.

13         THE COURT:  Okay.  Overruled.  Go ahead,

14  Mr. Bednarski.

15  Q    (By Mr. Bednarski)  Was Mike running the company when

16  you came on in 2000 -- when you came on in 2003, when you

17  first started, was Mike running the company?  The day-to-day

18  business?

19  A    Not solely.  But, yes, he was.

20  Q    Who else was running the day-to-day?

21  A    Dee.

22  Q    Dee.  Now, do you know whose company it is?

23  A    I've always been told Dee.

24  Q    Have you ever seen the articles of incorporation?

25  A    No.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 465

 1    Q    Have you ever asked for them?

 2    A    No.

 3    Q    Why not?

 4    A    I -- no reason to.

 5    Q    Okay.  So, at any time in the 12 years, have you ever

 6    believed it was Mike's company?

 7    A    No.

 8    Q    Why not?

 9    A    Because I was told from everyone that Dee owned the

10    company.

11    Q    When -- when you first started at the company, was --

12    was -- Dee, I think you said, was involved in the day-to-day

13    operations?

14    A    Oh, yes.  Yeah.

15    Q    What was she doing at that time?

16    A    Paid -- she helped with payroll.  I mean, there was an

17    accountant, but I know that if they had questions and paying

18    bills, I think she helped coordinate all that side of the

19    business.

20    Q    At any time did her role start to decrease?

21    A    She -- she has another company, and so I can't remember

22    exactly if hers started to decrease before Mike's when they

23    moved out of town.  The other -- the employees were -- were

24    taking more of the responsibility and doing all of that.

25    Q    Did Mike's role with the company ever decrease?

Page 466

1   A    Yes.

2   Q    Do you know approximately when?

3   A    I don't remember exactly when Roger Otterstein was

4   hired, but sometime after he was hired, him and Brendan were

5   basically running the company, and Mike and Dee were, for the

6   most, part retired.

7   Q    Do you recall if Mike ever stopped working for the

8   company?

9   A    When Roger and Brendan were running it he would come in

10  sometimes once a week or every other week, but I don't

11  know -- I think he was just checking in.

12  Q    Was he doing any work that he was doing before?  Was he

13  doing -- you know, like, was he the catchall at that point?

14  A    No.  Huh-uh.  No.

15  Q    And if you would turn to Exhibit -- if you would turn

16  to Exhibit 19, please.

17  A    In which book?

18  Q    Sorry.

19        MR. BEDNARSKI:  Your Honor, if I may approach and

20  show him which one since there are two books up here.

21  Q    (By Mr. Bednarski)  So, I'm just referring you to

22  page 2 of Exhibit 19.  This document says that Mr. Wilhite

23  retired on August 11th of 2008.  Do you know if he -- if he

24  retired then or stopped working then?

25  A    We always called it just partial retirement.  There was

United States of America vs.                        Evidentiary Hearing - Day III
Michael David Wilhite                                         September 17, 2015

Page 467

1    other people in charge of running the day-to-day business.

2    Q    At that time, partial retirement, did he continue to

3    get a paycheck?  And if you don't know, that's okay.  Do you

4    know if he continued to get a paycheck after August 11th of

5    2008?

6    A    I can't remember when I started signing checks, so I --

7    I don't believe he's ever gotten a paycheck, but I can't say

8    for sure.

9    Q    Okay.  When -- when he went into this partial

10   retirement, would he still come by the office?

11   A    Yeah.  It's my -- as I was saying earlier, to my

12   recollection I think once a week or sometimes once every

13   other week for just a few hours.

14   Q    And what would he be doing when he came to the office?

15   A    He was usually just touching base with Roger and

16   Brendan.

17   Q    And then we've heard, you know, that unfortunately

18   Roger had passed away.

19   A    Right.

20   Q    And that Brendan was let go.

21   A    Correct.

22   Q    When that happened, did Mike's appearance at Advanced

23   Floor Concept increase?

24   A    Yes.

25   Q    How often was he coming at that point?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 468

1  A    I believe at -- for a little while it was four days a

2  week.  It might have been three.  I don't remember for

3  certain.

4  Q    What was he doing when he was coming to the office?

5  A    We don't share the same office space, so I was doing

6  the day-to-day stuff, and -- I mean, if someone didn't pick

7  up the phone, he'd pick up the phone if it was ringing.  That

8  kind of thing.  If -- if we had a question about something

9  important I could approach him, but I was the catchall at

10  that point.

11  Q    And that was going to be my next question.  Was he

12  running the company at that point?

13  A    No.

14  Q    Does he still come into the office today?

15  A    Yes.

16  Q    So, has he been doing that for the last four, five, six

17  years, somewhere in that range?

18  A    Yes, the amount of time has shrunk.

19  Q    How often is he coming in now?

20  A    Right now it's usually two days a week, roughly.

21  Q    What does he do when he comes into the office?  It's

22  okay -- it's okay to say nothing even though he's sitting

23  here.

24  A    Yeah.  Just not working on the day-to-day business.

25  Q    Is he working on signing contracts?

United States of America vs.                    Evidentiary Hearing - Day III
Michael David Wilhite                                  September 17, 2015

Page 469

```
 1   A     No.

 2   Q     Is he signing checks?

 3   A     No.

 4   Q     Is he bidding on projects?

 5   A     No.

 6   Q     Is he having interactions and negotiations with

 7   contractors?

 8   A     No.  Unless I ask him to.

 9   Q     Suppliers?

10   A     Right.  And just only if I ask him to.

11   Q     Do you ask him to at times?

12   A     Occasionally.

13   Q     Why?

14   A     Just to get his input.  He's got a lot of experience.

15   And if we're trying to make a change, thinking about

16   switching different subcontractors, that's, you know, kind of

17   a big deal for certain things that we do, so I want input.

18   Q     When you sign a contract, are you binding the company

19   to that contract?

20   A     I believe so, yes.

21   Q     When you sign a supply order, are you binding the

22   company to pay that?

23   A     Yes.  Yes.

24   Q     When you sign checks, are you binding the company to

25   pay that?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 470

 1  A    Yes.

 2  Q    When -- and you talked initially about when you first

 3  started, Dee was involved in the company.  She was involved

 4  in the day-to-day operations.

 5  A    Uh-huh.

 6  Q    Has her involvement decreased over the years?

 7  A    Yes.

 8  Q    Do you still have contact with her?

 9  A    Not a lot, but occasionally.

10  Q    Why don't you have contact with her on a more regular

11  basis?

12  A    There's not really a need.  You know, all of us that

13  are running the day-to-day operations have been there a long

14  time, and we kind of do the same type of business that we've

15  always done.  So, it runs pretty smoothly.

16  Q    If there are any issues, if it's not running smoothly,

17  who do you call?

18  A    If -- if Mike's in the office, I go to Mike.

19  Q    And if Mike's not in the office?

20  A    I would call for Mike or Dee down at their house.

21  Q    If it's a financial issue, who would you call?

22  A    Financial issue I would usually talk to Cindy in

23  accounting, and then we would make a decision if we need it

24  call or --

25  Q    And if you had to call, who would you call?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 471

1   A    I would call the house and ask for Mike or Dee.  I

2   mean, I would talk to whoever picked up the phone.

3            MR. BEDNARSKI:  If I may have a moment, Your

4   Honor.

5            THE COURT:  Yep.

6   Q   (By Mr. Bednarski)  Mr. Jackson, is this a company

7   that's actually owned by Mike, but in Dee's name?

8   A    I don't believe so, but I've never seen any paperwork.

9            MR. BEDNARSKI:  Thank you.  I have no further

10  questions.

11            THE COURT:  Mr. Jackson, could you go through your

12  titles that you've held with this company, starting with when

13  you were first employed.

14            THE WITNESS:  I'm sorry.  Say -- I didn't hear

15  you.

16            THE COURT:  Your titles.

17            THE WITNESS:  My titles?  Like I said, we don't do

18  a lot of titles, but I -- I've pretty much been the manager

19  of engineering and estimating.

20            THE COURT:  That's all?

21            THE WITNESS:  Yes.

22            THE COURT:  Okay.  And do you have any follow-up?

23            MR. BEDNARSKI:  Just a quick follow-up.

24  Q   (By Mr. Bednarski)  As manager of estimating and

25  engineering, do you only oversee estimating and engineering?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 472

 1   A    No.

 2   **Q    Even though that's your title, do you have -- what**

 3   **other duties do you have besides manager of estimating and**

 4   **engineering?**

 5   A    If there's -- if there's any issues in the field, you

 6   know, ordering materials, I'm ultimately responsible

 7   basically for every -- all the day-to-day operations

 8   besides -- I sign the checks, but I don't -- you know, I

 9   don't do the accounting side of it.

10           MR. BEDNARSKI:  Thank you.  No further questions.

11           THE COURT:  And Mr. Jackson, have you hired

12   employees?

13           THE WITNESS:  Yes.

14           THE COURT:  Who have you hired?

15           THE WITNESS:  I hired Linda Gould.  She was -- she

16   was receptionist, slash -- she helps out (unintelligible).

17           THE COURT:  Okay.  And since you've been there

18   since 2003, is she the only person that the company has

19   hired?

20           THE WITNESS:  That the company has hired?

21           THE COURT:  Yes.

22           THE WITNESS:  No.

23           THE COURT:  Who hired everyone else?

24           THE WITNESS:  Our field manager hired a lot of the

25   field workers.  And internally, I believe -- I don't know who

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 473

 1   directly hired Cindy, our current accountant.  It was Mike

 2   and/or Dee.

 3            THE COURT:  Okay.  Have you ever fired anyone?

 4            THE WITNESS:  No.

 5            THE COURT:  The people in the field, are they day

 6   laborers?

 7            THE WITNESS:  No, they're employees of the

 8   company.

 9            THE COURT:  Okay.  How many?

10            THE WITNESS:  I would say it's approximately 25 to

11   30.

12            THE COURT:  Okay.  But that's not something you're

13   tasked with keeping track of?

14            THE WITNESS:  We've had some recent hires, so I

15   don't know the exact count right now.  But that's our field

16   superintendent.  We consult on that, and he ultimately

17   interviews them and hires them.

18            THE COURT:  Okay.  Any further questions?

19            MR. BEDNARSKI:  No, Your Honor.

20            THE COURT:  Go ahead.  Do you have any cross?

21            MS. FROEHLKE:  Yes, Your Honor.

22                      CROSS-EXAMINATION

23   BY MS. FROEHLKE:

24   Q    Mr. Jackson, would you say the Wilhites have been good

25   employers?

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                September 17, 2015

Page 474

```
 1    A     Yes.

 2    Q     And you've seen a lot of them over the years?

 3    A     Yes.

 4    Q     Mike a lot more than Dee, though, would you agree?

 5    A     Yes.

 6    Q     In fact, Dee testified earlier in this hearing that she

 7    talks to you once or twice a year.  Would you agree with

 8    that?

 9    A     That might be about right.  It wouldn't be much more

10    than that, if it is more than that.

11    Q     And you're aware of her business DW Support Services,

12    right?

13    A     Yes.

14    Q     Her business was, for a time, in the same office

15    building as Advanced Floor; is that correct?

16    A     That is correct.

17    Q     And Mr. Wilhite didn't spend time doing work for DW

18    Support at any point that you know of, right?

19    A     I don't know.

20    Q     To your knowledge --

21    A     I know he's done -- he's helped her with inspections.

22    Q     So, he has worked for DW Support?

23    A     To help her with inspections.

24    Q     Okay.  You're not aware of the respective salaries of

25    Mr. and Mrs. Wilhite, I assume?
```

Page 475

```
 1   A    I sign checks, but I haven't totaled anything up on an
 2   annual basis or anything like that.
 3   Q    And you testified you haven't seen the articles of
 4   incorporation, right?
 5   A    Correct.
 6   Q    Now, you testified a minute ago you were told from day
 7   one it was Dee's company.  Can you explain the context of
 8   that conversation on your first day of work?
 9   A    I don't remember it specifically, I just remember
10   always knowing -- I was always told it was Dee's company.
11   Q    Who told you that?
12   A    Probably Mike, but I don't remember specifically.
13   Q    You are aware that Mr. Wilhite has a criminal
14   conviction, right?
15   A    Yes.
16   Q    He spent time in prison.  You know that?
17   A    Yes.
18   Q    Do you know what the criminal conviction was for?
19   A    I don't know exactly.  Something to do with stocks.
20   Q    Something to do with stocks?  Is that what you said?
21   A    Yeah.
22   Q    And why do you think it was something to do with
23   stocks?
24   A    That's what I was told.
25   Q    By whom?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 476

```
 1   A    Mike.

 2   Q    And what was the context of that conversation?

 3   A    I don't even know when it came up.  It was close to 12

 4   years ago.  I think it was pretty early on when I was there.

 5   Q    He told you --

 6   A    I do remember he wanted me to know that if -- because

 7   other people in the construction industry I think knew about

 8   it, so he wanted me to know about it in case I ever heard

 9   anything.

10   Q    Did you ever hear anything?

11   A    No.

12   Q    When he told you he had a criminal conviction, did he

13   tell you he owed money because of it?

14   A    He didn't say he owed money.

15   Q    What did he say?

16   A    He said that there was people that might want money.

17   Q    Did he say what people?

18   A    Well, I think he just, in general, meant the

19   government.

20   Q    Why do you think that?

21   A    Because I think he went to jail -- I think the

22   government put him in jail.

23   Q    At what point did you start calling yourself general

24   manager?

25   A    Like I said, we don't really have titles.  There's only
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 477

1    four of us usually in the office.  But if someone was to ask

2    me what I do, I would say general manager because I'm the

3    catchall.

4    Q    If someone was to ask you that five years ago, would

5    you have said general manager?

6    A    Yes.  Well, if -- after Brendan was let go, yes.

7    Q    So, would you say that's about the time you started

8    calling yourself general manager was when Brendan was let go?

9    A    I never really called myself general manager until, I

10   think -- I don't know.

11   Q    Today?

12   A    Yeah.  Or -- no one's really ever asked me that.  But

13   if someone had asked me that I would say I'm the manager.

14   I've said I'm the manager.  I haven't said I'm the general

15   manager.

16   Q    Okay.  So, it sounds like there was no formal

17   promotion, right?

18   A    No.

19   Q    Your pay hasn't increased based on a change in title?

20   A    Not on a change in title, no.

21   Q    And I know you testified that you don't really have

22   titles.  You have never signed a document as CEO, have you?

23   A    No.

24   Q    Why not?

25   A    As CEO?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 478

1    Q    **Yes.**

2    A    Like signing my name and saying CEO?

3    Q    **Yes.**

4    A    I haven't had anything put in front of me or anything

5    that I've had to sign saying CEO.

6    Q    **Why would you not have to sign as CEO?**

7    A    That, I usually send to Dee to sign.  Something like

8    that.

9    Q    **Dee signs as CEO?**

10   A    I don't know if she signs as CEO, but if it says owner

11   or something like that, I always have Dee sign something like

12   that.  If there's some documents that say the owner or CEO to

13   sign this, and then there's other documents that say the

14   representative or what have you.  I sign all of that, but if

15   it says owner I don't sign it.

16   Q    **Are you aware that Mr. Wilhite has signed many times as**

17   **CEO, Advanced Floor documents?**

18   A    Not specifically, no.

19   Q    **Do you -- do you believe if you sign something as CEO,**

20   **would that be a problem?**

21   A    I don't know the ramifications of something being CEO

22   or not, what it is.  I -- I'm not called a CEO, so I wouldn't

23   probably -- like I said, I wouldn't sign something that if it

24   specifically was printed saying CEO, I probably would not

25   sign that.  Or I would ask a question.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 479

1  Q    Do you recall Mr. Wilhite falling ill at any point,

2  like seriously ill, during your tenure at Advanced Floor?

3  A    Not seriously ill.  I do remember -- I believe he went

4  to the emergency room one time.

5  Q    Do you recall when that was?

6  A    Not exactly.  It was probably anywhere -- I would guess

7  anywhere from two and a half to five years ago.

8  Q    And Mr. Wilhite never formally announced his retirement

9  to you, right?  You called it a partial retirement, I think?

10  A    When he put Roger and Brendan in charge of the company

11  he was still coming in the once-a-week or

12  once-every-other-week.  So, we just kind of said he's

13  partially retired.

14  Q    Who do you mean by "we"?

15  A    Just the other employees in general.

16  Q    Is partial retirement something he ever said?

17         MR. BEDNARSKI:  Objection, Your Honor.

18  Speculation as to what -- I can't tell if she's asking --

19         THE COURT:  Said to you.

20         MR. BEDNARSKI:  -- he understood or --

21         THE COURT:  No.  No.  She said is that something

22  he ever said.

23         MR. BEDNARSKI:  Oh, okay.  I apologize.

24  A    I don't remember specifically.

25  Q    (By Ms. Froehlke)  And you don't recall a retirement

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 480

```
 1   memo going out to employees?

 2   A    No.

 3   Q    You don't recall a retirement party?

 4   A    No.

 5   Q    And you intend to stay employed with Advanced Floor; is

 6   that correct?

 7   A    Yes.

 8            MS. FROEHLKE:  No further questions.

 9            THE COURT:  Okay.  Any redirect?

10            MR. BEDNARSKI:  Just briefly, Your Honor.

11                      REDIRECT EXAMINATION

12   BY MR. BEDNARSKI:

13   Q    Mr. Jackson, you said you currently sign the paychecks,

14   right?  Is there any paycheck for Mr. Wilhite?

15   A    No.

16            THE COURT:  Do you sign all checks?

17            THE WITNESS:  Yes, unless I'm not there.  Like,

18   this last pay period I had a vacation day, and so one of

19   the -- my coworkers did sign the checks that time.

20            THE COURT:  Who has check-signing authority within

21   the company?

22            THE WITNESS:  Myself, and Nate Stiverson, and Dee.

23   I'm not sure if anybody else -- I don't believe anybody else

24   does.

25            THE COURT:  Okay.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 481

1    Q    (By Mr. Bednarski)  The -- Ms. Froehlke also asked you

2    about did your pay -- that your pay didn't increase with the

3    change of title when you became general manager.

4    A    Right.

5    Q    Obviously, you didn't actually get the title of general

6    manager.  Did your pay increase when you took over the

7    running of the day-to-day operations of the company?

8    A    Not in exact conjunction with that.  That's when the

9    construction industry -- that's when things were slow.

10   That's, I believe, part of the reason Brendan was let go.

11   And so, you know, times were tough.  There wasn't a lot of

12   business.

13   Q    After -- once the times got better, did your pay

14   increase commensurate with someone who is managing the

15   day-to-day operations?

16   A    Yes.  Yes.  I'm -- I'm paid well compared to the other

17   employees.

18   Q    And -- and do you know why that is?

19   A    Because I manage the day-to-day operations.

20   Q    Thank you.

21   A    And I'm the key contact for the company.

22   Q    Thank you.

23        MR. BEDNARSKI:  No further questions.

24        THE COURT:  Okay.  You can step down.  Thank you.

25        THE WITNESS:  Thanks.

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                      September 17, 2015

Page 482

```
 1              THE COURT:  And call your next witness.
 2              MR. BEDNARSKI:  Your Honor, this is where I'm
 3   going to step out and Mr. Mikulecky is going to take care of
 4   this next witness.
 5              THE COURT:  What do you have did you say?
 6              MR. BEDNARSKI:  A DMV hearing, Your Honor, and
 7   they don't ask me if -- they just set it, and if I move to
 8   continue it my client loses his license until the next
 9   hearing date.  So, I apologize.
10              THE COURT:  From the sublime to the mundane.
11   That's your job, huh?
12              MR. BEDNARSKI:  Every day, Your Honor.
13              MR. MIKULECKY:  Your Honor, our next witness, we
14   call Cindy Barker.
15              THE COURT:  Okay.  Ms. Barker.
16              THE COURTROOM DEPUTY:  If you could raise your
17   right hand.
18              (The witness, Cynthia Barker, was sworn to tell
19   the truth by the Courtroom Deputy.)
20              THE WITNESS:  (Inaudible) Wait a minute.  The
21   chair's not rolling.  Okay.
22              MR. MIKULECKY:  Do you need help, or are you all
23   set?
24              THE WITNESS:  I'm all right.
25              MR. MIKULECKY:  All right.
```

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                   September 17, 2015

Page 483

 1                          DIRECT EXAMINATION

 2     BY MR. MIKULECKY:

 3     Q     Please state your name.

 4     A     Cynthia Ann Barker.

 5     Q     Ms. Barker, where are you employed?

 6     A     Advanced Floor Concepts.

 7     Q     How long have you been there?

 8     A     Since January 27, 2010.

 9     Q     What is your position at Advanced Floor Concepts?

10     A     I'm the accountant.

11     Q     What are your responsibilities?

12     A     A lot of different things.  I do accounts receivables,

13     accounts payable, payroll, sales tax, wage withholding,

14     taxes, whatever else needs to be done.

15     Q     On the financial side?

16     A     Yes.

17     Q     Okay.  During the time that you've been at Advanced

18     Floor Concepts, do you know Mrs. Dee Wilhite?

19     A     Yes.

20     Q     How do you know her?

21     A     She's the owner of the company.

22     Q     Do you interact with her in your role as the finance

23     person for AFC?

24     A     Yes.

25     Q     How often?

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                          September 17, 2015

Page 484

1   A    As need be.  She's the one that trained me, and we
2   think enough alike that she's given me the authority to pay
3   the bills as I see fit.  When I have questions I call her.
4   She's in my QuickBooks every day.  I see her little pop-up in
5   the window.
6   Q    Explain what that means, in your QuickBooks every day.
7   A    Okay.  QuickBooks is the accounting system I use.
8   Q    For AFC?
9   A    For AFC.
10  Q    Okay.
11  A    And there is a little pop-up box that when she gets on
12  I see when she gets on, and then when she leaves I see her
13  leave.
14  Q    So, you're able to -- you're able to tell that she's on
15  QuickBooks at times; is that right?
16  A    Right.
17  Q    Okay.  What are Mrs. Wilhite's responsibilities as it
18  interacts with your job?
19  A    Well, with my job she does the reconciliation of the
20  bank statements.  So, she knows the checks that I've written
21  in and out.  She does the FUTA and the SUTA unemployment
22  taxes.  If I have questions regarding anything, she's who I
23  call for the financial things.
24  Q    You said that Mrs. Wilhite has given you authority to
25  pay bills on behalf of the company, correct?

United States of America vs.                                      Evidentiary Hearing - Day III
Michael David Wilhite                                                        September 17, 2015

 1   A     Yes.

 2   Q     If you've got financial questions, or a financial

 3   decision that you're uncomfortable making, who do you ask for

 4   help or to make those decisions?

 5   A     It varies.  I might go to Mike or I might go to Dee.

 6   Either one.  I assume they -- Well, I shouldn't say that.

 7   Q     Who, in your opinion, has the final authority on the

 8   financial decisions for the company?

 9   A     Dee.

10   Q     What's your basis for that?

11   A     Because she owns the company.

12   Q     What's your basis then for saying that Mrs. Wilhite

13   owns the company?

14   A     I've seen papers that she -- that she sends to the

15   Secretary of State that lists her as the sole owner.

16   Q     In your working at AFC since January, 2010, have you

17   seen Mr. Wilhite in the office?

18   A     Yes.

19   Q     During that time period, about how often does he come

20   in?

21   A     In the beginning it was full time.  Now, it's two,

22   three days a week.  It just depends.

23   Q     Do you know currently what his responsibilities are?

24   A     Mr. Wilhite's?

25   Q     Yes, ma'am.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 486

 1   A    To help whoever needs help, I guess.

 2   Q    **Currently, who signs contracts on behalf of the**

 3   **company?**

 4   A    Torin.  Torin Jackson.

 5   Q    **Who signs the checks on behalf of the company?**

 6   A    Torin Jackson or Nate Stiverson.

 7   Q    **Okay.  You don't -- do you have authority to sign**

 8   **checks?**

 9   A    No.

10   Q    **Why not?**

11   A    It's a check and balance.  Somebody needs to know what

12   I'm spending.  I just can't go out and do whatever.

13   Q    **Is that an issue of business integrity?**

14   A    Yes.

15   Q    **To make sure -- is that something that's important to**

16   **you?**

17   A    Yes.

18   Q    **Why?**

19   A    Because in the past, before Advanced Floor Concepts, I

20   had been asked to do things that weren't on the up-and-up.

21   Let's put it that way.

22   Q    **When you were employed somewhere else?**

23   A    Yes.

24   Q    **What did you do as a result?**

25   A    I quit.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 487

1    Q    Rather than being involved in something like that?

2    A    Yes.  And I told Mike and Dee when they interviewed me,

3    that in accounting what's right is right, and what's wrong is

4    wrong.  And if they ask me to do anything different that I'd

5    quit -- I would quit.  I told them that right up-front.

6    Q    Who in your -- based on what you've seen in the

7    operations of the company, who's running the company now at

8    AFC?

9    A    Torin.  He does the day-to-day operation.  Makes those

10   kind of decisions.

11   Q    You said that the integrity is important to you and you

12   want to make sure that that's not a problem in the company.

13   Have you seen any integrity issues at Advanced Floor

14   Concepts?  Anything that's given you concern?

15   A    No.

16   Q    Do you see anything that leads you to believe that Mike

17   is the owner of Advanced Floor Concepts?

18   A    No.  I mean, I think they discuss things as a husband

19   and wife, but -- no.

20   Q    Do you think that Mr. Wilhite is the actual owner, and

21   he's hiding behind Mrs. Wilhite the ownership of this

22   company?

23   A    No.

24   Q    If you thought that, what would you do?

25   A    Quit.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 488

1          MR. MIKULECKY:  Thank you.  No further questions.

2          THE COURT:  Ms. Barker?

3          THE WITNESS:  Yes.

4          THE COURT:  If I ask you, do you understand what

5   the concept of a boss is, would you say that you do?

6          THE WITNESS:  Yes, I think I do.

7          THE COURT:  Would you say that Mr. Wilhite is your

8   boss?

9          THE WITNESS:  No.  I would say Mrs. Wilhite is.

10         THE COURT:  So, when he's in the office the two or

11  three days a week he's neither treated like a boss or he acts

12  like a boss.  Is that your testimony?

13         THE WITNESS:  Yeah.  I guess so.  I mean, I think

14  if I was fired, Dee would be the one to do it.  Is that what

15  you're asking me?

16         THE COURT:  No.  I'm asking whether people treat

17  him as a boss.  My dad owned a bank for many years, and then

18  he retired.  And he came in every day.

19         THE WITNESS:  Uh-huh.

20         THE COURT:  I promise you, people treated him as a

21  boss.  I just want to know whether people treat Mr. Wilhite

22  as a boss or not.

23         THE WITNESS:  I think we respect him as one of

24  the -- I don't know what you would call it as.  One of the --

25  we respect him.  Let's just put it that way.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 489

1            THE COURT:  Why do you respect him?

2            THE WITNESS:  Because of his position.

3            THE COURT:  And what is his position?

4            THE WITNESS:  Well, he's there to help us.  Help

5   us answer questions that we don't know the answers to.  He

6   pretty -- he trusts us enough to make the decision -- a lot

7   of the decisions.

8            THE COURT:  Okay.  Anymore redirect?

9            MR. MIKULECKY:  Yes, Your Honor.  Just --

10            THE COURT:  Go ahead.

11            MR. MIKULECKY:  -- to follow-up on that.

12   **Q    (By Mr. Mikulecky)  You said that you give him respect**

13   **because of his position.  Is that because of the experience**

14   **that he's had?  Is that what you're trying to say?**

15            MS. FROEHLKE:  Objection.  Leading.

16            THE COURT:  I'll allow it.  Since it's in response

17   to my questions.

18   A    Yes, it is.  Because we know that he has done the work,

19   so he can answer the questions that are in the field.  And --

20   and I guess I need to say, I think we all respect each other

21   in the office just because of our positions.  I mean, there

22   is no backbiting, there's no game-playing.  I think we all

23   respect each other.

24            MR. MIKULECKY:  Thank you for clarifying that.

25            THE COURT:  Any cross?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 490

```
 1            MS. FROEHLKE:  Yes, Your Honor.
 2                      CROSS-EXAMINATION
 3   BY MS. FROEHLKE:
 4   Q    Ms. Barker, it sounds like you enjoy your work.
 5   A    I do.
 6   Q    You're close with the Wilhites?
 7   A    Yeah.
 8   Q    Would you agree?
 9   A    Yeah.
10   Q    You and Dee think alike, I think you said?
11   A    Yes.  We do think alike.  I mean --
12   Q    What do you mean by that?
13   A    We're approximately the same age, so we have the same
14   values, we have the same -- just how things should be paid
15   and -- and that kind of thing.
16   Q    And it sounds like Advanced Floor has been a good
17   employer to you?
18   A    Yes, they have.
19   Q    How often would you say you see Mrs. Wilhite on an
20   annual basis?
21   A    I have no idea.
22   Q    More than once?
23   A    Oh, yeah.  She -- I don't know how -- I don't know the
24   answer to that.  I don't know when she -- you know, I don't
25   keep track of when she comes in.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 491

1   Q    Sure.  What about a monthly basis?  How often would you

2   say you see her?

3   A    Again, I really don't know.

4   Q    Do you see her every month?

5   A    I -- I -- not every month.  But I -- like I said, I

6   know she's on the books.  I talk to her on the phone a lot.

7   Q    Right.  But seeing her physically in the office, that

8   happens not every month.  Would you say more than three times

9   a year?

10  A    I -- I really don't know.  Yeah.  I would think more

11  than three times a year.

12  Q    And you're aware that Mr. Wilhite has a criminal

13  conviction, right?

14  A    Yes.

15  Q    How did you learn that?

16  A    I don't know.  I think he told me.  I don't know

17  whether it was him or Torin.  Somebody told me.

18  Q    Would it have been early on in your career with AFC

19  that you learned that?

20  A    I really don't remember when I learned that.  I knew

21  it -- it wasn't a secret I don't think.

22  Q    What do you mean it wasn't a secret?

23  A    I mean, they're pretty open about what goes on there.

24  Q    So, what is your understanding of Mr. Wilhite's

25  criminal conviction?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 492

```
 1   A    He did something wrong and he went to jail.
 2   Q    Do you know specifically, though -- what is your
 3   understanding of what he did wrong?
 4   A    I don't -- I don't know the answer to that.
 5   Q    Did he assault someone?
 6   A    No.
 7   Q    What is your understanding?
 8   A    Well, he did something in the security division.
 9   Q    With securities?
10   A    Yeah, securities.
11   Q    Do you know any more specifics?  What he did with
12   securities?
13   A    No, I don't.
14   Q    Do you know that he owes money for what he did?
15   A    No, I don't know that either.
16   Q    You're testifying that you've never learned that
17   Mr. Wilhite owes some sort of money to someone because of his
18   past?  Is that your testimony?
19   A    Yes.  That's my testimony.
20   Q    Mr. Wilhite told us yesterday that -- well, actually,
21   the binder in front of you, if you could turn to Exhibit 19.
22   A    This one?
23   Q    Yes, that big white one.  They're labeled with tabs and
24   I can come over and get you there.
25   A    Okay.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 493

1    Q    This is a letter from our office on August 28th, 2008.

2    Do you recognize it?

3    A    No.  I wasn't there then.

4    Q    Have you ever seen a letter from our office come to

5    Advanced Floor?

6    A    If something came from there I would just give it to

7    him, unopened.

8    Q    To who?

9    A    To Mike and Dee.

10   Q    Who interviewed you for your job?

11   A    Mike and Dee.

12   Q    They both were present?

13   A    Uh-huh.

14   Q    Who asked you the questions?

15   A    They both did, I'm pretty sure.

16   Q    And your title is accountant; is that right?

17   A    Yes.

18   Q    So, you're generally aware of payroll?

19   A    Yes.

20   Q    And you know that Mr. Wilhite doesn't receive a

21   paycheck, right?

22   A    Yes.

23   Q    Did Mr. Wilhite ever tell you that he was retired?  I

24   believe you just testified, when you started he was working

25   full-time; is that right?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 494

 1   A     Yes.

 2   Q     Did he tell you at that time he was retired?

 3   A     He said he was going to cut back on hours is I believe
 4   the way he stated it.

 5   Q     Did he ever use the word retired?

 6   A     I don't think so.  I don't -- I know he's talked about
 7   retiring, but I don't know if he said it in the sense of the
 8   number of days he's working that he was retiring.

 9   Q     When he talks about retiring, what does he say?

10   A     That they're thinking about it.  You know.

11   Q     Can you recall the last time that conversation came up?

12   A     No.  I don't -- it's been recently, but I don't know
13   when.

14   Q     As the accountant, were you aware that Mrs. Wilhite's
15   salary doubled the pay period after her husband stopped
16   receiving a paycheck?

17   A     It did not double.  I don't -- no.

18   Q     You weren't aware of that?

19   A     No.

20   Q     And you believe Mr. Wilhite is the CEO of Advanced
21   Floor, right?

22   A     Yes.

23         MS. FROEHLKE:  No further questions.

24         THE COURT:  Oh, okay.  I have one.  Did you just
25   say that you admit Mr. Wilhite is the CEO?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 495

 1           THE WITNESS:  Well, he's the one that if we have

 2   questions we can -- you know, we bounce them off him, he

 3   bounces -- goes to his truck and talks to Dee.

 4           THE COURT:  Right.  But she asked you whether you

 5   admit that he's the CEO and you said yes.  Didn't you just

 6   say yes to that question?

 7           MS. FROEHLKE:  Yes.

 8           THE COURT:  Did you just say yes to that question?

 9           THE WITNESS:  Yes, I did.

10           THE COURT:  All right.  What does CEO stand for?

11           THE WITNESS:  Chief executive officer.

12           THE COURT:  All right.  Do you want to amend your

13   answer as to whether you think he's a boss, or are you going

14   to stand by your answer that he's not a boss?  If he's the

15   CEO of this company?

16           THE WITNESS:  He is there to help us with hard

17   decisions that we can't make.  Um, boss.

18           THE COURT:  It's not a difficult question, ma'am.

19           THE WITNESS:  Okay.

20           THE COURT:  A chief executive officer, you're --

21   you're in a company.  How many companies have you worked for?

22           THE WITNESS:  Dozen, half dozen.  Something like

23   that.

24           THE COURT:  Okay.  So you know what a CEO is.

25           THE WITNESS:  Uh-huh.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 496

```
 1              THE COURT:  Is the CEO a boss?  And if you don't
 2    think it is, that's fine.
 3              THE WITNESS:  Yeah.  Do I think -- yeah, he is the
 4    CEO, but I think he has to run -- things go through -- has to
 5    be decided by Dee.
 6              THE COURT:  A company can have more than one boss.
 7              THE WITNESS:  Okay.  Okay.
 8              THE COURT:  There's 16 bosses in this building
 9    alone.
10              UNKNOWN SPEAKER:  Only 16?
11              THE COURT:  In this building, I said.  All right.
12    Go ahead.
13                        REDIRECT EXAMINATION
14    BY MR. MIKULECKY:
15    Q    You're struggling a little bit with --
16    A    Yeah, I am.
17    Q    And let me explore that a little bit.  Earlier you
18    said, I believe -- and correct me if I'm wrong -- that you
19    think that Torin Jackson is the one who is running the
20    company now.  Is that correct or incorrect?
21    A    He's the one that makes the day-to-day decisions, yes.
22    Q    And you're handling the financial side you said,
23    correct?
24    A    Yes.
25    Q    All right.  Currently, then, what is left for Mike to
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 497

```
 1    do that you consider him to be the CEO?
 2    A    To answer our hard questions.  You know, there are
 3    things that come up that the -- either Torin or myself don't
 4    know the answer to.  So, we run it to Mike, and I assume he
 5    talks with Dee about it, and then they make a decision and
 6    tell us.
 7    Q    Okay.  You said as part of your answer also that
 8    Mr. Wilhite goes to his truck and calls Dee?
 9    A    Correct.
10    Q    Okay.  And then he comes back with a response?
11    A    Yes.
12    Q    Okay.  When you or Mr. Jackson have a difficult
13    answer -- difficult decision to make, that's the process
14    you've seen?
15    A    That's the process I've seen.
16    Q    Okay.  You've also talked about that you don't see Dee
17    at the office very often, but you talk on the phone a lot,
18    correct?
19    A    Correct.
20    Q    How often do you talk on the phone?
21    A    As need be.  I mean, I've been there five years, so I
22    pretty well know what they want and what they don't want.
23    So --
24    Q    I'm sorry.
25    A    You know, there's not that -- on the day-to-day things
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 498

```
 1    there's not that many hard questions coming up from the
 2    financial end of it.
 3    Q    Have you been delegated responsibilities?
 4    A    Have I what?
 5    Q    You've been delegated responsibilities, you've
 6    testified earlier, correct?
 7    A    Yes.
 8    Q    Are most of the issues that -- most of your day-to-day
 9    work, are you able to satisfy those functions within the
10    responsibilities you've been delegated?
11    A    Yes.
12    Q    Is that -- does that have any effect as to why you are
13    or are not calling Dee?
14    A    Yes.  I mean, if she sees something that she doesn't
15    like when she sees the QuickBooks, then she calls me.  But
16    otherwise it's pretty much, you know, pay the bills, make
17    payroll.
18    Q    Day-to-day areas that are within your areas of
19    responsibility?
20    A    Right.
21            MR. MIKULECKY:  Okay.  Nothing further.  Thank
22    you.
23            THE COURT:  Thank you.  You can step down.  Thank
24    you.
25            MR. BEDNARSKI:  And, Your Honor, she's released
```

United States of America vs.                    Evidentiary Hearing - Day III
Michael David Wilhite                                    September 17, 2015

Page 499

1    from our subpoena.  I know she's still on -- like, the

2    government had issued a subpoena as well, I assume.

3              MS. FROEHLKE:  No, she can be (unintelligible).

4              THE COURT:  Okay.  Thank you.

5              MR. BEDNARSKI:  Just wanted to check.

6              THE COURT:  By the way, you guys know that after

7    you testify they can stick around and watch.  So

8    sequestration doesn't affect that.

9              All right.  Do we have any more evidence by the

10   interested parties?

11             MR. BEDNARSKI:  Yes, Your Honor.  We would call

12   Francisco Carranza.

13             THE COURT:  Okay.

14             THE COURTROOM DEPUTY:  Would you raise your right

15   hand.

16             (The witness, Francisco Carranza, was sworn to

17   tell the truth by the Courtroom Deputy.)

18             THE WITNESS:  I will.

19                      DIRECT EXAMINATION

20   BY MR. BEDNARSKI:

21   Q    Good morning, Mr. Carranza.

22   A    Good morning.

23   Q    How are you?

24   A    A little nervous.

25   Q    Would you please introduce yourself to the Court, and

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 500

```
 1   spell your last name for the record.

 2   A    My name is Francisco Javier Carranza.

 3   Q    And could you spell your last name for the record.

 4   A    C-a-r-r-a-n-z-a.

 5   Q    Mr. Carranza, how old are you?

 6   A    59.

 7   Q    59.  Where do you work?

 8   A    I work for Advanced Floor Concept.

 9   Q    How long have you worked for Advanced Floor Concept?

10   A    In summer, right, like, 12 years, 13 years.

11   Q    I'm sorry, 13, 14 years?

12             THE COURT:  12 to 13 he said.

13             MR. BEDNARSKI:  12 to 13.

14   Q    (By Mr. Bednarski)  Do you recall when you were hired?

15   A    Say that again.

16   Q    Do you recall what year you were hired?

17   A    I interview with Mike when I hired.  And I worked for

18   another company and mentioned Mike need work -- people work

19   for the company.  And I talk to Mike and I agreed work for

20   the company.

21   Q    Do you recall when that was?  Do you recall what year

22   that was?

23   A    I do not remember.

24   Q    Okay.  What do you do for the company?

25   A    I'm a crew leader.  I run the crew that work for the
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 501

1    company.

2    Q    Okay.  And have you always been in that side, the

3    installation side of the floors?

4    A    Yes.

5    Q    And you said Mike was the one that hired you?

6    A    I talked to Mike -- well, the interview was done with

7    Mike.

8    Q    Okay.  Your interview was with Mike?

9    A    Yeah.

10   Q    Okay.  And was he the one that hired you?

11   A    Him?

12   Q    Yes.

13   A    Yeah.  Yeah.

14   Q    Okay.  Mr. Carranza, based on working there 12, 13

15   years, do you know who owns the company?

16   A    Dee.  Dee Wilhite.

17   Q    Okay.  How do you know that?

18   A    Well, I remember in the first times, the crew is a

19   small one, and everybody know Dee.  When we -- we agree

20   working the time, or whatever the work, Dee write our

21   paycheck (unintelligible) his name.  And Mike tell us,

22   exactly when we start, Dee owned the company.  Dee is the

23   person that decide every -- everything what we need to do.

24   That's -- that's (unintelligible) call.

25   Q    In your experience, is that how it's run?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 502

 1   A    Yeah.  For many years.

 2   Q    And when you say "for many years," are you talking the

 3   whole time you're there or just part of the time you're

 4   there?

 5   A    This whole -- I mean, for my personal?

 6   Q    Yes.

 7   A    It's all the time, I know Dee is the owner of company.

 8   Q    Was there any time when Mike was -- was the owner of

 9   the company?

10   A    No.  I don't know.

11   Q    Has Mike ever held himself out as the owner of the

12   company?

13   A    No.

14   Q    When you first started, did you have a lot of contact

15   with the office?

16   A    No.  We, all the time, work in the field.  You know,

17   our production, our job, it is outside.  Outside

18   (unintelligible).

19   Q    Did you --

20   A    (Unintelligible)  Uh-huh.

21   Q    Sorry.  Were you asking -- I'm sorry.  Did -- at any

22   point were you having weekly meetings in the office?

23   A    We -- we have safety meetings, according with the law,

24   explain every -- every single people.  Our -- our safety

25   stuff (unintelligible) side job, that's what we got a

**United States of America vs.**
**Michael David Wilhite**

**Evidentiary Hearing - Day III**
**September 17, 2015**

Page 503

1    meeting.  For many times our meeting is when paydays, we got

2    our meetings in the morning.

3    Q    And in the beginning when you first started working for

4    Advanced Floor Concepts, who was involved in those meetings?

5    A    Mike is in charge for the -- for the -- for the

6    superintendents.  I can't remember -- they got a

7    superintendents in after two or three years, but all the

8    meetings and the -- they like how the company grow, how the

9    company need work, that's exactly in the meetings.

10   Q    And when you say they were telling you this information

11   who is "they"?

12   A    Well, I talk today, I got so many years in the company,

13   so the company got many (unintelligible) when we start with

14   small crew.  The company try to grow, and grow, and bring on

15   more crews.  We build two, three crews, four crews, and

16   people help in the office like superintendents.  You ask me

17   the names, I don't remember so many names.

18   Q    Okay.  So, let's -- let's go back in the beginning when

19   it was a small business.

20   A    Uh-huh.

21   Q    Who was involved in those weekly meetings that you

22   would be in?

23   A    Mike and Dee.

24   Q    Was Dee involved in the company in the beginning when

25   you started working there?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 504

 1   A    A hundred percent.

 2           MR. BEDNARSKI:  May I have a moment?

 3           THE COURT:  Yes.

 4           MR. BEDNARSKI:  No further questions, Your Honor.

 5           THE COURT:  Any cross?

 6           MR. VILLASENOR:  A couple things, Your Honor.

 7           THE COURT:  Go ahead.

 8                 CROSS-EXAMINATION

 9   BY MR. VILLASENOR:

10   Q    Mr. Carranza, you work out on the field -- in the

11   field?

12   A    Every day.

13   Q    Okay.  You don't -- you do not work in the office?

14   A    Oh, no.

15   Q    No?

16   A    No.

17   Q    And one last question.  Francisco, do you like your

18   name?  Your first name?

19   A    It's okay.

20   Q    Okay.  That's my son's name.  So --

21           MR. VILLASENOR:  I don't --

22           THE COURT:  You can step down.  Thank you.

23           MR. BEDNARSKI:  You're all done, Mr. Carranza,

24   thank you.

25           Your Honor, we would next call Jim Lovell.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 505

```
 1              THE COURT:  Okay.  When do you think you'll wrap
 2    up your case?
 3              MR. BEDNARSKI:  Your Honor, we have two more
 4    witnesses this morning.  We would hope to finish by 2:30,
 5    3 o'clock.
 6              THE COURT:  Okay.  And --
 7              MR. BEDNARSKI:  And, Your Honor, to let the Court
 8    know, there's one witness, Tami Ashe, that we'll need to have
 9    her do a telephonic.  She broke her foot, and I believe the
10    government has no objection to handling her testimony over
11    the phone.
12              THE COURT:  Okay:  How long is your case going to
13    be, Mr. Villasenor?
14              MR. VILLASENOR:  Oh, we may have four witnesses, I
15    think, but -- or maybe two or three.  It's fairly short since
16    we're kind of really just doing the --
17              THE COURT:  Understood.
18              MR. VILLASENOR:  -- the direct.
19              THE COURT:  Okay.  Go ahead.
20              MR. BEDNARSKI:  And, Your Honor, just as it
21    relates to theirs, I think the other thing is we're -- we're
22    agreeing to submit the video deposition of Mr. Clement.  Not
23    that we all have to sit in here and watch it, but it would be
24    available for the Court to review.
25              THE COURT:  Okay.  Do you know what the format is?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 506

1    Is it a DVD?

2              MS. FROEHLKE:  Your Honor, the -- we provided the

3    original DVD into evidence.

4              THE COURT:  Okay.  How long is it?

5              MS. FROEHLKE:  It's an hour and 10 minutes.

6              THE COURT:  Okay.  And you're both submitting it,

7    the entirety of the testimony?

8              MR. BEDNARSKI:  Yes.  We're stipulating to the --

9              THE COURT:  Was it a trial deposition?

10             MR. BEDNARSKI:  It was deposition in preparation

11   for this hearing, Your Honor.

12             THE COURT:  Very good.

13             MR. MIKULECKY:  Mr. Lovell.

14             THE COURT:  Mr. Lovell, come on forward.

15             THE COURTROOM DEPUTY:  If you could raise your

16   right hand.

17             (The witness, James Lovell, was sworn to tell the

18   truth by the Courtroom Deputy.)

19             THE WITNESS:  I do.

20                      DIRECT EXAMINATION

21   BY MR. MIKULECKY:

22   Q    **Good morning.**

23   A    Good morning.

24   Q    **Please state your name.**

25   A    Jim Lovell.  Actually James Lovell.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 507

```
 1    Q     Okay.  Mr. Lovell, are you employed?
 2    A     I own a construction company.  Technically, I'm
 3    employed.  I'm a salaried employee, yes.
 4    Q     Okay.  What's the name of the company?
 5    A     It's the Lovell Group.
 6    Q     Are you familiar with Advanced Floor Concepts?
 7    A     Yes.
 8    Q     How?
 9    A     I've done business with Advanced Floor somewhere around
10    20 years.
11    Q     What type of construction does your company do?
12    A     We do residential custom homes.
13    Q     Done business with Advanced Floor Concepts for 20 years
14    you say?
15    A     Somewhere around there, uh-huh.
16    Q     They install the steel floors in some of your homes
17    then?
18    A     They did.  Right.  Started out with steel floors and it
19    progressed to the structural concrete floors.
20    Q     Do you know Michael Wilhite?
21    A     I do.
22    Q     How?
23    A     Well, I met him originally in the mid '90s.  I was
24    working for the Genesee Company, and we were looking for
25    alternatives to some of the soil problems that were going on
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 508

1    in Highlands Ranch and Lone Tree and around.  And Advanced

2    Floor had developed a program, and by -- the company I was

3    working for, the Genesee Company, was using Advanced Floors

4    to -- to do those.

5    Q    Do you know Mrs. Darla Dee Wilhite?

6    A    I do.

7    Q    How do you know her?

8    A    Well, so I would -- I would purport to you that Mike

9    and Dee Wilhite are friends.  We've kind of known each other

10   off and on over the -- I mean, I wouldn't say we're intimate

11   friends.  We -- it's not like we see each other every week or

12   every month, but, you know, probably have had breakfast or

13   lunch with Mike, oh, four or five times over the years, and

14   actually have been to his house in Westcliffe on vacation

15   where my wife and I went down that way.

16   Q    Is your friendship with the Wilhites going to affect

17   your testimony or ability to tell the truth here today?

18   A    No.

19   Q    Okay.  What has been your interaction, then,

20   professionally with Mr. and Mrs. Wilhite and Advanced Floor

21   Concepts?

22   A    Well, my interaction with Advanced Floor has been

23   almost solely with Torin.  Torin has been my contact.  He

24   visits our projects.  Any issues I've dealt with Torin on.  I

25   have not dealt with Mike or Dee, really, on -- for years in

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 509

```
 1   that issue -- or if ever.
 2   Q    That's always been the case that you and your company
 3   have dealt with Torin?
 4   A    That's true.
 5   Q    So for bidding the project you said that's Torin's
 6   responsibility with your company?
 7   A    That's correct.
 8   Q    Okay.  For issues relating to performance?
 9   A    Uh-huh.
10   Q    Questions on the job?  Installation?
11   A    Yep.
12   Q    That's all Mr. Jackson?
13   A    Right.  That's exactly right.
14   Q    Do you know who owns Advanced Floor Concept?
15   A    I do.  Some years ago, many years ago, having lunch
16   with -- with Mike he told me that Dee owned the company.
17   Q    Have you in your personal interactions or professional
18   interactions with Advanced Floor Concepts and the Wilhites,
19   seen anything that would lead you to question that Dee is the
20   owner of Advanced Floor Concepts?
21   A    No.
22   Q    Perhaps you have already answered this with your
23   question -- or your answer about with whom your company
24   deals, but who is running Advanced Floor Concepts currently?
25   A    Torin.  To my knowledge.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 510

1   Q     Thank you.

2             MR. MIKULECKY:  Nothing further.

3             THE WITNESS:  Uh-huh.

4             THE COURT:  Any cross?

5             MR. VILLASENOR:  Yes.

6                   CROSS-EXAMINATION

7   BY MR. VILLASENOR:

8   Q     Mr. Lovell?

9   A     Uh-huh.

10  Q     Yeah.  Have you ever told anyone that you think

11  Mr. Wilhite owned Advanced Floor Concepts?

12  A     No.

13  Q     Do you recall on July 1st, receiving a phone call from

14  someone from my office?

15  A     I do.

16  Q     Troy Tyez?

17  A     I don't remember who, but I remember having a

18  conversation.

19  Q     All right.  And what was the conversation?

20  A     Well, he asked me these similar questions.  He asked me

21  what my interaction was with Advanced Floor.  He asked me, to

22  my knowledge, who I understood owned Advanced Floor, and I

23  told him Dee.  And that was pretty much -- it was a pretty

24  short conversation.  A couple minutes.

25            MR. VILLASENOR:  May I have one second, Your

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 511

1    Honor?

2            THE COURT:  Yep.

3    Q    (By Mr. Villasenor)  Mr. Lovell, you'd also testified

4    that you've been doing business with Advanced Floor for 20

5    years, correct?

6    A    Well, so, I worked for another homebuilder, okay, so

7    in -- as that homebuilder I was construction manager for --

8    with the Genesee Company for the southern part of Denver, and

9    I didn't -- I didn't contract with Advanced Floors, but I

10   dealt with them in the managerial part of my job.  And then I

11   started a construction company in 1996, and started

12   contracting with my company with Advanced Floor, yes.

13   Q    And who did you deal with in 19 -- beginning 1996 with

14   Advanced Floor?

15   A    You know, to my recollection I've always dealt with

16   Torin.

17   Q    And you think he worked at Advanced Floor in 1996?

18   A    I have no idea.  I just -- that's -- to my recollection

19   that's just -- I don't ever remember not dealing with Torin

20   at Advanced Floors.

21   Q    You could have dealt with someone else, you just don't

22   recall?

23   A    I just -- yeah.

24   Q    And it could have -- it could have been Mr. Wilhite?

25   A    I have no idea.  That's just not my recollection.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 512

1   Q    Did you ever deal with Mrs. Wilhite?

2   A    You know, I -- yes.  So, with my friendship with the

3   Wilhites, every once and a while when you'd call into

4   Advanced Floor she would answer the phone.  And I don't know

5   if you'd call that dealing with her.  But, you know, we'd

6   yuck it up.

7   Q    Okay.  You would have a social conversation?

8   A    Exactly, yeah.  And, you know, when I started -- yeah.

9   Q    Okay.

10          MR. VILLASENOR:  Nothing further, Your Honor.

11          THE COURT:  Okay.  Mr. Lovell, are you pretty sure

12  or certain that you started your own company in 1996?

13          THE WITNESS:  Well, it was '96 or '97.  It was

14  called Trillium Homes in those days.  I'd have to go back and

15  look at the documents, but I'm pretty sure it's '96.

16          THE COURT:  Okay.  And do you think -- do you

17  believe that you started dealing with Advanced Floor Concepts

18  virtually immediately when you started that company?

19          THE WITNESS:  So, in those days I -- I'm not

20  certain.  Let me just say that to you.

21          THE COURT:  Okay.

22          THE WITNESS:  In those days we were still flirting

23  with using wood structural floors in houses.  And then in the

24  mid to later '90s, the issues of mold began to arise, and we

25  very quickly moved away from wood floors.  So, I can't -- I

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 513

 1   can't answer that with any certainty.

 2            THE COURT:  Do you know if you would have dealt

 3   with Mr. Wilhite in his capacity as employed by a different

 4   company?

 5            THE WITNESS:  No, I did not.

 6            THE COURT:  Not Steel by Design?  Anything like

 7   that?

 8            THE WITNESS:  I don't remember.  That would not --

 9   no.  Not that I know of.

10            THE COURT:  Okay.  Thank you.

11            THE WITNESS:  Uh-huh.

12            THE COURT:  Anything further?

13            MR. MIKULECKY:  No, sir.

14            THE COURT:  Okay.  You can step down.  Thank you

15   very much.  You're finished.  Thanks.

16            MR. BEDNARSKI:  Your Honor, we're -- sorry.

17            THE COURT:  You've got to share it.

18            MR. BEDNARSKI:  No.  We -- we were going back and

19   forth of whose witness this was.  And I thought it was his,

20   and he's like, no, it's yours.  I'm, like, no, I think it's

21   yours.  And then I looked, and I said, oh, I guess it's mine.

22            THE COURT:  So, when I was an Assistant US

23   Attorney I was co-counsel with an attorney -- I won't tell

24   you who, but if there's time I'm going to have lunch with

25   that person today -- and we were defending, and our opponent

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 514

1  called a witness, and right when that witness got up on the

2  stand -- you know, you prepare for a witness in advance,

3  right?  I mean you --

4          MR. BEDNARSKI:  Yes, Your Honor.

5          THE COURT:  I mean, especially in cross.  You have

6  your cross all written out and ready to go weeks, months in

7  advance.  And he had his witnesses and I had my witnesses.

8  And when you're not doing the witness you can do other

9  things, right.  You can work on your stuff or do a brain

10 dump.  So, this witness gets up to testify, and he turns to

11 me and he says I'm not feeling very well.  I'm not going to

12 be able to do the cross on this witness, will -- will you do

13 it.  Having not prepared a thing on that witness.

14          So, anyway, that's a test of a litigator is to

15 cold turkey cross-examine somebody you have no knowledge of.

16 So --

17          MR. BEDNARSKI:  That's very true.  That's very

18 true.

19          THE COURT:  All right.  Your next witness.

20          MR. BEDNARSKI:  We're going to call Mark Stubbert,

21 Your Honor.

22          THE COURT:  Okay.  Come on up here, Mr. Stubbert.

23          THE COURTROOM DEPUTY:  Over here.  Would you raise

24 your right hand.

25          (The witness, Mark Stubbert, was sworn to tell the

United States of America vs.                    Evidentiary Hearing - Day III
Michael David Wilhite                                      September 17, 2015

Page 515

 1   truth by the Courtroom Deputy.)

 2              THE WITNESS:  I do.

 3              THE COURT:  Have a seat.

 4                    DIRECT EXAMINATION

 5   BY MR. BEDNARSKI:

 6   Q    Good morning, Mr. Stubbert.

 7   A    Good morning.

 8   Q    If you would please introduce yourself to the Court,

 9   and spell your last name for the record, please.

10   A    I'm sorry, what was that?

11   Q    Would you please introduce yourself to the Court, and

12   then spell your last name for the record.

13   A    Okay.  My name is Mark Stubbert.  My last name is

14   spelled S-t-u-b-b-e-r-t.

15   Q    Mr. -- and is it pronounced Stubbert (spoken Stub-ert)

16   or Stubbert (spoken Stew-bert)?

17   A    Stubbert (spoken Stub-ert).

18   Q    Stubbert.  Mr. Stubbert, where do you work?

19   A    Barton Supply.

20   Q    What do you do for Barton Supply?

21   A    I'm the vice president.

22   Q    As vice president what do you do?

23   A    I oversee all the customers hip facing side of the

24   business.  The outside sales, inside sales support,

25   estimating, project management.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 516

1   Q    And what does Barton Supply do?

2   A    Barton Supply is a steel fabrication, rebar

3   fabrication, and miscellaneous items supply house for the

4   construction industry.

5   Q    How long have you worked for them?

6   A    Seven year -- a little over seven years.

7   Q    We had -- this isn't my book.  We had Mr. Cleveringa in

8   here earlier today, and he had talked about that he works for

9   Kodiak Building Partners, and that they, I think, own Barton

10  Supply; is that right?

11  A    Yes.

12  Q    So, do you work at all as part of Kodiak Building

13  Partners, or are you solely with Barton Supply?

14  A    I do do some work with -- on the Kodiak side of things

15  in -- in some identifying acquisitions, and some negotiation.

16  Occasionally.  It's not a very -- I'm not very active in that

17  role.

18  Q    It's not something that is one of your primary duties?

19  A    No.

20  Q    Now, do you know Advanced Floor Concepts?

21  A    I do.

22  Q    How do you know them?

23  A    They have been a customer of ours for -- since I came

24  on board with Barton.  For a number of years.

25  Q    Were they -- did they do business with Advanced Floor,

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 517

```
 1   to your knowledge, before you came?

 2   A    Yes.

 3   Q    Approximately how long has Advanced Floor and Barton

 4   been partners as it relates to Barton being the supplier?

 5   A    I believe it was '98 was when we started the

 6   relationship.

 7   Q    Now, have you had a lot of interactions with Advanced

 8   Floor Concepts?

 9   A    Yes, quite a bit.

10   Q    In those seven years?

11   A    Yes.

12   Q    Based off that interaction, do you know who owns

13   Advanced Floor Concepts?

14   A    Yes.

15   Q    Who is that?

16   A    Dee Wilhite.

17   Q    How do you know that?

18   A    In a lot of communications with her when she was very

19   active in the business.  Her and I communicated quite a bit.

20   And then all of the documentation that we've always had.

21   Q    When you say your interactions with her, was that when

22   you first started at Barton?

23   A    Yes.

24   Q    Was she active in the discussions with you relating to

25   the supply of steel?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 518

```
 1   A    Mostly she -- she dealt with the financial end of

 2   things.  And when I messed up, I got yelled at.

 3   Q    By who?

 4   A    Dee.

 5   Q    That's probably not a lot of fun.

 6   A    No.

 7   Q    Now, when you say you would have frequent interactions

 8   with her, how often were these interactions?

 9   A    For probably with the first year I was with Barton it

10   was a couple times a month.

11   Q    Has that increased or decreased?

12   A    Decreased.

13   Q    How -- how much contact do you have with Dee now?

14   A    Very little.

15   Q    Do you have, now -- when do you think it kind of got to

16   very little?

17   A    Well, when we -- we went through the downturn there was

18   -- there was a lot of pullback in the market.  We downsized,

19   Advanced downsized.  Dee was working on some other -- another

20   business that she was working in.  So, yeah, it was probably

21   2009, 2010 when she wasn't actively coming up as often.

22   Q    And when you say she wasn't actively coming up, would

23   these times that you had interactions with her, were they in

24   person or were they over the phone?

25   A    Both.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 519

1  Q    And so, the -- now that they've decreased, have they

2  both decreased or just the in-person or just the phone?

3  A    They both decreased.

4  Q    Because you're also not making mistakes?

5  A    I wouldn't say that, but okay.

6  Q    Based off of when her interaction with Barton Supply

7  and you decreased, who did you and Barton Supply -- I'm just

8  going to say you because I'm going to associate you with

9  Barton Supply if that's okay?

10  A    Absolutely.

11  Q    Who did you start having more contact with at that

12  point?

13  A    Torin Jackson on the operational side of things on a

14  regular basis.  Pricing, you know, just the day-to-day

15  business side of it.  And then Cindy who's their accounting

16  on the financial end of things.

17  Q    Is that who yells at you now?

18  A    Yeah.  Yeah.  She usually just e-mails me though.

19  Q    Oh.  Do you -- do you have a lot of contact with Mike

20  Wilhite?

21  A    Yeah.  Once or twice a month we -- we get together and

22  talk about what's happening in the industry and -- yes.  So,

23  yeah, we've got a decent amount.

24  Q    Are those interactions based off of doing supply orders

25  with Barton Supply?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 520

```
 1   A    Not particularly, no.
 2   Q    Do they deal with contracts between Barton Supply and
 3   Advanced Floor Concepts?
 4   A    No.
 5   Q    Are they kind of a little more personal than
 6   professional?
 7   A    A little more personal.  If -- Mike's taking some of
 8   the role of if -- if we mess up he usually calls me out on
 9   the carpet.  And that's the business side of things.  And
10   then we spend a lot of time talking about what the industry
11   as a whole is doing.
12   Q    When -- when you first started having contact with
13   Advanced Floor, did you have a lot of contact with Mike in
14   relation to the day-to-day business between Barton Supply and
15   Advanced Floor Concepts?
16   A    A little bit initially, and obviously it's grown over
17   time.
18   Q    And when you say it's grown over time, what do you mean
19   by that?
20   A    Just the relationship between the two of us has grown.
21   Q    So, the relationship has grown.  Has the number of
22   times you're in communication with him increased or decreased
23   over the years?
24   A    Well, from the very beginning they've increased, and
25   then it kind of stabilized.  A couple times a month we try to
```

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                    September 17, 2015

Page 521

 1    get together and grab lunch or just communicate with one

 2    another.

 3    Q    And when you're communicating, is it dealing with the

 4    day-to-day operations of Advanced Floor Concepts and their

 5    relationship with Barton Supply?

 6    A    Sometimes, yes.  Sometimes we talk about a lot of

 7    different other things.

 8    Q    And then obviously, like you talked about, you also

 9    talk about, like, the state of the industry?

10    A    Right.  What -- what other builders and different

11    markets are doing; new products that he's developing; new

12    products that we're working on.

13    Q    Is Mr. Wilhite negotiating prices with you?

14    A    No.

15    Q    Is he negotiating products with you?

16    A    No.

17    Q    And I should say, is he negotiating purchases?  That

18    was probably a bad question, negotiating --

19    A    Oh.

20    Q    -- products.  Is he negotiating purchases from Barton

21    Supply to Advanced Floor?

22    A    No.  Not as a -- no.

23    Q    Who's doing that now?

24    A    Torin Jackson.

25    Q    Do you have -- how often are you having contact with

United States of America vs.                          Evidentiary Hearing - Day III
Michael David Wilhite                                      September 17, 2015

Page 522

1    Torin?

2    A    Daily.

3    Q    Do pretty much all sales of supplies from Barton to

4    Advanced Floor Concepts go through you?

5    A    Yes.  Me and my -- I have a support staff that works

6    for me.

7    Q    Sure.  Sure.  And what I mean by that is there's not

8    another person at Barton Supply that negotiates with Advanced

9    Floor Concepts?

10   A    No.  There's -- it's just me.

11   Q    In these dealings with Mike and Dee and Advanced Floor

12   Concepts, has it ever been made known to you that Mike is the

13   owner of Advanced Floor Concepts?

14   A    It has not.

15   Q    Has it ever been made known to you that Mike is -- is

16   really the owner, but Dee is just kind of the straw man?

17   A    No, it has not.

18   Q    Based on your interaction is that the case?

19   A    Yes.

20   Q    That -- that Dee is the straw man and Mike is the owner

21   of the company?

22   A    No, that Dee is the owner of the company.

23   Q    Sorry.  And I should have made that question a little

24   bit better.

25   A    Okay.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 523

1  Q    So let me ask it again.

2  A    Okay.

3  Q    Based off of your interactions with -- with Advanced

4  Floor Concepts and the Wilhites, is this a straw company of

5  Mike's, but Dee -- it's in Dee's name only?

6  A    No.  It is not a straw company of Mike's.  It is Dee's

7  company.  Does that answer that -- is that the --

8  Q    And I appreciate, like -- I apologize for the

9  convoluted nature of that question.  I apologize.

10       Now, in 2013, were you involved in the negotiations

11  between Kodiak Building Partners and Advanced Floor Concepts

12  regarding the potential sale of Advanced Floor Concepts?

13  A    I was.

14  Q    What was your role in those negotiations?

15  A    I was the -- the initial negotiation person for Kodiak

16  Partners in that.

17  Q    And as part of that initial negotiation, and I think we

18  heard from Mr. Cleveringa, you are not an owner of Barton

19  Supply, correct?

20  A    I am not, no.

21  Q    And not an owner of Kodiak Building Partners, correct?

22  A    Correct.

23  Q    However, you were able to --

24  A    I have a 403(b), so I don't know how that actually

25  quantitates.  If that's -- because I do have an investment in

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 524

1    the Kodiak --

2    Q    Okay.

3    A    -- side of the business, but it's very small.

4    Q    Okay.  Okay.  So, you have a -- through a 403(b), like,

5    retirement type aspect --

6    A    Yes.

7    Q    -- you gain some shares in Kodiak Building Partners?

8    A    Yes.

9    Q    Is that about right?

10   A    Yes.

11   Q    Based off of that, are you listed as an owner in any of

12   the documents?

13   A    No.

14   Q    Were you still able to -- were you given permission to

15   negotiate on behalf of Kodiak Building Partners related to

16   this potential sale of AFC?

17   A    Yes.

18   Q    Did you have final authority to accept a deal?

19   A    I did not, no.

20   Q    If you were having these negotiations, discussions, if

21   a counterproposal was made was that something you could

22   accept, or did you have to do something else with that?

23   A    I had to take it to the committee at Kodiak, and we

24   would counterpropose back and forth.

25   Q    And who did you deal with from Advanced Floor Concepts

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 525

1    regarding the potential sale of Advanced Floor Concepts to

2    Kodiak Builders?

3    A    Primarily Mike.

4    Q    Did you have interactions with anyone else?

5    A    At the very end of it there was a little bit of

6    interaction with Dee, but the initial negotiation component

7    of it Mike was kind of the counterpart role to mine.

8    Q    So, the counterpart to what you were.  So, how would

9    you describe that?

10   A    He was taking the -- as I was taking offers to -- from

11   him to Kodiak, he was doing the same with Dee as we were

12   trying to come to a mutually beneficial --

13   Q    In these initial settlement negotiations, did Mike have

14   final authority to accept a deal?

15   A    He did not, as I understood it, no.

16   Q    When you would make a counterproposal on behalf of

17   Kodiak Builders is that something, based off your

18   interaction, that Mike was able to accept on the spot?

19   A    No.

20   Q    What was your understanding of what Mike did with that

21   counterproposal?

22   A    He would take it to Dee and then come back with

23   whatever counterproposal of the counterproposal.

24   Q    Okay.  Now, I want to take you to the Government's

25   Exhibit 44.  It's in that book, yeah?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 526

```
 1   A    The big one.

 2   Q    Yeah.  The big one.  Do you recognize that e-mail?

 3   A    Yeah.

 4   Q    It's been a while.  It was --

 5   A    It's been a while.

 6   Q    -- 2013, right?  About two years ago?

 7   A    Yep.

 8   Q    Actually, just over two years.  That's -- time's going

 9   by too fast.

10   A    Uh-huh.

11   Q    And this is an e-mail from Mike to you; is that right?

12   A    The -- 44 is an e-mail from me to --

13   Q    It says --

14   A    -- to Mark.

15   Q    -- to --

16   A    Yes.  Yes.

17   Q    -- Mark.

18   A    cc'd Dee, yes.

19   Q    Okay.

20   A    Sorry.

21   Q    And I think you said it's cc'd with Dee's information

22   as well?

23   A    Yeah.

24   Q    Right?

25   A    Yep.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 527

1   Q    And these are some of the salient points related to the

2   potential acquisition of AFC by Kodiak Building Partners,

3   correct?

4   A    Yes.  I believe at that time we were trying to acquire

5   49 percent to maintain the d/b -- d/b/a status.

6   Q    And when you say the d/b/a status, the fact that it

7   would still be a woman-owned business?

8   A    Yes.

9   Q    And then if you would go to -- and this e-mail is from

10  Mike.  Do you know whether these were Mike's points or Dee's

11  points?  And if you don't know, you can say you don't know.

12  A    I do not know.

13  Q    Now, if you go to Exhibit 45.  This is an e-mail that's

14  sent to you; is that right?

15  A    Yes.

16  Q    It contains the letter of intent from Kodiak Building

17  Partners to Advanced Floor Concepts; is that right?

18  A    Yes.

19  Q    Now, in that it's signed by Mr. Wilhite as CEO.  Do you

20  see that on page 5 of 8?

21  A    Uh-huh.

22  Q    I'm sorry, I just need you to say yes or no.

23  A    Yes.

24  Q    Thank you.

25  A    I'm sorry.  Yes.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 528

1   Q    No.  That's okay.  At any point did Michael Wilhite

2   ever sign any documents related to the potential acquisition

3   of AFC by Kodiak Building Partners as the owner?

4   A    No.  And this is -- specific to that, it's a letter of

5   intent.  It's not a -- it's not a finalized agreement of any

6   kind.

7   Q    So, what's the purpose ever a letter of intent?

8   A    It's basically just showing intent between the two

9   parties.  Steve, who wrote the initial letter that we sent

10  out, and then Mike followed up with it, signed it.  It's --

11  it's -- it's -- basically, it's, you know, our intent is to

12  move forward from this point.  Kind of agree as to the

13  structure of due diligence, and as we move forward in the

14  negotiation portion as well as nondisclosures, things along

15  those lines that would -- might jeopardize relationships with

16  other customers or suppliers.

17  Q    So, essentially -- and correct me if I'm wrong -- I

18  letter of intent is so the companies can open negotiations?

19  A    Yes.

20  Q    Now, I want to take you to Exhibit 49 -- or 47.  I

21  apologize, 47.  Do you see that?  Both the e-mail, as well as

22  the memorandum that comes afterwards?

23  A    Yes.

24  Q    What was your understanding of what this memorandum was

25  for?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 529

1   A    This was -- so, as we -- we were progressing through

2   any purchase -- and if you actually look at it closely, the

3   one that we had done just prior to that was New England

4   Building Supply.  So, we took a template of what that letter

5   that we normally send to all employees that are impacted,

6   whether it be on the Kodiak side as well as the acquired

7   company's side, and we just kind of change wording so it fits

8   that specific acquisition.

9   Q    Okay.  And it looks as if this was e-mailed to you in

10  September of 2013?

11  A    Yes.

12  Q    Was this memorandum ever finalized?

13  A    Oh, no.

14  Q    And when you say, "oh, no," what do you mean?

15  A    We -- the reality, Dee didn't -- didn't like the final

16  agreement and put a stop to the entire process.

17  Q    So, this is just one of the things that would have been

18  finalized if there had been a deal struck between Kodiak

19  Building and Advanced Floor?

20  A    Yeah.  Yeah.  Just kind of the checklist of things you

21  start going through as you're moving for -- in the

22  negotiation process.

23  Q    So, was this ever finalized on behalf of Kodiak

24  Building Partners, to your knowledge?

25  A    I believe we had kind of a -- a rough draft of a final

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 530

1 draft, but it never -- it was never released as I understood

2 it.

3 Q    And is this -- would this memorandum, in your opinion

4 based off of your dealings, would it have been -- would it

5 have needed to be signed off on by Dee?

6 A    Yes.

7 Q    And to your understanding, has this memorandum, as it's

8 written with the line-outs, the red lines, ever been approved

9 by Dee, to your knowledge?

10 A    No, it has not.

11 Q    And then you said that ultimately the deal didn't work

12 out, correct?

13 A    Correct.

14 Q    And do you know the reason why the deal didn't work

15 out?

16 A    I -- I -- once the -- the kind of accounting side took

17 over and it was -- there was a -- the comfort level that Dee

18 felt negotiating with me versus what the Kodiak kind of

19 process was, didn't really fit what she thought it -- it just

20 made her uncomfortable.

21 Q    And so whose decision, as far as you know, was it to

22 not move further from the Advanced Floor side?

23 A    It was Dee's.

24 Q    Was this at the time when your contact with Dee during

25 these negotiations increased?

United States of America vs.                    Evidentiary Hearing - Day III
Michael David Wilhite                                      September 17, 2015

```
 1    A    I honestly don't think -- no, I don't believe so.

 2              MR. BEDNARSKI:  Your Honor, if I may approach.

 3    I'm just not sure if Exhibit Z is still on the stand.

 4              UNKNOWN SPEAKER:  Z?

 5    Q    (By Mr. Bednarski)  Okay.  I'm handing you what's

 6    previously been entered as Defendant's Exhibit Z.  This is an

 7    e-mail from -- and I'm just talking about the very first one.

 8    Okay?

 9    A    Yeah.

10    Q    The one from you to Mr. Sweeney, and then also to Brian

11    Cleveringa.

12    A    Yes.

13    Q    And in it, it states that:  I think more of this is

14    coming from Dee not Mike.  I think this is more my fault, not

15    making sure that she has a better understanding of the

16    overall process.

17              At the time that you wrote this, were you having

18    communications with Dee regarding this potential acquisition

19    of AFC by Kodiak Building Partners?

20    A    Very briefly.  The -- the genesis of this was more so,

21    very important customer to the Barton side of the business.

22    And we had a group of Kodiak guys that were upset, feeling

23    that they didn't -- that they should be trusted.  And, you

24    know, taking the onus off of them, putting it more on me.

25    Q    Okay.  And that's because of your relationship with
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 532

 1    AFC and --

 2    A    Yes.

 3    Q    -- Dee Wilhite, right?

 4    A    Yes.

 5              MR. BEDNARSKI:  May I have one moment.

 6              THE COURT:  Yep.

 7              MR. BEDNARSKI:  No further questions.

 8              THE COURT:  Mr. Stubbert, did the company's

 9    relationship with Advanced Floor change at all after the

10    negotiations fell through?

11              THE WITNESS:  It was -- it was a little tender for

12    a while, but I think we've moved past that.

13              THE COURT:  Did it affect sales?

14              THE WITNESS:  It did not, no.

15              THE COURT:  Sales never have decreased as a result

16    of that?

17              THE WITNESS:  No, they have not.

18              THE COURT:  Just the feelings were hurt and had to

19    be fixed?

20              THE WITNESS:  Yes.

21              THE COURT:  Okay.  Any cross?

22              MS. FROEHLKE:  Yes, Your Honor.

23                      CROSS-EXAMINATION

24    BY MS. FROEHLKE:

25    Q    Mr. Stubbert, you've known the Wilhites for a long time

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 533

1    it sounds like.

2    A    Right at seven years, yes.

3    Q    You have only known them seven years?

4    A    Yeah.  I believe that that's when I started with Barton

5    was seven years ago.

6    Q    Okay.  You consider them friends of yours, right?

7    A    Yes.

8    Q    Would you say good friends?

9    A    Yes.

10   Q    And you meet with them in a social capacity?

11   A    More so Mike, but, yes.  I have met with Dee in a

12   social capacity as well, but --

13   Q    What kind of events or context was that?

14   A    With Dee the -- the -- we do the Christmas party every

15   year, the -- the -- a -- what do you call it -- picnic every

16   year that Dee attends all of those.  Those are the ones that

17   I see her socially.

18   Q    When do you see Mike socially?

19   A    I think once every few months we'll have dinner

20   together.

21   Q    And you also have a business relationship obviously?

22   A    Yes.

23   Q    And you just called him a -- or you just called

24   Advanced Floor a very important customer; is that right?

25   A    They are -- they're Barton's largest single customer.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 534

1    Q    How much money do you think Advanced Floor is bringing

2    in for Barton on an annual basis?

3    A    In top line sales, north of $2 million.

4    Q    And you'd like that continue, I assume?

5    A    Oh, absolutely.

6    Q    You know that Mr. Wilhite has a criminal conviction?

7    A    I do.

8    Q    What do you know about it?

9    A    I -- that there was -- there was some fraud in -- in

10   financial dealings, whether it was stock or Ponzi scheme or

11   something along those lines.  I don't remember the -- all the

12   details about it, but --

13   Q    But --

14   A    I'm sorry?

15        THE COURT:  Let him finish.  Go ahead.

16   Q    (By Ms. Froehlke)  Go ahead, Mr. Stubbert.  I

17   apologize.

18   A    And it was back in the late '90s, if I remember

19   correctly.

20   Q    How did you first learn about this?

21   A    Mike was very honest with me, and we sat down and had a

22   long conversation about it.

23   Q    When was that?

24   A    I'm going to say '99, maybe 2000.  No, sorry.  So, it

25   was the second year I was with them.  I got my dates messed

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 535

1   up here.  So, it would have been 2009 to 2010.

2   Q    And what did he say in that long conversation?

3   A    Well, we were -- we were having a conversation about

4   Christianity.  We're both Christians, and he wanted to

5   explain some of his past and -- and talk about what had

6   happened.  So, we sat down and had a long conversation about

7   it.

8   Q    Do you remember specifics?

9   A    Just what I -- I stated earlier.

10  Q    And it was some sort of financial fraud?

11  A    Yes.

12  Q    Did he tell you that he owed money to people?

13  A    No.  At that point, no.

14  Q    Did he tell you at any point that he owed money to

15  people?

16  A    We -- within the last year or so, yes, we talked about

17  that.

18  Q    And what was that conversation?

19  A    That there was a restitution involved in the -- in the

20  original conviction.

21  Q    Was that before or after Barton was involved in

22  negotiating the sale of Advanced Floor?

23  A    I honestly could not tell you for sure and think -- to

24  be totally honest about it.  I don't -- I don't recall

25  exactly the date.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 536

1   Q    Okay.  But, you first started doing business with

2   Advanced Floor in 2008, about, you would say?

3   A    Yeah.  When I -- it was -- August of 2008 was when I

4   started with Barton.  It was very shortly after that.

5   Q    And did you meet Mr. Wilhite in person at that time?

6   A    No.  Actually, it was Torin's predecessor.  And I only

7   remember the first name of Roger at the time.

8   Q    When did you first meet Mr. Wilhite?

9   A    It was probably a month or two following that.

10  Q    So, would you say September, October, 2008?

11  A    Yeah.  It was -- it was right when we started actively

12  doing business again with them.

13  Q    How often were you interacting with Mr. Wilhite at that

14  time?

15  A    I think I probably interacted with him the one time

16  when I came into the office.  It was both he and Dee.  And

17  then it was maybe once or twice after that for the following

18  six months.  And then I believe Roger passed away, and they

19  became more active in the company.  The economy really kind

20  of took a southward turn on all of us, so we were working

21  together quite a bit.

22  Q    When you first interacted with Mr. Wilhite, did he tell

23  you he was retired?

24  A    Not that I recall, no.

25  Q    Has he ever told you he's retired?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 537

 1   A    No.

 2   Q    As far as the ownership of the company goes, you know

 3   that Dee's name is on everything, right?

 4   A    Yes.

 5   Q    And isn't it true that you received a phone call from

 6   our office on July 1st?

 7   A    Yes.

 8   Q    You spoke with Investigator Troy Tyez; is that right?

 9   A    I believe so, yes.

10   Q    And in response to his question if you knew who owned

11   AFC, you responded, Well, I know Dee's name is on everything.

12   Is that right?

13   A    Probably -- that's what he recalls from the

14   conversation?

15          THE COURT:  No.

16   Q    (By Ms. Froehlke)  Is that what you recall?

17   A    It was --

18          MS. FROEHLKE:  I apologize, Your Honor.

19          THE COURT:  That's okay.  I don't want you to just

20   adopt the answer because you think it might be true.  We're

21   asking for your memory.

22   A    I don't recall.  But it was an unexpected phone call.

23   I returned his call as I was driving down the road.

24   Q    (By Ms. Froehlke)  So you don't recall saying, Well, I

25   know Dee's name is on everything?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 538

1    A    I -- I -- not in that detail, no.

2    Q    **Do you deny that you would have said that?**

3    A    No.  I mean, I -- as -- I do not deny that.

4    Q    **Are you aware of Mr. Wilhite owning anything in his**

5    **name?**

6    A    No.  I wouldn't know anything on that end of, you

7    know --

8    Q    **So, no?**

9    A    Yeah.  No.

10   Q    **You introduced Mr. Wilhite to Steve Sweeney; is that**

11   **right?**

12   A    Yes.

13   Q    **And he -- who is he?**

14   A    Steve Sweeney?

15   Q    **Uh-huh.**

16   A    Is the -- well, now he's the president of Kodiak

17   Building Partners.

18   Q    **When did you introduce the two of them?**

19   A    It was prior to the Barton/Kodiak acquisition.  We

20   actually took Steve and Paul Hylbert, who are the two

21   principals at Kodiak, to the Advanced office to introduce

22   them to -- what would be our largest customer.

23   Q    **Was Dee there at that time?**

24   A    No.  She was not.

25   Q    **You introduced them to Mike only, right?**

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 539

1    A    It was primarily Torin, and Mike was there as well.

2    Q    Did you introduce Mike as -- what position did you

3    introduce Mike as holding, if any?

4    A    I couldn't recall.

5    Q    And a relationship started building from there, right?

6    A    The -- the relationship with Steve and --

7    Q    Advanced Floor.

8    A    Yes.

9    Q    Do you recall when the topic of purchasing Advanced

10   Floor first came up?

11   A    Yeah.  It was -- it would have been prior to all of

12   these e-mails.

13   Q    Do you remember a conversation specifically?

14   A    I do not, no.

15   Q    You were not at a seminar, were you?

16   A    I'm sorry?  No.

17   Q    A seminar about buying businesses.  You weren't

18   attending that with -- with Steve Sweeney, were you?

19   A    No.

20   Q    Have you ever attended a seminar about buying a

21   business?

22   A    No.

23   Q    What was -- I apologize.

24        MS. FROEHLKE:  Withdrawn.

25   Q    (By Ms. Froehlke)  So you did exchange a number of

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 540

1   e-mails regarding this potential purchase, as you just

2   testified on direct.  If you could turn to Exhibit 44.

3   A    (Coughing).  Excuse me.

4   Q    First, I would like to focus on the top of the page

5   where the caption of the e-mail is.  It's an e-mail to you;

6   is that correct?

7   A    Uh-huh.

8   Q    Markstubbert@bartonsupply.com.  You've copied Dee

9   Wilhite, right?  Or I should say her husband copied her on

10  the e-mail?

11  A    Yes.

12  Q    And her e-mail is Theranch@SCCCinspections.com?

13  A    Yes.

14  Q    What is SCCCinspections.com, if you know?

15  A    I believe that's her inspection company.  I don't know

16  for sure.  But I know she does inspections for banks as well,

17  on preconstruction inspections, if I remember the whole thing

18  correctly.

19  Q    Okay.  So, this is from August 14th, 2013, right?

20  A    Yep.

21  Q    And Mr. Wilhite has written:  These are the salient

22  deal points as I understand them.  Please review and comment.

23  Thanks.

24       If you look about halfway down the page, Mr. Wilhite

25  has written:  Mike Wilhite will continue to operate the

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 541

1    company at his current work schedule and salary until

2    December of 2015.

3        What was your understanding of his current work

4    schedule and salary at that time?

5    A    It was -- I recall roughly three days a week.  I do not

6    recall what the pay structure was.  That was not -- at the

7    point where a lot of this was done, we hadn't gone to the P&L

8    portion of the negotiations.

9    Q    At any point, did you learn Mr. Wilhite's salary?

10   A    Yeah.  I -- I probably did when we -- when were moving

11   forward with the review of financials.

12   Q    How would you have learned that?

13   A    It would have -- well, it depends on what the

14   financials said.  I can't sit down and say, you know, this is

15   exactly what it -- what it means.  It's -- it could have been

16   listed on a number of different areas within the financials.

17   Q    What kind of areas would his salary be listed in?

18   A    I would -- well, you would have your -- your employee

19   salary breakout.  If there was anything in an employment

20   agreement, it could be -- it could be a draw against

21   earnings.  Again, without having the actual financials

22   sitting in front of me, I couldn't tell you exactly how we

23   would have come up with a figure.

24   Q    Do you recall ever learning that Mr. Wilhite, in fact,

25   has not made any money from Advanced Floor since 2008?

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                      September 17, 2015

Page 542

1    A     No, I don't recall that.

2    Q     **Does that surprise you?**

3    A     Not necessarily.  I mean, there's lots of different

4    ways.  You either take a salary or they take draws or, you

5    know, Dee could be pulling a draw out of the company, and --

6    you know, there's a lot of different ways to structure the

7    way that a corporation is run.

8    Q     **But your understanding was his schedule was about three**

9    **days a week at that time?**

10   A     Yes.

11   Q     **You mentioned that in your communications with**

12   **Mr. Wilhite he would take his -- he would take the**

13   **information you two shared to Dee, and then come back with**

14   **some sort of answer; is that right?**

15   A     Yes.

16   Q     **He never told you that he was taking things to Dee in**

17   **writing, did he?**

18   A     Not that I -- I couldn't recall that.  It was -- I know

19   that Dee's -- yeah.  I couldn't -- I can't recall how exactly

20   that conversation would have gone.

21   Q     **You were never present for any of those conversations,**

22   **right?**

23   A     No.

24   Q     **If you could turn to Exhibit Z, it's actually the loose**

25   **piece of paper that Mr. Bednarski was talking about earlier.**

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 543

1   So, if you could look at the top of the page, again.  This is

2   from you.

3   A     Uh-huh.

4   Q     And it is to Steve Sweeney, copying Brian Cleveringa --

5   and he's also at Kodiak, right?

6   A     Yes.

7   Q     So, this is from September 10th, 2013.  And you have a

8   feeling that this is coming -- the mistrust that they talk

9   about below, is coming more from Dee and not Mike because you

10  think this is more your fault in making sure she has a better

11  understanding of the overall process, right?

12  A     Yes.  That's what I -- that's what I wrote in the

13  e-mail.

14  Q     Can you explain why you thought that Dee was not having

15  a good understanding of the process?  Did Dee tell you that?

16  A     No, but -- but.  Knowing the relationship that I have

17  with Mike and the communication that we were doing, this was

18  -- this was entirely on the Kodiak side of the business.

19  They weren't communicating well with Mike or Dee at that

20  point.  This is -- I mean, it is literally a response to the

21  -- my e-mail in this particular point, because I remember

22  this extremely well, it's -- the Kodiak guys did not handle

23  the communication at all well with what they were looking for

24  as far as the financial information, all of the things

25  that -- and just helping a person who's never sold a company

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 544

1    understand when a big investment company comes in and buys.

2    Q    Why --

3    A    So --

4    Q    -- did you feel it was your fault that Dee was not

5    understanding?

6    A    Well, when I -- when I stepped back out of the

7    situation, and we'd come up with the salient points of, you

8    know, how the baseline deal was structured and then it moved

9    to the accounting side of things, I didn't -- I didn't stay

10   involved into it and help that process out.  I didn't -- you

11   know, it's a -- you know, we're talking it was just bad

12   business on my end not staying involved in the process.

13   Q    When you say we came up with the salient points, you

14   mean you and Mike, right?  You just testified --

15   A    Yeah.

16   Q    -- when we came up --

17   A    Yes.

18   Q    And when you say it went to the accounting side of

19   things, what do you mean?

20   A    So, you know, in reference to the LOI, it talks about

21   the -- basically, you take the P&Ls, and all of the financial

22   statements, and everything and you put those -- you know, you

23   kind of run them through the accounting process.

24   Q    At Kodiak?

25   A    At Kodiak.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 545

1  Q    So, you did not mean Advanced Floor's accounting, you

2  meant Kodiak's accounting, right?

3  A    Right.

4  Q    So you stepped back from that process?

5  A    Yes.

6  Q    But the -- this mistrust issue was resolved, right?

7  A    You -- oh, as far as -- no, it was not resolved.  We

8  didn't -- we didn't finalize the deal.

9  Q    Well, negotiations continued for another two months;

10 did they not?

11 A    They did.  But we still -- there was never a point in

12 which it got resolved.  I -- for what I consider -- yeah, I

13 never fully resolved the problem, obviously because we're two

14 separate companies.

15 Q    If you could turn to Exhibit 46, Mr. Stubbert.

16 Mr. Wilhite responded to these due diligence items on

17 September 26 --

18 A    Uh-huh.

19 Q    -- is that right?  He doesn't mention any mistrust

20 issues?

21 A    Okay.

22        THE COURT:  Well, that's a question.

23        THE WITNESS:  Oh, I'm sorry.

24 Q    (By Ms. Froehlke)  Would you agree that there's no

25 issues of mistrust or misunderstanding of what's going on,

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 546

 1    right?  This is a response to due diligence?

 2    A    This is a response to due diligence.  Without having

 3    read the entire thing -- yeah, it appears that way.

 4    Q    Let's turn to page 6 of 12 of this exhibit.  This is an

 5    e-mail, again, from Mr. Wilhite.  You're copied.  This is

 6    about a month later, October 29th, 2013.  Mr. Wilhite has

 7    apparently spoken with a bank officer concerning Advanced

 8    Floor's guarantor obligation and he is, again, going over

 9    deal points, right?

10    A    That -- yes.

11    Q    At that time there was no concern about mistrust then?

12    It was moving forward?

13    A    I -- I believe that there was -- yes, the snapshot of

14    the e-mail doesn't have anything on the trust side of it.

15    Q    And the negotiations were --

16    A    Moving forward.

17    Q    -- moving forward?

18    A    Yes.

19    Q    If you could turn to Exhibit 45, please, Mr. Stubbert.

20    The second page.  This is the letter of intent?

21    A    Yes.

22    Q    From August of 2013?

23    A    Yes, it is.

24    Q    If you go to the Section 2, Consideration and Structure

25    -- and if you need a zoomed-in version you can look at the

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 547

1    screen there next to you.

2             I'm looking four bullet points down:  The

3    operating committee, including Mike Wilhite, Steve Sweeney,

4    and Mark Stubbert govern strategic decisions of the business,

5    with Mike Wilhite continuing to lead the business on a

6    day-to-day business through December, 2015.

7    A    Correct.

8    Q    So, you were on the operating committee?

9    A    Yes.

10   Q    Who assigned members of the operating committee?  Who

11   decided that?

12   A    I believe it was a negotiation between Steve, Mike, and

13   I as to who would be in the operating committee.

14   Q    Dee was not involved in those discussions?

15   A    Not in the day-to-day discussions, no.  But there

16   should -- if -- somewhere in here there's got to be an e-mail

17   trail that follows that up because that was -- it was a

18   communication that was going back and forth.

19   Q    Mr. Stubbert, was Dee involved in these discussions?

20   Yes or no?

21   A    She was not.  As I said, she was not involved in the --

22   the -- the one-on-one communications, but there was e-mails

23   that would have led up to this LOI getting issued.

24   Q    So, that's a no.  She was not involved in the

25   discussions for the operating committee?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 548

```
 1              MR. BEDNARSKI:  Your Honor, he's answered the
 2    question.
 3              THE COURT:  Well, he says -- it's vague.  It would
 4    have been e-mails, okay.  I understand that.  But her
 5    question to you is, with regard to setting up an operating
 6    committee and going into all of these bullet points, who
 7    negotiated it for Advanced Floor?  Was it --
 8              THE WITNESS:  It would have been --
 9              THE COURT:  -- Mike, Dee or both?
10              THE WITNESS:  It would have been Mike.  Mike,
11    Steve, and I sat down and looked at the baseline structure
12    together for the operating committee.
13    Q    (By Ms. Froehlke)  Let's go the Exhibit 47.  Mike has
14    sent you this e-mail with an attachment on September 5th,
15    2013, and says, I'm sure that there is more that we can add.
16    Your comments, question mark.  And you discussed this on
17    direct.  This is a track change document that was originally
18    from a different business that was acquired, right?
19    A    Yes.
20    Q    And Mike made changes as appropriate for Advanced
21    Floor; is that correct?
22    A    Yeah.  I think there was a number of different people
23    that would have made changes without -- but, yes.
24    Q    Do you submit that this document was edited by more
25    than just Michael Wilhite, as you're just looking at it right
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 549

1   now?

2   A    I would think probably, but not -- not having the

3   original e-mail in front of me, and then --

4   Q    If you could turn to page 6 of 18, Mr. Stubbert.

5   A    Okay.

6   Q    When you looked at those track changes, did you notice

7   that every single track change was assigned to the name

8   Michael Wilhite?  Did you take note of that at all?

9   A    No.  I'm sorry, I did not even realize he had the --

10  Q    So you'd agree he made all these edits?

11  A    Yes.

12  Q    At any point, did you tell Mr. Sweeney that Michael had

13  a criminal conviction?  Mr. Sweeney.  I apologize.

14  A    Yeah.  We -- there was a point.  I couldn't tell you

15  the date, but we had that conversation.

16  Q    Was it before or after these negotiations stopped?

17  A    I couldn't tell you the date at which that happened,

18  but we did have that -- Mike -- or Steve and I had that

19  conversation.

20  Q    What was his response to that?

21  A    I -- I don't recall the -- honestly, it was -- yeah.  I

22  don't recall.

23          THE COURT:  Mr. Stubbert, did the topic of

24  Mr. Wilhite's credit history ever come up during the

25  negotiations?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 550

```
 1              THE WITNESS:  No, it did not.

 2              THE COURT:  You can proceed.

 3    Q    (By Ms. Froehlke)  Were you aware of his credit history

 4    at all?

 5    A    No.

 6    Q    So just to clarify, Mr. Stubbert, you have never --

 7    would you agree with me that you have ever -- I apologize.

 8    Have you ever said to anyone, with regard to Advanced Floor's

 9    ownership, that, quote, Dee's name is on everything?  Do you

10    agree or disagree?

11              THE COURT:  That's two questions.  Start it again,

12    please.

13              MS. FROEHLKE:  Yes, Your Honor.

14    Q    (By Ms. Froehlke)  Have you ever said to anyone, with

15    regard to Advanced Floor's ownership, that, quote, Dee's name

16    is on everything?

17    A    I couldn't answer.  I -- sorry.  I can't give you a yes

18    or no, because I'm not sure how I would -- if I phrased it

19    that way or not.

20    Q    But you think you would have said that in a

21    conversation with our office in July?

22    A    It's possible.  I don't recall.

23              MS. FROEHLKE:  One moment, Your Honor.

24              THE COURT:  Sure.

25              MS. FROEHLKE:  No further questions.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 551

 1                   THE COURT:  Okay.  I have one other.  I've been
 2    meaning to ask this to somebody.  There's quite a few
 3    references in here to Mr. Wilhite's part in this continuing.
 4    Okay?  His salary continuing, his schedule change continuing.
 5    Did you see those?
 6                   THE WITNESS:  Yes.
 7                   THE COURT:  And is that also a memory that you
 8    have that -- that he was to continue in his schedule and his
 9    salary?
10                   THE WITNESS:  Yes.  It was a point that I -- Mike
11    is the -- is a fantastic salesperson, and that's a very hard
12    thing to find in -- in this industry.
13                   THE COURT:  Okay.
14                   THE WITNESS:  And the knowledge base that he has
15    in the industry, having him continue in that role would have
16    been a great asset to the company.
17                   THE COURT:  And your obligation was on behalf of
18    Barton.  And Kodiak.  I guess, both?
19                   THE WITNESS:  It would have been Kodiak primarily,
20    yes.
21                   THE COURT:  Okay.  And you were protecting their
22    interests?
23                   THE WITNESS:  Yes.
24                   THE COURT:  How do you know what he was making?  I
25    mean, what if his salary was a million dollars a year?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 552

```
 1              THE WITNESS:  Well, we -- that would then -- it
 2   would have -- there's no way it could have been a million a
 3   year, but I understand that.
 4              THE COURT:  Why?
 5              THE WITNESS:  The company wouldn't support that
 6   type of a salary.
 7              THE COURT:  Okay.  What was his salary?
 8              THE WITNESS:  I don't recall off the top of my
 9   head.  It was somewhere in the hundred-thousand-dollar range,
10   but I couldn't give you a real hard number.
11              THE COURT:  Thank you.
12              THE WITNESS:  And -- yeah.
13              THE COURT:  Okay.
14              MR. BEDNARSKI:  Hopefully I don't need them yet.
15                     REDIRECT EXAMINATION
16   BY MR. BEDNARSKI:
17   Q    Mr. Stubbert, just a couple of questions.  Mr. Froehlke
18   asked some questions regarding your personal relationship
19   with Dee and Mike.
20   A    Uh-huh.
21   Q    Based off of that personal relationship, would you lie
22   for them?
23   A    I would not.
24   Q    Based off of the professional relationship Barton has
25   with -- with Advanced Floor Concepts, and your desire to have
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 553

1   that continue since they are Barton's single largest

2   customer, would you lie for Dee and Mike in order to keep

3   that partnership going?

4   A    I would not.

5   Q    You had indicated that you and Mike had talked about

6   that he had this conviction and that he told you about it in

7   2009, 2010, and then in the last year he told you that he

8   owed some money.  At any time did Mr. Wilhite tell you that

9   he was trying to hide assets so he didn't have to repay that

10  restitution?

11  A    No.

12  Q    And I think you had indicated that you -- you took

13  Mr. Sweeney and, I think you said, Hylbert, right?

14  A    Yes.

15  Q    To Advanced Floor Concepts?

16  A    Yes.

17  Q    And I just want to make sure that I understand

18  correctly.  When did you initially take them to Advanced

19  Floor Concepts?

20  A    Prior to the finalization of the purchase of Barton

21  Supply, they wanted to go out and see the types of businesses

22  that we were doing business with.

23  Q    So, is this before or after the negotiation related to

24  the acquisition of Advanced Floor Concepts started?

25  A    Long before.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 554

1  Q    So, this was in the timeframe when Kodiak Building

2  Partners was potentially going to acquire Barton Supply?

3  A    Yeah.  It was -- yeah.  I believe it was a week or two

4  before that we finalized.

5  Q    And I think you had indicated that you were primarily

6  introducing them to Torin?

7  A    Yes.

8  Q    Why was that?

9  A    Torin is our day-to-day interaction point with

10 Advanced.

11 Q    And what was the idea of -- what was the point of

12 introducing Mr. Sweeney and Mr. Hylbert to Torin?

13 A    Torin has a much better look into how our business

14 supports their business than Mike does.  Mostly because it

15 is -- you know, it's where the two companies intermix, that

16 Torin and Nate and Skyler are there estimating and ordering,

17 and us delivering materials.

18 Q    You had also -- Ms. Froehlke asked some questions

19 regarding Mr. -- Mr. Wilhite's credit history.  Did his

20 credit history matter to the negotiations related to the

21 acquisition of Advanced Floor Concepts?

22 A    None whatsoever.

23 Q    Why not?

24 A    It's a business.  We wouldn't look at individual

25 credit.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 555

1   Q     And if you were looking at the business, would his

2   credit history matter if he was not an owner of the company?

3   A     It would not.

4   Q     You had also talked briefly with Ms. Froehlke about

5   Exhibit 46.  It related to some e-mails that went back and

6   forth, and she was asking you questions about there's no

7   statements in there about the mistrust that was still there?

8   A     Correct.

9   Q     Do you recall that?  And you talked briefly about,

10  well, that's -- that's a snapshot of an e-mail, and it does

11  not say there's no mistrust issues.  Do you recall that

12  statement?

13  A     Yes.

14  Q     To your knowledge, was there still this mistrust

15  ongoing even though the negotiations were still ongoing?

16  A     Yes.  I mean -- I don't know if I can expound, but --

17  Q     Please.

18  A     You know, they end result on not finalizing the

19  acquisition is entirely driven by that.  It's -- it fit with

20  our business model as far as Kodiak and Barton, and it fit

21  with what Dee was looking for and exiting that with a, you

22  know, very good financial kind of landing pad for them.  So

23  all the pieces were in place except for the trust.

24  Q     And who had that mistrust?  Was it Mike?  Dee?  Who?

25  A     I would say it --

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 556

```
 1              MS. FROEHLKE:  Objection.  Speculation.
 2              MR. BEDNARSKI:  I think he can answer it if he
 3   knows, Your Honor.
 4              THE COURT:  Well, ask him, first, if he has a
 5   basis for knowing who it was?
 6   Q    (By Mr. Bednarski)  Do you know who had that mistrust
 7   with the Kodiak Building Partners?
 8   A    Yes.
 9   Q    Who did?
10   A    Dee.
11              MR. BEDNARSKI:  May I have a moment, Your Honor?
12              THE COURT:  Yes.
13   Q    (By Mr. Bednarski)  Just a couple of other questions.
14   Ms. Froehlke had asked some questions regarding, did you make
15   the statement of, well, you know Dee's name's on it.  And you
16   recalled, I don't remember if I used that language or not.
17        As part of these negotiations related to the
18   acquisition of AFC, were you provided any documents related
19   to who was the owner of Advanced Floor Concepts?
20   A    I believe we -- we -- I was not provided with that no.
21   We would have gotten that from the Secretary of State.
22   Q    And if you would go to Exhibit -- I believe it is 46.
23   If you would go to Exhibit 46, please.
24   A    (Coughing).  Excuse me.
25   Q    As part of the due diligence list, you were also cc'd
```

Page 557

1   on it; is that correct?

2   A    Correct.

3   Q    Now, under No. 32, was it answered as to who owns the

4   company?

5   A    Yes.

6   Q    And what -- what were you told as part of this due

7   diligence list?

8   A    That Dee was listed as the owner of the sub -- Sub S

9   corporation.

10  Q    Do you recall if you also received the articles of

11  incorporation, the operating, agreement of Advanced Floor

12  Concepts?

13  A    I do not recall if I received any of that, no.

14  Q    Now, that language, Well, I know Dee's name on it,

15  what, if anything, did you mean by that?

16  A    Well, I mean, that's the -- my understanding of

17  corporate stuff, if I -- if I said that, and I very well

18  could have, her name is on the Subchapter S corporate

19  documentation.  It's also on the -- the original credit

20  application with Barton Supply, dated all the way back in

21  1998, I believe.

22  Q    And finally --

23  A    And she was the signer of checks up until -- I believe

24  after Brendan and Roger left the company -- or one was

25  relieved from the company and the other one passed away.  And

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 558

1    she was the one that I dealt with quite a bit in that real

2    downturn in the economy on the financial end of things.

3    Q    Now, the last thing is, the judge asked you a few

4    questions regarding the salary of Michael Wilhite, and you

5    said, I thought it was around a hundred thousand dollars.

6    What are you basing that off of?

7    A    And I -- as I -- you know, and I don't -- when we

8    pulled all of this up there should have been a P&L that was

9    attached to it at some point, and it was -- the corporate

10   officers would be listed on that salary distribution.  I

11   don't recall exactly how it was listed out, whether it was

12   listed as Mike or just listed as corporate officers, or

13   whether it was listed as Dee, and a monthly amount of money

14   that was paid out in that line item as it was broken out.

15   And then when we received back our diligence information it

16   gave us a starting point.

17   Q    So that hundred thousand dollars, could that have been

18   Dee's salary, not Mike's?

19   A    It could very well have been, yes.

20   Q    Thank you.

21         MR. BEDNARSKI:  No further questions.

22         THE COURT:  Mr. Stubbert, you were involved in

23   this negotiation that failed.

24         THE WITNESS:  Uh-huh.

25         THE COURT:  Were you involved also in the

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 559

1   negotiation between Kodiak and Barton?

2           THE WITNESS:  To a lesser degree, but, yes.

3           THE COURT:  Okay.  And have you ever been involved

4   in any other purchases of businesses?

5           THE WITNESS:  Mostly in this type of a situation

6   where I would start the conversation and then let the

7   accounting side take it over.

8           THE COURT:  Okay.  How many occasions do you

9   suppose that you considered -- either considered or actually

10  done the purchase of another business?  Either being

11  purchased yourself or on behalf of a company investigating

12  the possibility of purchasing a company?

13          THE WITNESS:  Once for a myself, and then once

14  this last year where we actually finalized with a company

15  called Steel Star.

16          THE COURT:  Okay.  All right.  Thank you.

17  Anything further?

18          MR. BEDNARSKI:  No, Your Honor.

19          THE COURT:  Okay.  You can step down.

20          THE WITNESS:  Okay.

21          MR. BEDNARSKI:  Your Honor, we'll release him from

22  our subpoena at this point.

23          THE COURT:  Okay.  Very good.

24          MR. BEDNARSKI:  So that means you don't have to

25  come back.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 560

```
 1              THE COURT:  You're free to go.

 2              THE WITNESS:  So I (unintelligible).

 3              MR. BEDNARSKI:  You do not have to come back to

 4   the courthouse.

 5              THE COURT:  Okay.  So, I assume you want a break?

 6              MR. BEDNARSKI:  Yes.

 7              MR. MIKULECKY:  Yes.

 8              THE COURT:  You don't have to.

 9              MR. BEDNARSKI:  Well, you had -- I thought --

10              THE COURT:  I've been know to work people through

11   lunch and all the way --

12              MR. BEDNARSKI:  I thought you had said you had a

13   lunch with that --

14              THE COURT:  No.  No.  Potentially.  But --

15              MR. BEDNARSKI:  Oh, okay.  But we put it off until

16   later.

17              THE COURT:  So --

18              MR. BEDNARSKI:  We're fine with a break, Your

19   Honor.  We have witnesses -- obviously, Ms. Ashe is ready to

20   testify when we come back.  The other ones will be here at

21   1:00, so we can start off -- I would ask that we can start

22   around 1:30.

23              THE COURT:  Whenever you want.

24              MR. BEDNARSKI:  And that way give people time to

25   grab a bite.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 561

```
 1              THE COURT:  Okay.  Is that okay with you guys?

 2              MR. VILLASENOR:  How about 1:40.

 3              UNKNOWN SPEAKER:  1:37 and a half.

 4              THE COURT:  Look at the mediator.  Did you get it

 5   done?

 6              MR. MIKULECKY:  No.  No.  Way far apart.

 7              THE COURT:  Okay.

 8              MR. MIKULECKY:  I invoked your name and they ran

 9   out screaming.

10              THE COURT:  Send them up to me.  Okay.  We'll be

11   in recess.

12              THE COURTROOM DEPUTY:  All rise.  Court is in

13   recess.

14              (A break was taken from 12:34 p.m. to 1:47 p.m.)

15              THE COURT:  Please be seated.  Welcome back,

16   everybody.  00-cr-504.  Back on the record, still in the case

17   of the Wilhites.  Are you ready to proceed?

18              MR. MIKULECKY:  Yes, Your Honor.  Call Robert

19   Corne.

20              THE COURT:  Thank you.  By the way, whenever we

21   come from a break you can have the witness in here.

22              MR. MIKULECKY:  Oh, okay.

23              THE COURT:  They don't have to be outside.

24              MR. MIKULECKY:  Okay.  Thank you.

25              THE COURTROOM DEPUTY:  Raise your right hand.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 562

```
 1              (The witness, Robert Corne, was sworn to tell the

 2     truth by the Courtroom Deputy.)

 3              THE WITNESS:  I do.

 4              THE COURT:  Hello.

 5                      DIRECT EXAMINATION

 6     BY MR. MIKULECKY:

 7     Q    Good afternoon.  Please state your name and spell your

 8     last name for the Court.

 9     A    My name is Robert Corne, C-o-r-n-e.

10     Q    How are you employed, Mr. Corne?

11     A    I am employed with Corne Jantz & Associates.

12     Q    What is that?

13     A    That's a CPA firm, downtown Denver here.

14     Q    Are you a CPA?

15     A    Yes, I am.

16     Q    Are you familiar with Advanced Floor Concepts?

17     A    I am.

18     Q    How so?

19     A    We picked them up as a client in early 2006, I believe.

20     Might have been late 2005.  And they have been clients ever

21     since.

22     Q    "We" is --

23     A    The firm.

24     Q    -- Corne Jantz?

25     A    I'm sorry.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 563

1    Q    Okay.  That's fine.  In your role then as a CPA for

2    Advanced Floor Concepts, do you know Mr. and Mrs. Wilhite?

3    A    I do.

4    Q    Okay.  What work does Corne Jantz do for Advanced Floor

5    Concepts?

6    A    As an accounting firm we do -- we specialize in taxes,

7    so we do their tax returns, tax planning, things like that

8    for them.

9    Q    Just for Advanced Floor Concepts is what I want to

10   focus on.

11   A    Okay.

12   Q    So, what do you do for Advanced Floor Concepts?

13   A    Their tax returns, tax planning, tax projections.

14   Things mostly involving taxes.

15   Q    Okay.  So there'd be an annual tax return for the

16   corporation?

17   A    That's correct.

18   Q    Okay.  What other annual forms would you be preparing,

19   or quarterly forms you would be preparing for them?

20   A    We would -- we don't do employment tax forms or excise

21   tax forms, or any of those kinds of things.  We -- we feel

22   somebody else can do that cheaper, so we basically do the tax

23   returns and the tax planning and -- for the organization.

24        THE COURT:  So the only form you would ever be

25   assisting them on is their annual tax return?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 564

```
 1              THE WITNESS:  Yes.  Uh-huh.
 2   Q    (By Mr. Mikulecky)  That would involve the actual tax
 3   return for the corporation itself; is that right?
 4   A    That's correct.
 5   Q    And what associated forms would be with the preparation
 6   of that form that you would work on?  For example, would you
 7   do a K-1?
 8   A    Yes.  Yeah.  I'm sorry, I consider it a package thing.
 9   And I -- grocery -- what it was.  So, yes, it's a Form 11 --
10   when we first picked them up they were filing a regular
11   corporate tax return, a Form 1120.  The next year they --
12   they switched to a Form 1120S, Subchapter S corporation.  And
13   that Subchapter S corporation distributes the income to the
14   shareholders, so there's a form K-1 that's included with that
15   particular form.  And there's depreciation schedules, and
16   jobs credit forms and things like that.  Anything that was
17   relevant for the tax -- that particular tax year is included
18   with the form.
19   Q    The conversion to a Sub S corporation, does someone
20   have to make that election?
21   A    Yes.  Yes.  The shareholders have to make that
22   election.
23   Q    And who made the election in the case of Advanced Floor
24   Concepts?
25   A    Darla Wilhite did.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 565

1    Q    The K-1s that you describe that show the income to the

2    shareholders, who has been the shareholder that's received

3    those K-1s?

4    A    Darla Wilhite.

5    Q    Has Mr. Wilhite received it at any time?

6    A    No.

7    Q    Okay.  At any point in time that you've had Advanced

8    Floor Concepts as a client has Advanced Floor Concepts been

9    audited by the IRS?

10   A    Yes, they have.

11   Q    When was that?  Ballpark.

12   A    I'm relying on memory, but I think it was around 2006

13   or '7.  Not too long after we picked them up as a client.

14   Q    Okay.  Do you remember the issues that the IRS was

15   looking at at that time?

16   A    Yes.  There was a -- actually, it was a field audit.

17   It was by a senior agent that was most capable.  I was quite

18   impressed.  I used to work for the IRS, and this gentleman

19   was pretty good.  And so he -- he was very thorough, and did

20   a great job.  He was firm, but he -- but he did a great job.

21   Q    Do you remember what specifically they were looking for

22   or what they looked at?

23   A    It was almost like a compliance audit.  What we used

24   to, when I was in, called it tax compliance, where you looked

25   at everything just to see what the compliance in the industry

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 566

 1   was.  And so it was a fairly thorough audit.

 2   Q    You said you worked for the IRS previously before you

 3   went into private practice, correct?

 4   A    That's correct, uh-huh.

 5   Q    Did you conduct those audits as well as an IRS officer

 6   or agent?

 7   A    I did.

 8   Q    With the audit that was done of Advanced Floor

 9   Concepts, was one of the issues that was examined by the

10   auditor the issue of the corporate ownership of Advanced

11   Floor Concepts?

12   A    Yes.  That's usually the beginning.  You want to see

13   the formation documents and things like that just to start

14   off with.

15   Q    Okay.  Did the IRS agent raise any questions about who

16   owned, or the ownership of the corporation?

17   A    No.  That was never an issue.

18   Q    You said that you picked up -- your firm picked up the

19   company Advanced Floor Concepts as a client, 2006, 2007

20   timeframe --

21            THE COURT:  2005, 2006.

22            MR. MIKULECKY:  Thank you, Your Honor.

23   Q    (By Mr. Mikulecky)  2005, 2006.  Did you conduct any

24   review of Advanced Floor Concepts yourself in terms of the

25   operations of the company?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 567

```
 1   A    Yes.  We -- we did.  When we pick up a client there's a
 2   number of things we like to do.  Because we find that some
 3   clients are negligent in keeping their charter up and things
 4   like that.  So, we'll usually get on the State's website and
 5   ensure that the documents have been filed, so that they're a
 6   legal corporation and things like that, and matters like
 7   that.  Tried to look at the corporate documents as best we
 8   could.  But they had a law firm that was representing them
 9   too, so we didn't have to go into as much depth as we usually
10   did because they did a good job.
11   Q    In addition to looking at the structure of the
12   corporation to make sure that it's set up properly, do you
13   look to see whether there are any lack of records or
14   inconsistencies in terms of operations and ownership?
15   A    I would say -- you know, to specifically look at it and
16   look for those, I would say they would have to more appear as
17   you're looking through the documents in general.  Because
18   sometimes you -- you know, they'll jump out at you if there's
19   an inconsistency.  But, as far as spending, you know, a
20   detailed amount of time checking that, other than, you know,
21   checking with the State of Colorado, I would say no more than
22   normal.
23   Q    Okay.  So you look to see if anything is amiss,
24   anything jarring as you're going through the corporate
25   organization and corporate documents; is that accurate?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 568

1   A    That's correct.  Because we also do estate planning,

2   help our clients with estate planning.  And the ownership of

3   things, how they're titled is very important.  And they can

4   be missed a lot of times.

5   Q    Did you see anything amiss, or anything jarring when

6   you did this review with Advanced Floor Concepts?

7   A    No, we did not.

8   Q    Does your company have other clients that are

9   husband-and-wife teams, but the one spouse owns a hundred

10  percent of the company?

11  A    Yes, we do.

12  Q    Any idea how many there are?

13  A    I never counted, so I'm guessing.  I would say 15 or

14  more.  Something like that.

15  Q    Okay.

16  A    And some of them, if they're -- we -- if they're a

17  small business that requires a license to operate then it's a

18  little different, but things like construction companies,

19  retail outlets, things like that that require no license it's

20  pretty common.

21  Q    In all of the documents that you filed on behalf of

22  Advanced Floor Concepts, who's been listed as the owner?

23  A    Darla Wilhite.

24  Q    And those are the tax returns and such that you

25  prepared, correct?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 569

 1   A     That's correct.

 2   Q     Okay.  You've also, though, had independent

 3   communication with the IRS about Advanced Floor Concepts,

 4   haven't you?  Outside of just the tax returns?

 5   A     Oh, yes.  Yes.  They -- in 2008, when the economy

 6   turned around and things started going downhill, they had

 7   overpaid their taxes for 2008 and they had a loss.  And so

 8   there was a -- for a couple years in a row there were refund

 9   opportunities and -- and there was some -- oh, difficulty in

10   getting those back.

11   Q     Take a look, if you would, in the smaller notebook in

12   front of you, at Exhibit X.  And if those are the numbered

13   ones it will be the other exhibit book.  Are you there?

14   A     Yes.  Uh-huh.

15   Q     Can you identify that, please?

16   A     Yes.  This was written by me, evidently on

17   October 20th, 2009.

18              MR. MIKULECKY:  Your Honor, this one is not

19   stipulated.

20   Q     (By Mr. Mikulecky)  You said that you wrote this letter

21   October, 2009.  To whom?

22   A     To the Internal Revenue Service.

23   Q     All right.  Is this a record that was prepared in the

24   normal -- or a letter prepared in the normal course of your

25   business?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 570

 1   A    Yes, it was.

 2   Q    Okay.  Is this a record, then, that was retained also

 3   in the normal course of your business?

 4   A    That's correct.

 5   Q    Is this a true and accurate copy of the letter that you

 6   sent?

 7   A    As best as I can tell, yes.

 8   Q    Now, I know it's not signed.  Do you recall, was this

 9   letter actually sent?

10   A    Yes, it was.

11           MR. MIKULECKY:  Okay.  Your Honor, we'd move for

12   the admission of Exhibit X.

13           MS. FROEHLKE:  Your Honor, we object as to

14   relevance.

15           MR. MIKULECKY:  Your Honor, in the third paragraph

16   there's a note about Mrs. Wilhite owning 100 percent of the

17   corporations.  And what Mr. Corne will testify to is the IRS

18   looked at that issue, and determined and agreed that

19   Mrs. Wilhite owned a hundred percent of the corporations.

20           MS. FROEHLKE:  Your Honor, I would object to any

21   testimony about what the IRS indicated that's not

22   memorialized in the exhibit.

23           THE COURT:  We'll have to wait and see.  Right now

24   he's not offering that as evidence it's just a statement that

25   -- by counsel.  He's just offering this document, which is

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 571

1    Mr. Corne's representation to the treasury that Mrs. Wilhite

2    owns a hundred percent of both corporations.  It's not a fact

3    disputed that she did on paper.  You agree with that?

4              MS. FROEHLKE:  Yes, Your Honor.  And I think the

5    witness can testify to that without this document.

6              THE COURT:  Okay.  I'll admit it.  So overruled.

7              (Exhibit X admitted into evidence.)

8    Q    (By Mr. Mikulecky)  Can you explain the circumstances

9    that happened that led to you sending the letter, Exhibit X,

10   please.

11   A    Basically, if I remember right -- I'm relying on my

12   memory -- the refund was being held up by the Internal

13   Revenue Service, and so we inquired as to the status of it.

14   And they responded by saying --

15             MS. FROEHLKE:  Objection.  Hearsay.

16             THE WITNESS:  Pardon me?

17             MR. MIKULECKY:  Not offered for the truth, I'm

18   just asking for the situation.  So, I don't know that we

19   care, really, what the IRS had to say, I'm just having him

20   explain the situation --

21             THE COURT:  Okay.

22             MR. MIKULECKY:  -- that led to the letter.

23             THE COURT:  So don't testify as to any statements

24   by the IRS.  Okay?

25             THE WITNESS:  Okay.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 572

```
 1              THE COURT:  Try to explain the situation generally

 2    if you can.

 3              THE WITNESS:  Okay.

 4              THE COURT:  Sustained.

 5    A    The -- we were responding because the refund had not

 6    been received.  So, we were disappointed that the IRS had not

 7    received the Form 1045 that we had submitted.  So, basically,

 8    we submitted another one.

 9    Q    (By Mr. Mikulecky)  And did you learn what the reason

10    was that the refund was being held?

11    A    That was I think the next step, possibly of this one.

12    The refund was being held up because --

13              MS. FROEHLKE:  Objection.  Hearsay.

14              MR. MIKULECKY:  That's fine.  We'll move on with

15    that.

16              THE COURT:  Sustained.

17    Q    (By Mr. Mikulecky)  Why were you sending in evidence of

18    a hundred percent ownership?

19    A    Because we had to allocate the -- the refund that was

20    being generated was based on itemized deductions and net

21    operating loss allocations.  And the allocations, they were

22    being allocated to a year they filed separately, and so we

23    had to have some justification for our allocation of that --

24    of those lost past (unintelligible) to each individual party.

25    Q    If Mrs. Wilhite was not the owner of 100 percent of the
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 573

1    corporations, in your opinion as a CPA would she have been

2    entitled to the refunds that you sought?

3    A    No.

4    Q    After you sent this information in to the IRS, did you

5    get the refund?

6    A    Yes.

7    Q    Were there other times that you have communicated with

8    the IRS relating to tax issues for Advanced Floor Concepts or

9    Mrs. Wilhite?

10   A    There were times -- (unintelligible) they involved --

11   or I think from 2008 to -- for about four years they had net

12   operating losses in the companies, which they used to

13   carryback to get refunds.  And a number of those years there

14   were questions about --

15            MS. FROEHLKE:  Objection.  Hearsay.

16            THE COURT:  I'll let it -- questions about what?

17            THE WITNESS:  About --

18            THE COURT:  Overruled.

19            THE WITNESS:  About the allocation of expenses

20   between the two parties and things like that.  And they were

21   generally resolved.

22   Q    (By Mr. Mikulecky)  All right.  You said that they were

23   entitled to refunds.  Who were entitled to losses?  Who was

24   entitled?  Who's "they"?

25   A    I'm sorry.  I speak jointly, but the bulk of the losses

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 574

1    were -- were Dee's because -- see, when I say losses I'm sort

2    of combining things.  The losses that were passed through

3    from the corporations were one, and then there were

4    significant charitable contributions that were made, and --

5    individually.  Because, remember, this corporation passed

6    income through the individual returns.  And so, the

7    corporation also passed charitable contributions through.

8    And so the treasury was interested -- they questioned whether

9    Mrs. Wilhite was entitled to all of the charitable

10   contributions that they were being passed through.  And so,

11   basically my providing the corporate documentation and things

12   like that, they subsequently agreed to our allocation.

13   **Q    Was there also a time that Mrs. Wilhite's tax refund**

14   **was held?**

15   A    Yes.  There was one time when it was appropriated by

16   the government and -- regarding a liability that was -- that

17   Mike had with the government.  And we wrote the treasury a

18   letter and they issued the refund.

19   **Q    Was it held by the treasury or held by the Department**

20   **of Justice; do you recall?**

21   A    Well, the treasury was given the responsibility to

22   collect it, from what we understand, by the Justice

23   Department, SEC, or whoever authorized them to collect it for

24   them.

25   **Q    All right.  You had talked about the fact that your**

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 575

 1   company has 12 or 15 different clients that have companies

 2   100 percent owned by one spouse and not the other; is that

 3   right?

 4   A    That's correct.

 5   Q    A similar situation to what we have with Mrs. Wilhite

 6   and her companies, right?

 7   A    That's correct.

 8   Q    Is there anything unethical or improper for accounting

 9   purposes for that sort of a situation?

10   A    No.

11   Q    Is there anything improper or unethical about

12   Mrs. Wilhite owning the companies here?

13   A    No.  No.

14   Q    Have you ever seen any documents or actions of

15   Mr. Wilhite that's inconsistent with Mrs. Wilhite owning the

16   companies?

17   A    No, I -- I have never seen any documents that would

18   (unintelligible) that.

19   Q    Have there been any times, that you're aware of, that

20   showed that Mrs. Wilhite owned the companies, any actions of

21   hers?

22   A    I'm sorry?

23   Q    Sure.  Looking for any examples of actions you have

24   seen over the years that in your mind shows that

25   Mrs. Wilhite, in fact, owns these companies and not

United States of America vs.                                   Evidentiary Hearing - Day III
Michael David Wilhite                                                  September 17, 2015

Page 576

 1   Mr. Wilhite?

 2   A     There were a number of occasions.  I can think of two

 3   in particular.  One, where Advanced Floor was approached by a

 4   potential buyer, and Mike was excited -- or at least

 5   interested in searching out a sale and -- but Darla was not.

 6   And ultimately it did not sell.

 7            And the -- and also there was an authority issue

 8   with -- authority might be a poor choice of words.  But there

 9   was an issue of charitable contributions during a time when

10   the economy was turning down that -- you know, most people

11   say that cash is king and you want to conserve it, Darla

12   continued to give strongly to charitable organizations that

13   she was affiliated with, and Mike was of the mind that during

14   down times like that that cash could be conserved until times

15   got better.  But -- but Darla's view prevailed.  I don't -- I

16   can't remember a time on a big issue where Darla's issues

17   didn't prevail.

18   Q     In all the years that you have served as accountant for

19   Advanced Floor Concepts, have you ever had any concern that

20   it was set up as a straw man company with Dee as the paper

21   owner and Mike was the real owner of the company?

22   A     I have never seen that -- anything that would give me

23   that opinion.

24   Q     As an accountant if you thought that was occurring,

25   what are your obligations?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 577

 1  A    I would have to withdraw from the engagement.

 2  Q    **You haven't done that?**

 3  A    No.  No.

 4  Q    **You haven't seen anything to give rise to any ethical**

 5  **concerns or violations?**

 6  A    No.

 7  Q    **Thank you.**

 8          MR. MIKULECKY:  Nothing further.

 9          THE COURT:  Any cross?

10          MS. FROEHLKE:  Yes, Your Honor.  Just a moment.

11                    CROSS-EXAMINATION

12  BY MR. FROEHLKE:

13  Q    **Hi, Mr. Corne.**

14  A    Hi.

15  Q    **I want to clear one thing up right away.  The term**

16  **straw man company I think was used in your direct**

17  **examination.  What does that mean to you?**

18  A    Straw man, what it means to me, would be that somebody

19  being represented as the owner who was not.

20  Q    **Okay.  So, you just testified that you've worked on the**

21  **Wilhites' accounts for -- I guess it would be nine years,**

22  **since 2006?**

23  A    That's correct.

24  Q    **And you also have a personal relationship with them;**

25  **would you agree?**

Page 578

1   A    As we do with most of our clients, yes.

2   Q    So you're friends?

3   A    I would say so, yes.  Uh-huh.

4   Q    And they're a pretty lucrative client for you; would

5   you agree?

6   A    They've had their ups and downs, but we've done a lot

7   of work for them.

8   Q    Well, you do meet with them a lot as their accountants,

9   right?

10  A    When you say a lot, it's -- that's relative to me,

11  because we have clients that we meet with much more.

12  Q    How often would you say you meet with the Wilhites?

13  A    Twice to three times a year.  It depends on -- like,

14  the company, when there was a buyer that approached them,

15  there was some pretty steady involvement; when the IRS audit

16  was taking place, there's some pretty steady involvement.

17  But a normal year, there's tax planning time, doing the tax

18  returns, explaining them, and so it might be three or four

19  times a year.  Something like that.

20  Q    Tax planning time would be January to April?

21  A    Tax planning time?  No, tax planning time would be

22  before the tax return is due.

23  Q    I see?

24  A    So it would be anything but tax season.

25  Q    I see.  My -- my mistake.  So, from April to December,

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 579

1    then, is tax planning time, right?

2    A    Right.  Uh-huh.

3    Q    So, three or four times -- did you say three times in

4    that time period?  Is that --

5    A    Yeah.  It could very well be depending on what issues

6    were up, and things like that.

7    Q    Okay.  And you just talked about charitable donations.

8    The bulk of the charitable donations is to the Cowboy Church;

9    is that right?

10   A    There have been some large ones there, but they have

11   given longer to -- I think it's an organization called

12   La Quinta, or whatever, that feeds people in --

13   Q    Well, Mr. Corne, I don't mean the longest --

14   A    Oh, okay.

15   Q    -- charity.  I mean, the most money has gone to the

16   Cowboy Church; would you agree?

17   A    I would -- I would say that's probably true.

18   Q    And the Cowboy Church is a church that Mrs. Wilhite

19   bought, right?  She built?

20   A    As far as I know they --

21   Q    She purchased the land --

22   A    -- helped --

23   Q    -- on the --

24   A    They helped build it.  I mean --

25   Q    Well, Mrs. Wilhite purchased the land for the church;

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 580

1  is that right?

2  A    Possibly, yeah.  I'm not aware of who bought the land,

3  really.  So it would be conjecture on my part to --

4  Q    **As her accountant you weren't aware of Mrs. Wilhite**

5  **purchasing a large portion of land for building a church?**

6  A    If I was, I -- I forgot about it.  I mean, because it

7  doesn't ring a bell.

8  Q    **But --**

9  A    I mean, they could have -- could have very well

10 mentioned it to me.

11 Q    **But you did just say they helped build it, right?**

12 A    With money and physically.

13 Q    **Advanced Floor had built the church, right?**

14 A    Advanced Floor?  Well, that would be -- see, when --

15 when somebody owns an 1120S corporation, a Subchapter S

16 corporation, money -- all the money in the -- all the net

17 income in that corporation flows through to the individual

18 shareholders.  So, the individual shareholders can take

19 draws, they can pay things or whatever.  The important thing

20 is, is how those are treated; that they are treated as a

21 distribution to the -- to the shareholders.  So, you know, it

22 was probably convenient for it to go through Advanced Floor,

23 but I couldn't say Advanced Floor built it.

24 Q    **The physical labor, Advanced Floor contributed, right?**

25 A    If they did, I wasn't aware of it.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 581

1   Q    Okay.  And, Mr. Corne, forgive my ignorance, but can

2   you explain in a little more detail about the difference

3   between a Sub S corporation that the Wilhites elected to

4   change to, and whatever they were prior to that.

5   A    Okay.  A Subchapter C corporation, just called a

6   regular corporation, the income stays in the corporation and

7   it's taxed in the corporation.  The only way to get it out is

8   through dividends or salary.  And a Subchapter S corporation

9   is what you call a flow-thru company.  The income that you

10  make in that company flows through to the individual

11  shareholders.  And so it becomes their money when it's

12  earned.  You just have to make sure that you're keeping it in

13  the right categories and stuff like that.

14  Q    By their money, you mean the Wilhites' money?

15  A    Darla's money, yes.  Uh-huh.

16  Q    Because as you understand it, Mr. Wilhite has no

17  assets; is that right?

18  A    I'm not -- I would say he has little to no personal

19  assets.  I'm not a -- I'm really not a -- we didn't do any

20  estate planning for him per se, so I'm not sure.  I -- I

21  don't think he has any assets.  I'm not sure.

22  Q    So, being a Sub S corporation, Mrs. Wilhite, as the

23  named shareholder, can take distributions whenever she feels

24  the need?

25  A    That's correct.  Yeah.  Yeah.  Yeah.  It's part of the

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 582

```
 1    -- her statutory right to -- to have access to that money.
 2    And if she pays it directly, it's still labeled as a
 3    dividend.  I mean, say, she pays it to -- loans it to her
 4    child or something, it still comes out of her personal
 5    distributions.  So --
 6  Q    I'd like to go back to these meetings that your firm
 7    has with the Wilhites.  Have you been present at all the
 8    meetings?
 9  A    Pardon me?
10  Q    Are you present at all of the meetings?
11  A    That our firm has?
12  Q    With the Wilhites.
13  A    I'd say the bulk of them, yes, I think so.
14  Q    And any meeting that -- both Wilhites come to the
15    meetings, don't they?
16  A    Yes.  Uh-huh.  Well, let's say -- depending on what it
17    is, but -- but when it becomes -- when it involves large
18    corporate issues, yes, both of them are there.
19  Q    When -- what situations occur with only one of them
20    there, and which one?
21  A    Oh, when -- in the early stages when they were
22    approached by a buyer, the formative stages of what that
23    offer was going to look like, and what was going to be
24    acceptable and whatever, and then as it moved forward, Dee
25    was involved.  Mrs. Wilhite.  I'm sorry.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 583

1   Q   I'm sorry.  Is your testimony that Dee was meeting with

2   the accounting firm alone?

3   A   Oh, there were times, but I can't say specifically

4   when.  For that particular thing she became involved with

5   Mike and with everybody else in the negotiations and the

6   discussions.

7   Q   I'm sorry, Mr. Corne.  My question has to do with the

8   meetings that the Wilhites have at your firm?

9   A   Okay.

10   Q   And my question is does Dee come to meetings alone,

11   without her husband, at your firm?

12   A   Actually, I think they've only been to my firm about

13   twice.  And I know Mike and Dee came together once, but --

14   Q   Mr. Corne, you just testified that you -- your firm

15   meets with the Wilhites three times during tax preparation

16   season.

17   A   That's correct.

18   Q   Are you saying the meetings don't occur at the firm?

19   A   That's correct.

20   Q   Okay.  So, wherever these meetings occur, does

21   Mrs. Wilhite ever show up without her husband?  That is my

22   question.

23   A   Yes.  Uh-huh.

24   Q   And what circumstances did that occur?

25   A   Oh, in tax planning in a lot of the circumstances.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 584

1    Let's see, we generally meet at their office down at Castle

2    Rock.

3    Q    At Advanced Floor?

4    A    Right.

5    Q    Has Mike met with you without Mrs. Wilhite?

6    A    Yes, he has.  Uh-huh.

7    Q    And under what circumstances has that occurred?

8    A    Oh, Mike's generally been in charge of initiating tax

9    planning; i.e., as in things like that, and ideas he, you

10   know, is working with in the company.  And then I suspect,

11   you know, once it's formulated and some ideas are -- are

12   filtered out, then usually him and Darla come and, you know,

13   either decide to or not to accept the tax recommendations.

14   Q    What kind of ideas has Mr. Wilhite proposed relating to

15   tax preparation for Advanced Floor?

16   A    For tax preparation, usually he asks us to propose

17   things, like make up a list.

18   Q    Well, Mr. Corne, you just testified that Mr. Wilhite

19   comes up with ideas.  What do you -- what do you mean by

20   that?

21   A    He comes up with ideas like -- it would be a general

22   idea of, okay, we're paying a lot in taxes.  You know, what

23   -- what -- what opportunities are out there to mitigate some

24   of these taxes or to minimize these taxes.  And so, we would

25   go off and -- and research some ideas and whatever, bring

United States of America vs.                    Evidentiary Hearing - Day III
Michael David Wilhite                                    September 17, 2015

Page 585

1   them back, and -- and see which ones were accepted or

2   rejected.  So --

3   Q    Can you name a specific idea that Mr. Wilhite has had?

4   A    Oh, retirement plans, ESOPs.  The bulk of -- of things

5   that -- that -- retirement plans are kind of a permanent tax

6   deferral, whereas some other things will defer taxes for a

7   while.  And so, it's funny, the bulk of the things we looked

8   at or whatever were -- were not incorporated.

9   Q    The ideas weren't incorporated, is that what you mean?

10  A    Right.  Uh-huh.

11  Q    You testified a few minutes ago that you have other

12  clients that are married couples where one person owns the

13  business, right?

14  A    That's correct.

15  Q    Is it typical that the nonowner spouse runs the

16  company?

17  A    I would say my strongest client like that, that's

18  exactly what happens.

19  Q    Can you elaborate, Mr. Corne?

20  A    Well, it's a company in Oklahoma and it's owned by the

21  wife, and the husband is involved in the day-to-day

22  management of the company.

23  Q    Does that husband have a restitution order against him

24  for a felony conviction?  The Oklahoma husband who runs the

25  company?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 586

```
 1   A    I'm not sure I understand your question.

 2   Q    Mr. Corne, you just described a company in Oklahoma

 3   where the wife owns it and the husband runs it, correct?

 4   A    Depending on how you mean runs it.  He --

 5   Q    I think you just said he operates the company.

 6   A    He does.  Uh-huh.

 7   Q    Does that husband, to your knowledge, have any sort of

 8   debt or judgment against him?

 9   A    Not that I'm aware of.

10   Q    Would you be concerned if he did?

11   A    I don't know if I would or not.  It depends on what it

12   was.

13   Q    Well, let's get back to, just generally, your clients

14   who are married couples where one spouse owns the company.

15   Okay?

16   A    Uh-huh.

17   Q    Is it typical that the nonowner spouse is considered

18   penniless?

19   A    I would say not at all.

20   Q    I'm sorry.  Can you repeat that.

21   A    Not at all.

22   Q    Okay.  And you know that Mr. Wilhite has operated the

23   day-to-day company much more than Mrs. Wilhite, right?

24   A    Yes.  Uh-huh.

25   Q    I'd like to talk specifically about the fall of 2008.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 587

 1    The Wilhites met with your firm on August 14th, 2008, didn't

 2    they?

 3    A    If you have records that --

 4         THE COURT:  Give him some connection.  Give him

 5    some information about that.

 6         MS. FROEHLKE:  Sure.  Yes, Your Honor.

 7    Q    (By Ms. Froehlke)  So, Mr. Corne, we've talked about

 8    meetings with your firm.  During these meetings the

 9    accountant takes notes, right?

10    A    Generally, yes.  Uh-huh.

11    Q    Contemporaneously while they're in the meeting, right?

12    A    Uh-huh.

13    Q    And they document what is discussed in the meeting,

14    right?

15    A    Yeah.  I would have to say I'm guilty of not doing that

16    sometimes depending on what it is.  I mean, I might go back

17    and summarize the -- the things we agreed upon and -- and

18    whatever.

19    Q    And these notes then go into the clients' files.  Would

20    that be correct?

21    A    Yes.  Uh-huh.

22    Q    Did you review the Wilhites' file before testifying

23    today?

24    A    Parts of it.  The tax returns and stuff.

25    Q    Did you review the notes in the Wilhites' file before

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 588

1   testifying today?

2   A    No.  Huh-uh.

3   Q    Do you -- but your firm did meet with the Wilhites on

4   August 14, 2008.  That is in their file, isn't it?

5   A    If it's in the file then we did, yes.

6   Q    On August 14th, 2008, your firm did not take any

7   notation related to retirement, right?

8              THE COURT:  Ms. Froehlke, do you have --

9              MS. FROEHLKE:  I do.  I --

10             THE COURT:  Can you give it to him.

11             MS. FROEHLKE:  Yes.  I apologize, Your Honor.

12             THE COURT:  Okay.  It's -- it would be hard for

13   anybody to remember something that happened on a particular

14   day seven years ago.

15             MS. FROEHLKE:  That is completely fair.  Your

16   Honor, is it all right if I put it on the Elmo?

17             THE COURT:  Yes.

18             MR. MIKULECKY:  Your Honor, it's not listed as an

19   exhibit, and I'm not sure if this is impeachment.

20             THE COURT:  It would have to be, wouldn't it?

21             MR. MIKULECKY:  Well, that's the question, I

22   guess.  I'm not sure how yet, because this is about a meeting

23   and he hasn't testified about a meeting.  So, I'm not sure

24   where the --

25             THE COURT:  Right.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 589

```
 1                MR. MIKULECKY:  -- impeachment is.
 2                THE COURT:  Yeah.  Let's get something -- well, I
 3      asked her to do this to refresh his memory because she's
 4      asking him, did you meet, and he's saying -- he probably
 5      suspects she has something in front of her that says they
 6      did, and so he's agreeing just because that's what humans do.
 7      But I'd like him to be sure that he did.
 8                MR. MIKULECKY:  Understood.  She's now asked about
 9      whether retirement is in the notes.
10                THE COURT:  Right.  Let's not -- let's not do
11      that, yet.  Let's just -- Mr. Corne, looking at that, are
12      those -- is that your handwriting?
13                THE WITNESS:  No, it is not.  It's -- I can tell
14      whose it is, though, if you'd like me to comment.
15                THE COURT:  Yes, go ahead.
16                THE WITNESS:  This is one of my partners, John
17      Rawls' handwriting.
18                THE COURT:  Okay.  Is there any indication from
19      that that you were there on that day at that meeting?  Or
20      look at it and see if it jogs any memory of you being there.
21                THE WITNESS:  Nothing that jogs my mind as
22      participating in it.
23                THE COURT:  Okay.  Go ahead.
24      Q   (By Ms. Froehlke)   Mr. Corne, you testified that the
25      notes taken during client's meetings are taken
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 590

1    contemporaneously, right?

2    A    Yes.  Uh-huh.  Well --

3    Q    And those notes are --

4    A    I'm sorry.  I, a lot of times, rely on memory and go

5    back to the office.  And if we agreed upon something or there

6    was something -- because sometimes we'd meet for a couple

7    hours and nothing transpires.  If something does, I like to

8    go back and --

9    Q    Sure.

10   A    -- and I'm generally not a contemporaneous note-taker.

11   Q    So, they're taking at or around the time --

12   A    Yes.

13   Q    -- that the meeting occurs though?

14   A    Uh-huh.

15   Q    And they are kept in the regular course of business in

16   the client's file; is that right?

17   A    That's correct.  Uh-huh.

18   Q    And making these notes is a regular practice of your

19   firm; is that right?

20   A    That's correct.  Uh-huh.

21        MS. FROEHLKE:  Your Honor, I think the foundation

22   is laid for this to be a business record.  Even if the

23   witness was not present at the meeting, it is a business

24   record of his firm.

25        THE COURT:  I can't disagree since he's identified

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 591

1  the handwriting as his partner's.

2          MR. MIKULECKY:  Although he hasn't testified that

3  he knows the practice of Mr. Rawls.  And also, we're still

4  questioning why is this being introduced for impeachment when

5  there's not been (unintelligible).

6          THE COURT:  Okay.  Well, let's -- let's deal with

7  the practices of Mr. Rawls.

8  Q    (By Ms. Froehlke)  Mr. Corne, does Mr. Rawls, to your

9  knowledge, also take notes contemporaneously at or around the

10 time that meetings happen?

11 A    He does more so than I do, for sure.

12 Q    And that's a regular activity of his then, it sounds

13 like?

14 A    Yes.  Uh-huh.

15 Q    And those notes are put in the clients' files as a

16 business record and they're kept that way, right?

17 A    That's correct.

18          THE COURT:  What's your purpose?

19          MS. FROEHLKE:  Your Honor, the notes of this

20 day -- the purpose is to show that the Wilhites met with

21 their accountant three days after an alleged retirement,

22 never mentioning retirement, and, in fact, talking about

23 Mike's salary being changed to ownership status.  And we also

24 have subsequent notes that show when the firm was put on

25 notice of an alleged retirement.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 592

```
 1              THE COURT:  Sounds relevant to me.
 2              MR. MIKULECKY:  Although, it may be, Your Honor,
 3   this is not introduced as an exhibit.  It's Mr. Rawls' notes,
 4   so he cannot say what they read.  He also hasn't said -- he
 5   stated that Mr. Rawls more often than he does makes
 6   contemporaneous notes.  We have no idea if these are
 7   contemporaneous or not.  Since he wasn't present at the
 8   meeting he can't say what was talked about and what was
 9   written down.
10              THE COURT:  Well --
11              MR. MIKULECKY:  Without Mr. Rawls being here,
12   these have no probative value.  And it's offered for
13   impeachment, but there's been no statements which are being
14   impeached.
15              THE COURT:  I -- I have an interest in knowing why
16   you didn't mark it as an exhibit.
17              MS. FROEHLKE:  I intended -- I was thinking I
18   would use it as impeachment, Your Honor, but -- and I now
19   would move to admit it.
20              THE COURT:  Well, you can't use it as impeachment,
21   obviously, since he wasn't at the meeting, so --
22              MS. FROEHLKE:  I did not realize this was not his
23   handwriting.
24              THE COURT:  Okay.  Well, I don't know about the
25   probative value part.  I think it would have probative value,
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 593

 1  I'm just not sure this is the right witness to introduce it.

 2          MR. MIKULECKY:  Your Honor, it would only have

 3  probative value if the person who wrote it said, I wrote down

 4  everything and, yes, there was no discussion regarding

 5  retirement.  For all we know they spent three hours on

 6  retirement, but he didn't write it down for some reason.  We

 7  have no idea.

 8          MS. FROEHLKE:  Your Honor, I think --

 9          THE COURT:  So, we can't --

10          MS. FROEHLKE:  -- that goes to weight, not

11  admissibility.

12          THE COURT:  Let him finish.

13          MR. MIKULECKY:  If I could have a chance --

14          THE COURT:  Let him finish.

15          MS. FROEHLKE:  I apologize.

16          MR. MIKULECKY:  So, we have no idea if it was

17  discussed or not.  That's what they're trying to prove.  But

18  without having the author of these notes to --

19          THE COURT:  We have some idea, Mr. Mikulecky.

20          MR. MIKULECKY:  What we know is that it wasn't

21  worked out.  For all we know the Wilhites said we don't want

22  to write -- don't put it down.

23          THE COURT:  We don't know what was not -- what was

24  discussed and not put down.

25          MR. MIKULECKY:  Exactly.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 594

```
 1            THE COURT:  I agree.  But we do know what was
 2    discussed and put down.
 3            MR. MIKULECKY:  Correct.  Or at least what was put
 4    down.  (Unintelligible) discussed (unintelligible) was there.
 5    Could have been his thoughts.
 6            THE COURT:  And for that reason --
 7            MR. MIKULECKY:  We don't know that was part of the
 8    discussion.
 9            THE COURT:  -- I would give you the right to call
10    Mr. Rawls and introduce evidence of matters that were
11    discussed but were not put down in notes, in order to remedy
12    that issue.  So, what -- what other problem do you have with
13    it?
14            MR. MIKULECKY:  It's being a new exhibit and it's
15    being offered for impeachment, but it's not impeachment.
16            THE COURT:  It's more in the form of rebuttal, in
17    my opinion, and it's not impeachment.  So, there is that
18    sticky little rule that you didn't provide it in advance.
19            MS. FROEHLKE:  We did provide it, Your Honor.
20            THE COURT:  I mean, as a -- listed as an exhibit.
21    I mean, he said there were 10,000 pages produced.  Fair
22    notice requires that we list exhibits.  So, I agree that
23    absent its use in rebuttal or some other lawful purpose under
24    the rules of evidence that your failure to mark it as an
25    exhibit before trial will preclude it this time.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 595

1           MS. FROEHLKE:  Your Honor, may I then question the

2    witness about when the firm was on notice of retirement?

3           THE COURT:  I'm not barring you from questioning

4    anything right now.

5    Q    (By Ms. Froehlke)  Mr. Corne, if you could no longer

6    look at that document.  Your firm was not put on notice of

7    Mr. Wilhite's retirement until December, 2008, right?

8    A    I can't remember exactly when it was, but that -- that

9    date sounds close.

10   Q    And your firm was not put on notice during an

11   August 14th, 2008 meeting that Mr. Wilhite had retired,

12   right?

13          MR. MIKULECKY:  Objection.  Your Honor, he already

14   testified he wasn't at the meeting, so he would have no way

15   of knowing.

16          THE COURT:  Well, he may have.  The firm starts

17   with the name Corne, doesn't it?

18          THE WITNESS:  It does.

19          THE COURT:  Okay.  So, he may have some kind of

20   notice.  If he's the kind of boss that I am, he'd be pretty

21   nosey.  So if he does, he does.  If he doesn't, he doesn't.

22   Go ahead and ask the question.

23   Q    (By Ms. Froehlke)  Your firm was not put on notice of

24   Mr. Wilhite's retirement on August 14th, 2008, when Mr. Rawls

25   apparently met with the Wilhites, right?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 596

1   A    I would have to say I was not aware of it if it -- if

2   it did take place.

3   Q    **You do know that Mr. Wilhite claims to have retired in**

4   **the fall of 2008?**

5   A    Yes, uh-huh.

6   Q    **You do know that he has continued to operate the**

7   **company since that time?**

8   A    I -- he's participated in the company.  Mr. Wilhite set

9   up some procedures that were designed to make the company

10  saleable.  In other words, that it could run itself without

11  his participation or Darla's participation, and he was --

12  he's been quite successful at that.  And so, you know, I

13  think he's like a lot of people who retired that they -- it

14  -- it takes a while to totally retire.  It's -- it's tough

15  walking out of something that you helped birth.

16  Q    **Is it typical for a retired client of yours to be in**

17  **the office three days a week?**

18  A    I'm retired -- retiring from my practice.  You know,

19  (unintelligible) in the office.  I'd rather be in the office.

20  That's personal, so I'll --

21  Q    **That's fair.**

22  A    But -- but, yes, it's -- I mean, you're an important

23  individual doing important things, and then all of sudden

24  nobody is calling on you, and you're not making important

25  decisions, and you go -- before I had to mow the grass and do

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 597

1    the flowers I -- it was much more rewarding to be in the

2    office talking with important people.  So, it's a slow

3    transition for some of us.  Other people do it right away and

4    are quite happy with it.  I was not.  I -- I enjoy -- I'm

5    glad I can still participate in the firm.

6              THE COURT:  How is it that you don't have any gray

7    hair?

8              THE WITNESS:  My wife wants to know too.  So --

9              THE COURT:  Mr. Mikulecky, you need to take note

10   of however he lives.  Okay?

11             MR. MIKULECKY:  I need to have his wife talk to my

12   wife about it.  And that's not on the record, right.

13             UNKNOWN SPEAKER:  I'm having that.

14   Q   (By Ms. Froehlke)  Mr. Corne, you're aware that

15   Mrs. Wilhite's salary doubled the first pay period that

16   Mr. Wilhite was retired, right?

17   A    Actually, I thought she made more money the year before

18   that.  Like, two-hundred-and-some thousand.  But I could be

19   wrong.

20   Q    Well, go ahead and turn in your exhibit notebook to, I

21   believe, it's Exhibit 19.

22             THE COURT:  And by the way, Ms. Froehlke, he

23   hasn't testified to knowledge that he retired in August, so

24   are you telling him that Mr. Wilhite retired in August?

25             MS. FROEHLKE:  Let me think about that, Your

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 598

 1   Honor.

 2          THE COURT:  Okay.

 3   Q    (By Ms. Froehlke)  I apologize, Mr. Corne.  I meant to

 4   direct you to Exhibit 24.

 5   A    Oh, okay.

 6   Q    I got them confused.

 7   A    I was going to say, I couldn't that.

 8   Q    Mr. Corne, this is a document that Advanced Floor

 9   provided our office.

10   A    Okay.

11   Q    Have you seen this before?

12   A    Oh, I'm sure I -- when we were preparing the return we

13   keep a copy of -- of this kind of information.

14   Q    If we could -- if you could please turn to the page --

15   the third page that lists Mrs. Wilhite's paychecks in the

16   year 2008.  You'll see that on August 15th, 2008, she made

17   her typical amount of $2,291.60.  The next paycheck, two

18   weeks later, her salary jumped to $4,176.20.  Do you see

19   that?

20   A    Uh-huh.

21   Q    And if you want to look on the screen, it's zoomed in

22   there.  I don't -- it's small font.

23   A    No, I can see them.

24   Q    Okay.

25   A    And the total of these numbers, to make it easy for

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 599

1    you, would be represented on -- on the corporate tax return

2    about mid way down for each year that she received

3    compensation under the officer's compensation.  So, that

4    hopefully would confirm these numbers in total.

5    Q    So, as her accountant, did you have discussions with

6    her about doubling her salary?

7    A    We probably did, mainly because at that particular time

8    the Internal Revenue Service had a program out that said

9    closely held corporations that are operated as a Subchapter S

10   corporation have to pay the controlling shareholders, any

11   shareholders, a reasonable amount of compensation or there

12   would be repercussions.

13            In other words, one of the things that was going

14   on is people were forming Subchapter S corporations, not

15   paying themselves a salary, avoiding all payroll taxes on

16   that and just receiving dividends.  And you could avoid

17   30-$40,000 in payroll taxes.  So, we approached all of our

18   clients that had Subchapter S corporations to make sure that

19   they were compensating at a fair level to the shareholders.

20   Q    Mr. Corne, I believe you testified that the Wilhites

21   went to a Sub S corporation a year after your --

22   A    In 2006, correct.

23            MR. MIKULECKY:  Objection.  Your Honor, he didn't

24   say the Wilhites did, he said Mrs. Wilhite did.

25            THE COURT:  The company did.

Page 600

 1              MS. FROEHLKE:  The company did, I apologize.

 2    Q    (By Ms. Froehlke)  The company -- I think Mr. Mikulecky

 3    interrupted you, but you said 2006?

 4    A    That's correct.  Elected to be taxed as a Subchapter S

 5    corporation.

 6    Q    And so you're testifying that this raise in pay was

 7    because of that change in 2006?

 8    A    No.  No.  It was basically --

 9    Q    Do you know the reason behind this?

10    A    It was more like 2007, 2008, 2009 that this -- that

11    these programs were being started by the Internal Revenue

12    Service to evaluate compensation on the part of shareholders.

13    See, they were having financial difficulties, and so they

14    would prefer not to have paid out any salaries, because the

15    corporation needed the funds to pay the debt that they owed.

16    It was substantial.  But tax law required that they pay

17    themselves.  And he had to pick something that was

18    reasonable, even though the IRS doesn't watch the amount of

19    hours you work, he had to pick a number that passed the

20    first-blush test of what was reasonable compensation.

21              THE COURT:  Mr. Corne, the question to you was did

22    you note that salary was doubled.  And then you went into an

23    explanation that around this time you were advising clients

24    on this IRS enforcement.  But I don't think you specifically

25    said that that is the reason with regard to this person.  So,

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 601

 1   do you actually have a memory that -- that it doubled, or

 2   roughly, because of that IRS rule?

 3             THE WITNESS:  No.  I do not.  I thought I looked

 4   at the returns this morning and saw a higher compensation in

 5   a year before that.  But I may be mistaken.

 6             THE COURT:  Okay.

 7   Q    (By Ms. Froehlke)  So, Mr. Corne you don't recall the

 8   reason why Mrs. Wilhite's salary doubled?  Is that

 9   essentially what you're saying?

10   A    Specifically, no.

11   Q    Okay.

12   A    Generally, that was what our approach was.

13   Q    If you could look at this, and read No. 7 and see if it

14   refreshes your memory as to why her salary increased.  And

15   let me know when you're done reading No. 7 listed there.

16   A    I hate to say this.  This, again, is John Rawls's --

17   Q    Does it refresh your recollection as to why

18   Mrs. Wilhite's salary increased, Mr. Corne?

19   A    Well, other than Mike withdrawing some of his

20   responsibilities, Dee was charged with more work, so it would

21   have been hard to justify for not getting more compensation.

22             THE COURT:  She's asking kind of a -- she's asking

23   the question in an appropriate legal way, but sometimes a way

24   that witnesses don't understand.  So, does that -- reading

25   that, does it give you any additional memory or -- I mean,

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                   September 17, 2015

Page 602

1    you can understand the words that --

2            THE WITNESS:  No.  I'm just guessing as to why,

3    but I really have no recollection of --

4            MS. FROEHLKE:  We don't want you to guess.

5    Q    (By Ms. Froehlke)  Mr. Corne, to your knowledge did

6    Advanced Floor ever apply for preferred government contracts

7    for this (unintelligible) business administration?

8    A    Not that I'm aware of.

9    Q    You are aware that Advanced Floor on the last day of

10   2014 transferred $200,000 out of its operating account into a

11   foundation that you advised the Wilhites on founding?

12   A    Yes.  Uh-huh.

13   Q    That is the Yahab Foundation?

14   A    The Yahab, uh-huh.

15   Q    And you and Mr. Wilhite had e-mail discussions about

16   that transfer, didn't you?

17   A    Actually, I believe -- I don't remember who all was

18   involved, but I know Mike was, along with Darla was pretty

19   involved with that.  It was her thrust that was making that

20   possible.

21   Q    Mr. Corne, please turn to Exhibit 37 in the white large

22   notebook.  The earlier in time e-mail there, on

23   December 23rd, 2014, is from your colleague Mr. Rawls.  He

24   stated it was good talking to Mr. Wilhite today.  As

25   discussed, you will do an inventory of your gold coins,

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 603

1    precious metals, and we will talk on Monday about year-end

2    options.

3          Were you aware of that conversation that he had with

4    Mr. Rawls?

5    A    I believe I was, to some degree.

6    Q    Did you ever see the inventory of gold coins, precious

7    metals?

8    A    No, I did not.

9    Q    What is your knowledge of the dollar amount of gold

10   coins and precious metals that Advanced Floor holds?

11   A    That Advanced Floor holds?  We used to carry it on the

12   balance sheet, and I'm guessing it's a number like 50- or-

13   60,000, something like that.  They -- they have had an

14   investment in precious metals for quite a long time.

15   Q    Would looking at the grand ledger of Advanced Floor

16   refresh your recollection as to exactly how many -- how much

17   of an investment there was?

18   A    It could.  It should, really, because it was -- it was

19   listed on the balance sheet under -- right under the cash, I

20   believe, so --

21   Q    If we could turn to a nonstipulated exhibit, 49.  On

22   the second page.

23          MR. MIKULECKY:  Your Honor, before we get there,

24   two objections.  First, we're on the scope of direct.  So,

25   I'm not sure of the relevance of an investment listed on the

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 604

 1  balance sheet.

 2          THE COURT:  Did you name Mr. Corne as a witness?

 3          MS. FROEHLKE:  I don't think our final witness

 4  list did, no, Your Honor.

 5          THE COURT:  Okay.  And we are -- there was no

 6  testimony about gold, so how is this relevant to any issue

 7  that was brought up on direct?

 8          MS. FROEHLKE:  Your Honor, the transfer of funds

 9  out of Advanced Floor at the end of the year in 2014 is

10  relevant to show intent and lack of mistake as to --

11          THE COURT:  I'm not talking about relevance, I'm

12  talking about relating it to the direct.  You can -- anybody

13  can list this witness.  You could have listed this witness if

14  you wanted general information out of him, but cross is

15  limited to the scope of direct if you have not identified,

16  independently, him as a witness for you.  So, how does this

17  relate to the direct?

18          MS. FROEHLKE:  Your Honor, I believe this relates

19  to the direct to show, first of all, Mr. Wilhite's control

20  over -- to refute the witness's testimony on direct that

21  Mrs. Wilhite has complete control over the financials, as

22  these e-mails I think will demonstrate, and I -- I -- the

23  e-mail references Mike's inventory of gold and precious

24  metals, and so I think that is then related, again, to his

25  control over the finances.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 605

1         THE COURT:  Mike's inventory.  Where did we get
2    that?
3         MS. FROEHLKE:  The e-mail on Exhibit 37, the
4    December 23rd, 2014 e-mail says, Hi, Mike.  It was good
5    talking to you today.  As discussed, you will do an inventory
6    of your gold coins, precious metals, and we will talk on
7    Monday about year-end options.
8         THE COURT:  But the e-mail is to Mike Wilhite,
9    Advanced Floor Concepts, isn't it?
10        MS. FROEHLKE:  Yes, Your Honor.
11        THE COURT:  So, I don't see that it relates --
12   that it's relevant to Mr. Wilhite personally, especially
13   since all we've gotten out of this witness is he has a
14   general understanding of the discussion about precious
15   metals, but he didn't say anything specific about this
16   e-mail.  So, we're kind of drifting away from the rules of
17   evidence.  I understand the relevance of any evidence you can
18   show this witness that, in fact, Mr. Wilhite was in charge,
19   but I don't see the ledger as establishing that.  How does
20   the ledger establish that Mr. Wilhite's in charge?
21        MS. FROEHLKE:  Your Honor, I can -- I can move on.
22        THE COURT:  Okay.  Please.
23   Q    (By Ms. Froehlke)  Mr. Corne, let's go back too
24   Exhibit 37.  You testified that you were generally aware of
25   the conversation Mr. Wilhite had with John Rawls on

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 606

1  December 23rd?

2  A    That's correct.

3  Q    And what was your knowledge of the content of that

4  conversation?

5  A    Well, they were looking for ways to come up with the

6  money to contribute to Yahab.  And the investments were --

7  had depreciated in value, and so -- and being able to sell

8  and liquidate them by the end of the year was -- to the best

9  of my knowledge was difficult to impossible, and they needed

10  to make the contribution by 12/31.  So, basically,

11  Mrs. Wilhite took it as a draw and sent the contribution to

12  Yahab.

13  Q    I'm sorry, you just said the investments had -- the

14  investments had decreased in value?  Is that what you just

15  said?  Diminished in value?

16  A    I think at that particular time when they were talking

17  about it, gold and silver had gone down and so -- and besides

18  that, they would have had to sell it -- sell the precious

19  metals, clear them, get the money -- get the transaction

20  completed before 12/31.  And I can't remember if it was the

21  valuation or the fact that it took too long, or a combination

22  of both of them to get -- it was much easier to get the

23  transaction consummated at 12/31 by writing a check to Yahab

24  directly.

25  Q    And Mike is asking about the transfer of those funds in

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 607

1    the e-mail above your colleague's e-mail; is that right?

2    A    Right.  Yeah.

3    Q    To your knowledge, was -- did you have any

4    conversations with Darla Wilhite as to the transfer of the

5    funds?

6    A    Yes.  Uh-huh.

7    Q    Was Mr. Wilhite present for those conversations?

8    A    Yes.

9    Q    What about when Yahab Foundation was incorporated?  You

10   were present for conversations related to that too, weren't

11   you?

12   A    Part of them, at least, yes.

13   Q    And both Wilhites were present, right?

14   A    Yes.

15   Q    You're aware that Mr. Wilhite owes a restitution debt

16   of $1.7 million?

17   A    He has mentioned that before.

18   Q    Did he mention that in relation to Advanced Floor at

19   all?

20   A    He -- I'm not sure what you mean by "in relation to

21   Advanced Floor."

22   Q    Well, in what context has Mr. Wilhite told you about

23   his restitution debt?

24   A    Oh, in a number of different ways.  I mean, he was

25   impacted by the -- by the entire proceedings, and basically

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 608

1  did not know what the government was doing, or when they were

2  going to do it or whatever, and -- and kind of left him on

3  edge as to the uncertainty of what was going on.

4  **Q    When did these conversations take place?**

5  A    I'd say throughout the, oh, seven of the nine-year

6  process or whatever, as an underlying concern that

7  Mr. Wilhite had.

8           MS. FROEHLKE:  No further questions.

9           THE COURT:  Okay.  Mr. Corne, what is your

10  understanding -- you -- you say you're retired.

11           THE WITNESS:  Partially.  Correct.

12           THE COURT:  Partially retired.

13           THE WITNESS:  Uh-huh.

14           THE COURT:  Do you still do the AFC account?

15           THE WITNESS:  I'm involved with it.  John now

16  spearheads it, but yes.  I would say, yes.

17           THE COURT:  Okay.  And so what is your

18  understanding of Mr. Wilhite's connection with AFC?

19           THE WITNESS:  Oh, that -- I don't know where you

20  want me to start in, but Mike is really good at setting into

21  place procedures and policies, and the underlying management

22  things that kind of keep things operational and in place;

23  whereas, Darla was the -- the big pitcher.  The one who made

24  the final decisions on stuff.  Mike was the operational guy

25  whose goal was to build a corporation that was

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 609

```
 1   selfsustaining; that him nor Darla had to be in top, right.
 2   Because if you're selling the company to somebody, when you
 3   don't have to discount it for manager's compensation or
 4   whatever it's far more valuable.  And I think he'd achieved
 5   that to quite a degree.
 6           THE COURT:  Would you say that in your involvement
 7   with the company that Mr. Wilhite is one of the persons who
 8   speaks for the company?
 9           THE WITNESS:  Yes.
10           THE COURT:  And has his role changed any during
11   the time of your engagement with the company?
12           THE WITNESS:  Not that I perceived.
13           THE COURT:  You said that -- by the way, do you
14   know any positions he's held or now holds with the company?
15           THE WITNESS:  Not formally.  Like -- I probably
16   need to ask him and find out, but basically because of the
17   interaction we have with Advanced Floor just a couple times a
18   year, I'm not really -- I know Mike is involved, and I don't
19   know whether it's as a spouse or whatever.  Because a lot of
20   our companies that are owned by one spouse or the other, both
21   spouses seem to participate.
22           THE COURT:  Is -- are positions held relevant at
23   all to the work of an accountant for a company like this?
24           THE WITNESS:  I'm sorry.  I --
25           THE COURT:  What people hold, what positions
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 610

1   within a company, is that relevant at all to what you do for

2   them?

3            THE WITNESS:  Generally, I don't put a lot a

4   weight on it.  Mainly because over time you -- you indirectly

5   find out who's in charge and what's going on, and sometimes

6   titles are not always indicative of what transpires.

7            THE COURT:  But it doesn't have any legal impact

8   or import on what you do for them?

9            THE WITNESS:  Not as far as a title goes that I'm

10  aware of.

11           THE COURT:  Okay.  And the companies that you've

12  worked for where there's an owner spouse, I think you said

13  that it was -- it would be unusual that the manager spouse

14  receives no compensation.  You said that would be unusual?

15           THE WITNESS:  Yes, I -- uh-huh.

16           THE COURT:  Okay.  So, would that raise any flags

17  that someone who is involved in the day-to-day business, and

18  intense meetings like you've had with Mr. Wilhite for the

19  duration of the time you've worked for them, has not drawn

20  any money and not been paid any money from the company in the

21  last seven years, would that cause any concern on your part?

22           THE WITNESS:  There -- there is a point where it

23  would cause concern based on how much participation they have

24  and things like that.  And I can't say that we have a clear

25  picture of -- of what that participation level is or

United States of America vs.                          Evidentiary Hearing - Day III
Michael David Wilhite                                        September 17, 2015

Page 611

 1   whatever.

 2          THE COURT:  Very good.  Anybody have any questions

 3   in light of what I've said?  Or wait.  You're entitled to

 4   redirect anyway.

 5          MR. MIKULECKY:  Thank you, Your Honor.  Just

 6   following up briefly.

 7                    REDIRECT EXAMINATION

 8   BY MR. MIKULECKY:

 9   Q    You said that since you've been involved with your work

10   for your company with AFC, from what you can see Mike's role

11   really hasn't changed, correct?

12   A    That's correct.

13   Q    Okay.  And you know, however, that Mike hasn't had an

14   income from AFC for several years?  More than several years,

15   correct?

16   A    Right.  I think it's 2008.  I just noticed this

17   morning.

18   Q    Do you see any red flags or concerns that you have,

19   based on what the judge was asking you, about AFC and whether

20   Mike owns AFC based on those issues?

21   A    I have no question that Mike does not own AFC.  His

22   participation level is -- my confines are accounting and the

23   Internal Revenue Service, making our client and the

24   government happy in that regard.  And the -- Mike getting or

25   not getting any compensation, those can come and go.  And so

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 612

1   it depends on the duration, the extent of the activity.

2   Because if Mike was really active in the company,

3   participating, there could be -- because of what's deemed to

4   be owed to the government or whatever, I could see where

5   somebody would have a concern about that.

6           From an IRS standpoint, or my accounting firm's

7   standpoint, whether he's paid or not paid is really

8   immaterial as long as there's enough compensation being

9   recognized that payroll taxes are being paid out and stuff

10  like that.  So, it depends on his participation level before

11  I would get excited.

12  Q   And you're not excited, and you don't see any problems

13  at this point?

14  A   Not at this point.  No.

15  Q   Okay.

16          THE COURT:  Is that it?

17          MR. MIKULECKY:  Yes, sir.

18          THE COURT:  Okay.  (Unintelligible).

19          THE WITNESS:  Okay.  Thank you.

20          THE COURT:  Thank you.

21          THE COURTROOM DEPUTY:  Are you ready for the next

22  one?

23          MR. BEDNARSKI:  Yes.

24          THE COURT:  They are.  I think.  You guys ready

25  for the next witness?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 613

1          MR. BEDNARSKI:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MR. BEDNARSKI:  Tami Ashe.  We're going to call

4    her.

5          MS. FROEHLKE:  And also, Your Honor, I think that

6    we had a conversation.  We had one witness who can only

7    testify today.  I anticipate it would probably be about an

8    hour between both sides.

9          UNKNOWN SPEAKER:  (Unintelligible).

10          MS. FROEHLKE:  Linda Gould.

11          MR. BEDNARSKI:  I don't think it will be an hour.

12    But, Your Honor, we have three witnesses left.  Most of them

13    are pretty quick.

14          THE COURT:  Okay.

15          MR. BEDNARSKI:  But if it becomes an issue, we'll

16    -- we'll call.

17          MS. FROEHLKE:  Okay.  Thanks.

18          MR. BEDNARSKI:  Will I be able to stand back here

19    or do I need to come closer?  I know in state court I have to

20    go up close to where the phone is.

21          THE COURT:  The phone is up in another world, so

22    you can be by a microphone.

23          MR. BEDNARSKI:  Ah, the netherworld.

24          THE COURT:  The name of the witness, again,

25    please.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 614

 1              MR. BEDNARSKI:  Tami Ashe.

 2              THE COURTROOM DEPUTY:  She didn't answer the first

 3   time.

 4              MR. BEDNARSKI:  She did or did not?

 5              THE COURTROOM DEPUTY:  Twice, she did not.

 6   303-944-2344?

 7              UNKNOWN SPEAKER:  (Unintelligible).

 8              MR. BEDNARSKI:  Your Honor, while I work on this

 9   witness, we -- we have other witnesses here, so we can keep

10   things moving.

11              THE COURT:  You're choice.  I don't mind waiting.

12   It's up to you.

13              MR. BEDNARSKI:  In order to keep it moving why

14   don't we call Brendan DePaola.

15              UNKNOWN SPEAKER:  Step on up.  I'll tell you

16   later.

17              THE COURTROOM DEPUTY:  Raise your right hand.

18              (The witness, Brendan DePaola, was sworn to tell

19   the truth by the Courtroom Deputy.)

20              THE WITNESS:  I certainly do.

21              THE COURTROOM DEPUTY:  Is that a (unintelligible).

22              THE WITNESS:  I'll shut it off (unintelligible).

23              THE COURTROOM DEPUTY:  (Unintelligible) you can

24   have a seat right there.  Thank you.

25   /////

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 615

```
 1                    DIRECT EXAMINATION

 2   BY MR. MIKULECKY:

 3   Q    Good afternoon, Mr. DePaola.  Could you please state

 4   your name and spell your last name.

 5   A    Brendan DePaola.  My last name is D-e-P-a-o-l-a.

 6   Q    Mr. DePaola, where are you currently employed?

 7   A    BMC.

 8   Q    BMC.  What is that?

 9   A    That is a building materials supply house.

10   Q    How long have you been employed there?

11   A    About two years.

12   Q    Have you ever worked for Advanced Floor Concepts?

13   A    Yes, I have.

14   Q    When was that?

15   A    August, 2004, until September 2010.

16   Q    What was your position during those times or positions?

17   A    I started off as a field superintendent and then I

18   worked my way up, eventually becoming vice president of the

19   company with Roger.

20   Q    When did you become vice president of the company with

21   Roger?

22   A    It was about 2009, I believe.  2008 or '9.

23   Q    2008 or 2009?

24   A    Somewhere in there.

25   Q    Okay.  Roger is who?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 616

```
 1   A    Roger is --

 2   Q    His last name, I'm sorry.  His last name?

 3   A    I don't recall.

 4   Q    Was it Roger Otterstein?

 5   A    Yes, sir.  Otterstein.

 6   Q    Okay.

 7   A    Some things I try to put out of my mind.

 8   Q    Understood.  You left in September, 2010, right?

 9   A    Yes.

10   Q    All right.  And you were laid off at that time, right?

11   A    Yes.

12   Q    And you had -- unfortunately had a difficult time

13   finding another job after you got laid off, right?

14   A    Correct.

15   Q    Took about two years before you found one?

16   A    Yes.

17   Q    Okay.  And you said that some things you try to put out

18   of your memory.  What are you -- what are you trying to

19   forget?  When you were asked about Roger Otterstein --

20   A    Nothing particular.  Just -- you know, I can remember

21   things when I was in third grade, and sometimes I don't

22   remember what I did yesterday.  So --

23   Q    Okay.  Understood.  What were your responsibilities

24   when you worked at AFC?

25   A    Basically the general running of all the operations of
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 617

1   the company.  Overseeing that things got done correctly.

2   Responsible for financial planning, and committing to those

3   goals of whatever we decided and the timing.

4   Q    That was the time when you and Mr. Otterstein were

5   running the company; is that right?

6   A    Correct.

7   Q    Okay.  Did you split responsibilities, you and

8   Mr. Otterstein?

9   A    Roger was involved in everything, but he also was more

10  in the sales end of the company.

11  Q    So, he -- it sounds like he did sales, you did more

12  operations; is that right?

13  A    Correct.

14  Q    Okay.

15  A    But we helped each other, we crossed over.  We worked

16  together quite well.

17  Q    What time period was it that you and Roger worked

18  together to operate the company?

19  A    About that same time period.  About mid 2008 -- between

20  -- until Roger died.  Don't ask me a date.  I don't recall.

21  It's one of those things I'd like to forget.

22  Q    I understand.  You know Mr. and Mrs. Wilhite, right?

23  A    Of course.

24  Q    You know them through Advanced Floor Concepts?

25  A    Yes.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 618

1   Q    Okay.  During the time that you and Mr. Otterstein were

2   running the company, 2008 to 2010 timeframe, what were

3   Mr. Wilhite's responsibilities with AFC?

4   A    Well, when I first there, got there, he and Dee ran the

5   company together.  I reported to Mike.  Dee was -- they

6   shared an office.  They were working together.  She was

7   always there, almost every day with -- with us.  Mike was out

8   in the field.  He helped deliver materials.  He did -- he was

9   hands-on with the company.  We all treated it as if it was

10  our own because we believed in it.  We cared about it.  We

11  wanted to make it bigger, better.  We wanted to be the best.

12  Q    That everyone --

13  A    We all treated it like it was our own.

14  Q    Everyone treated it as their own company?

15  A    I wouldn't say everybody, but we tried to create

16  that -- I tried to create that atmosphere with the employees

17  for sure.

18  Q    Did you call it your company then?

19  A    Of course.

20  Q    Even though you knew you didn't own it, obviously,

21  right?

22  A    I'm sorry.  Say that again.

23  Q    Even though you knew you didn't own the company, you

24  still --

25  A    Right.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 619

1   Q   -- called it your company?

2   A   Yeah.  Because I take -- I mean, I'm a guy.  We take

3   pride in our things.  Our job is how we define ourselves,

4   so --

5   Q   Do you know who owned the company, AFC?

6   A   Absolutely.

7   Q   Who was that?

8   A   Dee.

9   Q   How do you know that?

10  A   Everything that was in the company's name was -- had

11  Dee's name on it.  She introduced herself as the owner.  She

12  wrote the checks.  So, yeah.  Dee -- Dee was -- anything that

13  was major decisions in the company had to go through Dee for

14  sure.

15  Q   You said when you first started work Mrs. Wilhite, Dee,

16  was there almost every day and Mike was working in the field.

17  Did that change over the time you worked at AFC?

18  A   Yeah.  They both eventually were trying to work out of

19  the office more and give more responsibility to Roger and I

20  so they could semi retire.  And they kept an eye on things

21  and how the company worked.  We had meetings all the time and

22  reported back to both of them on how operations were running,

23  how profits were going.  They both still had a finger in it,

24  but they didn't have the -- they weren't there on an everyday

25  basis.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 620

1   Q    Okay.  During the time period that you and

2   Mr. Otterstein were in charge, were you also involved in

3   hiring employees?

4   A    Yes.

5   Q    Okay.  Interviewing employees?

6   A    Yes.

7   Q    Do you remember a gentleman by the name of Dennis

8   Cross?

9   A    Yes.

10  Q    Did you and Mr. Otterstein interview Dennis Cross?

11  A    Yes, we did.

12  Q    Do you remember when that was or the circumstances

13  about that?

14  A    I don't remember the exact timeframe.

15  Q    Okay.  Do you remember, for example, was it at the

16  office?  Was it at a hotel?

17  A    It was in the office in the conference room.

18  Q    Who did you report to after you had interviewed Mr. --

19  well, did you interview more than just Mr. Cross for a

20  position?

21  A    Yes.

22  Q    For Mr. Cross's position?

23  A    Yes.

24  Q    Okay.  What position was Mr. Cross hired for?

25  A    Accounting.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 621

1   Q    And so it would be -- I can even ask you a better

2   question.  Did you interview more than one person for that

3   position?

4   A    Yes, we did.

5   Q    Did you --

6   A    It was about -- we narrowed it down to, I believe, 10

7   people that we interviewed.

8   Q    And did you make a -- you and Mr. Otterstein have a

9   conclusion as to who you thought was the best candidate?

10  A    Yes.

11  Q    Who did you convey that to?

12  A    Both Dee and Mike.

13  Q    Do you know who made the decision whether or not to

14  hire Mr. Cross?

15  A    No, sir, I do not know.  I know that they weighed their

16  decision heavily on what we -- our feedback to them.

17  Q    Okay.  Did you ever have any conversations with

18  Mr. Wilhite about ownership of the company?

19  A    Like I just said, I wanted to own it, so, yeah.

20  Q    Any conversations with Mr. Wilhite about him owning the

21  company?

22  A    No.  It was always -- always known who owned the

23  company.

24  Q    Did you ever see any actions from Mr. Wilhite which

25  were inconsistent with him not owning the company?  In other

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 622

1    words, it kind of showed that he maybe owned the company

2    based on what he was doing?

3    A    No more than the rest of us.  We all gave it our all.

4    We all treated it like it was our own.  And so, no, I mean, I

5    don't see anything, like I said, that he owned the company

6    versus Dee, no.

7    Q    Do you know Linda Gould?

8    A    Yes.

9    Q    Who is she?

10   A    She was our receptionist, office manager.

11   Q    At AFC?

12   A    At AFC.

13   Q    Did she work there the same times that you did?

14   A    Yes.  Not the entire time as I did.

15   Q    Do you remember the time period that she worked there?

16   A    I believe she was hired when we got to the new office

17   space, which I think was 2006 or '7, roughly.  And she left

18   shortly before I departed.

19   Q    Was her -- do you know if her termination was voluntary

20   or involuntary?

21   A    I believe she was laid off because we were trying to

22   save money to save the company.

23   Q    Did she ever come and talk to you about -- when you

24   were both employed at AFC, talk to you about how she was

25   being treated at AFC?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 623

1  A    She came in once and a while crying.  That's about it.

2  Q    **What was she crying about?**

3  A    I don't recall.  At different times.  Different things,

4  different times.  But she felt people were picking on her.

5  Q    **Did she ever complain that she thought she was being**

6  **treated unfairly?**

7  A    I mean, like, from a management point of view, no.

8  Q    **From any point of view.**

9  A    Yes.

10 Q    **She would talk to you about that she thought she was**

11 **being treated unfairly at AFC?**

12 A    Overburdened.

13 Q    **Okay.  Did you ever hear Mr. Wilhite tell Mrs. Gould --**

14 **Ms. Gould that he, Mr. Wilhite, owned the company, it was his**

15 **company?**

16 A    No, I did not.

17 Q    **Mr. Wilhite never had any conversations with you about**

18 **that?  Is that what you testified to?**

19 A    That he owned the company?

20 Q    **Yes, sir.**

21 A    No.

22 Q    **Based on your years of working at AFC and what you saw**

23 **and observed, who do you believe owns AFC?**

24 A    Dee.

25 Q    **Any doubt in your mind?**

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 624

 1   A     None.

 2   Q     Thank you.

 3              THE COURT:  Any cross?

 4              MS. FROEHLKE:  Yes, Your Honor.

 5                    CROSS-EXAMINATION

 6   BY MS. FROEHLKE:

 7   Q     Mr. DePaola, do you have a graduate degree?

 8   A     I do.

 9   Q     What is it in?

10   A     Masters in Business Administration with an emphasis in

11   finance.

12   Q     And you didn't pay for that all on your own, did you?

13   A     No, I did not.

14   Q     Who helped you?

15   A     AFC.

16   Q     Advanced Floor paid for your degree?

17   A     Yes, they did.

18   Q     When you departed you were also laid off, right?

19   A     Yes.

20   Q     And Mr. Wilhite laid you off, right?

21   A     Yes, I believe.  And Dee was sitting in the same room,

22   but, yes, Mike spoke the words.

23   Q     And I want to talk about that room.  You said they

24   shared an office, right?

25   A     Yes.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 625

1    Q    And Dee was running DW Support out of that office,

2    wasn't she?

3    A    Yes.  I don't know (unintelligible) I know she did

4    inspections.  I don't even know the name of it, honestly.

5    Q    You are unaware of what DW Support is?

6    A    I'm not unaware of the company, I'm unaware of

7    (unintelligible).

8    Q    But you do know that Dee -- Dee's office for her other

9    company was the shared office with Mike, right?

10   A    Yes.

11   Q    And you were aware that Mr. Wilhite had a criminal

12   conviction, weren't you?

13   A    Yes.

14   Q    What was your understanding of what the criminal

15   conviction was?

16   A    I -- I -- I really don't know exactly.  It had to do

17   something with collecting money from overseas and being

18   misappropriated with another person.  And what exactly

19   happened I don't know.  I know that --

20   Q    You don't --

21   A    I'm sorry.  Go ahead.

22   Q    Go ahead.

23   A    I don't know remember all the details of it.

24   Q    Do you remember any other details besides what you just

25   said?

Page 626

```
 1   A     I know that Mike spent some time in the federal
 2   penitentiary.  He talked about that and his time there, but
 3   not really so much the case.  It really didn't apply to me so
 4   I didn't give a care.
 5   Q     You --
 6   A     That's all prior to me coming on board.
 7   Q     That was prior to your employment?
 8   A     His time in jail?
 9   Q     Oh, I misunderstood you.  I apologize, Mr. DePaola.
10   You only had these discussions during your employment, right?
11   A     Yes.
12   Q     And you were aware that Mr. Wilhite owed some money
13   because of the financial fraud?
14   A     Yes.  I believe I did know that, yes.
15              MS. FROEHLKE:  No further questions.
16              THE COURT:  Mr. DePaola, you said major decisions
17   went through Dee.
18              THE WITNESS:  Uh-huh.
19              THE COURT:  What were major decisions?
20              THE WITNESS:  Financial decisions; whether we were
21   going to invest or not invest; or hire people, not hire
22   people; where we wanted to office out of; whether we were
23   going to get bank loans or not, et cetera.
24              THE COURT:  And you did not have any hiring and
25   firing authority then?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 627

```
 1              THE WITNESS:  Final decisions?

 2              THE COURT:  Yes.

 3              THE WITNESS:  No.

 4              THE COURT:  Only Ms. Wilhite had that?

 5              THE WITNESS:  Well --

 6              THE COURT:  Or Mr. Wilhite, but --

 7              THE WITNESS:  They followed my recommendations,

 8     let's put it that way.

 9              THE COURT:  Sure.  You were -- you would be a

10     recommending official, but you didn't have the authority to

11     actually on the bottom line hire or fire anybody; is that

12     correct?

13              THE WITNESS:  Actually, at the end when I became

14     vice president, yes, I did have full authority to fire

15     somebody if I wanted to.

16              THE COURT:  How did you know that?

17              THE WITNESS:  They told me that they would back up

18     my decision.

19              THE COURT:  Okay.  Did you fire somebody?

20              THE WITNESS:  Yes.

21              THE COURT:  Who did you fire?

22              THE WITNESS:  Jimmy.  I forget his last name.

23              THE COURT:  What was Jimmy's job?

24              THE WITNESS:  Jimmy was a superintendent.

25              THE COURT:  A field superintendent?
```

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                      September 17, 2015

Page 628

1              THE WITNESS:  Uh-huh.

2              THE COURT:  Okay.  Why did you fire him?

3              THE WITNESS:  Basically not following company

4    policy, not following my policy.  Treating crews poorly.

5              THE COURT:  What was the policy --

6              THE WITNESS:  Degrading them.

7              THE COURT:  -- of yours he didn't follow?

8              THE WITNESS:  I asked him to do certain tasks,

9    follow-up with crews, make phone calls, et cetera, basically

10   his job, and he didn't really care to do it the way I asked

11   him to.  And then I also heard that he was degrading crews,

12   and calling them names and cussing at them, causing

13   disturbances on -- in an AFC uniform, in an AFC truck on a

14   work site, and that's just not acceptable.

15             THE COURT:  Thank you.  Anything further from

16   either of you based on that?

17             MR. MIKULECKY:  Nothing further, Your Honor.

18             THE COURT:  Okay.  You're excused.  Thank you.

19             THE WITNESS:  Thank you.

20             MR. BEDNARSKI:  And Your Honor, I'm still unable

21   to get ahold of Ms. Ashe, so we still have another in-person,

22   so we will call Torrey Sanborn --

23             THE COURT:  Very good.

24             MR. BEDNARSKI:  -- at this time.

25             UNKNOWN SPEAKER:  (Unintelligible).

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 629

```
 1            THE COURT:  Ms. Ashe has the broken foot
 2   (unintelligible).
 3            MR. BEDNARSKI:  Yes, Your Honor.
 4            THE COURT:  Okay.
 5            MR. BEDNARSKI:  And I've been telling her a lot of
 6   different times that we were going to have her be available
 7   and it just wasn't working out.  So, I don't know if --
 8            THE COURT:  Where is she from?
 9            MR. BEDNARSKI:  She's here in Colorado, Your
10   Honor.  She works over at the GM dealership.
11            THE COURT:  In Denver?
12            MR. BEDNARSKI:  Yes, Your Honor.
13            THE COURT:  Hopefully she's not running errands
14   because it's always better to have live testimony if they're
15   mobile.
16            MR. BEDNARSKI:  Well, and that's why -- that's why
17   she has to testify by phone.  She's not mobile with a broken
18   foot, so she cannot drive.
19            THE COURT:  Right.  A very long bath she's taking.
20            THE COURTROOM DEPUTY:  Would you raise your right
21   hand.
22            (The witness, Torrey Sanborn, was sworn to tell
23   the truth by the Courtroom Deputy.)
24            THE WITNESS:  Yes, I do.
25            THE COURTROOM DEPUTY:  You can sit right there.
```

United States of America vs.                                  Evidentiary Hearing - Day III
Michael David Wilhite                                         September 17, 2015

Page 630

```
 1                    DIRECT EXAMINATION

 2   BY MR. BEDNARSKI:

 3   Q    Good afternoon, Mr. Sanborn.

 4   A    Good afternoon.

 5   Q    How are you doing today?

 6   A    Fantastic.

 7   Q    If you would please introduce yourself to the Court,

 8   and then spell your last name for the record.

 9   A    Okay.  I'm Torrey Locke Sanborn, S-a-n-b-o-r-n.

10   Q    And if you would, just for the record, it's Torrey with

11   a Y or an I?

12   A    T-o-r-r-e-y.

13   Q    Okay.  Mr. Sanborn, how old are you?

14   A    I'm 46 years old.

15   Q    Where do you currently work?

16   A    I work at a company called Lightning Bolt and Nut.

17   Q    And what do you do for that company?

18   A    I own the company.

19   Q    Okay.  And what does that company do?

20   A    We sell construction supplies.

21   Q    What type of construction supplies?

22   A    Fasteners, bolts, nuts, screws.

23   Q    Kind of like what it says, Lightning Bolt screw?

24   A    Exactly.

25   Q    Now, do you know the Wilhites?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 631

1   A    Yes.

2   Q    Do you know Advanced Floor Concepts?

3   A    Yes.

4   Q    How do you know Advanced Floor Concepts?

5   A    I think I'm right here.  About this time in 1996, I

6   worked for a company called Barton Supply, and Don Barton is

7   one of the owners.  He had been contacted, I think by Mike --

8   honestly, I'm not sure.  Somebody had contacted him and said,

9   hey, would you call this guy.  He's a potential customer.

10  So, I -- I reached out to Mike because I had been given a

11  number by Donny Barton.

12  Q    Now -- so you worked for Barton Supply?

13  A    Correct.

14  Q    What did you do for Barton Supply?

15  A    At that time I was their inside sales manager.

16  Q    So, what was your role or duties as the inside sales

17  manager?

18  A    So, I basically oversaw two -- we had two gentlemen

19  that worked inside sales and then I kind of negotiated the

20  delivery schedules for what my two guys would try to sell and

21  promise, and what our guys would try to deliver on a

22  timely -- somewhat timely manner.  And so I kind of ran in

23  between them.  And then, also, I had actual customer

24  accounts.  I had probably 60 to 80 accounts in my name.

25  Q    Okay.  Now, was AFC one of those accounts?

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                      September 17, 2015

Page 632

 1   A    Yes.

 2   Q    And you had indicated that you thought it was back in

 3   '96.  Are you positive about the start time of when you

 4   started this relationship with Advanced Floor?

 5   A    It's either -- I believe it's either '96 or '97.  And

 6   I'm not positive.  I could figure it out, but without access

 7   to anything at Barton Supply I'm guessing.

 8   Q    And we're looking at 18, 19 years ago; is that right?

 9   A    Yes.

10   Q    So --

11   A    It's been a while.

12   Q    So exactly when it started is up to recall?

13   A    Uh-huh.

14        THE COURT:  Well, when did you start with Barton?

15        THE WITNESS:  I started with Barton Supply in

16   1993.

17        THE COURT:  Okay.  And how long were you there?

18        THE WITNESS:  Nine and a half years.

19        THE COURT:  Thank you.

20        THE WITNESS:  Yes, sir.

21   Q    (By Mr. Bednarski)  Now, when you reached out to

22   Advanced Floor Concepts, who did you reach out to?

23   A    Originally I spoke to Mike.

24   Q    And can you -- I don't want you to tell me exactly what

25   was talked about, because I don't remember that from

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 633

 1   yesterday let alone 18 years ago.

 2   A    I -- I can tell you pretty clearly.

 3   Q    I was going to ask you, generally, what did you guys

 4   discuss in this phone call that you had with Mr. Wilhite?

 5   A    At the time, Mike asked about product availability.  At

 6   the time we sold quite a few structural steel components,

 7   beams and posts.  I'm assuming he probably drove past our

 8   yard because where he was buying was about a mile down the

 9   road.  So, I'm assuming he drove by and that's why he had

10   called Don Barton.  Don Barton referred him to me.  I called

11   Mike.  We talked about, kind of, can I provide the products

12   that Advanced Floor was using.  I said I think we can.  So, I

13   worked up some prices, and I met -- I went and met with him

14   and Dee down at the office in Castle Rock.

15   Q    So, the first phone call you had with someone from

16   Advanced Floor Concepts was with Mike?

17   A    Correct.

18   Q    And I think you said he was just a mile down the road.

19   Did he tell you that, or how did you know he was -- he was so

20   close?

21   A    You know what, he -- kind of a funny story, and I don't

22   know if you'll remember this.  But somebody at a competitor

23   of mine basically accused him of stealing product.  They had

24   made the product incorrectly, so he took it back to show them

25   that, hey, this doesn't work in the field, so he brought them

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 634

1    it.  So, as he was bringing it in, they accused him of taking

2    it out.  And honestly it upset him.  He was, like, I'm

3    bringing it back because you guys didn't make it right.  Now

4    you're accusing me of stealing it.  And I think that's why he

5    stopped to see me, to be honest, was because he was

6    frustrated with the reaction.  He had already purchased the

7    material, bringing it back to show their shortcomings, they

8    then accused him of stealing the material.  And I think he

9    basically said, you know what, we need to figure something

10   else out.

11           And I know at the time they were struggling to

12   make -- they really weren't in that realm with the business

13   and they were trying to be, and they were making a lot of

14   mistakes.

15   Q    So, when you first had this -- and then I think you

16   said the first meeting you had was with both Dee and Mike?

17   A    Correct.

18   Q    At Advanced Floor Concepts' office?

19   A    Correct.

20   Q    And was -- where was this in the state of Advanced

21   Floor Concepts?  Was it still in its infancy?  Had it been

22   going on for a couple years?  Had it been established?  Do

23   you recall?

24   A    To be honest, I think they'd been in business -- and

25   I'm guessing here, I think they'd been in business for maybe

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 635

1   a year or year and a half.  But it was -- it was clearly in

2   its infancy.  They were still doing sort of a revolutioning

3   as far the product design.  And that's where I worked with

4   Mike is really kind of trying to figure out what product

5   worked best in the field.  He was in charge of the guys in

6   the field and installing it, so they would basically complain

7   to him that this did or didn't work.  And he was the

8   mouthpiece to me to tell me -- in all honesty from

9   Spanish/English, the conversion -- telling me what did and

10  didn't work.  And then I tried to help him come up with ideas

11  that brought the cost down, but met the structural

12  qualifications for the product he was trying to make.

13  **Q    Throughout the time -- and did you have AFC as a client**

14  **of yours until you left Barton Supply?**

15  A    I did.

16  **Q    So, throughout those years that you were at Barton**

17  **Supply, and AFC was a customer of yours, did you have**

18  **frequent contact with Advanced Floor Concepts?**

19  A    Constantly.

20  **Q    Who -- who were you having constant contact with?**

21  A    So, it court -- it sort of depended upon what the

22  matter was about.

23  **Q    Okay.**

24  A    So, they had a couple people in the office.  One of

25  them is a guy named Shea.  It's Dee's son.  He kind of helped

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 636

1   me -- he tried to do the field ordering, so he would send in

2   orders with a given recipe list that then I would basically

3   take and make, and then I would deliver it to the job site.

4   On a job site if we screwed up -- keep in mind this is all

5   new business, so mistakes happen -- I was dealing with Mike

6   with the mistakes just trying to keep Advanced Floor's

7   schedule intact, and trying to refine our product.  And then

8   if it came down to money I dealt with Dee.

9   Q    And, I'm sorry, I just want to make sure.  When it came

10  down to the money side of it that's when you dealt with Dee?

11  A    Correct.

12  Q    Now, in the beginning, or in your time with having

13  contact with AFC, how would you describe your contact with

14  Dee Wilhite?

15  A    So, basically my interaction with her was pretty

16  simple.  Any billing discrepancies, any monies that were

17  either past due or owed, if there was any question on any of

18  the invoices, I dealt with Dee.  Anything that was like a

19  field operation or a project manager -- I don't know what

20  title you'd call that -- Mike's wheelhouse was the field and

21  kind of running the guys, and scheduling and product and,

22  really, inventions and innovation.  And Dee's was the money

23  side of it.  Because, I mean, Mike was out in the field and,

24  frankly, he couldn't answer any questions on money either.

25  Q    Got you.

Page 637

1   A    He was a waste of time in that realm.

2   Q    Sure.  How often through that timeframe would you say

3   you had contact with Dee Wilhite?

4   A    At least weekly.

5   Q    And when you say "at least weekly" was this in person

6   weekly or by phone weekly?  Or did it -- was it some of both?

7   A    It was some of both.  I would say physically it was

8   probably every other week, and on the phone it was weekly or

9   sometimes a couple times a week.

10  Q    How often would you have contact with Mike?

11  A    Almost daily.

12  Q    And that's because of being -- him being in the field?

13  A    Correct.  We were -- so, as an example we'd schedule an

14  order -- I'm going to make this up, but we'd schedule an

15  order for 8 a.m. delivery.  Something would happen on their

16  end.  I don't know what.  They don't deliver it until 8:00,

17  because if you deliver it then it would get stolen or

18  something would happen, so he might push it back to noon and

19  want another job that wasn't being delivered at 8:00.  So, it

20  was kind of a juggling for us trying to fulfill their needs

21  all over the place trying to deliver product on time and

22  correctly, both piece count and manufactured.  A lot of the

23  product is manufactured.  So there's a huge, huge opportunity

24  for mistakes.  And, unfortunately, from both ends we made

25  mistakes, but we communicated through each other to try to

Page 638

1    make that more accurate.

2    Q    Now, in the beginning you had indicated that you had

3    this weekly contact with Dee.  Did that become less over

4    time?

5    A    It did.

6    Q    How -- how did it become less?

7    A    We just made less mistakes.  I mean, frankly, to start

8    out, there was billing errors from our side.

9    Misunderstandings on the billing for what we were billing

10   them for because we were changing product names.  So, as an

11   example, there'd be a bracket -- and a purlin bracket is a

12   small bracket and a main bracket is a big bracket, and we

13   made both.  So, we had come up with names for all of them.

14   And just as we evolved and the product became better and more

15   refined we changed names.  And just trying to explain all

16   those things, once the product kind of got evolved -- and I

17   would say at about the two-year or two-and-a-half-year

18   point -- we kind of had it figured out so we knew we were

19   speaking the same language.

20            So, then I just -- billing became more accurate.

21   They understood the billing they were getting, and the bills

22   got paid.  So it just sort of evened out.

23   Q    So, as the company -- as both companies kind of learned

24   how to work together, that contact with Dee from the

25   financial side wasn't necessary?

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                    September 17, 2015

Page 639

1    A    It was still necessary.

2    Q    Okay.

3    A    Their average days to pay were quite frequently beyond

4    the net 30 terms.  So, when I needed money I called Dee and

5    said, Dee, I need money.

6    Q    And would she take care of getting you the money?

7    A    Uh-huh.

8    Q    Now, based off of your interaction with Advanced Floor

9    Concepts, do you know who owned Advanced Floor Concepts?

10   A    I knew Dee owned it.

11   Q    Okay.  Based off of what?

12   A    She introduced herself as the owner to me originally,

13   but --

14   Q    So, in that first meeting you had --

15   A    Yes.

16   Q    -- Dee said she was the owner?

17   A    Uh-huh.

18   Q    Did Mike at all say he was the owner?

19   A    No.

20   Q    Throughout the entire time that you worked with

21   Advanced Floor Concepts, did Mike ever say he was the owner

22   of Advanced Floor Concepts?

23   A    No.  He said he was the janitor.  I mean --

24   Q    Jokingly, right?

25   A    Jokingly.  Clearly, he was the field manager.  I mean,

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 640

1   and, again, I -- I know it sounds silly 18 years later, but

2   it was pretty obvious that he was running around trying to

3   literally keep all the people in place and scheduling.

4   Q    Now -- sorry.  I had a place I was going to go and I

5   forgot where I was going to go.

6            Oh, it sounded like you were about to say

7   something else.  That -- you said Dee had told you that she

8   was the owner.  Was there anything else that led you to

9   believe she was the owner of Advanced Floor Concept, not

10  Mike.

11  A    No.  I mean, like I say, she -- so, keep in mind when

12  I've got Mike on the phone it was just questions can you

13  produce product, can you do this.  I said, yes, we can do

14  that.  We set up a meeting.  I went down and met with both of

15  them.  Dee basically explained that she was the point of

16  contact, and she's the person that I would need to deal with.

17  Mike was the field contact.  That was who I would need to

18  deal with.  Which is relatively common.  I mean, I kind of

19  figure out who the decision-makers are and then I address

20  them sort of in their wheelhouse, and then we really didn't

21  talk about it after that.  I mean, like I say, I dealt with

22  Mike if it was a field issue, and I dealt with Dee if it was

23  a money issue.

24            MR. BEDNARSKI:  May I have a moment.

25            Mr. Sanborn, thank you for your time.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 641

```
 1              THE WITNESS:  Sure.
 2              MR. BEDNARSKI:  I have no further questions.
 3              THE COURT:  Any cross?
 4              MR. VILLASENOR:  Yes, Your Honor.
 5                       CROSS-EXAMINATION
 6  BY MR. VILLASENOR:
 7  Q    Mr. Sanborn, you said that Mr. Wilhite didn't say that
 8  he was the owner, right?
 9  A    Correct.
10  Q    You meant he didn't say he was the owner to you, right?
11  A    He asked if he said if he was the owner to me.  Dee was
12  expressed as the owner.  I mean --
13  Q    But Mr. Wilhite never said he was the owner to you,
14  correct?
15  A    Correct.
16  Q    Thank you.
17              THE COURT:  All right.  You're excused.
18              THE WITNESS:  Yes, sir.
19              THE COURT:  Thank you.
20              THE WITNESS:  Okay.
21              UNKNOWN SPEAKER:  They might have Tami but, so --
22              UNKNOWN SPEAKER:  Tami?  You know, Tami?
23              UNKNOWN SPEAKER:  Yeah, we haven't been able to
24  get ahold of Ms. Ashe, so what I would ask is that we take
25  their witnesses out of order --
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 642

```
 1            THE COURT:  That's fine.

 2            UNKNOWN SPEAKER:  -- while we continue to try to

 3  get in touch with her.

 4            THE COURT:  That's fine.  Do you want to take a

 5  break, or not?

 6            UNKNOWN SPEAKER:  If we could take a short one,

 7  Judge.

 8            UNKNOWN SPEAKER:  Five minutes.

 9            UNKNOWN SPEAKER:  Like, 5, 10 minutes.

10            THE COURTROOM DEPUTY:  All rise.  Court is in

11  recess.

12            (A break was taken from 3:29 p.m. to 3:43 p.m.)

13            THE COURT:  Very good.  Please be seated.  Back on

14  the record in 00-cr-504.  We've completed all but one witness

15  for the Wilhites.  And what are we doing now?

16            MS. FROEHLKE:  Your Honor, the United States calls

17  Linda Gould.

18            THE COURT:  Okay.  Linda Gould.

19            THE COURTROOM DEPUTY:  If you would please stand

20  up and raise your right hand.

21            (The witness, Linda Gould, was sworn to tell the

22  truth by the Courtroom Deputy.)

23            THE WITNESS:  Yes.

24  /////

25  /////
```

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                  September 17, 2015

Page 643

```
 1                    DIRECT EXAMINATION

 2   BY MS. FROEHLKE:

 3   Q    Ms. Gould, could you state your name and spell it for

 4   the record, please.

 5   A    Linda Gould, G-o-u-l-d.

 6   Q    And where are you employed?

 7   A    Now?

 8   Q    Yes.

 9   A    The Town of Castle Rock.

10   Q    What do you do for the Town of Castle Rock?

11   A    Office assistant.

12   Q    What are your duties in that capacity?

13   A    Oh my gosh.  Customer service, general admin.

14   Administrative stuff.

15   Q    How long have you been there?

16   A    Since April.

17   Q    What was your position prior to April?

18   A    I was a private events manager.

19   Q    Okay.  Where was that?

20   A    Cherokee Ranch and Castle.

21   Q    And what were your duties there?

22   A    I did all private and corporate events.  Did the master

23   calendar for the entire event facility.  I did purchasing and

24   supplies of all of the alcohol.  Just general administrative

25   stuff there as well.
```

United States of America vs.                                    **Evidentiary Hearing - Day III**
Michael David Wilhite                                                     September 17, 2015

Page 644

1    Q      Do you know Mr. Wilhite?

2    A      I do.

3    Q      How do you know him?

4    A      I worked for him.

5    Q      When did you first meet Mr. Wilhite?

6    A      I don't know the exact date.  I started in February,

7    early February of 2008.

8    Q      When you say started, where do you mean?

9    A      At Advanced Floor Concepts.

10   Q      Did you meet him on your first day?

11   A      I honestly don't recall.  But I'm sure -- quite sure I

12   met him the first week.

13   Q      How did you first hear about the Advanced Floor job?

14   A      Through Craigslist.

15   Q      And what was your position that you applied for?

16   A      Project coordinator.

17   Q      Who hired you?

18   A      Torin Jackson.

19   Q      What was your -- what were your duties as project

20   coordinator?

21   A      When I first started there it was my job to set up all

22   of the jobs as they came in.  And then once I got them set up

23   they went to engineering, and they worked their magic with

24   them.  The job -- once the job was completed, then it came

25   back to me and I reconciled the project file.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 645

1    Q    Who was your direct supervisor?

2    A    Torin Jackson.

3    Q    Who was Torin's boss?

4    A    Mike Wilhite.

5    Q    Do you know who was in charge of Advanced Floor when

6    you started?

7    A    Mike Wilhite.

8    Q    Why do you say that?

9    A    Because everybody knew who was in charge.  Mike wasn't

10   necessarily in the office every day, but everything went

11   through him.  Everything did.

12   Q    Could you turn to Exhibit 43 in the larger notebook in

13   front of you.  The smaller one has letter exhibits and the

14   larger one has number exhibits.

15   A    Okay.

16   Q    Do you recognize this document?

17   A    Yes, I do.

18   Q    What is it?

19   A    It's an e-mail that I received from Mike while I was

20   working there.

21   Q    What was the context of this e-mail?

22   A    Clarifying job responsibilities.

23   Q    And what -- what change -- did anything change in your

24   job responsibilities based on this e-mail?

25   A    Yeah.  Yeah.  Want me to elaborate?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 646

1    Q    Sure.

2    A    A lot of things changed with my job.  I wasn't just a

3    project coordinator the whole time I worked there.  I was

4    there approximately six months, and Mike gave Roger

5    Otterstein a promotion to executive VP of sales -- not

6    executive, I'm sorry, VP of sales.  And Roger wanted help, so

7    I ended up helping Roger out.  I also helped out Cory

8    Phillips who ran Steel Deck Supply, which was another

9    company.  I took over some of the -- let me see, I moved my

10   desk up front and took over where the receptionist had been

11   after they got rid of her.

12        I did some accounting assistant stuff, just inputting

13   payables that were -- that came in through the mail, just

14   inputting those into QuickBooks.  That's all I ever did with

15   that.

16   Q    Do you recall specifically what changed in your duties

17   relating to this e-mail?

18   A    Related to this e-mail when -- when Roger died, which

19   was end of February, I believe, maybe early March of 2010, I

20   was helping out just a little bit more with some things, and

21   then they brought in Cindy as a temporary employee.  And when

22   they brought her in it -- that was really close to about the

23   same time -- actually, I think Cindy started right before

24   Roger went in the hospital.  So, it was like within the same

25   amount of time.  This e-mail was to clarify that I was no

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 647

1   longer going to be doing some of these things that I was kind

2   of filling in with.

3   Q    Was it unusual for Mr. Wilhite to send an e-mail

4   clarifying people's positions?

5   A    I don't recall any previous e-mails clarifying

6   positions now.

7   Q    What about general communication?  Was it unusual for

8   him to clarify or define positions of different employees?

9   A    Again, I couldn't honestly say when it came to defining

10  positions.  I mean, yes, we got e-mails from Mike all the

11  time, but as far as defining positions, this is the only

12  e-mail I recall.

13  Q    Did you ever meet Mrs. Wilhite?

14  A    Yes.

15  Q    When did you first meet her?

16  A    Probably within that same week that I worked there.

17  Q    When you started in February, 2008?

18  A    Yes, exactly.

19  Q    What did you understand her position to be?

20  A    I was told that she was named -- the business was in

21  her name, that it was Mike's company.  There were three

22  businesses.  One of them was actually Dee's business, and the

23  other two were Mike's businesses.

24  Q    What was Dee -- what was actually Dee's business, to

25  your understanding?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 648

1   A    Southern Colorado Construction Consulting.

2   Q    **Did you ever do any work for Southern Colorado**

3   **Construction Consulting?**

4   A    Only, like, toward the last six months, maybe a year

5   that I was there.  Because she had laid off one of her

6   employees, and all I ever did was just answer the phone for

7   her on occasion.  That was it.

8   Q    **How did you come to be helping with SCCC let's call it?**

9   A    Because we were all in the same building.

10   Q    **Who asked you to help with Dee's company?**

11   A    Dee did.  She asked me if I would answer the phones

12   while she was out.

13   Q    **Did Mrs. Wilhite ever ask you to do anything for**

14   **Advanced Floor?**

15   A    No.  No.

16   Q    **What -- you mentioned that there were three companies.**

17   **What were the other two?**

18   A    AFC, which was Advanced Floor Concepts.  That's who I

19   was originally hired to work for.  And the other one was

20   Steel Deck Supply.

21   Q    **What was Steel Deck Supply?**

22   A    They supplied steel.

23   Q    **Who do you mean by "they"?  Who ran that company?**

24   A    Cory Phillips.  I don't remember his title.  But he

25   pretty much did everything for that company.  But, of course,

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 649

1   under the direct supervision of Mike.

2   **Q     Did you know who owned Steel Deck Supply?**

3   A    It was in Dee's name, but it was Mike's company.

4   **Q     What makes you say that?**

5   A    Every -- everything I was ever told was it was in Dee's

6   name, but it was Mike's company.

7   **Q     To your knowledge, what were Mr. Wilhite's job duties**

8   **at Advanced Floor?**

9   A    He made all the decisions.  I mean, anything --

10  anything that came up.  If I had anything come up I would go

11  directly to my supervisor, who was Roger Otterstein at that

12  time, and Roger would -- if Mike wasn't in the office Roger

13  would pick up the phone and call Mike.

14  **Q     Who else reported --**

15          THE COURT:  Hold on.  Could I have attorneys

16  approach, please.

17          (The following bench conference was had.)

18          THE COURT:  Tell me, what happened

19  (unintelligible) company today (unintelligible) was it --

20          MS. FROEHLKE:  Mrs. Wilhite talked --

21          THE COURT:  Was it the other company?

22          UNKNOWN SPEAKER:  Steel Deck Supply, yes, and

23  Mrs. Wilhite testified about it.

24          THE COURT:  She did?

25          UNKNOWN SPEAKER:  Yes.

Page 650

```
 1            MS. FROEHLKE:  It went under.  It was

 2   unsuccessful, and they lost a lot of money on it.

 3            UNKNOWN SPEAKER:  She talked about that was an

 4   example of when she waited too late to jump into an industry.

 5            THE COURT:  What did she say about how long it was

 6   open?

 7            UNKNOWN SPEAKER:  About what?

 8            THE COURT:  How long it was open.

 9            UNKNOWN SPEAKER:  Four years.

10            THE COURT:  From when to when?

11            UNKNOWN SPEAKER:  I'm going from memory here, but

12   I think it was about from '07 to '0 -- to '11.  Somewhere in

13   there.

14            THE COURT:  Okay.  I apologize for not catching

15   it.  Thanks.

16            (The preceding bench conference was concluded.)

17            THE COURT:  Please continue.

18   Q    (By Ms. Froehlke)  To your knowledge, who reported

19   directly to Mr. Wilhite?

20   A    We all did, in a sense.  But I reported to Roger

21   Otterstein, who reported to Mike.  I also reported to Torin

22   Jackson, who reported to Mike.  And I also reported to Cory

23   Phillips, who reported to Mike.

24   Q    To your knowledge, did anyone report directly to

25   Mrs. Wilhite related to Advanced Floor?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 651

1    A    No.

2    Q    Who did you consider to be the owner of Advanced Floor?

3    A    Michael Wilhite.

4    Q    And why do you say that?

5    A    It -- we all knew.  I mean, that's what we were told.

6    It was Mike's company.

7    Q    Do you recall who told you that?

8    A    In the very beginning when I first started working

9    there, I do not.

10   Q    At any time do you recall a specific instance where

11   someone told you that?

12   A    Mike himself told me that.

13   Q    And what context was that in?

14   A    He was -- Roger -- when Roger got sick he was in the

15   hospital for several weeks before he died.  And, like I said,

16   that was, I think, at the end of February, 2010.  Michael was

17   in the office a lot more at that point, and I don't -- I

18   don't even remember what happened, but Mike was mad one day

19   about something, and he walked into my office.  I didn't have

20   a door, but I had an entryway, it was just like a hallway,

21   and he put his hands up on the hall -- each wall, and yelled

22   at me, This company may be in Dee's name, but everybody knows

23   it's my company and I make the rules.

24   Q    What was your response to that?

25   A    I honestly --

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 652

1   Q    If anything?

2   A    -- don't think I did respond.  I may have said, Okay.

3   I mean, there wasn't a lot of conversation.  He walked away

4   after he said that.  He was -- I don't even remember what

5   brought it on.  I know he was obviously mad, but he tended to

6   be -- I wouldn't say mad, but not the same person that I had

7   known previously to Roger getting sick.  It was like he -- he

8   wasn't happy that he had to be there more.

9   Q    How often was Mr. Wilhite in the office before Roger

10  got sick?

11  A    I'd say, average, two days a week.

12  Q    And then you said that increased when Roger got sick?

13  A    Yeah.  When --

14  Q    What did it increase to?

15  A    When Roger went into the hospital Mike was in the

16  office more.  Three to five days a week.

17  Q    Did that remain constant then after Roger passed away?

18  A    Until I was laid off, yes.

19  Q    When were you laid off?

20  A    July 19th, 2010.

21  Q    Could you explain the circumstances surrounding that?

22  A    Mike laid me off.

23  Q    Do you recall where you were or --

24  A    Yes.  Mike was back in the warehouse smokin' a

25  cigarette, and I went back there to tell him something.  And

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 653

1  he says, Okay, well, I've got you here -- just

2  nonchalantly -- I've decided we no longer need your position.

3  And I was like, Okay.  I mean, it was -- it was a very calm

4  conversation.  That was it.  We might have talked for two

5  minutes, I don't know, and I walked off.

6  Q    To your knowledge, did Mr. Wilhite layoff or fire any

7  other employees?

8  A    I don't know.  I mean, I've heard things, but that

9  happened after I left, so --

10 Q    Okay.  Do you recall -- so you started, I think you

11 said, in February, 2008?

12 A    Uh-huh.

13 Q    At any point do you recall Mr. Wilhite retiring?

14 A    No.

15 Q    Did he ever talk about retirement that you recall?

16 A    No.

17 Q    Did you notice a drop in his work attendance at all in

18 the fall of 2008?

19 A    No.  He was always -- when I first -- from the time I

20 started there until Roger got sick, he was always in there

21 roughly two days a week.

22 Q    Did Mr. Wilhite or Advanced Floor employees ever talk

23 about him owing money to someone?

24 A    No.

25 Q    Did you -- were you aware of a criminal case?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 654

 1   A    I was not.  I was told the reason why the businesses

 2   were all in Dee's name was because Mike had served time

 3   for --

 4             MR. MIKULECKY:  Object on hearsay.

 5   A    -- tax evasion.

 6             THE COURT:  Sustained, unless we can get the

 7   speaker.

 8   Q    (By Ms. Froehlke)  Do you remember who told -- do you

 9   remember who told you what you were just testifying to?

10   A    Everybody.  Everybody told me that.

11   Q    Do you remember specifically?

12   A    It was what was known in the office is that that was

13   the reason.

14             MR. MIKULECKY:  Objection, Your Honor.  We still

15   don't have that.

16             THE COURT:  Yeah.  Hold on a second.  I think that

17   probably is still not there.  So, unless you can give me some

18   kind of exception to the hearsay rule.

19   Q    (By Ms. Froehlke)  Ms. Gould, can you think of anybody

20   specifically that would have told you that?

21   A    Fern Pena.

22   Q    Who is Fern Pena?

23   A    She was the accountant when I was first hired.

24   Q    And what would she have told you about Mr. Wilhite's

25   debt?

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                    September 17, 2015

Page 655

 1              MR. MIKULECKY:  Still, Your Honor, objection.

 2              THE COURT:  I -- I don't think you've established

 3      she speaks for the company.  Unless it's an officer or

 4      employee then -- or actually we're not even dealing with

 5      Advanced Floor here.  The actual defendants, the parties are

 6      individuals.  So unless it's one of these two individuals I

 7      think it's hearsay.  So, sustained.

 8      Q    (By Ms. Froehlke)  Do you recall -- other than the

 9      specific instance you just told us about with -- when Mike

10      explained to you that he was in charge, do you recall

11      Mr. Wilhite ever talking about his criminal case?

12      A    I never knew there was a criminal case until I got a

13      phone call in April or May of this year.  I never knew that.

14      Q    Do you recall him talking about owing money?

15      A    No.

16              MS. FROEHLKE:  Your Honor, I believe the

17      foundation has been laid for this witness to talk as to

18      reputation concerning character among associates, which is

19      803(21).  She said it was known among the employees at the

20      company.  Everybody told her.  She has named a specific

21      employee who told her these things.  But I believe this goes

22      to a reputation among associates.

23              THE COURT:  It's colorful.  What's your objection

24      now?

25              MR. MIKULECKY:  They still don't have a basis for

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 656

1  how she got that, and for her to explain that to lay that

2  foundation she's going to be relying on hearsay.

3          THE COURT:  Well, she said everybody knew that he

4  was the boss, the owner, and I -- Ms. Froehlke didn't ask,

5  but if everybody means all the people in the company, I would

6  say that's Mr. Wilhite's associates.  So, it seems to fit

7  803(21).  Can you explain why it doesn't, if he has the

8  reputation of being the boss, the owner?  (Unintelligible)

9  reputation it wouldn't, you know, be anything other than

10  that.

11          MR. MIKULECKY:  You're Honor, we've also had

12  testimony from other employees contrary to this.  Obviously,

13  it wasn't everybody.  She hasn't established who that is,

14  we've only established that they're associates.  So, we still

15  don't have the foundation laid.  In fact, she's the only

16  person who's testified to this.

17          THE COURT:  Well, your witnesses all testified to

18  their knowledge based on Dee's statement and what's in the

19  paper record, not anything else that I can recall.  Unless

20  you can tell me --

21          MR. MIKULECKY:  I believe they've also talked

22  about Mr. Wilhite's statements.

23          THE COURT:  Right.  Which, by the way, were

24  hearsay that was not objected to because you were offering

25  your own client's statements for the truth of the matter,

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 657

1    which is hearsay.  But it wasn't objected to, so it came in.

2    But that just makes a fact issue and a matter of credibility.

3    And I would say it wouldn't preclude this evidence, so it's

4    overruled.

5    Q    (By Ms. Froehlke)  Ms. Gould, earlier you testified

6    that everybody in the company knew Mr. Wilhite was the boss.

7    I believe we were also discussing that everyone knew he owed

8    money of some kind.  Can you tell the context of what that --

9    A    I did not know he owed money.

10   Q    Did you know he had -- I believe you were explaining

11   the context of knowing he had gotten in some sort of trouble?

12   A    Yes.

13   Q    Can you explain that?

14   A    That's what I was told, that there was a tax evasion

15   issue years earlier.  I did not know it was -- I was never

16   told that it was ongoing or anything that was still owed or

17   anything like that.  I don't know how tax evasion works.  But

18   I was told that was the reason the company was not in his

19   name.

20   Q    Did --

21   A    Because he couldn't be.

22         MR. MIKULECKY:  Your Honor, move to strike.  This

23   is not just reputation.

24         THE COURT:  Well, it's -- she said, "I was told."

25   Again, we moved away from general reputation.  So, you're

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 658

1    right.  That's sustained.  And I won't regard that.

2    Q    (By Ms. Froehlke)  Ms. Gould, did the -- did your

3    associates and you discuss these things on a regular basis?

4    How did you -- was it your impression that within Advanced

5    Floor the associates were aware of these facts?

6    A    Yes.

7    Q    Why do you say that?

8    A    Things would come up -- I mean, just in normal

9    conversation, and it was -- it was pretty evident that

10   everybody had been told the same story.

11   Q    Did Mrs. Wilhite ever interact with you relating to you

12   getting laid off?

13   A    No.

14   Q    Are you aware of Mrs. Wilhite -- how often was

15   Mrs. Wilhite in the building where Advanced Floor was while

16   you were working there?

17   A    Very often, because she was there running her own

18   business.

19   Q    And which business are you referring to when you

20   say that?

21   A    The Southern Colorado Construction Consulting.

22   Q    Where was her office specifically?

23   A    Her and Mike shared an office.  We were in two separate

24   locations during the time I was employed there, but in both

25   locations they shared an office.  And in both locations their

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 659

```
 1   office was right near -- very near mine.
 2           MS. FROEHLKE:  If I could have a moment, Your
 3   Honor.
 4           THE COURT:  Sure.
 5           MS. FROEHLKE:  No further questions.
 6           THE COURT:  Cross?
 7                     CROSS-EXAMINATION
 8   BY MR. MIKULECKY:
 9   Q    Good afternoon, Mrs. Gould.  I'm Scott Mikulecky.  I'm
10   the attorney for Mrs. Wilhite and Advanced Floor Concepts.
11   You remember the exact date you were laid off, correct?
12   A    Yes, I do.
13   Q    And the circumstances and what Mr. Wilhite was doing in
14   the location, correct?
15   A    Right.
16   Q    Burned into your mind, right?
17   A    Absolutely.
18   Q    You were not expecting that, were you?
19   A    The layoff?  No, I was not.
20   Q    Pretty jarring, wasn't it?
21   A    No.  It wasn't jarring, but Mike had told me five weeks
22   earlier that he wasn't going to lay me off.  So I was
23   surprised, but I was actually relieved.
24   Q    And you had a call from the US Attorney's Office to ask
25   you about testimony in this case, correct?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 660

```
 1   A    Right.

 2   Q    And they told you at that point that Mike had scammed

 3   $5 million, correct?

 4   A    I -- No. 1, I don't recall him ever saying scammed.  I

 5   recall hearing the word fraud.  And 5 million, no, I don't

 6   recall that number.

 7   Q    What number do you recall?

 8   A    I know it was millions, but I honestly couldn't tell

 9   you how many millions.

10   Q    Okay.  So, they told you that Mike defrauded or frauded

11   people out of millions of dollars, right?

12   A    Right.

13   Q    And they also told you that Mr. Wilhite only served 30

14   days in the jail, correct?

15   A    Yes.

16   Q    And they told you that that was because he had turned

17   on the other guy, right?

18   A    Right.

19   Q    And they told you that that other guys had served 20

20   years in jail, right?

21   A    Was sentenced to 20 years.  I don't know how long he

22   served.

23   Q    Now, you weren't involved in the financial affairs of

24   Advanced Floor Concepts, correct?

25   A    No.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 661

1   Q    So you don't know anything about the financial

2   decisions, correct?

3   A    Right.

4   Q    You also weren't involved in any of the discussion that

5   Mr. Wilhite might have had regarding any decisions that were

6   referred to him, correct?  You weren't present when

7   Mr. Wilhite was making decisions, right?

8   A    I was present at times.  But, I mean, I don't recall

9   specific decisions.  But, absolutely, I was present many

10  times when we were all talking to Mike.

11  Q    Well, you testified that there were times that Roger

12  would pick up the phone and call Mike, right?

13  A    That was when Mike wasn't in the office.

14  Q    So --

15  A    Roger was my direct supervisor.

16  Q    And Mr. Wilhite and Mrs. Wilhite shared an office,

17  right?

18  A    They did share an office.

19  Q    And you have no idea what they discussed between them,

20  obviously, correct?

21  A    Not unless I was in there.

22  Q    Okay.  So, when Mr. Wilhite was making decisions, you

23  don't know when he was making decisions who he might have

24  consulted with, right?

25  A    Not unless I was there.  But there were times I was

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 662

 1    there.

 2    Q    You don't know what the extent of his authority was,

 3    correct?

 4    A    Of Mike's authority?

 5    Q    Correct?

 6    A    Mike called the shots.

 7    Q    But you know that there were decisions that Michael

 8    made in your presence that you're testifying to, right?

 9    A    Yes.

10    Q    And you don't know if those were within the extent of

11    authority he had been given, correct?  All you know is that

12    he made a decision, correct?

13    A    Right.

14    Q    You don't know what his authority was, other than you

15    know that he made whatever decision you saw?

16    A    He was the authority.

17    Q    Not what I asked.  My question was, you only know what

18    decision he made in your presence, correct?

19    A    Right.

20    Q    So, you don't know if that was within or outside the

21    limit of whatever authority he had been given, correct?

22    A    Correct.

23    Q    You don't know who was involved in financing the

24    company, do you?

25    A    No.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 663

1    Q    You said that Mr. Wilhite came at some point and yelled

2    at you, correct?

3    A    Yes.

4    Q    Offices were pretty small, right?

5    A    Yes.

6    Q    Anyone else hear that?

7    A    Yes.

8    Q    Who was that?

9    A    Brendan DePaola.

10   Q    Did Mr. DePaola talk to you about that?

11   A    Yes, he did.

12   Q    What did he say?

13   A    Ten minutes later he walked into my office and asked me

14   if I was okay.  I said yes.  And Mike yelled, so it was

15   pretty clear.  Pretty easy to hear.

16   Q    You know that Mr. DePaola testified that that didn't

17   happen?

18   A    Excuse me?

19   Q    I said, do you know Mr. DePaola testified that did not

20   happen?

21   A    I did not know that.

22   Q    Okay.  Exhibit 43 in front of you.

23        THE COURT:  By the way, that's not a fair

24   question.  As sequestered witnesses, of course no witness is

25   going to know what any other witness testified to.  So, you

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 664

```
 1   can phrase it a different way, but that's not a fair way to

 2   phrase it.

 3   Q    (By Mr. Mikulecky)  Come back to that in a little bit.

 4   Exhibit 43.  Do you have that in front of you still?

 5   A    I do.

 6   Q    And that's talking about different responsibilities

 7   being changed around a bit, correct?

 8   A    Right.

 9   Q    And that was shortly after Mr. Otterstein died,

10   correct?  Been several months?

11   A    Yeah.  Yeah.

12   Q    And so part of that was reshuffling some of his

13   responsibilities, correct?

14   A    No, I don't think this -- I honestly would have to read

15   it again, but I don't think it mentioned anything about

16   Roger's responsibilities.

17   Q    Well, it's reshuffling some of the responsibilities of

18   the office, right?

19             THE COURT:  Did you say Roger?

20             MR. MIKULECKY:  Yes, sir.  Roger Otterstein.

21             THE COURT:  Wasn't he dead by this time?

22             THE WITNESS:  Yes.

23             MR. MIKULECKY:  That's my point is he died several

24   months before this, was my question.

25             THE COURT:  Oh.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 665

```
 1   A    Yeah, I don't think this e-mail had anything to do with
 2   Roger's responsibilities.  This was an e-mail to clarify what
 3   I was doing and what they no longer wanted me to do.
 4   Q    (By Mr. Mikulecky)  Well, you're not the only one
 5   addressed in the memo, correct?
 6   A    I know I'm not.  But that's why this e-mail was
 7   written.  I know that because I was there, and I knew what
 8   was going on in the meantime.
 9   Q    So, they were trying to change some of your
10   responsibilities?
11   A    Yeah.  Because they -- they took away my QuickBooks
12   access when they did this, which was -- I mean, yeah.
13   Q    And that upset you?
14   A    No.  No.  I was swamped with work to do.
15   Q    You said that Torin Jackson hired you, correct?
16   A    Yes.
17   Q    And he was your direct supervisor, right?
18   A    When I first started, yes.
19   Q    In your responsibilities you never saw any documents
20   that showed Mr. Wilhite as Advanced Floor Concepts when you
21   worked there, correct?
22   A    Documents that --
23   Q    Yeah.
24   A    -- had his name on there?
25   Q    No, that showed him -- any documents that listed
```

United States of America vs.                               Evidentiary Hearing - Day III
Michael David Wilhite                                            September 17, 2015

Page 666

1    Mr. Wilhite as the owner?

2    A    As the owner, no.

3    Q    Yes.  Yes, ma'am.  And you never saw the tax returns

4    for the company?

5    A    If I did, I don't recall.

6    Q    Do you recall -- well, then you wouldn't recall who

7    signed the tax returns then?

8    A    No.

9    Q    Okay.  And you said that everyone knew that it was

10   really Mike's company?  Is that your testimony?

11   A    Yes.

12   Q    Does that include Cindy Barker?

13   A    Absolutely.

14   Q    Does that include Brendan DePaola?

15   A    Yes.

16   Q    And Francisco -- and I'll probably mispronounce it --

17   Carranza?

18   A    Yes.  But the way you worded that, you said everyone

19   knew it was -- it was Mike's company.  Everyone knew Dee

20   owned it on paper, but that it was Mike's company.

21   Q    That includes Torin Jackson?

22   A    Yes.

23            MR. MIKULECKY:  May I have a moment, Your Honor?

24            THE COURT:  Yes.

25            MR. MIKULECKY:  Nothing further, Your Honor.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 667

 1   Thank you.

 2          THE COURT:  Okay.  Ms. Gould, did you file for

 3   unemployment after you were let go?

 4          THE WITNESS:  Yes, I did.

 5          THE COURT:  Did the company dispute that or not?

 6          THE WITNESS:  No.

 7          THE COURT:  Okay.

 8          THE WITNESS:  Mike told me when he laid me off

 9   that he wouldn't dispute it.  That was part of that

10   two-minute conversation we had that day.

11          THE COURT:  You guys can ask any follow-up if you

12   want on that.

13          MS. FROEHLKE:  No, Your Honor.

14          THE COURT:  Okay.  You're excused.

15          MR. BEDNARSKI:  Your Honor, to let the Court know,

16   we were able to reach Tami Ashe.  She was going into a

17   meeting.  She'll be ready to testify at 4:30.

18          THE COURT:  Where's the meeting?

19          MR. BEDNARSKI:  Well, no, she's -- like, it's a

20   meeting at her -- at Phil Long Ford, Your Honor.  Like, it's

21   a meeting with -- with groups.

22          THE COURT:  I thought she couldn't travel out of

23   her house?

24          MR. BEDNARSKI:  No.  No.  No.  Like, what she did

25   was -- someone gave her a ride to work.

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                  September 17, 2015

Page 668

```
 1              THE COURT:  Oh.
 2              MR. BEDNARSKI:  And she can't leave from work
 3   until that person, who I believe is her husband, comes and
 4   picks her up and takes her home.
 5              THE COURT:  She can't leave from the auto dealer
 6   until --
 7              MR. BEDNARSKI:  Correct.
 8              THE COURT:  -- her husband picks -- okay.
 9              MR. BEDNARSKI:  Correct.  She can't drive here.
10              THE COURT:  No cars available.
11              MR. BEDNARSKI:  Correct.  Correct.
12              THE COURT:  I understand.  It's fine.  I'm just
13   tweaking.  So what are we doing next?
14              MR. VILLASENOR:  We can call a witness if you
15   want.  Dennis Cross.
16              MR. BEDNARSKI:  That's fine with us, Your Honor.
17              THE COURT:  Okay.  Then we can do another one out
18   of order?
19              MR. VILLASENOR:  Yes.
20              UNKNOWN SPEAKER:  Sit down?
21              THE COURTROOM DEPUTY:  If you can raise your right
22   hand.
23              (The witness, Dennis Cross, was sworn to tell the
24   truth by the Courtroom Deputy.)
25              THE WITNESS:  Yes.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 669

1          THE COURTROOM DEPUTY:  Okay.  You can sit right

2    there.

3          THE WITNESS:  Thank you.

4                DIRECT EXAMINATION

5    BY MR. VILLASENOR:

6    Q    Mr. Cross, good afternoon.

7    A    Good afternoon.

8    Q    Please state your full name for the record.

9    A    Dennis James Cross.

10   Q    Where do you --what city do you presently live?

11   A    Centennial, Colorado.

12   Q    Who is your employer now?

13   A    Reclaimed DesignWorks.

14   Q    And what do you do for this employer?

15   A    I am their controller, CFO.

16   Q    What is your education, sir, generally?

17   A    I went to business school, Parks Business School.

18   Graduated in '73, Associate's Degree in Accounting.

19   Q    In accounting?

20   A    Yes, sir.

21   Q    Are you familiar with Advanced Floor and Michael

22   Wilhite?

23   A    Yes, I am.

24   Q    How so?

25   A    I was employed by them from April of 2009 to December

United States of America vs.                                  Evidentiary Hearing - Day III
Michael David Wilhite                                                   September 17, 2015

Page 670

```
 1  of 2009.

 2  Q    And did you interview at Advanced Floor with

 3  Mr. Wilhite?

 4  A    I did.  I interviewed first at a hotel, and when he got

 5  the candidates down I met with Mr. Wilhite and Mrs. Wilhite

 6  to be interviewed.

 7  Q    Okay.  And who is Mrs. Wilhite?

 8  A    Michael Wilhite --

 9  Q    Mrs. Wilhite is --

10  A    Oh, Dee.  His wife.  Yes.

11  Q    Okay.

12  A    Yeah, Darla.  Is it Darla?

13  Q    Did you interview with anyone else?

14  A    The initial interview was with Brendan DePaola and with

15  Roger Otterstein.

16  Q    During your interview with the Wilhites, who asked the

17  questions in that interview?

18  A    The majority of the questions were from Mike.

19  Q    And what were your duties at -- and what were you hired

20  on at Advanced Floor?

21  A    I was hired on as their accountant.

22  Q    Controller?

23  A    Controller, yes.

24  Q    Are they the same thing to you?

25  A    Pretty much, yes.
```

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                    September 17, 2015

Page 671

1   Q    Okay.   Who were your supervisors, if any, at Advanced

2   Floor?

3   A    Well, most of the time, I -- I -- any discussions I had

4   about financial statements and that sort of thing was with

5   Mike -- Mr. Wilhite, excuse me.   And when I was trying to get

6   cash, seeing where -- where jobs were at and that sort of

7   thing, it was with Roger Otterstein.

8   Q    Okay.

9            THE COURT:  Mr. Cross, I didn't catch -- what

10  position were you hired into?

11           THE WITNESS:  As controller --

12           THE COURT:  Controller.

13           THE WITNESS:  -- of the corporation.

14           THE COURT:  Sorry about that.

15  Q   (By Mr. Villasenor)  And what orders or directions did

16  Mr. DePaola give -- give you?

17  A    Mr. DePaola didn't give me very many.  Like I said,

18  most of my discussions were with Mike and with Roger.

19  Q    And Mr. Otterstein?

20  A    Yes.

21  Q    What orders or directions did Mr. Otterstein give you?

22  A    Mr. Otterstein and I would meet in the morning to

23  discuss what jobs were out there, and what he thought he was

24  going to get money on.  Most of my discussions with him were

25  basically on cash flow issues.  So, we discussed what jobs

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 672

1   were at and monies coming in.

2   Q    Okay.  And what about Mr. Wilhite?  What orders or

3   directions did he give you?

4   A    Most of the time if I had a problem, Mike was the man I

5   went to.  And the directions I got from him were financial

6   statements were presented there and any questions he had, I

7   answered those.

8   Q    Did Ms. -- Mrs. Wilhite ever direct you or give you

9   orders?

10  A    Sometimes, but not very often, no.

11  Q    And what were those circumstances?

12  A    Oh, it might have dealt with cash flow and that sort of

13  thing, but nothing material.  Not very often.

14  Q    Okay.  To your knowledge, what was Mrs. Wilhite's

15  involvement at Advanced Floor?

16  A    I -- I knew that Mrs. Wilhite owned the company.  And

17  she was up, you know, a very limited amount of time during

18  the week, so I didn't have much contact with her.

19  Q    When you first started working at Advanced Floor, who

20  signed the checks for the company?

21  A    At that point in time it was Dee -- or Mrs. Wilhite,

22  excuse me.  She signed the checks.

23  Q    Did that change at any point?

24  A    It did, because I asked the question based on other

25  places I had been at.  I found it curious that Mike wasn't

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 673

1  signing checks; that Brendan wasn't signing checks; that
2  Roger wasn't signing checks.  And that's when I came to find
3  out that given something in Mr. Wilhite's background he
4  couldn't sign the checks, or wasn't going to sign the checks,
5  and I became the signer on the checking account.
6  Q    Okay.  And what were the circumstances for which Mr.
7  -- as you learned, that he couldn't sign checks?
8  A    It was my understanding it was something in his past
9  and he spent some time in jail.  And I didn't go into
10 particulars about what that was.  I believe it was something
11 to do with wire fraud, but I never specifically asked him.
12 Q    Any other reasons as to why he was not signing checks
13 that you learned about?
14 A    Not to my knowledge.  That was about it.
15 Q    During -- during your tenure as controller, did you
16 observe Mr. Wilhite at work?
17 A    Yes, I did.  Uh-huh.
18 Q    And how often did you speak with him?
19 A    Oh, at least once or twice a week.  I mean, he was in
20 that many days, so --
21 Q    And who was in charge of Advanced Floor from your
22 vantage point?
23 A    To my knowledge, from the meetings that I attended with
24 the bank and with everybody else, Mike was the one in charge.
25 Q    Give us examples of why you think Mr. Wilhite was in

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 674

 1    charge.

 2    A    We -- we had a meeting with ANB Bank regarding a line

 3    of credit.  When that took place, it was obvious to me that

 4    Mike was in charge, sitting at the head of the table, asking

 5    the question, answering the questions.  We termed an employee

 6    there and Mike handled the termination of that employee, so I

 7    always thought he was in charge.

 8    Q    Who was the employee that Mr. Wilhite fired?

 9    A    His name was Cory.  He worked for Steel Deck Supply,

10    which was a kind of a sister company to Advanced Floor

11    Concepts.

12    Q    Mr. Cross, who did, if anybody, your performance review

13    at Advanced Floor?

14    A    My first review was handled by Mike Wilhite and by

15    Brendan.  And most of that was done by Mike, because Brendan

16    and I didn't have much interaction.

17    Q    Mr. Cross, did Mr. Wilhite himself tell you why he

18    could not sign checks for Advanced Floor?

19    A    I -- I don't -- it had to do with his background and

20    him being -- you know, spending time in jail.

21              THE COURT:  The question is --

22              THE WITNESS:  Yes.

23              THE COURT:  -- Mr. Cross, did Mr. Wilhite say

24    something to you about that, not just your general

25    understanding.

United States of America vs.                           Evidentiary Hearing - Day III
Michael David Wilhite                                         September 17, 2015

Page 675

1              THE WITNESS:  Not that I recall.

2    Q    (By Mr. Villasenor)  Mr. -- Mr. Cross, during your

3    tenure there, did you learn whether any precious metal

4    purchases were being made through an Advanced Floor checking

5    account?

6    A    During the -- before the meeting with ANB Bank, I

7    reviewed the balance sheets from prior periods up to that

8    point.  And it was an investment account that had some money

9    in it.  Given the cash flow situation we were in, money was

10   always very, very tight, and the bank wasn't going to lend us

11   any more, I asked Mr. Wilhite about that -- that account.

12   His comment to me was that that was silver that he purchased

13   that was inside of kegs, and that was his retirement account

14   and it was on his land.

15   Q    Did you say anything in response to that?

16   A    No.  It pretty much showed to me that I wasn't going to

17   get any relief from a cash flow standpoint, so I didn't

18   pursue it any further.

19   Q    Did Mr. Wilhite ever mention that he owed restitution

20   to the government?

21   A    Yes, he did.  And that came up in the course of a

22   conversation that Roger Otterstein was paying restitution to

23   the Wilhites.  And so, it came up from Roger that, yes,

24   Mr. Wilhite needed to make restitution on whatever he was put

25   in jail for.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 676

1          MR. BEDNARSKI:  Objection, Your Honor.  I'm sorry,

2     the testimony is that Mr. Otterstein told him?

3     (Unintelligible) an objection.

4          THE COURT:  Who told you that?

5          THE WITNESS:  I had started my conversation with

6     Mr. Otterstein because he was making restitution to the

7     Wilhites, and that's when I -- when I spoke to him that's

8     when Roger had told me that Mr. Wilhite was making

9     restitution.

10          MR. BEDNARSKI:  So the objection is, coming from

11     Mr. Otterstein.

12          THE COURT:  Okay.  It's the hearsay.  What's your

13     position on this?

14          MR. VILLASENOR:  I mean, it's not being admitted

15     for the truth as -- that could be admitted on purpose --

16     nonhearsay purpose of affect on the listener.

17          THE COURT:  What affect did it -- what affect do

18     you think it had that's important to this case?

19          MR. VILLASENOR:  I could -- I could ask him.

20          THE COURT:  Because of course anything someone

21     hears has an affect on them, but that doesn't make whatever

22     affect it is material to a lawsuit.

23          MR. VILLASENOR:  That's true.  Well, let me -- let

24     me rephrase.

25          THE COURT:  Okay.  So, it's sustained as far as --

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                    September 17, 2015

Page 677

 1              MR. VILLASENOR:  Yes.

 2              THE COURT:  -- (unintelligible) as well.

 3    Q    (By Mr. Villasenor)  Was Mr. Otterstein an officer of

 4    Advanced Floor Concepts?

 5    A    I understood him to be the vice president.

 6    Q    Okay.  So what did Mr. Otterstein tell you about

 7    Mr. Wilhite's restitution?

 8              MR. MIKULECKY:  Your Honor, this relates to

 9    Mr. Wilhite individually, not Advanced Floor Concepts.

10              THE COURT:  Right.

11              MR. VILLASENOR:  Well, he -- he's the vice

12    president.  It's an agent and -- an agent of the --

13              THE COURT:  No.  I mean, it has to be a party or a

14    party's agent I guess, and he's not a personal agent.

15              MR. VILLASENOR:  Your Honor --

16              THE COURT:  He may be an agent of the corporation.

17              MR. VILLASENOR:  Advanced Floor is -- is an

18    interested party here.

19              MR. MIKULECKY:  But it relates to the restitution

20    of Mr. Wilhite not Advanced Floor Concepts.

21              THE COURT:  Well, is one of you representing

22    Advanced Floor Concepts in this lawsuit?

23              MR. MIKULECKY:  I'm sorry.  Am I or is he?

24              THE COURT:  Is one of you -- are one of you

25    representing Advanced Floor Concepts in this lawsuit?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 678

 1                    MR. MIKULECKY:  I am.

 2                    THE COURT:  Have they made an appearance at this

 3      hearing?

 4                    MR. MIKULECKY:  Yes, sir.

 5                    THE COURT:  Are they a party then?

 6                    MR. MIKULECKY:  As -- they're an interested party,

 7      yes, Your Honor.

 8                    THE COURT:  All right.  Then overruled.

 9      Q    (By Mr. Villasenor)  So what did Mr. Otterstein tell

10      you about Mr. Wilhite's restitution?

11      A    He -- he told me.  He threw a number out, but I can't

12      remember the number.  It was probably a million dollars that

13      Mr. Wilhite had to make restitution for some wire fraud or

14      something else that -- that happened in this past.

15      Q    You testified that you worked at Advanced Floor from

16      April, 2009, through December, 2009; is that right?

17      A    That's correct.

18      Q    Why did you leave Advanced Floor?

19      A    One of the reasons why I left is when I found out that

20      Mr. Wilhite's past was that he had been in jail, was also

21      that Roger Otterstein had been in jail, and Cody had been in

22      jail.  And it was a situation where I didn't feel great about

23      that.  It was kind of uncomfortable.  And the fact that every

24      Friday I was going to the mailbox to try and get enough cash

25      so that we could cover payroll, it was just a situation I

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 679

1    decided I no longer wanted to be in.

2          MR. VILLASENOR:  Okay.  No further questions.

3          THE COURT:  Okay.  Any cross?

4          MR. MIKULECKY:  Yes.

5                    CROSS-EXAMINATION

6    BY MR. MIKULECKY:

7    Q    Good afternoon, Mr. Cross.

8    A    Good afternoon.

9    Q    I'm Scott Mikulecky.  I'm the attorney for Advanced

10   Floor Concepts.  You worked there for, I'm sorry, eight or

11   nine months; is that right?

12   A    Well, it was probably six or seven.  Yeah, April to

13   December.

14   Q    And you testified that you were told that Mr. Wilhite

15   couldn't sign checks; is that right?

16   A    Yes.  Or he wasn't -- he wasn't signing checks.  I was

17   told that he wouldn't sign checks.

18   Q    Okay.  You got -- I'm sorry, that he couldn't or

19   wouldn't sign checks?

20   A    That he wouldn't.

21   Q    Okay.  Did you know that he was a signer on the account

22   before you became employed at Advanced Floor?

23   A    No, I didn't know that.

24   Q    Take a look -- there's a couple of big notebooks in

25   front of you.  Look at the largest of the two.  Look at

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 680

 1    Exhibit 4, if you would.  4.  Uh-huh.

 2    A    Yes, sir.

 3    Q    You've been in business.  You recognize that as a

 4    signature card for an account, correct?

 5    A    Yes, sir.  That's correct.

 6    Q    And you see in the upper right-side corner it's the

 7    signature for Advanced Floor Concepts, right?

 8    A    Yes, sir.

 9    Q    And Mr. Wilhite, in fact, is one of the signers,

10    correct?

11    A    Yes, sir.

12    Q    And the date in the lower left is July of 2008,

13    correct?

14    A    Yes, sir.

15    Q    Okay.  Take a look, if you would, at Exhibit 5.  And in

16    the bottom center there's 1 of 8.  If you could turn to page

17    7 of 8.  Tell me when you're there then, sir.

18    A    Yes, sir.  I'm there.

19    Q    There.  Okay.  And, again, you recognize this also as a

20    signature card on a bank account, right?

21    A    Yes, sir.

22    Q    Upper right corner, again, it's Advanced Floor

23    Concepts, right?

24    A    Yes, sir.

25    Q    Okay.  And, again, Mr. Wilhite's listed as a signer on

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 681

1    the account, correct?

2    A    Yes, he is.

3    Q    And, again, in 2007?

4    A    Yes, sir.

5    Q    Okay.  Now, we're going to test your dexterity and flip

6    to the smaller of the two books, if you would.  And go to

7    Exhibit P, as in Paul.

8    A    Yes, sir.

9    Q    All right.  Again, another signature card for Advanced

10   Floor Concepts, correct?

11   A    Yes, sir.

12   Q    Okay.  And this one you're added as a signer, correct?

13   A    I am.

14   Q    And Mr. Wilhite is not a signer now, correct?

15   A    That is correct.

16   Q    So, he didn't have signing authority on the checks

17   while you were there, correct?

18   A    That is correct.

19   Q    Okay.  And now we're going to get back nimbleness for

20   this afternoon.  Go back to Exhibit 5 in the large book,

21   please.

22   A    Okay.

23   Q    And this time page 3 of 8, please, sir.

24   A    Yes, sir.

25   Q    All right.  And this, again, an AFC signature card,

Page 682

1    right?

2    A    Yes, sir.

3    Q    And this is in May of 2010, right?

4    A    Yes, sir.

5    Q    And this is after you've left, right?

6    A    Correct.

7    Q    And, again, Mr. Wilhite is a signer on that account,

8    right?

9    A    That's correct.

10   Q    And on the next page, page 4 of 8 of Exhibit 5, an AFC

11   signature card updated in October, 2010.  Mr. Wilhite is

12   still the signer on the account, correct?

13   A    That is correct.

14   Q    So, the only time that Mr. Wilhite could not sign the

15   checks was when you were employed there, correct?

16   A    Based on this, it appears to be so, yes.

17   Q    Because he was not an authorized signer at that time,

18   right?

19   A    Correct.

20   Q    But he was at other times from what you've seen,

21   correct?

22   A    From what I've seen, yes.

23   Q    Okay.  You had access to the -- the financial

24   records --

25   A    Yes, sir.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 683

1    Q    -- of AFC when you worked there, correct, sir?

2    A    Yes, sir.  That's correct.

3    Q    Did you have access to the federal unemployment tax

4    reports?

5    A    Yes. (Unintelligible).

6    Q    And during the time you were there, did you review

7    those and see that Mrs. Wilhite signed all of those?

8    A    I don't recall.

9    Q    Do you recall that she signed all of the state

10   unemployment tax reports as well?

11   A    I -- I don't recall.

12   Q    Do you recall she signed all of the tax returns for AFC

13   as well?

14   A    No, sir.

15   Q    Okay.  You talked about an ANB Bank meeting that you

16   attended where a line of credit was discussed, correct?

17   A    Yes, sir.

18   Q    Do you know who was the guarantor on that line of

19   credit?

20   A    No, I do not.

21   Q    You don't know that it was solely Mrs. Wilhite?

22   A    No, sir.

23   Q    You testified -- let me --

24        MR. MIKULECKY:  Your Honor, if I could have just a

25   moment.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 684

1    Q    (By Mr. Mikulecky)  You testified that Mr. Wilhite told

2    you that he had buried silver coins in a keg on his property;

3    is that right?

4    A    That it came in kegs and yes, it was on his property,

5    that's correct.

6    Q    Not drinking kegs?

7    A    No.

8    Q    You know Mr. Wilhite doesn't drink, right?

9    A    I do not know that.

10           MR. MIKULECKY:  Nothing further.  Thank you.

11           THE COURT:  Okay.  Any redirect?

12           MR. VILLASENOR:  May I have a second, please?

13           THE COURT:  Yes.

14                   REDIRECT EXAMINATION

15   BY MR. VILLASENOR:

16   Q    If you'd go to Exhibit P, Mr. Cross.

17   A    Yes, sir.

18   Q    Where is your -- your signature?  If you don't mind

19   pointing it out.

20   A    My signature is right below Darla's on the right-hand

21   side.

22   Q    Okay.  And that -- this was -- it looks -- the date is

23   May 8, 2009, right?

24   A    That is correct.

25   Q    Okay.  So, you were put on on the signature

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 685

1   authorization form after you raised issues about you not

2   being on it?

3   A    Yes, sir.  That's correct.

4   Q    Okay.  And the signature cards that you saw, they --

5   they do not cover all of the existence of Advanced Floor do

6   they?

7   A    No, sir.

8   Q    Okay.  So, you don't know whether Mr. Wilhite was or

9   was not an authorized signer at other times?

10  A    No.  I did not have that knowledge, no.

11  Q    Okay.  Thank you.

12         THE COURT:  That's it?  Okay.  You can step down.

13  You're excused.

14         THE WITNESS:  Thank you.

15         THE COURT:  What are we doing next?

16         MR. BEDNARSKI:  Ms. Ashe, (unintelligible) Your

17  Honor.

18         THE COURTROOM DEPUTY:  She is available.

19         MR. BEDNARSKI:  It's just after 4:30, so -- and

20  she called me when Mr. Cross was just taking the stand.

21         MR. VILLASENOR:  And how late may we go today?

22         THE COURT:  Same time, if you want.

23         MR. BEDNARSKI:  I would prefer, Your Honor.

24         MR. VILLASENOR:  Yes.

25         MR. BEDNARSKI:  So that I --

United States of America vs.                              Evidentiary Hearing - Day III
Michael David Wilhite                                              September 17, 2015

Page 686

    1              MR. VILLASENOR:  So they don't -- don't have to

    2    come back.

    3              MR. BEDNARSKI:  -- don't have to necessarily come

    4    back up here tomorrow morning.

    5              THE COURT:  I may not have to drive back up here

    6    tomorrow morning either.

    7              THE COURTROOM DEPUTY:  Is this Ms. Ashe?  Okay.

    8    One moment.  I'm going to put you on speaker.

    9              UNKNOWN SPEAKER:  Bummer.

   10              UNKNOWN SPEAKER:  It wasn't me.

   11              THE COURT:  Maybe your magnetic personality

   12    canceled out the phone call.

   13              MR. BEDNARSKI:  Why, thank you, Judge.

   14              THE COURTROOM DEPUTY:  Ms. Ashe?  Hello?

   15              MS. ASHE:  Hello.

   16              THE COURTROOM DEPUTY:  Okay.

   17              MR. BEDNARSKI:  Hello, Ms. Ashe, can you hear me

   18    okay?

   19              MS. ASHE:  Yes, sir, I can.

   20              MR. BEDNARSKI:  Ms. Ashe, I think she's going to

   21    have you take the oath at this time.

   22              THE COURT:  Molly, is that automatically being

   23    picked up on the recording just because she's on the phone or

   24    is this a microphone that's going to pick her up?

   25              THE COURTROOM DEPUTY:  It's a mic -- it has to be

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 687

```
 1    on the microphone.
 2              THE COURT:  So, her voice is going to be recorded
 3    by one of these microphones, there's nothing within the phone
 4    system that's going to record her voice?  Do you know what
 5    I'm asking?
 6              THE COURTROOM DEPUTY:  It will be recorded on --
 7              THE COURT:  If a microphone is picking her up?
 8              THE COURTROOM DEPUTY:  All I did was I just -- I
 9    transferred her to the system just like if they transferred
10    her in the back -- from the back.  So, yes.
11              THE COURT:  Right.  Okay.
12              MR. BEDNARSKI:  So the system collects her, Judge.
13              THE COURT:  All right.  Very good.
14              MR. BEDNARSKI:  I think is what she said.
15              THE COURT:  Okay.  Go ahead.
16              THE COURTROOM DEPUTY:  Do you want me to swear her
17    in?
18              THE COURT:  Please.
19              (The witness, Tamara Ashe, was sworn,
20    telephonically, to tell the truth by the Courtroom Deputy.)
21              THE WITNESS:  I do.
22              THE COURTROOM DEPUTY:  Okay.  Thank you.
23                        DIRECT EXAMINATION
24    BY MR. BEDNARSKI:
25    Q    Ms. Ashe, would you please state your full name and
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 688

1  spell your last name for the record, please.

2  A   Tamara Packard Ashe, A-S-H-E.

3  Q   And do you go by Tami?

4  A   Yes, I do.

5  Q   Ms. Ashe, are you by yourself with the phone right now?

6  A   I'm sitting in my family room with my husband.

7  Q   If --

8       MR. BEDNARSKI:  Are you okay

9  with (unintelligible).

10  Q   (By Mr. Bednarski)  Just, if you would, don't look to

11  him for -- for the answers.

12  A   He doesn't have any idea what we're doing, so --

13  Q   Okay.  Sounds good.

14  A   He wouldn't really be the one to look for.

15       UNKNOWN SPEAKER:  (Unintelligible).

16  Q   (By Mr. Bednarski)   Ms. Ashe, where do you work?

17  A   I work at Phil Long Ford in the fleet department.

18  Q   Did you say in the fleet department?

19  A   Correct.

20  Q   How long have you been in the fleet department at Phil

21  Long Ford?

22  A   10 years.

23  Q   And what is the fleet department?

24  A   We sell -- well, we sell mostly to businesses, fleet

25  vehicles mostly to businesses.  And we do private individuals

United States of America vs.                               Evidentiary Hearing - Day III
Michael David Wilhite                                              September 17, 2015

Page 689

1   as well, but the process is just a little bit different than

2   retail.

3   Q    And so a fleet is where oftentimes businesses come in

4   and they buy vehicles for their business; is that right?

5   A    That can be fleet, correct.

6   Q    Okay.  And that's probably a very rudimentary statement

7   of it, but based off of your work with Phil Long Ford in the

8   fleet division, have you had contact with Advanced Floor

9   Concepts?

10   A    Yes, sir.

11   Q    Are they a client of Phil Long Ford?

12   A    I've known Mike and Dee for probably close to nine

13   years.  Nine or 10 years.

14   Q    And you said Mike and Dee, so is that who you have

15   contact with as it relates to Phil Long Ford's fleet with --

16   a fleet contract with Advanced Floor Concepts?

17   A    There is no contract that we have with them, but I talk

18   to each one of them.

19   Q    Okay.  Approximately over the 10 years, how many cars

20   has Advanced Floor Concepts bought from Phil Long Ford's

21   fleet division?

22   A    You know, I really couldn't even -- I don't know.  I

23   sell, you know, 50 or 60 cars every month, so I don't really

24   have an accurate, I think, you know --

25   Q    Okay.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 690

 1    A    -- recollection of that.

 2    Q    Is it more than one a year?

 3    A    It's -- I want to say about one a year, but, again, I

 4    don't -- I don't know a specific answer to your question.

 5    I'd have to go back and look at my records.

 6    Q    Sure.  Sure.  And I'm not asking for specifics because

 7    I know that's very difficult.  Do you have any -- would you

 8    say it's been more than five vehicles?

 9    A    I'd say probably about five, if I had to guess.

10    Q    Now, in those dealings -- and did you deal with

11    Advanced Floor Concepts on each of those purchases of

12    vehicles?

13    A    Yes.

14    Q    And who did you deal with from Advanced Floor Concepts

15    when doing the purchase of the vehicles?

16    A    Mostly Dee, sometimes Mike.

17    Q    And when you say mostly Dee --

18    A    She's always signed all the paperwork, and she was

19    the -- she was my -- contractually, she was my point of

20    contact.

21    Q    Now, did you also -- and I think you said you also had

22    some contact with Mike?

23    A    Yes.  He was the fleet manager for Advanced Floor

24    Concepts, it was my understanding, and we would design cars

25    together, you know, for his needs.  To meet his needs.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 691

1    Q    And what -- what is -- and what is your understanding

2    of fleet manager for Advanced Floor -- Advanced Floor

3    Concepts?

4    A    Somebody that manages their vehicles.

5    Q    So, when you say manages the vehicles, is that buy

6    them, sell them, that type of thing?

7    A    Not necessarily.  My recollection is it was mostly

8    definition of needs.  What they were going to be used for,

9    the vehicles, and with -- for the company.

10   Q    So, and so he would call -- Mike would call you and

11   tell you what kind of vehicle they would need?

12   A    We would discuss it.  I would also talk to Dee.  It

13   wasn't always Mike.

14   Q    And so if there was a discussion about the vehicle it

15   was either -- it was sometimes Mike and sometimes Dee?

16   A    Correct.

17   Q    And when it came down to the purchase of the vehicles,

18   who -- who did you have contact with?

19   A    Dee.

20   Q    Who signed all the paperwork as the purchaser for

21   Advanced Floor Concepts?

22   A    Dee.

23   Q    Based off of your understanding, who is the owner of

24   Advanced Floor Concepts?

25   A    Dee.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 692

1   Q    Was Mike in any way, shape or form, based off of your

2   dealings, an owner of Advanced Floor Concepts?

3   A    Not to my knowledge.

4            MR. BEDNARSKI:  May I have a moment?

5            THE COURT:  Yep.

6            MR. BEDNARSKI:  Thank you, Ms. Ashe.  I have no

7   further questions, but the -- one of the Assistant US

8   Attorney's may have some questions for you.

9            THE WITNESS:  Okay.

10           THE COURT:  Okay.  Any cross?

11           MS. FROEHLKE:  No, Your Honor.

12           THE COURT:  Okay.  We don't have any more

13  questions for you, Ms. Ashe -- this is the judge.  Thank you

14  and I hope you get well soon.  Okay?

15           THE WITNESS:  Thank you very much.  Good night.

16           THE COURT:  Bye, bye.

17           MR. BEDNARSKI:  Your Honor, at this time the

18  defendant Mike Wilhite, and the interested party, Dee Wilhite

19  will rest.

20           THE COURT:  Okay.  What is your remaining

21  evidence, please?

22           MR. VILLASENOR:  We have Mark Russell.

23           THE COURT:  Okay.  Is he here?

24           MR. VILLASENOR:  Yes.

25           THE COURTROOM DEPUTY:  Would you raise your right

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                 September 17, 2015

Page 693

 1   hand.

 2              (The witness, Mark Russell, was sworn to tell the

 3   truth by the Court.)

 4              THE WITNESS:  I do.

 5              THE COURTROOM DEPUTY:  You can have a seat.

 6                       DIRECT EXAMINATION

 7   BY MR. VILLASENOR:

 8   Q    Mr. Russell, good afternoon.  Please state your name

 9   for the record.

10   A    Mark Peter Russell.

11   Q    What is your occupation?

12   A    I am a structural engineer.

13   Q    And what is your education?

14   A    I have a Bachelor of Science from the University of

15   Wyoming.

16   Q    Are you a Licensed Professional Engineer?

17   A    Yes, I am.

18   Q    For how long?

19   A    Oh, let's see, about 22 years.

20              THE COURT:  Whoa.  (Unintelligible).

21   Q    (By Mr. Villasenor)  Are you familiar with Geoffrey

22   Clement and Michael Wilhite?

23   A    Yes.

24   Q    Tell us about the approximate date when you met

25   Mr. Wilhite.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 694

1    A    I met Mr. Wilhite in 1996 -- sometime in 1996, when I
2    was working at an engineering firm in the city of Arvada.  I
3    was working at a company called Gene and Associates, and he
4    came into the firm looking for a structural engineer to
5    design some structural steel houses.  He brought in some
6    plans that had been preliminary done for a different location
7    and they needed to be updated and, the foundation done for
8    Colorado.
9    Q    And did you do that for Mr. Wilhite?
10   A    Yes, I did.
11   Q    And what about continuing to work with him?  Did that
12   happen also?
13   A    Yes.  I don't remember how many houses that I had
14   engineered for him.  It was between one and three.  I
15   couldn't remember it at this point in time.  But then at that
16   time we also started looking into structural floors.  The
17   floor business -- or the homebuilding business had been sued
18   a lot due to the expansive soils and the movement of the
19   slab-on-grades, the structural slab -- or there were no
20   structural slabs.  So, the slab-on-grades were moving, and
21   there were lawsuits.  And insurance was getting real tough
22   for builders, and that opened an industry up for structural
23   floors.
24   Q    And at some point in time did you meet Mr. Clement?
25   A    Yes.  I met Mr. Clement probably on two occasions is

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 695

1 what I would say.  Once at the Polo Reserve where the homes
2 were being built, and then once at the building that he owned
3 off of Santa Fe Drive.
4 Q    Okay.  And at some point in time did you have talks
5 with Mr. Wilhite about forming a company, a structural steel
6 flooring company?
7 A    Yes, I did.
8 Q    Tell us about those talks.
9 A    Well, the structural -- or the steel-framed houses were
10 kind of new to the market also.  Everything was framed out of
11 wood because that's what the labor and the market was capable
12 of doing, and steel was not really competitive with wood at
13 that time.  Well, wood prices had risen a lot, steel had not.
14 And it was becoming more competitive to be able to do steel.
15 And there was also no -- little chance of mold and decay in
16 the product.  And so the houses were out of cold rolled
17 steel, and it was a very efficient product at the time.
18         Michael had brought in a -- a supplier, I think
19 they were out of Louisiana or somewhere, called McElroy
20 Metals.  And their products were real reasonable, so I set
21 out and did a design based on cold rolled members going into
22 a structural floor system.
23 Q    Okay.
24 A    And we discussed, you know, what the market could be
25 for that.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 696

1  Q    Okay.  And at some point in time did you, Mr. Clement,

2  and Mr. Wilhite enter into a memorandum of understanding?

3  A    Yes, we did.

4         MR. VILLASENOR:  Would you pull up Exhibit 8,

5  first.

6  Q    (By Mr. Villasenor)  It should be on your screen.  If

7  that's too small, let me know.  Is that -- Exhibit 8, is that

8  the memorandum of understanding you entered into?

9  A    Yes, I believe so.

10 Q    And your signature is there above your name?

11 A    That's correct.

12 Q    Tell us, what was going to be the role in this company?

13 A    Well, from what I remember, at that time I would be

14 doing design.  I would be a third owner.  Geoffrey Clement

15 would -- I think a third owner.  I remember reading on here,

16 it says that I would own 40 percent -- no -- yeah, 40.  I'd

17 be part owner in the company, and I would be doing the

18 engineering for the floor systems.

19 Q    Okay.  What about Mr. Wilhite's role?  What was your

20 understanding?

21 A    My understanding, Mr. Wilhite would be doing sales, and

22 would also be helping with getting the construction moving on

23 the floors as far as manpower for floor crews.

24 Q    Who is Darla Wilhite?

25 A    You mean -- Dee --

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 697

1    Q    Yes.

2    A    -- is who I know her as, is Michael's wife.

3    Q    Okay.  And what involvement, if any, did Mrs. Wilhite

4    was going to have in this company, in the memorandum of

5    understanding?

6    A    None that I know of.

7    Q    Did this company get off the ground?

8    A    No.  It never got off the ground.

9    Q    What happened?

10   A    Well, as we moved forward, the -- I found out that

11   Geoffrey Clement, who was the man that was going to be

12   financing the company, had basically embezzled the money he

13   had and he was going to prison.

14   Q    Okay.  And what did you do after you learned that, and

15   after the company didn't get off the ground?

16   A    Well, I still saw a good business for floors, and so I

17   decided to move forward and start a floor business myself.

18   Q    And what is the name of that business?

19   A    Steel Dimensions.

20   Q    Do you still own that business?

21   A    I still own that business today.

22   Q    And what does Steel Dimensions do?

23   A    It does structural floor systems, and also structural

24   steel fabrication.

25   Q    And it's done that since its formation?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 698

1   A    That's correct.

2   Q    Did you hire Mr. Wilhite to work for -- for Steel

3   Dimensions?

4   A    I did.

5   Q    And why did you hire him?

6   A    Well, first of all, part of it was Michael -- we

7   originally talked about structural floors, and Michael had a

8   good sales ability.  I mean, I -- I don't have sales ability.

9   I'm an engineer.  That's not what I do.  He had good sales

10  ability, and he'd go get 'er.  I could send him out there, he

11  could go find projects, he could help get things done.

12  Q    How did you pay Mr. Wilhite for the work that he did

13  for you at Steel Dimensions?

14  A    I paid Mr. Wilhite through his wife's company, DW

15  Services.  He came to me when we were ready to make the first

16  check and said would you please make it to my wife's company

17  and pay me this way.

18  Q    Okay.

19  A    He did not want to be an employee.

20  Q    Okay.

21  A    He wanted to be a subcontractor.

22  Q    Just to be clear, you did not suggest this method of

23  payment?

24  A    I did not, no.

25  Q    And how would you -- well, did you -- let me ask.  Did

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 699

1   Mr. Wilhite or the company -- which company were the checks

2   being made out to?

3   A   DW Support Services.

4   Q   Did you receive invoices from that company?

5   A   Yes, I did.

6   Q   Okay.  And to whom -- well, who did you pay?  That

7   company.

8   A   Michael would bring an invoice in and I would give him

9   a check.  So, he would take the check.

10  Q   And what would happen -- or what happened at the --

11  well, how long did Mr. Wilhite work for you?

12  A   Approximately seven years.  Seven years -- seven

13  months.  Excuse me.  (Unintelligible).

14  Q   Did you -- did you issue a 1099 at the end of the year?

15  A   I don't recall.  I had an accountant at the time then,

16  so if that's what he was supposed to do, that's what he would

17  have done.

18  Q   Did it make any difference to you the way you paid him,

19  whether it was as this method of independent contractor, or

20  whatever this was?

21  A   No.  It didn't make any difference to me because we

22  were setting up payroll, so -- he requested it.  I'm like,

23  well, I can do that.  That's fine.

24  Q   Did Mr. Wilhite drive a Steel Dimensions' truck?

25  A   No, he drove his own pickup.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 700

1  Q   Okay.  And what was the time period that Mr. Wilhite

2  worked for Steel Dimensions?

3  A   I started Steel Dimensions in April of '97, and so it

4  was from April until approximately sometime in October, I

5  believe.

6  Q   And what did Mr. Wilhite do for you?

7  A   Well, during that timeframe he did a lot of things.

8  There were only three of us.  My sister came on board shortly

9  after I started, and he helped -- he helped me get vendors

10  lined up.  He helped me get contractors, as far as people to

11  build floors for.  I knew a lot of custom builders, so I

12  would get floors from custom builders and stuff, and he would

13  work on the more tract or semicustom builders.  And he would

14  also help me find the labor to put the floors in and help

15  them get done.

16  Q   Did Mr. Wilhite, to your knowledge, speak with

17  contractors?

18  A   Well, with people in the field and with other

19  homebuilders, yes.

20  Q   Okay.  What about with installers?

21  A   Yes.

22  Q   With vendors?

23  A   Yes.

24  Q   Did Mr. Wilhite, while he was working for you, ever

25  represent himself as the contractor?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 701

 1    A    Well, I do remember one time when we were talking to

 2    one homebuilder, he kind of introduced us as saying, you

 3    know, I'm the contractor he's the -- he's the -- he's the

 4    engineer.

 5    Q    **Was his description of himself accurate?**

 6    A    Well, you know, you have to look at it from the

 7    standpoint of did he help me with all that stuff?

 8    Absolutely, yes.  Was his main focus to be sales?  That's

 9    what my main focus was for him, but he helped me get

10    everything done as we moved forward.  So, did he have

11    experience within the business?  Very, very little.

12    Q    **And which business is this?**

13    A    Within the -- the floor business within the structural

14    systems.

15    Q    **Okay.  What did you teach Mr. Wilhite, if anything,**

16    **about this steel floor business while he worked for you?**

17    A    Well, I taught him about how a steel floors is supposed

18    to work.  The things it's supposed to do as far as supporting

19    loads.  It's supposed to support gravity loads.  And then the

20    question becomes -- in the industry, was another question --

21    is whether it's supposed to support horizontal loads from the

22    foundation walls from the lateral pressures of it trying to

23    crush the floor.

24            And so, we installed the first floor, and it

25    didn't go as smooth as -- as we had hoped.  And as we moved

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 702

 1   forward I developed a new system, basically.  The system

 2   became where it had an angle iron that was welded on the end

 3   of wide-flanged beams that was much easier to get -- get

 4   fabricated and install on site.  And it was able to allow for

 5   a lot of the sloppy construction work on the foundations,

 6   because it had some ability for an inch-and-a-half play

 7   within the beams.

 8   Q    And what are the things that you trained Mr. Wilhite

 9   on?

10   A    Well, mainly, it's just how the floor system is going

11   to work.  And then he did a lot of searching for pricing, and

12   helping find builders so the company could get going.

13   Q    Did you prevent Mr. Wilhite from talking to contractors

14   or installers?

15   A    No.

16   Q    What about vendors?

17   A    No.

18   Q    You -- you testified a little bit earlier that you

19   developed a new system.  Can you explain what this system

20   that you developed is to the Court.

21   A    Well, like I said, the problem we had was that the

22   materials we used were a little longer lead time items, so it

23   would be longer to get a floor in.  They didn't get rolled to

24   real tight specifications, so the material when it fit in, it

25   -- we'd have to be too sloppy to make a good product.  And so

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 703

1   we looked into a system based on numbers.  Basically, what
2   did wide-flange beams cost us; are they competitive; and how
3   can we get them into a floor system; and how can we make the
4   connections in the field, and make the fabrication reasonable
5   for a residential project.  And that's when I developed the
6   flip system to go on the end of the beams.  And that is what
7   made the floor systems grow faster and be able to be
8   installed faster.
9   Q    To your knowledge, this clip system, had it been in
10  existence before?
11  A    No, it had not.
12  Q    During the time that Mr. Wilhite worked for you, what
13  things, if anything, did you notice about Mr. Wilhite taking
14  business away from Steel Dimensions?
15  A    Well, there was one occasion -- it was actually after
16  he left that we found out that he was -- he gave a bid to
17  Ashcroft Homes on his own -- from his own company after he
18  had given one from Steel Dimensions.
19  Q    And how do you know that?
20  A    We received a call from Ashcroft Homes who told us
21  that.
22       MR. BEDNARSKI:  Objection, Your Honor.  I'm going
23  to base it off of hearsay.  That -- his entire basis for it
24  is hearsay, so they're just trying to get around the hearsay
25  requirement.

United States of America vs.                          Evidentiary Hearing - Day III
Michael David Wilhite                                        September 17, 2015

Page 704

```
 1                THE COURT:  Mr. Villasenor?

 2                MR. VILLASENOR:  It's supposed to be admitted for

 3    notice.

 4                THE COURT:  Okay.  Sustained.

 5                MR. BEDNARSKI:  Move to strike, Your Honor.

 6                THE COURT:  It will be stricken.

 7                MR. VILLASENOR:  Yeah.

 8    Q    (By Mr. Villasenor)  Did you have any other way of --

 9    any source of learning about Mr. Wilhite taking business away

10    from your company, apart from the one you just talked about?

11    A    Well, we also knew that he was negotiating prices with

12    some vendors for his company because we were told that by --

13                MR. BEDNARSKI:  Objection, Your Honor --

14    A    I mean --

15                MR. BEDNARSKI:  -- based off of hearsay.

16                THE COURT:  Sustained.

17                MR. VILLASENOR:  All right.

18    Q    (By Mr. Villasenor)  Is that -- those are the only ways

19    that other vendors told you whatever they told you?

20    A    We also received some --

21    Q    Just a yes or no.

22    A    Yes.

23    Q    Okay.  At the time that Mr. Wilhite worked for you, was

24    your business expanding?

25    A    Yes.  It was a slow expansion because we were in the
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 705

1    process of learning, basically, a new product.

2    Q    Were you expecting an expansion?

3    A    Oh, yeah, absolutely.  We were expecting once we could

4    figure out how to get the materials to site quickly, how to

5    meet different builder's schedules, that we would grow very

6    rapidly.

7    Q    Okay.  And did that occur?

8    A    Yes.  We grew pretty rapidly in '98 and in early '99.

9    Q    But what about during the time that Mr. Wilhite worked

10   for you?

11   A    At that time we didn't grow very rapidly because, like

12   I said, we were learning a new product.

13   Q    Okay.

14   A    We didn't grow nearly as rapidly as we could have, but

15   we started growing rapidly after the product was finalized.

16   Q    This clip system that you developed, around what --

17   around what time -- what time period did you develop it?

18   A    It got developed basically in September of '97 is when,

19   basically, everything was starting to come together on it.

20   Q    And Mr. Wilhite left your company in October of 1997?

21   A    Yes.  Right after I developed that system.

22   Q    To your knowledge, why did Mr. Wilhite leave your

23   company?

24   A    To go out and start his own floor company.

25   Q    To your knowledge, did -- and what company was that?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 706

 1   A    Advanced Floor Concepts.

 2   Q    **To your knowledge, did Mr. Wilhite use your clip system**

 3   **at Advanced Floor?**

 4   A    Yes, he did.

 5   Q    **How do you know that?**

 6   A    Because we went out and observed his product going in.

 7   I don't remember what locations they were, but we went and

 8   out and observed some installations.

 9   Q    **You mean floor installations?**

10   A    Yes.

11   Q    **Okay.  After Mr. Wilhite left, did you lose any**

12   **clients?**

13   A    Yes, we did.  We lost some custom builders and a couple

14   semicustom builders.

15   Q    **Now, was your company in direct competition with**

16   **Advanced Floor at some point in time?**

17   A    Yes.

18   Q    **What's the time period?**

19   A    Basically from '97 until 2006.  We, really, after 2006

20   concentrated more on commercial.  We still do some floors

21   today, but at that time we were very busy in commercial and

22   didn't concentrate on it.

23   Q    **Commercial floors you mean?**

24   A    No, commercial construction.

25   Q    **Okay.  And is that what your company did since 2006?**

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 707

1    That's what it does primarily now?

2    A    Yes.

3    Q    Mr. Russell, to your knowledge, what -- what knowledge,

4    if any, did Mrs. Wilhite have in the steel floor industry?

5    A    I only met Mrs. Wilhite a couple of times, and as far

6    as I know, extremely limited because it was a new -- there

7    were new systems coming onto the market basically.  Because

8    before that, everything was slab-on-grade.

9    Q    What did Mrs. Wilhite do -- do you know what she did

10   for a living at that time?

11   A    I believe she worked doing progress inspections for

12   banks.

13   Q    What's a progress inspection?

14   A    Well, a bank usually has to have money drawn from the

15   account for the construction loan, and so the contractor will

16   submit a spreadsheet, or some type of form for the bank, for

17   how far they've made it in the construction for that draw.

18   And they'll have to be confirmed, so the bank can release

19   that money so they don't pay ahead of -- of the construction.

20   Q    And how do you -- how did you acquire this knowledge

21   that you just told us?

22   A    Because Michael would go out and do some inspections

23   for Dee during the week, and on the weekends.

24   Q    When he worked for you?

25   A    Yes.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 708

1   Q    Okay.  Do you have any other experience with -- what

2   are they called?  The type of inspector?

3   A    Oh, a progress inspection for the --

4   Q    A progress -- yeah.

5   A    Uh-huh.  I have a little bit.  I was a board of

6   director at Mountain View Bank of Commerce, and so we had

7   inspectors that worked for us.  And we would hire people that

8   have to have board approval to do the inspections.  And for

9   construction inspection, progress inspections we would see

10  this guy, and the bank president would say we can use him, we

11  can use him, and we'd approve it.

12  Q    Based on your experience, how much experience would a

13  progress inspector need to have in the construction field to

14  do -- to complete these progress inspections?

15  A    Well, it's really just a checkoff of what is listed on

16  the builder's draw to the bank as to what items had been

17  completed.  So, you would go out and maybe say, the

18  structural steel frame's in, the roofing's on, the slab's

19  done, check, check, that's done.  And maybe they billed for

20  the asphalt parking lot, not done, so they wouldn't check

21  that.

22  Q    Okay.

23            MR. VILLASENOR:  I need a moment, Your Honor.

24            THE COURT:  Okay.

25            MR. VILLASENOR:  I pass the witness.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 709

```
 1            THE COURT:  Any cross?
 2            MR. BEDNARSKI:  Yes, Your Honor.
 3                  CROSS-EXAMINATION
 4  BY MR. BEDNARSKI:
 5  Q    Good afternoon, Mr. Russell.
 6  A    Good afternoon.
 7  Q    Now, I just want to cover a couple areas with you.
 8            THE COURT:  Of course, Mr. Mikulecky you were
 9  objecting, weren't you?
10            MR. MIKULECKY:  No, he didn't -- we didn't object
11  at all.
12            THE COURT:  You didn't object to anything?
13            MR. BEDNARSKI:  I objected to hearsay that he was
14  saying, Your Honor.
15            THE COURT:  Never mind.  I'm blending witnesses.
16  Go ahead.
17  Q    (By Mr. Bednarski)  Mr. Russell, you'd indicated that
18  back in approximately '96, that's when you first met Mike
19  Wilhite; is that right?
20  A    That's correct.
21  Q    And it was in that timeframe that, I think you had
22  said, you had engineered for him some of these structural
23  steel houses?
24  A    That's correct.
25  Q    And that was also involving Mr. Clement, correct?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 710

```
 1   A    That's correct.
 2   Q    I think these structural steel houses was where -- was
 3   in the Polo Reserve where you met Mr. Clement that one time?
 4   A    That's correct.
 5   Q    One of the times you met him?
 6   A    Yes.
 7   Q    And so based off your contact, Mr. -- Mr. Wilhite was
 8   an employee of Mr. Clement as it related to these structural
 9   steel houses?
10   A    That, I didn't know.
11   Q    What you knew was that Mr. Clement was the -- kind of
12   the boss as it related to the structural steel houses, right?
13   A    I knew he was the moneyman.  That's all I knew.
14   Q    Okay.  So, he was the moneyman, and Mr. Wilhite was the
15   one contacting you about building these homes?
16   A    Contacting me about engineering them, yes.
17   Q    The design of the home?
18   A    Yes.
19   Q    Okay.  And once you designed the homes, did you have
20   any contact with who was building the homes?
21   A    No.  No, I -- there could have been some times that
22   there were some questions, but right offhand I don't recall
23   having contact.
24   Q    Now, you had indicated that you were having
25   conversations with Mr. Wilhite when steel was becoming
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 711

1    competitive as it related to not only the steel structural

2    houses, but also the steel structural floors; is that right?

3    A    That's correct.

4    Q    Now, at that time, you were also having discussions

5    with Mr. Clement as well, correct?

6    A    No.  I really had very few discussions with

7    Mr. Clement.

8    Q    That memorandum of understanding involves the three of

9    you, correct?

10   A    That's correct.

11   Q    It's not just you and Mike, right?

12   A    No.  There's -- if you look at it there's three.

13   Q    So, obviously you had to have some conversations with

14   Mr. Clement regarding starting this company?

15   A    I don't ever recall having a conversation beyond

16   meeting him at his office like I told you and --

17   Q    On the same day?

18   A    -- didn't know what time.  Beyond that.

19   Q    Okay.

20   A    And it could be.  I don't recall anymore.

21   Q    Sure.  Sure.  But, obviously, there had come to a

22   decision that you were going to get into business with

23   Mr. Clement?

24   A    Correct.

25   Q    As well as Mr. Wilhite?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 712

```
 1   A    Correct.

 2   Q    That memorandum of understanding said that Mr. Clement

 3   was going to own 40 percent, correct?

 4   A    I believe so, yes.

 5   Q    That you were going to own 40 percent?

 6   A    Yes.

 7   Q    And that Mr. Wilhite was going to own 20 percent?

 8   A    Yes.

 9   Q    The idea behind this was that Mr. Clement was going to

10   be the financier, right?

11   A    Yes.

12   Q    He was the one with the money?

13   A    That was my understanding.

14   Q    You were going to be the one designing them, right?

15   A    That's correct.

16   Q    You were going to be the engineer?

17   A    Yes.

18   Q    And then Mr. Wilhite was going to own 20 percent based

19   off of sales and installation?

20   A    Yes.

21   Q    Now, that deal never -- or that business never came to

22   fruition?

23   A    No, it did not.

24   Q    It was never started?

25   A    Thank goodness.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 713

1   Q    And it looked as if it was signed towards the middle of

2   December of 1996.  Does that sound about right?

3   A    It may very well be.  I don't remember.

4   Q    And we can go through it if it'll -- if it'll help.

5   A    Sure.

6   Q    If we go to --

7        MR. VILLASENOR:  Exhibit 8.

8   Q    (By Mr. Bednarski)  -- Exhibit 8.  You got that?

9   A    Yeah.

10  Q    And it shows that -- it looks as if everybody signed it

11  right around December 13th, December 15th, 1996?

12  A    That's correct.

13  Q    And when you signed it, you had no idea Mr. Clement was

14  going to jail?

15  A    No, I did not.

16  Q    Because I would -- and correct me if I'm wrong, you

17  would have never gotten into business with him?

18  A    No, I wouldn't have.

19  Q    Now, that memorandum of understanding says that the

20  company is supposed to be started within 30 days of that

21  memorandum of understanding, correct?  Essentially, the

22  memorandum of understanding lasts for 30 days.  It's the last

23  sentence.

24  A    Yes.  It says you have to reach a formal agreement

25  within 30 days.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 714

1  Q    And absolutely no formal agreement was reached?

2  A    That's correct.

3  Q    Now, I think part of that memorandum of understanding

4  was you were going to try to patent your designs?

5  A    I didn't think it was really a great thing to patent,

6  but that was one of the things I know that Geoffrey Clement

7  wanted and Michael wanted, was it patented.

8  Q    Now, after this company dissolved -- or it never even

9  started, isn't it true that Sharon Clement sued you over the

10 design of those structural steel floors?

11 A    I believe she -- she sent a letter asking -- saying

12 that she had part of the company -- she should have part of

13 the company because of this memorandum of understanding.

14 Q    Okay.

15 A    And that basically went away.

16 Q    Because no company was ever formed?

17 A    Nothing was ever formed.

18 Q    And no formal agreement was done?

19 A    Correct.

20 Q    But it was the Clements that were coming after you, or

21 attempting to come after you related to this memorandum of

22 understanding?

23 A    It was Sharon Clement, yes.

24 Q    Sharon.  Okay.  Now, after that company didn't form,

25 you saw that it was a good time to get into structural steel,

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 715

 1    whether it be houses or floors, right?

 2    A    Especially floors because that was -- again, the market

 3    was primed at that time, because something else had to enter

 4    the market due to all the lawsuits.

 5    Q    And one of the reasons you started your company at that

 6    point was because it was a good time to get in at the

 7    beginning, right?

 8    A    That's correct.

 9    Q    That if you got in too late in the game all the

10    contractors, custom builders, things like that would be

11    taken?

12    A    Well, you always want to get in when the market is

13    best, so --

14    Q    Kind of like buy low, sell high?

15    A    Sure.  If you can do it.

16    Q    Right.  And in this case, the idea was you wanted to

17    get in in the very beginning of these structural steel floors

18    taking off because it made good business sense?

19    A    Sure.  Yes.  It made most sense to move when the

20    market's best, yes.

21    Q    Now, in this, you started Steel Dimensions, right?

22    A    That's correct.

23    Q    You hired Mr. Wilhite, right?

24    A    That's correct.

25    Q    Did not make him an owner?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 716

 1   A     I did not.

 2   Q     No conversations about making him an owner?

 3   A     No.

 4   Q     Because, this was your idea and you wanted to run with

 5   it?

 6   A     Well, the company then was set with my family.  So, my

 7   father financed it and he's part owner in it.

 8   Q     Sure.

 9   A     So, it was set up more as a family business at that

10   point in time.

11   Q     Sure.  And at no time did you think, hey, I'll bring

12   Mike in?

13   A     I can't.

14   Q     At the start.  At the start.

15   A     Okay.  You're saying at the start versus at no time?

16   Q     Correct.

17   A     Well, that would be correct in saying that.  Did I

18   think it, yes.  I did think about bringing him in because if

19   somebody can help you get somewhere, you reward them.  And so

20   it entered my mind, but I also had family to think about too.

21   Q     Now, you had indicated that the paychecks went through

22   DW Support; is that right?

23   A     That's correct.

24   Q     And I think you had also indicated that you were just

25   -- again, this was a small company.  There were only three

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 717

1   employees, right?

2   A    That's correct.  In that timeframe.

3   Q    And you were just setting up payroll as it related to

4   your company?

5   A    Yes.

6   Q    And then I assume -- when Mr. Wilhite got you people to

7   install the floors, did they become employees or were they

8   also independent contractors?

9   A    At the time, I believe they were independent.  And they

10  became employees pretty quickly after we saw the -- the work.

11  But I -- I don't recall exactly how I did it, to be honest

12  with you.

13  Q    And probably, also, after you started getting payroll

14  and everything set up as well, right?

15  A    Yeah.  We had payroll set up by, I think, about --

16  well, actually, we set up payroll right away to pay me and my

17  sister then.

18  Q    Now, I think you had indicated that at least in the

19  beginning, and even when you hired Mr. Wilhite, he had very

20  little experience in the floor business, right?

21  A    That's correct.

22  Q    And even in the structural steel floor business, right?

23  A    That's correct.

24  Q    He was not an engineer?

25  A    That's correct.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 718

1   Q    I think you had also indicated that for your company,

2   in the beginning there was some slow expansion, right?

3   A    Yes.

4   Q    And then after 19 -- or starting in 1998, that's when

5   your company started to really grow?

6   A    Yeah.  We started to grow, especially after we moved to

7   Lafayette.  We built a facility and we started to grow then,

8   so everything could be fabricated right in our facility.

9   Q    So, you kind of took over manufacturing of these -- and

10  I'm going to say it right this time, unlike the deposition --

11  the cold rolled steel; is that right?

12  A    At that time we had removed most of the cold rolled

13  steel out of it and went to hot rolled wide-flanged beams.

14  Q    Oh.  But you were actually manufacturing that; is that

15  right?

16  A    That's correct.

17  Q    Now, I think you had stated that in the time that he

18  was with you when there was this slow expansion, he did do

19  some pricing, right?

20  A    Yes.

21  Q    He was primarily involved in installation, right?

22  A    Well, a combination of everything.  Because we were

23  small, and we -- at that time we just had to get things built

24  and so there were multiple -- multiple hats to where.

25  Q    Okay.  So everybody in the company wore multiple hats?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 719

```
 1   A    Pretty much.

 2   Q    Particularly in the beginning of a small -- small

 3   business?

 4   A    Yes.

 5   Q    Particularly in a small construction business?

 6   A    Yes.

 7   Q    You had indicated that he left in 1997 to start his own

 8   company, Advanced Floor Concepts, correct?

 9   A    That's correct.

10   Q    Now, are you aware that Advanced Floor Concepts is

11   actually owned by Dee Wilhite?

12   A    I am aware of it.  I have been told that.

13   Q    And is it fair to say that outside of going and

14   observing them do the installation of their floors in the

15   beginning, you didn't have any contact with what was going on

16   in the office of Advanced Floor Concepts?

17   A    No, I did not have any.

18   Q    Didn't know how many employees they had?

19   A    No.

20   Q    Didn't know who ran the business?

21   A    No.

22   Q    Didn't know who ran the finances?

23   A    No.

24   Q    And didn't know who -- whose company it really was

25   outside of being told it was Dee's company?
```

United States of America vs.                        Evidentiary Hearing - Day III
Michael David Wilhite                                      September 17, 2015

Page 720

```
 1   A    Correct.

 2   Q    You --

 3            MR. BEDNARSKI:  If I may have one moment, Your

 4   Honor.

 5            THE COURT:  Sure.

 6   Q    (By Mr. Bednarski)  Mr. Russell, I think you had

 7   indicated that you met Dee Wilhite maybe once or twice; is

 8   that right?

 9   A    Yes.

10   Q    Fair to say, you don't have an extensive knowledge of

11   her background?

12   A    No.

13   Q    Her construction background?

14   A    No.

15   Q    Her inspection background?

16   A    No.

17   Q    Now, you had indicated that, at least based off of your

18   knowledge dealing with these inspectors, that they -- based

19   off of being part of the board of directors, they just --

20   they mark things off, right?

21   A    Yes.  It's not an extensive inspection like you would

22   do if you were a building inspector.

23   Q    Correct.  It's not checking to see if things are built

24   to code?

25   A    Correct.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 721

1  Q    It's checking to make sure the -- what the contractor

2  says is done is done?

3  A    Yeah.  If the materials are in sight on site, what's

4  been installed.  That's basically it.

5  Q    It's fair to say each inspector is different?

6  A    I would assume, yes.

7  Q    Some inspectors may be more involved in asking

8  questions about the construction?

9  A    That's possible.

10  Q    Some could be less involved in that, and don't really

11  care about it and just want to mark off their list?

12  A    Yes.

13  Q    And fair to say that some inspectors may ask questions

14  about how different things are installed?

15  A    Yeah.  If they're on the site when they can talk to

16  somebody that can answer it, sure.

17  Q    Sure.  And because you weren't out with Dee Wilhite on

18  all of her inspections, it's fair to say you have no

19  knowledge about what information she learned from contractors

20  related to construction?

21  A    Yes.  I wouldn't know what she -- she's learned and

22  hasn't learned.

23  Q    Or related to structural -- structural floors, correct?

24  A    Well, I would say structural floors would be different

25  because, again, they were a new -- a new animal.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 722

1    Q    Okay.  But, fair to say, you don't know what knowledge

2    she may have gleaned from other contractors as it related to

3    structural steel floors, correct?

4    A    Well, I wouldn't know -- like I said, there weren't

5    many of them out there, so I would doubt there was much

6    available.

7    Q    Correct.  But I'm just saying you don't know how many

8    she inspected, right?

9    A    No.

10   Q    And whether or not she spoke with the individuals who

11   had installed them?

12   A    No.

13            MR. BEDNARSKI:  Thank you.  No further questions.

14            THE COURT:  Okay.  I have a couple, Mr. Russell.

15   At some point you gained an understanding that Mr. Wilhite

16   was competing by submitting a bid from someone else on your

17   projects?

18            THE WITNESS:  Yes.

19            THE COURT:  Okay.  Relative to his departure from

20   your company, when was that?

21            THE WITNESS:  That would have been in, I believe,

22   early October.

23            THE COURT:  So, before he left?

24            THE WITNESS:  No.  I believe he left in early

25   October.  So, we received a fax in right around the time he

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 723

```
 1   left.  I don't remember exactly how it occurred.
 2            MR. BEDNARSKI:  Your Honor, I'm going to object to
 3   the fax because it leads to hearsay.
 4            THE COURT:  Yeah, I understand.  I'd like you to
 5   look at Exhibit 21.  It's page 12, paragraph 64.
 6            THE WITNESS:  Page 12.  64 you said?
 7            THE COURT:  Yeah.
 8            THE WITNESS:  Okay.
 9            THE COURT:  Read that.
10            THE WITNESS:  All right.
11            MR. VILLASENOR:  And, Your Honor, he is quoted on
12   paragraph 65.
13            THE COURT:  I understand.
14            MR. VILLASENOR:  Okay.
15            THE COURT:  Did you read 64?
16            THE WITNESS:  64, yes.
17            THE COURT:  Does that give you any additional
18   understanding about when Mr. Wilhite left your company?
19            THE WITNESS:  Yes.  You know, we've stated on here
20   November 11th, so --
21            THE COURT:  Okay.  And then if that is true, and
22   just assume that it is, November 11th.
23            THE WITNESS:  Uh-huh.
24            THE COURT:  When would you have first had an
25   understanding that Mr. Wilhite was doing something for a
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 724

1   competing interest?

2          THE WITNESS:  Probably in the first week of

3   November.

4          THE COURT:  But before he -- he was gone?

5          THE WITNESS:  Before he was gone we -- we

6   understood -- we had -- and this is hearsay, of course, but

7   we had heard from the vendors.

8          THE COURT:  Well, you don't have to say that.  But

9   why wouldn't you fire him immediately when you found out he

10  was doing something contrary to your best interest?

11         THE WITNESS:  Well, at the time -- again, we're a

12  small company, we had to find out exactly what was going on.

13  And we're not going to go out and say you're fired just

14  because he's talking to vendors.

15         THE COURT:  Okay.

16         THE WITNESS:  We didn't know exactly the stint of

17  everything.  We knew he was getting pricing.

18         THE COURT:  At the time that this MOU was signed,

19  which we've heard was December of 1996, did you have any

20  understanding about whether Mr. Wilhite was in the steel

21  structural floor business at the time?

22         THE WITNESS:  No.  At the time, he had only been

23  working on the steel houses in the Polo Reserve.

24         THE COURT:  Okay.

25         THE WITNESS:  There was no steel structural floors

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 725

 1   that he was in the business in at that time.

 2              THE COURT:  Okay.  You think he was only working

 3   on steel framing?

 4              THE WITNESS:  That's correct.

 5              THE COURT:  You -- you said that you found out,

 6   must have been shortly after this MOU, that Mr. Clement --

 7   that this source of funds was tainted?

 8              THE WITNESS:  Yes.  I don't remember exactly what

 9   point, but I do know that the engineering firm I was working

10   for was struggling a little bit with payment, also.  And so I

11   don't recall exactly how it all worked out, but I did learn

12   that the houses had been paid for with tainted funds

13   somewhere in that -- in that timeframe after we signed that

14   MOU.

15              THE COURT:  But would it have been before the 30

16   days was up, or after, to your recollection?  And if you

17   don't have a recollection, that's fine.

18              THE WITNESS:  I don't have one.

19              THE COURT:  All right.  And do you have any reason

20   to believe that at about that time, Mr. Wilhite gained the

21   same knowledge that you had about Mr. Clement.

22              THE WITNESS:  Oh, I believe -- well, at that time

23   that's what I believed.  What I know now is completely

24   different.

25              THE COURT:  I'm sorry, what did you believe at the

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 726

1   time?

2          THE WITNESS:  Well, I understood that Mr. Clement

3   was going to be indicted for embezzling funds and --

4          THE COURT:  You understood that at about the time

5   of the MOU?

6          THE WITNESS:  No.  That was after.

7          THE COURT:  I'm talking about at the time of the

8   MOU you said that it didn't go through because Mr. Clement's

9   source of money was -- he gained it unlawfully.  I thought

10  that's what you testified to.

11         THE WITNESS:  No.  No.  I'm glad it didn't go

12  through.  I don't recall when I heard for sure that his

13  source of money was tainted.

14         THE COURT:  Okay.  Well, go ahead and restate your

15  testimony why you didn't go through with the MOU.

16         THE WITNESS:  Well, I just have to think back.

17  Let me try here.  It's been a long time.

18         THE COURT:  Yeah, that's fine.  I thought you had

19  testified about that (unintelligible).

20         THE WITNESS:  The -- the MOU came out.  I'm just

21  going back through it.  They wanted to patent the system, so

22  we looked a little bit on patenting the system.  I had

23  visited with a patent attorney.  And then -- I can't believe

24  if it was before the MOU ran out, because I don't know if

25  anybody is really paying attention to that date, or shortly

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 727

 1   after that I found that out.  I can't --

 2           THE COURT:  Found what out?

 3           THE WITNESS:  That -- that the funds were tainted.

 4           THE COURT:  All right.

 5           THE WITNESS:  That he did not have the funds to do

 6   this.

 7           THE COURT:  And do you have any reason to believe

 8   that Mr. Wilhite knew the same thing you knew, about that

 9   time, about Mr. Clement?

10           THE WITNESS:  Oh, yes.

11           THE COURT:  What would be the foundation for --

12           THE WITNESS:  Well, I would -- I learned from him

13   the problem with Mr. Clement.

14           THE COURT:  What did Mr. Wilhite tell you?

15           THE WITNESS:  I can't recall exactly what he told

16   me.  I did understand that he was being investigated for

17   embezzling money.

18           THE COURT:  You think Mr. -- your testimony is

19   Mr. Wilhite told you that about Mr. Clement?

20           THE WITNESS:  Yes.

21           THE COURT:  Around this time?

22           THE WITNESS:  Yes.

23           THE COURT:  Okay.  Did -- did he have any -- when

24   he worked for you did he have any kind of noncompete?

25           THE WITNESS:  No.

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 728

1              THE COURT:  You said he was a subcontractor or a

2    contractor, not an employee.

3              THE WITNESS:  I paid him as a subcontractor or

4    contractor because that's the way he asked me --

5              THE COURT:  Okay.

6              THE WITNESS:  -- to pay him.

7              THE COURT:  So wouldn't it be true that he would

8    be free to subcontract for anybody else, in addition to you?

9              THE WITNESS:  Technically, yes.

10             THE COURT:  You didn't talk to him about only

11   doing your work, did you?

12             THE WITNESS:  Not that I recall, no.

13             THE COURT:  Okay.  Any further questioning based

14   on my questions?

15             MR. VILLASENOR:  Yes.

16             THE COURT:  Go ahead.

17                    REDIRECT EXAMINATION

18   BY MR. VILLASENOR:

19   Q    How many hours was Mr. Wilhite working for you during

20   the time that he worked for you?  Per week, let's say.

21   A    I would say he's working 40 hours or better.  I mean,

22   it depends on if he was going to drop off a proposal or going

23   to a job site, but I know he's working probably 40 hours a

24   week.

25   Q    Full-time?

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 729

```
 1   A    Yes.
 2              MR. VILLASENOR:  That's it.
 3              THE COURT:  Okay.  Any questions from you,
 4   Mr. Bednarski?
 5              MR. BEDNARSKI:  No questions, Your Honor.
 6              THE COURT:  Okay.  You're excused.  Thank you very
 7   much.
 8              Okay.  Any other evidence from the United States?
 9              MR. VILLASENOR:  That's -- the only other witness
10   is Mr. Clement, and we have deposition.
11              THE COURT:  Okay.  And was that taken in prison?
12              MR. VILLASENOR:  No.  It was taken in my office.
13              MR. BEDNARSKI:  He's been released, Your Honor.
14              THE COURT:  He had a 20-year sentence and he's
15   been released?
16              MR. BEDNARSKI:  Yeah.
17              MR. VILLASENOR:  Yes.
18              MR. BEDNARSKI:  That was -- that was in '99, so 16
19   years.
20              THE COURT:  Yeah, but --
21              MR. VILLASENOR:  Good time --
22              THE COURT:  -- I think you serve 92 percent of
23   your time, don't you?
24              MR. BEDNARSKI:  80 -- 85 percent.
25              THE COURT:  85 percent in the federal system?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 730

```
 1                    MR. BEDNARSKI:  Yes.

 2                    THE COURT:  When was he released?

 3                    MR. BEDNARSKI:  I think earlier this year or late

 4     last year.

 5                    THE COURT:  Oh, okay.  That's better than I

 6     thought.  Okay.  All right.  Yeah.  We'll -- we'll review

 7     that in its entirety.  Beyond that, any more evidence?

 8                    MR. VILLASENOR:  The government rests.

 9                    THE COURT:  Okay.  Any rebuttal case?

10                    MR. BEDNARSKI:  No, Your Honor.

11                    THE COURT:  Okay.  When did we talk about -- are

12     we going to do simultaneous briefs then, findings of fact and

13     conclusions of law?

14                    MR. BEDNARSKI:  That's what we had talked about at

15     the --

16                    THE COURT:  All right.

17                    MR. BEDNARSKI:  -- at the status conference when

18     we set all of this, Your Honor.

19                    THE COURT:  Okay.  Has your schedule changed at

20     all so that you need to alter that?

21                    MR. MIKULECKY:  I would appreciate, Your Honor, if

22     we could extend back.  I start a vacation next week.

23                    THE COURT:  Me too.

24                    MR. MIKULECKY:  (Unintelligible).

25                    THE COURT:  Where you going?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 731

```
 1              MR. MIKULECKY:  Going to St. Croix in the US
 2   Virgin Islands.
 3              THE COURT:  Okay.
 4              MR. MIKULECKY:  I get back on the 30th, so I
 5   prefer we move it back a week, the second through
 6   (unintelligible).
 7              THE COURT:  Any objection?
 8              MR. VILLASENOR:  No.
 9              THE COURT:  Okay.  The 9th will be the time then.
10              MR. BEDNARSKI:  And, Your Honor, one final issue.
11   The Court had mentioned yesterday during Mr. Wilhite's
12   testimony regarding wanting to see the medical records --
13              THE COURT:  Yes.
14              MR. BEDNARSKI:  -- and whether we could have those
15   by tomorrow.  Obviously, Mr. -- if I ask for them it will
16   take 30 to 45 days.  Mr. Wilhite is willing to go get those,
17   I just don't know that I'll have them by the end of the day
18   tomorrow.
19              THE COURT:  Is there any reason you believe I
20   shouldn't look at those?
21              MR. BEDNARSKI:  No, Your Honor.
22              THE COURT:  Okay.  Do you have any objection to me
23   looking at his medical records?  And this concerns strokes
24   in --
25              MR. BEDNARSKI:  And the sleep apnea, Your Honor.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 732

```
 1            THE COURT:  -- 1998.  And sleep apnea.

 2            MR. BEDNARSKI:  Yes, Your Honor.

 3            MR. VILLASENOR:  Your Honor, I think he testified

 4   as to the medications he was -- does the Court want to verify

 5   those?

 6            THE COURT:  It would be important for me, yes.

 7   But, I -- I would respect any objection that you have, so

 8   I'll hear it now.

 9            MR. VILLASENOR:  I mean, it wasn't designated as

10   an exhibit.  It was never disclosed to us, and you -- you

11   sustained some of our objections for the same grounds.  I

12   think in fairness, the Court should not have the benefit of

13   those records.  Or, in the alternative, if we can admit the

14   records that Ms. Froehlke tried to admit, I'm happy to -- to

15   oblige.

16            THE COURT:  Doin' some horse-trading with the

17   judge.

18            MR. BEDNARSKI:  And, Your Honor, the only reason

19   we were getting the medical records was this Court had

20   requested them.

21            THE COURT:  Oh, no.  I mean, actually I'll take

22   that as a stipulation from the United States that he had

23   exactly the medical problems that he said he had.  Is that

24   your stipulation?

25            MR. VILLASENOR:  Depending to whether he is a
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 733

```
 1   credible witness.  I -- I can't give you that.  I'm sorry.
 2            THE COURT:  Well, then I probably need to look at
 3   them.  Okay?
 4            MR. BEDNARSKI:  And so, what I was asking, Your
 5   Honor, is could we have one week to provide those --
 6            THE COURT:  That will be fine.
 7            MR. BEDNARSKI:  -- both to the Court as well as --
 8            THE COURT:  And the United States can provide any
 9   objection in writing once you receive them.  I think you
10   should wait until you receive them.
11            MR. VILLASENOR:  Right.
12            THE COURT:  And then if you want to object, and I
13   find that your objection is well-noted, I -- I will let you
14   object -- actually, what we'll do is this.  You provide the
15   medical records.  When I get back in country we'll have a
16   brief telephone conference.  You can state any objection and
17   you can respond to any objection, and then I'll make a ruling
18   on the phone.
19            MR. BEDNARSKI:  Yes, Your Honor.
20            THE COURT:  Okay.  So let's do that somewhere
21   around October 9, maybe at 10:00.
22            MR. BEDNARSKI:  Your Honor, that's the day that
23   our final briefs are due.  Do you want us to do the briefs.
24            THE COURT:  Oh, no, you're right.  So, can you do
25   it the 7th?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 734

```
 1              MR. BEDNARSKI:  I can do it the 7th, Your Honor.

 2              THE COURT:  I'll be exhausted, but I'll be in all

 3  day, I think.  October 7th at 4:00.  Just a phone call.

 4              MR. BEDNARSKI:  Yes, Your Honor.

 5              MR. VILLASENOR:  That's fine.

 6              THE COURT:  All right.  Let's go through -- Molly

 7  is going to read to you the exhibits that are in evidence.

 8  I'd like you to compare that with what you have, and then

 9  make any corrections that you need to make.

10              UNKNOWN SPEAKER:  You're getting out of here?

11              THE COURTROOM DEPUTY:  You want me to include the

12  ones that nobody spoke about?

13              THE COURT:  Yes.  Everything that's been admitted,

14  including all those that were admitted by stipulation at the

15  beginning of the case.

16              THE COURTROOM DEPUTY:  Okay.  Exhibits 1 through 6

17  were admitted, 7 is not.  Exhibits 8 and 9 were admitted, 11

18  through 13, 14 through 26.

19              MR. BEDNARSKI:  Did you say 11 through 13?  Oh,

20  yeah, that's right.  That's right.  Okay.  I apologize.  Yes,

21  that's right.  Sorry.

22              THE COURTROOM DEPUTY:  Okay.  14 through 26.  27

23  was not admitted.  28 and 29 were admitted, 30 was not.  31

24  through 41 were admitted.  43 through 47 were admitted.  48

25  and 49 were not admitted.  And 50 was admitted.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 735

```
 1                  And then I've got A through --
 2                  THE COURT:  Let's -- let's stop with the
 3     Government's.  Ms. Froehlke?
 4                  MS. FROEHLKE:  Your Honor, I believe you admitted
 5     Exhibit 41 and 42, the tax returns, subject to a limitation
 6     of the signatures.  I'm not sure (unintelligible).
 7                  THE COURT:  I admitted them solely for the purpose
 8     of the --
 9                  THE COURTROOM DEPUTY:  (Unintelligible).
10                  THE COURT:  Pardon?
11                  THE COURTROOM DEPUTY:  I have 41 has been
12     admitted, but not 42.
13                  MR. MIKULECKY:  Correct.  42 were the corporate
14     returns, Your Honor, and those didn't come up.
15     (Unintelligible).
16                  UNKNOWN SPEAKER:  That's true.
17                  THE COURT:  Okay.  All right.  I admitted 41
18     solely for the purpose of --
19                  UNKNOWN SPEAKER:  What it listed as occupation.
20                  THE COURT:  Occupations next to signatures.
21                  UNKNOWN SPEAKER:  Yes, Your Honor.
22                  THE COURT:  Okay.  Any other correction,
23     Ms. Froehlke.
24                  MS. FROEHLKE:  No, Your Honor.
25                  THE COURT:  Mr. Bednarski or Mr. Mikulecky?
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 736

 1            MR. BEDNARSKI:  No.  We have that as well, Your

 2   Honor.

 3            THE COURTROOM DEPUTY:  Okay.  And then I have

 4   Exhibits A through R that were admitted.  T -- I'm sorry, T

 5   was not admitted.  U was not admitted.  V was admitted.  W

 6   was not admitted.  X, Y and Z were admitted.

 7            THE COURT:  Ms. Froehlke?

 8            MS. FROEHLKE:  I believe that's correct, yes.

 9            THE COURT:  Okay.  That's government's

10   recollection.  How about you two?

11            MR. MIKULECKY:  Your Honor, I think on S -- I

12   think the government agreed to the first page or two of S.

13   (Unintelligible.)

14            THE COURTROOM DEPUTY:  There was an objection to

15   the first e-mail, pages 2 and 3.

16            MR. MIKULECKY:  Right.

17            UNKNOWN SPEAKER:  The first e-mail in the time

18   sequence.

19            MS. FROEHLKE:  Right.

20            THE COURTROOM DEPUTY:  Has the rest been

21   stipulated?

22            MS. FROEHLKE:  The rest of it was stipulated, yes.

23            THE COURT:  Okay.  So what is stipulated in.

24            UNKNOWN SPEAKER:  Page 1 of Exhibit S, Your Honor,

25   and page 2, up through the e-mail that appears in the middle

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 737

1  of the page dated May 2nd, 2011, from Mr. Wilhite to

2  Mr. Taylor.  The e-mail that appears below that, from

3  Mr. Corne to Mr. Wilhite, beginning on page 2 and continuing

4  to page 4 is not.

5          THE COURT:  Okay.  Did you get that, Molly?  Any

6  other corrections from either of you?

7          UNKNOWN SPEAKER:  No, sir.

8          UNKNOWN SPEAKER:  No, Your Honor.

9          THE COURT:  Okay.  What we're going to do is

10  remove those that have not been admitted, put them in a

11  separate sealed packet so I will not consider those, but

12  they'll remain part of the record for any appeal purposes.

13  We'll look at the Clement deposition.  Were there any

14  exhibits as part of that deposition?

15          MR. VILLASENOR:  Yes.

16          THE COURT:  And are those included with the

17  packet?

18          MR. VILLASENOR:  Yes, with the paper.  The -- the

19  original.

20          THE COURT:  All right.  And --

21          MR. VILLASENOR:  Typically.

22          THE COURT:  -- are the exhibits that I'm to

23  consider stipulated then, the ones that are with that packet?

24          MR. BEDNARSKI:  Yes, Your Honor.

25          THE COURT:  Okay.  So I can be free to look at

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 738

1    anything in that packet?

2              MR. BEDNARSKI:  Yes, Your Honor.

3              THE COURT:  Right?

4              MR. VILLASENOR:  I think it's some of the same

5    exhibits that we covered here, so, yes.

6              THE COURT:  Okay.  Is there anything I'm

7    forgetting that we should be doing?

8              UNKNOWN SPEAKER:  Yes, Your Honor.  You discussed

9    about redacting some of the exhibits that had Social Security

10   numbers.

11             THE COURT:  I would then allow you to -- since

12   even the -- the not-admitted exhibits could be part of the

13   record someday, just -- and it's your clients' and -- mostly

14   your clients' Social Security numbers, agents -- every one of

15   those signature blocks, for example, for the bank has a

16   Social Security number.  So, if you want to go through on the

17   originals -- I don't want you to do it here because it's

18   going to be a detailed procedure looking at socials, but

19   would you mind me entrusting them to take the Court's

20   exhibits and black those out in some fashion?

21             MR. VILLASENOR:  Yeah, I don't mind.

22             THE COURT:  Okay.  Is that okay with you guys?

23             MR. BEDNARSKI:  Yes, Your Honor.

24             MR. MIKULECKY:  Yes, Your Honor.

25             THE COURT:  All right.  So, you take those.  We'll

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 739

1    deliver those to you.  Can you do it today?

2            THE COURTROOM DEPUTY:  Well, actually what we're

3    going to do is we're going to give each party that they

4    signed, and you signed, the stipulation.  We'll give each

5    party back their exhibits and they'll be responsible for

6    holding onto those exhibits --

7            THE COURT:  Right.

8            THE COURTROOM DEPUTY:  -- and redacting them

9    and --

10           THE COURT:  Well, what about the actual Court

11   admitted exhibits that are part of the official record?

12           THE COURTROOM DEPUTY:  That's what they keep.

13           THE COURT:  Okay.  But I have to have those for my

14   consideration, so --

15           THE COURTROOM DEPUTY:  You'll keep -- right.  I'll

16   take your book and I'll take all the stuff out of it.

17           THE COURT:  Okay.

18           THE COURTROOM DEPUTY:  And --

19           THE COURT:  So I'll just look at my book.

20           THE COURTROOM DEPUTY:  Correct.

21           THE COURT:  All right.  That's fine.  So, there

22   really is only one set of originals, but you each maintain

23   your own particular set, so then you'll each be responsible

24   for redacting Social Security numbers off of those.  Okay?

25           UNKNOWN SPEAKER:  Yes, Your Honor.

United States of America vs.                          Evidentiary Hearing - Day III
Michael David Wilhite                                      September 17, 2015

Page 740

```
 1               THE COURT:  All right.

 2               THE COURTROOM DEPUTY:  What is that

 3    (unintelligible)?  I have -- I was given these depositions.

 4    You don't need these, or do you?

 5               THE COURT:  No.  Depositions were only used for --

 6               UNKNOWN SPEAKER:  Impeachment.

 7               THE COURT:  -- Impeachment or recollection

 8    purposes; isn't that right?

 9               UNKNOWN SPEAKER:  Yes, Your Honor.

10               THE COURT:  I don't need those.

11               THE COURTROOM DEPUTY:  (Unintelligible).

12               THE COURT:  Do you think I need to maintain -- we

13    need to maintain, as part of the court file, the deposition

14    transcripts?

15               UNKNOWN SPEAKER:  I don't believe so, Your Honor.

16               UNKNOWN SPEAKER:  I don't think so, Your Honor.

17               THE COURT:  All right.

18               THE COURTROOM DEPUTY:  I will -- after you have

19    reviewed this deposition of Clement or Clément, depending on

20    how it's pronounced, I will --

21               THE COURT:  She's from Louisiana, by the way.

22               THE COURTROOM DEPUTY:  -- I will make a copy of

23    the paper and -- to keep here, and I'll return this to --

24    (unintelligible).

25               THE COURT:  Okay.  Anything else from the United
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 741

```
 1    States?

 2              MR. VILLASENOR:  No.

 3              THE COURT:  Okay.  From Mr. Bednarski or

 4    Mr. Mikulecky?

 5              UNKNOWN SPEAKER:  Not from me, Your Honor.

 6              THE COURT:  Okay.  Hold on.

 7              MS. FROEHLKE:  Your Honor, we do have the victim

 8    statement pursuant to the Victims' Rights Act.

 9              THE COURT:  Well, is that something I am legally

10    required or supposed to consider, or is it discretionary or

11    what?

12              MR. VILLASENOR:  It's our position that under the

13    Crime --

14              MS. FROEHLKE:  The Crime Victim Rights Act.

15              MR. VILLASENOR:  Right -- that you can consider

16    it.  I mean, they can make a statement.  It's not evidence,

17    it's simply a statement.  I was going to have Mr. Maine make

18    an oral statement.

19              THE COURT:  Okay.  Do you have any contrary

20    position?

21              MR. BEDNARSKI:  Your Honor, I believe -- I agree

22    with them I think it is something that the Court can

23    consider.

24              THE COURT:  Okay.

25              MR. BEDNARSKI:  The Court doesn't have to.
```

United States of America vs.
Michael David Wilhite

Evidentiary Hearing - Day III
September 17, 2015

Page 742

 1           THE COURT:  Okay.  Well, then submit it so at

 2    least I'll be able to exercise my discretion.  Anything

 3    further?

 4           UNKNOWN SPEAKER:  No, sir.

 5           UNKNOWN SPEAKER:  No.

 6           THE COURT:  All right.  Well, I'll say this.  This

 7    is the way I used to practice law, so this is enjoyable to

 8    me.  Because I will tell you, that most of the civil cases

 9    that I've heard -- trials, hearings -- do not involve this

10    level of expertise and professionalism and ability.  So, I

11    think you both did a wonderful job.  And it was really fun

12    for me to hear that kind of examination and cross-examination

13    again, because I have not really had a chance to do that

14    since I left the practice of law.  So, I want to thank you

15    for that.

16           UNKNOWN SPEAKER:  Thank you, Your Honor.

17           THE COURT:  All right.  So we'll be in recess

18    then.

19           THE COURTROOM DEPUTY:  All rise.  Court is in

20    recess.

21           (The hearing was in conclusion at 5:39 p.m.)

22           I certify that the foregoing is a correct
      transcript, to the best of my knowledge and belief (pursuant
23    to the quality of the recording) from the record of
      proceedings in the above-entitled matter.

24

25    /s/ Kelly Mair                September 23, 2015
      Signature of Transcriber         Date

United States of America vs.                                    Evidentiary Hearing - Day III
Michael David Wilhite                                                      September 17, 2015

Page 743

```
 1                          INDEX
         WITNESSES:                              PAGE NO.
 2
         FOR THE PLAINTIFF:
 3
         Brian Cleveringa
 4            Direct Examination by Mr. Villasenor        395
              Cross-Examination by Mr. Bednarski          410
 5            Redirect Examination by Mr. Villasenor      428

 6       Linda Gould
              Direct Examination by Ms. Froehlke          643
 7            Cross-Examination by Mr. Mikulecky          659

 8       Dennis Cross
              Direct Examination by Mr. Villasenor        669
 9            Cross-Examination by Mr. Mikulecky          679
              Redirect Examination by Mr. Villasenor      684
10
         Mark Russell
11            Direct Examination by Mr. Villasenor        693
              Cross-Examination by Mr. Bednarski          709
12            Redirect Examination by Mr. Villasenor      728


13
         FOR THE DEFENDANT:
14
         Michael Wilhite
15            Cross-Examination by Mr. Villasenor         430
              Redirect Examination by Mr. Bednarski       437
16
         Torin Jackson
17            Direct Examination by Mr. Bednarski         459
              Cross-Examination by Ms. Froehlke           473
18            Redirect Examination by Bednarski           480

19       Cynthia Barker
              Direct Examination by Mr. Mikulecky         483
20            Cross-Examination by Ms. Froehlke           490
              Redirect Examination by Mr. Mikulecky       496
21
         Francisco Carranza
22            Direct Examination by Mr. Bednarski         499
              Cross-Examination by Mr. Villasenor         504
23
         James Lovell
24            Direct Examination by Mr. Mikulecky         506
              Cross-Examination by Mr. Villasenor         510
25
```

United States of America vs.                                      Evidentiary Hearing - Day III
Michael David Wilhite                                                       September 17, 2015

Page 744

```
 1                              INDEX

 2    WITNESSES                                       PAGE NO.

 3    FOR THE DEFENDANT:

 4
      Mark Stubbert
 5         Direct Examination by Mr. Bednarski            515
           Cross-Examination by Ms. Froehlke             532
 6         Redirect Examination by Mr. Bednarski         552

 7    Robert Corne
           Direct Examination by Mr. Mikulecky           562
 8         Cross-Examination by Ms. Froehlke             577
           Redirect Examination by Mr. Mikulecky         611
 9
      Brendan DePaola
10         Direct Examination by Mr. Mikulecky           615
           Cross-Examination by Ms. Froehlke             624
11
      Torrey Sanborn
12         Direct Examination by Mr. Bednarski           630
           Cross-Examination by Mr. Villasenor           641
13
      Tamara Ashe (Telephonically)
14         Direct Examination by Mr. Bednarski           687

15

16                            EXHIBITS

17    Plaintiff's Exhibits:              Offered      Received

18       47 (pages 16-18)                  404          404

19

20    Defendant's Exhibits:              Offered      Received

21       Z                                 424          425

22       X                                 570          571

23

24

25
```