**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 00-cr-0504-CMA-MEH

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MICHAEL D. WILHITE,

    Defendant.

---

**UNITED STATES' OBJECTIONS TO THE REPORT AND RECOMMENDATION**

---

In 1997, Michael Wilhite had a six-figure debt to the Internal Revenue Service ("IRS") "hanging over [his] head." Doc. 115, *Recommendation, Findings of Fact* ("Rec. FOF") ¶ 32. He also found out that the Federal Bureau of Investigation ("FBI") and IRS were investigating him for wire fraud that he had already committed, a fraud that caused millions in harm to which he would later plead guilty and agree to pay restitution of $1.7 million. Doc. 11; Rec. FOF ¶¶ 4-5, 17-19, 32. But in 1997, Wilhite wanted to start a business. He knew that starting a business in his own name could "jeopardize" the assets he and his wife enjoyed. Trial Transcript ("Tr.") 457:16-458:2. Indeed, he had scrupulously kept all assets out of his name since 1992. Rec. FOF ¶ 3.

Wilhite tried to avoid this problem by clever accounting. He arranged to have his paychecks directed to a company called DW Support, a company formed by his wife, Darla "Dee" Wilhite ("Mrs. Wilhite") for the sole purpose of receiving Wilhite's paychecks. Rec FOF ¶¶ 22-24. DW Support then contributed $3,500 to form a new company, Advanced Floor Concepts ("AFC"); the contribution from DW Support was

more than half the initial cash capital in AFC. Doc. 115 at 22, 32-33. Wilhite was not

listed as an AFC owner; Mrs. Wilhite was listed as AFC's sole owner, but she referred to

AFC as "Michael's" company. *Id.* ¶¶ 31, 52.

Indeed, Wilhite then ran AFC like an owner. And as he put it to an employee,

"[t]his company may be in Dee's name, but everybody knows it's my company and I

make the rules." Tr. 651:18-23. Despite his claim to be a mere employee, he collected

no pay at all from 1997 to 2001, relying entirely on his wife for his income and support.[1]

Wilhite claimed he was paid in "chocolate chip cookies." Doc. 115 at 32 n.13. He started

collecting a paycheck in 2001, but then in August 2008, when the United States first

contacted AFC regarding his employment, he was again excluded from payroll, so there

were no wages to be garnished. Rec. FOF ¶¶ 60, 62-63, & at 32 n.12.

AFC is now worth millions. But since Wilhite's supervisory release ended in 2004,

he has not made a voluntary restitution payment to his victim.[2] He claims he holds zero

interest in AFC, and thus collects no salary or distributions from it. Meanwhile, Mrs.

Wilhite takes home significant salary and distributions on a monthly basis, all while

running DW Support, which also became a successful company in its own right.

The Clerk of the Court issued a writ of execution to collect on Wilhite's interest in

AFC, Mrs. Wilhite moved to quash the writ, and the Magistrate Judge held a three-day

evidentiary hearing in September, 2015. Docs. 31, 36, 88-90. The Magistrate Judge

issued a Recommendation that, with some key exceptions noted below, correctly

described most of the facts. Doc. 115. The Magistrate Judge was critical of Wilhite's

deceptive tactics, such as collecting no salary and pretending to be retired when he was

---

[1] Ex. 21, ¶ 48; Ex. 24, p. 6; Tr. 351:20-352:7.
[2] Ex. 20, p. 2; Tr. 307:1-5.

not. *Id.* at 32 n.12. The Magistrate Judge found that (a) "Wilhite certainly knew of the IRS lien" in 1997; (b) in 2008 he stopped receiving a paycheck to avoid garnishment; and (c) "a reasonable person could conclude that Wilhite's knowledge of the IRS lien against him demonstrates Mrs. Wilhite formed AFC in her name to avoid collection …." Doc. 115 at 32 & n.12. But in evaluating whether Wilhite's conduct was intended to "hinder, delay, or defraud any creditor," *Id.* at 29, the Magistrate Judge made a few important, outcome-determinative legal errors.

First, the Magistrate Judge appeared to believe, without a clear legal basis, that when evaluating whether Wilhite in 1997 was seeking to keep assets away from past and future creditors, the government could neither rely on the 1993 IRS debt, nor on the impending restitution for the fraud for which he knew he was being investigated. *Id.* at 31-32. As to the IRS debt, although there was already a lien for the unpaid tax debt, the Magistrate Judge believed that that the government needed to show that Wilhite had been "threatened with a lawsuit."  *Id.* at 31. The Magistrate Judge's narrow approach ignored the fact that avoiding a valid past debt for years is still deceptive as to creditors, even if the debt is a few years old and has been reduced to a lien. He thus appeared to set a rule that would allow debtors to avoid their creditors as long as they face no more than a lien.

Second, as to Wilhite's knowledge that investigators were onto his fraud, the Magistrate Judge believed that because "Wilhite received *none* of the proceeds of the criminal enterprise[3]," his knowledge of his fraud did not amount to concern "about a monetary liability linked to the crime." *Id.* at 31-32 (emphasis in original). The Magistrate

---

[3] Indeed, Wilhite testified that during the fraud he was waiting for the big pay day from his co-conspirator. Tr. 291:5-16.

Judge appeared to assume that a fraudster who causes financial harm (Wilhite did), but has not personally gained from the fraud, has no anticipation of a monetary liability. *Id.* at 31. The Magistrate Judge thus appeared to set a rule that would allow some fraudsters—those who gain nothing from their fraud— to hide and move assets before they are convicted.

Third, the Magistrate Judge appeared to assume that he could not in any way consider the cash Wilhite contributed to AFC, which amounted to 54% of AFC's capital, because Wilhite did not contribute that money directly but instead provided it through a separate legal entity controlled by his wife, DW Support. *Id.* at 32-33. The Magistrate Judge cited no authority to support the decision to disregard this indirect contribution. Ignoring this contribution would create an unjustified loophole for deceptive conduct like Wilhite's, and would give clear guidance to debtors on how to structure a transaction to avoid their creditors.

Fourth, the Magistrate Judge appeared to believe that when considering whether there were badges of fraud, he had to use a "scoreboard" method. *Id.* at 30-34. The Magistrate Judge fully agreed with the government that some "badges of fraud" were present. *Id.* at 31. He then concluded other factors did not point to fraud or were neutral, and found that there were more "non-badges" than "badges" of fraud. *Id.* at 34. The Magistrate Judge appeared to reason that because these "remaining factors" did not show fraud, there was no fraud. *Id.* at 32. This "scoreboard" approach was unjustified under the law, as it misinterpreted the "badges of fraud" approach, treating the factors as an exclusive list and giving each equal weight. On the contrary, the factors are non-

exclusive, and in many cases where fraud is present, there are only a few badges of fraud while other factors may be neutral or inapplicable.

Finally, the Magistrate Judge failed to consider other key indicia of ownership, failed to analyze the facts under the distinct constructive trust theory, and failed to find fraudulent intent relating to the Yahab Foundation conduct. *Id.* at 34-35. In light of the above errors, the Recommendation should not be adopted, the government's objection should be sustained, and this Court should enter an order denying the motion to quash, and concluding that Wilhite has a majority membership interest in AFC.

## I.      Standard of Review.

This Court must review the Recommendation *de novo.*  Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). The Court reviews *de novo* "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). This *de novo* review requires the Court to "consider relevant evidence of record and not merely review the magistrate judge's recommendation." *In re Griego*, 64 F.3d 580, 584 (10th Cir.1995). When performing this review, the Court 'may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.'" *Ross v. Rothstein*, 92 F. Supp. 3d 1041, 1048 (D. Kan. 2015) (citing Fed. R. Civ. P. 72(b)(3)).

## II.    The Recommendation erred on a key fact.

The United States does not object to the majority of the Recommendation's proposed findings of fact.[4] The proposed FOF ¶¶ 1 – 72, ¶ 74, and the direct and

---

[4] Although the proposed findings are mostly correct,  the Magistrate Judge erred in failing to find the United States' proposed facts ¶¶ 11, 15, 16, 36, 42, 43, 44, 46, 48, 49, 50, 54, 55, 58, 63-71, 75, 79, 102, 105-107, 111, 114, 118, and 120-129. Doc. 106, pp. 4-18. These facts were established by a preponderance of the evidence. Accordingly, the United States requests that

indirect rejections of the Wilhites' credibility (Doc. 115 at 13 n.4, 15 n.5, 31, 32 n.12) are correct. But the Magistrate Judge made a key misstatement in footnote 7, because it is contradicted by the record.

The Magistrate Judge assumed that Wilhite was paid by AFC from 1997 to 2008. Doc. 115 at 21 n.7. But the record clearly shows otherwise. Wilhite was *not* paid any salary or compensation by AFC from October 1997, when he began working at AFC, until February 2001. (Ex. 21 ¶ 48; Ex. 24, 6; Tr. 351:20-352:7.) He was still not getting paid when a Probation Officer interviewed him for his Pre-Sentence Investigation between January 4 and February 9, 2001. (Ex. 21, 1, 10-11 ¶ 48.) Mrs. Wilhite's first paycheck occurred in 1999, but Wilhite's first paycheck did not occur until February 28, 2001. (Ex. 21, 1, 6; Ex. 24, AFC's "Payroll Transaction by Payee.") Wilhite worked without compensation for 40 months while the company was getting off the ground. The Magistrate Judge relied on the opposite fact, that Wilhite was paid as an employee from 1997-2008, in error through key sections of its legal conclusions.

### III.   The factors, when viewed properly under the applicable law, show that Wilhite took action to hinder, delay, and defraud his creditors by hiding his equitable interest in AFC.

The Magistrate Judge correctly found that the factors under *Holman v. United States*, 505 F.3d 1060 (10th Cir. 2007), apply because a criminal restitution judgment lien can be enforced to the same extent as a tax lien. Doc. 115 at 26 (citing 18 U.S.C. 3613(c). Further, he correctly found that Colorado recognizes equitable ownership through the Colorado Uniform Fraudulent Transfer Act ("CUFTA") factors that are very

---

the Court adopt those facts, as allowed under Rule 72. Further, the Magistrate Judge did not make any proposed findings or conclusions on a writ of garnishment proceeding as to Yahab Foundation, an entity created by the Wilhites pending litigation. Doc. 52-1. As to that action, the United States objects to its failure to find the proposed facts ¶¶ 1-21. Doc. 71, 2-6.

similar to *Holman*, and that no actual transfer is necessary to analyze a nominee claim. *Id.* at 27-29.[5, 6]  The Magistrate Judge erred, however, as discussed below.

### A. In 1997, Wilhite knew of both present and future debts.

A key factor under *Holman* is whether a debtor's action with respect to property was taken to avoid a debt. *Holman* and CUFTA suggest consideration of whether the debtor "anticipated a debt"; "had been sued or threatened with suit," or whether "a substantial debt was incurred shortly before or shortly after [organization]."  *Holman*, 505 F.3d at 1065, n.1; COLO. REV. STAT. § 38-8-105(2)(d), (j). The Magistrate Judge found that this factor could not be shown, as a matter of law, either by Wilhite's substantial lien from his past tax debt, or by his concern about the investigation of his fraud. Doc. 115 at 31-32. But a proper legal analysis shows the opposite.

First, the standard is objective: in Colorado, the Court must examine whether Wilhite *reasonably should have known* that he would or had incurred debts. *CB Richard Ellis, Inc. v. CLGP, LLC*, 251 P.3d 523, 530 (Colo. App. 2010). As evidenced below, a reasonable person in Wilhite's position would have known of the debts.

The Magistrate Judge erred as a matter of law in ruling that the IRS debt could not be considered. Doc. 115 at 32. As *Holman* itself demonstrates, the debt can be in existence prior to transfer or acquisition of the property. 505 F.3d at 1062-63 (debtor owed IRS debt prior to purchase of home in name of nominees). Moreover, the factors

---

[5] The factors are set forth in the Recommendation at pages 29-30 and also, for the Court's convenience, attached as an exhibit to this Objection.

[6] The Recommendation appropriately combines the *Holman* and CUFTA factors, as they are very similar in substance. CUFTA factors are labeled with letters in the statute, *Holman* assigns numbers. As it noted, "factor (1) is similar to CUFTA factors (e) and (i); factor (2) is similar to factors (d) and (j); factor (3) is similar to factor (a); factor (5) is similar to factor (b), and factor (6) is similar to factor (h)." Doc. 115, 30 n.10. *See* Exhibit 1: List of *Holman* and CUFTA factors.

section of CUFTA is titled "Transfers fraudulent as to *present* and future creditors." COLO. REV. STAT. § 38-8-105 (emphasis added). The Magistrate Judge found that in 1997, Wilhite knew of his substantial past tax debt and the IRS lien. Rec. FOF ¶ 5.  He had been working for years, but for the full period since the tax debt arose (1993), he had received no salary and had kept all assets out of his name. *Id.* ¶¶ 3, 5, 7.  To conclude that a current debtor cannot be held liable for the same avoidance actions as a debtor worried about a future debt, is illogical, and contrary to the legal standards.

The Recommendation notes that because of the IRS lien, Wilhite was unable to secure a loan or line of credit necessary to form AFC due to a "poor credit profile." Doc. 115 at 32. The Magistrate Judge implied this explanation and the conclusion that Mrs. Wilhite is a nominee are mutually exclusive. However the fact that Wilhite's credit was bad due to the substantial tax debt he had been avoiding for years does not excuse his conduct in directing his paychecks to DW Support, rather than paying the IRS. Wilhite's poor credit is not a mitigating factor and the Recommendation cites no law to suggest it is. Indeed, it is expected that a judgment debtor would have poor credit as a result of their debt.

The evidence further establishes another debt: since Wilhite committed fraud prior to 1997, a reasonable person in his shoes should have known of the possibility of restitution. *United States v. Loftis*, 607 F.3d 173, 177-78 (5th Cir. 2010) ("[criminal debtor] should have reasonably believed that he was incurring debts beyond his ability to pay when he defrauded Lockheed and the government of millions of dollars.") (citing *United States v. Resnick*, 594 F.3d 562, 567 (7th Cir. 2010)). He knew the victim was induced to remit at least $1.7 million to the conspiracy as a direct result of Wilhite's

actions. (Ex. 24, 4 ¶ 8 (losses listed in Australian dollars).) Indeed, he directed the victim to remit funds to "Dee Medlicott," his wife's former name. (Ex. 7, 3-4; *Fact Stipulated by Parties*, Tr. 339:10-13.)

He also knew by June 1997, that a criminal sanction was possible. *See United States v. Schippers,* 982 F. Supp. 2d 948, 967 (S.D. Iowa 2013) (sufficient threat of suit when debtor knew SEC was "on his trail" even though no action had been brought at the time of transfer). In March 1997, after learning his co-conspirator had gone to prison, Wilhite hired a criminal defense attorney. Tr. 305:12-19. In June 1997, federal agents told him that he was the target of their investigation of a "fraud [that] involved over $5,000,000" and his "name is all over the paperwork." Rec. FOF ¶ 17. At the time of AFC's formation in November 1997, Wilhite had knowledge of two debts. Placing the company solely in his wife's name evaded Wilhite's present and future creditors, IRS and the victim of the fraud he had already committed. Finding otherwise was error.

### B.  Wilhite contributed to DW Support and AFC for no consideration.

Under *Holman* and CUFTA, the Court should consider whether the the debtor was "insolvent," whether "the transfer was substantially all debtors assets," and whether "inadequate or no consideration was paid by the nominee." *Holman*, 505 F.3d at 1065 n.1; COLO. REV. STAT. § 38-8-105(2)(e), (i). Contrary to the Magistrate Judge's conclusion, the evidence shows that these factors are met.

The Magistrate Judge acknowledged that at a time when Wilhite had no assets, he directed all of his paychecks to DW Support, which then contributed to the creation of AFC. Doc. 115 at 32-33. And it is undisputed that Wilhite received no consideration for the paychecks he directed to DW Support. Rec. FOF ¶ 24. In fact, Wilhite's $3,500

was at least 54%[7] of AFC's initial cash capital. And DW Support had no revenue except Wilhite's paycheck at that time. (Ex. L, 1-3.) The Magistrate Judge appeared to believe that he was unable to consider Wilhite's $3,500 because Mrs. Wilhite was listed as the owner of DW Support and also contributed $3,000 of her own money, which she borrowed from her mother. Doc. 115, at 32-33. Per the Court's analysis, Wilhite's $3,500 does not equate to a contribution for which consideration should be given. *Id.* 115, 32-33. However, the funds contributed to the formation of AFC by Mrs. Wilhite bestows her with a 100% ownership interest, and thus makes her the only spouse awarded equity in AFC.

The Magistrate Judge cited no legal basis for the assumption that Wilhite's majority contribution into AFC could not be considered. It is illogical and error that the two spouses' funds would be analyzed and weighed so disparately. Moreover, this analysis would set a dangerous precedent, as it would instruct fraudsters trying to avoid their government debts that they could contribute funds to a stand-alone entity as long as they made the contribution indirectly.

Wilhite received no consideration for his $3,500 capital contribution, nor did he receive consideration for later major contributions to AFC. Strikingly, Wilhite received no consideration for his operation of AFC for over 40 months, despite claiming to be running the business as an employee. *Supra*, § II, p. 5-6.  During that time, Mrs. Wilhite was also focused on establishing her business, DW Support. Rec. FOF ¶ 27, 36, 52.

---

[7] AFC's initial cash capital was in the form of Wilhite's $3,500 and a $3,000 loan from Mrs. Wilhite's mother, according to the Wilhites' testimony. Rec. at 22, 32-33. However, according to their own exhibits, the "Loan" from Mrs. Wilhite's mother did not occur until December 31, 1999, over two years after AFC was formed.  Ex. H. Therefore it is more likely that the $3,500 from Wilhite's paycheck was the *only* initial cash contribution for AFC, as the rest of its funding came from a line of credit.

Put simply, without Wilhite and his efforts to make AFC a successful company in that initial stage, there would be no AFC. The evidence shows that neither AFC nor Mrs. Wilhite gave consideration to Wilhite for these years of work. The Magistrate Judge's conclusion to the contrary is erroneous as a matter of law.

### C.  Wilhite has control over AFC.

The Magistrate Judge erred in its analysis of whether the debtor maintained possession and control of the property. *Holman*, 505 F.3d at 1065, n.1; COLO. REV. STAT. § 38-8-105(2)(b). He reasoned that Wilhite's "position as CEO or general manager of AFC does not itself confer ownership in the company." Doc. 115 at 33. That statement misapplies the law. While Wilhite's positions as CEO and general manager do not *per se* establish ownership, they do confer *control* over AFC. This factor looks to a debtor's *control* of the property, not to title. *McCallum Family L.L.C. v. Winger*, 221 P.3d 69, 75 (Colo. App. 2009) ("The proper inquiry [related to equitable ownership] is into the substance of the [company's] governance as well as its form.")[8]; *see also Freeman v. Complex Computing Co.,* 119 F.3d 1044, 1051 (2d Cir.1997) ("an individual who exercises sufficient control over the corporation may be deemed an 'equitable owner,' notwithstanding the fact that the individual is not a shareholder of the corporation").

---

[8] This analysis has been addressed in Colorado in the context of an alter ego analysis under the doctrine of piercing the corporate veil. As discussed in the government's proposed findings and conclusions, the *McCallum* analysis is applicable here. (Doc. 106 at 26 n.6); *see also Jones*, 2012 WL 569366, at *11 ("nominee and alter ego doctrines are closely related equitable creditor's remedies that focus on control").

Control is the least disputed issue regarding Wilhite's relationship to AFC. The Wilhites admit he ran the company from 1997 through 2008.[9] Rec. FOF ¶ 60. The Magistrate Judge did not consider other testimony and exhibits showing Wilhite's control of AFC, described in detail by the government's proposed findings. Doc. 106, 10-17, 20-23, 30-31. Instead, he compared Wilhite's authority to that of an officer at AFC, doc. 115 at 33, and relied exclusively on titles and paperwork, or on "form over substance." *McCallum*, 22 P.3d at 75. Similar to the debtor in *McCallum*, it is uncontested that Wilhite is not an owner on paper. It is his *conduct and control* of the company that show this factor is met. The Magistrate Judge erred in concluding otherwise.

### D.  The Recommendation incorrectly applied a rigid "scoreboard" method in the application of the nominee factors.

In its analysis of nominee factors, the Recommendation failed to look to the totality of the circumstances as required under *Holman*. Instead, it employed a "scoreboard" approach. It found that factors looking to insider relationship ("factors (3) and (a)") and benefiting from the property ("factors (6) and (h)") weighed in the government's favor, and found factor (4), whether interest was recorded, was neutral. It then found the remaining three factors, anticipation of a debt ("factors (2), (d), and (j)"), lack of consideration ("factors (1), (e), and (i)"), and control ("factors (5) and (b)") weighed in the Wilhites' favor, as discussed, *supra*. Doc. 115. at 31-33.

The Magistrate Judge erroneously analyzed each factor individually and with equal weight. Doc. 115 at 31-34. In the analysis of each factor, he stated whether the

---

[9] Indeed, the reason the Wilhites' concession ended in 2008 was because they were committed to the story of Wilhite's "retirement", which the Court acknowledged was a sham meant to evade the United States by removing Wilhite from AFC's payroll when in fact his schedule did not change. Doc. 115 at 32 n.12.

government "convinced"[10] the Magistrate Judge that the evidence establishes the factor. *Id.* If he found the government had proven a factor, he "weighed" the factor in favor of finding a nominee. *Id.* But if he found the government did not prove the factor, the factor "weighed in favor of Wilhites' position." *Id.* at 33, 34. The Court then tallied the results, finding that the Wilhites' position had one more factor in its favor than the government. Doc. 115 at 34.

The Recommendation's overall analytical approach to the nominee claim is erroneous for two reasons. First, the "scoreboard" approach failed to consider that the applicable nominee factors should be employed flexibly, focusing on the totality of the circumstances of the case. "Stepping back from the trees to scrutinize the forest, the Court is reminded that, *far from a mechanical checklist of factors*, the 'ultimate inquiry' in any nominee analysis is whether the taxpayer or the purported nominee is 'the true beneficial owner of the property.'" *Spotts v. United States*, 429 F.3d 248, 253 n.2 (6th Cir. 2005) (emphasis added)[11]; *see also Berkshire Bank v. Town of Ludlow, Mass*, 708 F.3d 249, 253-54 (1st Cir. 2013). Indeed, there is no requirement that each of the factors be present in every case (*United States v. Jones*, No. SACV 09-2792 DOC (ANX), 2012 WL 569366, at *11 (C.D. Cal. Feb. 17, 2012)), and even the presence one factor may be enough to find a nominee. *United States v. Spencer*, No. 10-CV-229-TCK-PJC, 2012 WL 4577927 at *7 (N.D. Okla. Oct. 2, 2012). Thus, the Recommendation failed to "step back from the trees to scrutinize the forest." *Spotts*, 429

---

[10] The government's burden is to prove, by a preponderance of the evidence, the property interest alleged in the writ of execution. *See United States v. Reed*, 168 F.Supp.2d 1266, 1271 n.1 (D. Utah, July 19, 2001). To the extent the Recommendation appears to impose a greater burden of proof ("convincing"), it constitutes legal error. Doc. 115 at 33.

[11] *Holman*'s six factors were adopted from the *Spotts* case. *Holman*, 505 F.3d at 1065, n.1

F.3d at 253 n. 2. Instead, it employed an incorrect, rigid method of tallying the factors for each party, which created a mechanical reliance on them without regard to how they relate to the case and to the equities as a whole.

Second, the "scoreboard" approach is especially problematic because the nominee factors should not be "weighted" equally. *In re Richards*, 231 B.R. 517, 579 (E.D. Pa. Jan. 29, 1999) ("[Factors] should not be applied rigidly or mechanically, as no one factor is determinative"). In fact, certain factors are more indicative of nominal ownership than others, with control being the most significant. *Id.*; *accord United States v. Novotny,* 2001 WL 1673628 at *3-4 (D. Colo. 2001); *United States v. Welch*, No. 11-CV-02292-CMA-KLM, 2013 WL 1444053, at *15 (D. Colo. Mar. 13, 2013), *rec. adopted* 2013 WL 1442627 (D. Colo. Apr. 8, 2013).[12] The correct totality of the circumstances approach should be applied as discussed.

### E.  The Court erred in failing to consider additional factors.

The Magistrate Judge also erred in appearing to apply the factors analysis as if they are an exclusive list. But, the *Holman* and CUFTA factors are non-exclusive. *See* COLO. REV. STAT. § 38-8-105 cmt. 6 (the court may look beyond the non-exclusive factors and take into account all indicia of fraud). Thus, the Magistrate Judge should have considered other badges of fraud or indicia of ownership in the totality of the circumstances.

Notably, as discussed in the government's proposed findings ¶¶124-129, and proposed conclusions § III.C.9, the beneficial owner of an asset holding himself out as the owner of that asset is clear indicia that he is a true owner. *See* Doc. 106 at 34-35;

---

[12] Although the Court found the control factor weighed in Wilhite's favor, it did so erroneously, as discussed above.

*United States v. N. States Investments, Inc.*, 670 F. Supp 2d 778, 789 (N.D.Ill. 2009). The Wilhites have held Wilhite out as AFC owner on numerous occasions. *See* Doc. 106 at 18-19. Their only explanations for these admissions were not credible (they were a "mistake," a "misstatement," or they "misspoke", doc. 106 at 18-19, 35). The Magistrate Judge referred to these facts, if at all, in isolation, apparently accepting the Wilhites' implausible explanations. Doc. 115 at 23.

Further, many of the CUFTA and *Holman* factors address a debtor's intent to defraud creditors. Federal Rule of Evidence 404(b) permits a court to consider evidence of prior wrongs or acts to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Here, the Magistrate Judge found that Wilhite had not had an asset in his name since 1992 (despite his role as CEO of a successful company) and that Wilhite's "retirement" in 2008 was an act intended to evade the United States from garnishing his wages. Doc. 115 at 4 & 32, n.12. But the Magistrate Judge failed to consider the noted conduct as showing Wilhite's evident intent, motive, and plan to evade the United States as a creditor. That is, since Wilhite attempted to evade the United States' restitution-enforcement efforts in 2008, his earlier conduct --- organizing a company in Mrs. Wilhite's name that would be primarily run and operated him --- should be seen in the same light.

### F.  The Magistrate Judge erred in failing to look to equities under a constructive trust theory.

The Court also erred in declining to address and find that Mrs. Wilhite holds Wilhite's majority interest in AFC through imposing a constructive trust. Doc. 115 at 34.

The Recommendation erred in finding that the theory employs the same analysis as the nominee factors analysis. *Id.*

Unlike the nominee factors analysis, constructive trust looks to unjust enrichment of the holder of the property. *Mansuco v. United Bank of Pueblo*, 818 P.2d 732, 737 (Colo. 1991). As discussed in the government's proposed conclusions, Mrs. Wilhite and AFC have been unjustly enriched by virtue of Wilhite's years of operating and managing AFC, often without pay. Doc. 106 at 35-37. Wilhite worked almost eleven years, from 1997 to 2001 and 2008 through the present, without pay. Indeed, Mrs. Wilhite's salary doubled during the first pay period that Wilhite was taken off payroll. Rec. FOF ¶ 64. He also has never received a profit distribution in his name. On top of her paycheck, Mrs. Wilhite enjoys these significant distributions. In that time Wilhite has managed the company, building it from the ground up, and even negotiating a multi-million dollar sale as an unpaid "owner's representative." Tr. 271:20-24. As a result, Mrs. Wilhite has been unjustly enriched by virtue of her husband's industriousness and travail. It is against equity for Mrs. Wilhite to retain exclusive ownership of the company while Mr. Wilhite remains "penniless," enjoying the benefits of AFC and evading his victim and the government. Therefore, the Court should impose a constructive trust.

IV.   **The Court erred in finding no legal interest in AFC.**

The evidence shows Wilhite has a legal ownership interest by virtue of the flexible limited liability company statute in Colorado. The Colorado Limited Liability Company Act ("CLLCA") defines a member as "a share of the profits and losses of a limited liability company and the right to receive distributions of such company's assets." COLO. REV. STAT. § 7-80-102(1). It does not assign any required acts to members, nor

does it require membership to be evidenced in writing. It is within the legal framework of LLCs in Colorado that Wilhite is a member of AFC without any written evidence of his membership. The Recommendation erred when it rejected the four indicia of membership proposed by the government, which were governance rights, management rights, financial rights, and contributions. Doc. 115, 20 (citing Doc. 106, 20-23). As discussed in the government's proposed conclusions, the evidence demonstrates that under those criteria, Wilhite has a majority legal interest in AFC. Doc. 106 at 21-23.

Instead of adopting the indicia of membership framework, the Recommendation reasoned that membership can only be shown through an "affirmative act", and such act cannot be assigned by estoppel. Doc. 115 at 20 (citing 1 Ltd. Liab. Co.: L., Prac. & Forms § 6:7 (2015). Even under this framework, the Recommendation erred in finding that Wilhite had not made affirmative acts to be a founding member. It is undisputed that more than half of AFC's initial capital came from Wilhite's Steel Dimensions paychecks. (Def. Ex. L, p. 3.) In the Magistrate Judge's analysis, Wilhite's $3,500 did not equal an "affirmative act" of contribution, because those funds were first deposited in DW Support's account. Doc. 115 at 22. He reasoned that because the Wilhites funneled his money through his wife's account, he could not have affirmatively contributed that money to the AFC account "himself." *Id.*

This conclusion — that Wilhite lost power over his wages because they were placed in his wife's account — improperly suggests that an individual can never retain dominion or control over an asset through another individual, including when the individuals plan to form a company together. Wilhite directed his pay into an account controlled by his wife because, without a bank account of his own, he needed a means

to funnel his pay from Steel Dimensions to AFC. Rec. FOF ¶ 3, 22-24. Indeed, Mrs.

Wilhite admitted that she founded DW Support solely to receive Wilhite's paychecks,

and DW Support did not have any other source of income or revenue until after AFC's

formation in December 1997. (Ex. L.) The evidence thus supports a finding that Wilhite

affirmatively contributed to AFC as a founding member.

Next, the Court determined that Wilhite did not perform an "affirmative act" of

services as a member. Doc. 115 at 23. As discussed, *supra*, this conclusion is not

supported by the evidence. Wilhite left a paid position with Steel Dimensions to work at

AFC, which he managed without compensation until February 2001, and since August

2008. This free labor and management represent a significant and valuable contribution

of services to the company. *See Fed. Nat. Mortg. Ass'n. v. Grossman*, No. 12-2953,

2014 WL 4055371, at * 6 (D. Minn. Aug. 15, 2014) ("The fact that a manager of an LLC .

. . receives no salary or other compensation supports the inference – absent any

plausible explanation as to why the manager would now work for free – that manager is

deriving some beneficial interest by managing that company"). Therefore, the

conclusion that he did not affirmatively contribute services as a member of AFC is

unfounded. While the CLLCA is flexible, it is not meant to "create an asset shelter for

clever debtors." *In re Albright*, 291 B.R. 538, 541 (Bankr. D. Colo. 2003). The Court's

conclusion allows this result.

**V.      The Magistrate Judge erred in failing to conclude that Yahab Foundation
         was formed with the intent to evade the United States during this litigation.**

The Magistrate Judge found that because the government did not establish that

Wilhite has a membership interest in AFC, he would not have an interest in the bank

account of Yahab Foundation ("Yahab"), a non-profit corporation Mrs. Wilhite started during the government's investigation of the Wilhites.[13]

This constitutes legal error because, as shown above, the Magistrate Judge also erred with regard to Wilhite's interest in AFC. Moreover, this is error because the Wilhites acted with fraudulent intent in dissipating AFC's assets during litigation, which is further 404(b) evidence of their intent to evade the government. The evidence shows that after being served with deposition subpoenas in September 2014, and just days before being deposed, Mrs. Wilhite created Yahab. Further, while Wilhite claimed to have no interest in Yahab, he was present during meetings with his accountants related to Yahab's creation. And on December 31, 2014, after Wilhite consulted with his accountant, AFC transferred $200,000 to Yahab. (Ex. 37.) Yahab then spent $173,000 on gold-coins purchases in transactions that Wilhite arranged and made. Yahab has not done anything with the gold coins, which are stored in a safe on the Wilhites' property.[14] The transfer that Wilhite directed was yet another effort to evade the United States while the Wilhites and AFC were subject to litigation regarding Wilhite's restitution enforcement. Thus, this portion of the Recommendation should be rejected, and the Court should deny the motion to quash the writ of garnishment.

VI.    **Conclusion.**

The Recommendation incorrectly focuses a great deal on the documents and actions of Mrs. Wilhite that it believed indicated that she was the owner of AFC. It then treats the evidence that supports her ownership interest as if it inherently negates the

---

[13] The Magistrate Judge held an evidentiary hearing on the government's writ of garnishment issued to the Yahab account. Doc. 67.
[14] Even if the coins had been sent to a charity, the activity of creating a foundation to dissipate AFC's liquid assets during litigation was still fraudulent. *CB Richard Ellis*, 251 P.3d at 529 ("[A] person should be just to his creditors before he is generous to others").

government's assertion that Wilhite is an owner as well. It does not. The United States does not seek to execute on 100% of AFC, because Mrs. Wilhite has a minority interest in AFC. Thus, the Court does not have to choose between Wilhite and Mrs. Wilhite as owners; rather, it merely has to determine if Wilhite had *some* ownership interest that was concealed under his wife's name.

The proper inquiry looks to the totality of conduct and actions of Wilhite and not the paperwork completed by Mrs. Wilhite; that is, function, not form. The Recommendation's ultimate conclusions undermine the basic tenets of nominee law by suggesting that evidence of nominal ownership negates evidence of beneficial ownership. In fact, its conclusions provide a roadmap for a business owner wishing to evade his creditors; he need only have a spouse claim to be title "owner" while he claims the title "CEO" or unpaid "owner's representative." Tr. 271:20-24. In a nominee case, it is axiomatic that a debtor will deny the existence of the ownership interest he has attempted to conceal. For this reason, nominee theory requires a court look behind the paper of ownership, and to the conduct of the so-called owners and the debtors.

In sum, the objections should be sustained and the portions objected to should be rejected. The Court should conclude that Wilhite has both a majority equitable and legal interest in AFC.

Respectfully submitted,

*s/Elizabeth M. Froehlke*
Assistant United States Attorney
1225 17th Street, Suite 700
Denver, CO 80202
Phone: 303-454-0126
E-mail: Elizabeth.Froehlke@usdoj.gov

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I hereby certify that on December 14, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

rbednarski@shermanhoward.com
Smikulec@sah.com
Juan.villasenor@usdoj.gov

and I hereby certify that on the same date as above, I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated above the nonparticipant's name:

None.



s/Elizabeth M. Froehlke

United States Attorney's Office