IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 00-cr-0504-CMA-MEH

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MICHAEL D. WILHITE,

    Defendant.

## UNITED STATES' BRIEF ON DEFENDANT'S OWNERSHIP INTEREST SHARE IN ADVANCE FLOOR CONCEPTS, LLC

The Court has concluded that Defendant Michael Wilhite has an equitable interest in Advanced Floor Concepts, LLC ("AFC") and Yahab Foundation ("Yahab"), which is subject to execution. Doc. 121 at 29. In the Order, the Court requested briefing "on the best method for determining Mr. Wilhite's percentage ownership of AFC and the assets of [Yahab]." *Id.* at 28-29.

The United States submits that the best method to determine Mr. Wilhite's equitable interest in AFC and, by extension, on Yahab's assets, is to ascertain the extent of his "contributions" under the Colorado limited liability company ("LLC") statute. Under that statute, a person may become a member of an LLC by contributing cash, property, or services to that LLC. Colo. Rev. Stat. § 7-80-102(4); *see also id.* § 7-80-501. And a member's interest in an LLC entitles him to receive the LLC's profits and losses, and the distributions of cash or other assets, "on the basis of the value … of the contributions made." *Id.* §§ 7-80-503 and 504. Application of the above principles in an

equitable fashion shows that Mr. Wilhite owns between 66.66 percent and 100 percent of AFC and, by extension, of Yahab's assets.[1]

## I.  Mr. Wilhite's ownership share in AFC ranges between 66 and 100 percent.

In this writ-of-execution proceeding, the United States is enforcing a $1.7 million criminal restitution judgment entered against Mr. Wilhite resulting from his guilty plea for a crime that involved "fraud or deceit." 18 U.S.C. §§ 3663A(a) and A(c)(1)(A)(ii) (making restitution mandatory for such crimes). Significantly, a "restitution order results in a lien in favor of the government on all of the Defendant's property, and rights to property."[2] *United States v. Thomas*, 165 F. Supp. 3d 992, 995 (D. Colo. 2015) (citing 18 U.S.C. § 3613(c), (f)). "Thus, the government has an interest *in all of the Defendant's property* for purposes of enforcing the restitution order and collecting the unpaid debt." *Id.* (emphasis added).

The government proceeded under a nominee theory, and the Court agreed that Mr. Wilhite has an *equitable* ownership interest in AFC and Yahab. Doc. 121 at 17, 28. In such proceedings, the Court sits in equity. *Id.* at 14. "Equity looks to the substance of a transaction rather than its form." *Ciccarelli v. Guar. Bank*, 99 P.3d 85, 88 (Colo. App. 2004), *overruled on other grounds by Lewis v. Lewis*, 189 P.3d 1134 (Colo. 2008). "The

---

[1] Yahab's assets are approximately $14,000, and are subject to a writ of garnishment. Docs. 53 and 56.

[2] The government need *not* prove that Mr. Wilhite's interest in AFC traces back to his crimes. Because all of Mr. Wilhite's property is subject to the lien under 18 U.S.C. § 3613(c), regardless of the source or where the property came from, such tracing is not necessary in the restitution context. The government, however, must demonstrate such traceability in a forfeiture proceeding. *See, e.g.*, 18 U.S.C. § 981(a)(1)(B) (subjecting to forfeiture any "property, real or personal, which constitutes or is derived from proceeds traceable to a violation of [multiple sections] … of this title or any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense[.]").

purpose of a court sitting in equity is to promote and achieve justice with some degree of flexibility; in other words, the court is to examine substance over form." Doc. 121 at 14.

In determining the equitable ownership share (or percentage) Mr. Wilhite has in AFC, the Court should consider the extent to which Mr. Wilhite's actions in forming and running AFC were "contributions." Under Colorado law, to become an LLC member with membership-interest rights, an individual *may* make a "contribution" but is not required to do so. Colo. Rev. Stat. § 7-80-501. The LLC statute broadly defines that term as "anything of value that a person contributes to a [LLC] to become a member in the [LLC] or in the capacity of a member in the [LLC], including cash, property, or services rendered or a promissory note or other binding obligation to contribute cash or property or to perform services." *Id.* § 7-80-102(4).

In turn, a membership interest consists of the "share of the profits and losses of a [LLC] and the right to receive distributions of such company's assets." Colo. Rev. Stat. § 7-80-103(10). While no Colorado case law has expounded on the membership-interest definition, generally an LLC member enjoys the following three categories of membership-interest rights:

> **1. Governance rights** entitle the member to decide on the fundamental structural issues of the LLC such as admission of new members, dissolution, merger and acquisition and to decide issues of basic governance policy with respect to the internal affairs of the LLC as an entity;
>
> **2. Management rights** entitle the member to participate in the operation of the business of the LLC and to pursue the business purpose of the LLC; and
>
> **3. Financial rights** entitle the member to receive or realize value from the LLC in the form of distributions of profit, an ownership interest in the

> assets of the LLC and appreciation in the worth of the membership interest of the member.

Nicholas G. Karambelas, 1 Ltd. Liab. Co.: L., Prac. and Forms § 7:3 (2015) ("Karambelas").[3]

Further, the statute provides that the LLC's profits and losses, and the distributions of cash or other assets, must be allocated "among the members … on the basis of the value … of the contributions made." Colo. Rev. Stat. §§ 7-80-503 and 504. Thus, for example, in *Langley v. Langley Properties, LLC*, No. 2010CV1340, 2011 WL 3645498 (Colo. Dist. Ct. July 28, 2011), the trial court held that because the member had made "100% of the cash contributions to Langley Properties, he [was] entitled to 100% of the profits, losses and assets of Langley Properties." *Id.* at *4.

Applying those principles here, the evidence shows that Mr. Wilhite made contributions to gain membership-interest rights in AFC by providing cash and services rendered. Colo. Rev. Stat. § 7-80-501. When each contribution is considered, they establish that Mr. Wilhite has an ownership share in AFC (and Yahab's assets) ranging between 66.66 percent and 100 percent.

---

[3] While this brief focuses on financial rights, because the Court sits in equity, it also should consider the totality of the circumstances (including management and governance rights) in fixing Mr. Wilhite's membership-interest share. As the Court found, Mr. Wilhite exercised significant management and governance rights over the AFC since its inception. Doc. 121 at 2 ("[Mr. Wilhite] worked as a manager and CEO for the company from its inception"); *see also* Pl. Exs. 9 (contracting authority); 11 (price/product control); 39 (inventory control); 43 (employee control); 36, 37 and 47 (merger and acquisition authority); Doc. 98 at 259:23-25; 350:20-22; 351:8-19; Doc. 99 at 649:7-9; 674:3-5 (CEO/manager control); Doc. 98 at 367:9-16, 386:21-23, and Doc. 99 at 582:6-18 (corporate decision making authority); Doc. 99 at 483:7-8; 624: 20-22; 670:1-6, 16-18; 652:20-22 (hiring/firing authority).

### A. Mr. Wilhite's cash contributions to AFC equate to a 100 percent membership interest in AFC.

As just noted, an individual may obtain membership-interest rights in an LLC by making a "cash" contribution. *Id.* Mr. Wilhite made two significant cash contributions to AFC: (1) 100 percent of AFC's initial cash capital; and (2) cash contributions in the form of the paychecks he deposited to DW Support, which then served as collateral to secure a $25,000 line of credit for AFC. These contributions were significant for a simple reason: without the initial cash capital and the collateral, AFC would not have gotten off the ground. Put differently, the cash contributions allowed AFC to begin operations.

First, the evidence shows that Mr. Wilhite contributed 100 percent of AFC's initial cash capital. As the Court correctly found, Mr. Wilhite "was able to contribute $3,500 in cash from his Steel Dimensions paychecks" as starting capital for AFC. Doc. 121 at 20. The Court also found that Mr. Wilhite never received any consideration for his contribution. *Id.* at 24; Doc. 97 at 216:9-14. Mr. Wilhite's cash contribution represents 100 percent of AFC's starting capital because the other cash infusion into AFC was a $3,000 *loan* from Mrs. Wilhite's mother. *Id.* at 84:10-24; Def. Ex. H. Critically, Mrs. Wilhite made no initial cash contribution with her own money to fund AFC. Doc. 97 at 248:21--249:1-4. Rather, AFC obtained a loan from Mrs. Wilhite's mother to fund AFC, but AFC paid that loan back. *Id.*

Second, the evidence also shows that Mr. Wilhite made an indirect cash contribution to support the main collateral so that AFC could obtain its $25,000 initial line of credit. As the Court correctly found, Mr. Wilhite contributed all of his paychecks from Steel Dimensions between April and October 1997 to DW Support, a company that was created *solely* for the purpose of receiving his paychecks. Doc. 121 at 7, 25. Those

5

paychecks, which totaled $21,562.66, were deposited into DW Support's bank account. *Id.* At the time, Mr. Wilhite's paycheck deposits were DW Support's *exclusive* source of revenue. Def. Ex. L at 1-3 (Payee Column "Steel Dimensions" and Deposits Column). Thus, in early November 1997, when Mrs. Wilhite applied for and obtained a line of credit, she pledged DW Support as collateral. Yet, it was Mr. Wilhite's paychecks that gave DW Support value as collateral. Doc. 97 at 79:5-12; 84:21-25; 85:1-15; 249:1-4; Def. Exs. G, L.[4] The significance of this indirect contribution to buttress the collateral for AFC's line of credit cannot be understated because the Wilhites used the line of credit to fund AFC's initial operations. Doc. 97 at 89:10-12.

Given that the above contributions represent 100 percent of the cash contributions used to get AFC off the ground, the Court may properly conclude that Mr. Wilhite has a 100 percent equitable membership share in AFC. Such a conclusion comports with the allocation of membership-interest percentages under the LLC statute. Generally, LLC membership-interest "percentages are allocated according to the dollar value of the contribution which each member makes to the LLC bears to the dollar value of the total contributions to the LLC." Karambelas § 7:3; *see also* Colo. Rev. Stat. §§ 7-80-503 and 7-80-504. And the membership-interest "percentage bears a mathematical relationship to the type and value of the contribution made to the LLC by each member." Karambelas § 7:3.

Here, because Mr. Wilhite made "100% of the cash contributions to [AFC], he is entitled to 100% of the profits, losses and assets of [AFC]." *Langley*, 2011 WL 3645498,

---

[4] Mrs. Wilhite also pledged as collateral a truck the Wilhites shared, a Jeep, and personally guaranteed the loan. Doc. 97 at 87-89:1-9.

at *4. Therefore, the evidence supports apportioning Mr. Wilhite with a one-hundred percent membership interest in AFC.

>   **B.   Mr. Wilhite's contribution of services rendered to AFC equate to a 66.66 percent membership interest in AFC.**

As noted above, an individual also may become an LLC member with membership-interest rights by making a contribution of "services rendered." Colo. Rev. Stat. § 7-80-501. The LLC statute, however, does not define that phrase. In interpreting a statute, the Court initially looks to the statute's language. *People v. McCullough,* 6 P.3d 774, 778 (Colo.2000). In doing so, the Court must "read words and phrases in context and construe them literally according to common usage unless they have acquired a technical meaning by legislative definition." *Klinger v. Adams Cty. Sch. Dist. No. 50*, 130 P.3d 1027, 1031 (Colo. 2006) (citing *People v. Yascavage,* 101 P.3d 1090, 1093 (Colo. 2004)). Generally, "services," when used as a noun, means "employment in work for another." *American Heritage Dictionary* 748 (3d ed. 1994).

In weighing Mr. Wilhite's services rendered to AFC, the Court should compare them with Mrs. Wilhite's services. The evidence shows that Mr. Wilhite has made a significant contribution in the form of services that amounts to, at a minimum, a 66.66 percent ownership share in AFC.[5]

---

[5] Even if Mr. Wilhite's "services rendered" to AFC were not a contribution under the law, the Court should deem them as creating a membership interest on AFC for him as a matter of equity. The LLC statute supports such a conclusion. Because a person "may be admitted to a[n] [LLC] as a member of the [LLC] and may receive a membership interest in the [LLC] *without making a contribution*," Colo. Rev. Stat. § 7-80-501 (emphasis added), the Court may properly deem Mr. Wilhite a member with membership-interest rights by reason of the significant amount of work (or "sweat equity") he has put into AFC since its inception. In this regard, the Court correctly found that Mr. Wilhite exercised sufficient control over AFC by exercising management rights, governance rights, and by benefitting from "the use of the property." Doc. 121 at 24-25.

The Court correctly found that Mr. Wilhite has served as AFC's "CEO and general manager from its inception." Doc. 121 at 8. The record amply supports this finding. Mr. Wilhite testified that he worked full time as CEO between 1997 and 2008. Doc. 98 at 350:13-22. While he claimed that he "retired" in 2008, the Court found that he lied. Doc. 121 at 27. Mr. Wilhite continued to act as CEO after 2008, leading the negotiations in 2013 to sell AFC to Kodiak Building Partners ("Kodiak"). Pl. Ex. 45 at 5 (signing letter of intent to enter into negotiations as CEO). And, as he wrote in an email to Kodiak, he intended to "continue to operate the company at his current work schedule and salary until December of 2015." Pl. Ex. 44 at 1; Doc. 98 at 377:4-22.

The Court should reasonably infer that, as CEO, Mr. Wilhite worked full time between October 1997 and March 2014. Assuming, that full-time work is 40 hours per week and one day is 8 hours, Mr. Wilhite worked 30,800 hours for that period of time.[6]

By contrast, during the same period, Mrs. Wilhite worked 15,400 hours. In her deposition, Mrs. Wilhite claimed that she split her time evenly between AFC and DW Support between October 1997 and 2014. Attach. 1, Dee Wilhite Depo. at 57-59. Assuming Mrs. Wilhite also worked a 40-hour week and split her time evenly between the two companies from October 1997 to March 2014, her services rendered to AFC would be 15,400 hours.

To determine the value of the Wilhites' services rendered as a "contribution" to obtain membership-interest rights in AFC, it is necessary to determine a membership-interest percentage of their respective contributions. And the membership-interest "percentage bears a mathematical relationship to the type and value of the contribution

---

[6] The government assumes, conservatively, that the Wilhites worked 50 weeks per year. Thus, in one year, they would have worked 2,000 hours (40 hours x 50 weeks).

8

made to the LLC by each member." Karambelas § 7:3. Assuming that each hour of services provided by the Wilhites has the same value, and adding up the hours the Wilhites worked over the relevant time period (30,800 + 15,400), equals 46,200 hours. Thus, Mr. Wilhite's contribution in services rendered was 66.66 percent (30,800/46,200) while Mrs. Wilhite's was 33.33 percent. Therefore, under this scenario, Mr. Wilhite's ownership share in AFC (and, by extension, in Yahab's assets) is 66.66 percent.

The above calculation has not accounted for the Wilhites' respective compensation they have received from AFC. If that were factored in, it would show a significant disparity. Despite that Mr. Wilhite provided to AFC two-thirds more services than Mrs. Wilhite, he earned approximately one-fourth of her compensation. As the Court found, Mr. Wilhite received no salary or compensation for his services at AFC between November 1997 "until February of 2001," or for 40 months.[7] Doc. 121 at 8; Pl. Ex. 24 at 6. And he has not received any compensation since August 2008. Pl. Ex. 24 at 6-10. Further, Mr. Wilhite only drew a salary between February 2001 and August 2008, for a total compensation of $228,971.67. *Id.* By contrast, between August 1999 and March 2014, Mrs. Wilhite drew $949,407.43 in salary. *Id.* at 1-6.

The disparate treatment in compensation continues to this day. In 2015, Mrs. Wilhite's annual salary was $146,700, while Mr. Wilhite's was $0. Attach. 2 at 10 (filed under restriction level 1). In addition, in its 2015 federal income tax return, AFC had gross revenue of over $8 million; gross profit of $1.3 million; and a net profit of $440,608. As of December 31, 2015, AFC also had retained earnings[8] of $526,777. *Id.* at 4. As the Court correctly found, "Mrs. Wilhite is the sole support for the couple and

---

[7] It appears that the Court mistakenly calculated the length of time as 18 months.
[8] Retained earnings are a "corporation's accumulated income after dividends have been distributed." EARNINGS, *Black's Law Dictionary* (10th ed. 2014).

[Mr.] Wilhite certainly has benefitted from any distributions paid to Mrs. Wilhite from AFC." Doc. 121 at 26.

In sum, in terms of services rendered to AFC, Mr. Wilhite's ownership share in the company should be 66.66 percent. That percentage accounts for Mr. Wilhite's significant "sweat equity" in the form of hours worked at AFC as CEO since its inception until 2014, during which he helped the company get off the ground and become successful.

## II. Conclusion.

The Court has correctly concluded that Mrs. Wilhite holds AFC as Mr. Wilhite's nominee and that, as a result, Mr. Wilhite has an equitable ownership interest in AFC and Yahab's assets. Doc. 121 at 29. Because the Court's task "is to promote and achieve justice," *id.* at 14, it should conclude that Mr. Wilhite has an ownership share in AFC between 66.66 percent and 100 percent, considering the extent of his cash and services contributions to AFC. If the Court gave equal weight (and, thus, value) to the services and the cash contributions Mr. Wilhite has provided to AFC, he should have an 83.3 percent share in AFC.[9] Similarly, the Court also should conclude that Mr. Wilhite has an interest in Yahab's assets ranging between 66.66 percent and 100 percent.

---

[9]To arrive at that figure, add 66.66% (minimum services provided contribution) to 100% (cash contribution), and divide by 2.


Respectfully submitted,

ROBERT C. TROYER
Acting United States Attorney


s/Juan G. Villaseñor
JUAN G. VILLASEÑOR
ELIZABETH M. FROEHLKE
Assistant United States Attorneys
United States Attorney's Office
1225 17th Street, Suite 700
Denver, CO 80202
Phone: 303-454-0185
E-mail: juan.villasenor@usdoj.gov

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on November 1, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

rbednarski@shermanhoward.com
Smikulec@sah.com

and I hereby certify that on the same date as above, I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated above the nonparticipant's name:

None.


s/Juan G. Villaseñor
United States Attorney's Office