**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Criminal Case No. 00-CR-00504-CMA-MEH

UNITED STATES OF AMERICA,

      Plaintiff,

v.

MICHAEL D. WILHITE,

      Defendant.

_____

**DEFENDANT'S AND INTERESTED PARTY'S BRIEF
REGARDING ISSUE OF TRACEABILITY**
_____

Defendant Michael Wilhite and Interested Party Darla Dee Wilhite, by their respective attorneys, hereby submit their Brief on the issue of traceability as ordered by this Court.[1]

## I.      PROCEDURAL BACKGROUND

On September 23, 2016, this Court issued its Order Rejecting Recommendation of United States Magistrate Judge holding, inter alia, that Mr. Wilhite had an equitable interest in Advanced Floor Concepts and an equitable interest in Yahab Foundation's bank account. (Doc. 121 at p. 27). The Court stated that it required additional

---

[1] This brief is filed to comply with the Court's Order but neither Defendant nor Interested Party are waiving any rights to appeal or contest this Court's Order Rejecting Recommendation of United States Magistrate Judge. (Doc. 121)

information from the parties as to the best method for determining Mr. Wilhite's percentage of equitable ownership of Advanced Floor Concepts and the assets of Yahab Foundation and, accordingly, the Court ordered the parties to brief the issue of "traceability" as to Mr. Wilhite's equitable ownership share in Advanced Floor Concepts and the assets of Yahab Foundation.  (Doc. 121, pp. 27-28).

## II.   ANALYSIS

The Defendant and the Interested Person have been unable to locate any relevant cases addressing the specific issue of traceability to provide guidance to this Court.  Although a few cases address traceability and equitable ownership, those cases address situations where a party had 100% ownership of an asset and transferred it to a third party or gave a third party all of the money necessary to purchase the asset.  *See Holman v. United States*, 505 F.3d 1060, 1065 (10th Cir. 2007), and cases cited therein. That is not the situation in this case.

However, the burden of proof remains with the plaintiff-creditor, the Government, in establishing the traceability of Mr. Wilhite's equitable ownership percentage. (Doc. 121 at 12) ("The burden of proof lies with the plaintiff-creditor to prove fraudulent transfer under the statute." (citing *Schempp v. Lucre Mgmt Grp., LLC*, 75 P.3d 1157, 1165 (Colo. App. 2003)).

No federal cases could be located that addressed how to determine the percentage of equitable ownership in an asset, which the Court seeks to determine here. Accordingly, because there appears to be no precedent to guide the Court in what

Active/43978966.1

it seeks to accomplish in this case, the Defendant and the Interested Person turn to analogous areas to provide guidance to this Court.

It is well established that this Court looks to state law to determine what rights Mr. Wilhite has in Advanced Floor Concepts which the Government seeks to reach. *See Holman v. United States*, 505 F.3d 1060, 1067 (10th Cir. 2007).   State law, however, provides no statutory or common law regarding "traceability" to determine an equitable percentage ownership in an asset.

Colorado corporate law, however, may provide an analogous area which may be utilized by the Court.  In accordance with C.R.S. §7-80-501, an ownership contribution of a member in a limited liability company may be in cash, property, or services rendered or a promissory note or other obligation to contribute cash or property or to perform services.  We believe this Court can analyze Mr. Wilhite's equitable interest in AFC and the assets of Yahab similarly.

**Cash, Property, Promissory Note, or Other Obligation**

There was no evidence at the hearing and this Court did not find that Mr. Wilhite provided any cash, property, promissory note, or had any other obligation to contribute cash, property or to perform services. Thus these portions of the statute are inapplicable.

This Court did find that Mr. Wilhite lent $3,500.00 to Advanced Floor Concepts through DW Support Services and received no consideration for the loan.  (Doc. 121 at 23).  Initially, it is important to note that the Colorado Statutes do not provide that money

lent to a company and repaid can be the basis for creating an ownership interest in the company.   Nonetheless, in the event the Court chooses to utilize money lent to Advanced Floor Concepts as a basis for determining ownership, Mr. Wilhite and Mrs. Wilhite present the following financial information for the Court's analysis.

Although this Court's Order stated that Mr. Wilhite lent $3,500.00 to Advanced Floor Concepts through DW Support Services, it is important to note that at the time the money was lent from DW Support Services to Advanced Floor Concepts in November, 1997, DW Support Services had only $1,288.78 in its bank account.  (Def. Exh. L, p. 3). As Mrs. Wilhite testified, she used overdraft coverage to fund the remainder of the $3,500.00 loan to Advanced Floor Concepts. The debt on that overdraft coverage was later repaid by funds earned solely by Mrs. Wilhite in December 1997. (Doc. 97 at 100:18-102:8;  Def. Exh.  L,  pg  3-12/30/97  Accounts  Receivable).    Accordingly, Mr. Wilhite, at best, lent only $1,288.78 to Advanced Floor Concepts through DW Support Services and Mrs. Wilhite lent the remaining $2,211.22 through DW Support Services' overdraft coverage.

The evidence at hearing also showed that Mrs. Wilhite lent Advanced Floor Concepts money through numerous sources:

a. She obtained a line of credit from Castle Rock Bank, and other banks, to provide financing when needed for Advanced Floor Concepts. (Doc. 97 at 79:10-12; 85:4-15; 89:10-25; 91: 6-8).  Those loans are noted on Defendant's Exhibit I and total $166,357.58.

Active/43978966.1

b. She obtained a loan from her mother for Advanced Floor Concepts in the amount of $3,000.00. (Doc 97 at 79:2-9; 84:5-24). That loan, which was repaid, is summarized on Defendant's Exhibit H.

c. She lent additional money from DW Support Services to Advanced Floor Concepts after Mr. Wilhite stopped working for Steel Dimensions and all income flowing into DW Support Services was the result of Mrs. Wilhite's work. Those loans are summarized on Defendant's Exhibit N and total $109,784.27.

The total of all the loans to AFC from all sources was $282,641.85. Mrs. Wilhite was responsible for lending $281,353.07 to AFC (including $3,000 from her mother). Mr. Wilhite lent $1,288.78 to AFC. The equitable ownership based on money lent to AFC would be 99.5% to Mrs. Wilhite and 0.5% to Mr. Wilhite. Even if this Court gives Mr. Wilhite the full $3,500.00 loan from DW Support and reduces Mrs. Wilhite's loans to $279,141.85, Mr. Wilhite would still only have a 1.20% equitable interest in AFC.

Therefore, it is clear based on the money lent to AFC that Mr. Wilhite has a negligible equitable interest in AFC ranging from 0.5% to 1.2% and Mrs. Wilhite has the remaining interest in AFC.

**Services Rendered**

Additionally, the Colorado statute states that ownership interest can be earned through services rendered. Although not expressly stated, logically this refers to unpaid services rendered, otherwise, there would be no consideration for the acquisition of

ownership interest since the member would have already received consideration through payment for the services rendered.

Both Mr. and Mrs. Wilhite worked for AFC without compensation during AFC's early years.  Mrs. Wilhite worked without a paycheck from formation of AFC until August 21, 1999, while Mr. Wilhite worked without a paycheck from formation of AFC until February, 2001.  (Gov. Exh. 24).  Mrs. Wilhite earned $52,371.12 from August 21, 1999 to February 28, 2001 when Mr. Wilhite began receiving a paycheck also.  If this Court were to consider Mr. Wilhite's unpaid services rendered from August 21, 1999 to February 28, 2001 to be valued the same as Mrs. Wilhite's services during that time, he could be credited with an additional $52,371.12 in member contributions.

Adding that amount to the amount Mr. Wilhite lent AFC, as discussed above, totals $53,659.90.  The total of the money lent to AFC by Mr. and Mrs. Wilhite and uncompensated services rendered is $335,012.97 and Mr. Wilhite's share is $53,659.90, which equates to Mr. Wilhite having a 16% equitable interest in AFC.

Even if this Court were to consider the compensated services rendered to AFC by Mr. and Mrs. Wilhite, Mr. Wilhite's equitable interest in AFC does not increase because Mrs. Wilhite shouldered the overwhelming majority of the risk, responsibility and work in making AFC a success.

### Duties, Responsibilities & Decision-Making Authority

This Court found that Mr. Wilhite "served as the CEO and General Manager of AFC from its inception."  (Doc. 121 at 7).  Specifically, this Court agreed with the

Government that because Mr. Wilhite "could hire and fire employees and direct their

duties, could adjust AFC's inventory, that he authored and implemented memos and

policies, and that he 'has knowledge of and participates in [AFC's] financial structure,'

and even that he participated in negotiations to sell the company", his role was

consistent with that of a CEO. (*Id.* at p. 24).  Therefore, his role as CEO was a factor in

this Court's determination that Mr. Wilhite had an equitable interest in AFC.  This Court

should examine both Mrs. Wilhite's role in AFC, as well as other employees' roles in

AFC, to determine Mr. Wilhite's equitable interest.

Mrs. Wilhite formed AFC.  Mrs. Wilhite handled all of the paperwork necessary

for incorporating the company, including preparing and filing AFC's articles of

organization (Doc. 97 at 110:16:20; 111:5-6; Ex. C); designating herself as the

registered agent, manager and owner of AFC (Doc. 97 at 111:2-4); signing the articles

of organization on October 24, 1997 (Doc. 97 at 111:7-8; Ex. C); setting up AFC's

Operating Agreement (Doc. 97 at 111:12-20; Ex. D); signing the Operating Agreement

as member and manager (Doc. 97 at 112:22-24; Ex. D); preparing the safety protocol

for AFC as President and owner (Doc. 97 at 113:7-12; Ex. D); signing AFC's Amended

and Restated Operating Agreement (Doc. 97 at 113:17-25; 114:1-5; Ex. E); applying for

the unemployment insurance tax account number (Doc. 97 at 116:24-25; 117:1-4; Ex.

F); applying for the wage withholding license (Doc. 97 at 117:5-12; Ex. F); applying and

signing the Colorado business registration for AFC (Doc. 97 at 117:15-23; Ex. F);

applying for an IRS employer tax identification number for AFC in her capacity as

manager/member (Doc. 97 at 118:2-11; Ex. F); receiving from the IRS the tax

identification number (Doc. 97 at 118:12-18; Ex. F); and applying and obtaining AFC's liability insurance, including worker's compensation, commercial liability, and vehicle insurance (Doc. 97 at 118:24-25; 119:1-24; Ex. F). Also, as described in detail above, she actively sought out loans and financing for AFC, including personally applying for and receiving a line of credit and personally guaranteeing the loan. Mr. Wilhite "did not have anything to do with" forming or financing AFC. (Doc. 97 at 119:25-120:1). Similarly, none of AFC's past or present employees were involved with the formation and/or financing of AFC.

From AFC's inception to today, Mrs. Wilhite has been heavily and intimately involved in AFC's day-to-day operations and she has never delegated her management duties: the final decision is with (and has always been with) her. (Doc. 97 at 218:1-4; Doc. 99 at 485:7-9). Nonetheless, when AFC began in 1997, it was never a one-woman show. AFC initially only had three employees – Mrs. Wilhite, Mr. Wilhite and Mr. Roger Otterstein – and consequently, they each had to wear many hats. (Doc. 98 at 322:4-6). Mrs. Wilhite was the bookkeeper and "was doing all of the accounting [herself], and purchasing supplies." (Doc. 97 at 123:12-15). She also handled the installation of the structural steel floors. (Doc. 98 at 322:4-6). Mr. Wilhite was involved as the General Manager, also handling sales, purchasing of materials, and installing the structural steel floors. Mr. Wilhite, however, did not handle any of the financial side of AFC. Instead, Mr. Wilhite assisted Mrs. Wilhite in running the day-to-day operations. (Doc. 99 at 464:15-21; 465:11-19).

Active/43978966.1

As AFC grew, Mrs. Wilhite hired more employees and delegated responsibilities for operating the company.  (Doc. 97 at 125:5-17).  For example, she "eventually hired an accountant to relieve [her] of doing payroll" but she "still oversaw all of the accounting, reconciling the accounts."  (Doc. 97 at 125:2-4).  She also gave employees such as Mr. Wilhite, Mr. Torin Jackson, and Ms. Fern Pena – among others – general authority to sign contracts and sign and deposit checks on behalf of AFC.  (Doc. 97 at 132:23-133-18; 134:12-135:4; 138:16-17; Exh. Q; Exh. 4; Exh. 5; Exh. 6).  Despite hiring employees and delegating responsibilities, Mrs. Wilhite continued being hundred percent involved in the company, including working out of the office almost every day with the rest of the employees. (Doc. 99 at 503:24-504:1; 618:4-7).  Mr. Wilhite has never solely ran the day-to-day operations of AFC.

Mrs. Wilhite continues to be involved in AFC, overseeing the "financial end of things", including AFC's accounting.  (Doc. 97 at 254:21-255:4; Doc 99 at 517:24-518:4; 618:4-7). For example, all major financial decisions (i.e., "whether we were going to invest or not invest; or hire people, not hire people, where we wanted to office out of, whether we were going to get bank loans or not, et cetera") go through her.  (Doc. 99 at 626:16-23).  Moreover, Mrs. Wilhite is in AFC's QuickBooks every day and is the go-to person for any questions regarding AFC's financials.  (Doc. 99 at 483:18-484:23).  Consequently, AFC employees recognize Mrs. Wilhite has the final authority regarding the financial decisions of AFC.  (Doc. 99 at 485:7-9; 626:16-23).

Torin Jackson, not Mr. Wilhite, is now responsible for AFC's day-to-day operations.  (Doc. 99 at 461:15-16; 472:5-9).  Mr. Jackson serves as the primary

contact for AFC's clients, he reviews and releases bids, reviews and signs contracts, schedules jobs to be done in the field, serves as the main contact for AFC's suppliers, and sets the pricing and estimating – in sum he is "the catchall."  (Doc. 99 at 461:4-14). While Mr. Wilhite still goes to the AFC offices 1 to 2 days a week, he has not worked full time at AFC since 2008.  (Doc. 99 at 466:7-14; 467:9-468:3; 468:14-20).

Despite Mr. Jackson's role in AFC, which is comparable to what Mr. Wilhite's role was with AFC at certain points since the company's formation, Mr. Jackson does not have a legal or equitable interest in AFC.  Notably, Mr. Jackson testified that when he started with AFC, Mr. Wilhite was not solely running the day-to-day, but rather, Mrs. Wilhite was also running the day-to-day.  Mr. Jackson does not speak with Mrs. Wilhite on a regular basis because "[t]here's not really a need" because the current AFC employees "running the day-to-day operations have been there a long time, and we kind of do the same type of business that we've always done. So, it runs pretty smoothly." (Doc. 99 at 470:12-15).


Mr. and Mrs. Wilhite believe there are two additional areas this Court should consider when determining Mr. Wilhite's equitable interest in AFC:  who bore the financial liability of AFC and the experience of both Mr. and Mrs. Wilhite when AFC was formed.

### Financial Liability

A review of both the hearing testimony and admitted exhibits shows Mrs. Wilhite shouldered all of the financial risk in forming AFC in 1997 and throughout its existence

to the present. She – not Mr. Wilhite – was and is personally liable to the banks for the lines of credits and loans, as well as commercial loans with AFC's different suppliers.  In short, it was Mrs. Wilhite who brought money, assets and credit to AFC – not Mr. Wilhite.  (Doc. 97 at 77:8-11; Exhs. G, O, and 3).

AFC, as a service-based business, needed funding for AFC in order to purchase a truck, tools, and material.  (Doc. 97 at 84:1-4).  To meet these needs, Mrs. Wilhite turned to several different sources.  First, she received a $3,000 loan from her mother, Lillian Elise.  Mrs. Wilhite was responsible making sure this loan was repaid.  (Doc. 97 at 84:5-24; Ex. H).  Additionally, she opened a $25,000 line of credit with the Castle Rock Bank as the member and owner of AFC, but also as the only personal guarantor.  (Doc. 97 at 79:10-12; 85:4-15; 86:5-10; Ex. G).  Mrs. Wilhite, as the personal guarantor, was required to provide as security DW Support's assets, which were DW Support's accounts receivable, and her personal credit to Castle Rock Bank.  (Doc. 97 at 86:7-10; 86:14-17; 89:4-9; Ex. G).  Mr. Wilhite, on the other hand, did not take out any personal loans on behalf of AFC, nor did he initially personally guarantee any loans on behalf of AFC.  At most, Mr. Wilhite was a co-owner of a DW Support pickup truck that was pledged as security.  (Doc. 97 at 88:5-14, Exh. G).  Finally, Mrs. Wilhite – not Mr. Wilhite – also applied for credit with Barton Supply in 1998 in order to purchase materials for AFC.  (Doc. 97 at 120:9-20; Ex. O).  After Mrs. Wilhite personally opened a line of credit with Castle Rock Bank, she periodically drew on the loan to fund AFC.  (Doc. 97 at 89:10-12; Exh. I).  The first loan she made to AFC was on December 31, 1997 for $1,400.  (Doc. 97 at 89:24-90:1; Exh. I).  Overall, between 1997 and 2007, Mrs. Wilhite

Active/43978966.1

loaned AFC $166,357.58 through Castle Rock Bank Line of Credit. (Exh. I).  DW

Support Services also lent money to AFC throughout 1997 and 1998, all of which was

repaid in full in 2003.  (Doc. 97 at 92:5-7; 106:1-22; 107:7-9; Ex. J; Ex. K; Ex. N).

When the recession hit in 2008, Mrs. Wilhite's personal liability was at stake – not

Mr. Wilhite's or any other AFC employee's. (Doc. 97 at 151:5-25; Ex. 3).  Mrs. Wilhite

had to refinance the AFC loan with ANB Bank.  (Doc. 97 at 151:6-25).  In order to

refinance that loan, she had to pledge her personal ranch in Westcliffe.  (Doc. 97 at

15:2-19; Exh. T, U).  In 2012, Mrs. Wilhite had a $1.8 million line of credit with ANB.

The line of credit had grown so large because of the failure of one of Mrs. Wilhite's

companies, Steel Deck Supply.   ANB demanded Mrs. Wilhite refinance the line of credit

or they were going to foreclose on her home. (Doc. 97 at 151:6-25). As a condition of

the refinance, Mrs. Wilhite had to again personally guarantee the line of credit and

pledge her home in Westcliffe. (Doc. 97 at 151:24-152:4).  Mr. Wilhite, on the other

hand, personally guaranteed the loan but he did not have any pledged assets on the

line.  (Doc. 97 at 153:10-11).


### Experience

Aside from shouldering the financial risks in forming AFC, Mrs. Wilhite invested

her forty plus years of experience in the construction industry into AFC.  (Doc. 97 at

46:22-24; 62:23-25).  When AFC was formed in 1997, both Mr. and Mrs. Wilhite had

construction experience.  Mr. Wilhite had limited experience in structural steel floors

based on working for Steel Dimensions for approximately six months. (Doc. 98 at

317:11-14).  Mrs. Wilhite, on the other hand, had over 41 years of construction experience.  (Doc. 97 at 46:22-24; 62:23-25; Exh. A).  Although some of her experience was in structural steel floors, a majority of it was in operating, financing and building a construction company.  (Doc. 97 at 56:23-57:14).  Mrs. Wilhite's experience was one of the necessary requirements in founding AFC because without knowledge about how to operate a company, AFC would have never been able to get off the ground.

Mrs. Wilhite gained experience within the construction industry after working for Medlicott Construction and Klebold Consulting.  (Doc. 97 at 58:18-21).  At Klebold Consulting, she performed site inspections for banks and did "preanalysis on projects to make sure that projects could be built for what the contractor was submitting in his budget ...."  (Doc. 97 at 60:3-7).  While at Medlicott Construction, Mrs. Wilhite received hands-on experience building homes and served as a project/construction manager. (Doc. 97 at 57:15-58:17).  Moreover she gained knowledge about building codes and plans and specifications.  (Doc. 97 at 58:6-10).

It was while Mrs. Wilhite was working in the construction industry performing site inspections that she encountered structural steel floors.  (Doc. 97 at 72:11-14).  She also assisted Mr. Wilhite on Steel Dimension projects building structural floors, which allowed her to become "very familiar with how they were put together."  (Doc. 97 at 253:2-4).  She became knowledgeable about the comparative cost of wood structural floors and steel structural floors and knowledgeable about the problems with TJI floors that steel addressed.  (Doc. 97 at 74:7-76:10).  This further demonstrated she was intimately involved in the operation of AFC, as well as its products and services.

Active/43978966.1

Although Mr. Wilhite also had experience with structural floors, Mrs. Wilhite was the driving force behind AFC because she was the one who recognized the business opportunity while performing inspections for Klebold.  (Doc. 97 at 77:22-25).   Mrs. Wilhite took the lead role in the operation of AFC because had been doing construction inspections from 1989 forward and she knew most of the major contractors in the Front Range.  Mrs. Wilhite personally knew 100 (or so) major contractors. (Doc. 97 at 78:20-22; 78:23-79:2). Also, AFC was able to purchase supplies based on her credit, and on the relationships she developed and fostered as a construction inspector for banks. (Doc. 97 at 78:20-79:2).

### III.   CONCLUSION

While Mr. Wilhite has provided services to AFC, Mrs. Wilhite has provided services and so much more to AFC that has allowed it to prosper – money, liability, services and contacts.

Utilizing the Colorado statute as a guide as discussed above, this Court could consider the money lent by Mr. and Mrs. Wilhite to AFC, and determine that Mr. Wilhite has an equitable interest between 0.5% and 1.2% in AFC, or, also considering the uncompensated services rendered by Mr. and Mrs. Wilhite, determine that Mr. Wilhite has an equitable interest of 16%.

The Defendant and Interested Party do not believe that this Court should award Mr. Wilhite an equitable ownership in AFC based on the compensated services he

Active/43978966.1

performed as an employee.  Otherwise, every paid employee of a company would have a claim of ownership.

Nor should this Court examine the work performed by Mr. Wilhite and Mrs. Wilhite and attempt to value their respective work to determine if Mr. Wilhite was undercompensated, and utilize the alleged under-compensation as a basis for awarding Mr. Wilhite an equitable interest in AFC.  This too sets a dangerous precedent for any employee to argue he or she was not fairly compensated and is thereby entitled to an ownership interest in the employer.[2]

However, even if this Court were to consider the compensated services of Mr. and Mrs. Wilhite to AFC, as is apparent from the above recitation of respective duties and responsibilities, Mrs. Wilhite shouldered the overwhelming majority of responsibilities and risks for the formation, operation, and success of AFC, while Mr. Wilhite assumed the duties identical to other employees.  An equitable apportionment of ownership under these facts is for the Court to find that Mrs. Wilhite owns between 85 to 90% of AFC while Mr. Wilhite has an equitable interest between 10 and 15%.

---

[2] This is especially true in light of the historical fact that women are paid 82% of what men are paid for performing the same work.

Active/43978966.1

Respectfully submitted this 1st day of November, 2016.

SHERMAN & HOWARD LLC


s/Richard F. Bednarski
Richard F. Bednarski #31157
90 South Cascade Avenue, Suite 1500
Colorado Springs, CO  80903
Phone:  719-475-2440
Fax:      719-635-4576
*Attorney for Defendant Michael D. Wilhite*


SHERMAN & HOWARD LLC


By:  s/Scott J. Mikulecky
Scott J. Mikulecky, #16113
90 South Cascade Avenue, Suite 1500
Colorado Springs, CO  80903
Phone:  719-475-2440
Fax:      719-635-4576
*Attorney for Interested Party*
*Darla Dee Wilhite*

Active/43978966.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of November, 2016, I electronically filed the foregoing **DEFENDANT'S AND INTERESTED PARTY'S BRIEF REGARDING ISSUE OF TRACEABILITY** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following at their e-mail addresses:

Juan G. Villasenor, Esq.
Elizabeth M. Froehlke, Esq.
U.S. Attorneys' Office
1225 17th Street, Suite 700
Denver, CO 80202
juan.villasenor@usdoj.com
elizabeth.froehlke@usdoj.com

*s/ Devon O. Ryan*

_____

Active/43978966.1