1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3    Case No. 00-cr-00504-PAB
     _____
4    UNITED STATES OF AMERICA

5         Plaintiff,

6    vs.

7    MICHAEL DAVID WILHITE

8         Defendant.
     _____
9              Proceedings before MICHAEL E. HEGARTY, United

10   States Magistrate Judge, United States District Court for

11   the District of Colorado, commencing at 10:10 a.m., July 21,

12   2015, in the United States Courthouse, Denver, Colorado.

13   _____

14            WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

15   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED . . .

16   _____

17                        APPEARANCES

18            ELIZABETH FROEHLKE and TONYA ANDREWS, Attorneys at

19   Law, appearing for the Plaintiff.

20            RICHARD BEDNARSKI, Attorney at Law, appearing for

21   the Defendant.

22            SCOTT MIKULECKY, Attorney at Law, appearing for

23   Interested Party.

24                   MOTION TO QUASH HEARING

25

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015
Page 2

```
 1              P R O C E E D I N G S
 2          (Whereupon, the within electronically recorded
 3   proceedings are herein transcribed, pursuant to order of
 4   counsel.)
 5          THE COURT:  00-cr-00504.  United States of America
 6   versus Michael D. Wilhite.
 7          For the United States, please.
 8          MS. FROEHLKE:  Elizabeth Froehlke for the United
 9   States.
10          THE COURT:  Thank you.
11          Good morning.
12          MS. ANDREWS:  Good morning, I'm just seated at
13   counsel table.  I don't anticipate speaking, but Tonya
14   Andrews, on behalf of the United States, as well.
15          THE COURT:  Okay.  Thank you.
16          MR. BEDNARSKI:  Good morning, Your Honor.
17          Richard Bednarski, on behalf of the defendant,
18   Michael Wilhite.
19          THE COURT:  Thank you.
20          MR. MIKULECKY:  Good morning, Your Honor.
21          Scott Mikulecky, appearing on behalf of the
22   interested party Yahab Foundation.  With me at counsel table
23   is Dee Wilhite, the founder of the Yahab Foundation.
24          THE COURT:  Very good.  Take a seat, please.
25          Okay.  So since we are basically proceeding on
```

United States of America vs.                                          Motion to Quash Hearing
Michael David Wilhite                                                           July 21, 2015

 1  your motion, Mr. Mikulecky, do you want to start?

 2              MR. MIKULECKY:  Okay.

 3              Your Honor, just so the Court is aware.

 4              MR. BEDNARSKI:  Your Honor, just so the Court is

 5  aware, rather than us both making similar arguments, if the

 6  Court is okay, if Mr. Mikulecky makes an argument that I

 7  agree with, I will just stand up and say, I concur, if that

 8  works with you.

 9              THE COURT:  Are you going to tell him when you

10  disagree with him, too?

11              MR. BEDNARSKI:  Yes, I will, Your Honor, but I

12  don't think that's going to happen.

13              THE COURT:  All right.

14              MR. MIKULECKY:  Good morning, Your Honor.

15              Representing the Jahab Foundation, we filed a

16  Motion to Quash the Garnishment.

17              A little background.  The garnishment that was

18  issued by the -- requested by the United States and issued

19  by the Court went beyond the language of the garnishment

20  statute.  So we think that it has some improper legal

21  grounds to be issued and we will take that up in a moment.

22              We also think that are insufficient facts to

23  support the allegation in the garnishment that Yahab

24  Foundation is an alter ego of the defendant Michael Wilhite.

25              So I think there are both legal and factual

United States of America vs.                                Motion to Quash Hearing
Michael David Wilhite                                                    July 21, 2015

Page 4

 1  insufficiencies to support the garnishment.

 2          Dealing first with the legal insufficiencies, the

 3  garnishment statute, 28 USC, Section 3205 specifically says

 4  that a garnishment -- the Court can issue a garnishment

 5  against property in which the debtor, quote, has a

 6  substantial nonexempt interest.  That's all that can be

 7  garnished.

 8          The United States in the garnishment, though, went

 9  a step further than that.  They sent a garnishment to A&B

10  Bank and asked for any bank accounts in which Mr. Wilhite

11  has a substantial nonexempt interest, but then they tacked

12  on two other areas they wanted to garnish.

13          First, any bank account in which he was simply a

14  signatory to the account.  And then secondly -- and what we

15  are here on today -- is the bank account of Yahab

16  Foundation, which the garnishment said -- United States

17  Attorney's Office alleges is an alter ego of the defendant

18  Mr. Wilhite, going beyond -- I'm sorry, going beyond the

19  language of the statute.

20          Under federal law, in accordance with the U.S.

21  Supreme Court case, U.S. versus Kimball Foods, 99 Supreme

22  Court 1448, it's a 1979 case, we looked to the law of

23  Colorado to demonstrate what assets the U.S. can attach or

24  garnish or execute on to satisfy a judgment against Mr.

25  Wilhite.  So Colorado law applies here.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 5

1        The Colorado Supreme Court, in In Re: Philips,

2   2006 Colorado Supreme Court case, 139, P.3rd, 639, has a

3   very specific provision I will come to in a moment, but also

4   some general statements about laws regarding corporations

5   and piercing corporate veil.

6        The Colorado Supreme Court starts by saying the

7   corporation is a separate legal entity.  And this separate

8   status isolates the action, the assets and the debts of the

9   corporation from the individuals that run the company,

10  maintaining a separate status between the individuals and

11  the corporation.

12       The Colorado Supreme Court went on to say that, in

13  extraordinary circumstances, the Court may ignore the

14  independent existence of the corporation and hold an

15  individual liable for the debts of the corporation.  That's

16  the traditional alter ego analysis.  So if the corporation

17  has debts, the individual can be liable for those debts.

18       Importantly, Colorado Supreme Court said it is for

19  the Court who makes that decision in extraordinary

20  circumstances when various elements are met; it is not for

21  the creditor to make that decision; in this case, the United

22  States Attorney's Office.

23       Now the garnishment statute says it has to be

24  property in which Mr. Wilhite has a substantial nonexempt

25  interest.  What the U.S. Attorney's Office did is they

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                        July 21, 2015

 1  bypassed this requirement that a court, a judge, you or

 2  another judge, rule that Mr. Wilhite has a substantial

 3  amount of interest in the Yahab Foundation.

 4          THE COURT:  What would have been the proper

 5  vehicle for them to get that determination?

 6          MR. MIKULECKY:  They have got two ways to do that,

 7  Your Honor.  One is to bring a separate lawsuit against

 8  Yahab Foundation arguing that it is an alter ego and ask the

 9  Court for a determination that -- it was an alter ego, and

10  therefore, the assets of Yahab are also the assets of Mr.

11  Wilhite.

12          The alternative is to simply follow the language

13  of the statute, issue a Writ of Garnishment to A&B Bank and

14  say, We want all property in which Mr. Wilhite has a

15  substantial nonexempt interest; not alter the language and

16  say, We want it to include these other companies.  Then when

17  A&B said, Mr. Wilhite has no accounts, they, under the

18  statute, then challenge that answer.  They traverse the

19  garnishment and we have a hearing at that point as to

20  whether or not Mr. Wilhite has that interest.

21          THE COURT:  So that lets a bank determine in the

22  first instance whether a debtor has the substantial

23  nonexempt interest in an account?

24          MR. MIKULECKY:  Right.  Because when we spoke to

25  the bank, they have a Court order that they have to freeze

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 7

 1   the Yahab account.  They don't make any determination.  The

 2   U.S. Attorney's Office made that determination.  There's

 3   been no judicial determination.  It was their feat that said

 4   that's what we are going to do.  So that's the procedures.

 5          And, in fact, Your Honor, that was done in a case

 6   just frequently, but just one example in the Seventh

 7   Circuit, U.S. versus Resnick, 594, F.3rd 562, a Seventh

 8   Circuit 2010 case.  And what they did, same sort of

 9   situation, there was a judgment against a criminal defendant

10   with an Order of Restitution.  The United States, through

11   Rule 69, some discovery, found out that there was a third

12   party, Mr. Resnick -- actually, a bookie -- who had taken

13   some money from the criminal defendant.  They then brought a

14   fraudulent transfer lawsuit against Mr. Resnick, saying,

15   You've got money you are not entitled to, give it back.

16          So that is another way to do it.  Those are the

17   proper procedures.  But they violated the proper procedures

18   set out in the statute and in violation of Colorado law.

19          So we think that that procedure is wrong for that

20   reason alone, and the garnishment can be quashed for that

21   reason.

22          Even more importantly, though, even if the

23   garnishment were the right procedure for declaring that

24   Yahab is an alter ego, they still have a problem because

25   what they are seeking to do, which is reverse piercing -- I

United States of America vs.                          Motion to Quash Hearing
Michael David Wilhite                                           July 21, 2015

Page 8

 1  will come back to this in a moment -- has never been allowed

 2  for a nonprofit corporation now.

 3          Now let me explain what I mean by that.

 4          An alter ego traditional analysis is that the

 5  corporation has debts and, normally, the individual over

 6  here controlling the corporation, an officer, director,

 7  shareholder, has no liability for those debts.  If there are

 8  certain standards met, as you know, the individual does have

 9  liability for the debts of the corporation.  So the

10  individual's assets are used to satisfy the corporate debts.

11          In In Re: Philips, the Colorado Supreme Court, for

12  the first time, allowed what is called reverse piercing.

13  And in that case, what the Colorado Supreme Court said is,

14  We are going to allow the assets of the corporation to be

15  used to satisfy the debts of the individual.  So they did it

16  backwards.  That was the time that the Colorado Supreme

17  Court allowed that.

18          Several years later, the Colorado Supreme Court

19  said, We will allow the traditional alter ego analysis where

20  an individual can be liable for the debts of the corporation

21  or a nonprofit.  The Colorado Supreme Court -- or any

22  Colorado court has not addressed the issue of whether the

23  reverse piercing applies to a nonprofit.

24          And that's an important distinction because there

25  is a Colorado statute, CRS, Section 7-123-105, which says

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                      July 21, 2015

Page 9

1  the assets of a nonprofit are exempt from attachment and

2  levy, unless there is liability insurance.  Otherwise, those

3  assets cannot be taken.

4           THE COURT:  So without making any kind of decision

5  on the merits of this case, does that not provide shelter

6  for someone to hide assets?

7           MR. MIKULECKY:  No.  Because what that does, Your

8  Honor, is it requires that there be a piercing of the

9  corporate veil or fraudulent transfer to get it out of the

10  501(c)(3).  So that's how you do it.  That's the process

11  supposed to be used.  You don't have the right, by decree of

12  the creditor, to say, Yes, the same, trust me, I'm going to

13  go take these assets.

14           Now, they may be allowed to reverse pierce and

15  that may be a way to reconcile that statute and hold that

16  without a fraudulent transfer an alter ego determination,

17  but someone, other than the U.S. Attorney's Office, has to

18  reconcile that, determine what will Colorado do, because

19  Colorado law applies here.

20           So, again, there is a way to do it.  You can't --

21  you're right -- just hide assets and claim what's a

22  501(c)(3) and get away with it.  But you have to go through

23  the proper steps.  And this is not the proper way to do it.

24           So I think that that is another problem and why

25  this garnishment should be quashed.  Finally, even if the

United States of America vs.                                   Motion to Quash Hearing
Michael David Wilhite                                                    July 21, 2015

Page 10

1  garnishment is the proper way to do it, and even if they can

2  reverse pierce of the nonprofit, both of which are

3  unestablished, we think the testimony will show that Mr.

4  Wilhite has no involvement and no control, as is necessary,

5  to establish the reverse alter ego piercing.  The testimony

6  will show that.  So on its face, we think the garnishment

7  should be quashed as well.

8           THE COURT:  Okay.

9           MR. BEDNARSKI:  Just briefly, Your Honor.  Richard

10 Bednarski on behalf of Michael Wilhite, the defendant in the

11 case and the defendant in the criminal case.

12          Obviously, we do not have a position regarding the

13 procedural requirements as it relates to Yahab.  As

14 indicated in the Writ of Garnishment, Mr. Wilhite was

15 convicted back in 2000.  We stipulate that there is judgment

16 out there; that that judgment is approximately 1.75 million

17 dollars, right in that area.  We also stipulate that he --

18 they did ask for that money.  He has no assets and so

19 couldn't pay it.

20          So the Writ of Garnishment as it related to any

21 bank accounts that were personally his, we stipulate to.

22 However, pursuant to the answer of the garnishee and the

23 bank, there is only one bank account that they did seize or

24 put on a hold status.  And that is the bank account that

25 relates to Yahab.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 11

1          Mr. Wilhite has no -- no assets.  He does not have

2   a bank account.  The Government is currently garnishing his

3   Social Security that he is receiving from the U.S.

4   Government.  I believe that is approximately 200 bucks a

5   month.

6          But we do concur with Yahab's recitation that we

7   do not believe that this Yahab Corporation is an alter

8   ego of Mr. Wilhite.  He was not involved in any of the

9   creation of it.  He's not involved in the running of it.

10  He's not involved, and wasn't involved, in the support of it

11  from a financial perspective.  The only thing he did was,

12  when Yahab made the decision through its board of directors,

13  to invest in gold and silver coins, he helped facilitate

14  that transaction.  He called and placed the order.  He went

15  and picked it up and brought it back to a director of the

16  board of the Yahab Corporation.

17          And the evidence, I think, will clearly establish

18  that this, the Yahab Corporation, was created by Dee

19  Wilhite, along with the two other directors; and that Mr.

20  Wilhite had no involvement in the creation of it.  And it is

21  not an alter ego of his.

22          THE COURT:  Thank you.

23          Is the United States going to make any kind of an

24  opening statement?

25          MS. FROEHLKE:  Yes, Your Honor.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015
Page 12

 1              THE COURT:  All right.

 2              MS. FROEHLKE:  Your Honor, I think it's important

 3      that we clarify procedurally, first of all, what's occurred

 4      here.

 5              Mr. Wilhite, being the defendant debtor, has the

 6      right to a hearing, objecting to Writ of Garnishment and we

 7      are here today for that purpose.  Under Section 3202 of the

 8      FCCPA, the hearing should be limited to one of three issues:

 9      Validity of the debt, the exemption of the property or the

10      applicable statute being followed correctly.

11              So addressing those three issues, two of which Mr.

12      Wilhite did cite in his Notice of an Objection, he cited the

13      applicable statute not being adequately followed.  It is

14      unclear to the United States how -- how that is an objection

15      of his.  Statute 3205 has specific procedural requirements

16      for the writ to be filed, and they include things like

17      including the debtor's address and the amount of the debt

18      and when it was entered and so forth.

19              So, logistically, it's unclear how that statute

20      was not followed adequately.  I did not hear opposing

21      counsel bring that -- bring that up in his opening

22      statement.

23              Further, the validity of the debt, as far as the

24      objection documents go, is not being questioned.  I think it

25      really is not in contest here, but the exemption of the

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 13

 1   property under the MVRA, the IRS code outlines the specific

 2   exempt property as applied to restitution enforcement.  It

 3   includes -- and I do have a list for the Court, if you would

 4   like to see it.  But it includes things like clothing,

 5   books, certain property that the IRS and the United States

 6   cannot seize in enforcing a restitution judgment.  However,

 7   it never includes liquid assets outside of very specific

 8   federal pension benefits that are not at issue here.

 9           So, in terms of the assertion that there is some

10   sort of exemption applies, that is just not the case here.

11           What we are here today to discuss, as I understand

12   from the opening statements, is ownership.  And ownership is

13   something that we have already set for a hearing in

14   September.  I met with opposing counsel on Friday and

15   assured them that, although we had issued this Writ of

16   Garnishment, we do not intend to file for the actual

17   garnishment of this account until that issue has been

18   determined in September.

19           I think it's important to understand the context

20   here, that the United States believes Mrs. Wilhite, for many

21   years now, has held all of the defendant's property as his

22   nominee, including a majority interest in Advanced Floor

23   Concepts.  She transferred, on the last day of the year in

24   December, $200,000 to this newly formed nonprofit, a

25   nonprofit that she incorporated three weeks before her

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 14

1  deposition in this case.  And, in fact, the testimony will

2  show that at her deposition, we talked about charitable

3  involvement and she failed to mention -- failed to mention

4  the Yahab Corporation that she had just incorporated.

5          Within a matter of weeks, she transferred $200,000

6  from the operating account of Advanced Floor Concepts, and

7  within two months from that date, the defendant himself

8  orchestrated the purchase of over $150,000 of gold coins.

9          How that has a charitable function, I'm not sure,

10  but even if it does, the defendant cannot, through his

11  nominee wife, dissipate his assets in anticipation of your

12  ruling in September.

13          And that was something we discovered through

14  subpoena in June, and we felt that we had to act quickly

15  because, clearly, the assets were being dissipated and

16  turned into gold coins, which are obviously easily an

17  movable and untraceable sort of asset.  Of the $200,000 that

18  was transferred already, there's only $14,000 left in this

19  account that has been frozen.

20          The defendant has not shown any sort of the

21  immediate need for this $14,000 since litigation has been

22  ongoing.  Mrs. Wilhite takes consistent monthly

23  distributions from the company in substantial amounts, and

24  we haven't enforced judgment against her in any way, you

25  know, for that income right now.  But the $200.000 transfer,

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 15

1  we believe is extremely suspect.  And even if it did have a

2  charitable purpose, which I'm not convinced of either, Your

3  Honor -- even if it did, that that doesn't -- the defendant

4  cannot choose to give all of his company's assets to

5  charity, instead of giving it to the victims of this crime.

6           So, at this time, I think this hearing should be

7  limited to the questions in Section 3202.  If the Court does

8  want to discuss the further issues, I think that's more

9  appropriate in the three-day evidentiary hearing we already

10 have set for September.

11          As I said, the United States has no intention of

12 actually seizing this account; but we felt that, given the

13 circumstances -- and especially, I think, the evasive nature

14 of the circumstances with Mrs. Wilhite not disclosing this

15 charity that she had just incorporated three weeks prior to

16 her deposition -- I think that the freezing of the assets,

17 whether it's through a Writ of Garnishment, or the Court has

18 wide discretion under the MVRA and 18 USC Section 3613A, to

19 essentially do whatever is necessary, including restraining

20 assets, when a judgment -- criminal judgment debtor is in

21 default, which Mr. Wilhite has not made a single payment

22 since 2004, other than his Social Security, which is on the

23 Treasury Offset Program.

24          THE COURT:  Mr. Bednarski or Mr. Mikulecky, why is

25 it not (inaudible) why is it (inaudible) right now?

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 16

1          MR. BEDNARSKI:  First, obviously in this case, we

2   are dealing with a completely separate corporation.  We are

3   dealing with the Yahab Corporation, as compared to Advanced

4   Floor Concepts.  Regarding the transfer at the end of the

5   year, at least at the time, there was no litigation.  In

6   fact, there was absolutely no litigation as it related to a

7   writ of post-judgment execution.  That wasn't filed until

8   March of this year.  We did set it for a hearing regarding

9   -- so we are dealing with separate corporations.

10          Now, it sounds like their -- their concern is

11   whether or not there is dissipation of assets.  A Writ of

12   Garnishment isn't there to protect against that.  That's

13   where, as Mr. Mikulecky, had testified -- or testified? --

14   as he argued previously, that is where a fraudulent transfer

15   aspect can come in.

16          The second, Your Honor, the reason we were --

17   brought in on behalf of Mr. Wilhite is it is a violation of

18   the statute in the sense that it indicates that you can only

19   issue a Writ of Garnishment against property in which my --

20   my client -- in this case, the debtor -- has a substantial

21   nonexempt interest.  And they haven't established that he

22   has any interest in the Yahab Corporation or the money that

23   was transferred, considering it has nothing to do with Mr.

24   Wilhite.

25          As indicated by the -- by Ms. Froehlke, he -- they

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                       July 21, 2015

Page 17

 1   have not stopped AFC from doing their ordinary course of
 2   business.  And at the time this was done, they were allowed
 3   to still go forward with their ordinary course of business,
 4   considering there was absolutely no litigation that either
 5   involved Mr. Wilhite or Mrs. Wilhite at the time, or her
 6   company, Advanced Floor Concepts.
 7           So that's why we filed it as a violation of the
 8   statute, Your Honor.
 9           The second aspect of it was based off of what
10   Mr. Mikulecky talked about before, which is by going and
11   getting a Writ of Garnishment without making the proper
12   determination ahead of time, that Yahab Corporation was an
13   alter ego of Mr. Wilhite, that that -- that also is a
14   violation of the statutes as it relates to a Writ of
15   Garnishment.
16           Finally, I understand that there is a specific
17   list of exemptions.  The reason I marked that, Your Honor,
18   is because, again, Mr. -- as indicated in our motion and why
19   we indicated that it was exempt property is Mr. Wilhite has
20   no right, title or interest in the Yahab Corporation.
21           THE COURT:  But (inaudible) other than what is
22   stated within the definition of exempt property in the
23   statute; is that correct?
24           MR. BEDNARSKI:  Correct.  It doesn't fit in as
25   clothing or anything like that.  It was -- it was put -- the

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                      July 21, 2015

Page 18

1   reason I marked "exempt" is because, again, we were arguing

2   that he has no right, title or interest in that property.

3            THE COURT:  Right.  Okay.

4            MR. MIKULECKY:  Building on that because I think

5   it has to be property of the debtor, and normally, again,

6   that's done by simply saying, We want everything that is

7   owned by Mr. Wilhite.  And to go beyond that requires an

8   additional judicial determination.  So we don't think the

9   statute was followed because the language of the statute

10  that allows the Writ of Garnishment to be reached and the

11  property reached was changed in the language of the

12  garnishment unilaterally by the U.S. Attorney's Office, so

13  they did not follow the statute.

14           Additionally, and on behalf of Yahab, we filed a

15  Motion to Quash because they just can't freeze our money,

16  regardless of whether we show a need for it or not, simply

17  based on their belief Mr. Wilhite has an interest.

18  Otherwise, there is no limit as to what they can take and

19  freeze and say, Well, we will sort it out later, all of your

20  money is frozen.  And trust me, there's some basis for it,

21  we will sort it out in a few months. They don't have that

22  right to do that.

23           And so there is the ability for us, on Motion to

24  Quash and on their lack of follow-through on this statute,

25  to be able to go forward on the hearing today.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 19

 1           Their worry about the transfer of assets, or the
 2    depletion of assets of Advanced Floors is getting the cart
 3    before two horses.  First, they have to show that Mr.
 4    Wilhite has an interest in Advanced Floor; that that's his
 5    money that was transferred.  And then secondly, they have to
 6    show a fraudulent transfer.  They don't have a fraudulent
 7    transfer action.  What they are trying to do is a
 8    prejudgment attachment, trying to freeze that money that is
 9    in Yahab, argue it's part of Advanced Floor, which is part
10    of Mr. Wilhite.  It's not even a prejudgment; it's a
11    prelawsuit.  We don't even have a lawsuit, much less a
12    prejudgment attachment.
13           So they are trying to bypass that, as well.  And
14    although they may have some concerns, they have got to
15    follow the right process.  And that's what we are here for
16    today.
17           THE COURT:  Ms. Froehlke, what principle do you
18    rely on in your garnishment to the bank to go beyond the
19    language of the statute and include any account in which he
20    is signatory or also directly foundation?  Where is the
21    authority for having done that?
22           MS. FROEHLKE:  Your Honor, the statute actually
23    does allow for this action.  Under Section 3002, the
24    definition section of the FCCPA, subsection 12:  Property is
25    defined as any present or future interest, whether legal or

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 20

 1  equitable, in real, personal, including choses in action or

 2  mixed property, tangible or intangible, vested or

 3  contingent, wherever located and however held, including

 4  community property and property held in trust, including

 5  (inaudible) and pension trusts.  And then it excludes some

 6  things related to Indian tribes and Indian lands.

 7         But we believe that this property is held in name

 8  alone by Mrs. Wilhite, and there is ample law that we can

 9  brief for the Court on this issue being litigated within the

10  enforcement action itself, whether it be through IRS or

11  through the Justice Department and like, if there isn't a

12  lawsuit filed, as Mr. Mikulecky said, because this is a

13  post-judgment debtor.  Thus, we do not have to be subject to

14  the prejudgment remedies that have certain requirements and

15  certain logistics that don't apply here, because this is a

16  post-judgment debtor.  He was ordered to pay 1.7 some

17  million dollars in 2001 and still owes about what he was

18  originally ordered to pay.

19         So the statute itself does define property in a

20  very broad manner.  It is true that you look to state law to

21  determine what property can be reached, especially related

22  to things like marital property.  However, the FCCPA is the

23  exclusive remedy of the United States and it allows certain

24  provisions that are not necessarily available to other

25  creditors, especially in a criminal context.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 21

 1          Again, if the Court is needing a different

 2   procedural mechanism for this, we cite 18 USC 3613A, which

 3   -- which I can just briefly -- briefly relate that.  The

 4   Court -- upon a finding the defendant is in default, which

 5   is 90 days past payment of his restitution -- and that's a

 6   voluntary payment, Your Honor -- the Court can do such

 7   things as revoke probation, resentence a defendant, hold

 8   them in contempt, enter a restraining order or injunction or

 9   the sale of property, accept a performance bond, enter

10   adjusted payment schedule or take any other action necessary

11   to obtain compliance with the order of a fine or

12   restitution.

13          I think that language, in and of itself, Your

14   Honor, allows flexibility in what the Court determines is

15   the most appropriate action here.  But in the meantime, the

16   United States does not intend, as I've have said several

17   times, to actually seize this account until we had

18   determined ownership and the substantial interest that Mr.

19   Wilhite has in this property in September through testimony

20   and exhibits for three days.

21          It is a complicated issue that we intend to

22   litigate fully, and I think this is premature; but at the

23   same time, these assets need to be retained.

24          And frankly, $14,000, as I said, there's no

25   showing of immediate harm or need to this money.  Ms.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 22

 1  Wilhite is taking distributions and income of upwards of

 2  $35,000 a month from this company.  So, I don't see that

 3  $14,000 is really causing any major issues in the

 4  defendant's day-to-day activities.  And it should be

 5  restrained since he has already dissipated $150,000 of that

 6  money himself personally going to do those purchases, which

 7  also demonstrates control over the funds, as well.

 8          THE COURT:  Is the concept of immediate harm or

 9  immediate -- show up the law anywhere through this kind of

10  proceedings?

11          MS. FROEHLKE:  It doesn't, Your Honor, except the

12  language citing an injunction here in 3613A, I think, just

13  the typical standards of an injunction may implicate that.

14  But I think, from a practical standpoint, there is no

15  immediate harm or need in keeping this -- keeping this bank

16  account restrained for the next six weeks until we determine

17  the ownership of Advanced Floors.

18          THE COURT:  Well, whether this turns out to be

19  sort of a part of a hearing later or whether it's a hearing,

20  in and of itself, with legal consequences, we are all here.

21  So I think we ought to go ahead and receive the evidence

22  that you are prepared to offer.  And then I will make a

23  determination as to whether or not this is going to be

24  evidence that's considered, in and of itself, for their

25  proceeding or whether it will be part of the proceeding in

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 23

1  six weeks.

2        MR. BEDNARSKI:  Yes, Your Honor.

3        I believe we have stipulations to exhibits.  Do

4  you want to enter yours now and we enter ours now?

5        MS. FROEHLKE:  Sure.

6        MR. BEDNARSKI:  Your Honor, if I may approach, I

7  do have defense exhibits that have been stipulated to and I

8  move for admission of Defense Exhibits 1-4 and 6-7.

9        THE COURT:  Are these originals or copies?

10       MR. BEDNARSKI:  They are copies.

11       THE COURT:  So we will have the originals given to

12 the court deputy.

13       MR. BEDNARSKI:  We got copies from the banks and

14 everything, so we don't have actual originals.

15       THE COURT:  Okay.  Well, what we will call the

16 original exhibits for purposes of the hearing.  Do you have

17 a set for her?

18       MR. BEDNARSKI:  Yes.

19       THE COURT:  Okay.  Are you saying these are all

20 stipulated to?

21       MR. BEDNARSKI:  I believe from the Government,

22 yes, Your Honor.

23       THE COURT:  Okay.

24       MS. FROEHLKE:  Yes, Your Honor, I also have the

25 Government's exhibits.  I have included what we have already

United States of America vs.                                        Motion to Quash Hearing
Michael David Wilhite                                                        July 21, 2015

 1  agreed on as Exhibit 5 because it's impeachment purposes,

 2  but I have Exhibits 1 through 4 and 6 and 7.

 3          THE COURT:  Okay.  So Mr. Mikulecky, call your

 4  first witness.

 5          MR. BEDNARSKI:  Your Honor, we would call Mike

 6  Wilhite.

 7          THE COURT:  Okay.  Mr. Wilhite.

 8          MICHAEL WILHITE - DEFENSE WITNESS - SWORN.

 9          THE COURT:  Mr. Wilhite, I need to remind you

10  (inaudible) out of a criminal proceeding, you have a Fifth

11  Amendment right to not incriminate yourself.  So just keep

12  that in mind.  Okay.

13                    DIRECT EXAMINATION

14  BY MR. BEDNARSKI:

15      Q    **Good morning, Mr. Wilhite.**

16      A    Good morning.

17      Q    **Now, these -- this proceeding is being recorded,**

18  **so make sure you speak up and speak into the microphone,**

19  **okay?**

20          THE COURT:  And you, too, Mr. Bednarski.

21          MR. MIKULECKY:  I will, Your Honor.

22          THE COURT:  Walking between the microphones

23  doesn't pick anything up.  Okay?

24          MR. BEDNARSKI:  Yes, sir.  The first thing is,

25  nobody has ever accused me of being quiet.

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                      July 21, 2015

Page 25

1      Q     (BY MR. MIKULECKY) Mr. Wilhite, would you please

2   introduce yourself to the judge and spell your last name for

3   the record.

4      A     My name is Michael Wilhite.  Last name is

5   W-I-L-H-I-T-E.

6      Q     Mr. Wilhite, how do you know Dee Wilhite?

7      A     Dee and I have been married for, coming up on 22

8   years.

9      Q     Now, do you guys live together?

10     A     Yes, sir.

11     Q     Where do you guys live?

12     A     In live in Custer County in south central

13   Colorado.

14     Q     Is that near the Westcliffe area?

15     A     Yes, it is.

16     Q     Now, do you know about the Yahab Corporation?

17     A     Yes, I do.

18     Q     Did you have any part in creating the Jahab

19   Corporation?

20     A     No, sir.

21     Q     Were you tasked with getting Mr. Holden, the

22   attorney that helped create the Jahab Corporation, involved

23   in the case?

24     A     No, sir.

25     Q     Did you ever meet with Mr. Holden regarding the

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                      July 21, 2015

Page 26

1    Jahab Corporation?

2        A    In the presence of Dee Wilhite and Rob Corwin

3    (phonetic) Advanced Floor Concepts CPA, there was a general

4    meeting where this type of thing was discussed, yes.

5        Q    What role, if any, did you have in giving

6    instructions for the creation of the Jahab Corporation?

7        A    I didn't do any of that.

8        Q    Did you -- did you fund the Jahab Corporation?

9        A    No, I did not.

10       Q    We heard in argument from the Government that

11   there was $200,000 that was transferred from Advanced Floor

12   to Jahab Corporation.  Do you recall hearing that argument?

13       A    Yes, I do.

14       Q    Did you authorize that transfer?

15       A    No, sir.  I don't have the ability to authorize

16   that type of thing.

17       Q    Why -- why weren't you involved in the creation of

18   Jahab?

19       A    My wife has been involved in charitable activities

20   for the last couple of decades and she is the owner of

21   Advanced Floor Concepts.  And we talked about that, and she

22   expressed some desire to set up a charitable foundation to

23   continue her charitable work.  And that's my understanding,

24   that Jahab arose out of that commitment to Christian

25   charities.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 27

1        Q    So these discussions you had with Dee regarding to

2   setting up the Yahab Corporation, can you briefly describe

3   what -- the extent of those discussions.

4        A    Well, they were just causal conversations over the

5   dinner table when she explained what she wanted to do and

6   that she had the ability to do it.  And I shared with her

7   that it would be a good idea.  And we are both involved in

8   Christian ministry and I encouraged her to continue along

9   that line.

10            THE COURT:  Mr. Bednarski, I assume these folks

11   are waiving the marital privilege?

12            MR. BEDNARSKI:  Yes, Your Honor.

13            THE COURT:  All right.

14            MR. BEDNARSKI:  Sorry.  I thought you were looking

15   over there for a second.

16        Q    (BY MR. BEDNARSKI) Now, in order to set it up, did

17   you have to consent to the creation of the Jahab

18   Corporation?

19        A    No, not at all.

20        Q    Now, the Government talked about that Jahab was

21   created in the first part of the September of 2014.  Do you

22   recall that discussion?

23        A    Yes.  That's -- that's my recollection, yes.

24        Q    Was that the first time you and Dee had talked

25   about Dee wanting to create a charitable Christian

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 28

1  organization?

2      A    No.  The first discussions along those lines were

3  back in the end of 2012 and continued through 2013 and were

4  apparently manifested in the creation of Jahab in 2014.

5          MR. BEDNARSKI:  Your Honor, if I may approach the

6  witness.

7      Q    (BY MR. BEDNARSKI) I'm handing Mr. Wilhite Exhibit

8  1 -- Defense Exhibit 1.  Mr. Wilhite, do you recognize that

9  document?

10     A    It appears to be Articles of Incorporation for the

11  Jahab Corporation.

12     Q    If you would go to the last page, please.

13     A    Yes.

14     Q    Did you sign it?

15     A    No, there is no signature by me on the last page.

16     Q    Whose signatures are on there?

17     A    On the left-hand side Darla Dee Wilhite,

18  identified as president.  And on the right side, Jim Davis,

19  identified as secretary.

20          MR. BEDNARSKI:  If I may approach --

21     Q    (BY MR. BEDNARSKI) Mr. Wilhite, I'm handing you

22  Defense Exhibit 3.  Do you recognize that document?

23     A    It appears to be an Application for Recognition of

24  Exemption in IRS Form 1023.

25          THE COURT:  Wait a second.  He asked you if you

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 29

 1  recognize it. I could sit there and read that, what you just

 2  read.  Do you recognize this document?

 3           THE WITNESS:  Thank you, Your Honor.

 4      A    No, I have no idea what this is.

 5      Q    (BY MR. BEDNARSKI) Mr. Wilhite, are you a

 6  signature on any of the bank accounts of the Jahab

 7  Corporation?

 8      A    No, sir.

 9      Q    I want to talk to you what, if any, involvement

10  you have with the Jahab Corporation.

11      A    I have no day-to-day involvement with Jahab at

12  all.

13      Q    Are you on their board of directors?

14      A    No.

15      Q    Why not?

16      A    Well, I wasn't asked to be on the board of

17  directors, to start with.

18           And Dee has shared with me that in creating the

19  board of directors -- and there are three of them -- that

20  for her to be on the board of directors and me to be on the

21  board of directors, the third director would be deemed

22  irrelevant since she and I could vote any, pass anything

23  that we wanted to do.

24           Dee has a commitment to having it be transparent

25  and completely without any suspicion of inside dealing or

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                      July 21, 2015

Page 30

 1  anything like that.  So it would be inappropriate for me to
 2  be on the board of directors.
 3       Q     Did you want to be on the board of directors?
 4       A     Not really.
 5       Q     Did you ask to be on the board of directors?
 6       A     No, I definitely did not ask to be.
 7       Q     Now, Ms. Froehlke talked about some precious
 8  coins.  Do you recall that discussion in our argument?
 9       A     Yes, I do.
10       Q     Did you, at any time, place orders with Colorado
11  Precious Metals and Coins after the creation of the Jahab
12  Corporation?
13       A     Yes, I did.
14       Q     Did you, at any time, place any orders for Jahab
15  Corporation with Colorado Precious Metals and Coins?
16       A     Yes.
17       Q     Why?
18       A     I was asked by Dee, with the authorization of the
19  board of directors, to place the orders with Colorado
20  Precious Metals and Coins.  I knew the fellow who owned
21  Colorado Precious Metals and Coins, always treated me fairly
22  and treated Dee fairly.  Pricing was competitive and I just
23  sold at her direction, simply because, you know, I had a
24  relationship with the gentleman.
25       Q     Explain that relationship to the Court.

Page 31

```
 1      A    Oh, through the last, at least ten years or so,
 2  Dee has acquired precious metals in the form of gold coins
 3  or silver coins from various different companies, including
 4  Colorado Precious Metals and Coins, and simply has
 5  accumulated them over the years.
 6           THE COURT:  Mr. Wilhite, you said "Dee has."  Mr.
 7  Bednarski asked you about your relationship, I think.
 8           MR. BEDNARSKI:  That is correct, Your Honor.  I
 9  was going to follow up on that.
10           THE COURT:  Very good.
11      Q    (BY MR. BEDNARSKI) So you talked about Dee
12  purchasing gold coins and silver coins in the past.  What --
13  how did your relationship with Colorado Precious Metals and
14  Coins begin and get to the point where you felt comfortable
15  going forward with Jahab's requests?
16      A    Dee had made several purchases from Colorado
17  Precious Metals -- well, she had actually -- they had a shop
18  in Colorado Springs and she was referred to them and she
19  went and visited them in the shop.  I later, on a separate
20  occasion, visited them in the shop.  Seemed like a nice,
21  straightforward person.  I believe that she knew someone,
22  although I can't recall who, that had dealt with them
23  successfully before.  So that's how the relationship began.
24      Q    So you again talked about Dee making these
25  purchases.  What was your involvement in any of those prior
```

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                      July 21, 2015

Page 32

1    purchases by Dee of these gold and silver coins?

2        A    Oh, when the product became available, Dave would

3    typically say call and say, We have your order ready for

4    pickup.  And on most occasions, I would meet Dave somewhere

5    in Colorado Springs and pick up the package for Dee.

6        Q    How would Colorado Precious Metals and Coins get

7    paid for those coins that you were picking up?

8        A    It was always by wire-transfer.  Dee would do a

9    wire-transfer out of her account in the required amount.

10       Q    Now, did you at any time authorize, on behalf of

11   Yahab, wire transfers to Colorado Precious Metals and Coins

12   for the purchase of those gold and silver coins?

13       A    No, I don't have the authority to do that.

14            MR. BEDNARSKI:  Your Honor, may I have a moment?

15            THE COURT:  Yes.

16            MR. BEDNARSKI:  I don't have any further

17   questions, Your Honor.

18            THE COURT:  Okay.  Cross-examination?

19                    CROSS-EXAMINATION

20   BY MS. FROEHIKE:

21       Q    Mr. Wilhite, I want to talk a little bit more

22   about your previous dealings or relationship with Colorado

23   Precious Metals.

24            The Yahab Foundation purchases were not the first

25   time you went to Mr. Bayuk to purchase gold coins or silver

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 33

1  coins; is that right?

2      A    No, that would not be correct.  If I understood

3  your question, you asked if I had gone to him to purchase

4  coins.  The only time I have ever met with Dave was to pick

5  up package of coins that were purchased by Dee.

6          MS. FROEHLKE:  May I have permission to approach

7  the witness.

8      Q    (BY MS. FROEHLKE) Mr. Wilhite, I have handed you

9  Government Exhibit 2.  If you could please open up to the

10 first page of that exhibit, do you recognize the document

11 there?

12     A    I have never seen this document before now.

13     Q    That document includes a signature at the bottom,

14 does it not?  If you could turn -- I think maybe our

15 exhibits are in a different order.

16          If you could actually skip the first four pages,

17 and turn to page 5.  I believe they are double-sided.

18          MR. BEDNARSKI:  Mine aren't double-sided and his

19 aren't either.

20          MS. FROEHLKE:  I apologize, Your Honor.

21     Q    (BY MS. FROEHLKE) Are you on the fifth page there,

22 Mr. Wilhite?

23     A    I believe so.  I'm not exactly sure.

24          MR. BEDNARSKI:  The fifth page is just like the

25 fourth, third and second page.  It's a (inaudible)

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 34

 1  transaction.

 2          MS. FROEHLKE:  If I could approach the witness,

 3  Your Honor --

 4          THE COURT:  Okay.

 5          MS. FROEHLKE:  -- I will get him to the page.

 6      Q    (BY MS. FROEHLKE) If you could tell the Court how

 7  many pages into the exhibit that is, just for clarification.

 8      A    Oh, it's five or six pages into the exhibit.

 9      Q    Do you recognize what you are looking at there?

10      A    Yes, I do.

11      Q    What is that?

12      A    It is a delivery receipt from Colorado Precious

13  Metals.

14      Q    And that's your signature at the bottom?

15      A    Yes, it is.

16      Q    And it's dated.  Do you see the date, it's about

17  -- it's on the right-hand side?

18      A    Yes.  Is it December 20, 2014?

19      Q    It looks like that may be a 3, December 30.  Is

20  that --

21      A    I'm sorry, I can't distinguish what the date is.

22      Q    That's fine.

23          So you are saying that this is a delivery receipt;

24  is that right?

25      A    Yes.  Well, I don't -- it's a receipt.  I don't

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                      July 21, 2015

Page 35

 1  know if the package was delivered on that date or if the

 2  order date was that date.

 3      Q    Do you recall signing on that date?

 4      A    I recall signing it, but I don't recall the date.

 5      Q    Do you recall when you signed this receipt,

 6  whether it was an order or a delivery receipt?

 7      A    This was typically a delivery receipt.

 8      Q    If you could turn to the next page.  Do you

 9  recognize these two documents?

10      A    Yes, I do.

11      Q    What are they?

12      A    They appear to be delivery receipts.

13      Q    And that's your signature on the bottom?

14      A    Yes, ma'am.

15      Q    What is that date?

16      A    On the left, it looks like February 6 of 2015.

17  And the right, it's difficult to make out, but it looks like

18  it's February.  I can't make out the second and third.

19      Q    Do you recall signing these receipts?

20      A    Yes, I do.

21      Q    These again were for delivery?

22      A    For delivery, yes.

23      Q    If you could turn to the next page.

24          THE COURT:  Let's go back to that page.  Mr.

25  Wilhite, your date is right next to your signature.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 36

```
 1              THE WITNESS:  Oh, I'm sorry, Your Honor.  I was

 2   looking up at the top right-hand corner.

 3       A    Next to my signature, yes, 2-24 of 2015.

 4              THE COURT:  That is the day you probably signed

 5   it?

 6              THE WITNESS:  Yes, Your Honor.

 7       Q    (BY MS. FROEHLKE) If you could go to the next

 8   page, Mr. Wilhite.  Do you recognize these documents?

 9       A    Yes, I do.

10       Q    And I know, again, it's a little bit difficult to

11   read, but do you see the date on the top right-hand of those

12   receipts?

13       A    It looks like September 19 of 2014.

14       Q    And on the left, do you see that date?

15       A    Looks like June 2 of 2014.

16       Q    You signed these two documents; is that correct?

17       A    Yes.

18       Q    And neither of these are for the Yahab Foundation,

19   right?

20       A    That would be correct.

21       Q    It doesn't list any other corporation on these

22   sheets, right?

23       A    No, it does not.

24       Q    Just your name and your wife's name?

25       A    Correct.
```

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 37

1    Q    Let's turn to the next page.  Do you recognize

2    these documents?

3    A    Yes, I do.

4    Q    And what are they?

5    A    Delivery receipts.

6    Q    Do you see the dates on these?

7    A    On the left one, it looks like 3-6 of 2014.  On

8    the right side, 3-27-2014.

9    Q    And that's your signature at the bottom.

10   A    Yes, ma'am, it is.

11   Q    Let's turn to the next sheet.  Again, can you tell

12   me what these are.

13   A    I'm sorry?

14   Q    Can you tell me if you recognize these documents.

15   A    Yes, I do.

16   Q    What are they?

17   A    Delivery receipts.

18   Q    And you have signed these documents; is that

19   right?

20   A    I'm sorry?

21   Q    You signed these document, these receipts; is that

22   right?

23   A    No, ma'am.  It appears that the one on the left is

24   signed by Dee Wilhite and the one on the right is signed by

25   me.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 38

1     Q    I apologize.  So on August 8, 2013, you signed the

2  receipt on the right; is that correct?

3     A    Right.

4     Q    So you have had quite a few dealings with

5  Mr. Bayuk, would you agree?

6     A    I think that's a fair statement.

7     Q    What would happen when you were signing these

8  receipts?  Can you walk us through the process of delivery.

9     A    I'm sorry, I didn't quite understand.

10    Q    When you signed these receipts, can you walk us

11 through what your interaction with Mr. Bayuk was.

12    A    We would normally meet for a cup of coffee and he

13 would have a package containing whatever items were

14 purchased.  And he would present the receipt for signature,

15 hand me the package.  We would finish our coffee and go our

16 separate ways.

17    Q    So of these nine different receipts we have talked

18 about, you were the delivery person for eight of them; is

19 that right?

20    A    Yes, ma'am.

21    Q    Why is that?

22    A    I was asked to do it. I travel through Colorado

23 Springs with some regularity.  And it was simply more

24 convenient for me to pick it up and bring it back to the

25 appropriate place.

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                        July 21, 2015

Page 39

 1     Q    How were these coins typically purchased?  How
 2   were they ordered?
 3     A    Always by wire-transfer, to the best of my
 4   recollection.
 5     Q    So if you could turn --
 6          THE COURT:  That question had two parts.  You
 7   said:  How were they purchased?  How were they ordered?
 8          MS. FROEHLKE:  Yes, Your Honor.
 9          THE COURT:  As to the ordering part, Mr. Wilhite,
10   what was your understanding of how the order got initiated?
11     A    Typically, I would initiate the order or Dee would
12   initiate the order.
13     Q    (BY MS. FROEHLKE) Did you initiate the eight
14   orders that you signed for?
15     A    I can't recall if I initiated each of the eight
16   orders.
17     Q    But you had initiated orders with Mr. Bayuk; is
18   that right?
19     A    Yes, I have.
20     Q    Did Mr. Bayuk ever meet with Dee in person, to
21   your knowledge?
22     A    I believe so, yes.
23     Q    More than the one time she signed?
24     A    Yes.
25     Q    If you could turn to -- I apologize again if I get

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 40

 1    -- these pages may be a little bit out of order.  But

 2    hopefully, they are not.

 3             If you could turn to second page of that exhibit,

 4    so it's going to look different than the receipt we just

 5    talked about.

 6             THE COURT:  You are not including the cover page

 7    as a page number?

 8             MS. FROEHLKE:  I'm not, Your Honor.

 9             THE COURT:  Okay.

10        Q    (BY MS. FROEHLKE) Now, we talked about that first

11    receipt from December of 2014.  As you read the date, you

12    thought maybe December 20th, it looked like December 30th,

13    it's a handwritten receipt, so we can talk to Mr. Bayuk

14    about what that date was.

15             But if you could look about halfway down this

16    page, you will see this is a screen shot of JP Morgan Chase

17    and Company bank statement.  Is that --

18        A    I'm sorry, what am I looking for halfway down the

19    page?

20        Q    On December 31, 2014, there's an incoming

21    wire-transfer from the Yahab Foundation for 49,300 -- I'm

22    sorry, $48,100.  Do you see that?

23        A    I'm not seeing it on this page.

24             THE COURT:  I'm not either.

25             MS. FROEHLKE:  I apologize, Your Honor.  Let me --

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 41

 1  if I could approach the witness and make sure we are on the

 2  same page.

 3          THE COURT:  Okay.

 4          THE WITNESS:  That's not 48,000.

 5      Q    (BY MS. FROEHLKE) (Inaudible).

 6      A    Yes.

 7          THE COURT:  Which line, Mr. Wilhite, are you on?

 8  Just go ahead and give me the --

 9          THE WITNESS:  This is about two-thirds of the way

10  down the page.

11          THE COURT:  Okay.

12          THE WITNESS:  12-31 of 2014 identifies incoming

13  wire-transfer.

14          THE COURT:  Go ahead.

15      Q    (BY MS. FROEHLKE) That wire-transfer represents

16  the delivery -- the same delivery receipt we talked about

17  from December 2014.  Would you agree?

18      A    I believe so, yeah.

19      Q    And so you are saying that the gold was delivered

20  to you before December 31, when that wire-transfer occurred?

21      A    No.  It can't be delivered before a wire-transfer.

22      Q    But it is a delivery receipt on a date prior to

23  the wire-transfer; is that what your testimony is today?

24      A    No, not at all.

25      Q    Would you say, then, it's an order receipt?

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                        July 21, 2015

Page 42

 1      A    I'm sorry, I'm not sure I understand the question.

 2      Q    **If you can go back to page 5, the first receipt we**

 3   **talked about in this exhibit, you testified a few minutes**

 4   **ago that it was a delivery receipt; is that right?**

 5      A    Okay.  Which receipt am I supposed to look at now?

 6      Q    **On page 5, a receipt from December 2014.**

 7           MR. BEDNARSKI:  (Inaudible).

 8      A    Is this the one that says:  Amount 48,100?

 9      Q    **(BY MS. FROEHLKE) Yes.**

10      A    Okay.  I'm looking at that page now.

11      Q    **Now, you testified a few minutes ago that that is**

12   **a delivery receipt?**

13      A    Correct.

14      Q    **Do you recall if you made the order for this**

15   **purchase?**

16      A    Yes, ma'am.

17      Q    **Did you?**

18      A    Yes.

19      Q    **Did you choose the amount $48,100 when you made**

20   **that order?**

21      A    I'm sorry, the question again was?

22      Q    **How did you come to order $48,100?  How did you**

23   **come to that decision?**

24      A    The requested quantity was 2500 one-ounce Silver

25   Eagles and the amount was specified by the vendor.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 43

```
 1      Q    How did you come to the decision to order
 2 2000-some Silver Eagles?
 3      A    I was asked by the board of directors of Jahab to
 4 order those and it was conveyed to me through Dee Wilhite.
 5      Q    Do you know why Mrs. Wilhite chose 2500 Silver?
 6      A    You would have to ask Ms. Wilhite.
 7      Q    What is the Silver --
 8           THE COURT:  (Inaudible).
 9           THE WITNESS:  I'm sorry.
10      A    The answer is no.
11      Q    (BY MS. FROEHLKE) Can you describe to me what a
12 Silver American Eagle is.
13      A    I'm sorry, I was focused elsewhere.  Your question
14 is now?
15      Q    What is a Silver American Eagle?
16      A    It's a gold coin -- I'm sorry.  It's a silver coin
17 issued by the United States Treasury.
18      Q    Do you know its value -- one coin's value?
19      A    I think face value, if I remember correctly, is
20 $5.
21           MS. FROEHLKE:  If I may have a moment, Your Honor.
22      Q    (BY MS. FROEHLKE) Mr. Wilhite, do you recall what
23 your exact direction was from your wife in purchasing these
24 coins in December?
25      A    Are you talking about this particular delivery
```

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 44

```
 1  receipt?
 2      Q    We can start with that, yes.
 3      A    The direction was to purchase 2500 Silver Eagles.
 4      Q    Did the direction involve any other detail?
 5      A    I don't recall any other specific details.
 6      Q    You mentioned that you are not involved in the
 7  day-to-day dealings, I think you said, of the Yahab
 8  Foundation.
 9      A    That is correct.
10      Q    To your knowledge, did the Yahab Foundation have
11  any other dealings than these purchases?
12      A    I wouldn't know all of the dealings of Jahab; but
13  I'm assuming that this is -- this may not be limited to a
14  single receipt.
15      Q    Well, we have seen several receipts.  I'm asking
16  if Yahab Foundation has any other charitable activity or any
17  other financial activity than purchasing gold coins, to your
18  knowledge.
19      A    I can't answer that question.
20      Q    Mr. Wilhite, do you recall when you first met Mr.
21  Bayuk, the owner of Precious Metals?
22      A    I don't recall a specific date.
23      Q    Do you recall if you met him through your wife?
24      A    Yeah.  I believe it was quite some time ago that
25  Dee met him first and I subsequently met him sometime later.
```

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                    July 21, 2015

Page 45

1              MS. FROEHLKE:  May I have permission to approach

2       the witness.

3              Q    (BY MS. FROEHLKE) Mr. Wilhite, I'm showing -- I

4       have given you what has been marked as Exhibit 6 of the

5       Government.  Do you recognize that document?

6          A    Give me just a second, please.

7               Yes.  Go ahead, please.

8          Q    What is that document?

9          A    Looks like a letter from the Department of Justice

10      to me.

11         Q    What is the date of that document?

12         A    April 3 of 2014.

13         Q    Do you recall receiving that document?

14         A    I believe so.

15         Q    And that instructed you to preserve all evidence

16      related to pending litigation on your company -- on Advanced

17      Floor on restitution enforcement?

18         A    Yes, ma'am.

19         Q    And you and I have met previously; is that right?

20         A    I'm sorry?

21         Q    You and I met at your deposition before today,

22      right?

23         A    Briefly, yes.

24         Q    On October 16.

25         A    If that was the date of the deposition, yes.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 46

1    Q    Do you recall receiving notice of that deposition

2  in September of 2014?

3    A    Yes, ma'am.

4          MS. FROEHLKE:  No further questions at this time.

5          THE COURT:  I wonder what your point was with this

6  last document.

7          MS. FROEHLKE:  Just that Mr. Wilhite was on notice

8  of pending litigation.  Even though we hadn't actually filed

9  a Writ yet, Your Honor, we were issuing subpoenas all summer

10  long, deposing the two witnesses on their interest in the

11  company.  And we sent a preservation notice in April of 2014

12  outlining the anticipated litigation on the ownership

13  issues.

14          THE COURT:  Right.  And are you making a

15  spoliation argument or something like that?

16          MS. FROEHLKE:  No, Your Honor.  Just a notice

17  argument.

18          THE COURT:  All right.

19          Mr. Wilhite, I have a few questions and, of

20  course, both counsel can follow up.

21          You state you were involved in discussions about

22  the formation of -- how do you pronounce it?  Is it Jahab?

23          THE WITNESS:  Your Honor, it's called Jahab.

24          THE COURT:  Does that stand for something.

25          THE WITNESS:  Yes, it does.  It's Hebrew and it's

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 47

 1   the infinitive form of the verb "to give."  And it would be

 2   pronounced with lots of phlegm on the back of your throat.

 3   Jahab.

 4            THE COURT:  And the purpose was to benefit

 5   Christian causes?

 6            THE WITNESS:  That is correct.

 7            THE COURT:  That's what you said?

 8            Now, to follow up on something that Ms. Froehlke

 9   said.

10            Are you aware of any money going to Christian

11   causes from Jahab?

12            THE WITNESS:  I am aware that contributions have

13   been made from Jahab to the Wild West Cowboy Church in

14   Western Colorado where both my wife and I attend.  I'm aware

15   that a significant amount of long-term food storage has been

16   purchased and stored to be made available as the need

17   arises.

18            THE COURT:  And that's stored at your premises?

19            THE WITNESS:  That's correct.

20            THE COURT:  Okay, all right.

21            Did you, in discussions you had forming Jahab, did

22   you discuss the benefit in forming a nonprofit versus giving

23   any monies directly to Christian causes?

24            THE WITNESS:  Yeah, from -- from what the attorney

25   who set it up, if it was a foundation, then that foundation

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 48

 1  had a separate existence, separate from Advanced Floor

 2  Concepts or Dee Wilhite; and that in the event of her death

 3  or something, that foundation could continue on under the

 4  direction of the directors and could continue to do its

 5  committed work, even if the person that organized it no

 6  longer existed.

 7              THE COURT:  Do you have any understanding as to

 8  whether transfers of money to Jahab would be considered

 9  charitable donations by your wife?

10              THE WITNESS:  I'm sorry, transfers of money from

11  another entity to Jahab?

12              THE COURT:  Yes.  Or -- well, who was transferring

13  -- who transferred money to Jahab?

14              THE WITNESS:  No one has ever transferred money to

15  Jahab, except for Advanced Floor Concepts, the company owned

16  by Dee Wilhite.

17              THE COURT:  As far as you know, it's only Advanced

18  Floor Concepts that has done that?

19              THE WITNESS:  That is correct.

20              THE COURT:  Do you know whether they consider that

21  a charitable donation that is tax deductible?

22              THE WITNESS:  Yes, I believe that is so.

23              THE COURT:  You say you had discussions on --

24  well -- I guess, I think it was your attorney -- about

25  whether you should be on the board of directors.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 49

```
 1              THE WITNESS:  Sure.
 2              THE COURT:  Did those discussions include the
 3  advisability of being on the board in light of the fact that
 4  you are a debtor in a criminal case?
 5              THE WITNESS:  No, no, those discussions didn't go
 6  there.  The discussions were really limited to if you were
 7  going to have three directors, do you want two of them to be
 8  husband and wife?  And is that the appropriate appearance
 9  for an independent charitable foundation?
10              THE COURT:  The directors, beside your wife, are
11  who?
12              THE WITNESS:  Jim Davis, who is a retired
13  associate pastor of a Christian church.  Larry Smith, who is
14  the current pastor of the Wild West Cowboy Church in Western
15  Colorado.  And then, of course, Dee Wilhite.
16              THE COURT:  Besides coins, were there ever
17  purchases of bars?
18              THE WITNESS:  No, absolutely not.
19              THE COURT:  It's only coins?
20              THE WITNESS:  Only U.S. currency.
21              THE COURT:  Okay.  And from the documents we have
22  seen, they demonstrate a number of purchases of coins over a
23  period of time?
24              THE WITNESS:  That is correct.
25              THE COURT:  Had any of those coins ever been
```

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 50

```
 1  disposed of, to your knowledge?

 2              THE WITNESS:  No, sir, not to my knowledge.

 3              THE COURT:  So every coin, ever precious metal or

 4  coin that you or your wife, whoever, that you were aware of

 5  that Jahab or anybody associated with your wife that was

 6  purchased, they have never been disposed; they have always

 7  been retained?

 8              THE WITNESS:  Absolutely.

 9              THE COURT:  Okay.

10              Mr. Bednarski, any questions?

11              MR. BEDNARSKI:  Just a brief follow-up, Your

12  Honor.

13              Your Honor, if may I approach this witness?

14              THE COURT:  Sure.

15                        REDIRECT EXAMINATION

16  BY MR. BEDNARSKI:

17      Q    Mr. Wilhite, I'm going to go to Government's

18  Exhibit 2, the receipts that we've been talking about as it

19  related to the delivery receipts from Colorado Precious

20  Metals and Coin.

21      A    Yes, sir.

22      Q    Now, on that first receipt that is dated some time

23  up in the top right-hand of December 2014, you talked about

24  your signature being down below; is that right?

25      A    That is correct.
```

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                    July 21, 2015

Page 51

1      Q    What is right above your signature?

2      A    It looks like --

3           MR. BEDNARSKI:  If I may approach, Your Honor, I

4   will show him.

5      A    I can see it.  It looks like it's a date of

6   1-13-2015, "Received By."

7      Q    (BY MR. BEDNARSKI) Why did you sign that?

8      A    Because I actually received the packages

9   containing the items on the receipt.

10      Q    So you were signing it as saying you received

11   these 2500 silver coins?

12      A    That is correct.  I took physical delivery of them

13   for Jahab.

14      Q    Is there a date above that "Received by," then by

15   your signature?

16      A    Yes, there is.  It's appears to be 1-13 of 2015.

17      Q    Do you recall if that's when you received the

18   delivery of these silver coins?

19      A    To the best of my recollection, yes.

20      Q    Now, if you turn to the next page, we will deal

21   with these next two, the one from February 24, both of these

22   dates.  Who does it say is the name as it relates on the

23   delivery receipt?

24      A    Are we looking at the --

25      Q    The very top, the name at the top regarding

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 52

1  Colorado Precious Metals and Coins, who is the receipt made

2  out to?

3      A    Michael Wilhite/Jahab.

4      Q    Is that on both of them?

5      A    Yes, sir.

6      Q    Now, down at the bottom, does it again say

7  "Received By," and then your signature?

8      A    Yes, it does.

9      Q    And what -- why did you sign this?

10     A    Because I physically took delivery of the items

11 for the benefit of Jahab.

12     Q    The Government asked you a few questions about

13 whether or not you initiated the orders.  And you said yes,

14 you initiated the orders.

15          What do you mean by you initiated the orders?

16     A    Receiving direction from Jahab to make purchases,

17 I would call Dave Bayuk of Colorado Precious Metals and say,

18 For Jahab, I would like to place an order for a specific

19 amount of either gold coins or silver coins.

20     Q    So when you say you initiated the orders, that

21 means you called the owner of Colorado Precious Metals and

22 Coins?

23     A    That is correct.

24     Q    When we talk about "initiate," was it your

25 decision to decide to buy these gold and silver coins?

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 53

 1      A    No, sir.  I don't have that authority.

 2           MR. BEDNARSKI:  May I have a moment?

 3           No further questions, Your Honor.

 4           THE COURT:  Ms. Froehlke, anything further?

 5           MS. FROEHLKE:  Yes, Your Honor.

 6                     RECROSS EXAMINATION

 7  BY MS. FROEHLKE:

 8      **Q    Mr. Wilhite, to your knowledge, where are these**

 9  **coins?**

10      A    To the best of my knowledge, they are locked in

11  the safe at Dee Wilhite's residence.

12      **Q    That's also your residence; is that right?**

13      A    Yes, I also live there.

14      **Q    Do you have a combination to that safe?**

15      A    No, I do not.  Oh, wait, I'm sorry.  I need to

16  correct that.

17           Dee ordered a new safe that is replacing an older

18  model which was not 100 percent secure.  That safe is being

19  delivered tomorrow morning and installed in place.  The

20  assets of Jahab will be transferred to that safe, and I will

21  not have the combination to that safe.

22      **Q    But you do have the combination to the old safe?**

23      A    Yes, I do.

24      **Q    And just to clarify, I believe you testified to**

25  **this already -- or your attorney may have argued it, but you**

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 54

```
 1  have no assets whatsoever; is that true, Mr. Wilhite?

 2  A    Not of any substance at all.

 3       MS. FROEHLKE:  No further questions, Your Honor.

 4       MR. BEDNARSKI:  Your Honor, if we can approach and

 5  grab these exhibits, we can put them back.

 6       THE COURT:  Yes.

 7       MR. MIKULECKY:  Ready, Your Honor?

 8       THE COURT:  Yes.

 9       MR. MIKULECKY:  Call Doug Holden.

10                   DOUGLAS HOLDEN,

11  having been first duly sworn, was examined and testified as

12  follows:

13                   DIRECT EXAMINATION

14  BY MR. MIKULECKY:

15       Q    Please state your name.

16       A    My name is Douglas Holden.

17       Q    Your business address, sir?

18       A    My business address 10526 West Alameda Avenue, in

19  Lakewood, Colorado.

20       Q    How are you employed, sir?

21       A    I am an attorney in private practice.

22       Q    How long have you been an attorney?

23       A    Since 1977, however many years that is.

24       Q    I understand.

25            Do you have an area of specialty or an area of
```

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 55

1  expertise in which you practice?

2      A    Well, I guess I would say I have a general

3  practice.  Most of my practice involves wills, trusts,

4  probate and some estate planning. I have a business

5  background, as well, so I do a lot of business work, profit

6  and nonprofit.

7      Q    When did you first meet Mrs. Dee Wilhite?

8      A    I believe in October of 2012, I received a phone

9  call from a CPA who asked me if I would be willing to meet

10 with both Dee Wilhite and Mike Wilhite regarding an estate

11 plan.  We met after that, not too long after that, to

12 discuss their estate plan.

13     Q    So since 2012, you have been helping Mrs. Wilhite

14 with her estate plan?

15     A    Yes.  The estate plan was established around that

16 time and there hasn't been a lot of ongoing discussion about

17 the estate plan because it was completed.

18     Q    Was there a discussion at that time about setting

19 up a charity or a foundation of some sort with Mrs. Wilhite?

20     A    Yes.  Well, I would say yes, it's my common

21 practice in this type of situation to address the issues of

22 foundations and other charitable organizations.

23     Q    So that was discussed first in 2012 when you met

24 with Mrs. Wilhite?

25     A    Yes, I believe so.

United States of America vs.                                  Motion to Quash Hearing
Michael David Wilhite                                                  July 21, 2015

Page 56

1      Q     Did you later, then, establish for her the Yahab

2   Foundation?

3      A     Yes.

4      Q     Do you remember when that was?

5      A     I believe in September of 2014, I again received a

6   call from that same CPA asking if I would be willing to work

7   with Mrs. Wilhite to set up the Foundation.  So we met

8   shortly after that.

9      Q     And this is the sort of work that you do as an

10   attorney, set up nonprofit organizations?

11      A     Yes.

12            MR. MIKULECKY:  Your Honor, if I may approach.

13            THE COURT:  Yes.

14            MR. MIKULECKY:  And also if I may hand several at

15   once, just to expedite.  It's going to be Defense Exhibits

16   1, 2, 3 and 4.

17      Q     (BY MR. MIKULECKY) Start with Defense Exhibit 1,

18   can you identify what that document is?

19      A     Yes, I can.

20      Q     What is that?

21      A     This is the Articles of Incorporation for Yahab

22   Foundation that I prepared and filed with the Colorado

23   Secretary of State.

24      Q     And it was filed, says in the right-hand corner,

25   on September 25, 2014, correct?

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 57

```
 1      A    That is correct.

 2      Q    Is this the standard sort of a document that you

 3  prepare?

 4      A    I'm sorry?

 5      Q    Is this the standard type of a document that you

 6  prepare for establishing a nonprofit corporation?

 7      A    Yes.

 8      Q    If you turn to the fourth page, it's

 9  entitled "Separate Provisions for the Articles of

10  Incorporation."

11           Do you see that?

12      A    Yes.

13      Q    The second section in the middle says, Prohibited

14  Activities?

15      A    Yes.

16      Q    I will paraphrase.  It says:  No part of the

17  earnings can go to the benefit of any member, officer or

18  private person.

19           Do you see that?

20      A    Yes.

21      Q    Why is that there?

22      A    Required by the Internal Revenue Service.

23      Q    So the money can't be used to benefit, for

24  example, Mrs. Wilhite or anyone else?

25      A    Yes, that's true.  We would never have received an
```

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 58

 1  exemption without this language.

 2      Q    The same page at the bottom has a section

 3  entitled "Distribution of Assets on Dissolution."

 4           Do you see that?

 5      A    Yes.

 6      Q    And I will paraphrase again.  That says if the

 7  company dissolves, the assets have to go to another

 8  501(c)(3), right?

 9      A    Yes.

10      Q    Why is that?

11      A    That is standard language required in order to get

12  the exemption.

13      Q    If you turn to two additional pages in Defense

14  Exhibit 1, you come to the bylaws of the Yahab Foundation.

15  Do you see that?

16      A    Yes.

17      Q    And the standard bylaws that you prepare for a

18  nonprofit corporation?

19      A    Yes.

20      Q    And look to the last page signed by Mrs. Wilhite

21  as the president, right?

22      A    Yes.

23      Q    And Mr. Davis as the secretary, right?

24      A    Yes.

25      Q    At this time that you were giving Yahab

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 59

1 Foundation, Incorporated with Mrs. Wilhite as the president,

2 Mr. Davis as the secretary, you had said that you previously

3 met with both Mrs. Wilhite and Mr. Wilhite, correct?

4      A    That is true.

5      Q    Did you know at this time that Mr. Wilhite was

6 under a restitution order from his prior criminal case?

7      A    I was aware of it, yes.

8      Q    Was that a factor at all in setting up Yahab

9 Foundation?

10     A    Wasn't a factor with me, no.

11          THE COURT:  I'm not sure that answers the

12 question.  He didn't limit it to you.

13     Q    (BY MR. MIKULECKY) Was it a factor with anyone of

14 which you had knowledge?  Was that discussed at all?

15     A    I don't know.  I don't know if it was a factor

16 with other people.

17     Q    Was it discussed at all?

18     A    We had -- was it discussed at the time of the

19 formation of the Foundation?

20     Q    Yes, sir.  That he had a restitution order?

21     A    I don't recall whether we discussed that

22 specifically, no, sir.

23     Q    Let me be blunt, then.  Was this being done to set

24 up the Yahab Foundation to hide assets of Mr. Wilhite, as

25 the Government has alleged?

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 60

```
 1      A    Of course not, no, sir.

 2      Q    What happens to the 501(c)(3) status if that was

 3  the intent of the Yahab Foundation?

 4      A    If it was discovered, then the organization would

 5  lose its exemption.

 6      Q    What would happen to your law license, sir?

 7      A    I'm sorry?

 8      Q    What would happen to your law license?

 9      A    Well, if I knew about it, I'm sure my law license

10  would be in jeopardy, as well.

11      Q    Thank you.

12           Take a look, if you would, at Defense Exhibit 2.

13  What is that document?

14      A    This is the assignment letter for an employee

15  identification number.

16      Q    This is from the IRS establishing a EIN for Yahab

17  Foundation, right?

18      A    Yes.

19      Q    Upper right corner dated September 25, 2014?

20      A    That is correct.

21      Q    Did you apply for the EIN on behalf of Jahab?

22      A    Yes, I did.

23      Q    Is that standard practice for you in establishing

24  a nonprofit?

25      A    Yes, it is.
```

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 61

1      Q      So this is the IRS saying it's been done and here
2   is the number?
3      A      Yes.
4      Q      Take a look, if you would, at Exhibit 3 -- Defense
5   Exhibit 3.  Can you identify that document, please, sir.
6      A      Yes, I can.  It is the Application for Recognition
7   of Exemption.
8      Q      Is this a document that you prepared?
9      A      Yes, it is.
10      Q      And this is required to obtain the 501(c)(3)
11   Status for Jahab; is that correct?
12      A      Yes, it is.
13      Q      And on the first page it identifies, in line 6,
14   that Dee Wilhite is the primary contact, correct?
15      A      Yes.
16      Q      And on the second page of Defense Exhibit 3, it
17   lists the officers and directors, doesn't it?
18      A      Yes.
19      Q      And it states that Ms. Wilhite is the president
20   and a director; Mr. Larry Smith, a director; Jim Davis,
21   secretary/treasurer and director.  Those are the entirety of
22   the board of directors and officers, correct?
23      A      Yes.
24      Q      Mr. Wilhite is not included in that, right?
25      A      That is true.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 62

1    Q    If you go through different pages to the last page

2    of the first form, which is the upper right corner, it says

3    page 12.

4    A    Yes.

5    Q    That's signed by Ms. Wilhite as the president and

6    director, correct?

7    A    Yes, sir.

8    Q    The next page is entitled "Unanimous Written

9    Consent In Lieu of First Meeting of the Board."

10         Do you see that?

11   A    Yes.

12   Q    This is a standard document that you prepare, as

13   well, for a nonprofit?

14   A    Yes.

15   Q    And at the bottom of that page, it identifies and

16   officially elects Ms. Wilhite and Mr. Davis as president,

17   chairman and secretary, respectively, correct?

18   A    Yes.

19   Q    On the next page, we have got the directors

20   officially appointed: Ms. Wilhite, Mr. Smith and Mr. Davis,

21   correct?

22   A    Yes.

23   Q    And again, not Mr. Wilhite, right?

24   A    Yes.

25   Q    And on the next page, we have the signatures with

United States of America vs.                              Motion to Quash Hearing
Michael David Wilhite                                                 July 21, 2015

1  consent to the meeting of the board and Mr. Davis as the

2  secretary, without Mr. Wilhite, correct?

3      A    Yes.

4      Q    Next page we have the Conflict of Interest Policy

5  and Agreement.  Is this something that you typically prepare

6  for a nonprofit?

7      A    Yes.

8      Q    And you prepared this document, as well?

9      A    Yes.

10     Q    And that's the six pages long.  If you go to page

11 6 of 6, Mr. Davis, as secretary, has signed this, correct?

12     A    Yes.

13     Q    Continuing on, the next page is

14 entitled "Supplemental Pages for Yahab Foundation."

15          Do you see that?

16     A    Yes, I do.

17     Q    On the right-hand side it says:  Page 1 of 3.  If

18 you would go to page 3 of 3.  I'm looking at part IX,

19 Financial Data.  Do you see where that is, sir?

20     A    Yes.

21     Q    It says, under line 19:  As of the date of

22 application, there are no assets or liabilities.  The

23 foundation expects a contribution from Dee Wilhite for her

24 various businesses of approximately $225,000 by the end of

25 the year.

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                        July 21, 2015

Page 64

1              Do you see where that I read that, sir?

2      A    Yes.

3      Q    Where did you obtain that information?

4      A    I received that in the initial meeting with Mrs.

5    Wilhite and Mr. Wilhite and their CPA.

6      Q    So you were told that Mrs. Wilhite was going to be

7    funding the Yahab Foundation at that time?

8      A    Yes.

9      Q    Going to the next page, which is

10   entitled "Attachment Form 1023, Part 4 Narrative

11   Description:  Your activities."

12             Do you see that?

13     A    Yes.

14     Q    VII:  How is the activity funded?  States: the

15   activity is funded by Mrs. Wilhite personally and through

16   her various businesses.

17             So that is just repeating what we already saw,

18   correct?

19     A    Yes.

20     Q    Same information, that it's going to be funded by

21   Ms. Wilhite?

22     A    Yes, sir.

23     Q    Finally, if you would take a look at Exhibit 4,

24   can you identify that exhibit, please.

25     A    Yes.  It is the confirmation letter from the

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 65

 1   Internal Revenue Service accepting and establishing Yahab

 2   Foundation as a tax-exempt organization.

 3        Q    As a 501(c)(3) exemption?

 4        A    Yes, sir.

 5        Q    And the date is difficult, but the year appears to

 6   be 2015; is that correct?

 7        A    Yes.

 8        Q    But the effective date is September 25 of 2014,

 9   correct?

10        A    Yes, sir.

11        Q    Does it typically take a fair amount of the time

12   to set up a 501(c)(3) and get the approval from the IRS?

13        A    This was -- this went through very quickly.  This

14   is unusual that it would goes through so quickly.

15        Q    In your experience, how long does it typically

16   take?

17        A    Well, here, the last one I did, took 18 months to

18   hear back.

19        Q    During your process of setting up Jahab and any

20   involvement you have had with it since then, has Mr. Wilhite

21   ever provided any direction or any decisions, of which you

22   were aware, on behalf of Jahab?

23        A    No directions or decisions.

24        Q    Have you seen any involvement of Mr. Wilhite in

25   the operations of Jahab?

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                       July 21, 2015

Page 66

1     A     No.

2     Q     There are some pretty strict IRS rules regarding
3   501(c)(3)'s, correct?

4     A     Yes, sir.

5     Q     The Government is arguing that the money in Yahab
6   should be taken and applied to a debt of Mr. Wilhite.  You
7   are aware that is what the Government is arguing, right?

8     A     Yes, sir.

9     Q     What would be the effect on Yahab's 501(c)(3)'s
10  status, if that were to occur?

11    A     I guess initially, I would say that the exemption
12  would be in jeopardy.  I would like to qualify that a bit,
13  if I could.

14    Q     Please.

15    A     I think if there were a finding of fact in a court
16  decision, then certainly once the Internal Revenue
17  understood that, they would move to terminate the exemption.

18    Q     Terminate the tax-exempt status?

19    A     Yes.

20    Q     What would be the consequences of that, start with
21  initially, for Advanced Floor Concepts that made that
22  donation?

23    A     They would have to recapture that taxwise.

24    Q     There was a question from the judge earlier about
25  whether or not there would have been a tax deduction for

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 67

1    that donation by Advanced Floor.  Is it your understanding

2    that they would have had a tax deduction for that donation?

3        A    Yes.

4        Q    Okay.  So they would have had to recapture that?

5        A    Yes.

6        Q    What about other transactions that Yahab

7    Foundation has engaged in if it's made donations; what

8    happens to those -- those donors, that money?

9        A    I think the same thing.  Anyone who received a

10   benefit would have -- more than likely, would have to

11   account for the benefit, and perhaps have to pay that back.

12   Any organization that it went to that is a tax-exempt

13   organization would also have to recapture.  And if there

14   were suggestions of improper activities, then that exemption

15   also might be in jeopardy.

16       Q    So if there were any donations made by Yahab to

17   third parties, if there had been an alter ego finding, then

18   they would have to do some repayment or recapture of the

19   donations that they received from Yahab?

20       A    Yes, sir, depending on the action of the service.

21       Q    Understood.

22            One final question -- or one final topic, then.  I

23   know you testified that you work a lot for nonprofits.  Are

24   you aware of the Colorado statute that exempts the assets of

25   nonprofits from execution?

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                    July 21, 2015

Page 68

 1      A    Yes, I am.

 2      Q    **Can you briefly summarize what that does.**

 3      A    Well, it exempts the assets unless there is

 4  liability insurance by the organization, and then that

 5  insurance would be subject to the amount of the levy.

 6           MR. MIKULECKY:  Nothing further.

 7           Thank you, Your Honor.

 8                     CROSS-EXAMINATION

 9  BY MS. FROEHLKE:

10      Q    **Mr. Holden, is it?**

11      A    Yes.

12      Q    **You -- you said that you first met the Wilhites in**

13  **October 2012; is that right?**

14      A    I'm sorry.  I'm a little hard of hearing, so --

15      Q    **No problem.  You said you first met the Wilhites**

16  **in October 2012; is that correct?**

17      A    Yes, that's the best of my recollection.

18      Q    **When did you first become aware of Mr. Wilhite's**

19  **restitution order against him?**

20      A    It would have been the first meeting, I would

21  imagine.  At least, that's what I'm recalling.

22      Q    **What was discussed about his restitution order?**

23      A    Well, it's a little bit involved.  It came about

24  with regard to his estate plan.

25      Q    **And Mrs. Wilhite took him off of their estate**

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 69

 1   plan; is that right?

 2       A    No.

 3            MR. MIKULECKY:  Your Honor, first, we want to make

 4   sure that, on behalf of Mrs. Wilhite preserving

 5   attorney/client privilege issues, we called Mr. Holden as

 6   the attorney for Yahab.  He's not testifying on

 7   communications with Mrs. Wilhite.

 8            THE COURT:  In her personal capacity --

 9            MR. MIKULECKY:  Correct.

10            THE COURT:  -- as opposed to representative

11   capacity to Yahab?

12            MR. MIKULECKY:  Yes.  So it's going beyond the

13   scope.  And also we want to preserve all the attorney/client

14   privilege communication.

15            THE COURT:  Okay.  Repeat the question, please.

16       Q    (BY MS. FROEHLKE) I believe the question was that

17   Mr. Wilhite is not a beneficiary of Mrs. Wilhite's estate;

18   is that correct?

19            THE COURT:  And what is the relevance of that?

20            MS. FROEHLKE:  The restitution order was the

21   reason that they initially sought Mr. Holden's advice and it

22   continued to be the reason that they were seeking Mr.

23   Holden's advice.

24            THE COURT:  Ask him that question.

25       Q    (BY MS. FROEHLKE) Was the restitution order the

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 70

1  reason they sought your advice in the estate planning, Mr.

2  Holden?

3      A   I -- I don't believe it was.  That was not stated

4  to me in that manner.

5      Q   Let's move on to the Yahab Foundation.

6  September 2014, you got a call from this CPA for the

7  Wilhites?

8      A   Yes.

9      Q   Is it unusual to be contacted by a CPA regarding

10 Foundation incorporation?

11     A   Not at all.

12     Q   What about funding for Foundations; does that

13 typically come from a limited liability company, in your

14 experience?

15     A   It comes from -- well, I guess, in my experience,

16 it would happen, yes.

17     Q   Would that be a typical scenario for a Foundation,

18 in your experience?

19     A   I'm sorry, you are going to have to define

20 typical.  It happens.

21     Q   Would it happen more than 50 percent of the

22 Foundations you have set up?  Have they been funded by a

23 limited liability company, exclusively?

24     A   Not in my experience, no.

25     Q   What about 10 percent?

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 71

1     A     Probably so.

2     Q     Probably about 10 percent of Foundations?

3     A     Yeah, I'm guessing.

4     Q     Sure.  In your experience, does the 501(c)(3)
5   typically purchase precious metals?

6     A     Not typically, no.

7     Q     What about keeping 501(c)(3) assets at the
8   president's personal residence, does that typically happen?

9     A     I would think so.  A lot of the -- again
10   explaining.  A lot of Foundations are handled out of the
11   personal residence of whoever sets it up, or any other place
12   that they happen to have business.

13     Q     Do you know the specific plan for the precious
14   metals that Yahab Foundation has purchased?

15     A     No, I don't.

16     Q     Has Mrs. Wilhite discussed future plans for those
17   melts with you in my way?

18     A     Not directly, no.

19           THE COURT:  Wait.  That's a lawyer answer.

20           THE WITNESS:  I'm sorry?

21           THE COURT:  You said, Not directly.  What do you
22   mean by "not directly"?

23           THE WITNESS:  There were no specific plans
24   mentioned to me about those assets.

25           THE COURT:  When you said "not directly," you

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 72

 1  qualified your statement.  I want to know why you qualified

 2  "not directly," instead of just saying no.

 3        THE WITNESS:  Well, I believe I understood what

 4  they were doing.  That's what I'm trying to say.

 5        THE COURT:  How did you understand?  Just because

 6  of the nature of their situation, that is the typical

 7  conclusion one would come to?

 8        THE WITNESS:  Yes, sir.

 9        THE COURT:  Okay.  Go ahead.

**10      Q    (BY MS. FROEHLKE) Do you know why Mr. Wilhite was**

**11  present at the initial Yahab meeting?**

12      A    No, I don't know why.

**13      Q    Did you advise the Wilhites that the donation**

**14  would be exempt from levy if there were a levy to be placed**

**15  on them, on the assets?**

16      A    I'm hesitant to answer due to attorney/client

17  privilege.

**18      Q    You testified you were aware of the Colorado**

**19  statute exempting nonprofit assets?**

20        THE COURT:  Wait.  It has been waived for the

21  purposes of the setting of the Yahab.  That was waived --

22  the door was opened by --

23        MR. MIKULECKY:  I think for Yahab, I have to

24  agree, yes, certainly.  But I think they are asking about

25  the assets exempt from execution on Mr. Wilhite's death.  So

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                    July 21, 2015

Page 73

 1  it's starting to stray a little bit.

 2          THE COURT:  As I understand it, it occurred during

 3  the sessions of setting up of Yahab, I think it's fair game.

 4  So go on.  Repeat the question.

 5          THE WITNESS:  I'm sorry, could you ask that again.

 6      Q   (BY MS. FROEHLKE) Did you advise the Wilhites, or

 7  discuss with the Wilhites that Yahab Foundation's assets

 8  would be exempt from levy if there were some sort of debt or

 9  creditor action?

10      A   I do not believe I did.

11      Q   Did you discuss levy whatsoever with the Wilhites

12  in relation to Yahab Foundation?

13      A   Not that I recall.

14      Q   Did you discuss restitution enforcement in any

15  way?

16      A   I don't believe so.

17          THE COURT:  Were you asked any questions along

18  those lines?

19          THE WITNESS:  I'm sorry?

20          THE COURT:  Were you asked any questions along

21  those lines about whether this would somehow be able to

22  protect that money from the United States Government?

23          THE WITNESS:  I don't believe so.

24          THE COURT:  Okay.

25      Q   (BY MS. FROEHLKE) But you were aware of the

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 74

1  restitution order; is that correct?

2      A    Yes, ma'am.

3      Q    Do you know what Jade Enterprises is?  Are you

4  familiar with that entity?

5      A    I'm not familiar with that.

6      Q    Are you familiar with the Cowboy Church -- I'm not

7  sure if I can say the full name, exactly where, but the Wild

8  Cowboy Church that the Wilhites attend?

9      A    I have heard of that organization, yes.

10     Q    Do you know how that organization started?

11     A    I do not.

12          MS. FROEHLKE:  No further questions at this time?

13          THE COURT:  Okay.  And anything further,

14  Mr. Mikulecky?

15          MR. MIKULECKY:  Yes, Your Honor.

16                   REDIRECT EXAMINATION

17  BY MR. MIKULECKY.

18     Q    Earlier you testified that in your experience it

19  might be unusual for a 501(c)(3) to hold precious metals,

20  right?

21     A    Yes.

22     Q    501(c)(3)'s, however, are allowed to invest,

23  right?

24     A    Yes, they are.

25     Q    In fact, virtually all of them do in hope of an

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                       July 21, 2015

Page 75

1  endowment and having an endowment be large enough to be able

2  to pay for the activities, correct?

3      A    That is true.

4      Q    And that's done by investments?

5      A    Yes.

6      Q    And the 501(c)(3) is free to choose within the

7  Internal Revenue Service guidelines whether they are going

8  to invest in stocks or bonds or precious metals or whatever

9  it may be, correct?

10     A    Yes.

11     Q    And there is nothing in the IRS guidelines

12  prohibiting a 501(c)(3) from investing in United States gold

13  and silver coins, correct?

14     A    Not that I know of.

15          MR. MIKULECKY:  Thank you.

16          THE COURT:  I have a question along those lines,

17  Mr. Holden.

18          Obviously, if the State of Colorado or the IRS

19  were to come along and do an audit to make sure this is

20  functioning as a 501(c)(3), they would want to see where the

21  money went.  And so what is the requirement to maintain some

22  kind of chain of custody or record when an investment, like

23  gold, which is easily transferred and hidden, what is the

24  requirement of some kind of record for that?  Do you know?

25          THE WITNESS:  I do not believe we established any

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 76

1  specific requirement, but I think normal and customary

2  accounting practices would control it.

3          THE COURT:  Which, in this case, would be what?

4          THE WITNESS:  Well, I believe the intake of an

5  asset would have to be logged and where it was stored would

6  have to be logged and disclosed.  And whether or not at the

7  time of the audit, those items were still there and

8  available.

9          THE COURT:  Do 501(c)(3)'s have to produce some

10 kind of yearly report, by any chance, by an audit or

11 financials?

12         THE WITNESS:  This is a little bit out of my area,

13 because the CPAs will handle that.  But there are some

14 annual filings that are made, but I'm not exactly clear on

15 everything that would go into that.

16         THE COURT:  Thank you.

17         Any further in light of my questions?

18         MR. MIKULECKY:  No, sir.  Thank you.

19         MS. FROEHLKE:  No, thank you.

20         THE COURT:  All right, you are excused Mr. Holden.

21 Thank you very much.

22         By the way, we can take a break at any time, it

23 would be fine, or else call your next witness, if you have

24 any additional witnesses.

25         MR. MIKULECKY:  One additional witness, Your

United States of America vs.                           Motion to Quash Hearing
Michael David Wilhite                                             July 21, 2015

Page 77

 1    Honor.  Call Darla Dee Wilhite.

 2              DARLA DEE WILHITE - DEFENSE WITNESS - SWORN

 3                         DIRECT EXAMINATION

 4    BY MR. MIKULECKY:

 5         Q    Would you state your name.

 6         A    Darla Dee Wilhite.

 7         Q    What is your address, Mrs. Wilhite?

 8         A    Westcliffe, Colorado.

 9         Q    That's pretty rural, so no street address, right?

10         A    Well, I have several.

11         Q    Okay.  What is your business address?

12         A    599 Poteka Way, Castle Rock, Colorado, and the

13    Westcliffe property.

14         Q    What is your role in Yahab Foundation?

15         A    I'm the president/director.

16         Q    When were you involved in its formation?

17         A    Yes, sir.

18         Q    When was that?  When was it formed?

19         A    In September of 2014.

20         Q    Had there been discussion about starting a

21    foundation before that?

22         A    Yes.

23         Q    Why did you start the foundation?

24         A    Well, I started it to -- to be able to direct

25    Christian ministries, or direct funds to Christian

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 78

 1  ministries and in hopes, at some point in time, others will

 2  be willing to contribute to that so that we can further the

 3  Christian ministries.

 4      Q    But why Foundations, as opposed to just donating

 5  money from your own bank account or the bank account of the

 6  church?  The judge had asked that question.  What is the

 7  purpose of the Foundation?

 8      A    Well, once again, the purpose of the foundation is

 9  to acquire funds and to direct the funds to specific areas,

10  i.e., Christian ministries.  And if I'm doing it -- if

11  someone is giving me money for a specific ministry and

12  through Advanced Floor Concepts, or to me personally, it's

13  not managed as well as it would be with the Foundation.

14      Q    Well, in fact, also, if I give you money for

15  charity, I don't get a tax deduction for that?

16      A    That's true.

17      Q    If I donated to 501(c)(3), I get a tax deduction?

18      A    That's correct.

19      Q    So there's a benefit for fund-raising purposes to

20  having a 501(c)(3)?

21      A    That is correct.

22      Q    Also, as Mr. Wilhite had testified, when you pass

23  away, your ability to give money, other than in your will,

24  disappears, though the Foundation continues, right?

25      A    That's true.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 79

1      Q    So those are the two main benefits of having a

2  Foundation?

3      A    Yes.

4      Q    Now, you have given money to charity before

5  starting the Yahab Foundation, right?

6      A    Right.

7      Q    How many years have you donated money?

8      A    Well, basically, all of my life; but in earnest,

9  since 1988.

10     Q    And so the judge knows, you just came to this

11  lately of donating money through Yahab Foundation.

12  Exclusive of the Yahab Foundation, how much money have you

13  personally given to charities, or through your companies?

14     A    About 1.6 million.

15     Q    That's over about that 20- or 30-years' span?

16     A    Yes, sir.

17     Q    And again, that's not counting Yahab?

18     A    No.

19     Q    So this isn't something new that you just came up

20  with, to start donating, right?

21     A    That's correct.

22     Q    Who was involved in starting Yahab?

23     A    Conversation with my CPA, that was one of the

24  primary, trying to figure out how we could mitigate -- I

25  don't know exactly how to put this -- to further the

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 80

 1  donations.  Also to the tax benefits to my company, we

 2  looked at that.  Several different ideas were floated out

 3  and it just seemed to be the right time.

 4          AFC had put aside a significant amount of money

 5  for IRS, and because of our estimated tax that we had been

 6  paying in, this money was there.

 7      Q    Let me back up on a couple of this.

 8          You said "we had discussed," is that you and the

 9  CPA --

10      A    Yes, sir.

11      Q    -- had discussions about an entity -- a 501(c)(3)

12  entity?

13      A    Yes.

14      Q    And also you said "AFC," that's short for Advanced

15  Floor Concepts?

16      A    Yes, sir.

17      Q    Can you briefly explain what that company is --

18  actually, that will be the subject of a detailed hearing

19  later, but just to give the judge a little background about

20  what that entity is.

21      A    Advanced Floor Concepts is a company that I formed

22  back in 1997 to build suspended structural steel floors

23  where the soils are expansive.

24          THE COURT:  What year was that?

25          THE WITNESS:  1997.

United States of America vs.                              Motion to Quash Hearing
Michael David Wilhite                                                July 21, 2015

Page 81

```
 1              THE COURT:  1997?

 2              THE WITNESS:  Yes, sir.

 3              THE COURT:  And you said you formed it?

 4              THE WITNESS:  Yes, sir.

 5              THE COURT:  So on the original incorporation

 6  documents, you are the owner?

 7              THE WITNESS:  Yes, sir.

 8              THE COURT:  And your husband is not?

 9              THE WITNESS:  No, he is not.

10              THE COURT:  In 1997, did he have any legal

11  relationship to that?

12              THE WITNESS:  I'm sorry?

13              THE COURT:  You said you formed it in 1997?

14              THE WITNESS:  Yes.  I formed it in 1997.

15              THE COURT:  At that time, when it was formed, did

16  your husband have any legal relationship to the company?

17              THE WITNESS:  None.

18              THE COURT:  Not a board member, not as an officer?

19              THE WITNESS:  No.

20              THE COURT:  Was he ever an employee?

21              THE WITNESS:  Yes.

22              THE COURT:  So he did the labor?

23              THE WITNESS:  Yes.

24              THE COURT:  All right, okay.

25      Q    (BY MR. MIKULECKY) Prior to Yahab donating $200 --
```

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 82

1   I'm sorry, to Advanced Floor donating $200 to Yahab, has

2   Advanced Floor previously donated money to charity?

3       A    Yes.

4       Q    For how many years, and ballpark, how much?

5       A    From 1997 going forward, approximately $500,000.

6            THE COURT:   Is that separate than the 1.6 that you

7   testified --

8            THE WITNESS:   No.   That's within that 1.6.

9       Q    (BY MR. MIKULECKY) So again, Advanced Floor

10  donating money is not something new; you have been doing it

11  since its inception, right?

12      A    Yes, sir.

13      Q    All right.   When the money was donated through

14  Advanced Floor Concepts, the $200,000, was Advanced Floor

15  Concepts rendered insolvent as a result of that $200-

16  transfer?

17      A    No, sir.

18      Q    Is it still doing well and profitable?

19      A    Yes, sir.

20      Q    Still have assets?

21      A    Yes, sir.

22      Q    Why did Advanced Floor Concepts fund the money on

23  December 31 of 2014?

24      A    I had to wait until the books were cut to the end

25  of the year to find out what our -- our bottom line was.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 83

 1  And I didn't want to put the company in jeopardy by taking

 2  money from one entity and putting it into another.

 3       Q    So you wanted to make sure you had the money to

 4  give it?

 5       A    Yes, sir.

 6       Q    Okay.  Because once you donate, you can't really

 7  get it back?

 8       A    That's correct.

 9       Q    And also, for tax purposes, you wanted to be able

10  to get it done within that tax year for the deduction?

11       A    Yes, sir.

12       Q    Advanced Floor Concepts did get a deduction for

13  that donation, correct?

14       A    Yes, they did.

15       Q    During arguments that you were here for, you heard

16  the attorneys discussing with the Court the suggestion that

17  Yahab was founded shortly around the time that your

18  deposition was taken.  Do you remember those kind of

19  discussions?

20       A    Yes.

21       Q    Was your deposition, in any way, a factor in the

22  formation of Yahab?

23       A    No.

24       Q    Now, you knew, obviously, that you were being

25  deposed when you were going through and getting Yahab

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                        July 21, 2015

Page 84

1   formed, correct?

2       A    Yes, sir.

3       Q    Why did it not cross your mind that the Government

4   was going to come after Advanced Floor?

5       A    I didn't have any idea we were being deposed,

6   other than the Government has continually, over the years,

7   requested very strange documents and very intrusive requests

8   about personal documents.  So this was just another hoop to

9   jump through for them.

10      Q    Let me probe that a little further.  You said over

11  the years the Government has asked for documents.  Have

12  there been times in the past that the Government has asked

13  for documents relating to Advanced Floor Concepts?

14      A    Oh, yeah.

15      Q    And how often over the past ten years or so has

16  that happened?

17      A    It seems like about every nine months, 15 months.

18      Q    Okay.  So just roughly, about once a year the

19  Government says, We want information about Advanced Floor

20  Concepts, right?

21      A    And everything else, personal and otherwise.

22      Q    At any time -- well, personal, did you give the

23  documents the Government requested?

24      A    Every time.

25      Q    Everything they have asked for?

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 85

1      A    Yes, sir.

2      Q    In any of those prior times that occurred in the

3   past ten years, had they previously ever come forward and

4   said, We think Mr. Wilhite owns Advanced Floor Concepts?

5      A    No, sir.

6      Q    So when you were deposed again and asked for

7   documents on Advanced Floor Concepts, any idea that this was

8   going to be any different this time?

9      A    No, sir.

10     Q    Did they ever tell you, even during the

11  deposition, they thought Advanced Floor Concepts belonged to

12  Mr. Wilhite?

13     A    No, sir.

14     Q    Let's talk about, then, the operations of Yahab.

15          You heard the testimony of Mr. Holden as to who

16  the board members are.  But let's start there.

17          Who are the current board members of Yahab?

18     A    Larry Smith and James Davis and myself.

19     Q    And that's been the same board since its

20  formation?

21     A    Yes, sir.

22     Q    Who are they?

23     A    I'm sorry?

24     Q    Who are they?  I know who you are, of course, but

25  who is Mr. Smith and Mr. Davis?

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 86

 1      A     Okay.  Larry Smith is the pastor of the Wild West

 2   Cowboy Church.  James Davis is a retired military and at one

 3   point in time, he was an assistant pastor.  And then myself.

 4      Q     Okay.

 5            MR. MIKULECKY:  Your Honor, if I can approach with

 6   several documents at once.

 7            THE COURT:  Yes.

 8      Q     (BY MR. MIKULECKY) Bringing you Defense Exhibit 5,

 9   6, 7 and 8.  Start with Defense Exhibit 5, do you see that?

10      A     Yes, sir.

11      Q     What is that?

12      A     It is the Minutes from the Board of Directors

13   Meeting.

14      Q     Dated January 1, 2015, right?

15      A     Thereabouts.  Not exactly.

16      Q     It's dated that.  The meeting probably didn't

17   occur on New Year's day, though?

18      A     That's correct.

19      Q     And present, you've got the three board members

20   listed, correct?

21      A     Yes.

22      Q     Was Mr. Wilhite present?

23      A     No.

24      Q     Under New Business, the first one, Donate funds to

25   the Wild West Cowboy Church acquisition of a snowplow, about

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 87

 1   $2,000, right?

 2       A    Yes.

 3       Q    And eventually, you see at the bottom after we get

 4   through the six enumerated points, all of these were

 5   approved expenditures by the board of directors for Yahab,

 6   correct?

 7       A    Yes.

 8       Q    So did Yahab, in fact, donate money to the church

 9   to purchase the snowplow?

10       A    Yes.

11       Q    Then, items 2 through 5 -- I'm sorry, items 2

12   through 4 are:  Convert cash in the bank account to buying

13   American Silver or American Gold Eagles.  Do you see those?

14       A    Yes.

15       Q    That was approved by the board of directors, as

16   well?

17       A    Yes.

18       Q    Let's focus on that a little bit more.

19            We will go through the transactions, and note, in

20   passing, that item 2 is for 2500 American Silver Eagles.

21   Mr. Wilhite had testified to that.  Who determined the 2500

22   Silver Eagles were going to be purchased?

23       A    We did.  We wanted to get -- at that point in

24   time, the Silver Eagles, if we purchased that amount, it was

25   at a discount.  It wasn't the usual sales price for Silver

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 88

1   Eagles, and just seemed like a good amount to start with.

2        Q    And "we" is who?

3        A    Jim, Larry and myself.

4        Q    The board of directors?

5        A    Yes, sir.

6        Q    Why purchase American Silver Eagles, as opposed to

7   simply put the money in a bank account for Yahab?

8        A    All I did was convert one form of money to

9   another.

10       Q    Because this is actually gold coins issued by the

11  U.S. Treasury, correct?

12       A    Yes, sir.

13       Q    And they have the ability to increase in value

14  because they are made of metal?

15       A    That's correct.

16       Q    So the board determined that they thought it was

17  going to be a better investment with more appreciation value

18  than simply the less than 1 percent you get in a savings

19  account?

20       A    Well, if I put it in a savings account, it's

21  .25 percent interest.

22       Q    Okay.  So the board decided to invest in these

23  Gold and Silver Eagles?

24       A    Right.

25       Q    Let's go down to item 5:  Purchase approximately

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 89

```
 1  8,000 pounds of long-term storage food for use in ministries

 2  from Survival Acres for 20,000.

 3            What is that about?

 4     A    That is long-term food storage.  Most of it is

 5  25-year shelf-life.  And Custer County is a very poor

 6  county.  And at any given point in time, there are folks who

 7  need food.  This way, we have it on hand in case there is an

 8  emergency need.

 9     Q    For the poor people that didn't have it?

10     A    Correct.

11            THE COURT:  Is this sort of an apophylactic idea,

12  Ms. Wilhite?

13            THE WITNESS:  Not really.  You know, I mean,

14  Custer County is very, very poor.

15            THE COURT:  Where is it stored?

16            THE WITNESS:  At my house.

17            THE COURT:  Right, but is it a basement, is it a

18  dugout?  Where is it stored?

19            THE WITNESS:  It's stored in a container.

20            THE COURT:  But where, physically?

21            THE WITNESS:  At my house.

22            THE COURT:  In the house?

23            THE WITNESS:  No, no, no, no, no.  Outside my

24  house.

25            THE COURT:  In a shelter?
```

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 90

```
 1              THE WITNESS:  No.  It's in a container.

 2              THE COURT:  But is it in the ground?

 3              THE WITNESS:  Yes.  It is in dirt so it will stay

 4  cool.

 5              THE COURT:  Is it underground?

 6              THE WITNESS:  No.

 7              THE COURT:  Partially underground?  I'm trying to

 8  figure this out.  Do you know what I'm talking about?

 9              MR. MIKULECKY:  I do.  If I can just interject,

10  Your Honor.

11              THE COURT:  Please.

12       Q    (BY MR. MIKULECKY) Is this in one of your farm

13  buildings?

14       A    No.  It's a self-contained container that there's

15  a hole that has been dug back into the hill.  It has been

16  slid in there to keep it cool.

17       Q    I think what the judge is suggesting, it sounds

18  like, if this is one of those dooms-day scenarios, and you

19  want to be able to hand it out?

20       A    No.

21       Q    Is that what you meant by the long-term?

22       A    No.

23       Q    (Inaudible) is that why you bought long-term for

24  this?

25       A    No.
```

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 91

1    Q    Is this a long-term food that you have got it on

2   hand whenever the need arises without it spoiling?

3    A    Correct.

4    Q    Okay.

5        THE COURT:  Is it visible to somebody who would

6   stand there and look at it?

7        THE WITNESS:  Yes.

8        THE COURT:  And is it a door that you go into?

9        THE WITNESS:  Uh-huh.

10        THE COURT:  Like a railroad car size or what?

11        THE WITNESS:  Yeah.

12        THE COURT:  All right.  Go ahead.

13        MR. MIKULECKY:  Thank you.

14    Q    (BY MR. MIKULECKY) So at the meeting of the Yahab

15   Foundation, Defense Exhibit 5, the board of directors met

16   and approved these transactions.  We have a donation, we

17   have a purchase and we have additional -- we have purchase

18   of Gold and Silver Eagles, correct?

19    A    Correct.

20    Q    Have there been other donations of Yahab

21   Foundation, other gifts given?

22    A    There was another donation to the Cowboy Church

23   for, I want to say $4,200.  I couldn't tell you exactly,

24   right off the stop of my head.  That was to further the

25   ministry of the arena -- or what we call our arena ministry,

Page 92

 1  where we -- we have different events bringing in folks who

 2  haven't been in a church, and they get introduced to it and

 3  we minister to them there.

 4      Q    Okay, and so there was another --

 5           THE COURT:  Mr. Mikulecky, was your question

 6  directed to money Yahab has given out, or money that Yahab

 7  has received?

 8           MR. MIKULECKY:  Money Yahab has donated, given out

 9  as gifts or donations.

10      Q    (BY MR. MIKULECKY) So there were additional

11  donations to the Cowboy Church?

12      A    Yes.

13           THE COURT:  Has anybody donated to Yahab, except

14  you?

15           THE WITNESS:  Not at this point in time.

16           THE COURT:  Have you solicited any donations?

17           THE WITNESS:  Not at this point in time.

18      Q    (BY MR. MIKULECKY) Take a look, if you would, at

19  Exhibit 6.  As part of the operations, did Yahab Foundation

20  set up a bank account?

21      A    Yes, sir.

22      Q    Exhibit 6, can you identify that, please.

23      A    Yes.  It's the signature card for the A&B Bank

24  account.

25      Q    Is that the bank account for Yahab Foundation?

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                   July 21, 2015

Page 93

 1      A     Yes, sir.

 2      Q     Who are the two signatories?

 3      A     Jim Davis and myself.

 4      Q     Mr. Wilhite is not?

 5      A     No, sir.

 6      Q     Did Yahab also file a tax return?

 7      A     Yes, sir.

 8      Q     And the Court had asked questions about reporting.

 9   Is Yahab required to file a Form 990 tax return as a

10   nonprofit?

11      A     Yes, sir.

12      Q     Take a look, if you would, at Exhibit 7, please.

13            Do you have that there?

14      A     Um-hmm.

15      Q     And is that the tax return for Yahab for tax year

16   2014?

17      A     Yes, sir.

18      Q     And if you look at the first page, it has

19   contributions at $200,000.  That was the money that was

20   donated, correct?

21      A     Yes, sir.

22      Q     If you turn to the sixth page, and it's numbered

23   up in the upper right-hand corner of Exhibit 5 -- I'm sorry,

24   sorry, Defense Exhibit 7, middle of the page lists again the

25   officers and directors.  Do you see that?

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 94

 1      A    Uh-huh.

 2      Q    **Yes?**

 3      A    Yes.

 4      Q    Sorry.  For the recording, it's easier to have a

 5 yes or a no.

 6           And again, we have got you, Mr. Smith and

 7 Mr. Davis; not Mr. Wilhite, correct?

 8      A    Correct.

 9      Q    And then finally, we get to the signature page,

10 which is page 13.  And that shows you signing as the

11 president, correct?

12      A    Correct.

13      Q    And then in terms of the contributors, continue to

14 go through pages, you get to Schedule B.  And on the

15 Schedule of Contributors, you are listed as a contributor

16 for $200,000 on page 1 of 1, correct?

17      A    Yes.

18      Q    And then finally, for assets, on the very last

19 page, it shows investments of $48,100 for the investments.

20 Do you see that?

21      A    Yes, sir.

22      Q    And that is exactly the amount that was authorized

23 in Defendant's Exhibit 5, line 2:  Convert cash and buy

24 $48,100 of American Silver Eagles, correct?

25      A    Yes, sir.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 95

1    Q    And those transactions that we saw were already

2    authorized by Yahab and Yahab paid for those, correct?

3    A    Yes, sir.

4    Q    Take a look, if you would, at Exhibit 8, Defense

5    Exhibit 8.  Do you have that?

6    A    Uh-huh.

7    Q    What are those series of three documents?

8    A    These are the instructions for a wire-transfer to

9    purchase precious metal.

10    Q    Authorizing the transferred money from Yahab's

11   bank account at Chase to purchase the silver and gold in

12   Colorado Precious Metals, correct?

13    A    Yes, sir.

14    Q    And so, for example, the first one on Exhibit 8 is

15   for $38,462.  And that's -- to go back to Exhibit 5, that's

16   item 4:  Convert cash and buy 38,430, the difference being

17   wire and transaction fees, correct?

18    A    Yes.

19         THE COURT:  Mrs. Wilhite, it seems obviously that

20   before this meeting someone had investigated the price of

21   these things, because they do fluctuate on a day-to-day

22   basis.

23         THE WITNESS:  Yes, sir.

24         THE COURT:  And you targeted specific dollar

25   amounts down to the tens of dollars.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 96

```
 1          THE WITNESS:  That's because we make a point of
 2  always calling Dave to find out what the --
 3          THE COURT:  Okay.
 4          THE WITNESS:  -- price is.
 5          THE COURT:  Right, but these were made with
 6  knowledge of what the current price --
 7          THE WITNESS:  Yes.
 8          THE COURT:  -- of precious metals were going for?
 9          THE WITNESS:  Yes.
10     Q    (BY MR. MIKULECKY) So the second page of Exhibit 8
11  is authorizing a wire-transfer for the 39,742.  And that's
12  for the second approved amount -- correct?
13     A    Yes.
14     Q    -- in the minutes?
15          And then finally, the last page is for 32,000.
16  That was in February.  That's after the minutes, Exhibit 5.
17  Was that also approved by the board?
18     A    It was, but there are not any minutes at this time
19  to show that.
20     Q    Was that done with a phone call among the board
21  members?
22     A    Yes, sir.
23     Q    Okay.  So Yahab Foundation, we have the members,
24  board of directors approving the transaction.  We have the
25  wire-transfers from Yahab to Colorado Precious Metals
```

Page 97

```
 1  purchasing those, correct?

 2      A     Correct.

 3      Q     And then finally, we have the bank account

 4  statement of A&B, Government Exhibit 1, and I think we are

 5  short -- here we go.

 6            MR. MIKULECKY:  If I may approach, Your Honor.

 7            THE COURT:  Yes.

 8      Q     (BY MR. MIKULECKY) Handing you what has been

 9  marked as (inaudible).

10            Handing you Government Exhibit 1, can you identify

11  that?

12      A     The bank statement from A&B Bank.

13      Q     And that's specifically for Yahab Foundation,

14  correct?

15      A     Yes, sir.

16      Q     Okay.  On the first page in the middle, we see the

17  wire-transfer, in accordance with the instructions in

18  Exhibit 8, the $48,100, on December 31, correct?

19      A     Yes.

20      Q     Second page of Government Exhibit 1, the payment

21  out of the Yahab Foundation account, do you see the

22  wire-transfer in the middle of the page?

23      A     Yes.

24      Q     What was that for?

25      A     39,742.28.
```

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 98

1    Q    And that tracks exactly with the second page of

2    Exhibit 8, the authorization you provided, and Exhibit 5,

3    the approval of the board of directors, correct?

4    A    Correct.

5    Q    Go then to the -- let's see.  We are up to the

6    fourth page of the exhibit.  It's February 27 statement.  In

7    the upper right-hand in the corner, there is another wire.

8    Do you see that?

9    A    Yes.

10    Q    And how much is that for?

11    A    19,546.08 -- oh, I'm sorry.  38,462.50.

12    Q    And then there is one below that, as well.  Do you

13    see those?

14    A    32,037.50.

15    Q    And, again, at the risk of being redundant,

16    consistent with the minutes and the authorizations that

17    Yahab provided, correct?

18    A    Yes, sir.

19    THE COURT:  Ms. Wilhite, with regard to items 3

20    and 4 on the minutes that's Exhibit 5, why would you do two

21    separate amounts, roughly the same, if you are buying the

22    same item?

23    THE WITNESS:  Well, in the first one, it was

24    39,240 for 31 ounces.  The price of gold went down, so the

25    next 30 were only 38,430.  So it was trying to make a wise

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 99

 1   investment.

 2        Q    (BY MR. MIKULECKY) Had you committed or in any way

 3   locked in the transaction with Colorado Precious Metals?

 4        A    For?

 5        Q    For the 39,000.

 6        A    Yes, sir.

 7        Q    So you couldn't rescind that and capture the lower

 8   price?

 9        A    No.

10             THE COURT:  So you were just approving, as a

11   corporation, because it was a nonprofit corporation

12   accepting a (inaudible) debt and adopting a (inaudible).  Is

13   that accurate?

14             THE WITNESS:  Well, these were on separate dates,

15   Your Honor.

16             THE COURT:  Well, no.  The board meeting is

17   January 1, 2015.  And if it happened on that day, it did.  I

18   mean --

19             THE WITNESS:  It didn't happen on that -- on that

20   date.

21             THE COURT:  Okay.  Was this just a conglomeration

22   of decisions and you just dated the document January 1?

23             THE WITNESS:  It took place -- it was in January.

24   I don't remember the exact date.

25        Q    (BY MR. MIKULECKY) So, Ms. Wilhite, the

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 100

1  transactions, to the Court's point and the minutes, are all

2  dated January 1; the approval was done some other time,

3  other than January 1; is that right?

4      A    That's correct.

5      Q    Were they done with phone conversation among the

6  board members?

7      A    No.  Actually, we probably met at church because

8  we all go to the same church.

9      Q    And then all of the decisions that were made were

10 just consolidated into these minutes dated January 1, which

11 is Exhibit 5?

12     A    Yes, sir.

13     Q    So that's why you have transactions at different

14 prices, because they would have been approved at different

15 times but simply put into the minutes for approval on

16 January 1?

17     A    Yes, sir.

18     Q    Understood.

19          Was Mr. Wilhite involved in any of these decisions

20 for purchasing the precious metals for the donations to the

21 Cowboy Church or the purchase of the food for the poor of

22 the county?

23     A    No, other than he picked them up for me.

24     Q    That's it?

25     A    Yes.

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                    July 21, 2015

Page 101

1      Q    He's not an employee, nor an officer or director?

2      A    No.

3      Q    Mrs. Wilhite, to be blunt -- the Government has

4   been beating around and let's be blunt with it -- did you

5   form the Yahab Foundation in order to defraud the Government

6   to stop them from collecting money that is owed by your

7   husband?

8      A    Absolutely not.

9           MR. MIKULECKY:  Thank you.  I have no further

10  questions.

11          THE COURT:  Cross?

12          MS. FROEHLKE:  Yes, Your Honor.

13                      CROSS-EXAMINATION

14  BY MS. FROEHLKE:

15     Q    Ms. Wilhite, I want to talk a little bit about the

16  Wild West Cowboy Church.  You and I have discussed that

17  church before, haven't we?

18     A    Yes.

19     Q    In your deposition, right?

20     A    Yes.

21     Q    And you told me that you built that church; is

22  that right?

23     A    That is correct.

24     Q    With money you inherited from your mother?

25     A    That is correct.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 102

1      Q     You bought the land, right?

2      A     Yes.

3      Q     And you pay the mortgage?

4      A     Yes.

5      Q     Would you describe --

6            THE COURT:  Paid off or you pay it on a regular

7      basis?

8            THE WITNESS:  Currently, I pay cash from my

9      mother's inheritance for the building.  And the construction

10     of the building, the land, I have been paying off on a

11     monthly basis.

12           THE COURT:  So there is a debt on the land but not

13     on the structure?

14           THE WITNESS:  Correct.

15           THE COURT:  Okay.

16     Q     (BY MS. FROEHLKE) And you met the pastors of that

17     church at a church in Pueblo; is that right?

18     A     That is correct.

19     Q     And convinced them to move to -- is it in

20     Westcliffe?

21     A     Yes.

22     Q     And you and your husband live in Westcliffe, I

23     think you testified to it a minute ago --

24     A     Yes.

25     Q     -- on over 300 acres of land; is that right?

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 103

 1      A    Yes.

 2      Q    Can you estimate how many parishioners belong to

 3    the Wild West Cowboy Church?

 4      A    Between 150 and 200.

 5      Q    Would you say you personally know the majority of

 6    them?

 7      A    A lot of them, yes.

 8      Q    Would you even describe yourself as the founder of

 9    the church?

10      A    I am one of the trustees of the church, yes.

11      Q    You also mentioned that the Government has been

12    asking for information on Advanced Floor Concepts for quite

13    some time?

14      A    Yes.

15      Q    Is that right?

16           You have only been deposed relating to your

17    husband's case once, right?

18      A    Yes.

19      Q    Have you been deposed, besides when you and I have

20    had --

21      A    Not -- not deposed, but there have been requests

22    for multiple, multiple documents.

23      Q    And those requests did not come in subpoena form

24    until last year.  Would you agree with that?

25      A    Yes.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 104

 1      Q    And you had not, prior to last year, received a

 2  litigation hold letter that your husband and I discussed

 3  when he was on the stand?  That was the first time our

 4  office had sent something like that to you and your

 5  husband -- your husband, right?

 6      A    I don't -- I haven't seen the letter, so I don't

 7  know what it says.  I don't know what a litigation hold is.

 8      Q    Well, let me talk a little bit more about the

 9  deposition that we had on October 16th.

10      A    What does this have to do with Yahab?

11      Q    Let me ask the questions here, Ms. Wilhite.

12          THE COURT:  Your attorney will object if there's

13  something to object to.

14          THE WITNESS:  Okay.

15      Q    (BY MS. FROEHLKE) So you and I had a discussion on

16  the record, right?

17      A    Right.

18      Q    And we talked about the founding of AFC, right?

19      A    Right.

20      Q    In 1997, right?

21      A    Yes.

22      Q    We talked about how your husband approached the

23  U.S. Attorney's Office that year related to Mr. Clemen's

24  indictment, right?

25      A    Yes.

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                       July 21, 2015

Page 105

1       Q      We talked about your husband's paychecks being

2    directed to you?

3       A      Yes, yes.

4       Q      And we even looked at some documents you had given

5    us that, where you related AFC -- described it as your

6    husband's company, right?

7              MR. MIKULECKY:  Your Honor, I'm not sure where we

8    are going.  First, it's beyond the scope.  Second, this is

9    supposed to relate to the Yahab Foundation garnishment, so I

10   think we are getting ahead of ourselves for the September

11   hearing here.

12             THE COURT:  A little bit.  I'm -- of all the

13   people in the courtroom, I don't have the background that

14   all of you guys have.  So I --

15             THE WITNESS:  I --

16             THE COURT:  I need some context, so I will

17   overrule the objection.  (Inaudible).

18             MS. FROEHLKE:  Yes, Your Honor, I think on direct

19   she did.

20             THE COURT:  Well, it's not beyond the scope but

21   that doesn't mean that we are going to have a side trial

22   here either.  So it's permissible at this point.

23       Q      (BY MS. FROEHLKE) In October 2014, what I am

24   trying to get to, I guess, Mrs. Wilhite, is that you and I

25   did discuss the Advanced Floor Concepts and its assets in

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 106

 1  detail, didn't we?

 2      A    I don't directly remember discussing the assets.

 3      Q    We discussed revenue; is that right?

 4      A    Yes.

 5      Q    We discussed your interest in the company?

 6      A    Yes.

 7      Q    We discussed your husband's interest in the

 8  company?

 9      A    Okay.

10      Q    Would you agree?

11      A    Yeah, yes.

12      Q    You hadn't been asked those specific questions on

13  the record prior to October 2014, right?

14      A    There were several meetings with the Department of

15  Justice where we came down and visited.  It wasn't actually

16  a deposition, but it was many, many questions.

17      Q    And when you say "several meetings," you mean one

18  meeting; is that right?

19      A    No, sir -- No, ma'am.  No ma'am.

20      Q    There were more than one meeting?

21      A    Yes, ma'am.

22      Q    But you also provided us subpoena responses from

23  Advanced Floor Concepts in the summer of 2014; is that

24  right?

25      A    Every time you have requested stuff, I sent it.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 107

1    Q    So you sent the employment handbook, right?

2    A    I don't remember.  It's -- you have virtually

3  everything from AFC.

4    Q    But you do remember being subpoenaed in the

5  summer, is that fair to say?

6    A    (No audio response.)

7    Q    Do you still have Government Exhibit No. 1 in

8  front of you, Mrs. Wilhite?

9    A    Yes.

10    Q    I would like you to turn to the second-to-the-last

11  page of that exhibit.  I know you went over the statements

12  with your attorney, but the second-to-the-last page actually

13  has the images of the checks.

14        Do you -- do you see that?

15    A    Okay.

16    Q    So the second-to-last page, I think, if I can see

17  correctly, on the final page, but the second-to-last page is

18  going to have the Yahab Foundation transfer from AFC.  Do

19  you see those images?

20    A    Yes.

21    Q    If you can turn to the final page, that represents

22  all of the other checks that have been written from Yahab

23  Foundation's account, right?

24    A    Yes.

25    Q    So we have here three checks to the Wild West

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 108

1  Cowboy Church; is that what you see, as well?

2      A    Yes.

3      Q    And those are for $1900, 1800-and-some dollars and

4  $4100, would you agree?

5      A    Yes.

6      Q    What do those donations represent specifically?  I

7  know you mentioned the snowplow?

8      A    The snowplow and explained we bought some panels

9  for the arena.  That was the $4100.  It says right here

10 specifically "Panels."  The other one was a floor-cleaning

11 machine.  We have concrete floors in the -- in the Sanctuary

12 that are very difficult to clean, so we purchased a

13 floor-cleaning machine.

14     Q    And those are the only donations that have been

15 made?

16     A    Yes.

17     Q    What is Jade Enterprises, that second image there?

18     A    Jade Enterprise is the long-term food storage.

19     Q    What exactly was purchased with that

20 19,000-and-some dollars?

21     A    8,000 pounds of food.

22     Q    What about the container that you described in the

23 ground?

24     A    That was not purchased by Yahab.  That was

25 purchased by me.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 109

```
 1              THE COURT:  Did you already have food in there
 2  before this purchase?
 3              THE WITNESS:  Some.
 4      Q    (BY MS. FROEHLKE) Has any of that food gone to any
 5  resident of your county?
 6      A    Not at this point in time.
 7      Q    Have you had -- eaten any of the food?
 8      A    No, ma'am.
 9      Q    Why was your husband at the initial meeting with
10  Mr. Holden surrounding Yahab Foundation's incorporation?
11      A    We were talking about financial planning.
12      Q    Your husband had no assets; is that right?
13      A    He is still my husband.  He was there.  My CPA was
14  there.  Mr. Holden was there.  I was there.
15      Q    So he was there because he is your husband and he
16  -- can you elaborate on that?
17      A    We discuss things.  I don't make unilateral
18  decisions personally without discussing it with my husband,
19  nor does he make any unilateral decisions without discussing
20  it with me.
21      Q    Have you put any other money aside in anticipation
22  of the hearing in September regarding the ownership of
23  Advanced Floor Concepts?
24              MR. MIKULECKY:  Object to the form of the
25  question, Your Honor:  Any other moneys?
```

United States of America vs.                                        Motion to Quash Hearing
Michael David Wilhite                                                              July 21, 2015

Page 110

 1          THE COURT:  I don't even understand it.  Any other

 2    money aside --

 3          Q    (BY MS. FROEHLKE) Other than the transfer of

 4    $200,000 to the Yahab Foundation, have you transferred any

 5    other significant amount of money out of Advanced Floor

 6    Concepts?

 7          A    No.

 8          Q    Who made the initial phone calls to Mr. Bayuk to

 9    find out the price of gold?

10          A    Michael.

11          Q    And I just want to be clear about Exhibit 5 --

12    Defense Exhibit 5.  What date was that document actually

13    created on?

14          A    It was just for the year.

15          Q    What date was it created on, Ms. Wilhite?

16          A    I -- I couldn't give you an exact date, I'm sorry.

17          Q    Was it created on New Year's Day?

18          A    No, ma'am.

19          Q    Was it created after the purchase of these

20    precious metals?

21          A    Probably, but I don't -- I couldn't tell you the

22    an exact date.

23          Q    Was it created after the garnishment was applied

24    for?

25          A    No, ma'am.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 111

 1      Q    Why did you put the date January 1, 2015 on these
 2  minutes?

 3      A    We have to have a meeting once a year and just put
 4  January 1st.

 5      Q    Knowing that was not the date, you put an
 6  incorrect date?

 7      A    We just put January 1st.

 8      Q    Ms. Wilhite, going back for a moment to your
 9  deposition, you and I discussed charitable involvement in
10  your deposition, didn't we?

11      A    Yes.

12      Q    I asked you what your involvement with charities
13  was?

14      A    Yes.

15      Q    Right?

16           And you listed several charities, didn't you?

17      A    Uh-huh.

18      Q    And (inaudible), I think was one?

19      A    Yes.

20      Q    The Cowboy Church?

21      A    Yes.

22      Q    And you listed several others; is that right?

23      A    Yes.

24      Q    You never told me about Yahab Foundation, did you?

25      A    It hadn't been fully -- it hadn't been funded.

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                    July 21, 2015

Page 112

1     Q    It had been incorporated, right?

2     A    It was incorporated, but you were asking me about

3  where I had put my charitable contributions.  I had not put

4  any charitable contributions into Yahab at that point in

5  time.

6     Q    In fact, I asked you about your involvement in

7  charities.  Do you recall that?

8     A    Not specifically.

9     Q    Would you like --

10    A    I remember us talking about charities, but not my

11  involvement with charities.

12    Q    Would you like to see a transcript of your

13  deposition?

14    A    It wouldn't make any difference.  I don't recall.

15    Q    Would seeing a transcript refresh your

16  recollection?

17    A    No, ma'am.  We talked about a lot of things that

18  day.

19         THE COURT:  Take a try anyway, please.

20         MS. FROEHLKE:  Permission to approach the witness.

21         THE COURT:  Yes.

22         MS. FROEHLKE:  Your Honor, I have marked as

23  exhibit with the excerpt -- with the relevant excerpt here,

24  if that's --

25         THE COURT:  Is there a copy?

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 113

 1            MS. FROEHLKE:  Yes, it's Government Exhibit 5, I

 2  believe I may have given you a copy; and if not, I can give

 3  you one.

 4            THE COURT:  Well, you didn't give me a copy of the

 5  page you are offering.

 6            MS. FROEHLKE:  That's correct, I apologize.

 7            Permission to approach the witness.

 8            THE COURT:  Yes.

 9       Q    (BY MS. FROEHLKE) Ms. Wilhite, I have handed you

10  what has been marked as the Government's Exhibit 5.  You

11  will see that it is an excerpt of the transcript of your

12  deposition from October 16, 2015?

13       A    Okay.

14       Q    And you are aware that you were under oath in that

15  deposition; is that right?

16       A    Yes.

17       Q    And you had to tell the full truth; is that right?

18       A    Yes.

19       Q    And I told you that if you didn't understand the

20  question, to please let me know and I could clarify it,

21  right?

22       A    Okay.

23       Q    And your attorneys had you review that transcript

24  after the fact; is that right?

25       A    Yes.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 114

```
 1      Q    And you didn't make any changes?

 2      A    No.

 3      Q    If you could, turn to, I believe the second page

 4 of the exhibit.  It should be page 67 -- or, no.  The second

 5 page of the exhibit should be page 67.  There's a 67, two

 6 lines down, a little 67 above the line 1.  Do you see that?

 7      A    I --

 8      Q    Where it says:  A2004?

 9      A    Yes.

10      Q    What -- at the bottom of that page on line 22 --

11      A    Uh-huh.

12      Q    -- it says:

13           Q:  Do you have any involvement with charities?

14           Do you see that?

15      A    Yes.

16      Q    And the next page it says.

17           A:  Yeah.

18           Q: what involvement do you have?

19           A: I support a lot of charities.

20           Is that right?

21      A    Yes.

22      Q    We then go on to talk and just talk about your tax

23 return and how much charitable giving you have taken part

24 in?

25      A    Yes.
```

Page 115

```
 1      Q    And line 6, you told me:  Not tens of thousands.
 2  Is that right?
 3      A    Yes.
 4      Q    And then you, on the following page, list what
 5  charities you did do.  That's on page 69, line 3.
 6           Answer:  The Cowboy Church, Joshua Fund,
 7  (inaudible) Asia, LaPinta Mission, Heaven's family
 8  (phonetic); is that right?
 9      A    They -- that's currently who I give to, yes.
10      Q    Would you say being the president of a charity is
11  being involved in the charity, Ms. Wilhite?
12      A    Yes.
13      Q    But you did not want to mention to me that you not
14  only support charities, you found them?
15      A    Hey, you were asking me --
16           MR. MIKULECKY:  Your Honor, she's misstated that.
17           THE COURT:  It doesn't matter, I don't view this
18  as particularly impeaching, so --
19           MR. MIKULECKY:  Thank you.
20      Q    (BY MS. FROEHLKE) So why did you not mention Yahab
21  Foundation?
22      A    Because I wasn't giving to it.  You were asking me
23  about the money that was showing on my tax return.  No funds
24  had been disbursed to Yahab at that point in time.  And when
25  I think of giving to charity, it's what have I given to
```

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                        July 21, 2015

Page 116

 1  charity.

 2      Q    At that time, you had discussed with Mr. Holden

 3  that you would be transferring a large amount of money that

 4  year; is that right?

 5      A    I hadn't -- I hadn't done it.  I didn't know by

 6  the end of the year how much money AFC was going to have

 7  available to give, positively.

 8           MS. FROEHLKE:  If I could just have a moment, Your

 9  Honor.

10           THE COURT:  Sure.

11           MS. FROEHLKE:  No further questions at this time,

12  Your Honor.

13           THE COURT:  Thank you.

14           Redirect?

15           MR. MIKULECKY:  Briefly, Your Honor.

16           THE COURT:  Okay.

17                    REDIRECT EXAMINATION

18  BY MR. MIKULECKY:

19      Q    Ms. Wilhite, you were asked questions about the

20  litigation hold letter.  Do you remember that?

21      A    Uh-huh.

22           MR. MIKULECKY:  May I approach, Your Honor?

23           THE COURT:  Yes.

24      Q    (BY MR. MIKULECKY) I hand you what has been marked

25  as Government Exhibit 6 and I will represent to you that

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 117

 1  that's what the Attorney's Office had asked your husband

 2  about litigation in that hold letter.

 3          First, that's not addressed or directed to you in

 4  any way, is it, ma'am?

 5      A    No, it is not.

 6      Q    It's addressed solely to your husband, isn't it?

 7      A    Yes.

 8      Q    And as you scan through there at all, do you see

 9  at all any mention of Advanced Floor Concepts?

10      A    No, sir.

11      Q    Now, you talked about other interviews in these,

12  (inaudible, counsel not speaking into microphone) other than

13  this time recently?

14      A    That's correct.

15      Q    But you have had numerous meetings and interviews

16  with representatives of the United States Attorney's Office,

17  correct?

18      A    Yes, sir.

19      Q    And they've had asked questions about (Inaudible,

20  counsel not speaking into microphone) representatives of

21  Mr. (Inaudible, counsel not speaking into microphone) and

22  such, right?

23      A    Right.

24      Q    (Inaudible, counsel not speaking into microphone.)

25  spoliation, correct?

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 118

```
 1      A    Correct.

 2      Q    Against your husband?

 3      A    Right.

 4      Q    (Inaudible, counsel not speaking into microphone.)

 5 all those documents (inaudible, counsel not speaking into

 6 microphone).

 7      A    (Inaudible.)

 8      Q    Each time the Government never contacted you again

 9 (Inaudible, counsel not speaking into microphone), correct?

10      A    Correct.

11      Q    (Inaudible, counsel not speaking into microphone.)

12           MR. MIKULECKY:  I have nothing further, Your

13 Honor.

14           THE COURT:  You may step down.

15           Do you have any other (inaudible)?

16           MR. BEDNARSKI:  We do have (Inaudible).

17           THE COURT:  (Inaudible).

18           MR. BEDNARSKI:  Five minutes.

19           THE COURT:  Okay.  And do you want to continue,

20 you both want to continue, right?

21           UNIDENTIFIED SPEAKER:   (Inaudible).

22           THE COURT:  Oh, yeah.

23           (Recess taken.)

24           THE COURT:  Back on the record in 00-cr-504.

25           United States, call your witness, please.
```

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 119

```
 1              MS. FROEHLKE:  We call David Bayuk to the stand,
 2    Your Honor.
 3              THE COURT:  How do you spell that last name?
 4              MS. FROEHLKE:  B-A-Y-U-K.
 5              THE COURT:  All right.
 6              DAVID BAYUK - GOVERNMENT WITNESS - SWORN
 7                        DIRECT EXAMINATION
 8    BY MS. FROEHLKE:
 9        Q    Mr. Bayuk, do you recall when you first met
10    either --
11              THE COURT:  Can I find out who this person is.
12              MS. FROEHLKE:  Yes, I apologize, Your Honor.
13        Q    (BY MS. FROEHLKE) Can you please state your name
14    and tell us what you do for a living.
15        A    It's David Bayuk, B-A-Y-U-K.  And I am the
16    president of the corporation under the name of Colorado
17    Precious Metals and Coins, Incorporated in Colorado Springs.
18        Q    When did you incorporate the company,
19    approximately?
20        A    1989.  Wait.  The company; the business started in
21    1983.
22        Q    Do you recall when you first met either of the
23    Wilhites?
24        A    I don't, other than the fact that it was many
25    years ago.  So it's not -- not.
```

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 120

```
 1              THE COURT:  Mr. Bayuk, could I ask you if you are
 2   appearing (inaudible) here voluntarily?
 3              THE DEPONENT:  I'm under subpoena.
 4              THE COURT:  Okay.
 5        Q    (BY MS. FROEHLKE) Do you recall if you first met
 6   Michael or Darla?
 7        A    I don't.  Forgive me, I don't.  They -- they seem
 8   integrated so they -- you know, I don't know remember
 9   whether, you know, it was the chicken or the egg, but I met
10   them around the same timeframe, but not together.
11              THE COURT:  Was that decades ago, ten years ago?
12              THE DEPONENT:  Probably within the last decade,
13   but if it was ten years ago, it wouldn't surprise me.
14        Q    (BY MS. FROEHLKE) And in what context did you meet
15   the Wilhites, to your recollection?
16        A    They were customers.  It was business.  And it
17   would have been like office, I had a showroom office on
18   Union Boulevard in Colorado Springs.
19        Q    Who of either the Wilhites have you dealt -- or
20   have you dealt with either of the Wilhites more than the
21   other over the years?
22        A    Michael more than Dee, but both of them.
23        Q    Within the last year, say, who have you primarily
24   dealt with?
25        A    Michael.
```

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 121

 1      Q    Can you describe how a transaction occurs when

 2  someone wants to purchase precious metals from you?

 3      A    Typically, it was a phone call order, a

 4  wire-transfer and a physical delivery.  Typically, those

 5  receipts are all as one.  It's -- it's an initiated receipt.

 6  It's an agreed-upon amount.  And then it's signed off on the

 7  bottom as a delivery.  Pretty simple.  Obviously, my own

 8  creation, but it just keeps my own paperwork straight.

 9            THE COURT:  (Inaudible).

10            THE WITNESS:  It's correct.  It would be typically

11  agreed upon at the time of the phone call.  Even sometimes I

12  have to call back just to confirm the order.

13            (Inaudible).

14            THE WITNESS:  I note it on the receipt in which

15  the receipt (inaudible).

16            THE COURT:  (Inaudible) you make a receipt right

17  there with the phone call?

18            THE DEPONENT:  Once it's agreed, yes.  As soon as

19  -- in other words, I will order a product, at the same point

20  in time agree upon (inaudible) it's indicated on the receipt

21  and then consummated by delivery.

22            MS. FROEHIKE:  Permission to approach?

23            THE COURT:  Sure.

24            MS. FROEHLKE:  Mr. -- I don't know which of you is

25  going to be cross-examining or both, but Mr. (inaudible).

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 122

 1     Q    (BY MS. FROEHLKE) Mr. Bayuk, it's -- I have handed

 2  you Exhibit 2 of the Government's.  And on the seventh page

 3  there is one of the receipts that you provided us?

 4     A    Yes.

 5     Q    Do you recognize that?

 6     A    Yes.

 7     Q    So can you explain to us -- we have had a little

 8  bit of confusion today about the dates on these receipts.

 9          Can you explain that, what each date that you see

10  on each receipt, what that represents.

11     A    On the top right is the order date and the bottom

12  date is the delivery.

13     Q    What about the names on the receipt; what would

14  the top line indicate?

15     A    Crossed out is "Michael Wilhite" and it was

16  replaced by the "Yahab Foundation."

17     Q    Would that indicate the person making the order?

18     A    It was at Michael's request, to change that on the

19  receipt.

20     Q    Michael requested -- Michael requested to

21  change --

22     A    Typically -- you know, I rarely work with

23  entities.  Mostly it's just individuals purchasing precious

24  metals.  We are selling precious metals.  So, obviously, I

25  know most of my customers by name, but Michael requested

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                      July 21, 2015

Page 123

1  that change on the receipt.

2      Q      He requested to have his name changed to Yahab

3  Foundation; is that correct?

4      A      Well, to have it as a Yahab Foundation receipt.

5      Q      So can you describe the process as it related

6  specifically to this transaction.

7      A      I'm not quite sure what you are asking me.

8             But in this case, he would have ordered 2500,

9  one-ounce American Silver Eagles over the telephone.  A

10  wire-transfer came into my business account at Chase, which

11  is indicated by (inaudible) and then once I have the

12  product, I physically deliver it, which would have been the

13  delivery date of January 13 of 2015.

14     Q      Are you aware of what Mr. Wilhite does for a

15  living, or if he has a job?

16     A      I understood that he had an involvement in

17  Advanced Floor Concepts.

18     Q      What was his involvement, to your understanding?

19     A      He was -- I'm not sure.  I never did any business

20  with that entity, but my understanding, it was some type of

21  a principal, but in terms of how the business was arranged

22  or what his relationship was economically, I do not know.

23     Q      Prior to today, what was your understanding of Mr.

24  Wilhite's position in the company?

25     A      That he was a -- some sort of principal.  I mean,

United States of America vs.
Michael David Wilhite

1  if I was to get concrete work done, I suppose I would have

2  called Michael.

3          MS. FROEHLKE:  If I may have a moment.

4      Q    (BY MS. FROEHLKE) Can you estimate how often prior

5  to this first Yahab receipt, Mr. Wilhite called you to place

6  ordered for precious metals?

7          MR. MIKULECKY:  I'm going to object.  This is

8  (inaudible).

9          THE COURT:  (Inaudible).

10         MS. FROEHIKE:  (Inaudible).

11         MR. BEDNARSKI:  (Inaudible) and beyond the scope

12  (inaudible) whether or not Mr. While has any interest, title

13  or rights to Yahab Corporation, whether or not he made other

14  purchases by (inaudible).

15         THE COURT:  I think a little bit of evidence is

16  fine, so I will overrule.  There has been prior testimony

17  from Mr. Wilhite about that.  So let's go ahead.

18      Q    (BY MS. FROEHIKE) Would you like me to repeat the

19  question?

20      A    Yes.

21      Q    Do you recall or can you estimate how often Mr.

22  Wilhite purchased this precious metal (inaudible).

23      A    No.  Other than the fact that I have done

24  transactions with my own hands, I personally can remember

25  with Dee, previous to this receipt that he had December 30,

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 125

1  2014.

2      Q    I know in our discussions you mentioned you don't

3  have records dating back before a fire of your home?

4      A    That is correct.  I moved my office to my home,

5  and in June of 2013, June 11, the Black Forest, where I

6  lived, my house burned down.  Among things I lost was that

7  paperwork.

8            THE COURT:  You know, I believe that, but I can't

9  tell you how many cases I have had where there's been a fire

10 (inaudible) it's a very interesting occurrence.

11           THE WITNESS:  There was a lot of homes burnt to

12 the ground.

13           THE COURT:  No, I know.  Sorry for your loss.

14           THE WITNESS:  Me, too.

15     Q    (BY MS. FROEHIKE) So the receipts that you've

16 provided us, those don't represent every transaction you

17 have had with Mr. Wilhite?

18     A    That is correct.  Only the ones postfire, which

19 was June 11, 2013.

20           THE COURT:  Can I ask you this, Mr. Bayuk.  If you

21 have a store front, why do you keep business records in your

22 house?

23           THE WITNESS:  Because I closed my store front.  I

24 no longer do business with the general public.

25           THE COURT:  You did --

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 126

1          THE WITNESS:  So I closed that aspect of the

2     business and sold the building and moved into what I

3     perceived to be semiretirement.

4          THE COURT:  So you don't -- you only with it

5     (inaudible).

6     A     That's correct.  I worked out a couple of those

7     (inaudible) from the trunk of my car.  Called riding my own

8     coattails.  Developed a pretty big following and a strong

9     clientele and a lot of, you know, goodwill and good

10    referrals.  And I thought I was simplifying my life, much to

11    my chagrin.

12    **Q     (BY MS. FROEHIKE) To your recollection in the past**

13    **transactions Mr. Wilhite has had with you, has he**

14    **represented himself as an individual or has he done it**

15    **through a business?**

16    A     The relationship was individual.  I mean, the

17    concept -- (inaudible) as I do with most of my clients.  For

18    the most part, they are all individual.  Over the years

19    people have, you know, S Corp, and LLCs and even charitable

20    organizations.  This isn't the first one.  But generally

21    speaking, it's personal.

22    **Q     When was the most recent time Mr. Wilhite called**

23    **you for a precious metals purchase?**

24    A     Without looking at the receipt, I can't tell you

25    whether it was last week, week after, week before, ten days

United States of America vs.                           Motion to Quash Hearing
Michael David Wilhite                                              July 21, 2015

Page 127

 1   ago.

 2       Q    Was there something different about that purchase?

 3       A    No.

 4       Q    Compared to the others in terms of whether he was

 5   doing it as an individual or some other -- was it through --

 6            I apologize, let me rephrase.  Compound question.

 7            Was it through Yahab Foundation?

 8       A    My understanding is that they were all the Yahab

 9   Foundation.

10            Although I'm pretty simplistic, you know, my

11   values are (inaudible) but, for (inaudible) where it would

12   have been a Yahab Foundation.

13            In this case, it was an entity, I believe, owned

14   by the Wilhites DW's Support.

15       Q    DWs Support Services, would that have been --

16       A    Yes.

17       Q    And you had not heard of that entity before, is

18   that fair to say?

19       A    That's correct.

20       Q    Mr. Wilhite did the purchase order, though?

21       A    I talked to him on the phone, yes.

22       Q    In the Yahab-specific purchases that have occurred

23   since December 2014, did you interact with Mrs. Wilhite in

24   relation to those precious metals?

25       A    No.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 128

 1              MS. FROEHIKE:  No further questions, Your Honor.

 2              THE COURT:  Before Mr. Bednarski asks any

 3    questions, I have one.

 4              You testified that previous to today, you would

 5    have been under the belief that Mr. Wilhite was a principal

 6    of Advanced Floor Concepts?

 7              THE WITNESS:  Yes.

 8              THE COURT:  Then what would that be based on?

 9              THE WITNESS:  Looking at the website,

10    conversations about building and building techniques and why

11    you would build with their format of construction.  I was

12    considering rebuilding my home on the existing lot.  And I

13    looked at his website and it was really interesting.  I

14    liked the work and I liked the -- the quality, what it

15    looked like, attention to detail.  I had an interest in it

16    (inaudible) finding an existing home and purchased that

17    instead.  So I didn't build a home.  That would have been

18    the extent.

19              THE COURT:  Thank you.

20              Mr. Bednarski.

21              MR. BEDNARSKI:  Thank you.

22                        CROSS-EXAMINATION

23    BY MR. BEDNARSKI:

24         Q    Is it?

25         A    (Inaudible) children pronounce it properly.  That

United States of America vs.                          Motion to Quash Hearing
Michael David Wilhite                                          July 21, 2015

 1   is (inaudible).

 2        Q    Yes, I know (inaudible).

 3             MR. BEDNARSKI:  When you get older, it all

 4   (inaudible).

 5        Q    (BY MR. BEDNARSKI) Now, based off some 20, 25, 30

 6   years doing this, did most of the people that you work with

 7   (inaudible)?

 8        A    Yes, right.

 9        Q    I think one of the things you had indicated was,

10   at least (inaudible) were individuals?

11        A    Yes, right.  That was back up.

12        Q    I think one of things you had indicated was, at

13   least recently, there was S Corporations, LLCs and

14   (inaudible) that have been doing business with you, right?

15        A    Yes.

16        Q    Now, obviously, the individual has to call and --

17   has to call, right (inaudible)?

18        A    That is correct.

19        Q    And pretty much anybody at the discretion of that

20   company could call if they had that relationship with you

21   (inaudible)

22        A    Yes, in terms how I choose to do business, it

23   would already be an existing relationship.

24        Q    Correct.  And --

25        A    Or a referral.  And I understand where the

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 130

1 referral came from and why.

2     Q    Sure, sure.  And so when Mr. Wilhite called to

3 make some of these purchases on behalf of Yahab Foundation,

4 he was calling you because he had that relationship?

5     A    That's correct.

6     Q    You had dealt with him previously?

7     A    Yes.

8     Q    And so when you take the order, as indicated on

9 this first one on page 7 of Government's Exhibit No. 2

10 (inaudible) is the reason why you (inaudible) make it

11 workable?

12     A    That's correct.

13     Q    Now, obviously, the order, it looks like you made

14 (inaudible) approximately December 20, right?

15     A    Yes.

16     Q    Now, later on was when the wire-transfer actually

17 occurred; is that right?

18     A    Yes.

19     Q    And if you would go to page 3, including the cover

20 sheet of the exhibit, on the JP Morgan Chase account --

21     THE COURT:  (Inaudible) a Chase account, does he?

22     MR. BEDNARSKI:  It's his Chase account.

23     THE COURT:  Is it?  Because these documents are

24 his documents.

25     MR. BEDNARSKI:  Yes, Your Honor.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 131

 1          THE COURT:  Okay, go ahead.

 2     Q    (BY MR. BEDNARSKI) This is Precious Metals' bank

 3  account (inaudible)?

 4     A    Yes.

 5     Q    (Inaudible).

 6          MR. BEDNARSKI:  Your Honor, I'm pointing down to

 7  the same transaction the Government had brought up before,

 8  which is December 31 --

 9          THE COURT:  Right.

10          MR. BEDNARSKI:  -- 2014, an incoming

11  wire-transfer.

12          THE COURT:  Right.

13     Q    (BY MR. BEDNARSKI) Now, actually the wire-transfer

14  related to the purchase, or to the order came from Yahab

15  Foundation; is that correct?

16     A    That is correct.

17     Q    Didn't come from Michael Wilhite individually?

18     A    That is correct.

19     Q    And so at the time when Mr. Wilhite asked you to

20  change the name on the receipt, it matched who you got paid

21  for -- who you got paid from for the order, correct?

22     A    Yes.

23     Q    Now, I think down below is where you had indicated

24  where Mr. Wilhite signs, and that's because (inaudible) the

25  receipt as well as the delivery confirmation?  I mean, when

United States of America vs.                                      Motion to Quash Hearing
Michael David Wilhite                                                         July 21, 2015

Page 132

 1   signs down at the bottom, he is acknowledging that he

 2   received the package that has 2500 silver coins?

 3       A    That is correct (inaudible) shared responsibility

 4   (inaudible) concern of the (inaudible) itself.  It's on

 5   paper physically.  It's his.

 6       Q    Absolutely.  That means, you have it, it's yours?

 7       A    That is correct.

 8       Q    If you go to page 8, we want to go to the other

 9   two receipts that involve Mr. Wilhite and Yahab.  Now both

10   of those indicated -- or both of those actually indicate --

11   it says:  Mike Wilhite/Yahab, correct?

12       A    That is correct.

13       Q    With one of them having Michael Wilhite

14   (inaudible)?

15       A    Yes.  I learned very slowly.

16       Q    Now, also as it relates to Dee's, the money that

17   you received from the wire-transfer in order to purchase

18   these coins came from Yahab Foundation, correct?

19       A    Yes.

20       Q    Not Michael Wilhite?

21       A    Yes, yes.

22            THE COURT:  I guess Mr. Bayuk, if this had been

23   the case when the order was first made, Mr. Wilhite did not

24   say it was Yahab, and that's why you only wrote Michael

25   Wilhite.  And then later he told you that it was for Yahab

United States of America vs.                          Motion to Quash Hearing
Michael David Wilhite                                            July 21, 2015

Page 133

1  and that's why you crossed it out?

2      A    Yes, because my relationship is with Michael

3  Wilhite and I have a tendency (inaudible)  That's who I'm

4  doing business with.  That's the way I understand,

5  (inaudible) what I concern myself with.

6          THE COURT:  But would you have a routine that if

7  somebody informed you, This is on behalf of X corporation,

8  you would put the name of X corporation?

9          THE WITNESS:  If they requested it, yes.

10     Q    (BY MR. BEDNARSKI) And receipt, the last page of

11  Exhibit No. 2 Government Exhibit 2 regarding DW's Support

12  Service --

13     A    Yes.

14     Q    -- that's one where the order came from Michael

15  Wilhite but it was for a specific corporation, right?

16     A    That is correct.  Michael Wilhite called me on the

17  phone, placed this order.

18     Q    Now, I just want to clarify a couple of things.

19          When you indicated that you thought Mr. Wilhite

20  was a principal of Advanced Floor Concepts, that was not

21  based on any statements of Mr. Wilhite indicating that he

22  was the owner of the company, correct?

23     A    That's correct.

24     Q    You indicated that you looked at Advanced Floor

25  Concepts website, right?

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 134

1      A     Yes.

2      Q     And that indicated that he did have some

3  involvement with Advanced Floor Concepts, correct?

4      A     Yes.

5      Q     That, I think at one point, it might have

6  indicated that he was the general manager or something like

7  that; is that correct?

8      A     I have no recollection of having -- of him having

9  a particular title at all, other than, you know, my sense is

10 he was a principal.  He never stated it.

11     Q     So then the last thing you indicated was you

12 thought he was a principal based off of his knowledge of the

13 (inaudible); is that correct?

14     A     That is correct.

15     Q     Which obviously, as an employee or someone who

16 works in the business, would understand that, even if he

17 wasn't a principal, correct?

18     A     Correct.

19     Q     Now, one last thing as it relates to Yahab

20 Foundation, outside of the three transactions that Mr.

21 Wilhite called you about on behalf of the Yahab Foundation,

22 it is true that you have actually no knowledge of the Yahab

23 Foundation and who created it, who funded it, anything like

24 that; correct?

25     A     That is correct.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 135

1            MR. BEDNARSKI:  Thank you.  I have no further

2    questions, Your Honor.

3            THE COURT:  Any redirect?

4                    REDIRECT EXAMINATION

5    BY MS. FROEHLKE:

6        Q    Where does the information and the value of these

7    coins come from?

8        A    There was a market structure.  There is a bid

9    asked of stocks and bonds.

10       Q    So it's changing daily?

11       A    It changes throughout the trade day.

12       Q    Would you say Mr. Wilhite's orders only involved

13   one phone call, or was it kind of a series of phone calls

14   where you would tell him the price and he would come back

15   with an offer kind of thing?

16       A    It varied.  I tend to like, at least, a verbal

17   confirmation.  You can't say he didn't say it (inaudible),

18   so I would confirm price, based on a price that I'm able to

19   lock in on the wholesale market.  Sometimes, you know, if

20   there's an hour that passes by between the first contact and

21   the second (inaudible) so I need to get it (inaudible), in

22   the market (inaudible) not selling to any buyer.  I like to

23   have it purchased on the (inaudible) then there is buy/sell

24   (inaudible).  Small, but I locked that in (inaudible)

25   sometimes there was a (inaudible) phone call (inaudible)

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 136

1    Q    Is it your impression that Mr. Wilhite had an

2    expertise in this area?

3    A    He, as much as a lot of my clients did, read or

4    educated by the market and why one would invest in this type

5    of product in the first place.

6    Q    Did you and he have discussions about (inaudible)?

7    A    Sure.  We had lots of discussions about lots of

8    things related to the economy and why the market prices are

9    where they are, and market manipulation, which is obviously

10   happening in the futures market, because you can't -- which

11   has nothing to do with small buyers and sellers, like

12   ourselves, but the big players in the game, we talked about

13   this kind of thing.

14   Q    When Mr. Wilhite asked you to change the receipt

15   to indicate Yahab Foundation, did you -- did he tell you

16   anything about Yahab?

17   A    Not -- not a lot.  It was just a nonprofit entity

18   to support a ministry.  And he was really involved in it, in

19   the church ministry (inaudible).

20   Q    Did Mr. Wilhite, in the years you have known him,

21   ever refer to Advanced Floor Concepts as his company?

22   A    I couldn't say that one way or the other.  I don't

23   know if that's a straightforward answer.  It's only because

24   I really don't have the sense of the ownership or how that

25   is set up.  I don't -- I still don't.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 137

1    Q    But in discussions, did he ever refer to it that

2    way, as if it was his company that he had control over?

3    A    I just saw him as a principal, you know.  His

4    relationship with Dee -- and I don't know if Dee owned it or

5    Michael owned it or whether it was a group of investors.  I

6    have -- I don't know.

7    Q    When Mr. Wilhite was speaking on behalf of the

8    Yahab Foundation and you quoted him a price, do you recall

9    if he said, I need to go get authorization for this price,

10   let me call you back?  Or did he, in the moment, approve

11   that price?

12   A    He seemed capable of making those decisions.

13   Q    So he did approve of the quote immediately?

14   A    Generally speaking, yes.

15        MS. FROEHIKE:  No further questions.

16        THE WITNESS:  Any more?

17        THE COURT:  Okay.  Well, no one asked him the most

18   important question.

19        What is going to happen to the price of gold?

20   Don't answer that question.

21        THE WITNESS:  It is (inaudible).

22        THE COURT:  (Inaudible).

23        THE WITNESS:  Well, (inaudible) an example.  There

24   was (inaudible) between the market price, (inaudible) which

25   is the future market and the U.S. and the New York monitors

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                        July 21, 2015

Page 138

1  exchange, the price has been dropping like stone.  Yet, I
2  can't (inaudible) of this case, silver (inaudible).  So they
3  (inaudible).
4           THE COURT:  (Inaudible).
5           THE WITNESS:  (inaudible) has been current and the
6  future prices higher than (inaudible), in the futures
7  market.
8           THE COURT:  Well, it's China.  Isn't it China?
9  Isn't everything China?
10          THE WITNESS:  (Inaudible.)
11          THE COURT:  (Inaudible).  Okay, thank you.
12          THE DEPONENT:  You are welcome.
13          THE COURT:  Any further evidence from the United
14 States?
15          MS. FROEHIKE:  No, Your Honor.
16          THE COURT:  Okay.  So I would like to address the
17 burden of proof.
18          Do you want to make closing statements?
19          MS. FROEHIKE:  Yes.
20          THE COURT:  Okay, I would like to address the
21 burden of proof.  This is going to have to be probably by
22 recommendation, as far as my research shows, since it's
23 dispositive.  So you each will get a second bite of the
24 apple after I write a recommendation and send it to the
25 (inaudible) so just keep that in mind, too.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 139

1           (Inaudible.)

2           MR. BEDNARSKI:  Your Honor, pursuant to 28 USC

3    3205 (inaudible) regarding objections to the answer, it

4    (inaudible) 20 days after receipt of the answer, judgment,

5    debtor or the United States can file written objections to

6    the answer (inaudible) the party (inaudible) the objection

7    (inaudible) burden of proof of proving such (inaudible) so,

8    obviously, we based off of the (inaudible) past that.  Mr.

9    Wilhite bear the burden of proving his case (inaudible) that

10   he has no right, title or interest in Yahab Foundation.

11          Regarding the procedural aspects, Your Honor, I'll

12   leave that to Mr. Mikulecky (inaudible) Your Honor, I think

13   based on the evidence that has been presented, it is clear

14   that while there was some discussions between Yahab and Mike

15   regarding a foundation, it was clearly Ms. Wilhite who is

16   the one who created the Yahab Foundation.  She is the one

17   who contacted Mr. Holden.  Mr. Holden took direction from

18   her.  He testified that he is the one who created the Jahab

19   Corporation documents, the different documents related to

20   bylaws, Article Of incorporation, the IRS and with the state

21   of Colorado throughout, he had indicated that he had never

22   once took any direction from Mr. Wilhite regarding the

23   creation of -- of the Yahab Foundation.

24          As testified to by Mr. Wilhite, as well as Ms.

25   Wilhite, there absolutely is no evidence to suggest that Mr.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 140

1  Wilhite was the one had engaged him for Yahab Foundation.

2          Regarding the little bit of evidence that the

3  Government brought in regarding Mr. Wilhite's involvement in

4  Yahab Foundation regarding callings and setting, placing

5  orders with the Colorado Precious Metals and Coins,

6  unfortunately, that did not rise to the level of Mr. Wilhite

7  having any right or interest to the property or in the

8  corporation of Yahab.

9          Any individual who (inaudible) direction of the

10 board of directors, whether it be employee, an accountant or

11 whatever, that may have a relationship with Mr. Bayuk, can

12 call him and request, and purchase on behalf of the either

13 themselves individually or another corporation.

14          The fact that Mr. Wilhite was involved in the

15 purchase of those points on behalf of Yahab does not, in any

16 way, shape or form, establish any evidence that Mr. Wilhite

17 is the one who formed the corporation or that he was

18 involved in the formation of the corporation.

19          Regarding Advanced Floor Concepts, that is

20 obviously something we are going to get to much later on,

21 Your Honor, in September, of what Mr. Bayuk even testified

22 that while he thought he was a principal, it wasn't based on

23 any representations that Mr. Wilhite made to him regarding

24 he being an owner.  He based it off of what (inaudible) and

25 and indicated that Mr. Wilhite (inaudible) was involved in

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 141

 1   Advanced Floor Concepts.  And on top of that, the fact that

 2   Mr. Wilhite had knowledge of how they -- how they installed

 3   these floors, which was now something he was considering

 4   doing after he lost his home.

 5          So I think all of the evidence at this point, Your

 6   Honor, points to the determination by this Court that Mr.

 7   Wilhite has no right, interest or property in the Yahab

 8   Foundation.  And all of the evidence of the witnesses

 9   support that.

10          THE COURT:  Thank you.

11          MR. MIKULECKY:  On the burden of proof issues

12   requested Your Honor, we actually have a shifting burden on

13   this.  Our motion filed on behalf of Yahab to quash the Writ

14   of Garnishment based on procedural issues, I think is

15   (inaudible) of order (inaudible) I think is our burden.  I

16   don't want to go through and reiterate the arguments that I

17   made at opening.  I'm sure they're ingratiated in your mind

18   and I don't need to repeat them.

19          THE COURT:  I will look at them hard.

20          MR. MIKULECKY:  Understand.

21          I do have two points, however.

22          First, counsel for the United States cited

23   definition of property.  It's important to know that in a

24   garnishment statute, that definition is essentially modified

25   because it says (inaudible) against property in which the

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 142

1  debtor has a substantial nonexempt interest.

2          So, yes, sir, it's property, but it's only

3  specific property.  It can't be an entire universe of

4  property.  So for the garnishment that gets narrowed, and

5  that's where we think they misstepped.

6          The United States also cited 18 USC 3613, a very

7  important point.  It said that the Court can take any

8  measure necessary.  We agree.  This is not the Court.  They

9  misstepped and we think that procedurally that's improper.

10          Let's talk, though, about then the fact that we

11  have, because we don't think those support the Government's

12  argument that there was alter ego.  And I think the most

13  constructive case to look at, your Honor, is that In re:

14  Philips case, the Colorado Supreme Court.  It's at 139 P.3rd

15  639, that allowed the reverse piercing.

16          Three elements that the Court said must be met for

17  that reverse piercing have to show that the controlling

18  insider of the corporation alter ego (inaudible) to each

19  other.  I will come back to that in a moment.

20          Second, justice requires the piercing because the

21  corporation has been used to perpetrate a fraud to defeat a

22  rightful claim.  Again, I'll get back to that in a moment.

23          And finally, an equitable result has (inaudible)

24  achieved by the piercing.

25          Now, here, though, is where the burden of proof

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 143

1 shifts because, in an accordance with Colorado law, the

2 party seeking to pierce the corporate veil must make a clear

3 and convincing showing that each element has been met; not

4 preponderance of the evidence.  Clear and convincing

5 standard is what is used here.  And that burden is on the

6 United States.

7          So let's go back to that first element then.

8 Controlling insider of the corporation are one and the same.

9 The Philips case, again, I think is instructive and to use

10 that as comparison.  The court there allowed reserve

11 piercing because the director, a person who was the

12 controlling insider, removed board of directors without

13 board approval.  Used the sale of corporate property to pay

14 for personal expenses.

15          The other shareholder in the corporation couldn't

16 explain what they were doing in the corporation.  There was

17 no bank account.  All of the assets of the corporation were

18 mingled with the personal bank account of the debtor in that

19 case.  There was (inaudible) it's on (inaudible) there were

20 no tax returns filed.  There were no bylaws laws.  There

21 were no board meetings.  There were financial statements.

22          We have all of that here.  We have absolutely

23 nothing in showing that Mr. Wilhite controlled the

24 corporation.  He was not an officer, not a director.  He was

25 not a manager.  He was not involved in the corporation.  He

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 144

 1  did not have a paid-consultant position.  He did not make

 2  decisions.  Wasn't a paid consultant, a contractor.

 3  Nothing.  All we have is that he physically picked up --

 4  picked up the phone, placed the order at the direction of

 5  the board of directors, for which we have minutes approval.

 6          And by the way, you can check that.  In terms of

 7  the timeframe, those minutes show three transactions.  There

 8  was a fourth transaction February 13, if you look at the A&B

 9  Bank records.  So (inaudible) between the third and fourth

10  transaction, because that fourth transaction wasn't

11  (inaudible).  So those were done in February, not at the

12  time of the garnishment (inaudible).

13          Nonetheless, all of that was done by the board of

14  directors.  Mr. Wilhite picked up the phone, ordered, as

15  required.  Picked them up.  The money was transferred out of

16  Yahab's bank account, which was funded by Advanced Floor

17  Concepts.  Mr. Wilhite had absolutely no involvement in

18  Yahab Foundation.  Nothing indicating he's in control.

19          The second element justice requires because

20  (inaudible) this corporation is being used to perpetrate a

21  fraud.  There is no suggestion of that.  To defeat a

22  rightful claim, the claim there, of course, is the United

23  States against Mr. Wilhite to be able to prevail on that;

24  however, again, the United States is jumping ahead and

25  presuming that Advanced Floor Concepts money, which was used

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 145

1  to fund Yahab, is really Mr. Wilhite's money.  It hasn't

2  been decided yet.

3          We are back to a prejudgment, prelawsuit

4  attachment.  So we don't have that either.  Finally, as

5  equitable result achieved by (inaudible).  I would like the

6  Court to pay particular intention to the ruling.

7  (inaudible) by the Supreme Court in the case, because it

8  said if an innocent shareholder or (inaudible) is going to

9  be damaged by this reverse piercing, then this element

10  cannot be met.

11         We have testimony of Mr. Holden that if this money

12  is taken by the United States upon the death of Mr. Wilhite,

13  Yahab will lose its 501(c)(3) status.  Importantly, that

14  means that Cowboy Church, who had three donations, a

15  separate independent entity, no suggestion of their

16  involvement in any way, I think that can have consequences

17  as well.

18         So, they, an innocent third party, is damaged by

19  this reverse piercing under Colorado law.  It cannot be

20  reverse-pierced, even if a reverse piercing had been

21  (inaudible) for a nonprofit.  And, again, there is no

22  authority for that.

23         THE COURT:  Ms. Froehlke.

24         MS. FROEHIKE:  Your Honor, first of all relating

25  to the burden of proof and procedurally what law we are

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 146

1   under here, the MVRA instructed the Attorney General's

2   Office to enforce restitution ordered to the same extent as

3   a tax lien.  Therefore, we are under the same provisions and

4   procedure that IRS has available to it.  And case law

5   relating to tax lien enforcement is the appropriate law to

6   look at.  Although that PCCPA does indicate that property

7   should be defined through state law, it is then federal law

8   that gives the tools and procedures to reach (inaudible).

9           It is clear, through the FCCPA, as Mr. Bednarski

10  referenced, the burden of proof does lie on the objecting

11  party to show whatever it is they are raising in terms of

12  the garnishment.

13          Further, the definition of property does not

14  (inaudible) through the post-judgment procedure of a

15  garnishment.  Instead, Mr. Mikulecky is -- is commingling

16  the definitions of substantial interest and (inaudible) of

17  property.  Property can be held in any name, taxing

18  enforcement law clearly has indicated.  And, in fact, is

19  frequently held in names other than the actual tax debtor or

20  (inaudible) debtor for the very purpose of evading that

21  obligation.

22          The interest in property is shown through custody

23  and control.  And I think that it is clear that Mr. Wilhite,

24  although his name is not on anything, which is, indeed, Your

25  Honor, his modus operandi, and it is exactly what we are

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 147

 1  asserting is going on in the big picture of this case.

 2          Although his name does not appear on anything, he

 3  has custody literally of these gold coins.  He was the one

 4  intercepting them.  He had (inaudible) tomorrow and he has

 5  control over them, as well.  He was approving the cost of

 6  the (inaudible) as Mr. Bayuk indicated over the phone.  He

 7  made the orders, he made the pickups.  And for all Mr. Bayuk

 8  knew, Dee while had nothing to do with any of this.

 9          Just because his name does not appear on these

10  minutes, when they are predated and on the actual IRS

11  document, does not mean that he does not have custody and

12  control over the assets.

13          It is unclear to the Government whether or not

14  those gold coins will ever see the light of day or ever see

15  a charitable purpose.  However, even if they have already

16  been designated with specific plans to give to the Wild

17  Cowboy Church, or any other charitable organization, that is

18  irrelevant to the question of whether or not that property

19  was dissipated in anticipation of litigation surrounding

20  Advanced Floor Concepts.

21          Again, though, Your Honor, the United States does

22  not intend to actually seize this property at this time and

23  in that there is only $14,000 left, that the parties have

24  already done an excellent job of transferring these assets

25  so that they are essentially unreachable, (inaudible) so and

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 148

 1   this safe that is coming into their house tomorrow.

 2           But, we simply want the Writ of Garnishment to

 3   stand and it will stand until we move for an order of

 4   garnishment.  And that is up to the Government, to move for

 5   it.  The statute don't allow us to move for it, as we have

 6   decided, for the 20-day objection period.

 7           Frequently we, for various reasons, don't move for

 8   an order of garnishment long after those 20 days have

 9   passed.  We simply are asking that this money remain

10   restrained until these subjective issues have been decided.

11           I think that if we are going to discuss case law

12   more in depth than argument today, we would ask that we be

13   given the opportunity for supplemental briefing.  The Tenth

14   Circuit has addressed these issues several times and I think

15   Tenth Circuit law is the applicable law to look to here as

16   it relates to Colorado state law defining property, which

17   the Tenth Circuit has done frequently, as well.

18           And beyond that, Your Honor, I think it's very

19   clear that whatever it's (inaudible) purpose is, the Yahab

20   Foundation is the Wilhites.  It doesn't have any other

21   donations coming in from third parties.  It doesn't have any

22   other third-party involvement, other than these board

23   members, who, apparently, don't meet on the days that they

24   have documented that they met.

25           Regardless, there is no separation of interest

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 149

```
 1   here between Yahab and the Wilhite.  Their interests are
 2   very much aligned and I think determining whether or not
 3   Yahab is truly an alter ego of the Wilhites require us to
 4   have the hearing in September that will determine ownership
 5   of Advanced Floor Concepts and ownership of the $200,000
 6   that was transferred in silver.
 7            I think, absent supplemental briefing, that we
 8   will rest on those arguments.
 9            THE COURT:  Okay.  Anything further?
10            Mr. Bednarski.
11            MR. BEDNARSKI:  I actually agree with her that the
12   burden is on us, and we accept that burden.  And based on
13   all of the testimony that the Court has heard today, there
14   is absolutely no evidence disputing that Mr. Wilhite has no
15   right, interest or title, or any type of involvement,
16   outside of making a few purchases.  He -- there's been
17   absolutely no evidence disputing that it was Dee Wilhite who
18   set up the corporation.  There has been absolutely no
19   evident disputing that Mr. Holden set it up at Dee Wilhite's
20   request.  There has been absolutely no evidence disputing
21   that Mr. Wilhite didn't sign any of corporation documents;
22   that all of the documents were prepared by an attorney here
23   in the state of Colorado who would lose his law license if
24   he was doing this as a fraud on the Government.
25            He told this Court that he -- it concern him, that
```

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 150

 1   Mr. Wilhite had the restitution.  He knew that that

 2   restitution was out there.  He did not believe this was in

 3   any way, shape or form, an attempt to shield assets because

 4   he would not have gone along with it.

 5          So it's great to say it's our burden; but if you

 6   don't have any evidence to dispute what we have presented

 7   through the witnesses and the evidence and the documents

 8   that we have provided, we have met our burden.

 9          And so there has been absolutely no evidence

10   disputing it.  They want to talk about he has control and he

11   has control of these assets.  Based on what, Your Honor?

12   Because he has a code to the safe that is in their house?

13   That doesn't mean he has control over it.

14          I think the Court could easily see that Ms.

15   Wilhite is not -- doesn't bow down to him; that she has her

16   own ideas, she has her own thoughts and she has her own

17   plans.

18          This was her plan, not Mr. Wilhite's.  And the

19   fact that (inaudible) could say, Okay, we will take it at

20   that, there is absolutely no evidence that that means that

21   there weren't discussions ahead of time regarding the value

22   of what silver or gold was at certain different times.

23          Mrs. Wilhite testified -- and there has been

24   absolutely no evidence disputing it, that the board of

25   directors agreed and confirmed that this is what they were

United States of America vs.                                    Motion to Quash Hearing
Michael David Wilhite                                                      July 21, 2015

Page 151

1  going to do as it related to investment, which is

2  appropriate for a 501(c)(3) corporation.  And they agreed on

3  the value of it.

4           There has been absolutely no evidence to dispute

5  that.  We have easily met our burden, Your Honor.  And this

6  is something that I understand, it's our burden, but if you

7  have no evidence disputing what we have presented, then we

8  have met that burden.

9           And we have not only met that burden, we far

10 surpassed it with all of the credibility of these witnesses,

11 Your Honor.

12          THE COURT:  Thank you.

13          MR. MIKULECKY:  Without repeating Mr. Bednarski's

14 argument, the only other issue that I -- point that I would

15 raise is counsel for the United States said that the alter

16 ego issue is to be determined.

17          First, I question that, frankly, because it's a

18 Writ of Execution on events (inaudible), I'm not sure how we

19 expand that to encompass a separate entity.

20          Nonetheless, I think the important concession is

21 determining an alter ego is an issue for Court, not for the

22 United States Attorney's Office, directing the garnishment

23 and tying up funds (inaudible).

24          THE COURT:  Okay, (inaudible).

25          (Inaudible) I'm giving you some direction as to

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 152

1  where I am at the moment.  So that by Monday at 5:00, if you

2  want to file any kind of cross-supplemental authority, you

3  may do so.  And you include addressing the Court's

4  (inaudible) in those.

5          I want to say that, in one sense, this is a little

6  bit premature because a ruling on Advanced Floor Concepts is

7  necessary to fully decide what is right with regard to the

8  funding of Yahab.

9          I do agree that if it were a stand-alone issue --

10 and I will have to decide whether it's stand-alone issue --

11 that, by a preponderance of the evidence, Mr. Wilhite does

12 have a substantial interest in Yahab.  So if that were -- at

13 the moment, that were a stand-alone, then that that would be

14 my ruling.

15         That is contingent, though, on what is the truth

16 with regard to Advanced Floor Concepts?  Because if the

17 Government were able to prove that that company is, in fact,

18 substantially owned by Mr. Wilhite, then -- then whatever

19 comes from that company anywhere was his money as well.

20         So, in a sense, (inaudible) without prejudice to

21 further argument, but at the moment, I don't think that

22 there is enough evidence that Mr. Wilhite has that

23 substantial interest in Yahab and its assets.

24         So that's sort of where I'm going at the moment.

25 I will have to determine exactly what I should be deciding

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 153

 1  right now, if anything, with regard to the Writ of

 2  Garnishment, whether it's premature, at the very least.

 3           So that's what I'm looking at.  I mean, there are

 4  obviously reasons why I'm doing that.

 5           I think, you know, I have questions, but they

 6  aren't serious enough questions to make me doubt while his

 7  interest in giving to charities, you know, if one of the

 8  purposes of the 501(c)(3) having been to collect money from

 9  others, make sure it's directed to the right kinds of

10  entities that everyone agrees it should be funded.  And I

11  think there has been no effort made in that whatsoever.

12  That's a little bit head-scratching, I guess.

13           Also, you know, the (inaudible) at times a good

14  investment to a crappy investment.  It has gone down,

15  probably to 20 percent probably, since they purchased it in

16  January.

17           So I do follow that market a little bit myself.

18  And, you know, that's all a guess.  It could be up

19  20 percent.  Circumstances have just not gone there.

20           And then, of course, Mr. Bednarski says no,

21  there's absolutely no evidence.

22           I think making the orders, going down and picking

23  up the gold, a witness, even maybe understanding that it was

24  Mr. Wilhite who was making the purchases and then later

25  having to change that, that is some evidence but not

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 154

 1  evidence enough, in my opinion.

 2            In fact, the silver coins have never been

 3  disposed of is somewhat assuring to me that if the United

 4  States prevails at a later proceeding, there's assets there

 5  to be found because (inaudible) never disposed of these.  So

 6  I'm not worried about that part.

 7            And anyway, so that is just some of the thoughts

 8  that have led me to what I believe I will do.  But I'm

 9  willing to read anything you file by Monday and will

10  consider that.

11            So, anything further before we dismiss?

12            Ms. Froehlke?

13            MS. FROEHIKE:  No, Your Honor.

14            THE COURT:  Mr. Mikulecky or Mr. Bednarski?

15            MR. BEDNARSKI:  No, Your Honor.

16            THE COURT:  And it's going to have to be by

17  recommendation.  So either fortunately or unfortunately for

18  you guys, you will have another bite at the apple, which is

19  inherent with the recommendation to the district judge.  So

20  you will have more work to do, probably, one way or the

21  other.

22            But thank you all.  Excellent job, very

23  interesting.  And it was nice to meet you, Mr. and Mrs.

24  Wilhite.

25            So we will be in recess.

United States of America vs.
Michael David Wilhite

Motion to Quash Hearing
July 21, 2015

Page 155

1        (Whereupon, the within hearing was then in

2   conclusion at 1:25 p.m.)

3

4

5

6        I certify that the foregoing is a correct

7   transcript, to the best of my knowledge and belief (pursuant

8   to the quality of the recording) from the record of

9   proceedings in the above-entitled matter.

10

11   /s/Carol Patterson                     December 7, 2016

12   Signature of Transcriber              Date

13

14

15

16

17

18

19

20

21

22

23

24

25

United States of America vs.
Michael David Wilhite

```
 1                    I N D E X

 2   WITNESSES:                              Page

 3   MICHAEL WILHITE:
     Direct examination by Mr. Bednarski      24
 4   Cross-examination by Ms. Froehlke        32
     Examination by the Court                 46
 5   Redirect examination by Mr. Bednarski    50
     Recross-examination by Ms. Froehlke      53
 6

 7   DOUGLAS HOLDEN:
     Direct examination by Mr. Mikulecky      54
 8   Cross-examination by Ms. Froehlke        68
     Redirect examination by Mr. Mikulecky    74
 9   Examination by the Court                 75

10   DARLA DEE WILHITE:
     Direct examination by Mr. Mikulecky      77
11   Cross-examination by Ms. Froehlke       101
     Redirect examination by Mr. Mikulecky   116
12
     DAVID BAYUK:
13   Direct examination by Ms. Froehlke      119
     Cross-examination by Mr. Bednarski      129
14   Redirect examination by Ms. Froehlke    135

15   EXHIBITS STIPULATED:

16   Government 1-8                            24
     Defense 1-4 and 6-7                       23
17

18

19

20

21

22

23

24

25
```