IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello

Criminal Case No. 00-cr-00504-CMA

UNITED STATES OF AMERICA,

 Plaintiff,

v.

MICHAEL DAVID WILHITE,

 Defendant.

**ORDER ADDRESSING MR. WILHITE'S OWNERSHIP INTEREST IN ADVANCED FLOOR CONCEPTS AND THE ASSETS OF THE YAHAB FOUNDATION AND PERMITTING FEDERAL GARNISHMENT OF THAT INTEREST**

This matter is before the Court to determine the percentage of Mr. Michael David Wilhite's ownership interest in Advanced Floor Concepts, LLC (AFC) and in the assets of the Yahab Foundation. Having thoroughly considered the parties' arguments, expert testimony, and relevant legal authority, the Court concludes that Mr. Wilhite has a 73.9% interest in AFC and a 72.4% interest in the $200,000 that AFC transferred to Yahab in 2014. The Court further concludes that this interest constitutes property that is subject to garnishment under federal law.

## I.   RELEVANT BACKGROUND[1]

On June 23, 2016, this Court issued an Order concluding that, under the Colorado Uniform Trust Act (CUFTA) and *Holman v. United States*, 505 F.3d 1060 (10th Cir. 2007), Mr. Wilhite holds a property interest in AFC and any assets stemming from AFC, even

---

[1] The Court has set forth the factual background to this case in numerous prior orders. (Doc. ## 115, 121, 136.) Those documents are incorporated herein by reference, and the facts contained therein need not be repeated here.

1

though his wife is listed as the sole founder and owner of the company. (Doc. # 121, p. 27–28.) The Court specifically found that the circumstances surrounding the creation of AFC (and the transfer of funds to the Yahab Foundation) demonstrate Mr. Wilhite's "actual intent to hinder, delay, or defraud" his creditors. (*Id.*)

The Court then asked the parties to brief the best method for determining the percentage of Mr. Wilhite's interest in the companies. (*Id.* at 28.) Finding the written briefing lacking, the Court set the matter for a hearing, which occurred over the course of two days, March 23, 2017, and April 14, 2017. (Doc. ## 151, 154.) Following the hearing, the parties submitted to the Court proposed findings of fact and conclusions of law on the issue. (Doc. ## 155, 156.) The parties propose as follows:

- The Government alleges that Mr. Wilhite has a 73.9% interest in AFC and a 72.4% interest in Yahab. The Government's figures are supported by the expert testimony of Michael Petron, a certified public accountant and certified fraud examiner.

- The Wilhites contend that Mr. Wilhite has a 10.45% interest in AFC and no interest in Yahab. The Wilhite's proposal is supported by the expert testimony of William Callison, an attorney with extensive experience in handling limited liability company matters.

For the reasons set forth below, the Court finds the Government's expert's conclusions more credible and the Government's position more persuasive.

## II.     LAW

In conducting the instant analysis, the Court sits in equity. *Miller v. Kaiser*, 433 P.2d 772, 775 (1967); *Double Oak Const., L.L.C. v. Cornerstone Dev. Int'l, L.L.C.*, 97

P.3d 140, 147 (Colo. App. 2003). The purpose of a court sitting in equity is to promote and achieve justice with some degree of flexibility; to this end, the court is to examine substance over form. *Garrett v. Arrowhead Imp. Ass'n*, 826 P.2d 850, 855 (Colo. 1992). "Equity . . . has to do with the substance and reality of a transaction—not the form and appearance which it may be made to assume . . . . [I]t is the real intention of the parties, and the true nature of the transaction that concern equity; . . . . no matter how many papers may have been executed to cover up the real purpose and give to the transaction an appearance other than the true one." *Rocky Mountain Gold Mines v. Gold, Silver, & Tungsten*, 93 P.2d 973, 982 (Colo. 1939).

The Court looks partly to the Colorado Limited Liability Company Act (CLLCA), which governs the interests and contributions of LLC members, to assess Mr. Wilhite's membership interest[2] in AFC. Colo. Rev. Stat. §§ 7-80-101, et seq. Colorado Revised Statute § 7-80-102(9) defines "member" as "a person with an ownership interest in a limited liability company with the rights and obligations specified under this article." A member's financial interest in a LLC, i.e. his ownership interest, is based on the value of contributions that member has made to the company. *See* Colo. Rev. Stat. §§ 7-80-503, -504; *see also* Nicholas Karambelas, 1 Ltd. Liab. Co.: L., Prac. and Forms § 7:3 (2016) (The interest percentage is expressed as a percentage of the whole and "bears a mathematical relationship to the type and value of the contribution made."). This value is also used to determine an individual's share in "the profits and losses" and the distribution of cash or other assets of the LLC. Colo. Rev. Stat. §§ 7-80-503, -504.

---

[2] The Court uses the terms "membership interest," "ownership interest," and "interest" interchangeably as there appears to be very little legal distinction between them in these particular circumstances.

3

In addition, § 7-80-108 binds members of an LLC to its operating agreement and requires that this Court give that agreement "maximum effect." *Weinstein v. Colborn Foodbotics, LLC*, 302 P.3d 263, 266 (Colo. 2013). The Court therefore also looks to AFC's Operating Agreement when assessing Mr. Wilhite's membership interest.[3] (Def. Ex. D, E.) The Agreement provides that a member's "membership interest" should "be expressed as the percentage equivalent of the number" that results from dividing the total of the member's capital account by the total of all members' capital accounts.[4] (Def. Ex. D, p. 2, ¶ 3; E, p. 1–2.) A capital account "reflects each member's capital contribution to the Company" and is required to "be set up and maintained . . . for each member" of AFC. (Def. Ex. D., p. 4, ¶ 4; E, p. 1.) The capital account should also track each member's distributions based on the profits and losses of the company. (*Id*.)

Although AFC did not maintain these accounts, the Court nonetheless finds that these provisions demonstrate the company's intent and understanding behind membership interests. That Mr. Wilhite, the CEO, did not sign the Operating Agreement does not mean that it is inapplicable to him. Indeed, Mr. Wilhite's signature is missing from numerous AFC documents despite his clear involvement in the company from its inception. The Court also rejects the Wilhites' argument that the Operating Agreement does not apply because Mrs. Wilhite began AFC as a single-member LLC. The

---

[3] The Court recognizes that § 7-80-108(1)(a) requires that the Operating Agreement govern the "rights, duties, limitations, qualifications, and relations" among the members of an LLC and "shall control" over any provision of the CLLCA. However, because there is some disagreement regarding the applicability of the Operating Agreement, the Court finds it sensible to also reference various CLLCA provisions governing this issue. Indeed, the CLLCA and AFC's Operating Agreement contain substantially similar provisions such that adherence to both sources does not create conflict or discord.

[4] AFC's Operating Agreement was amended in 2013, but the provisions pertinent to this case remain materially unchanged. The Court nonetheless quotes the language used in the 1997 Operating Agreement because it better reflects the Wilhites' original intentions with respect to the creation of AFC.

Operating Agreement clearly contemplates a multi-member organization and this Court has already concluded that Mr. Wilhite is considered a member, and indeed *owner*, of the Company. The 1997 Operating Agreement even concludes with Mrs. Wilhite certifying "that the Company's members have adopted the terms of this document." (Def. Ex. D.) The Wilhites' continued characterization of the company as a single-member entity is merely an attempt to further conceal the realities of AFC from the Court. Even Mr. Callison, the Wilhites' expert agreed that an LLC's operating agreement is "typically where [he] would go" to determine a member's interest in the company. (Doc. # 151, p. 162.)

Synthesizing the principles set forth in the CLLCA and AFC's Operating Agreement, the Court's finds it appropriate to conduct a two-part analysis. The Court's first task is to determine the value of Mr. Wilhite's contributions to AFC. Next, the Court must factor in any profits, losses, or distributions applicable to Mr. Wilhite and determine how they may affect or drive his overall interest in AFC. The figures resulting from these two steps will dictate the ultimate percentage of interest in AFC attributable to Mr. Wilhite.

### III.  ANALYSIS

#### A. CONTRIBUTIONS

AFC's Operating Agreement states that a member's contributions may be in the form of "cash, property, or services." (Def. Ex. 4, p. 3, ¶ 1.) Section 7-80-501 similarly provides, "[t]he contribution of a member [of a limited liability company] may be in cash, property, or services rendered or a promissory note or other obligation to contribute cash or property or to perform services." All parties and both experts agree that Mr. Wilhite's

5

contributions fall into two categories: (1) service contributions and (2) financial or cash contributions. (Doc. # 151, p. 19 (Mr. Petron), 170 (Mr. Callison).)

    1. Service Contributions

The parties and experts also agree that Mr. Wilhite's uncompensated services should form the basis for his service contributions. They disagree, however, on the value of Mr. Wilhite's uncompensated services and whether to include services provided after 2008, when he claims to have retired. Having thoroughly reviewed the dueling expert recommendations and supporting evidence, the Court finds Mr. Petron's approach more reasonable and reliable than Mr. Callison's approach.

First, Mr. Petron queried a nationally-reliable database from the Economic Research Institute (ERI), using data points that were reflective of AFC's size, operation, and location. (*See* Doc. # 151 at p. 20–21, wherein Mr. Petron explained that although typically used by Fortune 500 companies, the ERI database can also be used to set compensation rates for smaller-sized companies at "different geographic areas across the country"); *see also Warren v. Campbell Farming Corp.*, No. CV 05-441 MV/RLP, 2009 WL 10664916, at *11 (D.N.M. Mar. 30, 2009), aff'd, 461 F. App'x 779 (10th Cir. 2012) (commenting on the reliability of the ERI database). He specifically queried the database using the following categories: 1) Area (Castle Rock, Colorado, AFC's headquarters); 2) Industry: Structural Steel and Precast Concrete Contractors (using North American Industry Classification System ("NAICS") code 238120); and 3) Organization Size (AFC's revenue by year). (Pl. Ex. 51, ¶ 24.) Mr. Petron also included in his ERI compensation search Mr. Wilhite's position at AFC, which this Court previously classified as CEO. (*Id.*) Mr. Petron then broke down the fair market value of Mr. and Mrs. Wilhite's

6

uncompensated services by year to account for economic change, inflation, and the like. His expert report is thorough and well-supported and his testimony on this topic was credible.

Ultimately, Mr. Petron found the fair market value of Mr. Wilhite's uncompensated services between 1997 and 2016 to be $4,230,393. He calculated the fair market value of Mrs. Wilhite's uncompensated services between 1997 and 2016 to be $1,277,045.

The Wilhites dispute Mr. Petron's service calculation because the allege:

(1) Mr. Wilhite did not operate as the CEO of the company and therefore Mr. Petron's fair market salary figures are too high; and

(2) Mr. Wilhite retired in 2008 so the inclusion of any service contribution thereafter renders Mr. Petron's analysis faulty.

On these points, the Wilhites appear utterly divorced from reality. Indeed, the distance they occupy from the veracity of the facts in this case places them on the outskirts of Dante's Eighth Circle.

First, despite all the denials and smoke and mirrors information submitted by Mr. and Mrs. Wilhite, the credible evidence shows that Mr. Wilhite operated as the CEO of AFC from its inception. *See Rocky Mountain Gold Mines v. Gold, Silver, & Tungsten*, 93 P.2d 973, 982 (Colo. 1939) (the court's goal is to determine "the real intention of the parties and the true nature of the transaction . . . no matter how many papers may have been executed to cover up the real purpose and give to the transaction an appearance other than the true one.").

The following evidence supports this conclusion:

- The Wilhites admitted Mr. Wilhite managed AFC from 1997 to 2008. (Doc. ## 97, p. 259; 98, p. 350.)
- Mr. Wilhite has identified himself as the CEO or owner of AFC on numerous occasions, including on a commercial security agreement from 1997, on construction agreements from 2006, in the employee handbook, and during a potential sale of AFC in 2013. (Pl. Ex. 9 at 1; 45; Def. Ex. D; Doc. # 99, pp. 443–44.)
- A client and associate at AFC testified to viewing Mr. Wilhite as the decision-maker or owner of the company. (Doc. ## 97, p. 189–89; 99, p. 647.)
- Mr. Wilhite has authority to direct and control product and prices for AFC (Pl. Ex. 11 at 3, 4, 10, 12–13; Doc. # 97 at 192), to direct and control AFC employees' duties (Pl. Ex. 43), to enter into sales contracts on behalf of AFC (Pl. Ex. 9), and to hire and fire employees (Doc. # 99, p. 483, 624, 670, 652).
- Mr. Wilhite is intricately involved in the tax planning and preparation for AFC, as well as large corporate financial issues, such as six-figure distributions and debt-to-equity ratio analysis. (Pl. Exs. 36 and 37; Doc. # 98, p. 367; Doc. # 99 at 582).
- Mr. Wilhite has authored and implemented employee memos and policy guides for AFC from 1997 through at least 2013. (Pl. Ex. 11, p. 4, 6-8, 11; Pl. Ex. 47; Doc. # 98, p. 386.)
- In a 2001 Christmas letter, Mrs. Wilhite, referring to AFC, wrote "Michael's business continues to grow. His company is now the foremost provider of steel structural floors, suspended floors, and decks in Denver for the custom

builders." (Pl. Ex. 12; Doc. # 154, 378–79.) She then distinguishes AFC from "[her] own company." (*Id.*)

Thus, to base Mr. Wilhite's "services-rendered" contribution on anything less than CEO or owner status would not only inaccurately reflect the fair market value of his contributions to AFC, it would also legitimize and perpetuate a fraudulent scheme.

Second, this Court remains unconvinced that Mr. WIlhite "retired" in 2008. The only evidence supporting the Wilhites' claim that Mr. Wilhite retired in August of 2008 due to transient ischemic attacks or mini-strokes and sleep apnea is their self-serving testimony, which this Court found to be non-credible. In fact, substantial evidence in this case shows Mr. Wilhite's testimony under oath to the Court that he "retired" in 2008 is blatantly false:

- Numerous witnesses, including the Wilhite's tax accountant and suppliers to and employees of AFC, testified that Mr. Wilhite did not retire in 2008. (Doc. # 99 pp. 399, 608-09, 653; 669–70.)

- Around the time Mr. Wilhite received notice that the Government sought to garnish his wages from AFC, AFC stopped issuing paychecks to Mr. Wilhite; he received his last paycheck on August 15, 2008. The next payment cycle, on August 29, 2008, Mrs. Wilhite's paychecks doubled in amount. (Doc. # 115 at 32, n. 12.)

- Dennis Cross, the controller of AFC, testified that, in 2009, "it was obvious. . . that Mike was in charge, sitting at the head of the table, asking the questions, answering the questions." (Doc. # 99, p. 674.)

9

- Mr. Wilhite's duties and involvement actually *increased* at AFC in early March 2010. (Doc. # 99, p. 652.)
- In 2013, Mr. Wilhite negotiated the potential sale of AFC to Kodiak Building Partners, LLC ("Kodiak"), a private equity firm. Pl. Ex. 44. Kodiak believed that Mr. Wilhite was "running the business"; was the "brain" of AFC. (Doc. # 99, p. 406–407.) During negotiations, Mr. Wilhite, requested that he "continue to operate the company at his current work schedule and salary," and "continue to lead the business on a day-to-day basis" until December 2015. Pl. Exs. 44–45. Mr. Wilhite then signed the potential sale documents, dated August 26, 2013, as "Michael Wilhite, CEO." (Pl. Ex. 45, p. 5.)
- In 2015, current employees understood him to be either the CEO or the boss of AFC. (Doc. # 99, p. 494–95.)

Accordingly, the Court finds Mr. Petron's service calculation to be reasonable and accurate and rejects the Wilhites' contentions to the contrary. In so concluding, the Court also rejects Mr. Callison's opinion that Mr. Wilhite contributed $110,121 in uncompensated services and Mrs. Wilhite contributed $57,750 in uncompensated services. Mr. Callison's totals are based on two primary assumptions: (1) that Mr. and Mrs. Wilhite provided an equal amount of services and that the value of their time was equal; and (2) that no services after 2008 should be attributable to Mr. Wilhite because they occurred ten years after AFC's inception. Pursuant to the above-listed facts and analysis, this Court finds these assumptions to be faulty and Mr. Callison's findings on

this issue unreliable and unsupported.[5]  Indeed, it appears to this Court that many of Mr. Callison's determinations were based on blind belief in whatever the Wilhites told him, without regard to the substantial documentation and other evidence demonstrating the Wilhites' chronic attempt to conceal information from the Government and this Court.

Next, the Court examines the Wilhites' financial contributions to AFC.

2. <u>Financial Contributions</u>

The parties and experts agree that financial contributions may include any cash paid to the company with the exception of loans, particularly ones like those in this case that have been repaid.  Although this Court previously determined that Mr. Wilhite contributed at least $28,500 to AFC at its inception, the Court has reconsidered the issue and does not now consider those loans to be interest-earning contributions.  Because no other evidence or testimony has been presented suggesting that Mr. Wilhite provided any cash or financial support to AFC, the Court agrees with Mr. Petron that he should be credited with zero financial contributions.  The Court also agrees with Mr. Petron that Mrs. Wilhite should be credited with a cash contribution of $159,862 based on her contributions to AFC in 2009, 2010, 2013, and 2016 as recorded by AFC and reflected in Mr. Petron's condensed balance sheets.  (Pl. Ex. 58, 70.)  Ultimately, the Court finds Mr. Petron's breakdown of the Wilhites' cash contributions to be reasonable and adequately supported by the evidence and testimony presented at the hearing.

In so concluding, the Court rejects Mr. Callison's opinions that the following items should also be treated as financial contributions: (1) foregone interest on loans provided to AFC, and (2) Mrs. Wilhite's personal guarantees on those loans.  With respect to the

---

[5] The Court likewise disagrees with Mr. Callison's conclusion that Mrs. Wilhite deserves an extra 5% interest in AFC because she is its founding and sole manager.  Again, that conclusion is contradicted by an abundance of evidence in the record.

first, the Court finds that Mr. Callison's foregone interest calculations on loans that were either repaid or provided by someone other than the Wilhites are speculative and unsupported. The calculations result in negligible figures that are ultimately irrelevant to this Court's analysis. (Doc. # 151, p. 173–74.)

With regard to the second, the Court likewise finds Mr. Callison's guarantee-based contribution figures to be unsupported and declines to include them. The guarantees are tied to loans—loans which this Court and the parties have already determined do not qualify as contributions. Moreover, the guarantees were never called on and the risk never tempted. It makes little sense to this Court to tie a contribution credit to a guarantee because it is "risky" but not to a loan that is much riskier because the money was actually expended. Further, Mr. Callison assigned arbitrary percentages to Mrs. Wilhite's guarantees based on his subjective perception of the risk involved. He drew a 33% contribution credit from the 1.8 million dollar loan and a 10% credit from the $500,000 supplier loan without reference to applicable legal authority or practice standards.[6] When this Court prodded Mr. Callison for an explanation, Mr. Callison testified that his risk allocation, and ultimate contribution percentage, came "out of [his] head" and by asking "a couple of his colleagues." (Doc. # 151, p. 175.) Curiously, Mr. Callison did not attribute any contributions to Mr. Wilhite for his identical guarantees on these loans. (Pl. Ex. 66.) The Court therefore declines to include any foregone interest or guarantee-based credits to the total contribution amount of either Mr. or Mrs. Wilhite.

Ultimately, the Court finds that Mr. Wilhite's service and financial contributions total $4,230,393 and Ms. Wilhite's contributions total $1,436,907. As mentioned, to best

---

[6] Although Mr. Callison referenced *Belgard v. Manchac Techs.*, LLC, 92 So. 3d 660 (La. App. 2012), that case is inapposite here because, there, the parties agreed to allow the transfer of a membership interest in exchange for a line of credit. There was no such agreement in this case.

ascertain Mr. Wilhite's ownership percentage, the Court must next factor in AFC's profits, losses, and distributions.

## B. PROFITS, LOSSES, AND DISTRIBUTIONS

AFC's Operating Agreement provides for the creation of capital accounts that not only reflect each member's contributions to the LLC, but also "each member's share of profits in [the company], decreased by each member's share of losses and expenses." (Def. Ex. D, p. 4, ¶ 4; E, p. 1.)

Mr. Callison did not create capital accounts for the Wilhites; it does not appear that he considered AFC's profits, losses, and distributions in his assessment at all. Mr. Petron, however, determined capital accounts to be the best mechanism for folding AFC's profits, losses, and distributions into its member's contribution totals, and he therefore conducted a lengthy and comprehensive analysis to formulate such accounts for the Wilhites. After reviewing AFC's financial documents, Mr. Petron apportioned AFC's yearly profits, losses, and distributions between the Wilhites.[7] (Pl. Ex. 70.) He created multiple charts for this Court's review that ultimately reflect the running yearly totals in each Wilhite's capital account. Based on these capital accounts, Mr. Petron derived each Wilhite's corresponding ownership percentage.

Ultimately, as of 2016, Mr. Petron attributed to Mr. Wilhite a 73.9% interest in AFC and a 26.1% interest to Mrs. Wilhite. (Pl. Ex. 70.)[8] The Court finds Mr. Petron's

---

[7] The Court recognizes that AFC's financial records reflect that Mrs. Wilhite received 100% of AFC's distributions, but nonetheless agrees with Mr. Petron's apportionment method as the more equitable and accurate approach. Indeed, applying all of AFC's distributions to Mrs. Wilhite would actually reduce her overall interest in the company and be disadvantageous to Mr. Wilhite.
[8] At the hearing, Mr. Petron concluded that Mr. Wilhite has a membership interest of 73.4% and Ms. Wilhite has a membership interest of 26.6 %. (Doc. # 151, p. 54.) However, at the time, Mr. Petron was attributing a loan of $4,888 to Mr. Wilhite's contribution analysis. The Court has since

approach to be reliable and his related testimony on the issue credible. The Court, therefore, adopts these membership percentages. The Court next turns to examine the applicability of these percentages on the assets of Yahab.

## IV. YAHAB

Mrs. Wilhite created Yahab in 2014 and funded it with approximately $200,000 from AFC's operating account. (Doc. # 121 at 10.) This Court previously concluded that Mr. Wilhite's ownership percentage in AFC also applies to this $200,000. (Doc. ## 121, 136). Neither party has provided this Court with any reason to reconsider that ruling or trace more of Yahab's assets to AFC, and the Court declines to do so.

Because the funds were transferred in 2014, the Court applies Mr. Wilhite's ownership interest percentage from that year. Relying again on Mr. Petron's calculations, which this Court has already deemed reasonable and reliable, the Court imputes to Mr. Wilhite 72.4%, or $144,800, of the $200,000 that were transferred to Yahab in 2014.

Having resolved the value Mr. Wilhite's membership interest in AFC and funds transferred to Yahab, the only remaining issue before the Court is whether the Government may garnish that interest and the related funds. The Court therefore turns to the determination of whether the interest and funds qualify as property under federal law. *Holman*, 505 F.3d at 1067.

## V. FEDERAL GARNISHMENT

To satisfy a tax deficiency, the Government may impose a lien on any "property" or "rights to property" belonging to the taxpayer. [9] 26 U.S.C. § 6321. Section 6321

---

determined that loans should not be considered a capital contribution and therefore references the more accurate figures set forth in Exhibit 70.

[9] Under the Mandatory Victims' Restitution Act (MVRA), 18 U.S.C. §§ 3663A(a) and A(c)(1)(A)(ii), this Court's restitution order created a lien in favor of the United States "on all property or rights to

provides, "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount ... shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." *Id*. This language "is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *Drye v. United States*, 528 U.S. 49, 55–56 (1999) (citing *United States v. National Bank of Commerce*, 472 U.S. 713, 719–720 (1985)); *see also Glass City Bank v. United States*, 326 U.S. 265, 267 (1945) ("Stronger language could hardly have been selected to reveal a purpose to assure the collection of taxes."). Moreover, broad use of the term "property" indicates that "the Legislature aims to reach "'every species of right or interest protected by law and having an exchangeable value.'" *Jewett v. Commissioner*, 455 U.S. 305, 309 (1982).

The Federal Debt Collection Practices Act (FDCPA) provides another avenue for the "the United States . . . to recover a judgment on a debt," including criminal restitution.[10] *United States v. Coluccio*, 19 F.3d 1115, 1116 (6th Cir. 1994) (quoting 28 U.S.C. § 3001(a)(1)). The FDCPA was enacted to "create a comprehensive statutory framework for the collection of debts owed to the United States government" . . . "including criminal fines." *Id.* (quoting H.R. Rep. No. 101-736, 101st Cong., 2d Sess. 23 (1990) reprinted in 1990 U.S.C.C.A.N. pp. 6472, 6630, 6631); *see, e.g., United States v.*

---

property" belonging to Mr. Wilhite. The Government may enforce that lien "as if the liability of the person fined were a liability for a tax assessed under the Internal Revenue Code of 1986." 18 U.S.C. § 3613(c); *see also id.* § 3613(f). Tax liabilities are enforced under the tax lien statute. 26 U.S.C. § 6321.

[10] The MVRA also provides that a restitution order may be "enforceable in accordance with the practices and procedures for the enforcement of a civil judgment imposing under Federal law ...." 18 U.S.C. § 3613(a), and "by all other available and reasonable means." 18 U.S.C. § 3664(m)(1)(A)(ii). The United States is enforcing Mr. Wilhite's order of restitution under the Federal Debt Collection Practices Act (FDCPA) in addition to the tax lien statute.

15

*Sloan*, 505 F.3d 685, 696-97 (7th Cir. 2007) (upholding an order of garnishment for collection of a restitution judgment sought by the Government pursuant to the FDCPA).

The FDCPA provides that "the United States may levy '[a]ll property in which the judgment debtor has a substantial nonexempt interest.'" *United States v. Duran*, 701 F.3d 912, 915 (11th Cir. 2012) (citing 28 U.S.C. §§ 3202(a), 3203). "The United States may levy 'property which is co-owned by a debtor and any other person only to the extent allowed by the law of the State where the property is located.'" *Id.* (quoting § 3010(a)).

Applying these legal principles, the Court has no trouble concluding that Mr. Wilhite's 73.9% membership interest in AFC and his 72.4% interest in the $200,000 transferred to Yahab constitute "property" under the federal tax lien statute and the FDCPA such that it is subject to levy by writ of execution.[11]

## VI. CONCLUSION

For the foregoing reasons, the Court concludes that Mr. Wilhite has a 73.9% interest in AFC and a 72.4% interest in the $200,000 in funds transferred from AFC to Yahab. The Court also concludes that this interest constitutes property that may be garnished by the Government to satisfy Mr. Wilhite's substantial and long-outstanding restitution obligations.

DATED: October 13, 2017          BY THE COURT:

                                               CHRISTINE M. ARGUELLO
                                               United States District Judge

---

[11] The Government presents numerous ways that it might enforce this lien, and then states, "The Government will raise the [enforcement] matters through a separate motion and after conferring with the Wilhites' counsel." (Doc. # 156, p. 64.) The Court will therefore wait to opine on such issues until properly raised and adequately briefed by the parties.